# EXHIBIT 1



Deposition of:

**Becky Smith**

*April 24, 2017*

In the Matter of:

**Smith, Becky vs. C. R. Bard, Inc.**

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Becky Smith                          April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                   CHARLESTON DIVISION

3

4   IN RE: C.R. BARD, INC., PELVIC      MDL NO. 2187
    REPAIR SYSTEM PRODUCTS
5   LIABILITY LITIGATION

6   THIS DOCUMENT RELATES TO:

7   BECKY SMITH,
            Plaintiff,

8

            v.                         No. 2:15-cv-16402

9

    C.R. BARD, INC.,

10          Defendant.

11

12           DEPOSITION OF BECKY SMITH

13          Taken on behalf of Defendant

14

15        BE IT REMEMBERED THAT, pursuant to notice,

16   the deposition of BECKY SMITH was taken before

17   Heather L. Fairless, a Registered Professional

18   Reporter and Certified Shorthand Reporter, on

19   Monday, April 24, 2017, commencing at the hour of

20   9:50 a.m., in the offices of LNS COURT REPORTING &

21   VIDEOCONFERENCING, 1123 S.W. Yamhill Street,

22   Portland, OR 97205.

23

24

25

Becky Smith                                              April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 2

1       APPEARANCES:
2
3   WAGSTAFF & CARTMELL LLP
        BY JEFFREY M. KUNTZ
4       4740 Grand Avenue, Suite 300
        Kansas City, MO 64112
5       816-701-1100 . jkuntz@wcllp.com
        Attorney for Plaintiff
6
7   GREENBERG TRAURIG, LLP
        BY LEAH P. COLLINS
8       1900 University Avenue, 5th Floor
        E. Palo Alto, CA 94303
9       650-289-7805 . collinsl@gtlaw.com
        Attorney for Defendant
10
11  Also present:  Don Mackie
12
13              * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       BECKY SMITH,
2   Having first been sworn by the Certified Shorthand Reporter
3   to tell the truth, testified under oath as follows:
4
5       MS. COLLINS:  This will be the
6   deposition of Becky Smith.  This deposition is taken
7   for purposes of discovery and all other purposes
8   allowed under the Federal Rules of Civil Procedure,
9   the MDL 2187 deposition guidelines and Pretrial
10  Order No. 40 as amended by Pretrial Order No. 236.
11      Jeff, can we agree that all
12  objections except as to form and motions to strike
13  are reserved?
14      MR. KUNTZ:  Yes.
15
16          EXAMINATION
17  BY MS. COLLINS:
18  Q    My name is Leah Collins and I represent
19  Defendant C.R. Bard in this matter and we just
20  briefly met for the first time before this
21  deposition.  Correct?
22  A    Yes, that is correct.
23  Q    And have you ever had your deposition taken
24  before?
25  A    No.

Page 4

1   Q    Okay.  So I am just going to go over a few
2   ground rules with you.  So as you see, we have a
3   court reporter here that will be transcribing
4   everything today.  So please try to answer verbally
5   because she can't record like a head nod or a
6   shoulder shrug or anything like that.  And do you
7   understand that you are testifying under oath as if
8   you were testifying in court?
9   A    Yes.
10  Q    If you don't understand a question, please
11  just let me know and I will rephrase it.  If your
12  counsel objects, you can go ahead and still answer
13  the question unless he advises you otherwise; do you
14  understand that?
15  A    Yes, I do.
16  Q    Try not to answer before I am done asking the
17  question so that way we aren't interrupting each
18  other and we can keep a clean record for the court
19  reporter.  And then if you need a break at any time,
20  just let me know.  The only thing I ask is that if I
21  have asked you a question, that you answer it before
22  we go and take a break.
23  A    Okay.
24  Q    Are you currently taking any drugs or
25  medications that would affect your ability to

Page 5

1   testify, comprehend, or remember details or affect
2   your memory in any capacity?
3   A    I am not.
4   Q    Are you on any prescription medications right
5   now?
6   A    Yes, I am.
7   Q    What prescriptions are you taking?
8   A    I take Singulair, which is for allergies.
9   Q    And do you know the dosage of that?
10  A    10 milligrams, I believe.
11  Q    Okay.
12  A    And I also take a depression medicine which is
13  Lexapro and it is also at 10 milligrams.
14  Q    And is there any other reason that your memory
15  or details would be affected in any capacity today?
16  A    No.
17  Q    And do you agree to give your full and
18  complete testimony here today?
19  A    Yes, I do.
20  Q    Would you please state your full name for the
21  record?
22  A    Becky Rae Smith.
23  Q    And have you ever been known by any other
24  names or aliases?
25  A    I was Becky Reding and Becky Ockenfels.

2 (Pages 2 - 5)

Case 2:15-cv-16402   Document 42-1   Filed 08/14/19   Page 5 of 299 PageID #: 310

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.
April 24, 2017

**Page 6**

1 Q    Could you spell Ockenfels please.
2 A    It is O-C-K-E-N-F-E-L-S.  Reding is with one
3 D.
4 Q    And what is your date and place of birth?
5 A    I was born in Seaside, Oregon, and I was born
6 on January 30, 1959.
7 Q    And where do you currently live?
8 A    Nehalem, Oregon,
9 Q    And does anyone live with you?
10 A    My husband Don.
11 Q    Anybody else?
12 A    No.  I have a dog and a cat.  They wouldn't
13 like it if I ignored them.
14         MS. COLLINS:  I would like to mark as
15 Exhibit 1 a notice of deposition of Becky Smith.
16         (Exhibit No. 1 marked.)
17 Q    BY MS. COLLINS:  If you could just take a look
18 at that document and review it.  Have you ever seen
19 this document before?
20 A    Yes.
21 Q    And did you bring any of the documents with
22 you in response to Exhibit A?
23         MR. KUNTZ:  I am just going to, one,
24 incorporate our objections to the notice here and,
25 two, that a lot of those documents were produced

**Page 7**

1 pursuant to the plaintiff's fact sheet.
2         But go ahead and you can answer.
3         THE WITNESS:  I have nothing with me.
4 Q    BY MS. COLLINS:  Okay.  You are aware that you
5 are asserting a personal injury claim against Bard.
6 Correct?
7 A    Yes.
8 Q    Okay.  And you are alleging that the constant
9 heaviness and ache in your pelvic area, the severe
10 pain during intercourse, the fear of exercise except
11 for walking, and your weight gain are all caused by
12 the mesh implant.  Correct?
13 A    Correct.
14 Q    Are there any other issues that you relate to
15 the mesh implant that weren't listed on your PFS?
16 A    Well, after thinking about it, my husband and
17 I have had counseling a couple of different times.
18 And thinking back, I absolutely believe that has
19 something to do with our -- the mesh implant.  Just
20 the whole sexual issues have been very difficult for
21 me and I have actually kind of kept it to myself
22 that there was pain during intercourse.  I mean, my
23 poor husband just found out recently that that is
24 the case.  And so our relationship had been strained
25 to say the least.  So two different times we went

**Page 8**

1 through counseling.
2         And right now I am seeing a doctor,
3 regular practitioner and I have started on an
4 estrogen regime right now, trying to address the
5 aching in my pelvis.  And so that is the first part
6 and it has been a month and that has not changed.
7 And so I assume we are going to see -- her and I had
8 talked about seeing someone else about what else
9 needs to be done, what else can be done.  So I am
10 not sure where that is going.  So that is starting
11 and kind of ongoing.
12 Q    And who was that doctor that prescribed you
13 the estrogen regimen?
14 A    Her name is Shawn and I don't know how to
15 spell her last name.  It is like Kuehl, K-E-U-E-L
16 (sic).  There is an H in there.  I think I gave it
17 to Jeff at one point.
18         MR. KUNTZ:  I think it is in the fact
19 sheet, I think.
20         THE WITNESS:  It had been added right
21 at the very end because I called and said, hey, I am
22 just seeing a new doctor.
23         MR. KUNTZ:  Can we go off the record?
24         (Discussion off the record.)
25 Q    BY MS. COLLINS:  So just to be clear, the

**Page 9**

1 other issues are the counseling and the estrogen
2 regimen from Dr. Shawn Kuehl.  Correct?
3 A    I am not even sure if it is the estrogen
4 regimen but it is the looking into -- looking into
5 my issues with maybe the bladder, the mesh.  So I
6 assume that is what it is.  I am not -- I can't say
7 it because we just started.
8 Q    When did you start that?
9 A    About five weeks ago.
10 Q    And what is the treatment that she has you
11 doing?
12 A    I just have estrogen that I use at night.  It
13 is inserting of estrogen.
14 Q    Okay.
15 A    I am going to be doing that for six weeks and
16 then contact her if it is not -- if it hasn't
17 changed.
18 Q    And what was the purpose of this -- of
19 inserting of the estrogen?
20 A    To try and alleviate the pain that I have, the
21 dull aching pain from -- to see if that would help.
22 And I believe that would affect the tissue in some
23 way.
24         MS. COLLINS:  All right.  I would
25 like to enter as Exhibit 2 Becky Smith's Plaintiff

Becky Smith                                        April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 10

1  Fact Sheet.
2           (Exhibit No. 2 marked.)
3           MR. KUNTZ:  Where is my copy?
4           MS. COLLINS:  Would you like a copy,
5  Jeff?
6           MR. KUNTZ:  No, I am good.
7  Q     BY MS. COLLINS:  So if you could just take a
8  second to review that.
9  A     Oh, my God.  This took so long to fill out.
10 Yes.  It all looks so familiar.
11 Q     So is that your signature on the last page
12 verifying that all responses are true and accurate
13 to this document?
14 A     Yes, it is.
15 Q     Okay.  And as you sit here today, are all
16 these responses still accurate?
17 A     Yes, except what I just mentioned.
18 Q     Right, except for the ones that you wanted to
19 add?
20 A     Uh-huh.
21 Q     And did you personally complete this form?
22 A     Yes.
23 Q     Did your attorneys help you fill it out at
24 all?
25 A     No.

Page 11

1  Q     If you could turn to page 6, question 6A, it
2  says, "Describe the bodily injuries including any
3  emotional or physical injuries that you claim
4  resulted from the implantation of the pelvic mesh
5  products."  And in support of that you wrote, "I
6  have constant heaviness and frequent ache in my
7  pelvic area when I walk or am active for any length
8  of time, severe pain during intercourse which has
9  completely changed our intercourse options and has
10 caused me to feel guilty about getting the mesh
11 implant, fear of exercise except for walking due to
12 the mesh coming loose again and causing me more
13 pain, and I have gained 15 pounds because of this."
14 And you are claiming that those issues were all
15 caused by the mesh product.  Correct?
16 A     Yes.
17 Q     And on page 7, question 6E it asks whether you
18 are currently experiencing symptoms related to your
19 claimed body injuries, and you checked yes and
20 wrote, "I have a dull ache in my pelvic region any
21 time I am not laying down, painful intercourse
22 severe enough to curtail having intercourse except
23 on rare occasions."  And you are not currently --
24 and so you are claiming that all of those are a
25 result of the mesh implant.  Correct?

Page 12

1  A     Yes.
2  Q     Okay.  So I am just going to walk through some
3  of these claimed issues just to get a little bit
4  more detail about them.  So can you tell me a bit
5  about the constant heaviness and frequent ache that
6  you have in your pelvic area?
7  A     It is something I have never felt before and
8  it is -- when I sit, there is a heaviness and just
9  sort of an emanating ache.  It is like this really
10 dull ache.  There is no sharp pains except if I move
11 wrong or, you know, like get up or sometimes there
12 is, but generally it is just this dull ache.  And
13 the more tired I get, the more it hurt -- you know,
14 the more that seems to -- I don't know if I just
15 notice it more.  But walking, we take a walk a
16 couple miles, you know, two or three times a week
17 and it is always noticeable during that period of
18 time.  So it is just a strange dull ache that is
19 exhausting actually.
20 Q     And where do you feel the ache generally?
21 A     It is in my pelvis back towards -- not at the
22 anal area but back inside.
23 Q     Okay.
24 A     So when my doctor did an exam this last time,
25 she asked me, is this where it hurts?  And I said,

Page 13

1  yeah.  And she said, well, that is where the -- she
2  said, well, it looks like it might be where the
3  bladder sling and the mesh are, right where they
4  are.  So she actually did an examination.
5  Q     And when was the time -- when did you see her
6  for that examination?
7  A     The same -- that was that Shawn Kuehl so five
8  weeks ago.
9  Q     Five weeks ago?
10 A     Uh-huh, about.
11 Q     Okay.  And would you say the ache that you
12 have in your pelvic area is worse towards the end of
13 the day than it is at the beginning of the day?
14 A     No.  Doesn't change except if I am busy.  You
15 know, but really it is there all the time.  When I
16 wake up in the morning, it is there.
17 Q     And did you ever have that type of pain before
18 the mesh implant?
19 A     That is the only -- really, that is the only
20 reason I say that it has to be because of the
21 implant, because I did not have anything like that.
22 Q     And are there any activities -- I know you
23 briefly described your walking with your husband.
24 Are there any activities where you feel that pain
25 more so than at other times?

4 (Pages 10 - 13)

Becky Smith
April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 14

1  A    Well, exercising has been a big issue.  Yoga.
2  You know, I used to do Zumba and all kinds of things
3  and I just really had to stop doing it because of
4  the pain.
5  Q    So you did those activities prior to the mesh
6  implant.  Correct?
7  A    I did them prior to and tried afterwards.
8  Q    Okay.  And what was your experience with doing
9  yoga and Zumba and exercising after the mesh
10  implant?
11  A    I had to stop doing it because of the pain.  I
12  wasn't able to sustain it even for a whole session.
13  Q    And was that pain the same that you described
14  as the heaviness and the dull pain or was it a
15  different type of pain that you experienced?
16  A    It was the same dull pain but then there was
17  also those sharper pains.
18  Q    And when would you feel those sharper pains?
19  A    Just as I was doing the activity itself, you
20  know, movements with your body --
21  Q    Okay.
22  A    -- kicking legs and that kind of thing, and
23  yoga, you know, with the stretching, any time you
24  are using your hips and moving them from side to
25  side.

Page 15

1  Q    And is there anything that helps relieve that
2  ache and that pain that you feel?
3  A    I don't do much to alleviate it except take
4  Tylenol or Aleve or ibuprofen.
5  Q    And do those help at all?
6  A    I think they make me feel better.  I am not
7  sure if it helps because I feel like I am doing
8  something maybe.  It gets pretty frustrating.
9  Q    And does that type of pain -- I know that you
10  said you feel it first thing in the morning.  So is
11  that a constant pain or is it intermittent and kind
12  of related to certain activities?
13  A    It is constant.  I mean, I feel it right now.
14  I have done, you know, nothing.
15  Q    On a scale of one to ten, how would you rate
16  that pain that you feel?
17  A    Since it is constantly in my mind, I would say
18  it is at least a four.
19  Q    And have you seen a physician or talked to a
20  physician about that pain, the pelvic pain that you
21  feel?
22  A    Uh-huh.
23  Q    And who have you -- who did you go see?
24  A    Let's see.  So the pain from the first mesh
25  implant, I saw the same doctor a year later when the

Page 16

1  pain -- when I was bleeding, so I had the mesh
2  removed, part of it.
3  Q    Sorry.  Which doctor was that?  You mean the
4  same as your implanting physician?
5  A    Uh-huh, Dr. Kim.
6  Q    Okay.
7  A    So that was the first doctor I saw about it.
8  Q    Okay.  And she removed the mesh implant.
9  Correct?
10  A    Part of it, not all of it.  It is still there.
11  Just part of it.
12  Q    And what did she say about the pelvic pain you
13  were experiencing?
14  A    That the mesh had come loose.  The tissue was
15  eroding, that when I had the surgery, she didn't
16  really know what the surgery was going to be like.
17  And then after I had the surgery, she said that she
18  was able to just trim it up so she said she hoped
19  that would help with the pain.  She assumed it would
20  help with the pain.
21  Q    And did she give you any other options besides
22  trimming -- going in to trim the mesh implant to
23  help relieve the pain?
24  A    Not that I recall.
25  Q    And did she ever tell you that the pain you

Page 17

1  were experiencing was related to the mesh implant?
2  A    Directly related.  I mean, it was obvious.
3  The bleeding was there.  You know, I mean, it is
4  poking out.  It is mesh.  It is like -- so I don't
5  think it was hard to figure out.
6  Q    And what about Dr. Shawn Kuehl?  Did you ever
7  see her about the pelvic pain you were experiencing?
8  A    Just recently.
9  Q    And what did she have to say about that?
10  A    She actually consulted another doctor in the
11  office.  She just said, well, let me just find out
12  about this, because, you know, she looked in there.
13  I told her that is where the pain was.  She said,
14  well, you know, I see this -- you know, this mesh
15  and you have got this sling and they are pretty
16  immovable.  So she said, I am going to go ask.  So
17  she asked the OB-GYN.  So she said -- after they
18  talked, she said, well, we are going to do an
19  estrogen cream and then if that is still not going
20  to work, then we need to see her about it.
21  Q    Do you know the name of the OB-GYN she
22  consulted with?
23  A    I do if I can think of it.  It is -- can I
24  come back to that --
25  Q    Yeah.

5 (Pages 14 - 17)

Becky Smith                                        April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 18

1  A     -- if I think about it?  Okay.  I will try and
2  remember.  Dr. Gerken.  But I don't know how to
3  spell it.  G-E-R-K-I-N (sic).  And she is from
4  Tillamook.
5  Q     Okay.  So let's move on to talk about the
6  severe pain that you experienced during intercourse.
7  So when did that pain start for you?
8  A     I can't -- I mean, I don't remember the very
9  first time.  Since it was surgery, I think that I
10 just assumed that things were mending and that maybe
11 they would change over time, get easier, and it just
12 hasn't been the case so there has been pain for
13 years, I would say, since the implant.
14 Q     And how long after you had the mesh implant --
15 what was the gap between that date and when you
16 first had intercourse again?
17 A     It had to be at least two months and that is
18 the first time.  It had to be at least two months.
19 Q     And did you feel pain at that point?
20 A     Uh-huh.
21 Q     Is that a yes?
22 A     Yes.  I am sorry.  I forgot.  Thank you, yes.
23 Q     So the PFS indicates and what you stated in 6A
24 is that you had to change your intercourse options.
25 So what did you mean by that?

Page 19

1  A     Well, you know, face-to-face, you know, back
2  to front, those kinds of positions have changed just
3  because trying to make things more comfortable and
4  that just has not worked as well so...
5  Q     So are there any positions that you feel the
6  pain more so than other positions?
7  A     Uh-huh, absolutely.
8  Q     And when you do change positions, are you able
9  to have intercourse without feeling that pain?
10 A     No.  It is just lessened.  I mean, it is
11 debilitating, really.
12 Q     Your PFS also indicates that you feel guilty
13 about getting the mesh implant.  Could you kind of
14 talk to me about that a little bit?
15 A     Well, my husband and I have had a hard time --
16 I personally have had a hard time telling him that
17 we have had pain during intercourse because I know
18 that he is such a sweetheart, such a gentleman that
19 he would not want that part of his life at all, you
20 know.  And so obviously being a married couple you
21 want to have sexual activity.  And so for me it
22 was -- you know, I tried to hide it.  I avoided sex
23 and I wasn't even at first sure really why I was
24 doing that and then just realizing how painful it
25 was.  What was your question again?  I am sorry.

Page 20

1  Q     No, you answered it.  I just wanted to know --
2  you wrote in 6A here that you felt guilty about
3  getting the mesh implant so I just kind of wanted to
4  talk to you about that.
5  A     So it has changed our life completely.  I
6  mean, honestly I had no idea that having that mesh
7  would have anything to do with our sexual activity,
8  that it would change it at all.  And I obviously did
9  not want that to happen.
10 Q     Where exactly do you feel the pain during
11 intercourse?  Is there a specific region that you
12 feel it more so than --
13 A     Uh-huh, towards the back of my vagina.
14 Q     And is that the same area or a different area
15 than where you experienced the dull aching pain?
16 A     It is the same area.
17 Q     And can you describe the type of pain that you
18 feel?
19 A     That is sharp pain.
20 Q     Okay.  So in that regards it would be
21 different than the pain that you feel --
22 A     It is in the same area but it is more intense.
23 Q     Okay.  And how long does the pain last?
24 A     Really just during intercourse, that kind of
25 pain, and then it goes back to the dull ache.

Page 21

1  Q     And is there anything that makes that pain
2  that you feel during intercourse worse?
3  A     I don't know how to answer that.  I don't
4  know.
5  Q     Okay.  What about certain positions?  Does
6  that make the pain worse at times than others?
7  A     Yes.  It can absolutely be worse because of
8  the position or the thrusting or, you know, whatever
9  the strength of the thrust, I guess.
10 Q     Is this type of sharp intense pain -- is that
11 somewhat similar to the pain that you experience
12 when you exercise or do yoga that you were
13 describing earlier?
14 A     Is it similar, yes, but the intercourse is
15 more intense.
16 Q     Okay.  And does that pain end after or once
17 intercourse stops?
18 A     The sharp pain, yes.
19 Q     And have you seen a physician about the pain
20 that you were experiencing during intercourse?  Is
21 that a no?
22 A     I am trying to think.
23 Q     Okay.
24 A     I talked to Dr. Kim during the second surgery
25 about it and she just thought that the trimming the

6 (Pages 18 - 21)

Becky Smith
April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 22

1 mesh would alleviate that.
2 Q    And did it alleviate that pain?
3 A    No.
4 Q    Did you see any other doctor and talk to any
5 other doctor about the pain during intercourse you
6 were experiencing?
7 A    You know, I am not sure that I have -- I have
8 never been treated for it so I am not really sure
9 that I talked to anybody about it.  It is pretty
10 embarrassing so I didn't even talk to my husband
11 about it so...
12 Q    Okay.  So you also state in the PFS on
13 question 6A that you have a fear of exercise except
14 for walking due to the mesh coming loose again.  Can
15 you tell me what you mean by fear of exercise?
16 A    Well, I mean, I don't want to take on a yoga
17 class.  I don't want to go with my friends to Zumba
18 class because it is pretty embarrassing when I have
19 to stop in the middle or, you know, double over
20 with, oh, my gosh because -- and the pain is severe
21 and then I just end up not continuing with it and
22 so, yeah.  So fear of exercise is basically I don't
23 want to take it on because it really does hurt.
24 Q    Okay.  And what type of exercises did you
25 engage in before the mesh implant?

Page 23

1 A    Like I said, I have done yoga.  I have done
2 Zumba.  I have done aerobics.  I just went to the
3 weight room, elliptical machines, just the whole
4 gamut at the fitness center.
5 Q    And how often would you exercise prior to the
6 mesh implant?
7 A    Just go in, you know, kind of spurts, do it
8 three or four months at a time and then not and then
9 start it up again.
10 Q    And can you exercise at all now?
11 A    I walk.  I feel like that is exercise.
12 Q    Are you able to lift any weights at all
13 anymore?
14 A    I don't lift weights.
15 Q    So it also says that the mesh came loose.  Can
16 you talk to me about what happened when that -- or
17 how the mesh came loose?
18 A    Well, I don't know how it came loose but when
19 I noticed it, I was exercising with my son and
20 daughter-in-law and we had started this routine and
21 we met every week, I don't know, two or three times
22 a week and we would do a video and we would
23 exercise, and we had probably been at about four
24 weeks of that and, you know, there was pain and all
25 of that but then I just started just bleeding and so

Page 24

1 I quit and I, you know, went home and I told Don,
2 you know, that I had this -- you know, I was
3 bleeding.  I was really afraid because it had only
4 been a year since -- not even a year since I had had
5 the implant put in.  And Don said, well, you know,
6 Becky, there is -- you know, when we made love the
7 last night, there was this really sharp scraping in
8 there.  So anyway I think we investigated and there
9 really was just mesh poking out.  And so the mesh
10 had -- so that is where the bleeding was from.  It
11 was from my vaginal cavity.
12 Q    And what do you mean by a sharp scraping that
13 Don described?
14 A    You will have to ask him about it but I assume
15 when we were making love his penis was scraping
16 against the mesh.
17 Q    Okay.  And what type of pain did you
18 experience when -- with the bleeding and the mesh
19 coming loose?
20 A    Really dull aching was seriously, you know,
21 more intense and it was the sharp pain from -- I
22 assumed from the cutting of the tissue.
23 Q    And did you see a doctor when the mesh came
24 loose?
25 A    I went -- that is when I made appointment to

Page 25

1 see Dr. Kim again because she is the one who had
2 done it.  So I think I saw her in December or the
3 first part of January and then I had the revision
4 surgery in -- at the end of January.
5 Q    Okay.  And do you know how long after the mesh
6 implant procedure was done that it came loose?
7 A    I just know that the two surgeries were a year
8 apart.
9 Q    Okay.
10 A    So, you know, I don't know how long it had
11 been loose.  I don't know that.  I am sorry.
12 Q    Okay.  And did Dr. Kim tell you or give you a
13 reason of why the mesh implant would have came
14 loose?
15 A    You know, I don't recall.
16 Q    Okay.  Did she talk to you -- did she have any
17 conversation with you at all about how it came
18 loose?
19 A    You know, I would just be guessing to say -- I
20 honestly just do not remember.  I assume she just
21 said this happens sometimes, you know, because the
22 tissue is growing around it and maybe it didn't grow
23 around it.  I mean, in my head that is what I think
24 she said so I am guessing though.
25 Q    Okay.  And you also state at 6A of the PFS

7 (Pages 22 - 25)

Becky Smith
April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 26

1 that you have gained 15 pounds because of the mesh
2 implant. So can you tell me a bit more about your
3 weight gain?
4 A   I think it is just because of the exercise
5 that I haven't been able to do and it has been a
6 struggle. I am just going to say I know 15 pounds
7 doesn't seem like a ton to some people but I have
8 never been terribly overweight and it is pretty
9 disturbing. But anyway, it is really -- I am not
10 going to say it is from the mesh. It is from the
11 inability to exercise rigorously. Walking is for
12 old people. Sorry, but it is. I mean, my parents
13 walk.
14 Q   Did you ever try changing your eating habits
15 after the mesh implant to help with the weight gain
16 at all?
17 A   We diet regularly. It is not -- yeah, we just
18 diet healthfully.
19 Q   What type of healthful diets do you usually
20 engage in?
21 A   No sugar, you know, lots of vegetables and
22 fruit, yogurt, you know, no snacking, just reduction
23 of high-calorie foods.
24 Q   And do you have any family history of obesity
25 or weight gain at all?

Page 27

1 A   Not myself, no.
2 Q   Do you have any family history of thyroid
3 conditions?
4 A   No.
5 Q   Have you been diagnosed with a thyroid
6 condition?
7 A   No.
8 Q   Did you see a physician about the weight gain
9 issue at all?
10 A   It is always a conversation that I bring up.
11 They don't generally bring it up but I bring it up.
12 Q   Who did you talk to about that?
13 A   Every doctor I have ever had just, you know,
14 with the yearly physicals and things like that.
15 Q   And what did they tell you?
16 A   Reduce your food, walk, just the things that I
17 do.
18 Q   And has any physician that you saw ever told
19 you that the Bard product was a -- or was related to
20 your weight gain?
21 A   They didn't even know I had the Bard, I don't
22 think.
23 Q   Okay. Has any physician ever told you
24 directly that the Bard product caused injury to you?
25      MR. KUNTZ: Objection.

Page 28

1 Q   BY MS. COLLINS: You can answer.
2 A   Dr. Kim made it very clear that the mesh
3 poking through definitely was the cause of the
4 bleeding and the pain. There is no other reason for
5 it.
6 Q   And this was before she went in and did the
7 second procedure of the trimming. Correct?
8 A   I assume so.
9 Q   Has any physician ever told you that the
10 issues that you claim you are experiencing is Bard's
11 fault?
12 A   No.
13 Q   Has any physician ever been critical of Bard
14 or its products in your presence?
15 A   No, not at all.
16 Q   So who are your current physicians?
17 A   Just Shawn Kuehl. In the last two years my
18 physicians have moved. I have had two different
19 ones and so this is a very new one.
20 Q   And is she your primary care physician?
21 A   Yes.
22 Q   And do you have a current gynecologist?
23 A   I do not.
24 Q   Do you have a current psychiatrist or
25 psychologist?

Page 29

1 A   I do not.
2 Q   Do you have a pain management doctor?
3 A   No.
4 Q   And when was the last time you saw a
5 physician?
6 A   Five weeks ago.
7 Q   And I know you said before that Dr. Kuehl
8 spoke with an OB-GYN. Did you ever see that OB-GYN?
9 A   In the hall I did.
10 Q   But you never had an appointment with her?
11 A   Uh-uh.
12      THE REPORTER: I am sorry. In the
13 hall I did?
14      THE WITNESS: Yeah, when I was going
15 in and out of the room. I know her. I mean, we are
16 in a local area so...
17 Q   BY MS. COLLINS: But she never came in to the
18 exam room to you?
19 A   No. Shawn went out and talked to her.
20 Q   You said at the beginning of this deposition
21 that you and your husband had gone to counseling?
22 A   Uh-huh.
23 Q   When did you first start going to counseling?
24 A   I can't really say that first time. It has
25 been a while. We were trying to remember on the way

8 (Pages 26 - 29)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 30

1 here because I had said, well, what about the
2 counseling?  So I can say it was at least six or
3 seven years ago but not longer than that.  And it
4 was just somebody from the hospital.  And then the
5 most recent one -- and we just saw that woman for a
6 couple months, maybe three or four months.  And then
7 the most recent one is --
8 Q    Sorry.  Do you remember the name of that
9 counselor that you saw at the hospital?
10 A    Nope.
11 Q    Okay.  And then the most recent one, go ahead.
12 A    Amy Pulitzer and she -- we saw her for --
13 every week for about six or seven months.  Sometimes
14 we would see her individually.  Sometimes we would
15 see her together.
16 Q    And what was the -- and where is Amy Pulitzer
17 located?
18 A    In our area, Manzanita, Oregon.
19 Q    And when was the last time you saw Amy
20 Pulitzer?
21 A    I am just guessing two and a half years ago
22 maybe.  I mean, I am not sure, but about that.  Time
23 flies though.
24 Q    And what was the purpose of going to see her?
25 A    We were having trouble communicating and so we

Page 31

1 went into couples counseling.  We really were --
2 like I said, trouble communicating was huge.
3 Q    And why did you stop going to see
4 Dr. Pulitzer?
5 A    We felt like we were on a good footing.  We
6 were ready to work on our issues on our own.
7 Q    So prior to your implant surgery, what
8 medications were you currently -- what medications
9 were you taking on an ongoing basis?
10 A    The same, Singulair, Lexapro.  I think it was
11 Lexapro.  I took one other medication that was
12 similar to Lexapro and I switched but I don't know
13 when that was so...
14 Q    And the Lexapro is for --
15 A    Depression.
16 Q    Depression, okay.  And who prescribed you the
17 Lexapro?
18 A    I think it was Lynn Hoth.  She is a physician
19 in Seaside.  I had her for a pretty long time until
20 my insurance changed and didn't cover that insurance
21 anymore -- or that company anymore.
22 Q    And who is now filling that prescription for
23 the Lexapro?
24 A    Shawn.
25 Q    And how long have you been on Lexapro?

Page 32

1 A    Over ten years, over 12 years probably.
2 Q    But you were on it before your implant
3 surgery?
4 A    Uh-huh, yes.
5 Q    And do you keep a journal or a diary at all?
6 A    Sometimes, not on a regular basis.
7 Q    And when did you start keeping a journal or a
8 diary?
9 A    When I was in high school.  I should say I
10 don't keep a diary or journal on a regular basis.  I
11 write things down occasionally like on a calendar
12 or -- but it is not like this is how I am feeling
13 today.  I don't do that.
14 Q    And do you tweet or blog at all?
15 A    No.
16 Q    Do you have a Facebook page?
17 A    I do.
18 Q    Is your page on private?
19 A    I have no idea.  And I don't post things on
20 it.  I read things on it.  I like things on there.
21 Q    And are you on any other forms of social media
22 platforms?
23 A    I don't think so.
24 Q    You never know these days.
25 A    Pinterest.  I look at Pinterest but I suppose

Page 33

1 that is not one.
2       MR. KUNTZ:  I love Pinterest.
3       THE WITNESS:  Me too.
4 Q    BY MS. COLLINS:  Have you ever posted on any
5 social media blog or message board anything
6 concerning the transvaginal mesh or Bard?
7 A    Nope.
8 Q    So I just want to talk a bit about your prior
9 medical history.  How many times have you been
10 pregnant?
11 A    Six.
12 Q    And how many vaginal deliveries have you had?
13 A    Six.
14 Q    And did you have any vaginal tearing or
15 lacerations or did you need to be stitched up after
16 delivery?
17 A    My second child.  I had a double episiotomy.
18 Q    Was a vacuum ever used during delivery?
19 A    No.
20 Q    Were forceps used during delivery?
21 A    The second child had forceps.
22 Q    Your other four children didn't have forceps?
23 A    The five.
24 Q    Five children?
25 A    No.

9 (Pages 30 - 33)

Becky Smith                                              April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 34

1 Q    Okay.  And did you have any pelvic pain after
2 delivery?
3 A    I don't -- well, delivery itself is a little
4 bit painful so I don't think there was additional
5 pain.
6 Q    What about after the delivery, not during the
7 delivery?
8 A    I don't know.  I don't think so.  My oldest
9 child is 40 years old.  That is a long time ago.
10 Q    Did you have any complications after any of
11 the deliveries?
12 A    No, I did not.
13 Q    Have you had any miscarriages before?
14 A    No.
15 Q    Have you had any abortions before?
16 A    No.
17 Q    Aside from the surgery, two implants, and then
18 explant part of the Bard mesh, have you ever had
19 surgery on any other part of your pelvis?
20 A    At the same time I had the mesh, I had a
21 hysterectomy.
22 Q    And was that a total hysterectomy or what type
23 was that?
24 A    I still have my ovaries.
25 Q    In terms of approach, do you know if it was

Page 35

1 done abdominally or vaginally?
2 A    It was done vaginally.
3 Q    Have you ever had fibroids before?
4 A    Yes, I have.
5 Q    When did you have those?
6 A    I had a fibroid -- I think it was like 2002,
7 something like that.
8 Q    And what was the treatment for that?
9 A    All kinds of treatments.  I have always had --
10 the reason that I even knew about it is I have
11 always had -- I have been anemic because of my
12 menstrual cycles have always been very heavy and so
13 I have had anemia.  And at that time my anemia was
14 really severe and so I saw a specialist,
15 Dr. Mitchell, and he did not believe in
16 hysterectomies at the time and so he said that we
17 needed to do these procedures beforehand, you know,
18 and so one of them they found that -- he saw that I
19 had a fibroid so I was on medication to reduce the
20 fibroid.  Then they were going to go in there and
21 take it out, but when he went in there, the fibroid
22 wasn't there.  So I don't know what to tell you
23 about that.  Had them, didn't have them.  Who knows?
24 Q    Have you had tubal ligation?
25 A    Yes.  I had a tubal ligation.

Page 36

1 Q    And when was that?
2 A    For my 30th birthday.
3        MR. KUNTZ:  Oh, wow.
4        THE WITNESS:  Happy birthday.  Right?
5 So that was in like '89.
6 Q    BY MS. COLLINS:  Have you ever had any
7 sexually transmitted diseases or infections?
8 A    I have not.
9 Q    Aside from your pelvic issues, have you had
10 any cardiac or pulmonary issues?
11 A    No.
12 Q    Have you -- do you have any kidney or thyroid
13 issues?
14 A    I do not.
15 Q    Have you ever had cancer?
16 A    No.
17 Q    Have you ever had heart disease or
18 hypertension?
19 A    No.
20 Q    Do you have diabetes?
21 A    I do not.
22 Q    So your PFS also states that -- I mean, we
23 briefly talked about the weight gain issue so I just
24 want to go into it, A, a bit more.  Do you happen to
25 know what your body mass index is?

Page 37

1 A    No.
2 Q    And have you made any changes to your diet
3 regimen compared to before the implant and how you
4 eat now?
5 A    I definitely -- I don't know.  I always eat
6 well so I would say that there is no change.
7 Q    And has the weight gain impacted your
8 activities to work at all?
9 A    No, it has not.
10 Q    Has it impacted your ability to do household
11 chores?
12 A    No.
13 Q    What about your ability to exercise?
14 A    I don't know if it is the weight gain or the
15 pain.  I am not sure what is causing it.
16 Q    What about has it impacted your ability to do
17 social activities?
18 A    My ability or my desire?
19 Q    Let's start with your ability.
20 A    No.
21 Q    What about your desire?
22 A    Yeah.  It is hard to be overweight, be in
23 public places.
24 Q    Do you have any leg, back, or spine issues?
25 A    I do not.

10 (Pages 34 - 37)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 38

1 Q    Have you ever had any pain in your neck or
2 back?
3 A    Uh-huh.  I have pulled a muscle now and again.
4 Q    What about pinched nerves?
5 A    Probably but I don't remember, nothing like
6 long lasting or significant.
7 Q    Nothing that you have been diagnosed with.
8 Correct?
9 A    Not that I know of, no.
10 Q    And have you been diagnosed with any form of
11 arthritis?
12 A    No.
13 Q    You seemed hesitant about that.
14 A    Well, because I think I have arthritis in my
15 hands but I don't believe that that has actually
16 been a diagnosis.
17 Q    Okay.  What type of pain do you experience in
18 your hands?
19 A    Just thumb sort of pain and I have had a
20 steroid shot in my wrist, so...
21 Q    What was the -- who gave you that steroid
22 shot?
23 A    Some doctor at the local clinic.
24 Q    What was the purpose of it?
25 A    To relieve the pain.

Page 39

1 Q    Did he ever tell you what type of pain would
2 have caused -- or what type of pain it was?
3 A    He did.  He said that it was -- it is like a
4 pulled muscle or something and it is actually a
5 condition.  It is called Quervain's something.  I
6 don't remember what it is but it is like tendinitis,
7 similar to that.
8 Q    Have you ever been on any pain therapy for any
9 chronic pain conditions?
10 A    No.
11 Q    Do you smoke cigarettes?
12 A    No.
13 Q    Did you smoke cigarettes?
14 A    Never.  Very proud of that.
15 Q    Do you drink alcohol?
16 A    Occasionally.
17 Q    How often would you say?
18 A    On average once every two weeks.
19 Q    And aside from the issues that we have
20 discussed, have you ever had any other significant
21 health issues throughout your life?
22 A    Not that comes to mind.
23 Q    On page 10 of your PFS it indicates that you
24 had a uterine ablation in 2002 from Dr. Mitchell
25 Strauss.

Page 40

1 A    That was the fibroid.
2 Q    Okay.  And when that surgical procedure was
3 done, he didn't find any fibroids.  Correct?
4 A    Right.
5 Q    Did he do anything else during the procedure?
6 A    I have no idea.  I don't think so.  Like what?
7 I think it was just a scraping of the uterus to make
8 sure that it was -- I think he was trying to slow
9 the bleeding down.
10 Q    Right.  That is what I wanted to make sure
11 just because if -- just because he didn't see a
12 fibroid doesn't mean he went in and didn't do
13 anything so I just wanted to see what he had done
14 during that procedure.
15 A    I think he continued with the ablation.
16 Q    Okay.  And did that procedure help with the
17 heavy bleeding that you were experiencing?
18 A    No.
19 Q    So do you still -- or did you still experience
20 heavy bleeding after that procedure?
21 A    Yep.
22 Q    And have we discussed all of the pelvic
23 related issues, significant medical procedures, and
24 hospitalizations that you have undergone before the
25 Bard mesh implant?

Page 41

1 A    I feel like we have.
2 Q    Is there anything else that we haven't talked
3 about?
4 A    Tubal ligation, the ablation.  I think that is
5 it.  I feel like I have been really a healthy
6 person.  Very lucky to be healthy.
7 Q    And we talked briefly that you had been
8 prescribed antidepressants.  Do you recall when you
9 first started them?
10 A    No.  I would say, gosh, about the same time as
11 the ablation and all that so I would say around 2002
12 or '4 or somewhere around there.  I don't recall
13 exactly.
14 Q    And why were you placed on antidepressants?
15 A    Well, I had gone through a period of like six
16 weeks of no sleep, just huge, you know, mood issues,
17 a bunch of depressive signs.
18 Q    Do you know why you went through that period
19 of no sleep?
20 A    No, I do not.  I just was assuming it was
21 because I was depressed and I think that being
22 depressed is -- you know, it doesn't have anything
23 to do with me.  It has to do with my system working.
24 Q    But there was no significant event that --
25 A    No.

11 (Pages 38 - 41)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 42

1 Q    -- would have caused --
2 A    No.
3 Q    Who first diagnosed you with depression?
4 A    Lynn Hoth, I think.
5 Q    And you experienced depression before you were
6 implanted with the Bard product.  Correct?
7 A    Yes.
8 Q    And you were prescribed antidepressants before
9 you were implanted with the Bard product.  Correct?
10 A    Yes.
11 Q    Did you and your husband ever seek mental
12 health counseling or therapy or marriage counseling
13 before the implant surgery?
14 A    Yeah.  I think we did.
15 Q    Do you recall when that was?
16 A    The year before we married.
17 Q    And why did you go see a counselor?
18 A    To see if we were habitable, co-habitable
19 together, sort of figure things out, see if it was a
20 good decision.  I had already made two bad ones
21 so...
22 Q    And have you personally without your husband
23 ever sought counseling or therapy from a mental
24 health professional?
25 A    No.  You mean like a psychologist or -- yes,

Page 43

1 no.
2 Q    Did you ever go to therapy at all on your own?
3 A    I don't think so.
4 Q    So this next line of questions is going to
5 relate to your experiences and your symptoms before
6 the implant surgery and then I will let you know
7 when we are shifting to after.
8 A    Okay.
9 Q    So what pelvic symptoms were you experiencing
10 prior to the implant surgery that caused you to get
11 the surgery?
12 A    I went in for a hysterectomy.  The
13 hysterectomy doctor is located in the same place as
14 the urologist which is Kim.  So when I went for the
15 hysterectomy, she is a specialist.  She was
16 recommended from my nursey (sic) friends around
17 where I live.  So I went to see her and she also had
18 asked me about incontinence and other issues and she
19 said, well, you know, I have a colleague upstairs
20 that does that.  Do you want to -- you know, we
21 should talk to her.  I said, okay.  And so I went
22 up and talked to the urologist and we decided
23 through our conversation that I was a candidate for
24 a sling, a bladder sling and I assumed the mesh at
25 the same time.

Page 44

1 Q    And what was it that -- with that conversation
2 that they decided that you were a candidate for the
3 mesh and the bladder sling?
4 A    Well, I had pretty severe incontinence.
5 Severe as in walking too fast, sneezing would cause
6 leakage and so -- and I still had -- I had -- you
7 know, I couldn't completely relieve my bladder.  I
8 didn't know that but that was the case.  She
9 demonstrated that.  And then during the exam, she
10 talked about the sling and then she said that it
11 would be a good idea to do this mesh as well to
12 build up the vaginal walls.
13 Q    And how frequently did you experience
14 incontinence on a daily basis?
15 A    Daily.  How often?
16 Q    Yeah.
17 A    Many times.
18 Q    Did you ever have to wear a pad during the
19 day?
20 A    Uh-huh.
21 Q    How many would you go through a day, would you
22 say?
23 A    Oh, one.  One or two.  Two, I would say.
24 Q    And how frequently would you have to urinate
25 during the day?

Page 45

1 A    That is a great question.  I am not sure about
2 that.  I am sorry.
3 Q    Would you say it was more than normal prior to
4 having children?
5 A    You know, it wasn't the urgency to go.  That
6 was not my issue.
7 Q    So what would you say the issue was?
8 A    The leakage, yeah.
9 Q    And did you have any abdominal pain before
10 your implant?
11 A    Uh-uh -- no.  Excuse me.
12 Q    Did you have any of that discomfort in your
13 pelvic area before your implant?
14 A    No.
15 Q    Did you ever get bladder infections or UTIs
16 prior to the implant?
17 A    No.
18 Q    Did you have a bulge prior to the implant?
19 A    A bulge?
20 Q    A bladder bulge at all?
21 A    I don't know.
22 Q    Did you ever experience constipation before
23 your implant?
24 A    Not as a medical issue.
25 Q    Did you ever have a sensation that you

12 (Pages 42 - 45)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 46

1  couldn't completely empty your bowels at the end of
2  a bowel movement?
3  A    I don't know that either.
4  Q    Did you ever have pain during sex prior to the
5  implant?
6  A    No.
7  Q    How did the incontinence impact your life?
8  A    I always had to bring extra clothes.  You
9  know, I was always aware of how close a bathroom was
10 or, you know, wondering what the activities -- how
11 strenuous they were going to be, make sure I had
12 extra pads.
13 Q    The leakage that you experienced, would that
14 occur more with strenuous activity?
15 A    Uh-huh, yes.
16 Q    Were you still able to work?
17 A    Uh-huh, yes.
18 Q    I was just waiting for you to swallow.
19 A    Thank you.
20 Q    Were you still able to do household chores?
21 A    Yes.
22 Q    Were you restricted at all in what you could
23 do at home?
24 A    No.
25 Q    And would you say that your symptoms were

Page 47

1  getting worse over time?
2  A    Yes.  Yes, I would.
3  Q    How so?
4  A    Well, the incontinence was more frequent and
5  more serious.  It wasn't just a drop anymore.
6  Q    And would you say that that was a result of --
7  strike that.
8        Was it worse after your first childbirth
9  compared to your last childbirth?
10 A    No.  Really that did not change -- my
11 incontinence didn't change until just before I went
12 in.  It was like the last two or three years before
13 that that caused -- that it was noticeable.
14 Q    Okay.  Did you experience incontinence after
15 your first childbirth?
16 A    No.
17 Q    When would you say that the incontinence
18 started?
19 A    I would say it was after, you know, I did all
20 the ablation and that, so I think it was, I don't
21 know, just before I went in for the hysterectomy.  I
22 just think things were just really quickly changing.
23 It was a little scary actually.  So maybe since I
24 had -- it was '08 so I would say by '06 probably,
25 '07.

Page 48

1  Q    What year was your last child born?
2  A    '86.
3  Q    And you didn't experience any incontinence
4  between the period of '86 to about '06 or '07?
5  A    Not as a problem, no.
6  Q    Okay.  So as a result of the incontinence you
7  made the decision to seek the help of a physician.
8  Correct?
9  A    Uh-huh.
10 Q    And you ultimately saw Dr. Kim as a solution
11 for your problems.  Correct?
12 A    Yes, through my -- through the other doctor.
13 I remembered her name a little bit ago, but she is
14 the one who suggested I see Dr. Kim.
15 Q    So you were referred to Dr. Kim?
16 A    I was referred to Dr. Kim.
17 Q    I believe it was Dr. Lynn Hoth; is that right?
18 A    No.
19 Q    So you don't remember who referred you to
20 Dr. Kim?
21 A    I do.  I can tell you.  Let's see.  I know she
22 is written in here somewhere.  It was somebody at
23 the Portland Adventist.  Julie Crawford.
24 Q    Julie Crawford.  And who was Julie Crawford?
25 A    She was the obstetrician and gynecologist that

Page 49

1  did my hysterectomy.  She also -- both her and Kim,
2  Dr. Kim, did both of the -- I mean they both did the
3  hysterectomy and the bladder sling together.
4  Q    It was at the same time?
5  A    It was at the same time.
6  Q    Okay.  When was your first meeting with
7  Dr. Kim?
8  A    On the day that I met with Dr. Crawford about
9  the hysterectomy.
10 Q    And do you recall how long that first meeting
11 was?
12 A    No.
13 Q    Can you tell me a bit about the discussions
14 that you had with Dr. Kim?
15 A    It was very interesting.  I went in and she,
16 you know, asked about my incontinence and I said,
17 yeah.  And she said, well, so I would like you to go
18 in and go to the bathroom.  And so I did.  And then
19 she said, so now we are going to see if there is any
20 residual urine in your bladder.  And so she did a
21 catheter and took out an enormous amount of urine.
22 And I was like, what?  So anyway, she was like,
23 yeah, you have got some issues here and so it looks
24 like your bladder is sagging.  And so she explained,
25 you know, what was going on and I can't tell you

13 (Pages 46 - 49)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 50

1  exactly what was said but she said that, you know,
2  the bladder sling was probably the best solution
3  because it could just hold it.  You know, it could
4  hold the bladder up.  And then she also talked about
5  the vaginal walls may need work.  She asked if I had
6  problems defecating, and I said, not so much.  And
7  she said, well, you know, that might be an issue
8  down the road.  And so anyway, it was decided that
9  those two procedures would benefit me.
10 Q    So what do you mean by she thought that
11 defecating might be an issue down the road?
12 A    Well, I don't know.  She just said, you know,
13 sometimes when you have difficulty urinating,
14 sometimes it is all the same muscle areas and so
15 maybe your muscles are weakening and you need this
16 mesh that would really help.  So I don't think she
17 treated the -- you know, for not being able to have
18 a great bowel movement but that was part of the
19 conversation.
20 Q    Okay.  And when you described that you went to
21 the restroom and then she catheterized and there was
22 an enormous amount of bladder left, did you ever
23 feel or have any feeling that there was bladder --
24 A    No.
25 Q    -- or there was urine still in your bladder?

Page 51

1  A    No.  That is why it was so shocking to me.  It
2  really was a pretty shocking moment.
3  Q    And did she ever discuss alternative
4  treatments for you besides the bladder sling and the
5  mesh implant?
6  A    Not doing anything is what I remember.
7  Q    Did she ever discuss any medications that you
8  could take?
9  A    No.
10 Q    Did she ever discuss physical therapy or
11 exercises that you could do?
12 A    No.
13 Q    But she did say that you could do nothing.
14 Correct?
15 A    Yes.
16 Q    And why was that not an option for you?
17 A    It was a pretty serious -- you know, the
18 incontinence was very serious for me.  I really felt
19 like if there was something to be done, I was pretty
20 excited about that.  And she had been recommended to
21 me from my friend.  I mean, they were so -- they
22 really felt like she was a great doctor and so I
23 definitely had a lot of confidence in what she had
24 to say.
25 Q    And so her ultimate recommendation to you was

Page 52

1  the mesh implant and the bladder sling.  Correct?
2  A    Uh-huh, yes.
3  Q    And did she provide any literature or patient
4  brochures for you to read up on the bladder sling
5  and the mesh implant?
6  A    I assume she did but I don't remember them
7  or -- I mean, I think she was very informative so I
8  assume she did.
9  Q    And I know you don't remember, but would it be
10 your general practice to read through that
11 literature that she gave you?
12 A    Yes.  I am definitely the person who reads the
13 directions.  I, you know, look at all the pictures,
14 so, yes.
15 Q    Do you remember anything that the literature
16 said at all?
17 A    I remember some pictures.  You know, there was
18 a picture and this is what it looked like I think.
19 In my head that is what I see.  That is all.
20 Q    Did she diagram anything for you to help
21 explain the procedure?
22 A    She may have.  I don't remember.
23 Q    Did you ask Dr. Kim any questions about the
24 procedure?
25 A    I mean, I am sure I asked her a few questions,

Page 53

1  but I was really just waiting for her to tell me.  I
2  don't think I spent a lot of time asking a bunch of
3  questions.  I think I was asking like, well, what is
4  the recovery time?  Will this interfere with the
5  hysterectomy that I am going to have, because that
6  was my -- that was the most important procedure to
7  me was the hysterectomy.
8  Q    Why was that the most important?
9  A    Because I had been bleeding my entire life.
10 Okay?  That was -- and I was anemic.  It was just
11 really a problem.
12 Q    And what did she say that the bladder sling
13 and the mesh implant -- what type of effect did she
14 say that that would have on the hysterectomy?
15 A    I believe there was no effect and it would be
16 a great procedure to have at the same time.  You are
17 all in the same area.  You know, it is like a good
18 fit.  And she told me at the time that both doctors
19 would be doing each other's procedure.  Like she
20 would be doing the sling and then Dr. Crawford would
21 be her backup and the other way around.
22 Q    Did she ever tell you the name of the
23 manufacturer of the mesh implant like during that
24 conversation before the surgery?
25 A    Not that I remember.  The only thing I

14 (Pages 50 - 53)

Becky Smith                                    April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 54

1 remember is there was a -- during one of my
2 surgeries. I don't remember if it was the first or
3 second there was a representative during my surgery.
4 I had to sign a piece of paper that said that they
5 could be there during my surgery.
6 Q     And did that representative ever talk to you
7 about anything?
8 A     No.
9 Q     Do you know if they just watched the surgery
10 or what role they played?
11 A     I have no idea, and the only reason I remember
12 is because it just felt like what, ew. You know, I
13 didn't -- I thought it was strange. So that is why
14 I was thinking that maybe at that time they said,
15 oh, this is a Bard representative but I -- that
16 didn't settle in my head anywhere. I don't know.
17 Q     You don't know who -- what company --
18 A     I have no idea, none, none.
19 Q     -- they were representing?
20 A     Maybe it wasn't even that company. Maybe it
21 was something else, some other instrument they were
22 using. I have no idea.
23 Q     And did you trust Dr. Kim's recommendation for
24 the bladder sling and the mesh implant?
25 A     Absolutely.

Page 55

1 Q     And why is that?
2 A     Well, she was recommended to me by this nurse
3 that, you know, had worked with a lot of people.
4 She is my neighbor. She worked a long time. She
5 had seen this person. She had seen Dr. Crawford and
6 Dr. Crawford had recommended this other woman and so
7 I was just -- it was a great -- you know, a women's
8 hospital, so, yeah, she was an expert. I absolutely
9 trusted her.
10 Q     And prior to the surgery, did you do -- did
11 you evaluate Dr. Kim's skills at all on your own?
12 A     I did not.
13 Q     Had you talked to anyone who had surgery with
14 Dr. Kim?
15 A     Not before the surgery.
16 Q     Did you talk to anyone after the surgery?
17 A     My neighbor who had had a bladder sling and
18 she actually had to have hers redone.
19 Q     And Dr. Kim was the implanting physician on
20 that?
21 A     Uh-huh.
22 Q     What was is the neighbor's name that you spoke
23 with?
24 A     Gayle Stephens.
25 Q     Do you know why she had to have her bladder

Page 56

1 sling redone?
2 A     I think she -- I think during her recovery she
3 like made a quick move and like tore it or
4 something. It was something like that. It was
5 really her own -- kind of her own doing. I think
6 that is what she told us.
7 Q     Did you ever ask Dr. Kim about her
8 qualifications to perform this surgery?
9 A     No.
10 Q     Did you ask her if she had ever implanted this
11 product before and how many times she had implanted
12 it?
13 A     I don't believe it -- no, I absolutely didn't ask
14 her that, but I think she implied that she had done
15 this surgery many times so she certainly didn't
16 mention the product or anything like that.
17 Q     Did she ever tell you what the success rate
18 was of the product that she was using to implant?
19 A     I assume so.
20 Q     And you just don't remember what she said?
21 A     I do not remember. I think it was favorable.
22 Q     Did you do any of your own independent
23 research online about the course of treatment that
24 you were going to experience?
25 A     I did not.

Page 57

1 Q     Did you do any research specifically about the
2 transvaginal mesh and the Bard product that you were
3 going to be receiving?
4 A     Absolutely not. I just want to say one more
5 time the surgery I was most interested in was the
6 hysterectomy. This other one was almost like a
7 little picnic, you know, a little bonus.
8 Q     Okay. And prior to the surgery, did Dr. Kim
9 ever discuss the risks and benefits of the surgery
10 with you?
11 A     I am sure she must have. I just felt like she
12 was very informative and very thorough and I just
13 felt like it was going to be a great surgery, you
14 know, really solve my issues. So I am sure she
15 talked about it.
16 Q     And do you remember any part of that
17 conversation of what she said would be the benefits
18 or the risks of the surgery?
19 A     Well, the risks, I felt like they were just
20 like surgery risks like anesthesia. You know, there
21 would be a recovery period. So that is what I
22 remember. I don't -- I mean, the risks, I am just
23 going to say this: There was never anything about
24 sexual intercourse being different or -- I mean,
25 there is nothing like that that was mentioned. That

15 (Pages 54 - 57)

Becky Smith                                      April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 58

1 would have been a super red flag for me.
2 Q    So since you don't specifically remember,
3 would you defer to your physician about your
4 discussion and the general practice with informed
5 consent?
6         MR. KUNTZ:  Objection.
7         You can answer.
8         THE WITNESS:  Can you repeat the
9 question?
10 Q   BY MS. COLLINS:  So since you don't remember,
11 would you basically trust your physician's testimony
12 about the discussion about informed consent that she
13 would have given you?
14 A   Not at this point.  I mean, I don't know.  I
15 will just say I don't know.  Would I trust
16 everything?  I did then.  I mean, I trusted
17 everything she said then but now I would -- I would
18 do everything different so...
19 Q    What do you mean you would do everything
20 different?
21 A    I mean, I would never have had the mesh
22 surgery because of all the complications that -- my
23 life changing.  If I would have read anything online
24 or had any inkling that it would even have a chance
25 of causing any of the issues that have plagued us, I

Page 59

1 would never have had the surgery.
2 Q    You signed consent forms for the surgery.
3 Correct?
4 A    I am sure I did.
5 Q    And would it be your general practice to read
6 the forms before signing the consent forms?
7 A    No.
8 Q    And why not?
9 A    The consent forms are usually given to you
10 before surgery and the nurse usually tells you what
11 it says.  It usually says, you know, you are giving
12 us permission to do the surgery or you are giving us
13 permission to bill your insurance.  That has been my
14 experience.
15 Q    So you wouldn't have read through the consent
16 forms then?
17 A    I would have perused them.  Read them
18 thoroughly, it is not likely.
19 Q    So after your implant surgery, when was the
20 next time that you saw Dr. Kim?
21 A    After the bleeding, and like I said, I don't
22 know what time -- what date that was.  It was either
23 the end of December or the beginning of January
24 because my revision surgery was the end of January
25 so it was either the beginning or somewhere just

Page 60

1 before that.
2 Q    About a year later after the surgery?
3 A    It was exactly -- almost exactly a year later.
4 Q    Did you ever see her for a post-op
5 appointment?
6 A    Uh-huh.
7 Q    And when was that?
8 A    Four weeks, three weeks, six weeks after.  I
9 think there were two of them actually with her and
10 Dr. Crawford.
11 Q    And what was the prognosis at the post-op
12 appointment?
13 A    I think they said you are healing fine.
14 Q    Were there any complications that they
15 discussed with you?
16 A    No.
17 Q    Did you ever speak to Dr. Crawford about the
18 procedure that Dr. Kim conducted?
19 A    I never saw Dr. Crawford again after my
20 hysterectomy and the six-week, so I have never
21 talked to her about that.
22 Q    And did you ever meet any Bard sales
23 representatives?
24 A    Not that I know of.  Like I said, there was
25 that one person who was there at the surgery, but I

Page 61

1 don't know at this point, I don't know anything, who
2 they were, or even what product they represented.
3 Q    Did they have a conversation with you at all
4 before the surgery?
5 A    I think it was an introduction so, no,
6 conversation.
7 Q    And did you speak to anyone else about your
8 surgery?
9 A    Anyone else?
10 Q    Yeah.  Like besides Dr. Kim and --
11 A    Like to have the surgery or after the surgery?
12 Q    Just after the surgery.  Did you see any other
13 doctors at all?
14 A    I don't think so.
15         MS. COLLINS:  Can we take a quick
16 five-minute break?
17         MR. KUNTZ:  Sure.
18         (Recess.)
19 Q    BY MS. COLLINS:  So now I am just going to
20 talk to you about the implant surgery and your post
21 implant condition.  So you had the implant surgery
22 on January 15th in 2008; is that correct?
23 A    Yes.
24 Q    Do you know if you were under general
25 anesthesia?

16 (Pages 58 - 61)

Becky Smith
April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 62

1 A    Yes, I was.
2 Q    And do you remember any discussions that you
3 had with Dr. Kim after the surgery on the day of the
4 surgery?
5 A    I don't remember them. I know I did but...
6 Q    Did you stay overnight in a hospital?
7 A    Yes. I had the hysterectomy so that was the
8 reason I stayed overnight.
9 Q    Right, okay. And did you have any
10 complications while you were in the hospital?
11       THE WITNESS: Do you remember if I
12 had any -- I don't think so either. I don't know.
13 Sorry. I know I can't ask him.
14 Q    BY MS. COLLINS: Do you remember how long you
15 stayed in the hospital?
16 A    Two or three nights.
17 Q    Were you given any discharge instructions?
18 A    Oh, I am sure.
19 Q    Do you recall if you were given separate
20 discharge instructions for the mesh implant and
21 bladder sling and the hysterectomy?
22 A    I don't.
23 Q    Would it be your general practice to follow
24 the discharge instructions if they were given to
25 you?

Page 63

1 A    Uh-huh, absolutely.
2 Q    And how were you doing after the surgery?
3 A    Like right after the surgery? Well, I was
4 really laid up. I mean, it took the full four
5 weeks. You know, I thought I would get a lot of
6 reading done. Oh, this is so wonderful. I will
7 have all this time and really it was not like that
8 at all. It was full recovery. There was a lot
9 of -- I couldn't do anything. You know, just really
10 tired, exhausted. Very difficult to move. Don was
11 with me and my sister came and helped as well.
12 Q    Were you on bedrest for most of that time?
13 A    Uh-huh.
14 Q    Do you recall how long you were on bedrest
15 for?
16 A    Well, I was off work for probably -- I think
17 it was supposed to be six weeks, so it was like five
18 or six weeks before I got a go-ahead to go back to
19 work.
20 Q    And did you have any urinary incontinence
21 symptoms after the surgery?
22 A    Not that I recall.
23 Q    And did the surgery resolve your urinary
24 incontinence issues?
25 A    Yes.

Page 64

1 Q    So you took that four to six weeks off of
2 work. Correct?
3 A    Yes.
4 Q    And were you able to get through a full
5 workday after that recovery period?
6 A    I did. It wasn't easy but I did it.
7 Q    So did you have any issues -- what kind of
8 issues did you have?
9 A    Just tired. You know, I think just any normal
10 issues you would have after surgery and getting back
11 to full-time work.
12 Q    What do you do for a living?
13 A    I am a high school teacher.
14 Q    Do you teach a certain subject?
15 A    I teach -- I am a social studies teacher and I
16 teach reading, writing, all kinds of things.
17 Q    And besides that four-to-six-week gap before
18 you returned to work, how long did it take you to
19 return to your normal daily activities?
20 A    Great question. I assume -- but I don't know.
21 I am just assuming. So it didn't seem unusual, an
22 unusual amount of time.
23 Q    Would it be around the same time that you
24 started work, do you think?
25 A    It took me a little bit longer to really get

Page 65

1 my strength and my energy back.
2 Q    And did you consider Dr. Kim to be a good
3 physician?
4 A    I did very much so.
5 Q    And why did you stop seeing Dr. Kim?
6 A    There was just no more need. I had the
7 surgery. I had the revision surgery. I have not
8 had any need to go back to see her. I have -- my
9 incontinence has been taken care of.
10 Q    And when was the last time you saw her?
11 A    I can tell you. I have my last appointment, I
12 believe, card. It was either 4/16 -- 4/16/09,
13 9 o'clock in the morning.
14 Q    And you said that you did consider Dr. Kim to
15 be a good physician?
16 A    Yes.
17 Q    Do you still consider her to be a good
18 physician?
19 A    Yes, I do.
20 Q    Do you have any opinion of her and her skills
21 at all?
22 A    Well, I do. I think she did what she said she
23 was going to do in that my incontinence is fixed.
24 Q    And did you sue Dr. Kim at all?
25 A    No.

17 (Pages 62 - 65)

Becky Smith                                                 April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 66

1 Q   Why not?
2 A   Why would I?  I have no reason to sue her.
3 Q   So we have talked about all of your complaints
4 and your issues.  Correct?
5 A   Uh-huh.
6 Q   So now I just want to talk about how they have
7 affected your life.  Your incontinence that you had
8 for the reason that you had the mesh implant is
9 resolved.  Correct?
10 A   It is resolved.
11 Q   And have you regained your normal level of
12 sexual activity?
13 A   I have not.  And you know what?  I would take
14 incontinence over this 100 times.
15 Q   Prior to the mesh implant surgery, how often
16 were you able to engage in sexual intercourse?
17 A   Daily, up to daily.  I mean, obviously it is
18 probably not.  It is probably two or three times a
19 week.
20 Q   And what about post surgery?
21 A   Much limited.  I mean, hardly ever.
22 Q   Before the implant surgery were you able to
23 achieve orgasms through sex?
24 A   Absolutely.
25 Q   And what about post implant?

Page 67

1 A   Yes.  I can still orgasm.
2 Q   And what about your spouse who is making the
3 loss of consortium claim?  Is he still able to
4 orgasm through sex now?
5 A   If the sex happens, I assume, but it doesn't
6 happen because it is too painful.
7 Q   When was the last time you were able to engage
8 in sexual intercourse?
9 A   That is a great question.  I have no idea.  It
10 has been months, months.  And it was just as painful
11 then as it was the last time.  And I finally told
12 him that time it was painful so it was kind of
13 horrible.
14 Q   And have you been able to express your love
15 for your spouse in any other way besides just sexual
16 intercourse?
17 A   Absolutely.  We love each other very much.
18 Q   And is your marriage and relationship still
19 strong?
20 A   Yes.
21 Q   And what other ways do you express your love
22 and companionship for each other?
23 A   By being companions, being friends, living in
24 the same house, enjoying the same activities as in
25 more walks.

Page 68

1 Q   And has that changed since before the mesh
2 implant to now after the mesh implant?
3 A   I think it has taken a whole lot more effort.
4 It has taken a lot of effort to emphasize those
5 pieces because sexuality is a much easier way to
6 express love and affection.
7 Q   And would you say that this experience has
8 caused you and your husband to grow closer to each
9 other?
10 A   No, I would not.  I would say it has
11 definitely not caused that.
12 Q   Has it caused you to grow apart from each
13 other?
14 A   Yes.  Thus the counseling.
15 Q   And are there any hobbies or activities that
16 you can no longer do as a result of your mesh
17 implant?
18 A   Let's see.  I know there is a ton of things we
19 have changed and some it is unconsciously, some of
20 it is consciously.  But anything that is too
21 strenuous for me.  I mean, Don is a very active
22 person and so -- I mean, even too much digging in
23 the garden can be really painful and exhausting so,
24 I mean, it has curtailed it, yes.
25 Q   And are you making a claim for lost wages?

Page 69

1 A   No, I am not.
2 Q   And when was the last time that you were able
3 to take a vacation?
4 A   We took a vacation Christmas before last.  We
5 flew to Hawaii.
6 Q   And has your post-implant symptoms -- did that
7 affect your vacation at all?
8 A   We didn't go on any big, long hikes.  We kind
9 of sat around and read books and...
10 Q   And what would you have probably done if you
11 went on a vacation before the mesh implant?
12 A   Sightsee a lot, done a lot more hiking and
13 make kayaking.  I mean, we have done a lot of things
14 so...
15 Q   And due to the mesh implant, you are not able
16 to engage in activities like that?
17 A   I would say due to my -- you know, just how my
18 energy levels are lower.  Is it because of the mesh
19 implant?  It feels like it.
20 Q   And do you know anyone who works at Bard at
21 all?
22 A   I do not.
23 Q   And have you ever spoken to anyone who has
24 been employed at Bard?  And I know that you don't
25 know about that representative, so aside from that

18 (Pages 66 - 69)

Becky Smith                                                        April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

Page 70

1  representative.
2  A    I do not, no.
3  Q    And other than your lawyers, with whom have
4  you discussed this lawsuit?
5  A    My sister.
6  Q    What about other doctors or nurses?
7  A    (Shaking head.)
8  Q    Is that a no?
9  A    It is a no.  I am sorry.  No.
10 Q    And has anyone other than your attorneys ever
11 told you that Bard has done anything wrong?
12 A    Uh-uh.  I do not know anything about Bard.
13 Q    Has anyone ever told you that Bard was
14 negligent?
15 A    No.
16 Q    Has anyone ever told you that the mesh
17 implant --
18 A    Except my lawyer.
19 Q    Besides your lawyer, yes.
20 A    Okay.
21 Q    Besides your lawyer, has anyone ever told you
22 that Bard -- the mesh implant and the bladder sling
23 that you received was defective?
24 A    No.
25 Q    Okay.  So other than your attorneys, has

Page 71

1  anyone ever told you that Bard did not give adequate
2  warnings to their physicians?
3  A    I haven't heard anything like that.  I don't
4  know.
5  Q    Other than your attorneys, has anyone ever
6  told you that Bard did not give adequate
7  instructions to your physicians?
8  A    No.
9  Q    And have you shared with me all of your
10 complaints about the Bard products that you
11 received?
12 A    I believe so.
13 Q    So without telling me any specific
14 conversations that you had with your attorneys, what
15 did you do to prepare for this deposition today?
16 A    I got time off work.  We talked through e-mail
17 a few times kind of setting up the appointment, just
18 telling me where it would be, kind of how long it
19 would last.  We met last night.  We met this
20 morning.
21 Q    So how many times have you met with your
22 attorney to prepare for this deposition, not in
23 total, just to prepare for today?
24 A    We met in person twice.
25 Q    And how long did those meetings last?

Page 72

1  A    Three and one hour so four hours about.
2  Q    And did you meet with anyone else to prepare
3  for the deposition today?
4  A    Like... no.  I mean, no.
5  Q    Did you review any documents on your own or
6  with your attorney to prepare for the deposition
7  today?
8  A    No.  Say that again.
9  Q    Did you review any documents either on your
10 own or with your attorney to prepare for today?
11 A    Well, I did look at my fact sheet again to
12 make sure I had it.  I didn't know if I needed to
13 bring it and so -- and I ended up not bringing it so
14 I guess I didn't need it.
15 Q    And did you look at any of your medical
16 records at all?
17 A    I have never seen my medical records.
18 Q    At any time did you do any research about the
19 issues in this case?
20 A    (Shaking head.)
21 Q    Is that a no?
22 A    That is a no.  I can -- yeah, that is a no.
23 Q    Did you do any Google research about anything
24 to do with this case?
25 A    I just looked on -- in the newspaper today and

Page 73

1  they said that Bard was being bought by someone, so
2  I didn't do any research but I did see it.  And I
3  was wondering if it was the same Bard so I didn't
4  purposely do it.  It was on the front page.
5  Q    Did anyone instruct you on how to answer my
6  questions today?
7  A    No.
8  Q    So I just kind of want to talk about your
9  decision to file suit.  When did you make that
10 decision to file suit?
11 A    My sister saw an advertisement on TV that
12 talked about the transvaginal mesh and I didn't
13 even -- anyway, she said, oh, my God, there was a
14 list of all your symptoms.  And she is the only one
15 who knew my symptoms because we had talked about it.
16 Don didn't know about it.  So she actually called
17 the company or called the number on the board and
18 she said -- and then she told me about it.  And so I
19 decided -- and she knows how devastated it has been
20 for my life -- devastating.  And so I decided I
21 would just call the number.
22 Q    Do you remember when you first saw that
23 commercial on the television?
24 A    Maybe 2013 or '14.  '14, I believe it was,
25 2014.

19 (Pages 70 - 73)

Veritext Legal Solutions

800.808.4958                                              770.343.9696

Becky Smith
April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 74

1 Q    And that was when you made the decision to
2 file suit?
3 A    Yeah, uh-huh.
4 Q    And when did you first consult an attorney
5 about this case?
6 A    I can say it was close to that time, either
7 '14 or '15, not too -- I don't know.  Shortly after
8 that.
9 Q    Do you recall who you consulted with?
10 A    I am sorry.  I don't.
11 Q    How did you find your attorney?
12 A    From calling that -- from calling a number and
13 somehow in that process.
14 Q    Did you ever receive a call from a company who
15 knew that you had been implanted with the
16 transvaginal mesh and was offering to refer you to a
17 lawyer?
18 A    No, I don't believe so.
19 Q    Do you know anyone else who filed suit against
20 Bard?
21 A    Uh-uh.
22 Q    Did that neighbor that you spoke of earlier
23 when you were talking about --
24 A    No.
25 Q    Did she ever file suit?

Page 75

1 A    No, not at all, no.  She really -- her issue
2 was -- she doesn't have my issues.  Her issues are
3 different.
4 Q    And do you know anyone else besides that
5 neighbor we previously spoke about who was implanted
6 with the Bard mesh product?
7 A    Nobody.
8 Q    Have you sold or assigned any interest in your
9 right to recover any damages in this lawsuit to a
10 third party?
11 A    I don't even know what that would look like so
12 I assume no.
13 Q    Have you ever filed for bankruptcy before?
14 A    No.
15 Q    Have you ever filed a lawsuit before?
16 A    No.
17 Q    Have you ever been sued before?
18 A    No.
19 Q    Have you ever been arrested?
20 A    No.  Exciting.  I told you I just got a
21 speeding ticket though.
22 Q    I know you said you drink occasionally so how
23 often would you say that you drink?
24 A    I would just say -- I mean, it goes off and
25 on.  Sometimes when I am really drinking heavy it is

Page 76

1 like once a weekend.  One drink every weekend.  That
2 is when I am really swinging out.
3 Q    Do you use recreational drugs at all?
4 A    That is not Tylenol.  Right?
5 Q    Right.
6 A    So, no, I don't.
7 Q    Have you ever served in any branch of the
8 military?
9 A    Nope.
10 Q    Have you ever served as a witness in a trial?
11 A    Yes -- no.  Oh, no.  I am sorry.  I am the
12 jury.
13 Q    Have you ever served on the jury?
14 A    Yes.
15 Q    Do you agree that it is important for a jury
16 to consider both sides of the story before rendering
17 a verdict?
18 A    Absolutely.
19 Q    And have you ever had any reason to obtain an
20 attorney in the past prior to filing this lawsuit?
21 A    Yes.
22 Q    And what were those circumstances?
23 A    Divorce, child custody.
24 Q    Who did you hire at that time?  Do you recall?
25 A    Joel Sacks for one and Lois Albright.

Page 77

1 Q    And that was for?
2 A    Divorce and child custody.
3 Q    So can you tell me a bit about your
4 educational background?
5 A    I have a master's degree.  I have a bachelor's
6 degree in secondary education and a master's degree
7 in history and secondary education.
8 Q    And where did you receive your bachelor's
9 degree from?
10 A    Western Oregon University.
11 Q    And where did you receive your master's from?
12 A    First of all, excuse me, Western -- it is the
13 same college.  They just changed names.  Western
14 Oregon University for both.
15 Q    And do you hold any professional licenses or
16 certifications?
17 A    No, just the teaching degree.
18 Q    And where are you currently employed?
19 A    Neah-Kah-Nie High School in Rockaway.
20 Q    And you said that you teach social studies and
21 writing?
22 A    Literacy.  I also teach home ec.  I have a
23 variety of things on my plate.
24 Q    And have you ever been terminated or
25 voluntarily left a job due to any medical, physical,

20 (Pages 74 - 77)

Becky Smith April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 78

1 or psychiatric condition?
2 A    Nope.
3 Q    Have you ever filed a workers' compensation
4 claim?
5 A    Nope.
6 Q    Are you currently on social security
7 disability?
8 A    No.
9 Q    So how long have you and Don been married?
10 A    16 years.
11 Q    Have you ever been separated from Don?
12 A    No.
13 Q    Have you ever considered divorce?
14 A    No.
15 Q    Did Don accompany you to your doctors' visits
16 when you saw Dr. Kim or any of your doctors?
17 A    Yeah.  He has been there before.  I am not
18 sure if it was during that time but he has been
19 there before.  Actually I don't think he was there
20 during that time.  I think it was my sister who went
21 with me.
22 Q    To talk about the mesh implant?
23 A    Uh-huh.
24 Q    And you said that you have six children.
25 Correct?

Page 79

1 A    Yes.
2 Q    What are their names?
3 A    Cassy.  Do you need them all, the full name?
4 Q    Yeah.  Cassy, and then their ages as well.
5 A    Okay.  Cassy is 40.  Michael is 39.
6 Kellieanne is 37.  Rebecca is 36.  Will is 34 -- 33.
7 He will be not quite 34.  And Thomas is 29.
8 Q    And do any of your children live with you?
9 A    No.
10 Q    Did any of your children ever accompany you to
11 your doctors' visits?
12 A    No.
13 Q    Do you have any grandchildren?
14 A    Yes.
15 Q    How many grandchildren do you have?
16 A    Ten -- oh.  No, ten.
17 Q    And do you have any caretaking
18 responsibilities for any family member?
19 A    No.
20 Q    Do any of your family or friends have medical
21 training?
22 A    My oldest daughter is a registered nurse.
23 Q    That would be Cassy.  Right?
24 A    Cassy, uh-huh.
25 Q    Do any of your family or friends have any

Page 80

1 legal training?
2 A    No.
3 Q    Have any of your family or friends experienced
4 incontinence?
5 A    Yes.
6 Q    Who would that be?
7 A    Coworkers older than myself so it is only said
8 in passing.
9 Q    And do you know if they ever had a repair
10 involving mesh?
11 A    None.  None of them have.
12 Q    Okay.  That was a confusing question on my
13 point.
14 A    Yeah.  None of them that I know have.
15 Q    And have you ever had any family or friends
16 who had a hernia repair?
17 A    I believe -- I don't know.  Not that I know
18 of.  I think my brother has but I don't know that
19 for sure.
20 Q    Do you know if mesh was used in the hernia
21 repair?
22 A    I don't know what is used in hernia repair.  I
23 am sorry.
24 Q    Not just generally but just with his current
25 repair.

Page 81

1 A    I don't know.  I have no idea.
2        MS. COLLINS:  Okay.  That is all the
3 questions I have.  Jeff, do you have any follow-ups?
4        MR. KUNTZ:  I have one question.
5
6            EXAMINATION
7 BY MR. KUNTZ:
8 Q    Is the first time that you realized that Bard
9 might have created a defective product that led to
10 your injuries is when you talked to an attorney?
11 A    Yes.  I had no idea any other time that there
12 was anything wrong with the product.  I thought it
13 was me.
14        MR. KUNTZ:  No further questions.
15        MS. COLLINS:  No follow-ups.
16        (DEPOSITION ADJOURNED AT 11:53 A.M.)
17        (Signature Waived)
18            * * *
19        (NOTE:  Untranscribed steno notes
20        archived ten years on computer;
21        transcribed English files archived
22        five years on computer.)
23            * * *
24
25

21 (Pages 78 - 81)

Becky Smith                                April 24, 2017
Smith, Becky vs. C. R. Bard, Inc.

Page 82

1                EXAMINATION INDEX
2                          PAGE
3 BY MS. COLLINS                     3
4 BY MR. KUNTZ                      81
5              * * *
6            EXHIBIT INDEX
7 EXHIBIT      DESCRIPTION          PAGE
8 EXHIBIT 1   Notice of Deposition of Becky Smith    7
9 EXHIBIT 2   Plaintiff Fact Sheet          11
10 (Attached hereto.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1             CERTIFICATE
2        I, HEATHER L. FAIRLESS, a Registered
3 Professional Reporter, Washington Certified Court
4 Reporter, and an Oregon Certified Shorthand
5 Reporter, hereby certify that said witness
6 personally appeared before me at the time and place
7 set forth in the caption hereof; that at said time
8 and place I reported in stenotype all testimony
9 adduced and other oral proceedings had in the
10 foregoing matter; that thereafter my notes were
11 transcribed through computer-aided transcription
12 under my direction; and that the foregoing pages
13 constitute a full, true, and accurate record of all
14 such testimony adduced and oral proceedings had, and
15 of the whole thereof.
16        Witness my hand at Portland, Oregon, this
17 27th day of April, 2017.
18
19

20   _____
21   Heather L. Fairless
22   Oregon CSR No. 10-0418
23   Expires 9/30/17
24   Washington CCR No. 2842
25   Expires 10/01/17

22 (Pages 82 - 83)

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[& - amy]

Page 1

| & | | |
|---|---|---|
| **&**   1:20 2:3 | | |

**0**

**06**   47:24 48:4
**07**   47:25 48:4
**08**   47:24

**1**

**1**   6:15,16 82:8
**10**   5:10,13 39:23
**10-0418**   83:22
**10/01/17**   83:25
**100**   66:14
**11**   82:9
**1123**   1:21
**11:53**   81:16
**12**   32:1
**14**   73:24,24 74:7
**15**   11:13 26:1,6
  74:7
**15th**   61:22
**16**   78:10
**16402**   1:8
**1900**   2:8
**1959**   6:6

**2**

**2**   9:25 10:2 82:9
**2002**   35:6 39:24
  41:11
**2008**   61:22
**2013**   73:24
**2014**   73:25
**2017**   1:19 83:17
**2187**   1:4 3:9
**236**   3:10
**24**   1:19
**27th**   83:17
**2842**   83:24
**29**   79:7
**2:15**   1:8

**3**

**3**   82:3
**30**   6:6
**300**   2:4
**30th**   36:2
**33**   79:6
**34**   79:6,7
**35050**   6:8
**36**   79:6
**37**   79:6
**39**   79:5

**4**

**4**   41:12
**4/16**   65:12
**4/16/09**   65:12
**40**   3:10 34:9 79:5
**4740**   2:4

**5**

**5th**   2:8

**6**

**6**   11:1
**64112**   2:4
**650-289-7805**   2:9
**6a**   11:1 18:23 20:2
  22:13 25:25
**6e**   11:17

**7**

**7**   11:17 82:8

**8**

**81**   82:4
**816-701-1100**   2:5
**86**   48:2,4
**89**   36:5

**9**

**9**   65:13
**9/30/17**   83:23
**94303**   2:8

**97205**   1:22
**9:50**   1:20

**a**

**a.m.**   1:20 81:16
**abdominal**   45:9
**abdominally**   35:1
**ability**   4:25 37:10
  37:13,16,18,19
**ablation**   39:24
  40:15 41:4,11
  47:20
**able**   14:12 16:18
  19:8 23:12 26:5
  46:16,20 50:17
  64:4 66:16,22
  67:3,7,14 69:2,15
**abortions**   34:15
**absolutely**   7:18
  19:7 21:7 54:25
  55:8 56:13 57:4
  63:1 66:24 67:17
  76:18
**accompany**   78:15
  79:10
**accurate**   10:12,16
  83:13
**ache**   7:9 11:6,20
  12:5,9,10,12,18,20
  13:11 15:2 20:25
**achieve**   66:23
**aching**   8:5 9:21
  20:15 24:20
**active**   11:7 68:21
**activities**   13:22,24
  14:5 15:12 37:8
  37:17 46:10 64:19
  67:24 68:15 69:16
**activity**   14:19
  19:21 20:7 46:14
  66:12

**add**   10:19
**added**   8:20
**additional**   34:4
**address**   8:4
**adduced**   83:9,14
**adequate**   71:1,6
**adjourned**   81:16
**adventist**   48:23
**advertisement**
  73:11
**advises**   4:13
**aerobics**   23:2
**affect**   4:25 5:1
  9:22 69:7
**affection**   68:6
**afraid**   24:3
**ages**   79:4
**ago**   9:9 13:8,9
  29:6 30:3,21 34:9
  48:13
**agree**   3:11 5:17
  76:15
**ahead**   4:12 7:2
  30:11 63:18
**aided**   83:11
**albright**   76:25
**alcohol**   39:15
**aleve**   15:4
**aliases**   5:24
**alleging**   7:8
**allergies**   5:8
**alleviate**   9:20 15:3
  22:1,2
**allowed**   3:8
**alternative**   51:3
**alto**   2:8
**amended**   3:10
**amount**   49:21
  50:22 64:22
**amy**   30:12,16,19

Case 2:15-cv-16402   Document 42-1   Filed 08/14/19   Page 26 of 299 PageID #: 331

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[anal - calorie]

Page 2

anal 12:22
anemia 35:13,13
anemic 35:11
  53:10
anesthesia 57:20
  61:25
answer 4:4,12,16
  4:21 7:2 21:3 28:1
  58:7 73:5
answered 20:1
antidepressants
  41:8,14 42:8
anybody 6:11 22:9
anymore 23:13
  31:21,21 47:5
anyway 24:8 26:9
  49:22 50:8 73:13
apart 25:8 68:12
appearances 2:1
appeared 83:6
appointment
  24:25 29:10 60:5
  60:12 65:11 71:17
approach 34:25
april 1:19 83:17
archived 81:20,21
area 7:9 11:7 12:6
  12:22 13:12 20:14
  20:14,16,22 29:16
  30:18 45:13 53:17
areas 50:14
arrested 75:19
arthritis 38:11,14
aside 34:17 36:9
  39:19 69:25
asked 4:21 12:25
  17:17 43:18 49:16
  50:5 52:25
asking 4:16 53:2,3
asks 11:17

asserting 7:5
assigned 75:8
assume 8:7 9:6
  24:14 25:20 28:8
  52:6,8 56:19
  64:20 67:5 75:12
assumed 16:19
  18:10 24:22 43:24
assuming 41:20
  64:21
attached 82:10
attorney 2:5,9
  71:22 72:6,10
  74:4,11 76:20
  81:10
attorneys 10:23
  70:10,25 71:5,14
avenue 2:4,8
average 39:18
avoided 19:22
aware 7:4 46:9

**b**

bachelor's 77:5,8
back 7:18 12:21
  12:22 17:24 19:1
  20:13,25 37:24
  38:2 63:18 64:10
  65:1,8
background 77:4
backup 53:21
bad 42:20
bankruptcy 75:13
bard 1:4,9 3:19
  7:5 27:19,21,24
  28:13 33:6 34:18
  40:25 42:6,9
  54:15 57:2 60:22
  69:20,24 70:11,12
  70:13,22 71:1,6,10
  73:1,3 74:20 75:6
  81:8

bard's 28:10
basically 22:22
  58:11
basis 31:9 32:6,10
  44:14
bathroom 46:9
  49:18
bayside 6:8
becky 1:7,12,16
  3:1,6 5:22,25,25
  6:15 9:25 24:6
  82:8
bedrest 63:12,14
beginning 13:13
  29:20 59:23,25
behalf 1:13
believe 5:10 7:18
  9:22 35:15 38:15
  48:17 53:15 56:13
  65:12 71:12 73:24
  74:18 80:17
benefit 50:9
benefits 57:9,17
best 50:2
better 15:6
big 14:1 69:8
bill 59:13
birth 6:4
birthday 36:2,4
bit 12:3,4 19:14
  26:2 33:8 34:4
  36:24 48:13 49:13
  64:25 77:3
bladder 9:5 13:3
  43:24 44:3,7
  45:15,20 49:3,20
  49:24 50:2,4,22,23
  50:25 51:4 52:1,4
  53:12 54:24 55:17
  55:25 62:21 70:22

bleeding 16:1 17:3
  23:25 24:3,10,18
  28:4 40:9,17,20
  53:9 59:21
blog 32:14 33:5
board 33:5 73:17
bodily 11:2
body 11:19 14:20
  36:25
bonus 57:7
books 69:9
born 6:5,5 48:1
bought 73:1
bowel 46:2 50:18
bowels 46:1
branch 76:7
break 4:19,22
  61:16
briefly 3:20 13:23
  36:23 41:7
bring 6:21 27:10
  27:11,11 46:8
  72:13
bringing 72:13
brochures 52:4
brother 80:18
build 44:12
bulge 45:18,19,20
bunch 41:17 53:2
busy 13:14

**c**

c 6:2
c.r. 1:4,9 3:19
ca 2:8
calendar 32:11
call 73:21 74:14
called 8:21 39:5
  73:16,17
calling 74:12,12
calorie 26:23

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[cancer - correct]

Page 3

cancer 36:15
candidate 43:23
  44:2
capacity 5:2,15
caption 83:7
card 65:12
cardiac 36:10
care 28:20 65:9
caretaking 79:17
cartmell 2:3
case 7:24 18:12
  44:8 72:19,24
  74:5
cassy 79:3,4,5,23
  79:24
cat 6:12
catheter 49:21
catheterized 50:21
cause 28:3 44:5
caused 7:11 11:10
  11:15 27:24 39:2
  42:1 43:10 47:13
  68:8,11,12
causing 11:12
  37:15 58:25
cavity 24:11
ccr 83:24
center 23:4
certain 15:12 21:5
  64:14
certainly 56:15
certificate 83:1
certifications
  77:16
certified 1:18 3:2
  83:3,4
certify 83:5
chance 58:24
change 13:14
  18:11,24 19:8
  20:8 37:6 47:10

47:11
changed 8:6 9:17
  11:9 19:2 20:5
  31:20 68:1,19
  77:13
changes 37:2
changing 26:14
  47:22 58:23
charleston 1:2
checked 11:19
child 33:17,21
  34:9 48:1 76:23
  77:2
childbirth 47:8,9
  47:15
children 33:22,24
  45:4 78:24 79:8
  79:10
chores 37:11
  46:20
christmas 69:4
chronic 39:9
cigarettes 39:11
  39:13
circumstances
  76:22
city 2:4
civil 3:8
claim 7:5 11:3
  28:10 67:3 68:25
  78:4
claimed 11:19
  12:3
claiming 11:14,24
class 22:17,18
clean 4:18
clear 8:25 28:2
clinic 38:23
close 46:9 74:6
closer 68:8

clothes 46:8
colleague 43:19
college 77:13
collins 2:7 3:5,17
  3:18 6:14,17 7:4
  8:25 9:24 10:4,7
  28:1 29:17 33:4
  36:6 58:10 61:15
  61:19 62:14 81:2
  81:15 82:3
collinsl 2:9
come 16:14 17:24
comes 39:22
comfortable 19:3
coming 11:12
  22:14 24:19
commencing 1:19
commercial 73:23
communicating
  30:25 31:2
companions 67:23
companionship
  67:22
company 31:21
  54:17,20 73:17
  74:14
compared 37:3
  47:9
compensation
  78:3
complaints 66:3
  71:10
complete 5:18
  10:21
completely 11:9
  20:5 44:7 46:1
complications
  34:10 58:22 60:14
  62:10
comprehend 5:1

computer 81:20
  81:22 83:11
concerning 33:6
condition 27:6
  39:5 61:21 78:1
conditions 27:3
  39:9
conducted 60:18
confidence 51:23
confusing 80:12
consciously 68:20
consent 58:5,12
  59:2,6,9,15
consider 65:2,14
  65:17 76:16
considered 78:13
consortium 67:3
constant 7:8 11:6
  12:5 15:11,13
constantly 15:17
constipation 45:22
constitute 83:13
consult 74:4
consulted 17:10
  17:22 74:9
contact 9:16
continued 40:15
continuing 22:21
conversation
  25:17 27:10 43:23
  44:1 50:19 53:24
  57:17 61:3,6
conversations
  71:14
copy 10:3,4
correct 3:21,22
  7:6,12,13 9:2
  11:15,25 14:6
  16:9 28:7 38:8
  40:3 42:6,9 48:8
  48:11 51:14 52:1

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[correct - dr]

Page 4

59:3 61:22 64:2
66:4,9 78:25
**counsel** 4:12
**counseling** 7:17
8:1 9:1 29:21,23
30:2 31:1 42:12
42:12,23 68:14
**counselor** 30:9
42:17
**couple** 7:17 12:16
19:20 30:6
**couples** 31:1
**course** 56:23
**court** 1:1,20 4:3,8
4:18 83:3
**cover** 31:20
**coworkers** 80:7
**crawford** 48:23,24
48:24 49:8 53:20
55:5,6 60:10,17,19
**cream** 17:19
**created** 81:9
**critical** 28:13
**csr** 83:22
**current** 28:16,22
28:24 80:24
**currently** 4:24 6:7
11:18,23 31:8
77:18 78:6
**curtail** 11:22
**curtailed** 68:24
**custody** 76:23
77:2
**cutting** 24:22
**cv** 1:8
**cycles** 35:12

**d**

**d** 6:3
**daily** 44:14,15
64:19 66:17,17

**damages** 75:9
**date** 6:4 18:15
59:22
**daughter** 23:20
79:22
**day** 13:13,13
44:19,21,25 49:8
62:3 83:17
**days** 32:24
**debilitating** 19:11
**december** 25:2
59:23
**decided** 43:22
44:2 50:8 73:19
73:20
**decision** 42:20
48:7 73:9,10 74:1
**defecating** 50:6,11
**defective** 70:23
81:9
**defendant** 1:10,13
2:9 3:19
**defer** 58:3
**definitely** 28:3
37:5 51:23 52:12
68:11
**degree** 77:5,6,6,9
77:17
**deliveries** 33:12
34:11
**delivery** 33:16,18
33:20 34:2,3,6,7
**demonstrated**
44:9
**deposition** 1:12,16
3:6,6,9,21,23 6:15
29:20 71:15,22
72:3,6 81:16 82:8
**depressed** 41:21
41:22

**depression** 5:12
31:15,16 42:3,5
**depressive** 41:17
**describe** 11:2
20:17
**described** 13:23
14:13 24:13 50:20
**describing** 21:13
**description** 82:7
**desire** 37:18,21
**detail** 12:4
**details** 5:1,15
**devastated** 73:19
**devastating** 73:20
**diabetes** 36:20
**diagnosed** 27:5
38:7,10 42:3
**diagnosis** 38:16
**diagram** 52:20
**diary** 32:5,8,10
**diet** 26:17,18 37:2
**diets** 26:19
**different** 7:17,25
14:15 20:14,21
28:18 57:24 58:18
58:20 75:3
**difficult** 7:20
63:10
**difficulty** 50:13
**digging** 68:22
**direction** 83:12
**directions** 52:13
**directly** 17:2
27:24
**disability** 78:7
**discharge** 62:17
62:20,24
**discomfort** 45:12
**discovery** 3:7
**discuss** 51:3,7,10
57:9

**discussed** 39:20
40:22 60:15 70:4
**discussion** 8:24
58:4,12
**discussions** 49:13
62:2
**disease** 36:17
**diseases** 36:7
**district** 1:1,1
**disturbing** 26:9
**division** 1:2
**divorce** 76:23 77:2
78:13
**doctor** 8:2,12,22
12:24 15:25 16:3
16:7 17:10 22:4,5
24:23 27:13 29:2
38:23 43:13 48:12
51:22
**doctors** 53:18
61:13 70:6 78:15
78:16 79:11
**document** 1:6 6:18
6:19 10:13
**documents** 6:21
6:25 72:5,9
**dog** 6:12
**doing** 9:11,15 14:3
14:8,11,19 15:7
19:24 51:6 53:19
53:20 56:5 63:2
**don** 2:11 6:10 24:1
24:5,13 63:10
68:21 73:16 78:9
78:11,15
**dosage** 5:9
**double** 22:19
33:17
**dr** 9:2 16:5 17:6
18:2 21:24 25:1
25:12 28:2 29:7

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[dr - first]**

Page 5

31:4 35:15 39:24
48:10,14,15,16,17
48:20 49:2,7,8,14
52:23 53:20 54:23
55:5,6,11,14,19
56:7 57:8 59:20
60:10,17,18,19
61:10 62:3 65:2,5
65:14,24 78:16
**drink**  39:15 75:22
75:23 76:1
**drinking**  75:25
**drop**  47:5
**drugs**  4:24 76:3
**due**  11:11 22:14
69:15,17 77:25
**dull**  9:21 11:20
12:10,12,18 14:14
14:16 20:15,25
24:20

**e**

**e**  2:8 6:2,2 8:15,15
18:3 71:16
**earlier**  21:13
74:22
**easier**  18:11 68:5
**easy**  64:6
**eat**  37:4,5
**eating**  26:14
**ec**  77:22
**education**  77:6,7
**educational**  77:4
**effect**  53:13,15
**effort**  68:3,4
**either**  46:3 59:22
59:25 62:12 65:12
72:9 74:6
**elliptical**  23:3
**emanating**  12:9
**embarrassing**
22:10,18

**emotional**  11:3
**emphasize**  68:4
**employed**  69:24
77:18
**empty**  46:1
**ended**  72:13
**energy**  65:1 69:18
**engage**  22:25
26:20 66:16 67:7
69:16
**english**  81:21
**enjoying**  67:24
**enormous**  49:21
50:22
**enter**  9:25
**entire**  53:9
**episiotomy**  33:17
**eroding**  16:15
**estrogen**  8:4,13
9:1,3,12,13,19
17:19
**evaluate**  55:11
**event**  41:24
**ew**  54:12
**exactly**  20:10
41:13 50:1 60:3,3
**exam**  12:24 29:18
44:9
**examination**  3:16
13:4,6 81:6 82:1
**excited**  51:20
**exciting**  75:20
**excuse**  45:11
77:12
**exercise**  7:10
11:11 21:12 22:13
22:15,22 23:5,10
23:11,23 26:4,11
37:13
**exercises**  22:24
51:11

**exercising**  14:1,9
23:19
**exhausted**  63:10
**exhausting**  12:19
68:23
**exhibit**  6:15,16,22
9:25 10:2 82:6,7,8
82:9
**experience**  14:8
21:11 24:18 38:17
40:19 44:13 45:22
47:14 48:3 56:24
59:14 68:7
**experienced**  14:15
18:6 20:15 42:5
46:13 80:3
**experiences**  43:5
**experiencing**
11:18 16:13 17:1
17:7 21:20 22:6
28:10 40:17 43:9
**expert**  55:8
**expires**  83:23,25
**explain**  52:21
**explained**  49:24
**explant**  34:18
**express**  67:14,21
68:6
**extra**  46:8,12

**f**

**f**  6:2
**face**  19:1,1
**facebook**  32:16
**fact**  7:1 8:18 10:1
72:11 82:9
**fairless**  1:17 83:2
83:21
**familiar**  10:10
**family**  26:24 27:2
79:18,20,25 80:3
80:15

**fast**  44:5
**fault**  28:11
**favorable**  56:21
**fear**  7:10 11:11
22:13,15,22
**federal**  3:8
**feel**  11:10 12:20
13:24 14:18 15:2
15:6,7,10,13,16,21
18:19 19:5,12
20:10,12,18,21
21:2 23:11 41:1,5
50:23
**feeling**  19:9 32:12
50:23
**feels**  69:19
**felt**  12:7 20:2 31:5
51:18,22 54:12
57:11,13,19
**fibroid**  35:6,19,20
35:21 40:1,12
**fibroids**  35:3 40:3
**figure**  17:5 42:19
**file**  73:9,10 74:2
74:25
**filed**  74:19 75:13
75:15 78:3
**files**  81:21
**filing**  76:20
**fill**  10:9,23
**filling**  31:22
**finally**  67:11
**find**  17:11 40:3
74:11
**fine**  60:13
**first**  3:2,20 8:5
15:10,24 16:7
18:9,16,18 19:23
25:3 29:23,24
41:9 42:3 47:8,15
49:6,10 54:2

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[first - helps]

Page 6

73:22 74:4 77:12
81:8
**fit** 53:18
**fitness** 23:4
**five** 9:9 13:7,9
29:6 33:23,24
61:16 63:17 81:22
**fixed** 65:23
**flag** 58:1
**flew** 69:5
**flies** 30:23
**floor** 2:8
**follow** 62:23 81:3
81:15
**follows** 3:3
**food** 27:16
**foods** 26:23
**footing** 31:5
**forceps** 33:20,21
33:22
**foregoing** 83:10
83:12
**forgot** 18:22
**form** 3:12 10:21
38:10
**forms** 32:21 59:2,6
59:6,9,16
**forth** 83:7
**found** 7:23 35:18
**four** 15:18 23:8,23
30:6 33:22 60:8
63:4 64:1,17 72:1
**frequent** 11:6 12:5
47:4
**frequently** 44:13
44:24
**friend** 51:21
**friends** 22:17
43:16 67:23 79:20
79:25 80:3,15

**front** 19:2 73:4
**fruit** 26:22
**frustrating** 15:8
**full** 5:17,20 63:4,8
64:4,11 79:3
83:13
**further** 81:14

## g

**g** 18:3
**gain** 7:11 26:3,15
26:25 27:8,20
36:23 37:7,14
**gained** 11:13 26:1
**gamut** 23:4
**gap** 18:15 64:17
**garden** 68:23
**gardens** 6:8
**gayle** 55:24
**general** 52:10 58:4
59:5 61:24 62:23
**generally** 12:12,20
27:11 80:24
**gentleman** 19:18
**gerken** 18:2
**getting** 11:10
19:13 20:3 47:1
64:10
**give** 5:17 16:21
25:12 71:1,6
**given** 58:13 59:9
62:17,19,24
**giving** 59:11,12
**go** 4:1,12,22 7:2
8:23 15:23 17:16
22:17 23:7 30:11
35:20 36:24 42:17
43:2 44:21 45:5
49:17,18 63:18,18
65:8 69:8
**god** 10:9 73:13

**goes** 20:25 75:24
**going** 4:1 6:23 8:7
8:10 9:15 12:2
16:16,22 17:16,18
17:19 26:6,10
29:14,23 30:24
31:3 35:20 43:4
46:11 49:19,25
53:5 56:24 57:3
57:13,23 61:19
65:23
**good** 10:6 31:5
42:20 44:11 53:17
65:2,15,17
**google** 72:23
**gosh** 22:20 41:10
**grand** 2:4
**grandchildren**
79:13,15
**great** 45:1 50:18
51:22 53:16 55:7
57:13 64:20 67:9
**greenberg** 2:7
**ground** 4:2
**grow** 25:22 68:8
68:12
**growing** 25:22
**gtlaw.com** 2:9
**guess** 21:9 72:14
**guessing** 25:19,24
30:21
**guidelines** 3:9
**guilty** 11:10 19:12
20:2
**gyn** 17:17,21 29:8
29:8
**gynecologist** 28:22
48:25

## h

**h** 8:16
**habitable** 42:18,18
**habits** 26:14
**half** 30:21
**hall** 29:9,13
**hand** 83:16
**hands** 38:15,18
**happen** 20:9 36:24
67:6
**happened** 23:16
**happens** 25:21
67:5
**happy** 36:4
**hard** 17:5 19:15
19:16 37:22
**hawaii** 69:5
**head** 4:5 25:23
52:19 54:16 70:7
72:20
**healing** 60:13
**health** 39:21 42:12
42:24
**healthful** 26:19
**healthfully** 26:18
**healthy** 41:5,6
**heard** 71:3
**heart** 36:17
**heather** 1:17 83:2
83:21
**heaviness** 7:9 11:6
12:5,8 14:14
**heavy** 35:12 40:17
40:20 75:25
**help** 9:21 10:23
15:5 16:19,20,23
26:15 40:16 48:7
50:16 52:20
**helped** 63:11
**helps** 15:1,7

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[hereof - january]**

Page 7

| | | | |
|---|---|---|---|
| **hereof** 83:7 | 78:23 79:24 | 59:19 61:20,21,21 | **inside** 12:22 |
| **hereto** 82:10 | **hurt** 12:13 22:23 | 62:20 66:8,15,22 | **instruct** 73:5 |
| **hernia** 80:16,20,22 | **hurts** 12:25 | 66:25 68:2,2,17 | **instructions** 62:17 |
| **hesitant** 38:13 | **husband** 6:10 7:16 | 69:6,11,15,19 | 62:20,24 71:7 |
| **hey** 8:21 | 7:23 13:23 19:15 | 70:17,22 78:22 | **instrument** 54:21 |
| **hide** 19:22 | 22:10 29:21 42:11 | **implantation** 11:4 | **insurance** 31:20 |
| **high** 26:23 32:9 | 42:22 68:8 | **implanted** 42:6,9 | 31:20 59:13 |
| 64:13 77:19 | **hypertension** | 56:10,11 74:15 | **intense** 20:22 |
| **hikes** 69:8 | 36:18 | 75:5 | 21:10,15 24:21 |
| **hiking** 69:12 | **hysterectomies** | **implanting** 16:4 | **intercourse** 7:10 |
| **hips** 14:24 | 35:16 | 55:19 | 7:22 11:8,9,21,22 |
| **hire** 76:24 | **hysterectomy** | **implants** 34:17 | 18:6,16,24 19:9,17 |
| **history** 26:24 27:2 | 34:21,22 43:12,13 | **implied** 56:14 | 20:11,24 21:2,14 |
| 33:9 77:7 | 43:15 47:21 49:1 | **important** 53:6,8 | 21:17,20 22:5 |
| **hobbies** 68:15 | 49:3,9 53:5,7,14 | 76:15 | 57:24 66:16 67:8 |
| **hold** 50:3,4 77:15 | 57:6 60:20 62:7 | **inability** 26:11 | 67:16 |
| **home** 24:1 46:23 | 62:21 | **including** 11:2 | **interest** 75:8 |
| 77:22 | | **incontinence** | **interested** 57:5 |
| **honestly** 20:6 | **i** | 43:18 44:4,14 | **interesting** 49:15 |
| 25:20 | | 46:7 47:4,11,14,17 | **interfere** 53:4 |
| **hoped** 16:18 | **ibuprofen** 15:4 | 48:3,6 49:16 | **intermittent** 15:11 |
| **horrible** 67:13 | **idea** 20:6 32:19 | 51:18 63:20,24 | **interrupting** 4:17 |
| **hospital** 30:4,9 | 40:6 44:11 54:11 | 65:9,23 66:7,14 | **introduction** 61:5 |
| 55:8 62:6,10,15 | 54:18,22 67:9 | 80:4 | **investigated** 24:8 |
| **hospitalizations** | 81:1,11 | **incorporate** 6:24 | **involving** 80:10 |
| 40:24 | **ignored** 6:13 | **independent** 56:22 | **issue** 14:1 27:9 |
| **hoth** 31:18 42:4 | **immovable** 17:16 | **index** 36:25 82:1,6 | 36:23 45:6,7,24 |
| 48:17 | **impact** 46:7 | **indicates** 18:23 | 50:7,11 75:1 |
| **hour** 1:19 72:1 | **impacted** 37:7,10 | 19:12 39:23 | **issues** 7:14,20 9:1 |
| **hours** 72:1 | 37:16 | **individually** 30:14 | 9:5 11:14 12:3 |
| **house** 67:24 | **implant** 7:12,15 | **infections** 36:7 | 28:10 31:6 36:9 |
| **household** 37:10 | 7:19 11:11,25 | 45:15 | 36:10,13 37:24 |
| 46:20 | 13:18,21 14:6,10 | **informative** 52:7 | 39:19,21 40:23 |
| **huge** 31:2 41:16 | 15:25 16:8,22 | 57:12 | 41:16 43:18 49:23 |
| **huh** 10:20 13:10 | 17:1 18:13,14 | **informed** 58:4,12 | 57:14 58:25 63:24 |
| 15:22 16:5 18:20 | 19:13 20:3 22:25 | **injuries** 11:2,3,19 | 64:7,8,10 66:4 |
| 19:7 20:13 29:22 | 23:6 24:5 25:6,13 | 81:10 | 72:19 75:2,2 |
| 32:4 38:3 44:20 | 26:2,15 31:7 32:2 | **injury** 7:5 27:24 | |
| 46:15,17 48:9 | 37:3 40:25 42:13 | **inkling** 58:24 | **j** |
| 52:2 55:21 60:6 | 43:6,10 45:10,13 | **inserting** 9:13,19 | |
| 63:1,13 66:5 74:3 | 45:16,18,23 46:5 | | **january** 6:6 25:3,4 |
| | 51:5 52:1,5 53:13 | | 59:23,24 61:22 |
| | 53:23 54:24 56:18 | | |

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[jeff - loose]

Page 8

**jeff** 3:11 8:17 10:5
  81:3
**jeffrey** 2:3
**jkuntz** 2:5
**job** 77:25
**joel** 76:25
**journal** 32:5,7,10
**julie** 48:23,24,24
**jury** 76:12,13,15

**k**

**k** 6:2 8:15 18:3
**kah** 77:19
**kansas** 2:4
**kayaking** 69:13
**keep** 4:18 32:5,10
**keeping** 32:7
**kellieanne** 79:6
**kept** 7:21
**kicking** 14:22
**kidney** 36:12
**kim** 16:5 21:24
  25:1,12 28:2
  43:14 48:10,14,15
  48:16,20 49:1,2,7
  49:14 52:23 55:14
  55:19 56:7 57:8
  59:20 60:18 61:10
  62:3 65:2,5,14,24
  78:16
**kim's** 54:23 55:11
**kind** 7:21 8:11
  14:22 15:11 19:13
  20:3,24 23:7 56:5
  64:7 67:12 69:8
  71:17,18 73:8
**kinds** 14:2 19:2
  35:9 64:16
**knew** 35:10 73:15
  74:15
**know** 4:11,20 5:9
  8:14 12:11,13,14

12:16 13:15,22
14:2,20,23 15:9,14
16:16 17:3,12,14
17:14,21 18:2
19:1,1,17,20,22
20:1 21:3,4,8 22:7
22:19 23:7,18,21
23:24 24:1,2,2,5,6
24:20 25:5,7,10,10
25:11,15,19,21
26:6,21,22 27:13
27:21 29:7,15
31:12 32:24 34:8
34:25 35:17,22
36:25 37:5,14
38:9 41:16,18,22
43:6,19,20 44:7,8
45:5,21 46:3,9,10
47:19,21 48:21
49:16,25 50:1,3,7
50:12,12,17 51:17
52:9,13,17 53:17
54:9,12,16,17 55:3
55:7,25 57:7,14,20
58:14,15 59:11,22
60:24 61:1,1,24
62:5,12,13 63:5,9
64:9,20 66:13
68:18 69:17,20,24
69:25 70:12 71:4
72:12 73:16 74:7
74:19 75:4,11,22
80:9,14,17,17,18
80:20,22 81:1
**known** 5:23
**knows** 35:23 73:19
**kuehl** 8:15 9:2
  13:7 17:6 28:17
  29:7
**kuntz** 2:3 3:14
  6:23 8:18,23 10:3

10:6 27:25 33:2
36:3 58:6 61:17
81:4,7,14 82:4

**l**

**l** 1:17 6:2 8:15
  83:2,21
**lacerations** 33:15
**laid** 63:4
**lasting** 38:6
**law** 23:20
**lawsuit** 70:4 75:9
  75:15 76:20
**lawyer** 70:18,19
  70:21 74:17
**lawyers** 70:3
**laying** 11:21
**leah** 2:7 3:18
**leakage** 44:6 45:8
  46:13
**led** 81:9
**left** 50:22 77:25
**leg** 37:24
**legal** 80:1
**legs** 14:22
**length** 11:7
**lessened** 19:10
**level** 66:11
**levels** 69:18
**lexapro** 5:13 31:10
  31:11,12,14,17,23
  31:25
**liability** 1:5
**licenses** 77:15
**life** 19:19 20:5
  39:21 46:7 53:9
  58:23 66:7 73:20
**lift** 23:12,14
**ligation** 35:24,25
  41:4
**limited** 66:21

**line** 43:4
**list** 73:14
**listed** 7:15
**literacy** 77:22
**literature** 52:3,11
  52:15
**litigation** 1:5
**little** 12:3 19:14
  34:3 47:23 48:13
  57:7,7 64:25
**live** 6:7,9 43:17
  79:8
**living** 64:12 67:23
**llp** 2:3,7
**lns** 1:20
**local** 29:16 38:23
**located** 30:17
  43:13
**lois** 76:25
**long** 10:9 18:14
  20:23 25:5,10
  31:19,25 34:9
  38:6 49:10 55:4
  62:14 63:14 64:18
  69:8 71:18,25
  78:9
**longer** 30:3 64:25
  68:16
**look** 6:17 32:25
  52:13 72:11,15
  75:11
**looked** 17:12
  52:18 72:25
**looking** 9:4,4
**looks** 10:10 13:2
  49:23
**loose** 11:12 16:14
  22:14 23:15,17,18
  24:19,24 25:6,11
  25:14,18

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.
April 24, 2017

**[loss - note]**

Page 9

loss 67:3
lost 68:25
lot 6:25 51:23 53:2
55:3 63:5,8 68:3,4
69:12,12,13
lots 26:21
love 24:6,15 33:2
67:14,17,21 68:6
lower 69:18
lucky 41:6
lynn 31:18 42:4
48:17

**m**

m 2:3
machines 23:3
mackie 2:11
mail 71:16
making 24:15 67:2
68:25
management 29:2
manufacturer
53:23
manzanita 30:18
mark 6:14
marked 6:16 10:2
marriage 42:12
67:18
married 19:20
42:16 78:9
mass 36:25
master's 77:5,6,11
matter 3:19 83:10
mdl 1:4 3:9
mean 7:22 15:13
16:3 17:2,3 18:8
18:25 19:10 20:6
22:15,16 24:12
25:23 26:12 29:15
30:22 36:22 40:12
42:25 49:2 50:10
51:21 52:7,25

57:22,24 58:14,16
58:19,21 63:4
66:17,21 68:21,22
68:24 69:13 72:4
75:24
media 32:21 33:5
medical 33:9
40:23 45:24 72:15
72:17 77:25 79:20
medication 31:11
35:19
medications 4:25
5:4 31:8,8 51:7
medicine 5:12
meet 60:22 72:2
meeting 49:6,10
meetings 71:25
member 79:18
memory 5:2,14
mending 18:10
menstrual 35:12
mental 42:11,23
mention 56:16
mentioned 10:17
57:25
mesh 7:12,15,19
9:5 11:4,10,12,15
11:25 13:3,18
14:5,9 15:24 16:1
16:8,14,22 17:1,4
17:14 18:14 19:13
20:3,6 22:1,14,25
23:6,15,17 24:9,9
24:16,18,23 25:5
25:13 26:1,10,15
28:2 33:6 34:18
34:20 40:25 43:24
44:3,11 50:16
51:5 52:1,5 53:13
53:23 54:24 57:2
58:21 62:20 66:8

66:15 68:1,2,16
69:11,15,18 70:16
70:22 73:12 74:16
75:6 78:22 80:10
80:20
message 33:5
met 3:20 23:21
49:8 71:19,19,21
71:24
michael 79:5
middle 22:19
miles 12:16
military 76:8
milligrams 5:10
5:13
mind 15:17 39:22
minute 61:16
miscarriages
34:13
mitchell 35:15
39:24
mo 2:4
moment 51:2
monday 1:19
month 8:6
months 18:17,18
23:8 30:6,6,13
67:10,10
mood 41:16
morning 13:16
15:10 65:13 71:20
motions 3:12
move 12:10 18:5
56:3 63:10
moved 28:18
movement 46:2
50:18
movements 14:20
moving 14:24
muscle 38:3 39:4
50:14

muscles 50:15

**n**

n 6:2 18:3
name 3:18 5:20
8:14,15 17:21
30:8 48:13 53:22
55:22 79:3
names 5:24 77:13
79:2
neah 77:19
neck 38:1
need 4:19 17:20
33:15 50:5,15
65:6,8 72:14 79:3
needed 35:17
72:12
needs 8:9
negligent 70:14
nehalem 6:8
neighbor 55:4,17
74:22 75:5
neighbor's 55:22
nerves 38:4
never 12:7 22:8
26:8 29:10,17
32:24 39:14 57:23
58:21 59:1 60:19
60:20 72:17
new 8:22 28:19
newspaper 72:25
nie 77:19
night 9:12 24:7
71:19
nights 62:16
nod 4:5
nope 30:10 33:7
76:9 78:2,5
normal 45:3 64:9
64:19 66:11
note 81:19

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[notes - picture]

Page 10

| notes | okay | p | pelvic |
|---|---|---|---|

**notes**  81:19 83:10
**notice**  1:15 6:15
6:24 12:15 82:8
**noticeable**  12:17
47:13
**noticed**  23:19
**number**  73:17,21
74:12
**nurse**  55:2 59:10
79:22
**nurses**  70:6
**nursey**  43:16

**o**

**o**  6:2
**o'clock**  65:13
**oath**  3:3 4:7
**ob**  17:17,21 29:8,8
**obesity**  26:24
**objection**  27:25
58:6
**objections**  3:12
6:24
**objects**  4:12
**obstetrician**  48:25
**obtain**  76:19
**obvious**  17:2
**obviously**  19:20
20:8 66:17
**occasionally**  32:11
39:16 75:22
**occasions**  11:23
**occur**  46:14
**ockenfels**  5:25 6:1
**offering**  74:16
**office**  17:11
**offices**  1:20
**oh**  10:9 22:20 36:3
44:23 54:15 62:18
63:6 73:13 76:11
79:16

**okay**  4:1,23 5:11
7:4,8 9:14 10:15
12:2,23 13:11
14:8,21 16:6,8
18:1,5 20:20,23
21:5,16,23 22:12
22:24 24:17 25:5
25:9,12,16,25
27:23 30:11 31:16
34:1 38:17 40:2
40:16 43:8,21
47:14 48:6 49:6
50:20 53:10 57:8
62:9 70:20,25
79:5 80:12 81:2
**old**  26:12 34:9
**older**  80:7
**oldest**  34:8 79:22
**once**  21:16 39:18
76:1
**ones**  10:18 28:19
42:20
**ongoing**  8:11 31:9
**online**  56:23 58:23
**op**  60:4,11
**opinion**  65:20
**option**  51:16
**options**  11:9 16:21
18:24
**oral**  83:9,14
**order**  3:10,10
**oregon**  6:5,8 30:18
77:10,14 83:4,16
83:22
**orgasm**  67:1,4
**orgasms**  66:23
**ovaries**  34:24
**overnight**  62:6,8
**overweight**  26:8
37:22

**p**

**p**  2:7
**pad**  44:18
**pads**  46:12
**page**  10:11 11:1,17
32:16,18 39:23
73:4 82:2,7
**pages**  83:12
**pain**  7:10,22 9:20
9:21 11:8,13
13:17,24 14:4,11
14:13,14,15,16
15:2,9,11,16,20,20
15:24 16:1,12,19
16:20,23,25 17:7
17:13 18:6,7,12,19
19:6,9,17 20:10,15
20:17,19,21,23,25
21:1,6,10,11,16,18
21:19 22:2,5,20
23:24 24:17,21
28:4 29:2 34:1,5
37:15 38:1,17,19
38:25 39:1,2,8,9
45:9 46:4
**painful**  11:21
19:24 34:4 67:6
67:10,12 68:23
**pains**  12:10 14:17
14:18
**palo**  2:8
**paper**  54:4
**parents**  26:12
**part**  8:5 16:2,10
16:11 19:19 25:3
34:18,19 50:18
57:16
**party**  75:10
**passing**  80:8
**patient**  52:3

**pelvic**  1:4 7:9 11:4
11:7,20 12:6
13:12 15:20 16:12
17:7 34:1 36:9
40:22 43:9 45:13
**pelvis**  8:5 12:21
34:19
**penis**  24:15
**people**  26:7,12
55:3
**perform**  56:8
**period**  12:17
41:15,18 48:4
57:21 64:5
**permission**  59:12
59:13
**person**  41:6 52:12
55:5 60:25 68:22
71:24
**personal**  7:5
**personally**  10:21
19:16 42:22 83:6
**perused**  59:17
**pfs**  7:15 18:23
19:12 22:12 25:25
36:22 39:23
**physical**  11:3
51:10 77:25
**physicals**  27:14
**physician**  15:19
15:20 16:4 21:19
27:8,18,23 28:9,13
28:20 29:5 31:18
48:7 55:19 58:3
65:3,15,18
**physician's**  58:11
**physicians**  28:16
28:18 71:2,7
**picnic**  57:7
**picture**  52:18

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

[pictures - recess]

Page 11

pictures  52:13,17
piece  54:4
pieces  68:5
pinched  38:4
pinterest  32:25,25
  33:2
place  6:4 43:13
  83:6,8
placed  41:14
places  37:23
plagued  58:25
plaintiff  1:7 2:5
  9:25 82:9
plaintiff's  7:1
plate  77:23
platforms  32:22
played  54:10
please  4:4,10 5:20
  6:1
point  8:17 18:19
  58:14 61:1 80:13
poking  17:4 24:9
  28:3
poor  7:23
portland  1:22
  48:23 83:16
position  21:8
positions  19:2,5,6
  19:8 21:5
post  32:19 60:4,11
  61:20 66:20,25
  69:6
posted  33:4
pounds  11:13 26:1
  26:6
practice  52:10
  58:4 59:5 62:23
practitioner  8:3
pregnant  33:10
prepare  71:15,22
  71:23 72:2,6,10

prescribed  8:12
  31:16 41:8 42:8
prescription  5:4
  31:22
prescriptions  5:7
presence  28:14
present  2:11
pretrial  3:9,10
pretty  15:8 17:15
  22:9,18 26:8
  31:19 44:4 51:2
  51:17,19
previously  75:5
primary  28:20
prior  14:5,7 23:5
  31:7 33:8 43:10
  45:3,16,18 46:4
  55:10 57:8 66:15
  76:20
private  32:18
probably  23:23
  32:1 38:5 47:24
  50:2 63:16 66:18
  66:18 69:10
problem  48:5
  53:11
problems  48:11
  50:6
procedure  3:8
  25:6 28:7 40:2,5
  40:14,16,20 52:21
  52:24 53:6,16,19
  60:18
procedures  35:17
  40:23 50:9
proceedings  83:9
  83:14
process  74:13
produced  6:25
product  11:15
  27:19,24 42:6,9

56:11,16,18 57:2
  61:2 75:6 81:9,12
products  1:4 11:5
  28:14 71:10
professional  1:17
  42:24 77:15 83:3
prognosis  60:11
proud  39:14
provide  52:3
psychiatric  78:1
psychiatrist  28:24
psychologist  28:25
  42:25
public  37:23
pulitzer  30:12,16
  30:20 31:4
pulled  38:3 39:4
pulmonary  36:10
purpose  9:18
  30:24 38:24
purposely  73:4
purposes  3:7,7
pursuant  1:15 7:1
put  24:5

q

qualifications  56:8
quervain's  39:5
question  4:10,13
  4:17,21 11:1,17
  19:25 22:13 45:1
  58:9 64:20 67:9
  80:12 81:4
questions  43:4
  52:23,25 53:3
  73:6 81:3,14
quick  56:3 61:15
quickly  47:22
quit  24:1
quite  79:7

r

r  18:3
rae  5:22
rare  11:23
rate  15:15 56:17
read  32:20 52:4,10
  58:23 59:5,15,17
  69:9
reading  63:6
  64:16
reads  52:12
ready  31:6
realized  81:8
realizing  19:24
really  12:9 13:15
  13:19 14:3 16:16
  19:11,23 20:24
  22:8,23 24:3,7,9
  24:20 26:9 29:24
  31:1 35:14 41:5
  47:10,22 50:16
  51:2,18,22 53:1,11
  56:5 57:14 63:4,7
  63:9 64:25 68:23
  75:1,25 76:2
reason  5:14 13:20
  25:13 28:4 35:10
  54:11 62:8 66:2,8
  76:19
rebecca  79:6
recall  16:24 25:15
  41:8,12 42:15
  49:10 62:19 63:14
  63:22 74:9 76:24
receive  74:14 77:8
  77:11
received  70:23
  71:11
receiving  57:3
recess  61:18

Becky Smith

April 24, 2017

Smith, Becky vs. C. R. Bard, Inc.

[recommendation - set]

Page 12

recommendation
51:25 54:23
recommended
43:16 51:20 55:2
55:6
record   4:5,18 5:21
8:23,24 83:13
records   72:16,17
recover   75:9
recovery   53:4 56:2
57:21 63:8 64:5
recreational   76:3
red   58:1
reding   5:25 6:2
redone   55:18 56:1
reduce   27:16
35:19
reduction   26:22
refer   74:16
referred   48:15,16
48:19
regained   66:11
regards   20:20
regime   8:4
regimen   8:13 9:2,4
37:3
region   11:20 20:11
registered   1:17
79:22 83:2
regular   8:3 32:6
32:10
regularly   26:17
relate   7:14 43:5
related   11:18
15:12 17:1,2
27:19 40:23
relates   1:6
relationship   7:24
67:18
relieve   15:1 16:23
38:25 44:7

remember   5:1
18:2,8 25:20
29:25 30:8 38:5
39:6 48:19 51:6
52:6,9,15,17,22
53:25 54:1,2,11
56:20,21 57:16,22
58:2,10 62:2,5,11
62:14 73:22
remembered   1:15
48:13
removed   16:2,8
rendering   76:16
repair   5:4 80:9,16
80:21,22,25
repeat   58:8
rephrase   4:11
reported   83:8
reporter   1:18,18
3:2 4:3,19 29:12
83:3,4,5
reporting   1:20
represent   3:18
representative
54:3,6,15 69:25
70:1
representatives
60:23
represented   61:2
representing
54:19
research   56:23
57:1 72:18,23
73:2
reserved   3:13
residual   49:20
resolve   63:23
resolved   66:9,10
response   6:22
responses   10:12
10:16

responsibilities
79:18
restricted   46:22
restroom   50:21
result   11:25 47:6
48:6 68:16
resulted   11:4
return   64:19
returned   64:18
review   6:18 10:8
72:5,9
revision   25:3
59:24 65:7
right   5:4 8:2,4,20
9:24 10:18 13:3
15:13 36:4 40:4
40:10 48:17 62:9
63:3 75:9 76:4,5
79:23
rigorously   26:11
risks   57:9,18,19
57:20,22
road   6:8 50:8,11
rockaway   77:19
role   54:10
room   23:3 29:15
29:18
routine   23:20
rules   3:8 4:2

s

s   6:2
s.w.   1:21
sacks   76:25
sagging   49:24
sales   60:22
sat   69:9
saw   15:25 16:7
25:2 27:18 29:4
30:5,9,12,19 35:14
35:18 48:10 59:20
60:19 65:10 73:11

73:22 78:16
says   11:2 23:15
59:11,11
scale   15:15
scary   47:23
school   32:9 64:13
77:19
scraping   24:7,12
24:15 40:7
seaside   6:5 31:19
second   10:8 21:24
28:7 33:17,21
54:3
secondary   77:6,7
security   78:6
see   4:2 8:7 9:21
13:5 15:23,24
17:7,14,20 22:4
24:23 25:1 27:8
29:8 30:14,15,24
31:3 40:11,13
42:17,18,19 43:17
48:14,21 49:19
52:19 60:4 61:12
65:8 68:18 73:2
seeing   8:2,8,22
65:5
seek   42:11 48:7
seen   6:18 15:19
21:19 55:5,5
72:17
sensation   45:25
separate   62:19
separated   78:11
serious   47:5 51:17
51:18
seriously   24:20
served   76:7,10,13
session   14:12
set   83:7

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[setting - sure]**

Page 13

setting 71:17
settle 54:16
seven 30:3,13
severe 7:9 11:8,22
18:6 22:20 35:14
44:4,5
sex 19:22 46:4
66:23 67:4,5
sexual 7:20 19:21
20:7 57:24 66:12
66:16 67:8,15
sexuality 68:5
sexually 36:7
shaking 70:7
72:20
shared 71:9
sharp 12:10 20:19
21:10,18 24:7,12
24:21
sharper 14:17,18
shawn 8:14 9:2
13:7 17:6 28:17
29:19 31:24
sheet 7:1 8:19 10:1
72:11 82:9
shifting 43:7
shocking 51:1,2
shorthand 1:18
3:2 83:4
shortly 74:7
shot 38:20,22
shoulder 4:6
shrug 4:6
sic 8:16 18:3 43:16
side 14:24,25
sides 76:16
sightsee 69:12
sign 54:4
signature 10:11
81:17 83:19

signed 59:2
significant 38:6
39:20 40:23 41:24
signing 59:6
signs 41:17
similar 21:11,14
31:12 39:7
singulair 5:8
31:10
sister 63:11 70:5
73:11 78:20
sit 10:15 12:8
six 9:15 30:2,13
33:11,13 41:15
60:8,20 63:17,18
64:1,17 78:24
skills 55:11 65:20
sleep 41:16,19
sling 13:3 17:15
43:24,24 44:3,10
49:3 50:2 51:4
52:1,4 53:12,20
54:24 55:17 56:1
62:21 70:22
slow 40:8
smith 1:7,12,16
3:1,6 5:22 6:15
82:8
smith's 9:25
smoke 39:11,13
snacking 26:22
sneezing 44:5
social 32:21 33:5
37:17 64:15 77:20
78:6
sold 75:8
solution 48:10
50:2
solve 57:14
somebody 30:4
48:22

somewhat 21:11
son 23:19
sorry 16:3 18:22
19:25 25:11 26:12
29:12 30:8 45:2
62:13 70:9 74:10
76:11 80:23
sort 12:9 38:19
42:19
sought 42:23
southern 1:1
speak 60:17 61:7
specialist 35:14
43:15
specific 20:11
71:13
specifically 57:1
58:2
speeding 75:21
spell 6:1 8:15 18:3
spent 53:2
spine 37:24
spoke 29:8 55:22
74:22 75:5
spoken 69:23
spouse 67:2,15
spurts 23:7
start 9:8 18:7 23:9
29:23 32:7 37:19
started 8:3 9:7
23:20,25 41:9
47:18 64:24
starting 8:10
state 5:20 22:12
25:25
stated 18:23
states 1:1 36:22
stay 62:6
stayed 62:8,15
steno 81:19

stenotype 83:8
stephens 55:24
steroid 38:20,21
stitched 33:15
stop 14:3,11 22:19
31:3 65:5
stops 21:17
story 76:16
strained 7:24
strange 12:18
54:13
strauss 39:25
street 1:21
strength 21:9 65:1
strenuous 46:11
46:14 68:21
stretching 14:23
strike 3:12 47:7
strong 67:19
struggle 26:6
studies 64:15
77:20
subject 64:14
success 56:17
sue 65:24 66:2
sued 75:17
sugar 26:21
suggested 48:14
suit 73:9,10 74:2
74:19,25
suite 2:4
super 58:1
support 11:5
suppose 32:25
supposed 63:17
sure 8:10 9:3 15:7
19:23 22:7,8
30:22 37:15 40:8
40:10 45:1 46:11
52:25 57:11,14
59:4 61:17 62:18

Veritext Legal Solutions

800.808.4958

770.343.9696

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[sure - told]**

Page 14

72:12 78:18 80:19
**surgeries**  25:7
  54:2
**surgery**  16:15,16
  16:17 18:9 21:24
  25:4 31:7 32:3
  34:17,19 42:13
  43:6,10,11 53:24
  54:3,5,9 55:10,13
  55:15,16 56:8,15
  57:5,8,9,13,18,20
  58:22 59:1,2,10,12
  59:19,24 60:2,25
  61:4,8,11,11,12,20
  61:21 62:3,4 63:2
  63:3,21,23 64:10
  65:7,7 66:15,20,22
**surgical**  40:2
**sustain**  14:12
**swallow**  46:18
**sweetheart**  19:18
**swinging**  76:2
**switched**  31:12
**sworn**  3:2
**symptoms**  11:18
  43:5,9 46:25
  63:21 69:6 73:14
  73:15
**system**  1:4 41:23

**t**

**take**  4:22 5:8,12
  6:17 10:7 12:15
  15:3 22:16,23
  35:21 51:8 61:15
  64:18 66:13 69:3
**taken**  1:13,16 3:6
  3:23 65:9 68:3,4
**talk**  18:5 19:14
  20:4 22:4,10
  23:16 25:16 27:12
  33:8 43:21 54:6

55:16 61:20 66:6
  73:8 78:22
**talked**  8:8 15:19
  17:18 21:24 22:9
  29:19 36:23 41:2
  41:7 43:22 44:10
  50:4 55:13 57:15
  60:21 66:3 71:16
  73:12,15 81:10
**talking**  74:23
**teach**  64:14,15,16
  77:20,22
**teacher**  64:13,15
**teaching**  77:17
**tearing**  33:14
**television**  73:23
**tell**  3:3 12:4 16:25
  22:15 25:12 26:2
  27:15 35:22 39:1
  48:21 49:13,25
  53:1,22 56:17
  65:11 77:3
**telling**  19:16 71:13
  71:18
**tells**  59:10
**ten**  15:15 32:1
  79:16,16 81:20
**tendinitis**  39:6
**terminated**  77:24
**terms**  34:25
**terribly**  26:8
**testified**  3:3
**testify**  5:1
**testifying**  4:7,8
**testimony**  5:18
  58:11 83:8,14
**thank**  18:22 46:19
**therapy**  39:8
  42:12,23 43:2
  51:10

**thereof**  83:15
**thing**  4:20 14:22
  15:10 53:25
**things**  14:2 18:10
  19:3 27:14,16
  32:11,19,20,20
  42:19 47:22 64:16
  68:18 69:13 77:23
**think**  8:16,18,19
  15:6 17:5,23 18:1
  18:9 21:22 24:8
  25:2,23 26:4
  27:22 31:10,18
  32:23 34:4,8 35:6
  38:14 40:6,7,8,15
  41:4,21 42:4,14
  43:3 47:20,22
  50:16 52:7,18
  53:2,3 56:2,2,5,14
  56:21 60:9,13
  61:5,14 62:12
  63:16 64:9,24
  65:22 68:3 78:19
  78:20 80:18
**thinking**  7:16,18
  54:14
**third**  75:10
**thomas**  79:7
**thorough**  57:12
**thoroughly**  59:18
**thought**  21:25
  50:10 54:13 63:5
  81:12
**three**  12:16 23:8
  23:21 30:6 47:12
  60:8 62:16 66:18
  72:1
**thrust**  21:9
**thrusting**  21:8
**thumb**  38:19

**thyroid**  27:2,5
  36:12
**ticket**  75:21
**tillamook**  18:4
**time**  3:20 4:19
  11:8,21 12:18,24
  13:5,15 14:23
  18:9,11,18 19:15
  19:16 23:8 29:4
  29:24 30:19,22
  31:19 34:9,20
  35:13,16 41:10
  43:25 47:1 49:4,5
  53:2,4,16,18 54:14
  55:4 57:5 59:20
  59:22 63:7,12
  64:11,22,23 65:10
  67:7,11,12 69:2
  71:16 72:18 74:6
  76:24 78:18,20
  81:8,11 83:6,7
**times**  7:17,25
  12:16 13:25 21:6
  23:21 33:9 44:17
  56:11,15 66:14,18
  71:17,21
**tired**  12:13 63:10
  64:9
**tissue**  9:22 16:14
  24:22 25:22
**today**  4:4 5:15,18
  10:15 32:13 71:15
  71:23 72:3,7,10,25
  73:6
**told**  17:13 24:1
  27:18,23 28:9
  53:18 56:6 67:11
  70:11,13,16,21
  71:1,6 73:18
  75:20

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[ton - went]**

Page 15

| | | | |
|---|---|---|---|
| ton   26:7 68:18 | two   6:25 7:25 | urgency   45:5 | wake   13:16 |
| tore   56:3 | 12:16 18:17,18 | urinary   63:20,23 | walk   11:7 12:2,15 |
| total   34:22 71:23 | 23:21 25:7 28:17 | urinate   44:24 | 23:11 26:13 27:16 |
| training   79:21 | 28:18 30:21 34:17 | urinating   50:13 | walking   7:11 |
| 80:1 | 39:18 42:20 44:23 | urine   49:20,21 | 11:11 12:15 13:23 |
| transcribed   81:21 | 44:23 47:12 50:9 | 50:25 | 22:14 26:11 44:5 |
| 83:11 | 60:9 62:16 66:18 | urologist   43:14,22 | walks   67:25 |
| transcribing   4:3 | tylenol   15:4 76:4 | use   9:12 76:3 | walls   44:12 50:5 |
| transcription | type   13:17 14:15 | usually   26:19 59:9 | want   19:19,21 |
| 83:11 | 15:9 20:17 21:10 | 59:10,11 | 20:9 22:16,17,23 |
| transmitted   36:7 | 22:24 24:17 26:19 | uterine   39:24 | 33:8 36:24 43:20 |
| transvaginal   33:6 | 34:22 38:17 39:1 | uterus   40:7 | 57:4 66:6 73:8 |
| 57:2 73:12 74:16 | 39:2 53:13 | utis   45:15 | wanted   10:18 20:1 |
| traurig   2:7 | | | 20:3 40:10,13 |
| treated   22:8 50:17 | **u** | **v** | warnings   71:2 |
| treatment   9:10 | | | washington   83:3 |
| 35:8 56:23 | u   8:15 | v   1:8 | 83:24 |
| treatments   35:9 | uh   10:20 13:10 | vacation   69:3,4,7 | watched   54:9 |
| 51:4 | 15:22 16:5 18:20 | 69:11 | way   4:17 9:23 |
| trial   76:10 | 19:7 20:13 29:11 | vacuum   33:18 | 29:25 53:21 67:15 |
| tried   14:7 19:22 | 29:11,22 32:4 | vagina   20:13 | 68:5 |
| trim   16:18,22 | 38:3 44:20 45:11 | vaginal   24:11 | ways   67:21 |
| trimming   16:22 | 45:11 46:15,17 | 33:12,14 44:12 | wcllp.com   2:5 |
| 21:25 28:7 | 48:9 52:2 55:21 | 50:5 | weakening   50:15 |
| trouble   30:25 31:2 | 60:6 63:1,13 66:5 | vaginally   35:1,2 | wear   44:18 |
| true   10:12 83:13 | 70:12,12 74:3,21 | variety   77:23 | week   12:16 23:21 |
| trust   54:23 58:11 | 74:21 78:23 79:24 | vegetables   26:21 | 23:22 30:13 60:20 |
| 58:15 | ultimate   51:25 | verbally   4:4 | 64:17 66:19 |
| trusted   55:9 58:16 | ultimately   48:10 | verdict   76:17 | weekend   76:1,1 |
| truth   3:3 | unconsciously | verifying   10:12 | weeks   9:9,15 13:8 |
| try   4:4,16 9:20 | 68:19 | video   23:22 | 13:9 23:24 29:6 |
| 18:1 26:14 | undergone   40:24 | videoconferenci... | 39:18 41:16 60:8 |
| trying   8:4 19:3 | understand   4:7,10 | 1:21 | 60:8,8 63:5,17,18 |
| 21:22 29:25 40:8 | 4:14 | virginia   1:1 | 64:1 |
| tubal   35:24,25 | united   1:1 | visits   78:15 79:11 | weight   7:11 23:3 |
| 41:4 | university   2:8 | voluntarily   77:25 | 26:3,15,25 27:8,20 |
| turn   11:1 | 77:10,14 | **w** | 36:23 37:7,14 |
| tv   73:11 | untranscribed | | weights   23:12,14 |
| tweet   32:14 | 81:19 | wages   68:25 | went   7:25 23:2 |
| twice   71:24 | unusual   64:21,22 | wagstaff   2:3 | 24:1,25 28:6 |
| | ups   81:3,15 | waiting   46:18 53:1 | 29:19 31:1 35:21 |
| | upstairs   43:19 | waived   81:17 | |

Becky Smith
Smith, Becky vs. C. R. Bard, Inc.

April 24, 2017

**[went - zumba]**

Page 16

40:12 41:18 43:12
43:14,17,21 47:11
47:21 49:15 50:20
69:11 78:20
**west** 1:1
**western** 77:10,12
77:13
**witness** 7:3 8:20
29:14 33:3 36:4
58:8 62:11 76:10
83:5,16
**woman** 30:5 55:6
**women's** 55:7
**wonderful** 63:6
**wondering** 46:10
73:3
**work** 17:20 31:6
37:8 46:16 50:5
63:16,19 64:2,11
64:18,24 71:16
**workday** 64:5
**worked** 19:4 55:3
55:4
**workers** 78:3
**working** 41:23
**works** 69:20
**worse** 13:12 21:2
21:6,7 47:1,8
**wow** 36:3
**wrist** 38:20
**write** 32:11
**writing** 64:16
77:21
**written** 48:22
**wrong** 12:11 70:11
81:12
**wrote** 11:5,20 20:2

**y**

**yamhill** 1:21
**yeah** 13:1 17:25
22:22 26:17 29:14

37:22 42:14 44:16
45:8 49:17,23
55:8 61:10 72:22
74:3 78:17 79:4
80:14
**year** 15:25 24:4,4
25:7 42:16 48:1
60:2,3
**yearly** 27:14
**years** 18:13 28:17
30:3,21 32:1,1
34:9 47:12 78:10
81:20,22
**yep** 40:21
**yoga** 14:1,9,23
21:12 22:16 23:1
**yogurt** 26:22

**z**

**zumba** 14:2,9
22:17 23:2

West Virginia Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Review by Witness; Changes; Signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
subdivision (f)(1) whether any review was requested
and, if so, shall append any changes made by the
deponent during the period allowed.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 2

Jin-Hee Kim, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  CHARLESTON DIVISION

 4

 5   BECKY R. SMITH, et al.          )
                                     )
 6            Plaintiffs,            )
                                     )
 7       vs.                         ) Case No.
                                     ) 2:15-cv-16402
 8   C.R. Bard, Inc.,                )
                                     )
 9            Defendants.            )
     _____)

10

11

12            DEPOSITION OF JIN-HEE KIM, M.D.
              Taken in Behalf of the Plaintiffs

13
                        * * *

14
                 Thursday, June 13, 2019

15                   Portland, Oregon

16

17

18

     Reported by:

19       Shellene L. Iverson, CSR, CCR

20

21

22

23

24

25
```

Jin-Hee Kim, M.D.

Page 2

               INDEX
Deposition of:  Jin-Hee Kim, M.D.

        EXAMINATION INDEX
                          PAGE
DIRECT BY MS. SCARCELLO          5
CROSS BY MR. MANDELL            53
REDIRECT BY MS. SCARCELLO      132
RECROSS BY MR. MANDELL         168


        EXHIBIT INDEX
NO.  DESCRIPTION              PAGE
PLAINTIFFS'
1   "Amended Notice of Videotaped Deposition of  8
    Dr. Jin-Hee Kim" filed 5/22/19

2   Curriculum Vitae of Jin-Hee Kim        9

DEFENDANTS'

3   "Notice of Videotape Deposition of Dr.   54
    Jin-Hee Kim" dated 5/30/19
4   Align TO Instructions for Use        75
5   Avaulta Plus Instructions for Use    79
6   The Urology Clinic Medical Records   91

NOTE:  Deposition Exhibit Nos. 1 and 2 were marked
prior to the commencement of the proceedings.

Page 3

BE IT REMEMBERED THAT, pursuant to the
Oregon Rules of Civil Procedure, the deposition of
Jin-Hee Kim, M.D., was taken before Shellene L. Iverson,
a Certified Shorthand Reporter, in and for the state
of Oregon, commencing at the hour of 1:40 PM on the
13th day of June 2019, in the law offices of Hart
Wagner, 1000 Southwest Broadway, 20th Floor, in the
city of Portland, state of Oregon.

            APPEARANCES
For the Plaintiff:
    Lindsey N. Scarcello, Esquire
    WAGSTAFF & CARTMELL, LLP
    4740 Grand Avenue, #300
    Kansas City, Missouri  64112
    (816) 701-1100
    lscarcello@wcllp.com
For the Defendant:
    Michael Mandell, Esquire
    REED SMITH, LLP
    355 South Grand Avenue, #2900
    Los Angeles, California  90071
    (213) 457-8000
    mikemandell2@gmail.com
For the Witness:
    Aaron J. Potter, Esquire
    HART WAGNER, LLP
    1000 Southwest Broadway, #2000
    Portland, Oregon  97205
    (503) 222-4499
    ajp@hartwagner.com
Also Present:
    Colin Sorensen, Videographer, Discovery Media

            *  *  *

Page 4

        P R O C E E D I N G S


        THE VIDEOGRAPHER:  We are now on the
record.  My name is Colin Sorensen.  I am a
videographer for Golkow Litigation Services.
        Today's date is June 13, 2019, and the
time is 1:40 PM.
        This is the video deposition of
Dr. Jin-Hee Kim for the US District Court for the
Southern District of West Virginia, Charleston
Division.
        We are located today in Portland, Oregon,
in the matter of "Becky Smith vs. C.R. Bard,
Incorporated."
        Counsel, will you please introduce
yourselves for the record, and our court reporter,
Shellene Iverson, will swear the witness.
        MS. SCARCELLO:  Lindsey Scarcello on
behalf the plaintiff.
        MR. MANDELL:  Mike Mandell on behalf of
C.R. Bard, Inc.
        MR. POTTER:  Aaron Potter on behalf
Dr. Kim.
///
///

Page 5

        Jin-Hee Kim, M.D.
being first duly sworn by the Certified Shorthand
Reporter in the above cause, was examined and
Testified as follows:


        DIRECT EXAMINATION


BY MS. SCARCELLO:
    Q.  Hi, Dr. Kim.  Good afternoon.
    A.  Hi.
    Q.  Will you please state your name for the jury.
    A.  Jin-Hee Kim.
    Q.  And, Dr. Kim, as I said, my name is Lindsey
Scarcello.  I represent Becky Smith and her husband,
Don Mackie, in their product liability action against
C.R. Bard.
        You and I have never met or spoken before
today; is that right?
    A.  Correct.
    Q.  And you understand that you're not a party to
this lawsuit; is that right?
    A.  Yes.
    Q.  And you understand that Ms. Smith and her
husband have not offered any criticism of your care or
treatment in this lawsuit?

Jin-Hee Kim, M.D.

Page 6

1    A. Correct.
2    Q. Today I'll be asking some questions about your
3  care and treatment of Ms. Smith from late 2007 to
4  2009, but before we get started, have you ever given
5  your deposition before today?
6    A. Any deposition regarding this case?
7    Q. Not this case specifically, just at all.
8    A. Yes.
9    Q. Approximately how many depositions have you
10  given?
11    A. One.
12    Q. Okay.  And do you recall about when that was?
13    A. I believe it was June of 2018 although do not
14  quote me on that.
15    Q. That's okay.
16        So were you a witness in that -- in that
17  litigation?
18    A. I'm not sure I understand.  Witness?
19    Q. Or how about you explain how -- your
20  involvement in that case.
21    A. Similar deposition to this one.
22    Q. You said it was similar to this one?
23    A. Correct.
24    Q. Okay.  So were you a treating physician in a
25  case involving transvaginal mesh where an action had

Page 7

1  been brought against a manufacturer?
2    A. Yes.
3    Q. Okay.  And were you a defendant in that case?
4    A. No.
5    Q. Okay.  Have you ever provided expert witness
6  testimony?
7    A. No.
8    Q. Do you recall the name of the manufacturer of
9  the device involved in your 2018 deposition?
10    A. I do not.
11    Q. Okay.  So other than your one prior depo
12  regarding transvaginal mesh, you've never given any
13  other depositions at all.
14    A. That is correct.
15    Q. And have you ever testified in court?
16    A. No.
17    Q. Okay.  So you understand that the oath that
18  you swore before we began this afternoon is the same
19  oath that you would swear in a court of law?
20    A. Correct.
21    Q. And so you're under the same obligations to
22  testify truthfully and fully here today as you would
23  be if you were in a court of law.  Do you understand?
24    A. Yes.
25    Q. And is there any reason that you can't provide

Page 8

1  full, complete, truthful testimony here today?
2    A. No.
3    Q. One ground rule that makes things a little bit
4  easier for the court reporter is if we try to not talk
5  over one another.  So sometimes my question will
6  linger or you will know where I'm trying to go and be
7  inclined to answer, and other times I might interrupt
8  you with my question and I will try not to do that.
9  But it makes the court reporter's life a lot easier if
10  we wait for the other person to be completely done
11  talking before we start.
12        Can we both try to do that?
13    A. Yes.
14    Q. Great.
15        So before we get into Ms. Smith's care and
16  treatment, let's first discuss your educational and
17  professional background.  Actually, strike that.
18  Let's discuss the deposition notice which has been
19  marked as Exhibit 1.
20        And if the court reporter can please
21  provide that to the witness.
22        Have you seen this document before today?
23    A. Yes.
24    Q. Okay.  And was it provided to you by your
25  counsel?

Page 9

1    A. Correct.
2    Q. And there is a list of documents on the fourth
3  page of that that we requested that you bring with you
4  here today.  What documents have you brought with you?
5    A. My CV.
6    Q. Okay.  And there are documents related to your
7  care and treatment of Ms. Smith that were collected as
8  part of this litigation and were then provided to your
9  attorney.  Were those documents provided to you?
10    A. Yes.
11    Q. The medical records.  Okay.
12    A. Okay.
13    Q. Have -- do you have any independent way to go
14  out and get those medical records yourself?
15    A. No.  This is preelectronic medical records; so
16  they are all in storage, I believe.
17    Q. Okay.  Okay.  So we can set that aside and
18  move to your CV which has been marked as Exhibit 2.
19  If you could just give me an idea of your education
20  and training to become a surgeon.
21    A. I went to medical school at UCLA and did my
22  subsequent residency at UCLA as well.
23    Q. Any fellowships?
24    A. No.
25    Q. Okay.  And so you're -- you're a urologist; is

Jin-Hee Kim, M.D.

Page 10

1  that right?
2      A.  That is correct.
3      Q.  So do you in your current practice see male
4  and female patients?
5      A.  Yes.
6      Q.  In what specialties are you board certified?
7      A.  Urology.
8      Q.  Okay.  So you don't have a board certification
9  in female pelvic medicine and reconstructive --
10     A.  I have a subspecialty certification in female
11  pelvic floor and reconstructive surgery, yes.
12     Q.  Okay.  Have you done any research on behalf of
13  any mesh manufacturer?
14     A.  No.
15     Q.  Have you been involved in any studies
16  involving any mesh manufacturer?
17     A.  No.
18     Q.  Are you associated with any educational
19  institutions?
20     A.  No.
21     Q.  In what states are you licensed to practice
22  medicine?
23     A.  Oregon.
24     Q.  At what hospitals do you have privileges?
25     A.  Adventist Medical Center, Providence Medical

Page 11

1  Center, Legacy Emanuel, Legacy Good Sam, Legacy
2  Meridian Park.
3      Q.  And you're currently in private practice; is
4  that right?
5      A.  That is correct.
6      Q.  And how long have you been in private
7  practice?
8      A.  Can I look at my CV?
9      Q.  Of course.
10     A.  Since 2002.
11     Q.  All right.  In that time approximately how
12  many transvaginal mesh products do you think that you
13  implanted?  That can just be a ballpark.
14         MR. POTTER:  Are you asking how many
15  different types of products or how many surgeries --
16         MS. SCARCELLO:  How many --
17         MR. POTTER:  -- in total for the various
18  products?
19  BY MS. SCARCELLO:
20     Q.  How many surgeries in total for the various
21  products.
22     A.  And are you including pelvic floor
23  reconstruction and slings?
24     Q.  Yes.  You can break them up if you would like,
25  but I am interested to know both.

Page 12

1      A.  In the last 17 years?
2      Q.  Uh-huh, yes.
3          MR. MANDELL:  I'm going to object to
4  relevance.  It should be limited to 2008.
5  BY MS. SCARCELLO:
6      Q.  You can go ahead and answer the question.  I'm
7  just trying to get an idea of your experience.
8      A.  How about we just go by year because it will
9  be easier for me to calculate in my head here.
10     Q.  Okay.
11     A.  And let's say I do -- and this is very rough,
12  very rough estimation.  Perhaps five to ten cases a
13  month.
14     Q.  For the last 17 years?
15     A.  Yes.
16     Q.  Okay.
17     A.  Maybe less.  I mean it's very rough.
18     Q.  Right.  That's -- I appreciate that.  I'm --
19  I'm just trying to get a broad idea of your
20  experience.  So it's not -- certainly not a memory
21  quiz.
22         And of those approximately how many were
23  implanted for the treatment of pelvic organ prolapse?
24     A.  Let's say roughly two per -- three per month,
25  again, extremely rough estimate.

Page 13

1      Q.  Fair enough.  You said three per month; right?
2      A.  Uh-huh.
3      Q.  Okay.  For the last 17 years?
4      A.  Yes.
5      Q.  Okay.  And then does that mean that the
6  remaining two to seven per month were slings?
7      A.  Slings, yes.
8      Q.  Okay.  And then with Ms. Smith, it looked like
9  she had both a POP kit and a sling implanted at the
10  same time.  Is that a common practice, or was that a
11  common practice?
12         MR. MANDELL:  Object to form.
13         THE WITNESS:  I'm sorry?
14         MR. POTTER:  Go ahead.
15         THE WITNESS:  Yes.
16  BY MS. SCARCELLO:
17     Q.  So there would be some overlap in the number
18  of POP kits and midurethral slings; is that right?
19     A.  That is correct.
20     Q.  Okay.
21         MR. POTTER:  They may at times put
22  objections on the record --
23         THE WITNESS:  Oh, I see.  Okay.
24         MR. POTTER:  -- for them to deal with
25  later.

Jin-Hee Kim, M.D.

Page 14

1    THE WITNESS: Okay.
2    MR. POTTER: So as long as you understand
3  the question, you're free to answer.
4    THE WITNESS: Okay. As long as you don't
5  object.
6    MR. POTTER: We'll get there.
7  BY MS. SCARCELLO:
8    Q. Okay. So could you just briefly describe for
9  the jury what pelvic organ prolapse is?
10   A. It's instances where either -- it could be
11 either your bladder, could be uterus, it could be
12 rectum is no longer being well supported by your
13 pelvic floor and comes outside or comes down.
14   Q. And can you also briefly describe what stress
15 urinary incontinence is?
16   A. It's the loss of urine with any kind of
17 increased intraabdominal pressure, such as, coughing,
18 sneezing, jumping, bending over.
19   Q. And could you also just provide a brief
20 overview of your day-to-day practice, week-to-week
21 practice, what that generally looks like.
22   A. I see patients in clinic every day. I have
23 two half days of surgeries per week.
24   Q. Approximately how many of your patients are
25 female?

Page 15

1    A. Again, this is a very rough estimate. 60
2  percent of my patients.
3    Q. Okay. So the remaining 40 percent are male?
4    A. Uh-huh. Or other.
5    Q. Or other.
6    With respect to your female patients, how
7  many of them are experiencing pelvic organ prolapse?
8  It can be a rough estimate.
9    A. 15 percent.
10   Q. And then what percentage of your patients are
11 experiencing stress urinary incontinence?
12   MR. POTTER: You're talking female
13 patients?
14   MS. SCARCELLO: Yes.
15 BY MS. SCARCELLO:
16   Q. Specifically, what percentage of your female
17 patients experience stress urinary incontinence?
18   A. 25 percent.
19   Q. And so what other sorts of issues do you treat
20 specifically in women besides pelvic organ prolapse
21 and stress urinary incontinence?
22   A. Any kind of cancers that affect the -- the
23 urinary system, such as, kidneys, bladder, ureter;
24 dysfunctional voiding; stones, kidney stones.
25   Q. Okay. Is that all?

Page 16

1    A. Recurrent urinary tract infections. The
2  list --
3    Q. I just don't -- I just don't want to interrupt
4  you.
5    A. Yes. The list can go on.
6    Q. Okay.
7    A. Yes.
8    Q. Are you comfortable stopping there?
9    A. Yes.
10   Q. Okay. Thank you.
11   So can you explain just generally what it
12 means for a physician to act as a preceptor on behalf
13 of a medical device company?
14   A. It means that the company thinks you have
15 enough experience that you can show or teach other
16 physicians how to use their product.
17   Q. And have you worked as a preceptor?
18   A. I believe I have.
19   Q. And did you work for Bard as a preceptor?
20   A. I believe I have although my memory is fuzzy,
21 but I think I did.
22   Q. Okay. Do you know approximately how many
23 training sessions you provided on behalf of Bard?
24   A. I do not.
25   Q. Okay. Could you give me a rough estimate?

Page 17

1    A. It would be a complete guess.
2    Q. That's okay.
3    MR. POTTER: Well, she's not going to
4  guess.
5    Either you have an estimate or you don't.
6    THE WITNESS: I do not have an estimate.
7  BY MS. SCARCELLO:
8    Q. You don't have an estimate?
9    A. I mean I do not recall.
10   Q. Okay. Do you think it was more than five?
11   A. I do not think so.
12   Q. Okay.
13   A. But again...
14   Q. Okay. So I have documents from Bard that
15 indicate you started working in the preceptorship
16 program in 2007. Does that sound right to you?
17   A. If that's the documents -- if that's what it
18 says.
19   Q. Do you recall when you stopped providing
20 training on behalf of Bard?
21   A. No.
22   Q. Do you recall why you stopped providing
23 training on behalf of Bard?
24   A. Probably when the product went out of -- when
25 Bard stopped making the product which I do not recall

Jin-Hee Kim, M.D.

Page 18

1 when that was.
2    Q.  Okay.
3    A.  You probably have a better answer than I do.
4    Q.  Do you recall having an interview with a Bard
5 representative on April 12, 2007, regarding your
6 interest in Bard's preceptorship program?
7    A.  I do not.
8    Q.  Prior to that meeting -- do you have any
9 reason to dispute that you met with a Bard
10 representative on April 12, 2007?
11         MR. MANDELL:  Object to form.
12         THE WITNESS:  No.
13 BY MS. SCARCELLO:
14    Q.  You previously mentioned that you would defer
15 to the documents regarding your relationship with
16 Bard.  And so to that extent, I'm -- I'm -- that's why
17 I was asking about that specific date.
18         MR. MANDELL:  Object to form.
19         MR. POTTER:  Object to form.
20         MR. MANDELL:  Misstates her testimony.
21         MR. POTTER:  Misstates her testimony.
22         But if you have an answer, go ahead.
23         MS. SCARCELLO:  There wasn't a question.
24         MR. POTTER:  Well, you can't just restate
25 the witness' testimony inaccurately and then say it's

Page 19

1 not a question.  I'm just objecting to the fact she
2 never deferred to anything.  She said if you have
3 documents, she hasn't seen them.  If you want to show
4 her documents and let her look at them and see if
5 she has any reason to disagree with them, fine.
6 BY MS. SCARCELLO:
7    Q.  I'm not going to show you the documents
8 because I don't want to spend a whole lot of time on
9 this.
10         But the -- Bard has internal documents
11 that indicate that you had an interview April 12,
12 2007, and prior to that they sort of wrote up a
13 profile of you.  And in that profile it says that --
14 that you had 26 Avaulta cases to your credit and that
15 you were, quote, experienced with the following Bard
16 products:  Anterior/Posterior Avaulta; Uretex TO;
17 Pelvisoft, slash, Pelvicol; PelviLace TO.
18         Have you worked with those products
19 before?
20         MR. MANDELL:  Object to form.  Lacks
21 foundation.
22         MR. POTTER:  Join.
23         Go ahead and answer if you can.
24         THE WITNESS:  Could you restate the
25 products again?

Page 20

1 BY MS. SCARCELLO:
2    Q.  Sure.  That's no problem.  Anterior/Posterior
3 Avaulta, Uretex TO, Pelvisoft/Pelvicol, and PelviLace
4 TO.
5    A.  I am familiar with the products.  I am not
6 sure I used the Uretex TO ever.
7    Q.  Okay.  Thank you.
8         You had used the Avaulta, though.
9    A.  Yes.
10    Q.  And then this same document says that you
11 were, quote, working with the hospital to find a way
12 for attendees to have hands-on privileges.
13         MR. MANDELL:  Same objection.
14 BY MS. SCARCELLO:
15    Q.  At that this time trainees are wel--- at this
16 time trainees are welcome as observers.
17         So there was a time when it sounds like
18 your hospital was allowing you to provide
19 preceptorship services to Bard, but the trainees could
20 only observe.  Does that sound right to you?
21         MR. POTTER:  Object to form.
22         Go ahead and answer if you can.
23         MR. MANDELL:  Join in the objection.
24         THE WITNESS:  Yes.
25 ///

Page 21

1 BY MS. SCARCELLO:
2    Q.  Okay.  Thank you.  And then at some point the
3 hospital allowed trainees to have hands-on experience;
4 is that right?
5    A.  I do not think they ever did but, again,
6 I'm -- my memory is not -- this was over ten years
7 ago.
8    Q.  Fair -- fair enough.
9         Okay.  Then I have some notes from the --
10 from the interview and, again, just briefly.
11         MR. POTTER:  And since you're not going to
12 share them with the witness, are these her notes, or
13 are these the notes of the person who is apparently
14 interviewing her?
15         MS. SCARCELLO:  These are the notes of the
16 interviewer.  These are Bard's documents.
17 BY MS. SCARCELLO:
18    Q.  So the notes indicate that you were asked
19 whether it would be okay with you if on training days
20 you only used C.R. Bard urological products.  Are you
21 okay with this?  And the note indicates that you don't
22 use other products.
23         So at this time in 2007, were you using
24 exclusively Bard transvaginal mesh products?
25         MR. MANDELL:  Objection.  Lacks

Jin-Hee Kim, M.D.

Page 22

1  foundation.
2        MR. POTTER:  Object to form.  Foundation.
3  Hearsay.
4        Go ahead and answer if you can.
5        THE WITNESS:  I don't want to say I had a
6  contract with Bard when I was only using their
7  products.  That is not true.
8  BY MS. SCARCELLO:
9     Q.  Right.  So I'm not trying to say you had a
10  contract with them.  What I'm asking about is, prior
11  to becoming a preceptor for Bard, there was a
12  conversation that was had with Bard in which the notes
13  indicate that you said you use only Bard products.
14  And I'm just wondering --
15     A.  Uh-huh.
16     Q.  -- if that conforms with your recollection.
17        MR. MANDELL:  Same objections.
18        THE WITNESS:  No.
19  BY MS. SCARCELLO:
20     Q.  So you -- you think you used other non-Bard
21  products for the treatment of POP and SUI?
22     A.  I want to say yes.  Yes.
23     Q.  Okay.
24     A.  But, again, I'm not -- yeah.  My -- this is
25  digging into my memory.

Page 23

1     Q.  Right.  I understand it was a long time ago.
2  And I appreciate that -- you know, that nobody could
3  be expected to have perfect recall.  So that -- that
4  is understood.
5        The notes also indicate that you were
6  asked what is your signature and/or favorite repair,
7  and it says No. 1 is her stone procedures.  Do you
8  know what that means?
9        MR. MANDELL:  Same objection.
10        MR. POTTER:  Join.
11        Go ahead and answer.
12        THE WITNESS:  Kidney stones is what I'm
13  assuming I meant.
14  BY MS. SCARCELLO:
15     Q.  And so that was your signature procedure?
16     A.  I do not believe I was ever asked a question
17  of what signature procedure was.  This was probably
18  something they inferred from my -- again, not having
19  access to the notes and not having seen what the
20  actual notes say, but I would never use a word such as
21  a "signature" procedure.  So I believe that's a
22  misnomer.
23     Q.  Okay.  Do you do a lot of kidney stone
24  procedures?
25     A.  Yes.

Page 24

1     Q.  And is that probably a procedure that you
2  performed the most around April 2007?
3        MR. MANDELL:  Object to form.
4        THE WITNESS:  It's, honestly, impossible
5  to say.  You're asking me to recall surgeries that I
6  did over 12 years ago on a particular month, and it is
7  impossible to say.
8  BY MS. SCARCELLO:
9     Q.  I -- I understand that you don't have perfect
10  recall, and I don't expect you to.  I'm just asking in
11  general if these things make sense to you or if they
12  -- if it seems like that cannot possibly be true.
13        MR. POTTER:  Well --
14  BY MS. SCARCELLO:
15     Q.  So that's -- that's what I'm asking.
16        MR. POTTER:  Object to form because you're
17  using somebody else's notes that she didn't author
18  that you won't show to her to ask her if those notes
19  make sense to her on a conversation that she doesn't
20  recall from more than 12 years ago.
21        So with that standing objection, if you
22  can answer her questions, you're free to.
23        But can I have a standing objection so I
24  don't have to keep --
25        MS. SCARCELLO:  Yes.

Page 25

1        MR. POTTER:  -- raising this every
2  question?
3        MR. MANDELL:  I'll join in that.
4        MS. SCARCELLO:  That would be great.
5        THE WITNESS:  Typically we do -- I do a
6  lot of stone cases, yes.
7  BY MS. SCARCELLO:
8     Q.  Okay.  And then at this time it also says that
9  slings were your No. 2 procedure.  Is that --
10     A.  If that's what I said, but, again, my recall
11  is not perfect.
12     Q.  Okay.  Fair enough.
13        Then there are some internal messages
14  about this -- this ability for preceptees to engage in
15  hands-on training.  And there's an e-mail from May 9,
16  2007, from a Bard physician training specialist that
17  says, Initially we had a hold on Dr. Kim for contract
18  pending the privileges.  But you had prev- -- you
19  prior to this May 2007 e-mail had received privileges.
20  Does that sound right to you?
21        MR. POTTER:  Hold on.  Objection.  You're
22  not giving the witnesses context as to who the e-mail
23  is to, who the e-mail is from, whether she received
24  the e-mail.  And I think you're confusing who is
25  getting the privileges and then asking Dr. Kim to

Jin-Hee Kim, M.D.

Page 26

1  comment on it.
2      So if you want to show her the e-mail and
3  ask her questions about that, she'll answer.  But the
4  way that you're doing it, it's not fair to the
5  witness, and I don't know how she's expected to answer
6  your questions.
7      With that objection, if you have any way
8  of answering her question, you're free to do so.
9      MR. MANDELL:  Join in the objection.
10     THE WITNESS:  Was this an e-mail to me?
11 BY MS. SCARCELLO:
12     Q.  No, it's not an e-mail to you.
13     A.  Okay.
14     Q.  And I'm not really even asking about the
15 e-mail.  You can forget the e-mail.  I'm just asking
16 if at some point your institution allowed for you to
17 provide hands-on training to preceptees on behalf of
18 Bard.
19     A.  I believe I answered the question before --
20 yeah? -- whether --
21     MR. POTTER:  Answer again.
22 BY MS. SCARCELLO:
23     Q.  I don't recall your answer.  I'm sorry.
24     A.  Oh.  Whether Bard -- whether my institution
25 allowed nonprivileged physicians to have hands-on

Page 27

1  privileges.  Is that what -- the question you're
2  asking me?
3      Q.  Allowed -- my question is whether your
4  institution allowed you to provide hands-on training
5  to preceptees in your capacity as a preceptor for
6  Bard.
7      MR. MANDELL:  Object to form.
8      THE WITNESS:  And I answered this before.
9  I do not believe my institution allowed -- they
10 allowed observations.  I do not think they allowed
11 hands-on privileges.  Then, again, my memory is not
12 perfect.
13 BY MS. SCARCELLO:
14     Q.  That's okay.  I appreciate that.
15     Do you recall the amount that you were to
16 be paid by Bard for training sessions?
17     A.  I do not recall.
18     Q.  The documents that I have been provided
19 indicate that you were to be a paid of total of $1500
20 per day for on-site training sessions conducted at
21 your institution.  Does that sound right to you?
22     MR. MANDELL:  Object to form.
23     MR. POTTER:  Join.
24     THE WITNESS:  If that is what the document
25 says.  Again, I do not recall.

Page 28

1  BY MS. SCARCELLO:
2      Q.  Okay.  And for a full day of training, that
3  you were paid $2500 per day.  Do you have any reason
4  to dispute that?
5      MR. MANDELL:  Same objection.
6      MR. POTTER:  Objection.  And I really
7  don't see what the relevance is because she's already
8  testified that the hospital didn't allow her to do the
9  training.  So it's just a hypothetical of what she was
10 going to be paid, or are you asking her whether she
11 actually received this money for training and she
12 actually performed on behalf of Bard for this product?
13     MS. SCARCELLO:  I -- you completely lost
14 me.  I -- I --
15     If you wouldn't mind just reading back the
16 question.
17     I think we're pretty straightforward.
18     MR. POTTER:  Well, here's my objection.
19 You haven't established that she ever conducted
20 training.
21     MS. SCARCELLO:  She did at least -- she
22 said she did probably five.
23     THE WITNESS:  But I do not believe there
24 were hands-on training.
25 ///

Page 29

1  BY MS. SCARCELLO:
2      Q.  Okay.
3      A.  So there might have been observation as far as
4  I can recall.
5      Q.  Okay.
6      A.  Yes.
7      Q.  Fair enough.
8      MS. SCARCELLO:  There's nothing to
9  indicate to me that -- whether it was hands-on or not,
10 that the payment was any different.  And, regardless
11 of that, I'm just trying to find out the extent of her
12 relationship with Bard.  That's it.
13     MR. POTTER:  If you can answer what the
14 extent of your relationship was with Bard back in
15 2007, go ahead.
16     THE WITNESS:  That was the extent of my
17 relationship with Bard.
18 BY MS. SCARCELLO:
19     Q.  What was?  That you were --
20     A.  The -- what you were -- what you had just
21 mentioned.
22     Q.  The being involved in the preceptorship
23 program.
24     A.  Correct.
25     Q.  Okay.  And the $2500 per day honorarium sounds

Jin-Hee Kim, M.D.

Page 30

1 right to you?
2       MR. MANDELL:  Object to form.
3 BY MS. SCARCELLO:
4    Q.  Is that correct?
5    A.  Again, if that is what the document says --
6    Q.  Okay.
7    A.  -- I'll not dispute it.
8    Q.  Do you recall which products you used in your
9 capacity as a Bard preceptor?
10   A.  The Avaulta products.
11   Q.  Did you also use the Align products?
12   A.  Yes.
13   Q.  And did you use both the Align and the Align
14 TO devices?
15   A.  Yes.
16   Q.  Okay.  And in January 2008, you implanted the
17 Avaulta and the Align TO in Ms. Smith; is that right?
18   A.  Yes.
19   Q.  Okay.  And do you recall if there were any
20 trainees observing that procedure?
21   A.  I do not recall.  I do not recall.
22   Q.  Besides Bard were you ever involved in any
23 other company's preceptor programs related to
24 transvaginal mesh devices?
25   A.  I think I may have been involved with AMS but

Page 31

1 I have -- yeah.  I don't know.  I mean I think so.
2    Q.  And was it also AMS transvaginal mesh devices?
3    A.  Correct.
4    Q.  And do you recall which one?
5    A.  AMS has the Elevate product.
6    Q.  And do you recall the time frame?
7    A.  I do not.
8    Q.  Okay.  Do you recall receiving hands-on or
9 practical training with the Avaulta and Align TO?
10   A.  I don't recall specifically.  Usually -- I
11 have attended several cadaver labs, but I could not
12 tell you time, dates.
13   Q.  Prior to implanting the Avaulta in -- strike
14 that.
15       Prior to the first time you implanted the
16 Avaulta, do you believe that you attended a cadaver
17 lab?
18       MR. MANDELL:  Object to form.
19       MR. POTTER:  Are you talking ever or with
20 respect to your client?
21       MS. SCARCELLO:  I said prior to the first
22 time she -- she implanted an Avaulta product.
23       MR. POTTER:  So ever.
24       THE WITNESS:  I think so.  But, again, I'm
25 not sure of the time frame, but believe I did, yes.

Page 32

1 BY MS. SCARCELLO:
2    Q.  Okay.  And same question with regards to the
3 Align TO.  Do you think prior to the first time you
4 implanted an Align TO device that you had attended a
5 cadaver lab?
6    A.  I think I did.
7    Q.  Okay.  And can you just give us a general idea
8 of what is involved with a cadaver lab?
9    A.  It's where you go to a place that has cadavers
10 and you have -- perform procedures.
11   Q.  And you perform them on the cadavers.
12   A.  Correct.
13   Q.  And do you typically just work with one
14 cadaver, or do you practice the procedure multiple
15 times?
16   A.  Depends on the availability of the cadavers --
17   Q.  Okay.
18   A.  -- and how many the lab actually has.
19   Q.  Okay.  Do you recall with respect to the
20 Avaulta or the Align?
21   A.  I do not recall.
22   Q.  And after your training with Bard, were you
23 confident in your ability to perform the Avaulta and
24 Align TO implant procedures?
25   A.  Yes.

Page 33

1    Q.  And so if Bard has taken the position that the
2 plaintiff's injuries in this case are the fault of
3 third parties including implanting doctors such as
4 yourself, you would want to know that; right?
5       MR. MANDELL:  Object to form.
6       MR. POTTER:  Join.
7       THE WITNESS:  Sure.
8 BY MS. SCARCELLO:
9    Q.  And if Bard had blamed plaintiff's injuries on
10 implanting surgeons in documents filed in this
11 litigation and even during trials in open court, you
12 would want to know that; right?
13       MR. POTTER:  Object to form.  She's not
14 going to engage in speculation.  If you want to show
15 her a document that pertains to her care, she can
16 answer.  She's here as a fact witness.  We haven't
17 been provided any documents with respect to your
18 litigation.  And so you're asking her to speculate
19 about something she couldn't possibly know about and
20 then asking her a hypothetical question about it.
21 We're not going to do that.
22 BY MS. SCARCELLO:
23   Q.  My question is --
24       MR. POTTER:  I know what your question is,
25 but she's not going to --

Jin-Hee Kim, M.D.

Page 34

1      MS. SCARCELLO: I wasn't talking to you.
2  I'm asking you her.
3      MR. POTTER: Okay.
4      MS. SCARCELLO: And if you could just
5  reserve your objections to a form objection and either
6  requesting that your witness doesn't answer or not, I
7  would appreciate that because we only have limited
8  time.
9      MR. POTTER: Well, I'll make the
10 objections I think are appropriate. Why don't you ask
11 your next question.
12 BY MS. SCARCELLO:
13     Q. My question is: If Bard blamed plaintiff's
14 injuries on implanting surgeons in open court in these
15 transvaginal mesh cases, is that something that you
16 would want to know?
17     MR. MANDELL: Object to form.
18     MR. POTTER: Objection. Instruct the
19 witness not to answer. Next question.
20 BY MS. SCARCELLO:
21     Q. Do you recall when and where you received any
22 training on the Avaulta device?
23     A. No.
24     Q. Do you remember the number of days that you
25 trained on the Avaulta device?

Page 35

1      A. No.
2      Q. Do you recall whether there was a didactic
3  training provided on the Avaulta device?
4      A. I do not recall.
5      Q. Do you recall the name of the preceptor who
6  did your training on the Avaulta device?
7      A. I do not recall.
8      Q. Do you recall whether you had observed an
9  Avaulta implantation prior to your training on the
10 Avaulta device?
11     A. I do not recall.
12     Q. Is it fair to say that, when you went to the
13 professional education training with Bard, that this
14 was your first time to get in-depth information about
15 the Avaulta device?
16     MR. MANDELL: Object to form.
17     THE WITNESS: Do you have a date on that?
18 BY MS. SCARCELLO:
19     Q. No. I just wanted in general.
20     A. Oh.
21     Q. Would -- would attending a cadaver lab or a
22 didactic be the first time that you would have
23 received in-depth information about that device?
24     MR. POTTER: Object to form.
25     THE WITNESS: Probably.

Page 36

1  BY MS. SCARCELLO:
2      Q. Do you recall whether a PowerPoint
3  presentation was provided?
4      A. Unfortunately not.
5      Q. Do you recall if you were provided with any
6  materials?
7      A. I do not.
8      Q. Would you have assumed that the information
9  that was being provided to you at these training
10 programs was accurate, to the best of Bard's
11 knowledge?
12     MR. MANDELL: Object to the form.
13     THE WITNESS: I would hope so.
14 BY MS. SCARCELLO:
15     Q. With respect to your training on the Align TO,
16 do you remember the number of days that you trained on
17 the Align TO?
18     A. No.
19     Q. Do you recall whether you did a didactic
20 training?
21     A. No.
22     Q. Do you recall the name of your preceptor?
23     A. No.
24     Q. Had you ever observed an Align TO implantation
25 prior to your training with Bard on the Align TO?

Page 37

1      A. I don't think so. I don't know.
2      Q. Is it fair to say that, when you went to the
3  professional education training with Bard, that that
4  was your first time to get in-depth knowledge about
5  the Align TO?
6      MR. MANDELL: Object to form.
7      THE WITNESS: Probably.
8  BY MS. SCARCELLO:
9      Q. What, if anything, do you recall about the
10 oral presentation on the Align TO?
11     A. I do not recall.
12     Q. And, again, did you assume that the
13 information that was being provided to you by Bard
14 about the Align TO at the professional education
15 course was accurate to the best of Bard's knowledge?
16     MR. MANDELL: Object to form.
17     THE WITNESS: Yes.
18 BY MS. SCARCELLO:
19     Q. Did you assume that the risks that Bard knew
20 about, especially the serious risks that they knew
21 about, that were associated with the Align TO would
22 have been presented to you as part of that
23 presentation?
24     MR. MANDELL: Object to form. Lacks
25 foundation.

Jin-Hee Kim, M.D.

Page 38

1    MR. POTTER:  Object to form.
2    Go ahead if you can.
3  BY MS. SCARCELLO:
4    Q.  You can answer.
5    A.  Yes.
6    Q.  Did anyone from Bard ever tell you that
7  they -- that the company did no premarket testing
8  regarding the adequacy -- the adequate effective pore
9  size of the transvaginal mesh products?
10    MR. MANDELL:  Object to form as
11  irrelevant.
12    MR. POTTER:  Join and foundation.
13    Go ahead.
14    THE WITNESS:  Would you mind repeating the
15  question?
16  BY MS. SCARCELLO:
17    Q.  No problem.
18    Did anyone from Bard ever tell you that
19  they did not do any premarket testing regarding
20  adequate effective pore size for transvaginal mesh?
21    MR. MANDELL:  Same objection.
22    MR. POTTER:  Same objection.
23    THE WITNESS:  No.
24  BY MS. SCARCELLO:
25    Q.  Did anyone from Bard ever tell you that they

Page 39

1  did no premarket testing regarding polypropylene
2  degradation?
3    MR. MANDELL:  Object to form.  Lacks
4  foundation.
5    MR. POTTER:  Join.
6    THE WITNESS:  No.
7    MS. SCARCELLO:  Would you all just like to
8  have a standing objection to this line of questioning
9  as well?
10    MR. MANDELL:  Yes.
11    MR. POTTER:  Sure.
12  BY MS. SCARCELLO:
13    Q.  In fact, did anyone from Bard ever tell you --
14    MR. MANDELL:  And is this limited to
15  before her implant or at all times?
16    MS. SCARCELLO:  My question is did anyone
17  from Bard ever tell you, ever.
18  BY MS. SCARCELLO:
19    Q.  So did anyone from Bard ever tell you that the
20  manufacturer of the polypropylene that was used to
21  create its transvaginal mesh products provided this
22  medical application caution with the plastic?  Quote,
23  do not use this Phillips Sumika Polypropylene Company
24  material in medical applications involving permanent
25  implantation in the human body or permanent contact

Page 40

1  with internal body fluids or tissue.
2    MR. MANDELL:  Object to form.  Lacks
3  foundation.
4    THE WITNESS:  No.
5  BY MS. SCARCELLO:
6    Q.  Is that something you would have wanted to
7  know?
8    MR. POTTER:  Hold on.  I'm letting you ask
9  whether anybody told her that.  She's not going to
10  give you a hypothetical answer when you present her
11  with incomplete information here today; so on that
12  basis I'm going to instruct her not to answer.  If you
13  want to try to correct the question, feel free.
14    MS. SCARCELLO:  It's really not a
15  hypothetical.
16  BY MS. SCARCELLO:
17    Q.  My question is:  Is that something you would
18  want to know?
19    MR. MANDELL:  Join the objection.
20    MR. POTTER:  Well, she's not going to --
21  you haven't even provided foundation to her as to
22  whether that exists or not.  And then you ask her
23  whether she would want to know something.  I'm trying
24  to help you so you can correct your question;
25  otherwise, I'm just going to instruct her not to

Page 41

1  answer.
2    MS. SCARCELLO:  So she can't answer
3  whether she would like to know certain information?
4    MR. POTTER:  Correct.  She's here as a
5  fact witness.  If you want to ask her whether she was
6  aware of that information, she'll answer it.  She's
7  not going to tell you hypothetically whether she would
8  want to have known information that she's not getting
9  complete context about for the deposition.  That's my
10  instruction.
11    MS. SCARCELLO:  Then we'll -- we will just
12  go through what all she didn't know.
13    MR. POTTER:  Fine.  It's your time.
14  BY MS. SCARCELLO:
15    Q.  Did anyone from Bard ever tell you that its
16  manufacturing process damaged the polypropylene
17  material using heat, stress, and knitting?
18    MR. MANDELL:  Object to form.  Lacks
19  foundation.  Running objection.
20    MR. POTTER:  I'm just going to have my
21  standing objection.
22    MR. MANDELL:  Same objection.
23    THE WITNESS:  No.
24  BY MS. SCARCELLO:
25    Q.  Did anyone from Bard ever tell you that they

Jin-Hee Kim, M.D.

Page 42

1 didn't do any premarket testing regarding matching the
2 elasticity properties of the mesh with the properties
3 of the female pelvis?
4     A. No.
5     Q. Did anyone from Bard ever tell you that they
6 didn't do any premarket testing regarding deformation
7 of the product when it's placed under stress?
8     A. No.
9     Q. Did anyone from Bard ever tell you that this
10 deformation of the product when it's placed under
11 stress can change the character of the transvaginal
12 mesh device?
13     A. No.
14     Q. Did anyone from Bard ever tell you that there
15 was no premarket testing to determine whether the mesh
16 lacked structural stability?
17     A. No.
18     Q. Did anyone from Bard ever tell you that there
19 was no premarket testing as to the mesh's elasticity?
20     A. No.
21     Q. Did anyone from Bard ever tell you that there
22 was no premarket testing regarding the elongation
23 characteristics of the mesh after being implanted in
24 the human body?
25     A. No.

Page 43

1     Q. Did anyone from Bard ever tell you that there
2 was no premarket testing regarding the mesh's
3 inflammatory or foreign body response that causes
4 intense scarification or scar plating?
5     A. No.
6     Q. Did anyone ever tell you that the mesh's
7 inflammatory foreign body response can cause
8 contraction of the tissues which creates pain?
9     A. No.
10        Sorry. My alarm just went off. I have
11 to --
12        MS. SCARCELLO: We'll go off the record.
13        THE WITNESS: -- feed the meter.
14        THE VIDEOGRAPHER: We are off the record
15 at 2:21.
16        (Brief recess taken at 2:21 PM. Resume at
17        2:31 PM.)
18        THE VIDEOGRAPHER: We are back on the
19 record at 2:31.
20        MR. POTTER: And are we still on the list
21 of questions that we have the standing objection to?
22        MS. SCARCELLO: Yes.
23        MR. POTTER: Okay.
24 BY MS. SCARCELLO:
25     Q. So, Dr. Kim, we're back on the record after a

Page 44

1 short break.
2     A. Yes.
3     Q. You understand you're still under oath?
4     A. Yes.
5     Q. Okay.
6        MR. MANDELL: Just for the record, I have
7 the same standing objections.
8 BY MS. SCARCELLO:
9     Q. Did anyone from Bard ever tell you that there
10 was no premarket testing that porcine dermis added to
11 the Avaulta Plus product enhanced scar plate
12 formation?
13     A. No.
14     Q. Did anyone from Bard ever tell you that there
15 was no premarket testing regarding the blind passage
16 of the trochars which could damage tissue as it passed
17 and create a deformative load when the mesh is pulled
18 through the surface?
19     A. No.
20     Q. Did anyone from Bard ever tell you that, prior
21 to their product being placed on the market, Bard had
22 no clinical evidence to support the efficacy and
23 safety of its Avaulta Plus product?
24     A. No.
25     Q. Did anyone from Bard ever tell you that in

Page 45

1 physician training presentations Bard used one-year
2 data from a physician who studied the Avaulta devices
3 which quoted a 6.7 percent erosion rate but that that
4 same physician conducted a three-year study which
5 showed an erosion rate of 13.6 percent?
6     A. No.
7     Q. Were you advised by Bard that certain key
8 opinion leaders had recommended and volunteered to do
9 premarket randomized control trials as to the Bard
10 Avaulta products but that Bard rejected the same?
11     A. No.
12     Q. Were you ever advised by Bard or any Bard
13 representative that certain key opinion leaders had
14 recommended and offered to do a multicenter
15 post-market study on the Bard porcine products but
16 that Bard rejected that?
17     A. No.
18     Q. Did Bard or any company representative ever
19 advise you that one of Bard's leading mesh proponents
20 had proposed that Bard conduct a study on persistent
21 delayed healing and mucosal erosion seen in its
22 products that had been reported by implanting
23 physicians but that Bard refused to do so?
24     A. No.
25     Q. Did Bard or any company representative ever

Jin-Hee Kim, M.D.

Page 46

1  advise you that Bard had seen that its polypropylene
2  mesh in its Avaulta products could cause shrinkage or
3  contraction up to 30 to 50 percent?
4       A.  No.
5       Q.  Did Bard or any company representative ever
6  tell you that certain Bard Avaulta preceptors and
7  proctors began complaining about complications they
8  were seeing with the Avaulta products and that Bard
9  terminated those doctors' contractual relationships
10  with Bard?
11      A.  No.
12      Q.  Is it fair to say that your knowledge of the
13  risks and complications associated with the Avaulta
14  products grew, and you learned a lot more as time
15  passed?
16          MR. MANDELL:  Object to form.
17          MR. POTTER:  Object to form.
18          MS. SCARCELLO:  I'll strike that.  I will
19  restate the question.
20  BY MS. SCARCELLO:
21      Q.  Is it fair to say that over time your
22  knowledge of the risks and complications with the
23  Avaulta product increased?
24          MR. MANDELL:  Object to form.
25          MR. POTTER:  Object to form.

Page 47

1          THE WITNESS:  I may still answer?
2          MR. POTTER:  That means you can still
3  answer if you can.
4          THE WITNESS:  Sorry.  Would you mind
5  repeating the question?
6  BY MS. SCARCELLO:
7       Q.  No problem.
8          Is it fair to say that your knowledge of
9  the risks and complications associated with the
10  Avaulta device grew and -- strike that.
11          Is it fair to say that your knowledge of
12  the risks and complications associated with the device
13  increased over time?
14          MR. MANDELL:  Same objection.  Lacks
15  foundation.
16          MR. POTTER:  Objection.
17          Go ahead.
18          THE WITNESS:  I'm not sure that my --
19  that -- I mean, as I was using the product, my
20  knowledge grew.  Did I think it was more risky or --
21  than when I first used it?  No, if that's the question
22  you're asking me.
23  BY MS. SCARCELLO:
24      Q.  Okay.  Do you recall reviewing a document
25  referred to as the instructions for use, or the IFU,

Page 48

1  back when you were using the Avaulta?
2       A.  No.
3       Q.  So you did not review the IFU?
4          MR. POTTER:  Well, you asked her --
5          MR. MANDELL:  Object to form.
6          MR. POTTER:  -- if she recalled reviewing
7  it.  That's a different question.
8          Go ahead if --
9          THE WITNESS:  I do not recall reviewing
10  it.
11  BY MS. SCARCELLO:
12      Q.  Do you typically review the IFU for a device
13  at least once before you begin implanting it in your
14  patients?
15          MR. MANDELL:  Object to form.
16          MR. POTTER:  Go ahead.
17          THE WITNESS:  Is this the same as the
18  package insert?
19  BY MS. SCARCELLO:
20      Q.  Yes, yeah, uh-huh.
21      A.  I will look at the package insert, yes.
22      Q.  Okay.  And you look at the package insert --
23  strike that.
24          Is it fair to say that you look at the
25  package insert before you perform a procedure for the

Page 49

1  first time?
2          MR. MANDELL:  Object to form.
3          THE WITNESS:  No.
4  BY MS. SCARCELLO:
5       Q.  Would you ever perform an implantation of a
6  device without looking at the package insert?
7       A.  Yes.  If I knew enough about the product.
8       Q.  Okay.  Do you recall whether you looked at the
9  package insert for the Avaulta at some point prior to
10  January of 2008?
11      A.  I do not recall.
12      Q.  Do you recall whether you looked at -- I
13  thought you were going to say something.
14          Do you recall whether you looked at the
15  package insert for the Align TO prior to January 2008?
16      A.  I do not recall.
17      Q.  And just so I understand your testimony, you
18  might not -- you don't recall the actual event of
19  sitting down and looking at the insert, but do you
20  think that it is likely that you looked at the Avaulta
21  package insert at some point?
22          MR. MANDELL:  Object to form.  Misstates
23  testimony.
24          THE WITNESS:  Mostly what I care about is
25  what's FDA approved.  So I don't think I spent an

Jin-Hee Kim, M.D.

Page 50

1 inordinate -- you know, an inordinate amount of time
2 looking at any -- any inserts.
3 BY MS. SCARCELLO:
4    Q.  Okay.
5    A.  But, again, I don't recall.
6    Q.  Can you just kind of explain what a package
7 insert is? the information that's included in it.
8         MR. POTTER:  Object to form.
9         Go ahead if you can.
10        THE WITNESS:  I believe it has indications
11 for -- I mean, it would be helpful if I had a package
12 insert in front of me so I could know exactly what it
13 is.  I believe it has indication for use and how to
14 use the product.
15 BY MS. SCARCELLO:
16    Q.  Umm --
17    A.  I mean --
18    Q.  I'm sorry.
19    A.  Yeah.
20    Q.  Does a package insert typically list risks
21 associated with using a product?
22        MR. MANDELL:  Object to form.
23        THE WITNESS:  I don't know.
24 BY MS. SCARCELLO:
25    Q.  Did any of your Avaulta implant patients

Page 51

1 post-implant develop permanent dyspareunia?
2        MR. MANDELL:  Object to form.
3        MR. POTTER:  Are you talking prior to
4 her -- or during her care of Ms. Smith?  She's not
5 going to go off and testify about all the patients she
6 had after your client's surgery.
7        MS. SCARCELLO:  I'm just asking in general
8 if -- if she has had any patients who have developed
9 chronic dyspareunia after having an Avaulta device
10 implanted.
11        MR. POTTER:  Okay.  Let me -- let me do it
12 this way since you don't want to correct your
13 question.
14        Go ahead and answer to the extent you can
15 prior to the end of your treatment with Ms. Smith.
16 For any time period thereafter, I instruct you not to
17 answer.
18        THE WITNESS:  So this is for a specific
19 time period?
20        MR. POTTER:  Yes.
21        THE WITNESS:  I don't recall.  I don't
22 think so.
23 BY MS. SCARCELLO:
24    Q.  Do you recall anything in the Avaulta or the
25 Align TO package insert describing or instructing

Page 52

1 physicians in terms of how to remove mesh?
2        MR. MANDELL:  Object to form.
3        THE WITNESS:  No.
4 BY MS. SCARCELLO:
5    Q.  When you were trained as a resident, were you
6 trained on how to remove mesh?
7    A.  We had removed mesh, yes.
8    Q.  And approximately how many times did you
9 remove mesh during your training?
10    A.  During residency?
11    Q.  Uh-huh, yes.
12    A.  Now, this is digging way back.  Perhaps ten
13 times.
14    Q.  And so if Bard had information in its
15 possession regarding the advisability of undertaking
16 an excision or removal surgery, would you have liked
17 to have had that information available to you?
18        MR. MANDELL:  Object to form.  Lacks
19 foundation.
20        MR. POTTER:  Objection.  Instruct the
21 witness not to answer.
22        MS. SCARCELLO:  I will pass the witness.
23        MR. MANDELL:  Can we go off the record for
24 a second?  Take a quick break.
25        THE VIDEOGRAPHER:  We are off the record

Page 53

1 at 2:41.
2        (Pause in the proceeding.)
3        THE VIDEOGRAPHER:  We are back on at 2:42.
4
5        CROSS-EXAMINATION
6
7 BY MR. MANDELL:
8    Q.  All right, Dr. Kim.  My name is Mike Mandell.
9 I represent C.R. Bard in this matter.  This is the
10 first time you've ever met or spoken with me; is that
11 correct?
12    A.  Correct.
13    Q.  Other than for purposes of scheduling this
14 deposition, no one from or representing Bard has ever
15 contacted you about this lawsuit; correct?
16    A.  That's correct.
17    Q.  And you understand your deposition is being
18 taken in your capacity as one of Ms. Becky Smith's
19 treating physicians?
20    A.  Yes.
21    Q.  And specifically with relation with the
22 Avaulta Plus Anterior and Align TO which was implanted
23 in her to treat her SUI and cystocele on January 15,
24 2008; correct?
25    A.  Yes.

Jin-Hee Kim, M.D.

Page 54

1    Q.  Okay.  And you were the surgeon that did that
2  implantation; right?
3    A.  Yes.
4    Q.  Have you ever spoken with Ms. Smith about her
5  lawsuit?
6    A.  No.
7    Q.  Have you ever spoken with any of her other
8  doctors about her care prior to her 2008 surgery?
9    A.  No.
10    Q.  How about after the 2008 operation?  Have you
11  spoken to any of her doctors?
12    A.  No.
13    Q.  Discussion with anyone else other than your
14  attorney in preparation for this deposition?
15    A.  No.
16    Q.  Other than medical records, did you re- -- did
17  you review any other documents in preparation for this
18  deposition?
19    A.  No.
20    Q.  And I'm just going to introduce as Exhibit 3,
21  this is a notice of deposition.
22        (Deposition Exhibit No. 3 was marked.)
23  BY MR. MANDELL:
24    Q.  Were you -- have you seen this before?
25    A.  Yes.

Page 55

1    Q.  It -- was it provided to you by counsel?
2    A.  Yes.
3    Q.  And rather than going through all the requests
4  here, my understanding is you came here with your CV
5  and the medical file you have for Ms. Smith; is that
6  correct?
7    A.  I don't even have the medical file.
8    Q.  Okay.  Well --
9        MR. POTTER:  Pursuant to the agreement
10  that you guys --
11        MR. MANDELL:  Right.
12        MR. POTTER:  -- agreed that you had her
13  chart.
14  BY MR. MANDELL:
15    Q.  Right.  So you didn't -- you didn't produce
16  any additional medical records because we had already
17  produced her chart; is that correct?
18    A.  That is correct.
19    Q.  As far as -- are you -- are you a member of
20  any urological organizations?
21    A.  The American Urological Association.
22    Q.  Okay.  What about ACOG?
23    A.  No.
24    Q.  AUGS?
25    A.  No.

Page 56

1    Q.  Were you ever a member of AUGS?
2    A.  Yes.
3    Q.  When -- when were you a member?
4    A.  I don't know.
5    Q.  Okay.  Now I want to focus a little bit on
6  treatment prior to Ms. Smith's implant in 2008.  So
7  how many patients could you -- can you estimate you
8  treated for SUI at that time in January of 2008?
9    A.  That one month?
10    Q.  No.  Sorry.  Up until that time in January
11  2008, how many patients had you treated for SUI?
12    A.  Again, this is going to be an extremely rough
13  estimate.  Let's say ten a month.
14    Q.  Okay.  And you -- and when did you first
15  begin -- what year did you first begin treating
16  patients for SUI?
17    A.  If we count residency -- do we want to count
18  residency?
19    Q.  Let's start with residency, yeah.
20    A.  So I started my urology residency 1998.
21    Q.  Okay.  And then after residency that would
22  be --
23    A.  Until 2002.
24    Q.  2002.  Okay.
25        And as part of your practice in 2008, did

Page 57

1  you use synthetic urethral slings to help treat SUI in
2  your patient population?
3    A.  Prior to 2008?
4    Q.  And including 2008.
5    A.  Yes.
6    Q.  And how long had you been using synthetic
7  urethral slings for?  You know, how long had you been
8  using them for before the 2008 surgery?
9    A.  Just generic synthetic slings, not Bard
10  related.
11    Q.  Correct.
12    A.  Since residency.
13    Q.  Okay.  So that would be since 1998; correct?
14    A.  That is correct.
15    Q.  And were you using anything before -- before
16  that?
17    A.  Before residency?
18    Q.  Yes.  Did you --
19    A.  No, I was not.
20    Q.  Do you know which products from residency to
21  2008 you had used as far as synthetic urethral slings?
22    A.  We did not use a name brand kit.
23    Q.  Do you know what technique you used for
24  implanting synthetic urethral slings during that time
25  frame from when you first started to January 2008?

Jin-Hee Kim, M.D.

Page 58

1    A.  Used the retropubic approach.
2    Q.  Did you also use the transobturator approach?
3    A.  No.  Because it was not available at the time
4 of my residency.
5    Q.  And then --
6        MR. POTTER:  So -- just so you listen to
7 the time period.  He's not restricting his question to
8 residency.
9        THE WITNESS:  Okay.
10       MR. POTTER:  He's saying from residency
11 through 2008 --
12       THE WITNESS:  Oh, I see.
13       MR. POTTER:  -- when you did the surgery
14 on Ms. Smith.
15       THE WITNESS:  Was I using transobturator
16 tapes?
17 BY MR. MANDELL:
18   Q.  Yeah.  So were you using both approaches,
19 retropubic and transobturator approach?
20   A.  Once the transobturator tapes came on the
21 market, I pretty much stopped using retropubic.
22   Q.  Okay.  Was there a reason for that?
23   A.  It's less complications with the
24 transobturator and better for the patient with
25 excellent results.

Page 59

1    Q.  And as far as the synthetic slings that you
2 used since residency to Ms. Smith's implant, in terms
3 of the poly- -- polypropylene material used in each of
4 these slings, did you notice any difference between
5 other manufacturers' slings and Bard's?
6    A.  I have not.
7    Q.  Now, this case involves an Align TO sling.  Do
8 you have an estimate how many overall patients you
9 implanted with an Align TO sling at the time of
10 Mrs. Smith -- sorry -- Ms. Smith's surgery in January
11 2008?
12   A.  So what is the time frame you're asking me
13 about?
14   Q.  So any time before 2008 if you can give me an
15 estimate of how many Align TO slings you had
16 implanted.
17   A.  Honestly, the number will be just a complete
18 random guess.  I mean, it's probably not even
19 accurate.
20   Q.  I don't want you to guess; so if you can't,
21 then that's fine.
22   A.  Okay.  I don't know.
23   Q.  Do you know when you first started using the
24 Align sling?
25   A.  When did -- when did the Align sling come on

Page 60

1 the market?
2    Q.  That I don't know off the top of my head right
3 here.  So do you have a recollection of when you first
4 started using the Align TO sling?
5    A.  Can I say when it came on the market?
6    Q.  Yes.
7        Prior to the invention of urethral slings,
8 other surgical techniques were used to treat women
9 with SUI; correct?
10   A.  Yes.
11   Q.  And what type of surgical techniques were
12 used?
13   A.  This was actually even before my time when
14 they used either a Burch or Marshall-Marchetti.
15   Q.  And have you ever used those surgical --
16 surgical techniques?
17   A.  No.
18   Q.  As far as your knowledge, did you learn about
19 those techniques in medical school or residency?
20   A.  By "these techniques" you mean?
21   Q.  The Burch and the -- and the --
22   A.  I did not learn because these were prior to my
23 training.
24   Q.  Okay.  Do you know -- as far as those
25 techniques, can you tell me what complications are

Page 61

1 associated with them?
2    A.  Not personally because I never performed these
3 procedures, but, typically, women can experience
4 urinary retention, failure to treat the underlying
5 condition.
6    Q.  Would pelvic pain, vaginal pain be a risk of
7 those procedures?
8    A.  I would assume so.
9    Q.  Dyspareunia as well?
10   A.  Yes.
11   Q.  And scarring?
12   A.  (Nods head.)
13   Q.  Is that a -- is that a --
14   A.  Yes.
15   Q.  So you would agree that pelvic pain, vaginal
16 pain, dyspareunia, and scarring is a risk and
17 potential issue associated with all pelvic surgeries?
18       MS. SCARCELLO:  Object to the form of the
19 question.
20       THE WITNESS:  Pelvic -- surgeries as a
21 rule can cause scar tissue, will cause scar tissue so
22 yes.
23 BY MR. MANDELL:
24   Q.  And when you say causing scar tissue, you
25 relate that to also causing pelvic pain and

Jin-Hee Kim, M.D.

Page 62

1  dyspareunia as well?
2      A. It can.
3      Q. Now, of your experience with patients you've
4  implanted slings with, what has been your overall
5  experience with respect to their outcomes?
6          MS. SCARCELLO: Object to the form of the
7  question.
8          THE WITNESS: Are we talking about
9  transobturator tapes in particular?
10 BY MR. MANDELL:
11     Q. Yeah. We can -- well, we can just talk about
12 synthetic urethral slings, midurethral slings. What
13 has been your overall outcome with your patients?
14         MR. POTTER: Object to form.
15         Go ahead.
16         THE WITNESS: Good.
17 BY MR. MANDELL:
18     Q. And would you say the same with the -- with
19 your use of the Align TO?
20     A. Yes.
21     Q. And focusing on the time before Ms. Smith's
22 implant in 2008, did you offer nonsurgical treatments
23 to your patients with SUI?
24     A. Yes.
25     Q. And what sort of techniques were those?

Page 63

1      A. Revolving around pelvic muscle therapy whether
2  it be kegels at home or through actual physical
3  therapists.
4      Q. And what had been your patients' experience
5  with using those nonsurgical treatments?
6      A. Depends on the patients.
7      Q. How would you say it compared to synthetic
8  midurethral slings?
9      A. Not as effective.
10     Q. Now, switching to pelvic organ prolapse, can
11 you tell me how many patients you had treated for
12 pelvic organ prolapse at the time of Ms. Smith's
13 January 2008 surgery?
14     A. No.
15     Q. As part of your practice, did you use vaginal
16 mesh -- mesh in the surgical repair of pelvic organ
17 prolapse?
18     A. Yes.
19     Q. And how long had you been using mesh for
20 treatment of pelvic organ prolapse?
21     A. Since residency.
22     Q. Okay. So, again, 1998; right?
23     A. Yes.
24     Q. How -- can you tell me how many pelvic organ
25 prolapse surgical repairs you performed in your career

Page 64

1  by January 2008?
2      A. No.
3      Q. Can you tell me on average how many per year?
4      A. In general? I think we covered this before.
5  I'm going to say five per month.
6      Q. Okay. I'm sorry if I -- if I -- if this has
7  already been covered. I guess, let me specify how
8  many -- if you can, tell me on average how many per
9  year you performed pelvic organ prolapse surgical
10 repairs with mesh.
11     A. I would say five per year -- per month.
12     Q. Per month.
13         And what approach would you use for that?
14     A. Vaginal approach.
15     Q. Okay. Did you ever use the abdominal
16 approach?
17     A. No.
18     Q. And why not?
19     A. That is not part of my training.
20     Q. Now, with respect to PO- -- I'm going to refer
21 to pelvic organ prolapse as POP sometimes.
22         With respect to POP repair, did you ever
23 perform a primary repair as opposed to a repair
24 involving a medical device like mesh implant before
25 2008?

Page 65

1      A. Yes.
2      Q. And what type of primary repairs had you
3  performed?
4      A. Plication.
5      Q. What are some of the better known risks or
6  complications with a native tissue repair for pelvic
7  organ prolapse?
8      A. Mostly very high risk of recurrence.
9      Q. Would you agree that vaginally placed mesh to
10 treat POP is a minimally -- minimally invasive surgery
11 particularly when compared to other options such as
12 native tissue repair?
13         MS. SCARCELLO: Object to --
14         MR. POTTER: Object to form.
15         MS. SCARCELLO: -- the form of the
16 question.
17         MR. POTTER: Go ahead.
18         THE WITNESS: Depends what you mean by
19 "native form."
20 BY MR. MANDELL:
21     Q. We can -- we'll skip this one.
22         Do -- do you consider -- do you consider a
23 benefit of vaginal mesh products to treat POP that it
24 is minimally invasive?
25     A. It's a little tricky question because it

Jin-Hee Kim, M.D.

Page 66

1 really depends on your definition of "minimally
2 invasive." I mean minimally invasive to me means a
3 procedure I can perform in the office without
4 undergoing general anesthesia. So in that regard, no.
5     Q.  Okay.  I guess I was trying to compare it to
6 these other forms of native tissue repair that existed
7 before the mesh is what --
8     A.  Uh-huh.
9     Q.  -- I'm really getting at.
10     A.  Okay.
11     Q.  So compared to those, would you say a benefit
12 was that it's not -- it's less invasive?
13     A.  If you mean is it better to go in vaginally
14 than through a big abdominal incision, then the answer
15 is yes.
16     Q.  Okay.  And that was my question.
17         And what are some of the benefits of -- of
18 vaginal mesh repairs -- let me ask you this:  Is one
19 of the benefits of vaginal mesh repairs is it can --
20 can be done under regional anesthesia?
21         MS. SCARCELLO:  Object to the form of the
22 question.
23         THE WITNESS:  It can.
24 BY MR. MANDELL:
25     Q.  Okay.  And can it usually be done as an

Page 67

1 outpatient or overnight stay?
2     A.  Yes.
3     Q.  Have you noticed that, compared to other
4 methods, it -- it has a lower causation of pain?
5         MS. SCARCELLO:  Object to the form of the
6 question.
7         THE WITNESS:  I can't comment because I
8 don't really use a lot of other -- don't use any other
9 methods.
10 BY MR. MANDELL:
11     Q.  Okay.  So leading up to the 2008 implant with
12 Ms. Smith, can you tell me what products for pelvic
13 organ prolapse you used?
14     A.  Prior to the Bard product?
15     Q.  Yes.  So -- so we -- we -- we know you used
16 the Bard product in Ms. Smith, but prior to that what
17 other brands of POP mesh had you used?
18     A.  Prior to Bard I don't think I used a kit.
19     Q.  Do you -- I mean, do you recall any other
20 brands of -- of mesh products used for treating POP?
21     A.  Yes.  But not before the Bard product.
22     Q.  Okay.  You -- but you may have used other
23 products.  Is that my understanding?
24     A.  Yes.
25     Q.  And as far as your use of other products, did

Page 68

1 you find them to -- to all basically work in the same
2 way as -- you know, as vaginal mesh products work
3 for -- for supporting the POP?
4     A.  Yes.
5     Q.  And can you approximate how many patients you
6 placed an Avaulta product for the repair of POP at the
7 time of 2008?
8     A.  No.
9     Q.  In general what had been your experience with
10 mesh products for the treatment of POP?
11     A.  Good.
12     Q.  And that would include your experience with
13 using the Avaulta?
14     A.  Correct.
15     Q.  As far as nonsurgical options in 2008 and
16 prior, did you offer nonsurgical treatments to
17 patients with POP?
18     A.  Yes.
19     Q.  And what had been your patients' experience in
20 using those nonsurgical treatments?
21         MS. SCARCELLO:  Object to the form of the
22 question.
23         THE WITNESS:  Again, it depends on the
24 patients.
25 ///

Page 69

1 BY MR. MANDELL:
2     Q.  Okay.  What about someone with a Grade II
3 cystocele like Ms. Smith had?  Do you know what their
4 experience was like with nonsurgical treatments?
5         MR. POTTER:  Object to form.
6         MS. SCARCELLO:  Object to the form of the
7 question.
8         MR. POTTER:  Go ahead if you can.
9         THE WITNESS:  It is so dependent on the
10 patient no matter what the grade of the cystocele is.
11 BY MR. MANDELL:
12     Q.  Okay.  And, well, let me just ask you more
13 generally then.  How would you compare experiences of
14 your patients with nonsurgical treatment versus
15 transvaginal mesh treatment for repair of POP?
16         MS. SCARCELLO:  Object to the form of the
17 question.
18         MR. POTTER:  Join.
19         Go ahead if you can.
20         THE WITNESS:  Again, it depends on the
21 patients.  I mean, certainly, those that don't want to
22 undergo surgery will be happy if I offer them
23 nonsurgical methods; so...
24 BY MR. MANDELL:
25     Q.  In -- well, strike that.

Jin-Hee Kim, M.D.

Page 70

1      Have you ever used medical products made
2 out of polypropylene other than Bard's Align and
3 Avaulta products?
4     A. Yes.
5     Q. And you agree that polypropylene is suitable
6 to use -- for use in humans as medical device
7 implants?
8        MR. POTTER: Object to form.
9        THE WITNESS: As long as it is FDA
10 approved.
11 BY MR. MANDELL:
12     Q. Okay. Now, you're familiar with the Align --
13 hold on one sec.
14      Now, you're familiar with the Align TO
15 used to treat -- to treat SUI; right?
16     A. I am familiar with it.
17     Q. And you -- you can't tell me when you first
18 started using it, but you certainly used it during the
19 time frame from residency to Ms. Smith's implant in
20 2008; right?
21     A. Yes. Not the entire time frame.
22     Q. But somewhere in there.
23     A. Yes.
24     Q. And given your continued use of the Align, is
25 it fair to say you were satisfied with the product at

Page 71

1 the time?
2     A. Yes.
3     Q. You obviously wouldn't continue to keep using
4 it if you felt it wasn't giving the best possible
5 results for your patients; right?
6        MS. SCARCELLO: Object to form.
7        THE WITNESS: That is correct.
8 BY MR. MANDELL:
9     Q. Is there something in particular you liked
10 about the Align TO that you liked more than other mid
11 -- midurethral slings that were available on the
12 market?
13     A. No.
14     Q. Do you agree that as of September 2008 it was
15 within the standard of care for a surgeon to select
16 the Align urethral sling for treatment of SUI in
17 appropriate patients?
18        MR. POTTER: Hold on.
19        MS. SCARCELLO: Object to the form.
20        MR. POTTER: This witness isn't going to
21 give standard of care testimony either. So if you
22 want to rephrase the question as to why she chose it
23 or something, she can answer, but she's not going to
24 give standard of care testimony.
25   ///

Page 72

1 BY MR. MANDELL:
2     Q. Were you critical of any aspect of the design
3 or function of the Align TO?
4     A. No.
5     Q. Now, focusing on the Avaulta Plus Anterior,
6 you're familiar with that for the treatment of POP;
7 right?
8     A. Yes.
9     Q. Is there something in particular you liked
10 about the Avaulta Plus Anterior compared to other
11 transvaginal mesh products that were available on the
12 market at the time?
13        MS. SCARCELLO: Object to form.
14        THE WITNESS: I thought it was a good
15 product that was relatively easy to use.
16 BY MR. MANDELL:
17     Q. And, again, given your continued use of that
18 product up to 2008, is it fair to say you were
19 satisfied with the product?
20     A. Yes.
21     Q. And, obviously, you wouldn't continue to keep
22 using it if you felt it wasn't getting the best
23 possible results for your patients; right?
24        MS. SCARCELLO: Object to form.
25        THE WITNESS: Yes.

Page 73

1 BY MR. MANDELL:
2     Q. Now, you made the decision to choose to use
3 the Align TO and Avaulta Plus Anterior for Ms. Smith's
4 January 2008 surgery; is that right?
5     A. That is correct.
6     Q. Okay. Was there a reason you -- or strike
7 that.
8      Was there a reason you chose Bard products
9 as opposed to a different product?
10     A. I wonder whether Bard may have been the only
11 product available.
12     Q. And when you say "only product available," is
13 that --
14     A. At the time.
15     Q. -- available at the clinic you were at?
16     A. No.
17     Q. Oh.
18     A. Period.
19     Q. Okay. Would it be fair to say that you chose
20 to use the Align involved with Ms. Smith -- Smith
21 based on your experience with the products?
22     A. Yes.
23     Q. Now, you agree that all surgeries carry
24 certain risks; correct?
25     A. Yes.

Jin-Hee Kim, M.D.

Page 74

1    Q. And there's no procedure that is 100 percent
2  effective for all patients; true?
3    A. Yes.
4    Q. And there's no guarantee of success?
5    A. Yes.
6    Q. You did not provide Ms. Smith with any
7  guarantee of success with respect to her surgery;
8  correct?
9    A. I do not provide guarantees.
10    Q. In general how do you become aware of
11  potential risks of procedures that your perform with
12  medical devices?
13        MS. SCARCELLO: Object to form.
14        THE WITNESS: Prior experience, experience
15  of others.
16  BY MR. MANDELL:
17    Q. Medical school and residency, I presume.
18    A. That is correct.
19    Q. What about medical literature?
20    A. That as well.
21    Q. You try to keep up with the literature?
22    A. Yes.
23    Q. And that -- those prior experiences, medical
24  school and residency, medical literature, that's how
25  you educated yourself about the Align and Avaulta

Page 75

1  products?
2    A. Yes.
3    Q. Counsel previously discussed the instruction
4  for use documents. You indicated that you had no
5  recollection of reviewing those; so I presume that's
6  not something you rely on when you decide to perform a
7  procedure on -- on a patient. Rather, you're relying
8  on your medical literature, training, and experience;
9  right?
10        MS. SCARCELLO: Objection to the form of
11  the question.
12        MR. POTTER: Join.
13        Go ahead.
14        THE WITNESS: Yes.
15  BY MR. MANDELL:
16    Q. Now, I want to just bring out the instructions
17  for use for the Align. This will be Exhibit 4.
18        (Deposition Exhibit 4 was marked.)
19        MR. POTTER: Do you have another copy,
20  Michael?
21        Thank you.
22  BY MR. MANDELL:
23    Q. So I know you indicated that you don't have a
24  recollection of reviewing this document prior to
25  Ms. Smith's surgery. Right?

Page 76

1    A. Correct.
2    Q. And so it's fair to say you didn't rely on
3  this document when deciding to implant the Align TO in
4  Ms. Smith?
5    A. Correct.
6    Q. Now, I -- I understand you didn't rely on
7  this. I simply want to go through some of the
8  warnings in it and determine whether or not you were
9  aware of the possibility of those before using the
10  Align. Okay?
11    A. Okay.
12    Q. So if you look at the second page. And it
13  ends with Bates number 234 in the bottom right-hand
14  corner. If you look at the section "WARNINGS," it
15  says "The implant procedure and the instrumentation
16  associated with the surgical placement of the Align TO
17  Urethral Support System carry an inherent risk of
18  infection and bleeding, as do similar" -- "similar
19  urological procedures."
20        Do you see that?
21    A. Yes.
22    Q. And I'm presuming that's something you were
23  aware of prior to using the Align product on
24  Ms. Smith.
25    A. Yes.

Page 77

1    Q. Okay. So now under "ADVERSE EVENTS," there's
2  several adverse events listed here. And I'm just
3  going to go through the exercise of reading them to
4  you and asking you if you knew about them before
5  implanting the Align in Ms. Smith. Okay?
6        The first one here says that -- well, let
7  me read this. "Complications associated with the
8  proper implantation of the Align TO Urethral Support
9  System may include, but are not limited to:
10        "Postoperative hematoma, which may occur
11  following the implant procedure."
12        Were you aware of that before Ms. Smith's
13  2008 surgery?
14    A. Yes.
15    Q. It says "Temporary urinary retention, bladder
16  outlet obstruction, and voiding difficulties
17  associated with over-correction/too much tension
18  placed on the mesh sling implant."
19        Were you aware of that before her 2008
20  implant surgery?
21    A. Yes.
22    Q. It says "Perforations or lacerations of
23  vessels, nerves, bladder or any viscera, which may
24  occur during introducer needle passage."
25        Were you aware of that before her 2008

Jin-Hee Kim, M.D.

Page 78

1  surgery?
2      A.  Yes.
3      Q.  And then, finally, it says "Transitory
4  irritation at the operative wound site, which may
5  elicit a foreign body response that leads to
6  inflammation, infection, or erosion of the implant."
7          Were you aware of that before her 2008
8  surgery?
9      A.  Yes.
10     Q.  Okay.  And is it fair to say these adverse
11 events that I just listed are -- are all risks of
12 midurethral slings?
13     A.  Correct.
14         MS. SCARCELLO:  Objection to the form of
15 the question.
16 BY MR. MANDELL:
17     Q.  And would it be fair to say that those
18 risks -- those risks, excluding the erosion, are risks
19 for all pelvic surgeries whether or not you use mesh?
20         MS. SCARCELLO:  Object to the form of the
21 question.
22 BY MR. MANDELL:
23     Q.  Actually, let me strike that.  It was
24 confusing.
25         And -- and, again, these risks are not

Page 79

1  unique to the Align; is that correct?
2      A.  That is correct.
3      Q.  And -- and you agree that infection could
4  result in pain?
5      A.  Correct.
6      Q.  Inflammation could result in pain?
7      A.  Yes.
8      Q.  Scarification and contraction would result in
9  pain?
10     A.  Yes.
11     Q.  And mesh erosion, extrusion, and migration
12 could result in pain?
13     A.  Yes.
14     Q.  And you were aware of all of that before
15 Ms. Smith's 2008 implant; right?
16     A.  Yes.
17     Q.  Now I'm going to introduce as the next exhibit
18 the IFU for the Avaulta Plus.  This will be Exhibit 5.
19         (Deposition Exhibit No. 5 was marked.)
20 BY MR. MANDELL:
21     Q.  And I know this is not the most fun thing to
22 do, but I'm going to go through the same exercise with
23 you.
24         You, again, don't have a specific
25 recollection of reviewing this IFU before implanting

Page 80

1  the Avaulta and in Ms. Smith in 2008; right?
2      A.  Correct.
3      Q.  And you didn't rely on this document in
4  determining to prescribe the Avaulta Plus Anterior in
5  Ms. Smith in 2008; is that correct?
6          MS. SCARCELLO:  Object to form.
7          THE WITNESS:  Correct.
8  BY MR. MANDELL:
9      Q.  Understanding you didn't rely on this document
10 to make any medical decisions, I just want to go
11 through some of the adverse events listed here and
12 determine whether you were aware of them before
13 Ms. Smith's implant.  Okay?
14     A.  Okay.
15     Q.  Now, it says here on page Bates No. AVA ending
16 with 310 -- do you see that?
17     A.  Yes.
18     Q.  And do you see where it says "ADVERSE
19 REACTIONS"?
20     A.  Yes.
21     Q.  Okay.  It says "Potential adverse reactions
22 are those typically associated with surgically
23 implantable materials, including hematoma, seroma,
24 mucosal or visceral erosion, infection, inflammation,
25 sensitization, dyspareunia, scarification and

Page 81

1  contraction, fistula formation, extrusion and
2  recurrence of vaginal wall prolapse."
3          Did I read that correctly?
4      A.  Yes.
5      Q.  And were you aware of all of those things
6  before Ms. Smith's implant in 2008?
7      A.  Yes.
8      Q.  And you were -- to clarify, you were aware of
9  those being risks before Ms. Smith's implant in 2008;
10 correct?
11     A.  Yes.
12     Q.  And then it says, "Perforations or lacerations
13 of vessels, nerves, bladder, bowel, rectum, or any
14 viscera may occur during needle passage."
15         Did I read that correctly?
16     A.  Yes.
17     Q.  And, again, you were aware of that -- those
18 risks before Ms. Smith's implant surgery in 2008;
19 right?
20     A.  Yes.
21     Q.  Okay.  Now, going on to the next page here,
22 which ends in Bates Label 311, you'll see
23 "Implantation Technique for the Avaulta Plus
24 Biosynthetic Anterior Support System."  Do you see
25 that?

Jin-Hee Kim, M.D.

Page 82

1  A.  Yes.
2  Q.  And then I just want to flip to the next page
3  and just focus on No. 10.  And it says "The mesh
4  should be sufficiently anchored to stabilize it during
5  tissue ingrowth.  Additional sutures may be used to
6  secure the mesh tension-free.  Anchoring points should
7  be positioned at least 1 [centimeter] from the edge of
8  the mesh.  After desired positioning is complete, trim
9  all ends of the mesh arms below the level of the skin
10  and close incisions."
11      You were aware of this instruction before
12  the implant with Ms. Smith in 2008?
13  A.  Yes.
14  Q.  And it says here "Caution:  Excessive ten-" --
15  "Excessive tension [could]" -- "should be avoided on
16  the mesh suture attachment points to account for wound
17  shrinkage during the healing process."
18      You were aware of that tension concern
19  before the implant in Ms. Smith in 2008; correct?
20  A.  Yes.
21  Q.  Okay.  Now, looking back at that "ADVERSE
22  REACTION" section I read to you, would you agree that,
23  with the exception of the erosion, extrusion
24  mentioned, all the other adverse reactions mentioned
25  here are possible adverse events with surgery in

Page 83

1  the -- in the pelvic region?
2      MS. SCARCELLO:  Object to form.
3      THE WITNESS:  Yes.
4  BY MR. MANDELL:
5  Q.  And they're present in surgery to repair POP
6  with or without mesh; correct?
7      MS. SCARCELLO:  Object to form.
8      THE WITNESS:  Again, besides the mesh
9  erosion and passage of needles, yes.
10  BY MR. MANDELL:
11  Q.  Okay.  And with -- with respect to all of the
12  adverse reactions that we covered, would you agree
13  that all transvaginal mesh to treat POP have the same
14  similar risks listed here?
15      MS. SCARCELLO:  Object to form.
16      THE WITNESS:  Yes.
17  BY MR. MANDELL:
18  Q.  And these risks are not unique to the Avaulta;
19  correct?
20      MS. SCARCELLO:  Object to form.
21      THE WITNESS:  Correct.
22  BY MR. MANDELL:
23  Q.  Okay.  Now I just want to briefly -- you can
24  put that aside now.  I just want to briefly talk about
25  some of the adverse reactions in a little more detail

Page 84

1  with you as they relate to both the Avaulta Plus and
2  Align products.  Okay?
3      The risk of dyspareunia is not unique to
4  surgery using vaginal mesh, is it?
5      MS. SCARCELLO:  Object to form.
6  BY MR. MANDELL:
7  Q.  To pelvic surgery.
8  A.  It is not.
9  Q.  And what is dyspareun- -- I think you
10  described it earlier, but just in case, what is
11  dyspareunia for the record?
12  A.  I actually did not describe it, but I will do
13  so now.  Pain with sex.
14  Q.  Thank you.
15      Dyspareunia is a potential known
16  complication with native tissue repair that does not
17  use vaginal mesh; is that true?
18  A.  Yes.
19  Q.  And you agree that any pelvic surgery carries
20  a risk of dyspareunia?
21  A.  Yes.
22  Q.  In your practice is dyspareunia an extremely
23  common complaint among women?
24  A.  No.
25      MS. SCARCELLO:  Objection.

Page 85

1  BY MR. MANDELL:
2  Q.  You -- you were aware of the risk of
3  dyspareunia prior to performing surgery with the Align
4  and Avaulta on Ms. Smith; correct?
5  A.  Yes.
6  Q.  And you're aware of dyspareunia being a
7  short-term and long-term, or chronic, risk prior to
8  Ms. Smith's implant; correct?
9  A.  Correct.
10  Q.  Now, focusing on pelvic and vaginal pain.  The
11  risk of pelvic and vaginal pain is not unique to
12  surgery using vaginal mesh, is it?  And I'm sorry.  I
13  should specify pelvic surgery.
14  A.  No.
15  Q.  And pelvic and vaginal pain is a potentially
16  known complication with native tissue repair that does
17  not use vaginal mesh; right?
18  A.  Yes.
19  Q.  You were aware of the potential risk of pelvic
20  and vaginal pain prior to performing surgery with the
21  Align and Avaulta on Ms. Smith; correct?
22  A.  Yes.
23  Q.  And you were aware of the pelvic and vaginal
24  pain being a short-term and long-term risk, or chronic
25  risk, prior to Ms. Smith's implant; correct?

Jin-Hee Kim, M.D.

Page 86

1      MS. SCARCELLO:  Objection.
2      THE WITNESS:  Yes.
3  BY MR. MANDELL:
4      Q.  Okay.  Now, we already discussed that prior to
5  the mesh surgery of Ms. Smith you were aware of mesh
6  erosion and extrusion; correct?
7      A.  Yes.
8      Q.  As well as mesh migration; correct?
9      A.  Yes.
10     Q.  And prior to Ms. Smith's 2008 implant, you
11 were also aware that such risks of erosion, extrusion,
12 migration may cause chronic inflammation?
13     A.  Yes.
14     Q.  And may cause chronic pain?
15     A.  Yes.
16     Q.  And could cause bleeding?
17     A.  Yes.
18     Q.  These are all known risks for any surgery
19 involving vaginal mesh; correct?
20     A.  Yes.
21     Q.  Okay.  Risk of vaginal scarring is not unique
22 to -- to a surgery -- to pelvic surgery using vaginal
23 mesh, is it?
24     A.  No.
25     Q.  Vaginal scarring is a potential known

Page 87

1  complication with native tissue repair that does not
2  use mesh; right?
3      MS. SCARCELLO:  Object --
4      THE WITNESS:  Yes.
5      MS. SCARCELLO:  -- to form.
6  BY MR. MANDELL:
7      Q.  And agree that any pelvic surgery carries a
8  risk of vaginal scarring?
9      A.  Yes.
10     Q.  And you were aware of the potential risk of
11 vaginal scarring prior to performing the surgery of
12 the Align and Avaulta in Ms. Smith; correct?
13     A.  Yes.
14     Q.  And you were aware that scarring could lead to
15 pain and sexual pain both in the short term and long
16 term prior to Ms. Smith's 2008 implants?
17     A.  Yes.
18     Q.  The same would be true about ban- -- banding
19 as a risk?
20     A.  Yes.
21     Q.  Before the Align and Avaulta, you knew that
22 you would be implanting a foreign body into Ms. Smith;
23 correct?
24     A.  Yes.
25     Q.  And you learned about the body's inflammatory

Page 88

1  response to foreign materials during medical training;
2  right?
3      A.  Yes.
4      Q.  Before using the Align and Avaulta in
5  Ms. Smith, you knew that an inflammatory reaction to
6  mesh could occur; right?
7      A.  Yes.
8      Q.  Any patient can have an idiosyncratic reaction
9  to an implanted material; is that true?
10     A.  Yes.
11     Q.  And we just went over the IFU for Bard's
12 product that states that an inflammatory adverse
13 reaction is possible; right?
14     A.  Yes.
15     Q.  And that is consistent with your understanding
16 at the time you used the Align and Avaulta in
17 Ms. Smith; correct?
18     A.  Yes.
19     Q.  Do you agree that inflammation is a normal
20 part of the healing process?
21     A.  Yes.
22     Q.  Expected after surgery?
23     A.  Yes.
24     Q.  That the formation of scar tissue is a normal
25 and expected part of the healing process?

Page 89

1      A.  Yes.
2      MS. SCARCELLO:  Object to form.
3  BY MR. MANDELL:
4      Q.  Do you agree that contracture is a risk for
5  all vaginal mesh procedures?
6      MS. SCARCELLO:  Object to form.
7      THE WITNESS:  Yes.
8  BY MR. MANDELL:
9      Q.  And you knew this before Ms. Smith's 2008
10 implant procedures; right?
11     A.  Yes.
12     Q.  So having now reviewed the Align and Avaulta
13 IFUs, do you feel that the instructions for use that
14 accompanied those Avaulta and Align products were
15 adequate at the time of Mrs. Smith's 2008 implant?
16     MS. SCARCELLO:  Object to form.
17     MR. POTTER:  Object to form.
18     To the extent that you had an opinion back
19 at the time, you can answer.  You're not going to do a
20 retrospective, new, present-day opinion.
21     THE WITNESS:  Correct.  Yes.
22 BY MR. MANDELL:
23     Q.  And at the time of Ms. Smith's implant
24 surgery, did you feel you knew enough about the Align
25 and Avaulta Plus to make an informed decision about

Jin-Hee Kim, M.D.

Page 90

1 whether to use the product on Ms. Smith?
2         MS. SCARCELLO:  Object to form.
3         THE WITNESS:  Yes.
4 BY MR. MANDELL:
5    Q.  And at the time of Ms. Smith's implant, did
6 you feel you knew enough about the Align and Avaulta
7 Plus to make an informed decision about how to use the
8 products with Ms. Smith?
9    A.  Yes.
10         MS. SCARCELLO:  Object to form.
11 BY MR. MANDELL:
12    Q.  Now, I just want to be clear.  You didn't rely
13 on any materials from Bard in making your
14 determination to use the Align and Avaulta on
15 Ms. Smith; correct?
16         MS. SCARCELLO:  Object.  Object to the
17 form of that question.  Misstates her testimony.
18         THE WITNESS:  Okay.  Say that again.
19 BY MR. MANDELL:
20    Q.  Yeah.  Did you rely on any materials from Bard
21 in making your determination to prescribe and implant
22 the Align and Avaulta into Ms. Smith?
23    A.  No.
24    Q.  At your office in 2008, did you have any
25 Bard-specific pelvic mesh literature or brochures for

Page 91

1 patients?
2    A.  I may have.
3    Q.  Do you -- you don't recall one way or the
4 other?
5    A.  I don't -- no.
6    Q.  So if I asked you what those brochures would
7 say, you wouldn't be able to provide that; is that
8 correct?
9    A.  No.
10    Q.  I want to go to the medical records.  I
11 believe that was Exhibit --
12         MS. SCARCELLO:  Not entered as an exhibit
13 yet.
14         MR. MANDELL:  Oh, okay.  Can we go off the
15 record for a second?  Take a quick break.
16         THE VIDEOGRAPHER:  We are off the record
17 at 3:20.
18         (Pause in the proceedings.)
19         (Deposition Exhibit No. 6 was marked.)
20         THE VIDEOGRAPHER:  We are back on the
21 record at 3:22.
22 BY MR. MANDELL:
23    Q.  So, actually, before I go into these medical
24 records, I wanted to address something opposing
25 counsel asked you earlier.  She kept asking has anyone

Page 92

1 from Bard told you "X," "Y," "Z," or -- or that.  Do
2 you recall her -- her continual questions about
3 whether anyone from Bard told you something?
4    A.  Yes.
5    Q.  And those seemed to relate to studies about
6 mesh, key opinion leaders, things of that nature; is
7 that correct?
8    A.  Yes.
9    Q.  So have you seen any support for any of those
10 questions counsel asked you about?
11         MS. SCARCELLO:  Object to the form of the
12 question.
13         THE WITNESS:  I'm not sure what you mean
14 by "support."
15 BY MR. MANDELL:
16    Q.  Have you seen any documents supporting any of
17 the questions that counsel asked you about?
18         MS. SCARCELLO:  Object to form.
19         THE WITNESS:  No.
20 BY MR. MANDELL:
21    Q.  So you have no idea about the truthfulness of
22 those statements that -- that counsel was asking you;
23 is that correct?
24    A.  That is correct.
25    Q.  And so, obviously, they don't have an effect

Page 93

1 on your decision in 2008 to implant the Avaulta Plus
2 and Align TO in Ms. Smith; is that correct?
3         MS. SCARCELLO:  Object to form.
4         MR. POTTER:  Object to form.  I just want
5 to make sure I understand.  You're asking her whether
6 all of those --
7         MR. MANDELL:  Right.
8         MR. POTTER:  -- hypothetical statements
9 that counsel asked, whether that would have then
10 affected her decision-making?
11         MR. MANDELL:  That they -- since she
12 doesn't know the truthfulness of those statements,
13 they obviously have no impact on her decision in 2008.
14         MS. SCARCELLO:  Well, but -- and she can't
15 go back in time.  That's why they don't have --
16         THE WITNESS:  Well, I already answered
17 that I would not -- I was not aware of any of those
18 things that -- that opposing counsel from you told.
19 BY MR. MANDELL:
20    Q.  Okay.
21    A.  So I --
22         MR. POTTER:  So I want to be consistent
23 here with both of you.
24         MR. MANDELL:  Right.
25         MS. PINTO:  She's not going to take

Jin-Hee Kim, M.D.

Page 94

1 hypothetical information given to her today and tell
2 either of you what she would have potentially done in
3 2008 with that information.
4         MR. MANDELL: Okay.
5         MR. POTTER: She's already testified
6 nobody told her any of that information.
7         MR. MANDELL: Okay.
8         THE WITNESS: I have no information from
9 what the opposing counsel had said.
10 BY MR. MANDELL:
11    Q. All right. And so we'll just leave it at
12 that, that you agree that you don't know the
13 truthfulness of any of those statements. Correct?
14         MS. SCARCELLO: Object to form.
15         THE WITNESS: Since I wasn't -- testified
16 that I did not -- was not even aware of those so
17 that's where I stand.
18 BY MR. MANDELL:
19    Q. So you don't know the truthfulness about them;
20 is that correct?
21         MS. SCARCELLO: Object to form.
22 BY MR. MANDELL:
23    Q. If you're unaware.
24    A. I was unaware.
25    Q. One of the statements she asked you is if Bard

Page 95

1 ever told you if mesh -- mesh can elicit a foreign
2 body response that could cause pain. We just talked
3 about that; correct?
4    A. Yes.
5    Q. And although you're not aware of anyone from
6 Bard telling you that, you were aware of that before
7 the 2008 implant in Ms. Smith; correct?
8         MS. SCARCELLO: Object to the form of the
9 question.
10 BY MR. MANDELL:
11    Q. I can -- I can repeat the question.
12    A. Yes. Actually, I don't recall the initial
13 question, what the wordage was; so...
14    Q. So let me just say this. You were aware that
15 mesh could cause a foreign body response in a patient,
16 and that would, in turn, cause pain before Ms. Smith's
17 2008 implant; right?
18    A. Yes.
19    Q. All right. So going to the medical records
20 now, these are Exhibit 6. And these are Bates --
21 Bates labeled from 1 to 54. Now, were these records
22 prepared and maintained by your office in the ordinary
23 course of business at or near the time of the date on
24 the records?
25    A. Yes.

Page 96

1    Q. And fair to say that you try to put down
2 everything that is pertinent to your findings on the
3 date of a patient's visit or op- -- operation?
4    A. Yes.
5    Q. And when you create records, you try to be
6 accurate and complete; right?
7    A. Yes.
8    Q. Okay. So if we can go to page 35, this
9 appears to be the first time that Ms. Smith comes to
10 Urology Clinic.
11    A. No, it's not.
12    Q. Okay. Do you know the first time, then?
13    A. Page 12.
14    Q. Page 12. So this is dated 11/30/2007 and the
15 other record was dated -- on page 35 was dated
16 11/15/2007. That's why I was assuming it was the
17 first --
18    A. No. This was the records, if you looked at
19 page 39, by Dr. Julie Crawford who was the
20 gynecologist.
21    Q. And is she not part of your -- your clinic?
22    A. No.
23    Q. I see. Sorry about that.
24         So -- so you were cc'd on Ms. Crawford's
25 record here. It shows that on page 39; correct?

Page 97

1    A. Yes.
2    Q. And then presumably it looks like she
3 recommended her to go see you -- Ms. Smith to go see
4 you, and that's when you see her on page 12 here on
5 11/30/2007; is that right?
6    A. That is correct.
7    Q. Okay. Do you know if Ms. Smith provided you
8 with -- with -- you or your clinic with any of her
9 previous medical records?
10    A. Besides what she filled out for us in the
11 clinic.
12    Q. Okay. If there were any previous medical
13 records, they would be in this file; right?
14    A. That is correct.
15         MR. POTTER: Are you including the record
16 from 11/15 that you just identified?
17         MR. MANDELL: Right.
18 BY MR. MANDELL:
19    Q. So, I mean, if there were any other previous
20 records, they would be in this file we're looking at,
21 Exhibit 6.
22    A. Yes.
23    Q. Okay. So looking at page 12, this is
24 11/30/2007. Can you summarize why Ms. Smith visited
25 you and your diagnosis?

Jin-Hee Kim, M.D.

Page 98

1    A.  The patient was suffering from stress urinary
2  incontinence as well as heavy menses.
3    Q.  And so just go into that a little bit further.
4  She complained to you about stress incontinence;
5  right?  What symptoms was she having related to stress
6  urinary incontinence?
7    A.  She was having leakage with coughing and
8  sneezing.
9    Q.  And it looks like it says here that at some
10  point she was having to change pads two times a day;
11  is that correct?
12       MS. SCARCELLO:  Object to form.
13       THE WITNESS:  Yes.
14  BY MR. MANDELL:
15    Q.  Other than Ms. -- Ms. Smith's self-reporting
16  here, did you run any tests on her related to her
17  complaint of SUI?
18    A.  Just a urinalysis.
19    Q.  And what did -- what did that test conclude or
20  entail?
21    A.  Just dipping your urine in a urine dipstick.
22    Q.  Okay.  And you believed Ms. Smith was a good
23  candidate for the sling, the Align TO placement at
24  this time; correct?
25    A.  Yes.

Page 99

1    Q.  And why did you believe that?
2    A.  Because of her symptoms.
3    Q.  Okay.  And -- and you're referring to her
4  leaking symptoms; correct?
5    A.  That's correct.
6    Q.  And then on page 13, you indicate here that
7  she has a Grade I to II cystocele.
8    A.  Yes.
9    Q.  And what is -- what is a cystocele exactly?
10    A.  Cystocele is the prolapse of the bladder.
11    Q.  And what is a Grade I to II?
12    A.  Usually -- we have a grading system of I
13  through IV where IV is complete prolapse of the organ
14  outside of the vaginal introitus.  And I, II, III, is
15  anywhere between that.  III is up to the introitus.  I
16  to II is prior to the introitus.
17    Q.  And when you say "introitus," you're referring
18  to the vaginal opening?
19    A.  That is correct.
20    Q.  Now, you indicate here that -- if we're going
21  under "ASSESSMENT AND PLAN," you say here that --
22  well, let me strike that.
23       You also note -- note that she has a mild
24  rectocele -- is that correct? -- on page 13.
25    A.  Yes.

Page 100

1    Q.  And then under "ASSESSMENT AND PLAN" on the
2  same page, page 13, you say the rectocele is
3  asymptomatic so you don't feel that you need to treat
4  that at that time; is that correct?
5    A.  Yes.
6    Q.  And so did you -- did you end up treating her
7  for rectocele?
8    A.  No.
9    Q.  And so you did not ever perform a posterior
10  repair on Ms. Smith; is that correct?
11    A.  That is correct.
12    Q.  Now, it says "...but I do think she will be a
13  good candidate for a cystocele repair" --
14    A.  Uh-huh.
15    Q.  -- "and sling placement."  Do you see that?
16  And "I have talked to her about the possibility of
17  doing an Avaulta repair as well as a cystoscopy."
18    A.  Uh-huh.
19    Q.  Okay.  And that's a "Yes" that you see there?
20    A.  That is a "Yes."
21    Q.  So why did you think Ms. Smith would be a good
22  candidate for a cystocele repair?
23    A.  Because she had a cystocele and she was also
24  having stress incontinence at the same time.
25    Q.  And when you say "a cystocele repair," you're

Page 101

1  referring to a repair with the Avaulta; is that
2  right? that she'd be a good candidate for that.
3    A.  Yes.
4    Q.  Was Ms. Smith's cystocele symptomatic?
5    A.  From my history I'm not mentioning anything.
6  And, again, I don't have a true recollection of this.
7  I'm just going by my medical notes.
8    Q.  Okay.  So based off what you -- you can recall
9  now and -- and looking at the records --
10    A.  Uh-huh.
11    Q.  -- you don't have anything to add about that?
12    A.  No.
13    Q.  So what were Ms. Smith's risk factors for
14  development of SUI and cystocele?
15    A.  Mostly having had babies.
16    Q.  And when you say "babies," are you referring
17  to the six pregnancies and six vaginal deliveries she
18  had?
19    A.  Yes.
20    Q.  What effect, if any, could those multiple
21  deliveries have on Ms. Smith's pelvic floor?
22    A.  It can cause incontinence and prolapse.
23    Q.  And was she at risk for future pelvic issues
24  due -- due to the number of pregnancies she had?
25    A.  What do you mean by "future"?

Jin-Hee Kim, M.D.

Page 102

1    Q.  Just at risk for having pelvic -- you know,
2  additional pelvic issues.
3    A.  After the birth of her children?
4    Q.  Yes.  After six pregnancies.
5    A.  Yes.
6    Q.  And vaginal births I meant to say.
7         Now, how about the previous tubal
8  ligation? the 1999 procedure.  What effect, if any,
9  could that have on Ms. Smith's pelvic floor?
10   A.  I want to say none.
11   Q.  Okay.  Could it lead to scarring?
12   A.  It could.
13   Q.  What about the a- -- is it ablation?  Is that
14  the correct way to pronounce it?
15   A.  Yes.
16   Q.  -- in 2006 could -- could that -- what effect,
17  if any, could that have on Ms. Smith's pelvic floor?
18   A.  And I'm sorry.  What kind of ablation did she
19  have?  "Ablation" is a very generic term.
20   Q.  I -- I just have what's done -- what's done
21  here in your past surgical history, ablation in 2005.
22  If you don't recall the specifics of it, then that's
23  fine.
24   A.  I don't recall the specifics of it.
25   Q.  And then what about the D&C?  Which what does

Page 103

1  that stand for?
2    A.  Dilation and curettage.
3    Q.  And what effect, if any, could that have on
4  Ms. Smith's pelvic floor?
5    A.  Probably nothing.
6    Q.  Okay.  Would it -- could it also lead -- lead
7  to scarring?
8    A.  It could.
9    Q.  Okay.  Now, it says a full -- we're on page 13
10  again -- "A full PARQ." P-A-R-Q, "conference was held
11  regarding the procedure."  Now, a P-R -- PARQ,
12  P-A-R-Q, conference is required by law here in Oregon;
13  right?
14   A.  That is correct.
15   Q.  And can you describe to us what it is.
16   A.  It's basically the consent form we get for
17  surgery.
18   Q.  Okay.  So I -- I know that the acronym stands
19  for something, but I'm just going to sparse [verbatim]
20  it out with you.  So at this time you would have
21  discussed the risks, benefits, and options to
22  Ms. Smith; is that correct?
23   A.  That is correct.
24   Q.  That would be part of this conference?
25   A.  Yes.

Page 104

1    Q.  Can you tell me what risks you discussed with
2  Ms. Smith about the mesh procedure?
3    A.  So, again, I don't recall the specifics, but
4  my standard consent that I give for all patients who
5  are undergoing mesh -- vaginal mesh procedures include
6  risks from the anesthesia; risks of bleeding;
7  infection; risks of prolapse recurrence; risks of
8  mesh-related risks including extrusion, migration,
9  pain.
10   Q.  Would you have -- would part of your practice
11  be warning about the potential of pelvic and vaginal
12  pain?
13   A.  Yes.
14   Q.  And the potential for a risk of dyspareunia?
15   A.  Yes.
16   Q.  And -- and vaginal scarring?
17   A.  Yes.
18   Q.  And this was -- although you don't have a
19  specific recollection -- sorry.  Let me -- let me
20  strike that.
21        This was part of your common practice, to
22  warn any of your patients in 2008 who were having a
23  mesh procedure; correct?
24   A.  Correct.
25   Q.  Okay.  And when you go over risks with a

Page 105

1  patient, you assess whether they have the ability to
2  understand the risks you describe; right?
3    A.  Yes.
4    Q.  And -- and -- and when you went over the risks
5  with Ms. Smith, did you believe she was capable of
6  making an informed consent?
7    A.  I believe she was.
8    Q.  Now, as far as alternatives, it says you
9  discussed options with Ms. Smith.  What -- what were
10  those options?
11   A.  Again, I don't recall specifically, but my
12  standard options are pelvic floor exercises including
13  kegel exercises.
14   Q.  Did you discuss medications?
15   A.  Medications are not relevant or appropriate in
16  this case.
17   Q.  Okay.  Was she interested in pelvic floor or
18  physical therapy?
19   A.  Not to my knowledge.  Again, I don't recall.
20   Q.  Any other alternatives for Ms. Smith that you
21  haven't mentioned already?
22   A.  I don't think so.
23   Q.  Okay.  And she elected to proceed with the
24  surgery; is that correct?
25   A.  Yes.

Jin-Hee Kim, M.D.

Page 106

1  Q. And, finally, it says here "All questions were
2  answered and the patient agrees to proceed."  Do you
3  see that?
4  A. Yes.
5  Q. By noting this, you're indicating that
6  Ms. Smith consented to the procedure and you answered
7  any questions she may have had at the time; correct?
8  A. That is correct.
9  Q. Can you remember if Ms. Smith had any
10 questions?
11 A. I do not remember specifically.
12 Q. Do you know if anyone else was present with
13 her at the time?
14 A. I don't remember.
15 Q. Okay.  So let's see.  If we can go to page 32.
16 It looks like at the bottom here it says -- this is
17 the pre-op report by -- and pre-op history and
18 physical that Dr. Crawford performs on 10/10/2008.  Is
19 that --
20 A. Yes.
21 Q. Okay.  And it indicates on page 34 that you
22 were cc'd here.
23 A. Yes.
24 Q. Okay.  And so you would have read this record,
25 I presume.

Page 107

1  A. Yes.
2  Q. And it says on page 34 -- if you go to
3  "GYNECOLOGICAL," the second line, it says "On my exam,
4  there is no evidence of significant cystocele or
5  rectocele, and she appears apically supported.
6  However, on exam by Dr. Kim, she has a mild rectocele
7  and cystocele."
8     Do you see that?
9  A. Yes.
10 Q. Did you and Dr. Crawford talk about this?
11 Were you essentially saying the same thing?  I just
12 wanted to reconcile.
13 A. We did not speci- -- I don't recall
14 specifically talking about it.
15 Q. Okay.  Where -- are you -- are you guys saying
16 the same thing in some sense or -- or you don't know?
17 A. Well, Dr. Crawford thought there was no
18 significant cystocele or rectocele.
19 Q. And -- and you don't recall any discussion
20 with Dr. Crawford about it?
21 A. No.
22 Q. Okay.  If we go to page 32, and it's right
23 above the "PAST OBSTETRIC HISTORY."  It says
24 "Ms. Smith will be admitted on January 15, 2008, for a
25 planned...hysterectomy" -- sorry -- "for a planned

Page 108

1  total vaginal hysterectomy with a possible sling
2  procedure and cystocele repair.  Depending on her
3  exam, she may also benefit from an Avaulta mesh and/or
4  evaluation with cystoscopy."
5     Did I read that correctly?
6  A. Yes.
7  Q. So -- and then on January 15, 2008, Ms. Smith
8  was, indeed, implanted with the Avaulta mesh to treat
9  her cystocele; right?
10 A. Yes.
11 Q. So at the time of the surgery, do you recall
12 talking to Dr. Crawford about putting in the Avaulta,
13 or was that a decision that you made?
14 A. I'm assuming I talked to her about it.  I
15 mean, this is always a joint decision that we make.
16 Although Dr. Crawford usually defers to me as I tend
17 to do more pelvic floor prolapses.
18 Q. Okay.  And do you remember any specifics about
19 whatever discussion you may have had at the time?
20 A. I do not recall.
21 Q. And so would you say -- I think you kind of
22 answered this.  But the decision to implant the
23 Avaulta was -- was your decision.  It wasn't a -- a --
24 a mutual decision with the two of you?
25 A. Most likely my decision, yes.

Page 109

1  Q. And so you determined that Ms. Smith was a
2  good candidate for the Avaulta; right?
3  A. Yes.
4  Q. And that's -- and it seemed like -- like you
5  were going to make that decision once you actually
6  went in for the surgery; is that -- that correct?
7  A. Yes.
8  Q. And so why -- why, when you went into --
9  actually went in for the surgery did you determine she
10 was a good candidate?
11 A. Once the patients are under anesthesia and
12 they're relaxed, you can actually see whether there is
13 more of a prolapse or not, especially after the
14 hysterectomy has been performed.  Then it's even more
15 evident whether there is going to be issues with
16 prolapse.
17 Q. And -- and these were the indications for --
18 for why you ended up implanting the Avaulta; correct?
19 A. Yes.
20 Q. Now, it's your understanding that Ms. Smith
21 signed a consent form for -- for her procedure; is
22 that right?
23 A. Yes.
24 Q. Okay.  So I want to go to the implant
25 procedure record which is on 20 -- page 27.  And so,

Jin-Hee Kim, M.D.

Page 110

1  first, Ms. Smith had a hysterectomy -- hysterectomy
2  performed by Dr. Crawford, and you assisted in that;
3  correct?
4      A.  Yes, I believe so.
5      Q.  Okay.  Were there any complications with that
6  hysterectomy procedure?
7      A.  Not that I recall.
8      Q.  And then you performed the implants of the
9  Align TO and the Avaulta Plus Anterior; correct?
10     A.  Yes.
11     Q.  And Dr. Crawford assisted?
12     A.  That is correct.
13     Q.  Okay.  It looks like the Avaulta Plus Anterior
14  was implanted first; is that right?
15     A.  Before the --
16     Q.  Align.
17     A.  Yes.
18     Q.  Can you --
19     A.  After the hysterectomy.
20     Q.  Yes.  After the hysterectomy, but before the
21  Align; is that right?
22     A.  Yes.
23     Q.  Can you describe to me your implant technique
24  for the Avaulta Plus Anterior in Ms. Smith?
25     A.  Well, it is described in detail in this

Page 111

1  operative report.  Would you like me to read the
2  operative report?
3      Q.  If you're just going to read what's in the
4  operative report, then that's not necessary.
5      A.  Okay.
6      Q.  But if you have anything additional to add to
7  it or -- or just to describe how you do this procedure
8  in general, I'd appreciate it.
9      A.  I mean, it's -- if you want me -- I mean, I
10  don't recall exactly the actual procedure with
11  Ms. Smith, it being 11 years ago or more than that.
12  So I can just tell you in general what I do --
13     Q.  Okay.
14     A.  -- and that this was an uneventful surgery.
15  But the actual specifics of this particular surgery,
16  no, I -- I cannot tell you.
17     Q.  Can you -- can you just describe to me,
18  though, the technique that you use, I guess, for
19  implanting the Avaulta Plus Anterior back in 2008?
20     A.  So I inject with local anesthesia which
21  provides a little bit of hydrodistention.  I make an
22  incision in the anterior vaginal wall, dissect with
23  usually Metzenbaum scissors.  And -- and then we let
24  the mesh soak for a little while.  This one required
25  it to be soaked.  And then we pass a needle that goes

Page 112

1  through the transobturator for the very proximal --
2  I'm sorry -- the very distal arms.
3          And you have to then -- I believe with the
4  Avaulta you have to do another incision -- I'm sorry.
5  I haven't done the Avaulta in quite some time so -- I
6  guess right in front of the ischial spine.  Yes.  And
7  then you have to -- there's -- there are four arms on
8  it as you saw in the diagram.  The very top arm, or
9  very distal arm, goes through the transobturator
10  space.  The very proximal arm goes right in front of
11  the ischial spine I believe is what we were using at
12  the time.
13     Q.  Okay.  And, again, you said it was uneventful,
14  so no complications --
15     A.  Correct.
16     Q.  -- with the Avaulta?
17         And then with the Align, no complications
18  with --
19     A.  Yes.
20     Q.  -- implanting that; correct?
21         MR. POTTER:  Just for --
22  BY MR. MANDELL:
23     Q.  Sorry.  When you say "Yes," you mean no
24  complications; is that correct?  Or were there any
25  complications with the Align surgery?

Page 113

1      A.  There were no complications I can recall from
2  the surgery.
3      Q.  Okay.
4          MR. POTTER:  What I was going to say is
5  you were starting to talk over --
6          THE WITNESS:  Sorry.  Yes.  I realized
7  that.  And I'm talking over you too.
8          MR. POTTER:  Let him get his questions
9  out --
10         THE WITNESS:  Yes.
11         MR. POTTER:  -- and then answer.
12  BY MR. MANDELL:
13     Q.  So now, if we go to page 8, this is
14  Ms. Smith's post-op visit.  Do you see that?
15         And you indicate the patient is doing
16  extremely well.  Do you see that?
17     A.  Yes.
18     Q.  Okay.  And that's -- that's a true
19  statement -- right? -- that you wrote -- that you
20  wrote at the time.
21     A.  Yes.
22     Q.  Okay.  And then if we go to -- so it says
23  here on -- sorry.  Still on page 8, it says "She is
24  doing extremely well.  She is urinating without any
25  problems.  She is no longer having any problems with

Jin-Hee Kim, M.D.

Page 114

1  stress incontinence, and she is also having regular
2  bowel movements as well."
3         So it appears at this time her SUI and
4  cystocele are both resolved; is that correct?
5     A.  Yes.
6         MS. SCARCELLO:  Object to form.
7  BY MR. MANDELL:
8     Q.  Given the procedure was a success; is that
9  correct?
10         MS. SCARCELLO:  Object to form.
11         THE WITNESS:  Yes.
12  BY MR. MANDELL:
13     Q.  Now, you also note here under where it says
14  "O," the last sentence, it says "There is no sign of
15  any mesh extrusion."  And so at this time there was no
16  extrusion; is that correct?
17     A.  Yes.
18     Q.  Okay.  And then you asked to see her back in
19  six weeks.  Do you see that?
20     A.  Yes.
21     Q.  And do you see any record of Ms. Smith
22  returning in six weeks?
23     A.  It does say on April 3rd that she had
24  rescheduled her appointment.
25     Q.  And then did she ever come in again after

Page 115

1  April 3rd after -- or after that note?
2     A.  Does not look like it until January.
3     Q.  So you hadn't seen Ms. Smith until January
4  2009 when she comes back to you complaining of
5  feeling -- of her husband feeling mesh at the time of
6  having sex; right?
7     A.  Yes.
8     Q.  Now, you prescribed her estrogen cream.  Do --
9  do you know how long you would have prescribed her to
10  be taking that estrogen cream after this post-op in --
11  in 2/13/2008?
12     A.  I usually like to prescribe estrogen cream for
13  the first, at least, three months.  And then, when I
14  examine them again after three months, if everything
15  looks good, a lot of times I have them stop it.
16     Q.  So you don't know if -- if Ms. Smith continued
17  to use the estrogen cream because she didn't come back
18  within three months; is that correct?
19     A.  That is correct.
20     Q.  And she -- and -- and you were unable to,
21  then, assess if she needed to continue estrogen cream
22  because she never came back; is that right?
23         MS. SCARCELLO:  Object to form.
24  BY MR. MANDELL:
25     Q.  Until 2009.

Page 116

1     A.  That is correct.
2     Q.  Okay.  And is it true that estrogen cream can
3  help resolve pain and dyspareunia?
4     A.  It can.
5     Q.  So now if we go to this January 2009 record,
6  it indicates, again, here that she's not having any
7  SUI issues but it appears her complaint is some --
8  what you assess is mesh erosion at the proximal edge
9  of the mesh; is that right?
10     A.  Yes.
11     Q.  Do you know what device you're referring to
12  here?  Was it the Avaulta or the Align?
13         MS. SCARCELLO:  Object to form.
14         THE WITNESS:  This is most likely the
15  Avaulta.
16  BY MR. MANDELL:
17     Q.  Okay.  Now, is there any complaint of pain
18  related to this erosion?  If there was, would you have
19  noted that here in the record?
20         MS. SCARCELLO:  Object to form.
21         THE WITNESS:  There's a mention that her
22  husband noticed something during sexual intercourse.
23  BY MR. MANDELL:
24     Q.  But is there any -- there's no indication that
25  she was feeling any pain; is that correct?

Page 117

1         MS. SCARCELLO:  Object to form.
2  BY MR. MANDELL:
3     Q.  Whether it be -- whether that be pelvic
4  vaginal pain or dyspareunia pain.
5     A.  That is correct.
6     Q.  Okay.  And if she would have told you that,
7  you would have noted it here; correct?
8         MS. SCARCELLO:  Object to form.
9         THE WITNESS:  Well, I did note that the
10  patient states up until a month ago she did not feel
11  anything.
12  BY MR. MANDELL:
13     Q.  Okay.  But -- but, again, it's not noting
14  pain.  It's feeling something; right?
15     A.  Correct.
16     Q.  Okay.  Do you recall her telling you that she
17  felt any pain?
18     A.  I do not recall.
19     Q.  If she had told you that she was having a
20  sharp pain she felt during sex, is that something you
21  would have noted here?
22         MS. SCARCELLO:  Object to form.
23         THE WITNESS:  Most likely.
24  BY MR. MANDELL:
25     Q.  Now, just to clarify, it says here that

Jin-Hee Kim, M.D.

| Page 118 | Page 120 |
|---|---|

**Page 118**

1 "She...stopped using the Estrace cream several months
2 ago," and that was the cream you prescribed to her;
3 right?
4    A. Yes.
5    Q. And you never told her to stop using that
6 cream; right?
7    A. No.
8    Q. Okay. And what effect of not using that
9 cream, what effect could that have on Ms. Smith?
10    A. It could cause some vaginal irritation.
11    Q. Okay. Dryness? Discomfort? Does that --
12 does that sound correct?
13    A. Yes.
14    Q. Dyspareunia even?
15    A. Perhaps.
16    Q. Now, she claims she started a more rigorous
17 exercise regime. Is that -- could that have been any
18 contribution to this extrusion that occurred?
19        MS. SCARCELLO: Object to form.
20        THE WITNESS: She thinks it was.
21 BY MR. MANDELL:
22    Q. In your opinion.
23    A. I -- I -- I can't say.
24    Q. Okay. Now, you refer to it as erosion here,
25 but in the operating report, you referred to it as an

**Page 119**

1 extrusion. In your mind, is there any difference?
2    A. No.
3    Q. So to clarify, you saw the mesh coming through
4 the vaginal mucosa which is an erosion outside, and
5 that's sometimes referred to as an extrusion; right?
6    A. That is correct.
7    Q. Now, it says "A full PARQ conference was held
8 for the procedure, which is a revision and excision of
9 vaginal mesh erosion [and] was discussed at length
10 with the patient. The alternatives, risks, and
11 benefits were also explained and the patient agrees to
12 proceed."
13        Do you see that?
14    A. Yes.
15    Q. Okay. And that -- that would be the same --
16 would that have been the same conversation that we
17 discussed you had with the implant procedure?
18    A. Well, it's slightly different because the mesh
19 is already in.
20    Q. What -- as far -- well, let me restate it.
21        As far as risks involved, would there have
22 been any additional risks you would have added
23 different from what you told her in the implant PARQ
24 conference?
25    A. No.

**Page 120**

1    Q. Okay. So you still would have warned her
2 about the risks of continue -- you know, the risks of
3 dyspareunia; is that correct?
4    A. Yes.
5    Q. And the risk of vaginal or pelvic pain; is
6 that correct?
7    A. Yes.
8    Q. And the risk of additional scarring; is that
9 correct?
10    A. Yes.
11    Q. Okay. Now, it says here you -- I think you
12 recommended to perform surgery, but did you provide
13 Ms. Smith with other options?
14    A. I usually provide them with continue with
15 estrogen cream to see if that might help it.
16    Q. And from -- from your recollection in this
17 record, was -- was Ms. Smith interested in that?
18    A. Again, I don't recall but knowing -- since she
19 scheduled surgery soon afterwards, I suspect not.
20    Q. Okay. And she elected to proceed with the
21 surgery; right?
22    A. Yes.
23    Q. You -- you also indicate -- indicated --
24 indicated to her one of the risks would be failure of
25 the procedure?

**Page 121**

1    A. Yes.
2    Q. Okay. Now, on the operating report on page --
3 I think it's 24. You say "...a little bit of mesh
4 extruding..." Can you tell me what you mean by "a
5 little bit"?
6    A. I think I mean a little bit. Again, I -- I --
7 I, again, don't recall exactly; so I don't have the
8 dimensions for you.
9    Q. Okay. That's okay. But -- but overall would
10 you say that this was a very minor procedure?
11        MS. SCARCELLO: Object to form.
12        THE WITNESS: Yes.
13 BY MR. MANDELL:
14    Q. And -- and you would consider this extrusion
15 an expected risk of any pelvic mesh procedure; right?
16    A. It can happen, yes.
17    Q. And it was uneventful and no complications;
18 right?
19    A. From which surgery?
20    Q. This one. This 2009 surgery was uneventful
21 and no complications; right?
22    A. Yes.
23    Q. Did you conclude why this extrusion happened?
24    A. No.
25    Q. Would you say that tissue quality or -- or

Jin-Hee Kim, M.D.

Page 122

1  failure to use estrogen cream could have been a
2  reason?
3      A.  Potentially.
4      Q.  Just because you needed to revise the mesh, it
5  didn't mean there was anything wrong with the mesh; is
6  that right?
7      A.  That is correct.
8      Q.  Now, let's go to her post-op after this.  This
9  is February 2009, page 6.  And it looks like here you
10  note she's doing extremely well, putting on cream and
11  not having any problems and no evidence of mesh
12  extrusion at this time; is that correct?
13      A.  Yes.
14          This is -- I'm sorry -- page?
15      Q.  I have it on page 9.
16      A.  9?
17      Q.  Or is it 8?  I think it's 8.  Sorry.  This
18  would be -- wait.  6.  Page 6?
19          MR. POTTER:  Page 6.
20  BY MR. MANDELL:
21      Q.  Page 6.  I apologize.
22      A.  Okay.
23      Q.  This is page 6.  So this is after her revision
24  surgery, and you're noting she's doing very well, not
25  having any problems.  Do you see all of that?

Page 123

1      A.  Yes.
2      Q.  Okay.  And there's no evidence of any mesh
3  extrusion at this time; is that right?
4      A.  That is correct.
5      Q.  Okay.  And then on page 5, you have another
6  follow-up with her.  And it says she's doing extremely
7  well, no longer feeling any mesh, and that you do not
8  feel any more signs of mesh extrusion.  Is that
9  correct?
10      A.  Yes.
11      Q.  At this time she would have been permitted to
12  have sex; correct?
13      A.  This is how many weeks after surgery?
14      Q.  About two months after surgery.
15      A.  Yes.
16      Q.  And if she had any pelvic vaginal pain or
17  dyspareunia, if she had indicated that to you, that's
18  something you would have noted here; right?
19      A.  Yes.
20      Q.  Okay.  So now we're on, I believe, her last
21  visit to you which is page 4.  And this is April 2009.
22  Do you see that?
23      A.  Yes.
24      Q.  Again, you indicate she's doing extremely well
25  and that the excision surgery was successful.  You

Page 124

1  indicate that she's even quite happy with the results;
2  is that right?
3      A.  Yes.
4      Q.  So, in your opinion, was the excision
5  successful?
6      A.  Yes.
7      Q.  If Ms. Smith had indicated she had any pelvic
8  vaginal pain or dyspareunia at this time, that's
9  something you would have noted here; right?
10      A.  Yes.
11      Q.  During your examination, at any point from the
12  revision to these examinations, did you notice any
13  excessive scarring or banding?
14          MS. SCARCELLO:  Object to form.
15          THE WITNESS:  Not that I recall.
16  BY MR. MANDELL:
17      Q.  And if you would -- if you would have noticed
18  that, is that something you would have noted?
19      A.  Most likely.
20      Q.  Okay.  So after reviewing the records, this
21  looks like your last contact with Ms. Smith; is that
22  correct?
23      A.  Yes.
24      Q.  And just to confirm, when a patient comes to
25  you to follow up, do you ask them if they're -- if

Page 125

1  they have any problems?
2      A.  You mean just routinely?
3      Q.  Yes.
4      A.  For any patients?
5      Q.  Yes.
6      A.  Yes.
7      Q.  And -- okay.  And then -- we also went
8  over all of her post-op records, and, again, there's
9  no mention of Ms. Smith's SUI or cystocele after her
10  implant; is that correct?  Of symptoms.
11      A.  Right.  I mentioned that she's doing well --
12      Q.  Right.
13      A.  -- and no longer leaking.
14      Q.  So after her implant surgery, you would agree
15  that those issues, based on the last time you saw her,
16  were corrected and resolved.
17      A.  Yes.
18      Q.  In other words, the Align and Avaulta did what
19  they were intended to do; correct?
20      A.  Yes.
21      Q.  Ms. -- did Ms. Smith have a good prognosis for
22  her POP and SUI moving forward from the last time you
23  saw her?
24      A.  Yes.
25          MS. SCARCELLO:  Object to form.

Jin-Hee Kim, M.D.

Page 126

1  BY MR. MANDELL:
2      Q.  And you never formed an opinion that anything
3  was wrong with the Align or Avaulta that were
4  implanted in Ms. Smith; correct?
5          MS. SCARCELLO:  Object to form.
6          THE WITNESS:  No opinion.
7  BY MR. MANDELL:
8      Q.  Okay.  During the exam and subsequent
9  surgeries you had with Ms. Smith, the only thing you
10 -- you -- that she had was extrusion; is that correct?
11     A.  Correct.
12     Q.  Other than that you didn't note any problems
13 with the mesh; is that correct?
14     A.  Correct.
15     Q.  So based on all the risks and benefits you
16 understood to be related to the Align and Avaulta
17 Plus, is it fair to say that as of January 2008, what
18 you knew at that time, you felt the Align and Avaulta
19 was safe and effective and appropriate to treat
20 Ms. Smith for her stress urinary incontinence and
21 cystocele?
22         MR. POTTER:  Object to form.
23         Go ahead.
24         THE WITNESS:  This is prior to the
25 surgery?

Page 127

1  BY MR. MANDELL:
2      Q.  Yes.
3      A.  Yes.
4      Q.  And during your care and treatment of
5  Ms. Smith, you never came to the conclusion that there
6  was a specific aspect of the Align or Avaulta that
7  caused any injury to her; correct?
8      A.  Yes.
9          MS. SCARCELLO:  Object to form.
10 BY MR. MANDELL:
11     Q.  In 2008 you agree that you felt the Align and
12 Avaulta gave Ms. Smith the best chance of success with
13 respect to her stress urinary incontinence and
14 cystocele?
15     A.  Yes.
16     Q.  And you agree -- sorry.  I won't say that one.
17         Now, just real quickly, opposing counsel
18 mentioned that you were a preceptor for Bard.  Do you
19 recall her talking to you about that?
20     A.  Yes.
21     Q.  Do you know if Bard ever paid you any money?
22     A.  They may have.
23     Q.  Okay.
24     A.  Although I don't recall.
25     Q.  The -- now, the fact that -- the fact that you

Page 128

1  received training -- I'm sorry.  Let me strike that
2  again.
3          Did you ever feel coerced to use a
4  specific product because you attended a training
5  facilitated by Bard?
6      A.  Did I feel --
7          MS. SCARCELLO:  Object to form.
8          THE WITNESS:  -- coerced?
9  BY MR. MANDELL:
10     Q.  Yes.
11     A.  No.
12     Q.  And getting -- or what was your -- your
13 experience at the trainings, did you find those to be
14 beneficial to learn about the products?
15     A.  Yes.  But I'm going to just say generally
16 because I do not remember.
17     Q.  Okay.  And you agree that cadaver training
18 with experienced doctors is a valuable -- is valuable
19 for patient care?
20     A.  Yes.
21     Q.  You don't feel like the training Bard offered
22 is -- is a substitute for a surgeon's general training
23 and experience and own professional responsibility to
24 ensure that they know how to perform the surgeries
25 that they're performing with medical devices such as

Page 129

1  the Align and Avaulta?
2          MR. POTTER:  Object to form.
3          MS. SCARCELLO:  Object to form.
4          THE WITNESS:  So the question you're
5  asking me is, the cadaver training a
6  substitute for --
7  BY MR. MANDELL:
8      Q.  For your own training.
9      A.  It is not a substitute.
10     Q.  Okay.  Now, you obviously returned -- received
11 training to perform surgeries in medical school and
12 residency; right?
13     A.  Yes.
14     Q.  You also had training regarding surgery for
15 treatment of SUI and POP in medical and residency;
16 correct?
17     A.  Yes.
18     Q.  Medical school and residency.
19         And the training and teaching work that
20 you had done for Bard, was that done for the good of
21 patients in general?
22     A.  Yes.
23     Q.  You don't feel that the training and teaching
24 had -- had any -- or do you feel that the training and
25 teaching had any influence or bias over with -- over

Jin-Hee Kim, M.D.

Page 130

1 you with regard to your views on the appropriateness
2 of the use of a transvaginal mesh, whether it's the
3 Align or Avaulta, back in 2008?
4          MR. POTTER: Object to form.
5          MS. SCARCELLO: Join.
6          MR. POTTER: You're talking teaching and
7 training she received or teaching and training that --
8          MR. MANDELL: Yeah.
9          MR. POTTER: -- she was supposedly doing?
10          MR. MANDELL: So let me rephrase that.
11 BY MR. MANDELL:
12     Q. The -- with regard to the teaching and
13 training as it -- as it applies to Bard --
14     A. That I received.
15     Q. The teach -- the training that you received
16 and the -- and the -- the preceptor that you -- that
17 you did for Bard, focusing on that.
18          MR. POTTER: Well, and that's my
19 objection. I don't think we've ever established
20 exactly what she did as a --
21          MR. MANDELL: Oh.
22          MR. POTTER: -- preceptor or if she, in
23 fact, did it.
24 BY MR. MANDELL:
25     Q. Do you know -- do you know if you ever acted

Page 131

1 as a preceptor for Bard?
2          MR. POTTER: Object to form. Asked and
3 answered.
4          THE WITNESS: I believe I did act as a
5 preceptor. Again, I don't recall the numbers.
6 BY MR. MANDELL:
7     Q. Gotcha.
8          So your -- your training with Bard and --
9 and your -- and being a preceptor for Bard, did that
10 have any influence or bias over you with regards to
11 your views on the appropriateness of using
12 transvaginal mesh such as the Align or Avaulta?
13     A. No.
14     Q. Okay. Did it affect your medical -- medical
15 judgment in your decision to implant the Avaulta Plus
16 and Align TO in Ms. Smith?
17     A. No.
18     Q. Now, counsel had asked you about training that
19 you did receive with the Avaulta. She referred to it
20 as Avaulta products. Are you able to tell me if those
21 were the Avaulta or Avaulta Plus products?
22     A. I don't recall.
23     Q. And she kept using the phrase that the
24 training was one of the ways or only way you could
25 receive in-depth knowledge of the Align or Avaulta

Page 132

1 Plus. Do you recall that type of questioning?
2          MS. SCARCELLO: Object to the form of the
3 question.
4          THE WITNESS: I'm not sure she ever said
5 "only way to train."
6 BY MR. MANDELL:
7     Q. Or -- or -- or was a way for you to receive
8 in-depth knowledge of those products.
9     A. I don't know if she said that, but okay.
10     Q. Let's -- let's -- let's try to ask it a
11 different way.
12     A. Sure.
13     Q. Would you agree that those trainings were not
14 the only way for you to know knowledge of products for
15 midurethral slings and transvaginal mesh?
16     A. Yes.
17     Q. Okay. Finally, she -- she also brought up an
18 MSDS sheet, a material safety data sheet. She didn't
19 show you the document. Is that something you rely on
20 when making a medical -- medical decision in your
21 practice?
22          MS. SCARCELLO: Object to form.
23          THE WITNESS: No.
24 BY MR. MANDELL:
25     Q. Okay. You don't -- do you even know what that

Page 133

1 is?
2     A. No.
3          MR. MANDELL: Okay. I will reserve
4 whatever time I have remaining. Pass the witness.
5
6          REDIRECT EXAMINATION
7
8 BY MS. SCARCELLO:
9     Q. All right. So, Doctor, I have a few follow-up
10 questions regarding specifically your care and
11 treatment of the plaintiff. So if you could turn to
12 page 12 of the medical records. And this is from your
13 November 30, 2007, appointment with Ms. Smith.
14          And counsel asked you a few questions
15 about the history of present illness noted in the
16 record here. And in the interest in being complete,
17 am I correct that the history of present illness taken
18 down by you says that -- starting in about the middle
19 of the paragraph, "There are days when she does not
20 have to change her pad at all, but there are other
21 days when she changes it about twice, especially if
22 she has a cold"; is that correct?
23     A. Yes.
24     Q. Did -- was it your understanding that
25 Ms. Smith's urinary incontinence was having a profound

Jin-Hee Kim, M.D.

Page 134

1  impact on her life?
2        MR. MANDELL:  Object to form.
3        THE WITNESS:  I don't know.
4  BY MS. SCARCELLO:
5     Q.  Was there any indication that -- that this was
6  having a severe impact on her life?
7        MR. MANDELL:  Object to form.
8        THE WITNESS:  I don't know.  I'm always
9  assuming that, when a patient comes to see me for a
10  problem, it is affecting their life.
11  BY MS. SCARCELLO:
12     Q.  Okay.  Fair enough.  But I guess I'm just
13  asking, there are certainly -- in your practice you've
14  certainly seen pelvic organ prolapse that is much more
15  severe than Ms. Smith's; isn't that correct?
16        MR. MANDELL:  Object to form.
17        THE WITNESS:  I've seen all severity.
18  BY MS. SCARCELLO:
19     Q.  And is it fair to say that there are other
20  patients who you have treated who have reported the
21  impact on their life as being more substantial than
22  what is noted here with respect to Ms. Smith's -- the
23  impact on her life?
24        MR. MANDELL:  Object to form.
25        MR. POTTER:  Join.

Page 135

1        THE WITNESS:  There are patients who
2  complain more, yes.
3  BY MS. SCARCELLO:
4     Q.  Okay.  And is it fair to say that Ms. Smith
5  doesn't seem to be the type of person who complains a
6  lot?
7        MR. MANDELL:  Object to form.
8        MR. POTTER:  Join.
9        THE WITNESS:  I have no idea.
10  BY MS. SCARCELLO:
11     Q.  Okay.  You don't recall?
12     A.  No.
13     Q.  So the next sentence after the one I just read
14  says that "She does not have any issues with urgency
15  or urge incontinence"; is that right?
16     A.  Yes.
17     Q.  Are there other women who have pelvic organ
18  prolapse and incontinence that results in urgency and
19  urge incontinence?
20        MR. MANDELL:  Object to form.
21        THE WITNESS:  Yes.
22  BY MS. SCARCELLO:
23     Q.  You mention here that she does not have to
24  push or strain to have a bowel movement and that she
25  has not had any problems with urinary tract

Page 136

1  infections; is that right?
2     A.  Yes.
3     Q.  Counsel asked you some questions about
4  Ms. Smith's past surgical history, specifically
5  whether a tubal ligation from 1988 may have
6  potentially resulted in vaginal scarring.  Do you
7  recall that line of questioning?
8        MR. MANDELL:  Object to form.
9        THE WITNESS:  Yes.
10  BY MS. SCARCELLO:
11     Q.  And you indicated -- well, strike that.
12        Is there any indication in this record
13  that you found scarring in Ms. Smith's pelvic area
14  that -- that you would attribute to the tubal
15  ligation?
16        MR. MANDELL:  Object to form.
17        THE WITNESS:  No.
18  BY MS. SCARCELLO:
19     Q.  Is there any indication that the D&C performed
20  in 1980 caused scarring?
21     A.  Not that I indicated.
22     Q.  And if -- if Ms. Smith had excessive scarring
23  in her pelvic area, would you have noted that in your
24  notes?
25     A.  Most likely.

Page 137

1     Q.  Okay.  If you'll turn to the next page,
2  there's discussion -- I specifically want to ask about
3  the pelvic exam.  There are a lot of medical words in
4  that -- in those sentences that follow.  So could you
5  just read that into the record for us?
6     A.  Which part?
7     Q.  After "PELVIC EXAM."  Starting with "PELVIC
8  EXAM" and ending before the skin exam.
9     A.  "Reveals a normal vaginal introitus, normal
10  labia, normal urethral meatus, nontender urethra, and
11  nontender bladder.  She does have a grade I to II
12  cystocele and a mild rectocele.  I do not feel any
13  cervical motion tenderness.  She does not have any
14  real uterine descensus.  There is no evidence of
15  inguinal lymphadenopathy.  No peripheral edema."
16     Q.  So can you sort of explain in layman terms
17  what those findings mean? what that sentence -- those
18  sentences mean.
19     A.  Line by line?  Normal vaginal introitus?
20     Q.  Well, yeah.  Right.  You don't have to go
21  through every single -- every single thing that is
22  mentioned in your notes, but if you could just in
23  general explain what you found on the pelvic exam.
24     A.  So she has POP, Grade I to II mild rectocele.
25     Q.  And that was the extent of the findings during

Jin-Hee Kim, M.D.

Page 138

1 your pelvic exam; is that correct?
2 A. Correct.
3 Q. With respect to your assessment and plan, you
4 noted the rectocele is asymptomatic; is that right?
5 A. Yes.
6 Q. And so you did not feel that you needed to
7 treat that at that time; is that right?
8 A. Yes.
9 Q. But you did state that you think she will be a
10 good candidate for a cystocele repair and sling
11 placement; is that right?
12 A. Yes.
13 Q. With respect to the PARQ conference, I think
14 you previously mentioned the -- the risks and benefits
15 that you would have likely gone over with Ms. Smith.
16 With respect to an informed consent form, is that --
17 is there an informed consent signed before every
18 procedure that you perform?
19 A. The hospital requires an informed consent
20 form.
21 Q. Okay. And so if there isn't an informed
22 consent form for the implant procedure that is in
23 these records which was signed by Ms. Smith, then
24 that -- that is possible -- strike that.
25 If these records don't include an informed

Page 139

1 consent form that was signed by Ms. Smith, does that
2 mean that an informed consent was never signed by her?
3 MR. MANDELL: Object to form.
4 MR. POTTER: Object to form.
5 THE WITNESS: No.
6 BY MS. SCARCELLO:
7 Q. Basically what I'm trying to ask is: Is it
8 possible that an informed consent was signed and lost?
9 MR. POTTER: Object to form.
10 MR. MANDELL: Object to form.
11 THE WITNESS: I mean, possibly. Your
12 conjecture is as good as mine.
13 BY MS. SCARCELLO:
14 Q. Okay. My concern is -- is there any chance
15 that you moved forward with the implant procedure
16 without having a signed informed consent?
17 MR. MANDELL: Object to form.
18 THE WITNESS: Highly unlikely. Again, the
19 hospital -- we cannot go back to the operating room
20 without having an informed consent.
21 BY MS. SCARCELLO:
22 Q. Okay. And for the record, we have one that is
23 signed by you. We just don't have one signed by
24 Ms. Smith.
25 MR. POTTER: Counsel, I'll just put this

Page 140

1 on the record because I was looking at this as well.
2 I don't know whether we've been provided a complete
3 copy of the hospital chart because I also note that,
4 while this was a joint surgery with Dr. Crawford,
5 there's no informed consent form for Dr. Crawford's
6 surgery. So it's possible that whatever you guys have
7 provided to us is not the complete hospital record
8 from that time.
9 MS. SCARCELLO: Right. It's also possible
10 that what was provided to us and then passed on to you
11 was not complete; so --
12 MR. POTTER: Right. But what I'm getting
13 at is Dr. Crawford is not in her clinic. So we didn't
14 get Crawford's records. It's possible that whatever
15 you're looking for might somehow be with her records
16 since they did a joint procedure. I'm just putting
17 that out there as a possibility. I don't know that
18 for the record.
19 MS. SCARCELLO: Okay. I appreciate that.
20 BY MS. SCARCELLO:
21 Q. So let's move on to the operative note from
22 the implant procedure if you can turn to page 27. And
23 this was your operative note; is that right?
24 A. Yes.
25 Q. And this was dictated by you; is that correct?

Page 141

1 A. Yes.
2 Q. And it looks like it was dictated on January
3 15, 2008; is that right?
4 A. Yes.
5 Q. So the same day as the procedure.
6 A. Yes.
7 Q. And you mentioned previously that there --
8 there were no complications; is that right?
9 A. Yes.
10 Q. You also did a cystourethroscopy to confirm
11 that there was no bladder injury; is that correct?
12 A. Yes.
13 Q. I know that I pronounced that incorrectly.
14 I'm sorry.
15 Why did you opt for using the
16 transobturator sling on Ms. Smith?
17 A. As opposed to?
18 Q. As opposed to a retropubic.
19 A. At the time -- once transobturator slings came
20 into -- came into the market, those I found to be
21 safer, easier, and as effective if not better than
22 retropubic slings.
23 Q. And is that still your opinion today?
24 A. Yes.
25 Q. And do you still perform -- do you still

Jin-Hee Kim, M.D.

## Page 142

1  perform POP repairs using mesh devices?
2      A.  Well, mesh devices are -- are no longer on the
3  market.
4      Q.  Do you still perform stress urinary -- stress
5  urinary incontinence repairs using transvaginal mesh?
6      A.  Stress incontinence I treat with
7  transobturator tape if that's what you meant.
8      Q.  Did -- did -- did you mention before what
9  product you use -- I'm sorry.  We've had multiple
10  depositions today, and I'm -- I'm losing track of who
11  has said what.
12          Maybe I'll just ask you this:  What device
13  do you use for the treatment of -- for the surgical
14  treatment of stress urinary incontinence?
15      A.  I use transobturator tape.
16          MR. POTTER:  What time frame are we
17  talking about?
18          MS. SCARCELLO:  Today.
19          MR. POTTER:  Okay.
20  BY MS. SCARCELLO:
21      Q.  And what device is that?
22      A.  The one that I'm currently using is the Boston
23  Scientific Obtryx II.
24      Q.  And how long have you been using Boston
25  Scientific Obtryx II?

## Page 143

1      A.  Very rough time frame, four to five years.
2      Q.  The estimated blood loss was 600 ccs for the
3  entire case.  Is that normal for the entire case?
4      A.  Well, I usually don't do hysterectomies, but
5  this counts as the hysterectomy blood loss as well.
6      Q.  Right.
7      A.  Right.
8      Q.  So have you -- I mean, is that something that
9  it would be unexpected to lose 600 ccs in the course
10  of a hysterectomy and the pelvic organ prolapse and
11  stress urinary --
12      A.  It's within --
13          MR. POTTER:  Object to form.
14          THE WITNESS:  -- the normal --
15          MR. POTTER:  Go ahead.
16          THE WITNESS:  -- within the range.
17  BY MS. SCARCELLO:
18      Q.  Okay.  So next, if you'll go to page 9, which
19  is your first follow-up after the event.  Again, this
20  was just about a week after the implant; is that
21  right?
22      A.  This is from 1/23/2008?
23      Q.  Yes.
24      A.  Yes.
25      Q.  And you note that "She is doing very well"; is

## Page 144

1  that right?
2      A.  Yes.
3      Q.  Do you recall whether those are your words or
4  hers?
5      A.  No.
6      Q.  When you are -- when you're drafting notes of
7  this sort, do you -- do you take down word for word
8  what the patient says?
9          MR. MANDELL:  Object to form.
10          THE WITNESS:  Depends on the situation.
11  BY MS. SCARCELLO:
12      Q.  In this situation do you think that you did?
13      A.  I don't recall.
14      Q.  And you didn't perform a pelvic exam during
15  this follow-up; is that right?
16      A.  One week after surgery, I do not perform
17  pelvic exams.
18      Q.  Okay.  And then the next follow-up is
19  documented on page 8.  This is from February 13, 2008.
20  Again, you note that she's here for follow-up from her
21  sling placement about a month ago.  She is doing,
22  quote, extremely well.
23          Again, do you recall Ms. Smith stating in
24  her own words that she's doing extremely well?
25          MR. MANDELL:  Object to form.

## Page 145

1          THE WITNESS:  I don't recall.
2  BY MS. SCARCELLO:
3      Q.  You noted that she was no longer having
4  problems with stress incontinence and having regular
5  bowel movements; is that right?
6      A.  Yes.
7      Q.  Did you perform a pelvic exam at this
8  appointment?
9      A.  Yes.
10      Q.  During that pelvic exam, you noticed some
11  Vicryl stitches still in place; is that right?
12      A.  Yes.
13      Q.  Do know that this was normal for four weeks
14  post-op?
15      A.  Yes.
16      Q.  You did note that the cystocele is completely
17  gone; correct?
18      A.  Yes.
19      Q.  You also note that she has good pelvic muscle
20  tone overall; is that right?
21      A.  Yes.
22      Q.  And at this appointment you did not see any
23  sign of mesh extrusion?
24      A.  Yes.
25      Q.  Then last sentence here on this record is "I

Jin-Hee Kim, M.D.

Page 146

1  have encouraged her to continue with the estrogen
2  cream for now and...to continue with the pelvic rest";
3  is that right?
4      A.  Yes.
5      Q.  So then let's go to the January 16, 2009,
6  record which is on page 7.  Counsel asked you some
7  questions about reports of pain.  Do -- would you have
8  recommended a second procedure if Ms. Smith was not
9  experiencing any pain --
10         MR. MANDELL:  Object to form.
11  BY MS. SCARCELLO:
12      Q.  -- related to her mesh?
13         MR. MANDELL:  Object to form.
14         THE WITNESS:  Based on the findings of the
15  physical exam?  I mean, it's very vague.  A second
16  procedure?
17  BY MS. SCARCELLO:
18      Q.  Would you have -- would you have recommended a
19  revision procedure if Ms. Smith was not experiencing
20  any problems with her mesh?
21         MR. MANDELL:  Object to form.
22         THE WITNESS:  And she had mesh extrusion?
23  BY MS. SCARCELLO:
24      Q.  Yes.
25      A.  Depends on the significance of her issues and

Page 147

1  whether she was willing to try estrogen cream which is
2  something I always offer as a first-line treatment.
3      Q.  Do women commonly complain of irritation with
4  estrogen cream?
5      A.  It can happen.
6         MR. MANDELL:  Object to form.
7         THE WITNESS:  Yes.
8  BY MS. SCARCELLO:
9      Q.  And do women commonly discontinue use of
10  estrogen cream if they experience irritation with it?
11         MR. MANDELL:  Object to form.
12         MR. POTTER:  Join.
13         THE WITNESS:  Some do.
14  BY MS. SCARCELLO:
15      Q.  You noted that on physical exam she had
16  anterior vaginal wall mesh extrusion mostly in the
17  very proximal edge of the mesh; is that right?
18      A.  Yes.
19      Q.  You noted no other abnormalities?
20      A.  Yes.
21      Q.  And so based on that -- well, strike that.
22         You also note further up on the paper that
23  about a month ago her husband had noticed some
24  evidence of mesh during sexual intercourse; is that
25  right?

Page 148

1      A.  Yes.
2      Q.  And that it's becoming progressively worse; is
3  that right?
4      A.  Yes.
5      Q.  Do you know what this means "progressively
6  worse"?
7      A.  Probably he's feeling it more.
8      Q.  Okay.  Do you think that, if he is feeling it,
9  that she is feeling it also?
10         MR. MANDELL:  Objection.  Calls for
11  speculation.
12         MR. POTTER:  Join.
13         THE WITNESS:  Shall I still answer?
14         MR. POTTER:  If you can.
15         THE WITNESS:  Usually I ask whether they
16  are feeling it or not as well especially if the
17  husband feels it.
18  BY MS. SCARCELLO:
19      Q.  Okay.
20      A.  The fact that I did not mention it, that she
21  was having pain, to me means that she probably was not
22  having pain at the time.  But, again, this is
23  conjecture as well.
24      Q.  Right.  Right after that it says "The patient
25  states that up until a month ago, she did not feel

Page 149

1  anything at all"; is that right?
2      A.  Yes.
3      Q.  And so the implication of that is that she's
4  feeling something now.  Is that fair?
5         MR. MANDELL:  Object to form.  Calls for
6  speculation.
7         MR. POTTER:  Join.
8         THE WITNESS:  Yes.
9  BY MS. SCARCELLO:
10      Q.  Then you also noted she started a more rigor-
11  -- rigorous exercise regime that -- that she thought
12  may have contributed to her current problem; is that
13  right?
14      A.  Yes.
15      Q.  You made a special comment when counsel was
16  asking you about that.  You said, "She thought it
17  did."  Do you agree with her assumption?
18         MR. POTTER:  Object to form.
19         Go ahead.
20         THE WITNESS:  That the exercise made
21  things worse?
22  BY MS. SCARCELLO:
23      Q.  Yes.
24      A.  Do I think as a rule exercise makes pelvic
25  mesh extrusion worse?  Is that the question you're

Jin-Hee Kim, M.D.

Page 150

1  asking me?
2    Q. Sure, yeah.
3       MR. MANDELL: Object to form.
4       THE WITNESS: No.
5  BY MS. SCARCELLO:
6    Q. Okay.
7    A. Well, depends on the time frame. Because,
8  again, I don't want them to do anything -- this is why
9  I recommend doing pelvic rest for at least three
10 months after surgery.
11   Q. Right. Okay. But this is in January of 2009
12 almost exactly one year after the surgery; is that
13 right?
14   A. Correct.
15   Q. And she was following up with you during the
16 immediate post-op period when you would have
17 recommended no exercise, no intercourse, and things of
18 that nature; is that right?
19      MR. MANDELL: Objection.
20      THE WITNESS: Well, she didn't follow up
21 with me as I wanted to because I -- she only followed
22 up about with me about a month after surgery. I would
23 have recommended no intercourse and no exercise for
24 three months after surgery --
25 ///

Page 151

1  BY MS. SCARCELLO:
2    Q. Okay.
3    A. -- as a clarification.
4    Q. Okay. And would you have made that
5  recommendation to her only if she had come to see you
6  for additional follow-up, or is that something that
7  you would -- that you would tell people routinely?
8    A. This is pre-op.
9       MR. MANDELL: Object to form.
10 BY MS. SCARCELLO:
11   Q. Okay. So it was at this appointment that
12 you -- you both together decided to move forward with
13 the revision procedure; is that right?
14      MR. POTTER: Object to form.
15      Go ahead.
16      MR. MANDELL: Join.
17      THE WITNESS: Yes.
18 BY MS. SCARCELLO:
19   Q. And you note here under assessment and plan,
20 quote, "...I think this needs to be treated
21 surgically"; is that right?
22   A. Yes.
23   Q. So it was your assessment that surgery was
24 indicated; is that correct?
25   A. Yes.

Page 152

1    Q. And in terms of Ms. Smith's erosion, did you
2  form an opinion as to what was causing -- causing her
3  transvaginal mesh erosion?
4       MR. MANDELL: Objection. Asked and
5  answered.
6       THE WITNESS: No.
7  BY MS. SCARCELLO:
8    Q. One has to -- could there be any other cause
9  for transvaginal mesh erosion other than the mesh's
10 presence in the pelvic area?
11      MR. MANDELL: Object to form.
12      THE WITNESS: You mean are there any other
13 causes -- etiology behind pelvic mesh extrusion?
14 BY MS. SCARCELLO:
15   Q. Right.
16   A. Besides?
17   Q. Besides the implantation of pelvic mesh.
18      MR. MANDELL: Object to the form.
19      THE WITNESS: You mean if there were no
20 mesh implanted, would there be mesh erosion? No.
21 BY MS. SCARCELLO:
22   Q. Right. Okay. Thank you.
23   A. If that's the question.
24   Q. It -- it was. Thank you.
25      So based on your finding that the mesh was

Page 153

1  extruding and causing her and her husband some issues,
2  you determined in your medical judgment that it was
3  reasonable to undertake surgical attempts to remove
4  those parts of the mesh that you felt were
5  contributing to the pain?
6       MR. MANDELL: Object to the form.
7  Misstates facts.
8  BY MS. SCARCELLO:
9    Q. Or contributing to the issues. I'm sorry.
10      MR. MANDELL: Same objections.
11      MR. POTTER: Join.
12      THE WITNESS: Yes, I was going to remove
13 the part that had eroded.
14 BY MS. SCARCELLO:
15   Q. Okay. And let's look at the op note for the
16 excision which is from January 20, 2009, on page 24.
17      What was your preoperative diagnosis?
18   A. Vaginal extrusion.
19   Q. What was your post-operative diagnosis?
20   A. Same.
21   Q. And you performed an excision of the mesh
22 extrusion; is that correct?
23   A. Yes.
24      MR. MANDELL: Objection. Asked and
25 answered.

Jin-Hee Kim, M.D.

Page 154

1  BY MS. SCARCELLO:
2     Q.  And what were the indications for that
3  procedure?
4     A.  Vaginal mesh extrusion.
5     Q.  And it says here that she recently noticed
6  mesh extruding; and so that's why you all decided to
7  go forward with this revision.  Is that right?
8        MR. MANDELL:  Object to form.
9        THE WITNESS:  Yes.
10 BY MS. SCARCELLO:
11    Q.  The estimated blood loss it says was minimal;
12 is -- is that right?
13    A.  Yes.
14    Q.  And complications listed are none?
15    A.  Yes.
16    Q.  Can you explain for me just generally what you
17 did during the revision procedure?
18    A.  I injected the area around the mesh with local
19 anesthesia.  I make an incision usually surrounding
20 the mesh and undermine the mucosa surrounding it.  I
21 excised a piece of mesh that was poking out and then
22 make sure I can close everything up without tension.
23    Q.  And you note here that the excess mesh
24 material was removed quite easily?
25    A.  Yes.

Page 155

1     Q.  And that the edge of the vaginal incision was,
2  then, undermined which you just described to allow the
3  edges to come back together; is that right?
4     A.  Yes.
5     Q.  And all of the excess mesh material was easily
6  removed?
7     A.  Yes.
8     Q.  And then you used the Vicryl stitches to close
9  the area; is that right?
10    A.  Yes.
11    Q.  So there no complications, no adverse events
12 during the revision procedure.
13    A.  Correct.
14    Q.  And then there was a follow-up on February 6,
15 2009 on page 6.  Again, the words "She is doing
16 extremely well" appear in this record, and I'm
17 wondering if you recall today hearing Ms. Smith say
18 those words to you in her office -- in your office.
19        MR. MANDELL:  Object to form.
20        THE WITNESS:  I do not recall.
21 BY MS. SCARCELLO:
22    Q.  It says here that she's been using the Estrace
23 cream every day and not having any problems; is that
24 right?
25    A.  Yes.

Page 156

1     Q.  You noted that the anterior vaginal wall was
2  healing nicely; is that correct?
3     A.  Yes.
4     Q.  And you also note that you still feel the
5  stitches in place, but there was no evidence of any
6  mesh extrusion; is that correct?
7     A.  Yes.
8     Q.  You also asked her back for a follow-up in
9  four weeks, and she did follow up with you; is that
10 right?
11    A.  Yes.
12    Q.  And that was on March 5, 2009; correct?  And
13 those records are on page 5.
14    A.  Yes.
15    Q.  Again, the words "She is doing extremely well"
16 appear in this record.  Do you recall Ms. Smith saying
17 that to you in your office on March 5, 2009?
18    A.  No.
19    Q.  Again, you note that she's been putting the
20 cream on every day.  Does that mean the Estrace cream?
21    A.  Yes.
22    Q.  Meaning that she wasn't having problems with
23 it; correct?
24    A.  Yes.
25    Q.  Did you do a -- did you do a pelvic exam at

Page 157

1  this appointment?
2     A.  I did.
3     Q.  And you noted that the anterior vaginal wall
4  had healed; is that correct?
5     A.  Yes.
6     Q.  And no more signs of mesh extrusion; correct?
7     A.  Yes.
8     Q.  And then the last time that you saw Ms. Smith
9  was on April 16, 2009, and that record is on page 4.
10 You note that the -- you note that she was seeing you
11 "...status post a mesh excision in January 2009 after
12 an Avaulta surgery, which was really successful and
13 she is here for a follow-up."
14        Do you recall Ms. Smith saying to you in
15 your office in April 2009 that -- that she believed
16 the Avaulta surgery had gone really well?
17        MR. MANDELL:  Object to form.
18        THE WITNESS:  I do not recall.
19 BY MS. SCARCELLO:
20    Q.  Again, the words "She is doing extremely
21 well."  Do you recall in April of 2009 Ms. Smith
22 saying to you that she felt that she was doing
23 extremely well?
24        MR. MANDELL:  Object to form.
25        THE WITNESS:  I do not recall.

Jin-Hee Kim, M.D.

Page 158

BY MS. SCARCELLO:
1. BY MS. SCARCELLO:
2. Q. And here she -- you note that she is putting
3. Estrace cream on every day; is that right?
4. A. Yes.
5. Q. And it -- it did seem to be causing a little
6. bit of irritation; is that right?
7. A. Yes.
8. Q. And we sort of discussed that that -- that
9. irritation can be one possible side effect of the
10. estrogen cream; correct?
11. MR. MANDELL: Object to form.
12. THE WITNESS: It can be.
13. BY MS. SCARCELLO:
14. Q. Okay. Looks like you also gave her some
15. samples of Vagifem tablets; is that correct?
16. A. Yes.
17. Q. That's an alternative to the Estrace cream?
18. A. Yes.
19. Q. Okay. If you -- if you would, please look
20. back at the -- the package inserts that counsel
21. provided to you earlier for the Align TO and the
22. Avaulta plus. Specifically with respect to the Align
23. TO, I'm interested in the adverse events, and then
24. with the Avaulta Plus I'm interested in having a
25. conversation about the adverse reactions listed there.

Page 159

1. Do you see any mention in these documents
2. of any problem with persistent delayed healing?
3. A. No. But I haven't gone through the whole
4. document word by word.
5. Q. Right. There was a relatively detailed
6. discussion of the adverse reactions with counsel.
7. And, in fact, I believe he read them word for word.
8. So I was just asking, in general, as you look at these
9. documents, do you see any indication that a potential
10. adverse reaction would be persistent delayed healing?
11. MR. MANDELL: Object to form.
12. MR. POTTER: Join.
13. THE WITNESS: Not that I can see.
14. BY MS. SCARCELLO:
15. Q. Okay. Do you see anything here about
16. polypropylene mesh degradation?
17. A. No.
18. Q. Do you see anything here about excessive mesh
19. contraction in vivo causing the surrounding tissue to
20. shrink or contract?
21. MR. MANDELL: Object to form.
22. THE WITNESS: No.
23. BY MS. SCARCELLO:
24. Q. Do you see anything in these documents about
25. the products' arms stressing, moving, shrinking, or

Page 160

1. folding?
2. A. No.
3. Q. Do you see anything in these documents about
4. the tensile strength, elasticity, and density at the
5. tissue mesh interface causing a mechanical mismatch?
6. MR. MANDELL: Object to form.
7. THE WITNESS: No.
8. BY MS. SCARCELLO:
9. Q. Do you see any indication in either of these
10. documents that -- or specifically in the Avaulta
11. package insert that the mesh's characteristics were
12. not compatible with the normal -- the natural motion
13. of the female pelvis?
14. MR. MANDELL: Object to form.
15. MR. POTTER: Join.
16. THE WITNESS: No.
17. MR. POTTER: Just out of curiosity, are
18. you going to run through your whole list of
19. hypothetical questions that you asked her? because
20. I'll be asking for a standing objection again.
21. MR. MANDELL: Counsel, where are we on
22. time?
23. MS. SCARCELLO: Let's go off the record.
24. THE VIDEOGRAPHER: We are off the record
25. at 4:35.

Page 161

1. (Discussion was held off the record.)
2. THE VIDEOGRAPHER: And we are back on the
3. record at 4:38.
4. BY MS. SCARCELLO:
5. Q. So, Dr. Kim, before we went off the record, we
6. were sort of looking at package inserts for the
7. devices that were implanted in Ms. Smith and
8. discussing some side effects that weren't listed.
9. MR. MANDELL: Object to form.
10. MS. SCARCELLO: It wasn't a question.
11. MR. MANDELL: Object to your narrative.
12. MS. SCARCELLO: I was making a record of
13. what has gone on in the meantime and just
14. reestablishing what's going on because we asked for a
15. time check out of the middle of nowhere. So that's
16. what was happening.
17. BY MS. SCARCELLO:
18. Q. With respect to those two package inserts,
19. would you please resume looking at the pages that list
20. the adverse reactions.
21. With respect to either of these devices,
22. is there any mention of mesh shrinkage or contraction
23. so as to become folded over or twisted in vivo?
24. MR. MANDELL: Object to form.
25. MR. POTTER: Object to form. Both

Jin-Hee Kim, M.D.

Page 162

1 Exhibits 4 and 5 speak for themselves as to what is
2 and is not in there.  And I'd like a standing
3 objection for all of these questions that you're going
4 to ask Dr. Kim as to what's not in these documents so
5 I can quit interrupting.
6          MR. MANDELL:  And I would like to join in
7 that standing objection.
8 BY MS. SCARCELLO:
9    Q.  Is there any mention in the adverse reaction
10 or adverse event parts of these IFUs regarding mesh
11 inelasticity and stiffness?
12    A.  No.
13    Q.  In general, would you say that Ms. Smith was a
14 compliant patient?
15          MR. MANDELL:  Object to form.
16          THE WITNESS:  She did fail to follow up.
17 BY MS. SCARCELLO:
18    Q.  So is that a no?
19    A.  I'm just saying she failed to follow up so --
20 as a post-op patient during the first surgery -- after
21 the first surgery.
22    Q.  She did eventually follow up, though, didn't
23 she?
24          MR. MANDELL:  Object to form.
25          THE WITNESS:  A year later when she had

Page 163

1 problems, but she did not follow up completely after
2 the first surgery.
3 BY MS. SCARCELLO:
4    Q.  Did she use the estrogen cream that you had
5 prescribed to her?
6    A.  I don't know.
7          MR. MANDELL:  Object to form.  Which time
8 are you talking about?
9          MS. SCARCELLO:  Never mind.  The records
10 speak for themselves.
11 BY MS. SCARCELLO:
12    Q.  Do you have -- strike that.
13          We previously discussed the polypropylene
14 that is used in the transvaginal mesh devices.  And
15 you mentioned that you relied on the FDA approval of
16 the devices.  Do you recall that?
17          MR. MANDELL:  Object to form.
18          THE WITNESS:  Yes.
19 BY MS. SCARCELLO:
20    Q.  So is it fair to say that you rely on -- in
21 part, on the FDA clearance process to determine
22 whether a product is safe for implantation?
23    A.  Yes.
24    Q.  And is it your understanding that transvaginal
25 mesh for the treatment of pelvic organ prolapse has

Page 164

1 been recently removed from the market by the FDA?
2          MR. MANDELL:  Object to form.
3          THE WITNESS:  Transvaginal mesh kits have
4 been removed.
5 BY MS. SCARCELLO:
6    Q.  Right.  For the treatment of POP; correct?
7    A.  Yes.
8          MR. MANDELL:  Same objection.
9 BY MS. SCARCELLO:
10    Q.  And with respect to counsel's questions about
11 the polypropylene mesh's safety, do you have any
12 background in chemical engineering?
13          MR. MANDELL:  Object to form.  Never asked
14 about that.
15          THE WITNESS:  No.
16 BY MS. SCARCELLO:
17    Q.  Do you have any background in materials
18 engineering?
19    A.  No.
20    Q.  Do you have any background in the creation of
21 an implanted device?
22    A.  No.
23          MR. MANDELL:  Object to form.
24 BY MS. SCARCELLO:
25    Q.  And then regarding the informed consent, the

Page 165

1 surgical consent that you provide isn't presented to
2 the patient to sign -- strike that.
3          The surgical consent that you provide does
4 not advise the patient whether there is or could be a
5 defect in any medical product or device you were using
6 in the surgery; is that right?
7          MR. MANDELL:  Object to form.
8          MR. POTTER:  Object to form.
9          THE WITNESS:  No.
10 BY MS. SCARCELLO:
11    Q.  So when you say "No," you mean that potential
12 defects are not addressed in the informed consent?
13          MR. MANDELL:  Object to form.
14          MR. POTTER:  Object to form.
15          THE WITNESS:  No.
16 BY MS. SCARCELLO:
17    Q.  I'm sorry.  I don't understand the "No."
18    A.  No, I don't talk about potential product
19 defects.
20    Q.  Understood.
21          In the informed consent documents that
22 your patient signed, is there any mention whatsoever
23 of -- of possible risk of a defect -- defective
24 product being used in a procedure?
25          MR. MANDELL:  Object to form.

Jin-Hee Kim, M.D.

Page 166

1    MR. POTTER: Object to form.
2    THE WITNESS: I'm sorry. Repeat the
3 question again. In my informed consent --
4 BY MS. SCARCELLO:
5    Q. Right. Is there any mention of a possible
6 risk of a defective product being used in the
7 procedure?
8    A. No.
9    MR. POTTER: Form.
10 BY MS. SCARCELLO:
11    Q. Is that a part of your risk conversation that
12 you have with patients in the office?
13    MR. MANDELL: Same objection.
14    THE WITNESS: Depends on the product.
15 BY MS. SCARCELLO:
16    Q. Is that a conversation that you had with
17 Ms. Smith in 2008 about the Avaulta product?
18    MR. MANDELL: Object to form.
19    THE WITNESS: No.
20 BY MS. SCARCELLO:
21    Q. Is that a conversation that you had with
22 Ms. Smith about the Align TO product?
23    A. No.
24    MR. MANDELL: Same objection.
25 ///

Page 167

1 BY MS. SCARCELLO:
2    Q. You would never knowingly put a medical device
3 into a patient where you have even the slightest hint
4 of a defect in that device; is that right?
5    MR. MANDELL: Object to form.
6    MR. POTTER: Object to form.
7    Instruct you not to answer.
8 BY MS. SCARCELLO:
9    Q. Procedurally, if your patients won't sign
10 informed consents, they can't get a procedure, can
11 they?
12    MR. POTTER: Object to form.
13    THE WITNESS: No.
14 BY MS. SCARCELLO:
15    Q. And did you trust the manufacturer to provide
16 you with a nondefective medical device at the time
17 that you implanted the Avaulta and Align TO in
18 Ms. Smith?
19    MR. MANDELL: Object to form.
20    MR. POTTER: Join.
21    THE WITNESS: Did I trust them not to give
22 me a defective product?
23 BY MS. SCARCELLO:
24    Q. Did you rely on them not to give you a
25 defective product?

Page 168

1    MR. MANDELL: Same objection.
2    THE WITNESS: Yes.
3    MS. SCARCELLO: Okay. I have nothing
4 further.
5
6    RECROSS-EXAMINATION
7
8 BY MR. MANDELL:
9    Q. Okay. All right. Dr. Kim, there was some
10 discussion of whether we've been able to locate a
11 informed consent for the 2008 surgery of Ms. Smith.
12 Regardless of whether we find the signed informed
13 consent or not, she gave you an informed consent
14 during your PARQ meeting that you had with her prior
15 to the 2008 implant; correct?
16    A. That is correct.
17    Q. And you went through all the risks we
18 discussed with her at that time; is that right?
19    A. Yes.
20    Q. Now, counsel indicated that -- asked you a
21 bunch of questions of whether certain things were in
22 this IFU for the Avaulta. Do you recall that?
23    A. Yes.
24    Q. And we already discussed you did not rely on
25 this document whatsoever in prescribing the Avaulta to

Page 169

1 Ms. Smith; correct?
2    MS. SCARCELLO: Object to form.
3    THE WITNESS: Yes.
4 BY MR. MANDELL:
5    Q. Okay. And, in fact, she asked you about
6 contraction. And doesn't it say right here under
7 "ADVERSE REACTIONS" that scarification and contraction
8 is an adverse reaction?
9    A. Yes.
10    Q. Okay. And knowing that you don't rely on --
11 on these IFUs, is it fair to say you're -- you're not
12 in any position to say what should or shouldn't be
13 inside the instruction for use?
14    A. No.
15    Q. Is that fair? So you would agree with me?
16    A. I am not in a position to write any IFUs.
17    Q. Okay. Now, there was some discussion of -- of
18 all of these post-op encounters with Ms. Smith, you
19 know, referring to April 2009 where you say she's
20 doing extremely well; March 2009, extremely well; and
21 February 2009 that she's doing extremely well. Do you
22 recall all that?
23    MS. SCARCELLO: Object to form.
24 BY MR. MANDELL:
25    Q. Is that a "Yes"?

Jin-Hee Kim, M.D.

Page 170

1    A.  Yes.
2    Q.  Now, counsel said you -- asked you whether
3 Ms. Smith directly said that or not.  Do you recall
4 her asking you that?
5    A.  I do recall.
6    Q.  Regardless of whether Ms. Smith told you that
7 or you examined it yourself, the truth is she was
8 doing extremely well; is that -- is that correct?
9        MS. SCARCELLO:  Object to form.
10       THE WITNESS:  If that's what's written on
11 my note, then yes.
12 BY MR. MANDELL:
13   Q.  Okay.  So whatever is written here is the --
14 is the truth of what you observed at that time; is
15 that correct?
16       MS. SCARCELLO:  Object to form.
17       THE WITNESS:  Yes.
18       MS. SCARCELLO:  Okay.
19 BY MR. MANDELL:
20   Q.  And so, when you say she was doing extremely
21 well, we can all interpret that to mean she's doing
22 extremely well; is that correct?
23       MS. SCARCELLO:  Object to form.
24       THE WITNESS:  Yes.
25 ///

Page 171

1 BY MR. MANDELL:
2    Q.  Okay.  Now, as far as the revision procedure,
3 there was mention of her husband feeling mesh.  And
4 then I guess it says -- I apologize here.  I guess it
5 says here that -- that up until a month ago she did
6 not feel anything at all.  Do you recall that?
7    A.  Yes.
8    Q.  Now, the word "feel" doesn't mean pain; is
9 that correct?
10   A.  No.
11   Q.  Okay.  No -- no, I'm incorrect?
12   A.  It does not mean pain.
13   Q.  Okay.  So, again, if she had been reporting
14 pain, that would have been something you would have
15 noted here; right?
16   A.  I would have.
17   Q.  Okay.  There was a discussion about how women
18 commonly -- or sorry.  Let me strike that.
19       There was a discussion about how estrogen
20 cream may cause irritation.  Do you recall counsel
21 discussing that with you?
22   A.  Yes.
23   Q.  After the 2008 implant, is there anything in
24 your notes to indicate that Ms. Smith before she saw
25 you in 2009 was having any type of irritation with the

Page 172

1 estrogen cream?
2    A.  No.  Besides that one that I mentioned.
3    Q.  Right.  And that was actually in 2009; so --
4    A.  Yes.
5    Q.  -- we're talking about focusing between the
6 implant procedure and your follow-up appointments with
7 her.  Was there anything to indicate she was irritated
8 by the estrogen cream?
9    A.  No.
10   Q.  And, again, you never advised her to stop
11 continuing to take that estrogen cream after the 2008
12 implant procedure; is that correct?
13   A.  That is correct.
14       MR. MANDELL:  Let me just go off the
15 record for one second.  I'm sorry.
16       THE VIDEOGRAPHER:  We're off the record at
17 4:51.
18       (Pause in the proceeding.)
19       THE VIDEOGRAPHER:  We are back on the
20 record at 4:52.
21 BY MR. MANDELL:
22   Q.  There -- way -- if you can remember way back
23 at the beginning of this deposition, opposing counsel
24 was asking you about preceptor notes and asking you a
25 bunch of questions about those documents without

Page 173

1 showing them to you.  Do you recall that?
2        MS. SCARCELLO:  Object to form.
3        THE WITNESS:  Yes.
4 BY MR. MANDELL:
5    Q.  All right.  So you didn't see those documents
6 today; is that right?
7    A.  That is correct.
8    Q.  And so you don't know whether what she asked
9 you about is accurate or not; is that correct?
10   A.  That's correct.
11   Q.  Okay.  So your answers to her questions about
12 that were basically speculation since you don't know
13 what -- what those documents said; is that correct?
14       MS. SCARCELLO:  Object to form.
15       THE WITNESS:  Yes.
16 BY MR. MANDELL:
17   Q.  I just want to just briefly ask you a couple
18 of questions about training.  As a doctor who does
19 surgery on patients for pelvic care, did you find the
20 Bard trainings helpful?
21   A.  Yes.
22   Q.  Do you have any criticisms about those
23 trainings?
24   A.  No.
25   Q.  At these trainings did several other doctors

Jin-Hee Kim, M.D.

Page 174

1 attend it as well?

2    A. I believe so. Again, my recollection is poor.

3    Q. Okay. The fact that you may have been

4 reimbursed for any airfare or travel expenses when

5 taking these trainings, that -- that did not have any

6 effect on your decision to use Bard or feel beholden

7 to Bard; is that correct?

8    A. No.

9    Q. So, no, you didn't feel that you -- that

10 you --

11    A. I was not beholden to Bard.

12    Q. Thank you.

13      And you wouldn't rely solely on what a

14 company representative told you with regard to

15 technique, risks, or benefits related to a specific

16 medical device including the Align or Avaulta Plus;

17 correct?

18      MS. SCARCELLO: Objection.

19      THE WITNESS: Correct.

20      MS. SCARCELLO: Asked and answered.

21 BY MR. MANDELL:

22    Q. In fact, you don't have any recollection of --

23 or, in fact, you didn't rely on any statements from

24 Bard in deciding to prescribe the Avaulta Plus and

25 Align TO in Ms. Smith.

Page 175

1      MS. SCARCELLO: Objection.

2      MR. POTTER: Object to form.

3      MS. SCARCELLO: Form.

4      THE WITNESS: No.

5 BY MR. MANDELL:

6    Q. You didn't -- no, you didn't rely on any

7 statements?

8    A. Correct.

9      MR. MANDELL: That is all my questions,

10 and we can go off the record now.

11      THE VIDEOGRAPHER: We are off the record

12 at 4:54, and this concludes the deposition.

13      THE COURT REPORTER: Same orders as

14 before.

15      MS. SCARCELLO: I'm sorry?

16      THE COURT REPORTER: Same orders as

17 before?

18      MS. SCARCELLO: Yes, thank you.

19      MR. MANDELL: Yes.

20      MR. POTTER: Same issue with the read and

21 sign on the transcript.

22

23      (The deposition concluded at 4:54 PM.)

24

25

Page 176

1      C E R T I F I C A T E

2 STATE OF OREGON   )

               )

3 County of Multnomah ) ss.

4

5    I, Shellene L. Iverson, a Certified Shorthand

 Reporter for the State of Oregon, do hereby certify

6 that JIN-HEE KIM, MD, appeared before me and was sworn

7 at said time and place set forth in the caption

 hereof.

8

9    At said time and place I reported in stenotype all

10 testimony adduced and other oral proceedings had in

11 the foregoing matter; that thereafter my notes were

12 reduced into the typewritten transcript; and the

13 foregoing transcript, pages 4 through 175, both

14 inclusive, is a true and correct transcript of my

15 original stenographic notes.

16    I also certify I am not a relative or employee of

17 any attorney/counsel employed by the parties hereto or

18 financially interested in the action.

19    IN WITNESS WHEREOF, I have hereunto set my hand

20 and affixed my seal at Portland, Oregon, this 26th day

21 of June 2019.

22

23

          Shellene L. Iverson

24         Certified Shorthand Reporter

          Certificate No. 03-0386

25         Certificate Expires: 9/30/21

Page 177

1      - - - - - -

2      E R R A T A

3      - - - - - -

4 PAGE LINE  CHANGE

5 ___ ___  _____

6   REASON: _____

7 ___ ___  _____

8   REASON: _____

9 ___ ___  _____

10   REASON: _____

11 ___ ___  _____

12   REASON: _____

13 ___ ___  _____

14   REASON: _____

15 ___ ___  _____

16   REASON: _____

17 ___ ___  _____

18   REASON: _____

19 ___ ___  _____

20   REASON: _____

21 ___ ___  _____

22   REASON: _____

23 ___ ___  _____

24   REASON: _____

25

Jin-Hee Kim, M.D.

Page 178

1          ACKNOWLEDGMENT OF DEPONENT

2

3       I,_____, do hereby

4   certify that I have read the foregoing pages, and that

5   the same is a correct transcription of the answers

6   given by me to the questions therein propounded, except

7   for the corrections or changes in form or substance, if

8   any, noted in the attached Errata Sheet.

9

10

11  _____

12  JIN-HEE KIM, M.D.        DATE

13

14

15  Subscribed and sworn to

16  before me on this _____ day

17  of_____,20___, by _____

18  _____,

19  proved to me on the basis of satisfactory

      evidence to be the person(s) who appeared before me.

20

21       Signature _____

22

23

24

25

# EXHIBIT 3

Becky R. Smith

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION
 3   IN RE:  C. R. BARD, INC.,  )
     PELVIC REPAIR SYSTEM       )
 4   PRODUCTS LIABILITY         )   MDL No. 2187
     LITIGATION                 )
 5                              )
     THIS DOCUMENT RELATES TO:  )
 6   _____)
                                )
 7   BECKY R. SMITH,            )
                                )
 8              Plaintiff,      )
                                )
 9         vs.                  )   Case No. 2:15-cv-16402
                                )
10   C. R. BARD, INC.,          )
                                )
11              Defendant.      )
     _____)
12
13
14
                  DEPOSITION OF BECKY R. SMITH
15                 Volume 2, Pages 84-201
                Taken on behalf of the Defendant
16                    June 12, 2019
                        *   *   *
17
18
19
20
21
22
23
24
25
```

Becky R. Smith

Page 85

1      BE IT REMEMBERED THAT, pursuant to Oregon Rules
       of Civil Procedure, the deposition of BECKY R. SMITH
2    was taken before Joyce B. Imrie, OCSR No. 94-0293,
     WCSR No. 2792, on Wednesday, June 12, 2019,
3    commencing at the hour of 1:27 p.m., the proceedings
     being reported at the Marriott Residence Inn, 10555
4    NE Tanasbourne Drive, Hillsboro, Oregon.
5             *   *   *
6         APPEARANCES
7    WAGSTAFF & CARTMELL, LLP
     Lindsey N. Scarcello, Esquire
8    lscarcello@wcllp.com
     4740 Grand Avenue, Suite 300
9    Kansas City, MO  64112
     816.701.1100
10      Appearing for Plaintiff
11   REED SMITH, LLP
     Michael Mandell, Esquire
12   mmandell@reedsmith.com
     355 S Grand Avenue, Suite 2900
13   Los Angeles, CA  90071
     213.457.8095
14      Appearing for Defendant
15   Also present:  Donald Mackie
              *   *   *
16
17
18
19
20
21
22
23
24
25

Page 86

1           EXAMINATION INDEX
2                          Page
3    Examination by Mr. Mandell              87, 194
     Examination by Ms. Scarcello               192
4
5             *   *   *
6          EXHIBIT INDEX

     No.      Description           Page
7
     Exhibit 1    Plaintiff fact sheet for Becky Smith    94
8                 (SMITHB_PFS_00099-124)
9    Exhibit 2    Amended notice of deposition of    102
                  plaintiff Becky R. Smith, 6-4-19
10
     Exhibit 3    Medical records for Becky Rae    103
11                Smith from the Oregon Clinic
                  (SMITHB_OREGC_MDR00001-37)
12
     Exhibit 4    Deposition of Becky Smith, 4-24-17    128
13                in the matter of Becky vs. C. R.
                  Bard, Inc., no Bates numbers
14
     Exhibit 5    10-26-18 medical record for Becky    174
15                Smith from Legacy Health
                  (SMITHB_LMPMC_MDR00087)
16
17   Requested information:  NONE
18
19   Instruction not to answer:  Pages 94, 104, 110, 119,
20   151, 191, 194
21
22            *   *   *
23
24
25

Page 87

1          BECKY R. SMITH,
2    having first been sworn, testified further under oath as
3    follows:
4
5          FURTHER EXAMINATION
6    BY MR. MANDELL:
7    Q.  Good morning, Ms. Smith. I introduced myself off the
8        record a moment ago, but for the record, my name is
9        Michael Mandell, and I represent C. R. Bard, and I'm
10       here to take your deposition today.
11           This is your second time being deposed; is that
12       correct?
13   A.  That's correct.
14   Q.  The first time was back in April 2017 for the same
15       case; is that correct?
16   A.  Yes, it is.
17   Q.  Are you taking any drugs or medications that would
18       affect your ability to testify fully and accurately
19       here today?
20   A.  No, I'm not.
21   Q.  So is there any other reason that would affect your
22       ability to testify fully and accurately here today?
23   A.  No.
24   Q.  Now, I know you've had your deposition taken before,
25       but I'm going to go over some of the ground rules

Page 88

1        real quick.
2            Make sure to answer questions verbally.  No
3        head or -- shaking of your head or nodding of your
4        head so that the court reporter can get your
5        answers.
6            Do you understand that?
7    A.  Yes, I do.
8    Q.  We'll try our best not to talk over each other even
9        if you think you know what I'm going to say.
10           Is that okay?
11   A.  Yes, it is.
12   Q.  If at any time you do not understand my question,
13       please let me know so I can rephrase it.  I'm going
14       to assume if you answer my question you understood
15       it.
16           Is that fair?
17   A.  Yes.  That's fair.
18   Q.  If you need a break, let me know.  The only thing I
19       ask is, if I have a question, that you finish the
20       answer, and then we will take a break.
21           Okay?
22   A.  Okay.
23   Q.  You've taken an oath that requires you to tell the
24       truth, the whole truth and nothing but the truth.
25           Do you understand that?

Page 89

1  A. Yes, I do.
2  Q. And that is the same oath you would take if you were
3     to testify in court.
4        Do you understand that?
5  A. Yes, I do.
6  Q. Any questions about these instructions?
7  A. Nope.  Not at this time.
8  Q. Ms. Smith, we're here today because you sued my
9     client, C. R. Bard.
10       Do you understand that?
11 A. Yes.
12 Q. Now, you've already taken a deposition in April
13    2017, so the purpose of this deposition is to
14    understand all the facts surrounding your suit
15    against Bard that have occurred or changed since
16    your last deposition in 2017.
17       Okay?
18 A. Uh-huh.
19 Q. Now, your suit against Bard specifically pertains to
20    the products called Align TO and the Avaulta Plus
21    Anterior.
22       Do you understand that?
23 A. Yes.
24 Q. You understand that those products were implanted
25    into you January 15, 2008; is that correct?

Page 90

1  A. Yes.
2  Q. Have you been told by anyone other than your
3     attorneys which product, whether it be the Align or
4     the Avaulta, that has caused your injuries?
5  A. Nope.
6  Q. Throughout the deposition I'll be referring to those
7     products as the Align and Avaulta or collectively as
8     the mesh.
9        Do you understand that?
10 A. Yes.
11 Q. I may also use the term "physician," "doctor" or
12    "healthcare provider."  I mean those to mean any
13    healthcare provider you saw, whether it be a nurse
14    or doctor.
15       Do you understand that?
16 A. Yes.
17 Q. Also, when I use the term "explant," I'm referring
18    to your November 16, 2018, surgery with Dr. Denman
19    where mesh was removed.
20       Do you understand that?
21 A. Yes.
22 Q. And finally, when I refer to implant, I'm referring
23    to your January 15, 2008, surgery with Dr. Kim.
24       Do you understand that?
25 A. Yes.

Page 91

1  Q. Can you drive?
2  A. Yes.
3  Q. Did you drive today?
4  A. Yes.
5  Q. Do you have a handicapped or disabled person parking
6     sticker on your vehicle?
7  A. No.
8  Q. What are your current social activities?
9  A. I -- let's see.  What do I do?  I work at a coffee
10    shop a couple days a week.  I have dinner with
11    friends at my house or other places.  I have
12    grandchildren that come over to my house or I go to
13    theirs.
14       And children that we spend time together.  We
15    do -- we go to grandchildren's events, T-ball,
16    baseball, things like that.  We go camping.
17 Q. Anything else?
18 A. Off the top of my head, that's what I can think of.
19 Q. Any new -- any of those new activities since your
20    last deposition in April 2017?
21 A. No.
22 Q. Do you currently exercise?
23 A. I do not.
24 Q. Are you a member of a gym currently?
25 A. No, I'm not.

Page 92

1  Q. What did you do to prepare for your deposition
2     today?
3  A. I got the day off work.
4  Q. Did you meet with your attorney?
5  A. Before we came in here.  Yes.
6  Q. Did you have any phone calls with your attorney
7     before that?
8  A. No.
9  Q. You said you met with your attorney today before you
10    came in here.  How long was that for?
11 A. I don't know.  Ten, 15 minutes.
12 Q. That's your only meeting with your attorney in
13    relation to today's deposition; is that correct?
14 A. I just met her.  Yes.
15 Q. For your injuries related to this litigation, has
16    anyone besides a doctor referred you to a treating
17    physician?
18 A. Can you tell me what you mean by that?
19 Q. Yeah.  Has anyone other than a doctor referred you
20    to any of the doctors that you've seen for
21    treatment?
22 A. I'm going to say no.
23 Q. Has anyone other than a doctor recommended you
24    receive any type of medical treatment?
25 A. No.

Becky R. Smith

Page 93

1  Q.  Have your attorneys ever referred you to any
2      doctors?
3  A.  No.
4  Q.  Did you review any documents in preparation for this
5      deposition?
6  A.  No.
7  Q.  Have you ever looked at your medical records with
8      respect to the issues surrounding this case?
9  A.  I have not.
10 Q.  Have you done any Internet research to prepare for
11     today's deposition?
12 A.  No.
13 Q.  Any reading about Bard's products?
14 A.  No.
15 Q.  Any reading about mesh in general?
16 A.  No.
17 Q.  Did you prepare any notes for your deposition here
18     today?
19 A.  I did not.
20 Q.  Have you ever gone to Bard's website?
21 A.  I didn't know that they had a website.
22 Q.  Did you ever speak with anyone at Bard before you
23     had your implant in 2008?
24     MS. SCARCELLO:  I'll object to that question
25     and direct her not to answer.  That could have been

Page 94

1      covered in the previous deposition.
2      (Instruction not to answer.)
3  Q.  BY MR. MANDELL:  Have you spoken with anyone at Bard
4      since your last deposition?
5  A.  No, I have not.
6  Q.  Have you ever spoke -- strike that.
7      Prior to this litigation, had you ever heard of
8      C. R. Bard?
9  A.  No.
10 Q.  Prior to your implant, had you ever heard of
11     C. R. Bard?
12     MS. SCARCELLO:  I'll object to the question and
13     direct her not to answer.  It could have been
14     covered in her last one.
15     (Instruction not to answer.)
16 Q.  BY MR. MANDELL:  I'm going to hand you a -- as
17     Exhibit 1, this is the plaintiff fact sheet.
18     (Marked Deposition Exhibit No. 1.)
19 Q.  BY MR. MANDELL:  Have you seen this document before?
20 A.  This is the document I filled out.  It looks like
21     the document I filled out.
22 Q.  If you flip back to the last page, is that your
23     signature there?
24 A.  Yes, it is.
25 Q.  That's dated February 8, 2019, correct?

Page 95

1  A.  Yes, it is.
2  Q.  You're swearing under penalty of perjury that
3      everything to the best of your knowledge was true
4      and accurate at that time, correct?
5  A.  Yes.
6  Q.  And you reviewed this document before signing it,
7      right?
8  A.  Yes.
9  Q.  Did anyone help you fill out this document?
10 A.  No.  I wish they would have.  It was hard.
11 Q.  When was the last time you took a look at this?
12 A.  Maybe at my first deposition.  I don't know.  I
13     haven't seen this in a really long time.
14 Q.  The reason I'm asking is it's dated after your first
15     deposition.
16 A.  That's true.  It is.  So I must have.  Can I just
17     look at it really quickly?
18 Q.  Yes.  I was going to actually suggest we could go
19     off the record and give you a moment to look, and
20     let me know if there's anything you want to add or
21     change since it's been a couple months.
22 A.  Yes.  Thank you.
23     MR. MANDELL:  So we'll go off the record.
24     MS. SCARCELLO:  That's fine.
25     (Recess.)

Page 96

1  Q.  BY MR. MANDELL:  Ms. Smith, we just came back from a
2      brief break so you could review this Exhibit 1
3      plaintiff fact sheet.  I just asked you if there's
4      anything you see in there that you'd like to update
5      or change?
6  A.  There is nothing that I can see.  I know -- I
7      realize that I said at first that I hadn't seen this
8      for a really long time, but there is additional
9      information that I put on here, so I did recently
10     send information to my lawyer.
11 Q.  Now, when you say "send information," did you fill
12     out a handwritten one of these plaintiff fact sheets
13     that you sent to your lawyer?
14 A.  Uh-huh.
15     MS. SCARCELLO:  Is that a "yes"?
16 A.  Yes.  Sorry.
17 Q.  BY MR. MANDELL:  Do you have a copy of that
18     handwritten version?
19 A.  No.
20     Do I?
21     No.
22 Q.  It says here on I believe it's page 11, and if you
23     are going by the Bates label, which is on the bottom
24     right-hand corner, it ends with 109, to list any
25     doctors.

Becky R. Smith

Page 97

```
 1      I'm just curious if there's any -- since you
 2   filled this out in February 2019, if there's any
 3   additional doctors here that aren't listed that
 4   you've seen?
 5   A. Dr. Denman is not on here.  There she is up at the
 6   top.  I got that.  Okay.  So she's the last one.
 7   Nikki is in here?  So my -- Adrienne Fisher.  That's
 8   the one.
 9      So I also have Nikki Kuehl who is not on here.
10   She's my primary PA.  So she's the one I see.  She's
11   the one who referred me to Dr. Waugh, W-A-U-G-H.
12   Q. And you'll see No. 6 here on this page asks for any
13   additional surgeries or procedures that have
14   occurred.
15      Has there been anything after this November 16,
16   2018, surgery that you need to update?
17   A. No.
18   Q. You can put that to the side.
19      Actually, let me take that back.  You are
20   currently retired; is that correct?
21   A. Yes.
22   Q. That's occurred as of June 30, 2017, correct?
23   A. Yes.
24   Q. If you go to page 8 of this plaintiff fact sheet,
25   Exhibit 1, again, Bates No. 106, it says in the
```

Page 98

```
 1   bottom right-hand corner you are not making a claim
 2   for lost wages or lost earning capacity.
 3      Is that true?
 4   A. That's true.
 5   Q. You are still married to Donald Mackie; is that
 6   correct?
 7   A. Yes.
 8   Q. He still lives in your home?
 9   A. Yes.
10   Q. Since April of 2017, have you gone to any marital
11   counseling?
12   A. Yes.
13   Q. When did you go to marital counseling?
14   A. I don't know the dates.  I don't know the dates.
15   Sorry.
16   Q. Do you know who you went to see?
17   A. Uh-huh.  Amy Pulitzer in Manzanita.
18   Q. Can you spell that for the court reporter?
19   A. Pulitzer, P-U-L-I-T-Z-E-R.
20   Q. How many times did you see Dr. Pulitzer?
21   A. Don and I saw her together and separately, so I'm
22   going to guess four to six times.
23   Q. When was the last time that you saw her?
24   A. I don't know the dates.  I'm sorry.  It hasn't been
25   in the last year.  I know that.
```

Page 99

```
 1   Q. Where is Dr. Pulitzer located again?
 2   A. Manzanita, Oregon.
 3   Q. Since April 2017 have you and Donald Mackie been
 4   separated?
 5   A. No.
 6   Q. Has he accompanied you to any doctor visits that
 7   occurred after your deposition in April 2017?
 8   A. No.
 9   Q. How about your children?  Have they accompanied you
10   to any doctor visits since your deposition in 2017?
11   A. No.
12   Q. Have any of your children moved into your home since
13   April '17?
14   A. No.
15   Q. Has anyone else accompanied you to any doctor visits
16   since April 2017?
17   A. Yes.  My sister.
18   Q. Your sister's name?
19   A. Debbie Smith.
20   Q. Does Debbie live around here?
21   A. She lives in Wheeler, Oregon.
22   Q. Since April 2017 has anyone cared for you after any
23   of your surgeries that you've had?  Just to specify,
24   when I say "care," I mean family member or friends?
25   A. My husband and my sister Deb, I guess, the two of
```

Page 100

```
 1   them.
 2   Q. Since your last deposition, have you become aware of
 3   any family members or friends that have prolapse or
 4   incontinence?
 5   A. Can you repeat that question?
 6      MR. MANDELL:  Do you want to read it back?
 7      (The reporter read the last question.)
 8   A. No friends, no family.
 9   Q. BY MR. MANDELL:  Since your last deposition, have
10   you become aware of any family or friends who have
11   mesh implanted in them?
12   A. No.  There is somebody that I know of that's not a
13   friend or family.  She's a local in our community.
14   I guess that's what I want to say.  She's not a
15   friend or family.
16   Q. Have you spoken to her at all?
17   A. I have spoken to her.
18   Q. When was -- around what time did you speak to her?
19   A. It was around the time of my implant or my
20   extraction in 2017 -- no -- '18.  Sorry.
21   Q. What was this person's name?
22   A. Do I have to give it to you?
23   Q. Yes.
24      MS. SCARCELLO:  Yes.  You have to answer.
25   A. I feel really bad because she's a very private
```

Becky R. Smith

Page 101

1    person. It's Sue Crist, C-R-I-S-T.
2    Q.  BY MR. MANDELL:  Where does Ms. Crist live?
3    A.  Nehalem.
4    Q.  Did Ms. Crist have a repair involving mesh?
5    A.  I assume she did.
6    Q.  Do you know what product she may have had?
7    A.  No.  I have no idea.
8    Q.  Do you know if she filed a lawsuit related to mesh?
9    A.  I know she did not.
10   Q.  What was your discussions that you had with
11      Ms. Crist around 2018?
12   A.  She wanted to know if I knew of a doctor.
13   Q.  A doctor for what?
14   A.  For her mesh.  She was having serious problems with
15      her mesh.  My sister had talked to someone they had
16      known that I had pain, so she called me and asked
17      about my doctor, who I was seeing.
18          Then she told me that her doctor had suggested
19      she go to my doctor.  She said, you know, I went to
20      her once.  She wouldn't take my mesh out.  She
21      wouldn't do anything.  So I don't want to see her.
22          I said, well, I really like her.  I think she's
23      really great.  So that was our conversation.
24   Q.  When you say the doctor, we're referring to
25      Dr. Denman?

Page 102

1    A.  Yes.  Dr. Denman.
2          MR. MANDELL:  Next I'll introduce as Exhibit 2
3      the amended notice of deposition for your deposition
4      today.  This was served on June 4.  There you go.
5          (Marked Deposition Exhibit No. 2.)
6    Q.  BY MR. MANDELL:  Have you ever seen this document?
7    A.  Yes.
8    Q.  When do you recall first seeing it?
9    A.  Monday.  It was an email.
10   Q.  After you received this deposition notice, did you
11      go search for any documents to bring with you here
12      today?
13         MS. SCARCELLO:  I'll object just in general to
14      the notice and incorporate by reference our -- the
15      responses and objections that we filed earlier in
16      response to this notice of deposition.
17         Subject to those objections, you can answer
18      whether you looked for any documents.
19   A.  I did.
20   Q.  BY MR. MANDELL:  Okay.
21   A.  I didn't find them, either.
22   Q.  Okay.
23   A.  Dang.  I was going to look for my first deposition,
24      but I didn't find it.
25   Q.  Rather than going through the exercise of going

Page 103

1    through each one of these requests you can see on
2    the final three pages of this Exhibit 2, it's my
3    understanding that you did look for each of these
4    things and you did not find anything responsive?
5    A.  I did look for each of these things?
6    Q.  Yes.
7    A.  No.  I absolutely did not.  No.
8    Q.  Understanding that you didn't go through each one of
9    these, the answer would be that you did not search
10   for documents for each one of these requests?
11   A.  I did not.  I was a little crazy after I saw that.
12   Q.  Okay.  No problem.
13   A.  Okay.
14   Q.  Let's start with the injuries you are alleging in
15   this case against my client.
16      Strike that.
17      Let me go ahead and introduce as Exhibit 3 your
18   medical records from the Oregon Clinic.
19      (Marked Deposition Exhibit No. 3.)
20   Q.  BY MR. MANDELL:  These are Bates labeled MDR1 to
21   37.  We'll be using those page numbers on the bottom
22   right-hand corner to discuss those.
23      Do you understand that?
24   A.  Uh-huh.  Thank you.
25   Q.  I'll hand that over to you.  If you go to --

Page 104

1         MS. SCARCELLO:  Do you have a copy?
2         MR. MANDELL:  Yes, I do.  Sorry.
3    Q.  BY MR. MANDELL:  Just for the record, on page 1
4      there's a certification that these records are true
5      and correct copies as of 2-28-2019 of Ms. Smith's
6      records for the Oregon Clinic.  We'll come back to
7      these later, Ms. Smith.
8    A.  I have to tell you this is very curious.  I'm glad
9      you have these.  I don't.
10         MS. SCARCELLO:  Can we go off the record for a
11      second?
12         MR. MANDELL:  Sure.
13         (Discussion off the record.)
14   Q.  BY MR. MANDELL:  Ms. Smith, let's start with the
15      injuries you are alleging in this case against my
16      client.  My understanding is that it's, one,
17      pelvic/vaginal pain and, two, pain with sex.
18         Is that correct?
19         MS. SCARCELLO:  I'll object to the question to
20      the extent that it could have been and probably was
21      asked and answered in the 2017 deposition.  You
22      know, whether there's any update I think is a fair
23      question, but to that question as stated, I would
24      direct her not to answer.
25         (Instruction not to answer.)

Becky R. Smith

Page 105

1  Q. BY MR. MANDELL:  Are you going to listen to your
2     counsel's recommendation there?
3  A. Yes.
4  Q. Since 2017, your last deposition in 2017, my
5     understanding is that your injuries are, one, pelvic
6     and vaginal pain and, two, pain with sex.
7         Is that correct?
8  A. Those are my two complaints.  I also have a third
9     complaint that is bowel pressure that is difficult
10    to control, walking, whatever.  I'm not sure if I
11    discussed that earlier.  That is also an issue.
12 Q. Now --
13 A. So the pain is, like, all the time.  It's pelvic
14    pain that is constant.  Then the sexual pain is so
15    severe that it causes you not to have sex.
16 Q. Right.  We'll address those injuries separately.
17 A. Okay.
18 Q. Now, since your explant in 2018, are those three
19    complaints, pelvic pain, sexual pain, and complaint
20    with bowel pressure and control, still occurring?
21 A. Yes.
22 Q. Anything else?
23 A. I don't think so.
24 Q. So let's start with the pelvic pain and vaginal
25    pain.  Your Exhibit 1 indicated the -- the plaintiff

Page 106

1     fact sheet indicated that you still suffer from
2     pelvic pain and vaginal pain.
3         Is that correct?
4  A. Yes.
5  Q. Have your symptoms lessened after the explant
6     surgery in 2018?
7  A. Yes, they have.
8  Q. How have they lessened?
9  A. The constant ache in my pelvic area has lessened.
10    It still is tender.  It's sore.  I still have to
11    move around when I'm sitting.  I have to sit on a
12    pillow.  So they've lessened.
13 Q. After the explant and currently now, on a scale of
14    one to ten, what are you saying the pain is at?
15 A. Three to four.
16 Q. Now, you previously had testified to what the pain
17    felt like up to your April 2017 deposition.  I'm
18    just trying to understand.
19        Is it the same type of sensation that you felt
20    before that you described in your April 2017
21    deposition?
22 A. We're talking about the same area, the same pain.
23    It's just lessened.
24 Q. Okay.
25 A. If I remember correctly, I think I said I was at a

Page 107

1     four, and I probably should have said five or six.
2     I was still in denial about how much it hurt, what
3     the pain really was.
4  Q. Currently where does this -- if you were to be
5     specific, where does this pain originate?
6  A. Very low in my vaginal area and the very bottom
7     back.  So I can sit on it.
8  Q. Does this pain spread elsewhere?
9  A. It doesn't ever come up top.  It's very low.
10 Q. It's specific and localized?
11 A. Yes.  I believe so.
12 Q. How long does the pain last?
13 A. It's always there.
14 Q. Is it always the same or does it -- do you have some
15    days better than other days or sometimes are better
16    than other times?
17 A. I think if I am very active I notice it more.  It
18    feels heavier, like my butt is going to fall off.
19    Sorry.  I don't know how else to describe it.
20 Q. Does laying down help?
21 A. No.
22 Q. Let's focus on the pelvic and vaginal pain before
23    your explant in November of '18.  In your April 2017
24    deposition, you testified to the type of vaginal
25    pelvic pain you had, the duration and sensation.  I

Page 108

1     don't want to revisit that again.
2         Let's start with this.  What was your pain on a
3     scale of one to ten, three months before your
4     explant?
5  A. I would say it's five or six.
6  Q. Would you say that pain level was the same level of
7     pain you had from April 2017, at the time of your
8     deposition, until your explant in November of 2018?
9  A. Yes.
10 Q. I've got to tell you I have a record here that
11    says -- if you turn to Exhibit 3, MDR17, it says
12    here that your pain is a two out of ten, and that
13    was recorded three months prior to your explant.
14        Do you see that?  It's under History of Present
15    Illness.
16 A. Where was this done?  The Oregon Clinic?
17 Q. Yes.  This is August 23, 2018, about three months
18    before your explant.
19 A. Well, my pain is higher than two now, so I guess I
20    could just explain this off by saying that I was
21    super nervous about going.  I felt like -- I don't
22    know.  I felt guilty about this whole process of
23    having had the implant, and it was causing so many
24    problems for us.  I tend to downplay my pain and
25    whatnot even to my doctors.

Becky R. Smith

Page 109

1 Q. Now, before your explant, did any healthcare
2     provider ever tell you that your pelvic and vaginal
3     pain was related to your mesh?
4         MS. SCARCELLO: I'll object to the question to
5     the extent it calls for testimony that could have
6     been provided in April 2017.
7 Q. BY MR. MANDELL: I'll limit it. From 2017 to before
8     your explant in 2018, did any doctor say that your
9     pelvic and vaginal pain was related to your mesh?
10 A. When I went to Nikki Kuehl and I asked her
11     specifically if my pain could be from that, she said
12     she didn't know and that she would need to -- you
13     know, she sent me to Lindsey Waugh at the Oregon
14     Clinic, and in that visit she said that it could be
15     caused from that.
16 Q. That was Dr. Waugh?
17 A. Uh-huh.
18 Q. Anyone else other than Dr. Waugh say --
19 A. It's Waugh, W-A-U-G-H.
20 Q. Anyone else other than Dr. Waugh say that the mesh
21     could be the cause of your pelvic and vaginal pain?
22 A. The person who did the excision, Dr. Denman.
23 Q. Anyone else?
24 A. No.
25 Q. Did Dr. Denman or Dr. Waugh ever tell you that the

Page 110

1     pelvic and vaginal pain was related to a defect in
2     your mesh?
3 A. No.
4 Q. Did any physician ever tell you that the pelvic and
5     vaginal pain you experienced from 2017 to 2018 was
6     related to a defect in your mesh?
7 A. No. I had no idea about a mesh defect.
8 Q. Did any physician ever tell you that your pelvic and
9     vaginal pain that you felt before the explant was
10     Bard's fault?
11         MS. SCARCELLO: I'll object to the form of the
12     question. It could have been asked in the 2017
13     deposition.
14         And direct you not to answer.
15         (Instruction not to answer.)
16 Q. BY MR. MANDELL: Between 2017 and your explant in
17     2018, did any physician tell you that the pelvic and
18     vaginal pain you felt before the explant was Bard's
19     fault?
20 A. Absolutely not.
21 Q. When you go to your doctors, do you feel comfortable
22     speaking to them?
23 A. Mostly.
24 Q. You agree it's important for you to tell your
25     doctors everything about your condition in order for

Page 111

1     them to properly diagnose you, correct?
2 A. I understand that, but I don't think it always
3     happens. I know it doesn't always happen.
4 Q. Do you ever lie to your doctors?
5         MS. SCARCELLO: I'll object to the form of the
6     question. Again, I'll state this deposition is
7     supposed to be limited from April of 2017 forward.
8     To the extent your question calls for an answer
9     about anything prior to that time period, I would
10     direct my client not to answer.
11         MR. MANDELL: I'm just asking if she ever lies
12     to her doctors. If you want me to specify --
13 Q. BY MR MANDELL: Between 2017 to 2018 -- to
14     currently, have you ever lied to your doctors?
15 A. I haven't lied. No. Have I misstated? Have I
16     understood the situation? Yes. I believe I have.
17 Q. When you go to the doctor, do you tell the doctor
18     the whole and complete truth about everything that
19     you are dealing with physically at the time?
20 A. I think that would be difficult to do.
21 Q. Do you tell your doctor any -- all the physical pain
22     you may be having at the time?
23 A. No. It's usually something specific that we're
24     talking about, so I don't take notes with me, so
25     it's easy to forget what you wanted to say.

Page 112

1 Q. Just to clarify, you indicated that sometimes you
2     misstate things to your doctor. What is the
3     reasoning behind that?
4         MS. SCARCELLO: I'll object to the form. It
5     misstates her testimony.
6         Go ahead and answer.
7 A. As I said before -- for instance, when I said here
8     that I have a pain of a two, there's -- I don't even
9     think people would go to the doctor for a pain of
10     just two. In my head that's what I'm thinking.
11         When I was sitting there talking to her, I
12     really was nervous. Maybe at that moment the pain
13     was two because I wasn't really thinking about it.
14     But I can tell you that in general it's a four,
15     three or four.
16 Q. So in general, from April 2017 to your explant, it
17     was a three or four?
18 A. Yes.
19 Q. We're talking about the pain in -- your pelvic and
20     vaginal pain, correct?
21 A. Yes.
22 Q. Since your explant in 2018, has any physician ever
23     told you that the current issue that you have of
24     pelvic and vaginal pain is related to your mesh?
25 A. Including the doctor that just took the mesh out?

Becky R. Smith

Page 113

1 Q. Let me rephrase that. You had an explant procedure
2    to remove the mesh, correct?
3 A. Again. Yes.
4 Q. So has any doctor since then said that your current
5    pain with -- pelvic and vaginal pain is still
6    related to mesh?
7 A. The pain is the same. It has not changed. We
8    haven't spoken those words exactly, so I guess no.
9 Q. Has any physician ever told you that your current
10    pain -- pelvic and vaginal pain is Bard's fault?
11 A. No.
12 Q. Now let's focus on the pain with sex that you claim
13    is one of your injuries.
14    Okay?
15 A. Yes.
16 Q. You previously testified to pain with intercourse.
17    This was in April 2017. Are those symptoms the same
18    as you described in 2017, the sharp deep pain when
19    having intercourse, the same as they were from 2017
20    to your explant?
21 A. Absolutely.
22 Q. So no changes, whether that be worse or better?
23 A. Same.
24 Q. Did the frequency of your sex change at all from
25    April 2017 to the explant in November 2018?

Page 114

1 A. No.
2 Q. Then you had the November 2018 explant surgery. Did
3    this improve your symptoms of pain with sex in any
4    way?
5 A. It did not improve it. No. It made it worse.
6 Q. So since the explant surgery in 2018, the pain with
7    sex has actually --
8 A. Actually, not the pain. The pain has -- is maybe
9    slightly less. But I don't believe it is. But now
10    I bleed. Now I have bleeding with it.
11 Q. Let's explore -- let's start first with you said
12    maybe slightly less. On a scale of one to ten, what
13    would you say it is currently?
14 A. You know, I have to say I haven't practiced very
15    much. I've been in treatment since November. I
16    have not healed properly, and I'm still in
17    treatment. So sex has happened three or four times.
18    So I'm always not supposed to have it.
19 Q. Let's start with this then. After the explant
20    surgery in November 2018, when did you first attempt
21    to have intercourse?
22 A. Whenever the doctor said it was -- what was it?
23    After a month, and that didn't work, so maybe two
24    months.
25 Q. So you waited two months to have -- before you had

Page 115

1    intercourse after your explant surgery; is that
2    correct?
3 A. I believe so. It's either eight or ten weeks, and
4    I'm not sure. I think -- now that I think about it,
5    I think it was ten weeks.
6 Q. So ten weeks?
7 A. Yeah.
8 Q. Can you describe to me what occurred when you had --
9    as far as -- strike that.
10    Did you feel pain at this first attempt of
11    intercourse ten weeks after your explant surgery?
12 A. Yes.
13 Q. Can you describe to me how that was either the same,
14    different -- same or different from how you
15    described the pain in April 2017 with intercourse?
16 A. I'm going to say it was slightly less, slightly less
17    pain.
18 Q. But the same location?
19 A. Same place. Yes.
20 Q. The same sensation; is that correct?
21 A. Deep. Yes.
22 Q. I believe you described it as a deep sharp pain, so
23    that's the same?
24 A. Uh-huh.
25    MS. SCARCELLO: Is that a "yes"?

Page 116

1 A. Yes, it is.
2    Thank you.
3 Q. BY MR. MANDELL: After this first attempt ten weeks
4    after the explant, have you -- did you try
5    intercourse again after that?
6 A. After I went to the doctor and another two weeks.
7    You know, I don't remember. Whatever the doctor
8    said. She laid it out for me. We followed her
9    guidelines specifically.
10 Q. So ten weeks after the explant you attempted
11    intercourse and you felt pain. Did you then go to
12    your doctor to report that?
13 A. I did not go -- I went again, but I'm not sure if it
14    was right then. So I did see her again.
15 Q. Did you -- when you saw her again, did you report
16    any pain with sex?
17 A. Uh-huh.
18    MS. SCARCELLO: Is that a "yes"?
19 A. Yes, it is.
20 Q. BY MR. MANDELL: This is Dr. Denman, correct?
21 A. Uh-huh. Yes.
22 Q. What did Dr. Denman say in response to that?
23 A. To the pain?
24 Q. Yes.
25 A. She said, you know, I'm glad it's less, but there's

Becky R. Smith

Page 117

1  still, you know, mesh in there, so -- we got a lot
2  of it out, so there might be, you know, more. Well,
3  she knows there's more. I don't know. I was more
4  worried about the bleeding. When she looked, I
5  wasn't healed. That's another big deal.
6  Q. This issue of bleeding, when did this -- when did
7  you first notice this, the bleeding with having
8  intercourse? When was the first time you noticed
9  that?
10 A. First time we had intercourse.
11 Q. Ten weeks after the explant?
12 A. Uh-huh. We're talking just with intercourse, right?
13 Q. Right.
14 A. Uh-huh.
15 Q. Since the explant surgery in 2018, can you estimate
16 the number of times you attempted to have sexual
17 intercourse?
18 A. I guess six.
19 Q. Are you currently sexually active?
20 A. I'd love to be, but I'm not now because I'm healing
21 from the last surgery.
22 Q. You are healing from the November 2018 surgery?
23 A. Yes. I'm still bleeding. It's still not healed.
24 Q. In your last deposition, you testified that you were
25 still -- I'm sorry to get into the private nature of

Page 118

1  this stuff -- you were still able to achieve orgasm
2  despite the pain you were feeling.
3      Was that true as well from April of 2017 to the
4  explant in 2018?
5  A. Absolutely.
6  Q. What about currently? Are you still able to achieve
7  orgasm on any of the six times that you attempted
8  after your explant?
9  A. Not through intercourse.
10 Q. But you were able to achieve orgasm through
11 intercourse prior to the explant?
12 A. I'm going to say no. Nobody asked me specifically
13 like that.
14 Q. So it's my understanding through other types of
15 sexual activity you are able to achieve orgasm; is
16 that correct?
17 A. Yes. That's correct.
18 Q. That was the case since your April 2017 deposition
19 as well as currently?
20 A. Yes. I'm sorry. I had to think about that.
21 Q. Other than Dr. Denman, since your 2018 explant, have
22 you reported pain with sexual intercourse to any
23 other healthcare providers?
24 A. I haven't seen any others.
25 Q. At any time before your explant in 2018, excluding

Page 119

1  your post-op recovery from the -- strike that.
2      At any time before your implant, excluding your
3  post-op recovery from the implant and the revision
4  that you had, did any doctor ever tell you to limit
5  your sexual activity?
6      MS. SCARCELLO: I'll object to that to the
7  extent of the time frame before her implant and
8  before April of 2017 could have been asked in April
9  2017.
10     Direct you not to answer.
11     (Instruction not to answer.)
12 Q. BY MR. MANDELL: Let me rephrase it without using
13 too many words. Since April 2017 to the time of
14 your explant, did any doctor say -- tell you to
15 limit your sexual activity?
16 A. Let me answer it this way. The only doctors who
17 have said at any time to limit my sexual activity
18 was after surgery and while I was healing.
19     Does that answer the question?
20 Q. It does.
21 A. Okay.
22 Q. So no doctor since 2017 to now has ever told you
23 that you could not have intercourse, excluding the
24 post-op recovery?
25 A. Yes.

Page 120

1  Q. Have you or your spouse since April 2017 ever been
2  treated for sexual dysfunction?
3  A. No.
4  Q. Focusing on the time after April 2017, would you
5  say -- from then until currently, is your marriage
6  still strong?
7  A. It's a struggle, but it's strong. It's a struggle.
8  Q. Would you describe it as a loving relationship?
9  A. Absolutely.
10 Q. Today do you feel as much love towards your husband
11 as you did when you first got married?
12 A. Yes.
13 Q. Now, I saw in a record -- a recent record that your
14 husband had a pulmonary embolism, correct?
15 A. Yes.
16 Q. When was that?
17 A. A couple years ago.
18 Q. How was your husband treated?
19 A. How was he treated? He went to the hospital. He
20 had some -- he had a CT scan. He had some stuff
21 happening. The doctor there -- I don't know. I'm
22 nervous. I don't know. I can't think.
23 Q. No problem.
24     MS. SCARCELLO: Can we take a break?
25     MR. MANDELL: Sure. We can take a break.

Becky R. Smith

Page 121

1        (Recess.)
2   Q.  BY MR. MANDELL:  I was discussing with you your
3        husband's pulmonary embolism.  Did that have any
4        effect on his ability to do any physical activities
5        after he had that pulmonary embolism?
6   A.  Not in general.  No.
7   Q.  Has it affected his ability to have sex at all?
8   A.  No.
9   Q.  Before your explant, so focusing on April 2017 to
10       your explant, did any physician ever tell you that
11       your pain with sex was related to your mesh?
12  A.  Yes.  That's what Dr. Waugh says.  Yes.  Absolutely.
13  Q.  So Dr. Waugh.  Anyone else?
14  A.  Dr. Denman.  And they were assuming that was the
15       case.
16  Q.  Those were the only two healthcare providers,
17       correct?
18  A.  (Nods head.)
19  Q.  Did either of those doctors or any other doctor tell
20       you that the sharp pain you felt with sex was
21       related to a defect in your mesh?
22  A.  No.
23  Q.  Did any physician ever tell you from 2017 to the
24       explant that the pain with sex that you felt was
25       Bard's fault?

Page 122

1   A.  No.
2   Q.  Since your explant in November 2018, has any
3        physician ever told you that your current issue with
4        pain with sex is related to your mesh?
5   A.  Can you say that again, please?
6   Q.  Since your explant, has any physician ever told you
7        that the current issue you have with pain with sex
8        was related to your mesh?
9   A.  It's the same issue, so yes.
10  Q.  Which healthcare provider has told you that your
11       current issue of pain with sex is still related to
12       the mesh?
13  A.  It would be Dr. Denman.  She's the only one I've
14       seen.  Can I just say that I'm not sure if she said
15       those words exactly, but I assume that's the case.
16       It has to do with the mesh because I'm still healing
17       from it.  So that's what I'm saying, the whole mesh.
18  Q.  To clarify, your assumption is that your pain with
19       sex is still related to your mesh because you are
20       still feeling the same pain, correct?
21  A.  Yes.
22  Q.  But no doctor has specifically told you that your
23       current pain with sex is related to the mesh; is
24       that correct?
25  A.  I'm not sure.

Page 123

1   Q.  Since your explant, has any doctor said that your
2        current pain with sex is due to a defect with the
3        mesh?
4   A.  No.
5   Q.  Since your explant, has any physician ever told you
6        that your current issue with pain with sex is Bard's
7        fault?
8   A.  No.
9   Q.  The third injury that you brought up was an issue
10       with bowel incontinence and pressure?
11  A.  Uh-huh.
12  Q.  Is that a "yes"?
13  A.  Yes.
14  Q.  Now I want to direct your attention to Exhibit 3,
15       page -- Bates page starting on 11.  Do you see that
16       in the bottom right-hand corner?
17  A.  Yes.
18  Q.  Now, it says here -- let's actually turn to page 12
19       where -- this is a record of Dr. Denman on
20       August 29, 2018, and she's discussing your history
21       of present illness.
22           If we go to page 12, it says in the third line,
23       "She does have issues with bowel incontinence."
24           Do you see that?
25  A.  Uh-huh.  "She does have incontinence of urine."

Page 124

1   Q.  "She does not have incontinence of urine."
2   A.  "She does have issues with bowel incontinence."
3   Q.  "However, that has been becoming more troublesome.
4        She leaks liquid solid stool about once per week.
5        She has this issue when walking.  She has not done
6        anything about this."
7           Did I read that correctly?
8   A.  You are a good reader.
9   Q.  So the answer is "yes"?
10  A.  Yes.
11  Q.  Would I be correct in saying this is the first time
12       you reported to a healthcare provider having any
13       type of bowel issues?
14  A.  Yes.
15  Q.  Would I be correct in saying that these bowel issues
16       occurred somewhere along -- somewhere around this
17       time of August 29, 2018?
18  A.  They've been coming on.  I just -- in my mind, I
19       wasn't really sure if that was -- it's all in the
20       same area.  So I finally decided I would talk about
21       that issue as well and maybe it has something to do
22       with it.  I don't know.
23  Q.  Let me ask you this.  When did you first start
24       having symptoms of bowel incontinence and pressure?
25  A.  It's been going on for years.

Becky R. Smith

Page 125

1  Q. When you say years, when exactly?
2  A. I don't know.
3  Q. Has it been going on the last three years?
4  A. Yes.
5  Q. More than three years?
6  A. More than likely.  Yes.
7  Q. More than five years?
8  A. I think it's becoming worse and worse over that
9     period of time.
10 Q. Has it occurred -- has it been occurring for ten
11    years?
12 A. Not that I recall.  Like I said, it's been getting
13    worse and worse.
14 Q. Do you recall having any symptoms of it prior to
15    your 2008 implant?
16 A. I don't.
17 Q. Now let's go back to Exhibit 3, page 11.  You'll see
18    under Plan, No. 2, it says, "FI," which I'll
19    represent to you means fecal incontinence, which
20    is --
21 A. Lovely.
22 Q. -- the bowel pressure that we're discussing.
23       You understand that?
24       It says, "Discussed likely nerve damage for
25    FAVD," which I'll tell you stands for forceps

Page 126

1  assisted vaginal delivery, "/episiotomy with
2  delivery."
3     Let me stop right there.  Did you have a
4  forceps assisted delivery at some point?
5  A. Yes, I did.  1977.
6  Q. Then it says, "Discussed initial management with
7     fiber for bulking and possible change to Imodium if
8     not optimal control."
9        Do you see that?
10 A. Uh-huh.
11 Q. Then it says, "Reassurance, there is not a mesh
12    factor involved in the issue."
13       Do you see that?
14 A. Yes.
15 Q. So Dr. Denman told you that this bowel incontinence
16    and bowel pressure injury you are complaining about
17    is not related to the mesh; is that true?
18 A. I did not hear that verbatim.  No.  We did say we
19    were going to try bulking up, but that changed
20    nothing.
21 Q. Now, after seeing this record, do you still believe
22    that your bowel incontinence and bowel pressure is
23    related to your mesh?
24 A. It could be.
25 Q. Has any doctor told you that?

Page 127

1  A. Uh-huh.
2  Q. Is that a "no"?
3  A. I don't recall.
4  Q. Your belief that it could be an injury related to
5     the mesh is simply because it's in the same general
6     area as your other injuries you are claiming; is
7     that correct?
8  A. I'm saying that it could be involved.  Yes.
9  Q. But to your recollection, no healthcare provider has
10    told you that the mesh is causing these current
11    issues of bowel pressure and incontinence; is that
12    correct?
13       MS. SCARCELLO:  Object to the form of the
14    question; asked and answered.
15       You can answer.
16 A. I'm sorry.  I forgot the question already.
17       MR. MANDELL:  You can read it back.
18       (The reporter read the last question.)
19 A. I'm just going to say I did not hear that.
20 Q. BY MR. MANDELL:  Okay.
21 A. If they told me that, I did not hear that.
22 Q. Do you recall in your last deposition testifying
23    that Dr. Kim told you that you may have problems
24    defecating later on down the road?
25 A. I don't recall.

Page 128

1  Q. Do you recall her ever diagnosing you with
2     rectocele?
3  A. I don't even know what that is.
4  Q. Do you recall -- let me -- I'm going to read from
5     your deposition transcript on this issue real quick.
6     On page 49 -- we can introduce this as an exhibit if
7     you'd like.  Let's just do this as Exhibit 4.
8        (Marked Deposition Exhibit No. 4.)
9  Q. BY MR. MANDELL:  If you turn to page 49, it says on
10    line 13, "Can you tell me a bit about the
11    discussions you had with Dr. Kim?"
12       Your answer was, "It was very interesting.  I
13    went in and she, you know, asked about my
14    incontinence and I said, yeah."
15       I'm going to skip down a little bit and go
16    to --
17 A. What were you saying was so interesting?  My answer?
18    What are you talking about?
19 Q. I was having you follow along with me.  I want you
20    to turn to the next page, on page 50, and it says on
21    line 5, "She asked if I had problems defecating, and
22    I said, not so much.  And she said, well, you know,
23    that might be an issue down the road."
24       Do you see that?
25 A. Yes.  And I do remember her saying that now.

Becky R. Smith

Page 129

1  Q. Then on line 10 it asks, "So what do you mean by she
2     thought defecating might be an issue down the road?"
3        Do you see that?
4  A. Yes. I'm following.
5  Q. If we go to line 16, you said, "So I don't think she
6     treated the -- you know, for not being able to have
7     a great bowel movement, but that was part of the
8     conversation."
9        Do you see that?
10 A. Uh-huh.
11 Q. Is it your understanding then that you were not
12    treated for the bowel issues that Dr. Kim said you
13    may have later on down the road?
14 A. No. I don't actually see that as conclusive. No.
15 Q. Do you believe you were treated by Dr. Kim for bowel
16    issues?
17 A. I'm not sure.
18 Q. Now, you testified here, "So I don't think she
19    treated me, you know, for not being able to have a
20    great bowel movement."
21       Is it your understanding from your testimony
22    here you don't think she treated you?
23 A. It sounds like I wasn't sure. I'm still not sure.
24 Q. You are still not sure if the mesh is the reason for
25    these bowel issues currently, right?

Page 130

1  A. I hate my mesh, and I feel like it is a very --
2     could be the problem that I have. Absolutely.
3  Q. All right. Since we're talking about this, let's
4     discuss a little bit. The symptoms with the bowel
5     issues, can you describe those for me?
6  A. When I walk or I'm standing -- it's really walking.
7     Even if I have a bowel movement before I leave the
8     house, before I get too far, the symptoms, it's not
9     100 percent of the time, but I would say 85 or 90
10    percent of the time I have to have a bowel movement.
11    I have to cut the walk short, head back home.
12 Q. This has been from -- correct me if I'm wrong. This
13    has been something that has progressively gotten
14    worse since you first started noticing it; is that
15    correct?
16 A. Uh-huh. Yes.
17 Q. Your description that you just gave me is your
18    current symptoms, right?
19 A. Yes.
20 Q. Was there any change in your symptoms that you
21    currently have -- was there any change from the
22    explant procedure? Did the symptoms get better or
23    worse or stay the same after the explant procedure,
24    is a better way of asking it?
25 A. They have gotten better.

Page 131

1  Q. We're talking about the bowel issues.
2  A. Yeah. And I -- yes. They have gotten better. Now
3     that I think about it, they actually have gotten
4     better.
5  Q. How have they gotten better?
6  A. I can walk much more often now without having to
7     come back. Probably 60 percent of the time I can
8     finish the walk. Or I can come back -- I have to
9     come back. Forty percent of the time I can finish.
10 Q. Now I'm confused because you just said 80 to 90
11    percent of time you can't finish the walk.
12 A. Right. Now I'm going to say 60 percent of the time.
13    When you said before, I mean before the explant. So
14    when you say currently, I guess that means right now
15    it's better at I would say 60 percent.
16 Q. Do you have any pain associated with this?
17 A. No. Just pressure. No pain.
18 Q. Can you describe the pressure? We'll start with
19    location.
20 A. It's in my bowels, my anus.
21 Q. Is it a constant pressure? Does it come and go?
22 A. No. It's constant.
23 Q. I think that's fine for that. All right.
24       Other than your 2018 surgery with Dr. Denman,
25    did you seek treatment for any of these conditions

Page 132

1  we discussed?
2  A. When are you talking about?
3  Q. Let me clarify. We've been going over the three
4     injuries that you claim may be related to the mesh,
5     which were pelvic vaginal pain, pain with sex, and
6     these bowel incontinence issues and pressure,
7     correct?
8  A. Uh-huh.
9  Q. Other than your 2018 surgery with Dr. Denman, did
10    you seek treatment for any of these conditions since
11    then?
12 A. When I went back to see Dr. Denman. Yes.
13 Q. So just Dr. Denman has treated --
14 A. Just Dr. Denman.
15 Q. You've not seen any other doctors for these issues?
16 A. No.
17 Q. Did anyone assist you with scheduling an appointment
18    with the physicians at the Oregon Clinic, including
19    Dr. Denman?
20 A. Sorry?
21 Q. Did anyone assist you with scheduling your
22    appointments at the Oregon Clinic?
23 A. Anyone like who?
24 Q. Anyone other than --
25 A. A physician?

Becky R. Smith

Page 133

1  Q. -- a physician?

2  A. No.

3  Q. Has anyone assisted in paying for your treatment at

4     the Oregon Clinic?

5  A. No.

6  Q. Anyone arrange for travel costs associated with your

7     treatment to the Oregon Clinic in Portland?

8  A. No.

9  Q. Since your explant, has it been recommended that you

10    try physical therapy?

11 A. No.  We talked about that might -- being an issue,

12    but that -- it does not happen.  No.

13 Q. My question, though was, has anyone recommended that

14    you do physical therapy?

15 A. No.  We've talked about it, but it's not recommended

16    yet, if it's going to be.

17 Q. Has anyone since your 2018 explant recommended any

18    type of pain management therapy?

19 A. No.

20 Q. Have they recommended any type of pain medicines?

21 A. No.

22 Q. Have they recommended any type of trigger point

23    injections?

24 A. No.

25 Q. Are you doing anything currently on the advice of a

Page 134

1     physician or on your own initiative to get better?

2  A. Yes.

3  Q. What is that?

4  A. I'm taking the medication that has been provided or

5     suggested that I take.  I eat well.  I try to walk,

6     try to exercise by walking.  I don't drink very

7     much.  I don't smoke.  I try to be happy.

8  Q. You indicated you are taking the medication.  Is

9     that an estrogen medication?

10 A. Uh-huh.

11 Q. Has that been helping at all?

12 A. I don't know.

13 Q. Are you still taking that today?  Is that correct?

14 A. Yes.

15 Q. You were prescribed that by Dr. Denman; is that

16    correct?

17 A. Yes.

18 Q. You started taking that sometime -- did you start

19    taking that immediately after your explant surgery?

20 A. Sometime after that.  Yes.  Whenever it was

21    prescribed.

22 Q. So from your records I can see that since your 2017

23    deposition you continue to be treated for

24    depression, numbness and tingling in your hands and

25    feet, carpal tunnel syndrome, pain and tingling in

Page 135

1     your arms?

2  A. I'm not being treated for that.  I had a study done,

3     and I decided not to do anything about it because

4     this is so consuming.  Yes.  I have depression

5     medicine still.

6  Q. The study done, you are referring to the numbness

7     and tingling that you are having?

8  A. Uh-huh.

9     MS. SCARCELLO:  Yes?

10 A. Yes.  Sorry.

11 Q. BY MR. MANDELL:  Tell me what happened with the

12    study.

13 A. I had the study done.  Previously I had carpal

14    tunnel in this hand and had surgery on it, so I

15    actually knew what was going to happen with this

16    hand.  So I went in and I had the study done.  She

17    said, yes, I have carpal tunnel.

18    I just didn't have enough finances basically to

19    do the treatment, and I just decided to suffer

20    through that stuff.

21 Q. This is Dr. Barbara Hills; is that correct?

22 A. I believe so.  Yes.

23 Q. It looks like this occurred -- the study occurred in

24    September 2018; is that right?

25 A. Uh-huh.

Page 136

1     MS. SCARCELLO:  Is that a "yes"?

2  A. Yes.

3  Q. BY MR. MANDELL:  So you still have these symptoms

4     today of carpal tunnel syndrome; is that right?

5  A. Yes.

6  Q. Are you planning on having any type of treatment or

7     surgery for that?

8  A. I don't know.

9  Q. Has the carpal tunnel syndrome that you still have

10    today put any physical limitations on you?

11 A. Yes.  I mean I have to sew less.  I have to, you

12    know, drive less, switch my hands around.  I have

13    compensated.

14 Q. Has it affected your ability to exercise?

15 A. No.

16 Q. How about kayaking?

17 A. No.

18 Q. Any activities other than what you've told me that

19    you've had to compensate for, that you cannot do

20    anymore because of the carpal tunnel syndrome?

21 A. No.

22 Q. I know there was some mentioning of pain and

23    tingling in your arms.  Is that something you also

24    feel or is it just the carpal tunnel?

25 A. Carpal tunnel all the way.  It's all the same thing.

Becky R. Smith

Page 137

1 Q. You were diagnosed with depression prior to your
2    implant; is that correct?
3 A. Yes.
4 Q. It still continues to this day; is that correct?
5 A. That's correct.
6 Q. What medication do you currently take?
7 A. I take Lexapro and Wellbutrin.
8 Q. How long have you been taking those for?
9 A. Lexapro over ten years, maybe 15 years, and the
10    Wellbutrin just in the last year or so, I believe.
11 Q. What was the reason for adding on the Wellbutrin?
12 A. My depression symptoms are still there.  So
13    Dr. Kuehl and I talked about what else could happen,
14    especially since I couldn't exercise, so I added the
15    Wellbutrin.
16 Q. Nurse practitioner Kuehl prescribed that; is that
17    correct?
18 A. Yes.
19 Q. You said your symptoms of depression.  What are
20    those symptoms?
21        MS. SCARCELLO:  I'll object to the form of the
22    question just in terms of it's vague in terms of
23    time frame.  Are we talking 2017 forward?
24 Q. BY MR. MANDELL:  Yes.  We're talking about 2017
25    forward.  You indicated you were still having

Page 138

1    depression symptoms, which is why you took
2    Wellbutrin, so I'm just asking you to explain what
3    those depression symptoms were?
4 A. It's hard to tell I've been taking it for so long.
5    If I don't take it, I can tell you what the symptoms
6    are.  I'm very dizzy, lightheaded.  I have confused
7    thinking, very tired, irritable.  There's probably a
8    whole lot more things I can't think about.
9 Q. Have you been consistently taking your medication
10    since April 2017 to today?
11 A. Yes.
12 Q. Now, if we go to Exhibit 3, let's go to page 2,
13    MDR2, it says here -- this is an August 13, 2018,
14    visit with nurse practitioner Kuehl.
15        Do you see that?
16 A. Uh-huh.
17 Q. Is that a "yes"?
18 A. Yes.
19 Q. It notes here, it looks like, the third dash, "Has
20    been using Lexapro 20 milligrams a day for over ten
21    years for depression."
22        Do you see that?
23 A. Uh-huh.
24        MS. SCARCELLO:  Is that a "yes"?
25 A. Yes.

Page 139

1 Q. BY MR. MANDELL:  The next sentence says, "For the
2    past year she has felt depression increasing again.
3    Her head feels heavy and she feels sluggish and
4    irritable."
5        Is that correct?
6 A. Those are more symptoms.  Absolutely.
7 Q. Is that a symptom of your medicine that you are
8    taking or a symptom of the depression?
9 A. Pardon me?
10 Q. It says your head feels heavy and she feels sluggish
11    and irritable.
12 A. I see your question.  This is in addition to the
13    Lexapro.  That's why I went in initially is to just
14    say this just isn't enough.  I just feel really
15    terrible.
16        Is that the answer?
17 Q. I think I understand it now.  This is when you went
18    in to get the Wellbutrin, right?
19 A. Yes, it is.  Well, to see if it should change.  I've
20    been taking it for a long time.  I don't know if
21    that makes a difference.
22 Q. Up around this time in August 13, 2018, you'd agree
23    that you were feeling sluggish, correct, as noted
24    here?
25 A. Yes.

Page 140

1 Q. The sluggishness, you would agree that would affect
2    your ability to do certain activities like
3    exercising?
4 A. No.  It's -- no.
5 Q. If you feel sluggish, what activities does it
6    prevent you from doing?
7 A. You can still walk.  It doesn't matter how tired you
8    are or whatever.  It's a walk.  Feeling sluggish is
9    kind of in your head and it's less -- it doesn't let
10    you think well.  Yeah.  I don't know.  It didn't
11    stop me from doing anything.
12 Q. Would you agree that your energy felt lower when you
13    felt sluggish?
14 A. Probably.  Yes.
15 Q. Now, you previously testified to saying that your
16    mesh implant has lowered your energy, which was the
17    reason why you couldn't hike and kayak.
18        Do you recall saying that?
19 A. Sure.
20 Q. I'm asking you here, because your energy was lower
21    at this time, is that an additional reason why you
22    might not have been able to hike and kayak?
23 A. No.  This is different.
24 Q. Do you believe that this sluggishness that you are
25    feeling at this time prevented you from doing any

Becky R. Smith

Page 141

1    sort of activities at all?
2    A. No.
3    Q. Do you still have anemia?
4    A. No.
5    Q. It looks like you were diagnosed with low back pain
6        in 2005.  Is that something you still feel today?
7    A. No.
8    Q. Since your 2017 deposition, have you been diagnosed
9        or treated for any cardiac or pulmonary issues?
10   A. No.
11   Q. Kidney or thyroid issues?
12   A. No.
13   Q. Cancer?
14   A. No.
15   Q. Blood pressure issues?
16   A. No.
17   Q. Diabetes?
18   A. No.
19   Q. Any back, neck or spine issues?
20   A. No.
21   Q. Fibromyalgia?
22   A. No.
23   Q. Since April 2017, have you been involved in any
24       motor vehicle accidents?
25   A. No.

Page 142

1    Q. Any broken bones?
2    A. No.
3    Q. Any significant surgeries other than the explant in
4        2018?
5    A. No.
6    Q. Any accidents or injuries for which you needed
7        stitches?
8    A. No.
9    Q. Are you still good to go or do you need a break?
10   A. I'm good.  Thank you.
11   Q. At your last deposition you indicated you were
12       seeing nurse practitioner Nikki Kuehl who put you on
13       estrogen to try to address what you described as an
14       aching in your pelvis.
15           Do you recall that?
16   A. Yes.
17   Q. You indicated you were on the estrogen regimen for
18       about a month at that time.  Do you recall that?
19   A. Huh-uh.
20   Q. So that's a "no"?
21   A. That's a "no."
22   Q. Nurse practitioner Kuehl had prescribed you
23       estrogen.  How long did you take this estrogen that
24       she prescribed you back in March of 2017?
25           MS. SCARCELLO:  I'll object to the time frame

Page 143

1    of your question.
2            MR. MANDELL:  We didn't have this record at the
3    time of the deposition.
4            MR. SCARCELLO:  Okay.  My position -- it's our
5    position that not having the record doesn't mean
6    that you couldn't have asked questions about her
7    ongoing treatment at that time.  Subject to that,
8    I'll allow her to answer.
9    Q. BY MR. MANDELL:  I'm just briefly going to go over
10       this stuff.  She prescribed it to you in March of
11       2017. How long did you take it for?
12   A. I assume I took it for as long as she prescribed it.
13   Q. In this record, Ms. Kuehl discusses about you seeing
14       a Dr. Gerken, an ob/gyn, for a steroid injection.
15           Do you recall that?
16   A. We talked about it.
17   Q. Did you ever go see Dr. Gerken?
18   A. No.
19   Q. Why not?
20   A. I don't remember.
21   Q. Did you ever have steroid injections at any point
22       before the November 2018 surgery?
23   A. No.
24   Q. Were they offered to you by any other doctors from
25       April 2017 to your 2018 explant surgery?

Page 144

1    A. I had one steroid injection in my life, and it was
2        in my wrist.  So no and no.  I don't even know what
3        a steroid would be for.  I'm confused.
4    Q. Is there any reason why you did not return to
5        Dr. Kim for treatment around this time of April
6        2017?
7    A. I wanted a new doctor.  She was not -- she's not who
8        my doctor suggested, so I didn't have -- it's been a
9        long time since I'd seen her, so I didn't really
10       feel like I was a patient.
11           MS. SCARCELLO:  Can we take a break?
12           MR. MANDELL:  Sure.
13           (Recess.)
14   Q. BY MR. MANDELL:  I just wanted to actually pull your
15       attention back to Exhibit 1, the plaintiff fact
16       sheet that you filled out in February of this year.
17       Go to page 7, which is Bates labeled at the very
18       bottom 105.
19           It says in part E, "Are you currently
20       experiencing symptoms related to your claimed bodily
21       injuries?"  And you say, "Yes."
22           I don't see anywhere here any discussion about
23       bowel incontinence or pressure.  Do you see anything
24       there about that?
25   A. No.

Becky R. Smith

Page 145

1  Q. Looking at your claims again, are you still claiming
2     that bowel incontinence, pressure is part of your
3     injuries related to mesh in this lawsuit?
4  A. It could be.
5  Q. So you don't know one way or the other; is that
6     correct?
7  A. I don't know one way or the other.
8  Q. I want to go back to Exhibit 3, the medical records.
9     If we go to page 2, this is your August -- this is
10    MDR2, August 13, 2018, visit with nurse practitioner
11    Nikki Kuehl.
12       Am I stating that correctly?
13 A. Yes.
14 Q. My only question for you here is, on the third page
15    it says, "Breast and pelvic exam:  Declined." Do
16    you recall why a pelvic exam was declined at this
17    time?
18 A. It's for a pap smear and I don't need one.  I don't
19    have a need for that.
20 Q. In this record it does say that on page 2 you are
21    experiencing vaginal pain and the mesh was trimmed
22    one year after procedure which did not resolve the
23    pain.
24       Do you see that?
25 A. Uh-huh.

Page 146

1  Q. Is that a "yes"?
2  A. Yes.
3  Q. And that is something that you reported to
4     Ms. Kuehl; is that right?
5  A. Yes.
6  Q. She didn't perform an exam at this time to determine
7     if you were having pain; is that correct?
8  A. She would not have had to do that.  Correct.  I told
9     her there was pain.
10 Q. Would I be correct that this is the first time that
11    you reported the vaginal pain that you were having
12    since the 2009 excision?
13 A. I don't know.
14 Q. Would this be the first time that you saw a
15    healthcare provider for vaginal or pelvic pain
16    following the 2009 excision?
17 A. I don't know.  Don't recall.
18 Q. Now let's go to the next record here on -- it's
19    actually on page 17, MDR17.  This is August 23,
20    2018.
21       Are you there?
22 A. Yes.
23 Q. This is -- it says office visit with Lindsey Waugh,
24    Dr. Waugh, right?  Is that correct?
25 A. I believe so.  Yes.

Page 147

1  Q. It states under History and Present Illness, "States
2     that she had a bladder sling placed and hysterectomy
3     around 2008, thinks Adventist, since then she has a
4     constant dull pain especially with intercourse."
5        Do you see that?
6  A. Yes.
7  Q. That's what you told Dr. Waugh, that your vaginal
8     pain and pain with sex started in 2008, right?
9  A. Yes.
10 Q. And this is the same pain you claim to have leading
11    up to your explant performed in November 2018,
12    correct?
13 A. Yes.
14 Q. The same pain you claim to currently experience?
15 A. The same area.  The pain is not quite the same.
16 Q. That's because the pain has actually decreased since
17    the explant; is that right?
18 A. Slightly.  Yes.
19 Q. It says here you've been claiming this pain since
20    2008.  Do you know who you went to go see for that
21    pain?
22 A. No.  In 2009 I went to see Dr. Kim to have -- to see
23    what the issue was.  So I went to my physician
24    maybe.
25       MS. SCARCELLO:  I would object to the question

Page 148

1  to the extent we're discussing anything that
2  happened prior to April of 2017.
3  A. Good.
4  Q. BY MR. MANDELL:  What do you recall Dr. Waugh doing
5     here on this office visit?
6  A. She did an exam.
7  Q. What type of exam did she do?
8  A. A vaginal exam.
9  Q. Can you describe to me what she did as far as the
10    vaginal exam?
11 A. No.
12 Q. It indicates there that she palpated inside your
13    vagina.  Does that help refresh your memory?
14 A. No.  It doesn't help.
15 Q. If I asked you where she palpated inside your
16    vagina, would you be able to give me a response?
17 A. I know at one point she pushed where it hurt very
18    much.
19 Q. Can you describe to me where she pushed?
20 A. Deep into my vaginal area.
21 Q. Right or left side, center?
22 A. Down low.  I can't tell you anything else.
23 Q. No more specifics than that?
24 A. No.
25 Q. Did Dr. Waugh perform any other tests other than a

Becky R. Smith

Page 149

1  vaginal exam?
2  A. I don't recall.  I'm sorry.
3  Q. We're looking at page 17, right, Bates label 17?
4  A. Yes.
5  Q. It says here under History of Present Illness, if we
6     go to the third paragraph, starting on the sentence
7     that says sling, do you see that?  "Sling is working
8     great, no leaking"?
9  A. I don't.
10 Q. We're on MDR17.  Under History of Present Illness,
11    if we go to the third paragraph, second sentence.
12 A. Yes.
13 Q. "Sling is working great, no leaking."
14       Do you see that?
15 A. Uh-huh.
16 Q. Was that true at the time?
17 A. Right.  I was not incontinent.  Absolutely.
18 Q. Then it says, "Sexually active with single male
19    partner.  But has decreased frequency of intercourse
20    due to pain."
21       Is that a true statement?
22 A. Absolutely.
23 Q. So you were having sex in August 23, 2018, correct?
24 A. I was sexually active to some degree.
25 Q. What frequency at this time were you having

Page 150

1  intercourse?
2  A. Very infrequently.
3  Q. Can you give me an estimate of how many times per
4     week?
5  A. I could give you how many times per month, which is
6     zero.  How many times per quarter, maybe once.
7     Maybe three or four times a year before this.
8  Q. So when it's reported here that you are sexually
9     active, but the frequency is decreased, you are
10    referring to these quarterly attempts; is that
11    correct?
12 A. Uh-huh.  Yes.
13 Q. This is all self reported by you?  Do you understand
14    that?
15 A. Yes.
16 Q. Now, it says -- let's go down to -- well, I'll read
17    this.  On the next line it says, "Pain is during
18    deep penetration.  Aching in nature.  Pain worsens
19    with different positions but is present all the
20    time.  Does not interfere with orgasm."
21       Is that all a true statement?
22 A. Yes.
23 Q. That's something I believe you testified to in your
24    last deposition.  Do you recall that?
25 A. No.

Page 151

1  Q. Now, on the second-to-the-last sentence, it says,
2     "Does not use estrogen cream on a regular basis.
3     Used estrogen for a while after mesh, not
4     currently."
5       Is that a true statement?
6  A. It's a true statement.
7  Q. Why did you stop using estrogen cream?
8  A. It wasn't -- I wasn't seeing a physician at this
9     time for this.  So estrogen is not supposed to be
10    used on a regular basis.
11 Q. When it says was using estrogen for a while after
12    mesh, not currently, can you tell me what period of
13    time you were using it?
14       MS. SCARCELLO:  Object to the question to the
15    extent it calls for testimony that could have been
16    given in April of 2017 and direct you not to answer.
17    (Instruction not to answer.)
18       MR. MANDELL:  I'm not quite sure it calls for
19    that testimony.  It depends what her answer is.
20 Q. BY MR. MANDELL:  Let me ask you this.  This is --
21    we're focusing on -- you had a visit in March of
22    2017 with nurse practitioner Nikki Kuehl where you
23    said you were taking estrogen cream, and now we're
24    in August 23 of 2018, and it's saying you are not.
25       I want to know what period of time you were

Page 152

1  taking it?
2  A. I think what it should have said was if I had taken
3     it.  I really don't recall if I was using it at that
4     time.  It has to be prescribed to you.  It's not an
5     over-the-counter.
6  Q. Understood.
7  A. So I'm not sure.
8  Q. Do you know if you completed whatever prescription
9     prescribed from nurse practitioner Kuehl --
10    completed the course of treatment for estrogen
11    cream?  Do you know that?
12 A. I do know that.  I did.
13 Q. On page 18 -- again, I apologize for going into the
14    personal nature of these things, but it's involved
15    with the claim of the case.  It says here, "Partner
16    has history of genital herpes."
17       Do you see that?
18 A. Uh-huh.
19 Q. It says, "Yes."
20       Is that correct?
21 A. That's correct.
22 Q. Has there been times where you did not have sexual
23    activity because of your partner having an outbreak?
24       MS. SCARCELLO:  I will object to the form of
25    the question to the extent that it is asking for

Becky R. Smith

Page 153

1    events prior to April of 2017.
2    Q. BY MR. MANDELL:  Since April 2017, has there been
3      any times where you did not have sexual intercourse
4      because of your husband having an outbreak?
5    A. No.
6    Q. Would you have sexual intercourse with your husband
7      if he did have an outbreak at the time?
8    A. No.
9    Q. How often does your husband have an outbreak of
10     genital herpes, would you say?
11   A. In the last 15 years, none.
12   Q. Now, if we go to page 21, it says here under Plan --
13       Do you see that?
14   A. Yes.
15   Q. It says, "Discussed prolapse with regards to
16     different compartments.  Anterior prolapse continues
17     to be well supported."
18       Do you see that?
19   A. Yes.
20   Q. You understand that your anterior prolapse was
21     something that Dr. Kim treated you for with the
22     Avaulta?  Do you know that?
23   A. I couldn't have said that myself.
24   Q. Was it your understanding that that is what you were
25     treated for by Dr. Kim?

Page 154

1    A. For the anterior prolapse?
2    Q. Yes.
3    A. Yes.
4    Q. It was still supporting your prolapse at this time;
5      is that correct?
6    A. I don't understand the question.  I don't know where
7      we're at in the timeline here.
8    Q. We're still in August of 2018.  Dr. Waugh is saying
9      that your anterior prolapse continues to be well
10     supported.  I'm just asking you do you agree with
11     that statement?
12   A. I trust her judgment.
13   Q. It says, "Posterior compartment to level of the
14     hymenal ring."
15       Do you recall any discussion with Dr. Waugh
16     about that?
17   A. No.
18   Q. Now, it says -- if we go down to the next little
19     line, it says -- we'll go to the second sentence
20     there.  It says, "No evidence of mesh erosion on
21     exam."
22       Do you recall Dr. Waugh telling you that?
23   A. Yes.
24   Q. Did you mention at this time to Dr. Waugh that you
25     had a lawsuit pending regarding your mesh?

Page 155

1    A. No.
2    Q. It says here that he discussed meeting with -- it
3      says here, "Discussed meeting with Dr. Batalden to
4      consider mesh excision for pain reduction versus
5      other options."
6        Do you see that under Plan?
7    A. Yes.
8    Q. Do you know what other options Dr. Waugh was
9      referring to here?
10   A. I don't recall.
11   Q. Did you ever meet with Dr. Batalden?
12   A. No, I did not.
13   Q. Why not?
14   A. Because I met with Dr. Denman.
15   Q. So now you end up seeing another doctor, Dr. Denman,
16     right?  Is that correct?
17   A. Yes.
18   Q. The same symptoms we've been discussing about
19     vaginal and pelvic pain and pain with sex, that's
20     what led you to see Dr. Denman; is that correct?
21   A. Yes.
22   Q. Why did you -- strike that.
23       Can you tell me everything you can recall about
24     the first time you visited Dr. Denman on August 29,
25     2018?

Page 156

1    A. I was -- I went to see her.  I told her I had
2      been -- she knew I had been referred from Dr. Waugh.
3      We talked about what my symptoms were.  I told her
4      that I was just taking a last stab to see if there
5      was something that could be done about the pain so I
6      didn't have to live with it for the rest of my life.
7      As well as my sexual activity being, you know,
8      completely curtailed.
9        She said, well, let's have an exam.  She
10     examined me.  Then we talked about what could be
11     done.  I asked her if she thought it would be a good
12     option to have the surgery, have it removed, and
13     she -- from what I recall, I felt like she said that
14     we could get -- we probably wouldn't be able to get
15     all the mesh, but we would be able to get the part
16     that had sloughed off and become this -- the part
17     that was very painful.
18       She drew a picture for me exactly what it
19     looked like, you know, and it accordions down.
20     That's the part she would try and take out.
21   Q. So if I heard you correctly, you made the initial
22     request for surgery, is that correct, as an option?
23   A. No, no, no, no.  I did not ask for surgery.
24   Q. Now, you said that Dr. Denman physically examined
25     you.  What did she do as far as a physical

Becky R. Smith

Page 157

1   examination?
2   A.  Well, it felt very similar to the one that Dr. Waugh
3       did.
4   Q.  Did she palpate inside your vagina?
5   A.  Yes.
6   Q.  Do you recall the specific area that she palpated?
7   A.  Yes, I do.
8   Q.  Can you tell me that?
9   A.  The same one that Dr. Waugh palpated, the same one
10      that Dr. Kuehl did.  There's just one spot that
11      hurts, and it's always the same place.  She found
12      it.
13  Q.  Let's go to -- we're still on page MDR11, Bates
14      label 11.  I want to read the History of Present
15      Illness.  It says, "Becky is 59 years old, g6p6 with
16      a history of a TVH for" -- I cannot pronounce
17      this -- "menorrhagia and prolapse approximately nine
18      years ago, 2009."
19          Am I reading that correctly?
20  A.  Yes.
21  Q.  "At which time she had an anterior and posterior
22      repair for prolapse as well as an incontinence
23      procedure."
24          Do you see that?
25  A.  Yes.

Page 158

1   Q.  "She did have mesh placed.  The entire procedure was
2       done vaginally.  She did not have any issues
3       immediately post-op, voided well and did not need a
4       catheter."
5           Do you see that?
6   A.  Yes.
7   Q.  This record says you had no issues immediately
8       post-op.  That's true, right?
9   A.  I don't recall.
10  Q.  Then it says, "About a year after the procedure, she
11      did have vaginal bleeding and went back to OR for a
12      mesh revision."
13          Do you see that?
14  A.  Yes.  I don't know what OR is.
15  Q.  Operating room.
16  A.  Perfect.  Okay.
17  Q.  So about a year after you went in for a mesh
18      revision.  Is that also correct?
19  A.  It was almost exactly a year.  Yes.
20  Q.  Then she goes on to say that after this she started
21      to have dyspareunia which has never resolved.
22          Is that correct?
23  A.  That's true.  Yes.
24  Q.  Now, going back to the page 11 where it talks about
25      Plan, it says on No. 1, "Pain/Mesh - long discussion

Page 159

1   held regarding likely surgery that she had, reason
2   for scarring, likelihood of decreasing pain with
3   mesh removal."
4       Do you see that?
5   A.  Uh-huh.
6   Q.  Then at the end of this paragraph it says,
7       "Discussed" -- last sentence says, "Discussed
8       limited data guiding management; however, at this
9       point she is interested in being more aggressive."
10          Do you see that?
11  A.  Yes.
12  Q.  Why did you want to be more aggressive?
13  A.  I'd been living in pain for too long, living without
14      sex for too long.  I'm not getting any younger.
15  Q.  Did you, having a lawsuit, have anything to do with
16      your desire to be more aggressive?
17  A.  No, no, no.
18  Q.  Did Dr. Denman provide you with any alternatives to
19      the mesh removal surgery?
20  A.  Do nothing was one alternative.  It wouldn't have
21      resolved anything.  I don't recall.
22  Q.  Do you recall if Dr. Denman suggested trying pain
23      medications first as an alternative?
24  A.  I don't believe so.
25  Q.  What about physical therapy as an alternative?

Page 160

1   A.  No.
2   Q.  What about did she provide trigger point injections
3       as an alternative?
4   A.  No.
5   Q.  Did she say that you could do an estrogen regimen
6       instead of surgery as an alternative?
7   A.  No.
8   Q.  Anything that you recall other than what you told me
9       as an alternative to the mesh removal that
10      Dr. Denman told you?
11  A.  No.
12  Q.  So it sounds like Dr. Denman didn't provide you with
13      any alternatives other than to do nothing or to
14      remove the mesh.
15          Is that correct?
16          MS. SCARCELLO:  Object to the form of the
17      question.
18          You can answer.
19  A.  Can you repeat the question?
20  Q.  BY MR. MANDELL:  Dr. Denman provided you with no
21      alternatives to remove the mesh or do nothing;
22      is that correct?
23          MS. SCARCELLO:  Same objection.
24          You can answer.
25  A.  I only remember the surgery one.

Becky R. Smith

---

**Page 161**

1  Q. BY MR. MANDELL:  Okay.  And what was Dr. Denman's
2     initial recommendation after performing the exam on
3     you?
4  A. That it was very clear where the mesh was and that
5     it was very painful there and removing it could
6     possibly give me some relief.
7  Q. Did Dr. Denman provide you with any literature or
8     patient brochures?
9  A. Not that I recall.
10 Q. It does say here on page 11 that -- if you look
11    right above No. 2 under Plan, it says, "Handouts
12    regarding pelvic floor website provided for
13    additional resources for further information and
14    support."
15 A. I do remember that.  Yes.  I do remember that.
16 Q. Did you review those?
17 A. No.
18 Q. So she offers it to you, but you never looked at
19    them, right?
20 A. I took them home, and then I immediately -- I think
21    I tried to look up one, and it was, like, forget it.
22    Oh, man.
23 Q. You indicated that she drew a picture for you,
24    right?
25 A. Yes.

---

**Page 162**

1  Q. Did she do any type of animation or videos?
2  A. No.
3  Q. Did she take any photographs?
4  A. After the surgery.
5  Q. Did anyone tell you your condition would resolve if
6     you had your mesh removed?
7  A. No.
8  Q. Do you know if your implanting physician Dr. Kim and
9     your explanting physician Dr. Denman coordinated,
10    corresponded or communicated in any way about your
11    care?
12 A. I have no idea.
13 Q. Now, it says here on page 11 -- tell me if you can
14    see this, "Reviewed" -- this is under Plan.  It's
15    about three lines above the No. 2.  It says,
16    "Reviewed whether she's involved in lawsuit, she's
17    responsible for obtaining directions as to how/if
18    the mesh is to be preserved as evidence from her
19    lawyers and to bring that with her to the hospital
20    the DOS."
21       Do you see that?
22 A. Yes.
23 Q. Why did you tell Dr. Denman you were in a lawsuit?
24 A. She asked me.
25 Q. What did she ask you about the lawsuit?

---

**Page 163**

1  A. She just asked me if I -- after the whole meeting
2     was over, I was up, had my coat on, my purse,
3     heading out the door, and she said, are you in --
4     she said, are you in a lawsuit?  She said, if you
5     are, we'll need to get forms filled out so that we
6     can preserve -- they'll want this mesh preserved.
7  Q. Any other discussion about the lawsuit with her?
8  A. No.  No.
9  Q. Now, looking at the History of Present Illness on
10    page 11, MDR11, we're looking at the second line
11    there, it says, "At which time she had an anterior
12    and posterior repair."
13       Did you report to Dr. Denman that you had a
14    posterior repair?
15 A. I don't recall.
16 Q. We discussed earlier that Dr. Kim did not perform a
17    posterior repair on you.  Do you recall that?
18 A. I recall our discussion.
19 Q. But as far as your recollection, do you know one way
20    or the other?
21 A. I don't understand the question.
22 Q. You recall our discussion.  Do you know if a
23    posterior repair was performed on you as you
24    reported here to Dr. Denman?
25       MS. SCARCELLO:  Object to the form of the

---

**Page 164**

1     question.  I think it assumes facts not in evidence.
2        You can answer.
3  A. I don't know that I said that.
4  Q. BY MR. MANDELL:  Now we're going to page 12.  This
5     is -- first sentence there -- actually, first line
6     there, it looks like it's the third sentence that
7     starts with "she was on vaginal."
8        Do you see that?
9  A. Yes.
10 Q. "She was on vaginal estrogen around the time of her
11    surgeries but not long term."  Does that -- is that
12    true?
13 A. I believe so.
14 Q. It says, "She has not had pelvic floor PT," which
15    I'll say represents physical therapy.
16       Was that true at the time?
17 A. That's true.
18 Q. "She is not on pain medication."
19       Was that true as well?
20 A. Yes.
21 Q. It indicates further down here on page 12 under the
22    Genitourinary Current Symptoms, second-to-last one
23    says, "Are you sexually active?"  It says, "Yes."
24       Is that what you see there?
25 A. Yes.

---

Becky R. Smith

Page 165

1  Q.  Is it true that you were sexually active at this
2      time?
3  A.  Yes.
4  Q.  As far as frequency, would it be the same as what
5      you described to me in the last --
6  A.  Yes.
7  Q.  I'll finish my statement.
8          -- the last record with Dr. Waugh; is that
9      right?
10 A.  Yes.
11 Q.  On page 13 under Gynecologic History, the last one
12     there says, "Did you have any of the following?"  It
13     says, "Severe tearing/cutting or episiotomy, forceps
14     delivery."
15        Do you see that?
16 A.  I'm sorry.  No.  What page?
17 Q.  Page 13 under Gynecologic History, the last one.
18 A.  Yes.
19 Q.  Do you recall what Dr. Denman had to say about that?
20        MS. SCARCELLO:  Object to the form of the
21     question.
22        You can answer.
23 A.  No.
24 Q.  BY MR. MANDELL:  Do you recall having any discussion
25     with Dr. Denman about severe tearing, cutting or

Page 166

1      episiotomy or the forceps delivery?
2  A.  No.
3  Q.  Dr. Denman put in her notes something called
4      banding.  Do you know what that is?
5  A.  No.
6  Q.  I take it you don't recall any discussion about
7      that?
8  A.  I'd have to know what banding was to answer that.
9  Q.  Do you recall her using that word with you?
10 A.  No.
11 Q.  Now, it looks like on page 15 under Patient
12     Counseling it says, "Please start the estrogen
13     cream."  It looks like she prescribes you estrogen
14     cream to start on.
15        Is that right?
16 A.  Yes.
17 Q.  It says here, "In postmenopausal women, local
18     estrogen use has been shown to improve tissue
19     quality and decrease discomfort."
20        Do you see that?
21 A.  Yes.
22 Q.  Was that something you were also aware about from
23     past providers like Ms. Kuehl and Dr. Kim?
24 A.  Yes.
25 Q.  From 2017 to currently, did you stop taking estrogen

Page 167

1      on your own accord at any point?
2  A.  No.  I used the prescriptions and stopped when they
3      were done.
4  Q.  It's your understanding that you followed whatever
5      doctors' instructions it was as far as using the
6      estrogen cream to completeness?
7  A.  Yes.
8  Q.  It looks like the next step here was to schedule
9      your explant procedure; is that right?
10 A.  I believe so.
11 Q.  Did you ever seek a second opinion regarding whether
12     an explant should be performed on you?
13 A.  I kind of felt like Dr. Denman was the second one
14     since I'd already seen Dr. Waugh.
15 Q.  Dr. Waugh never indicated an explant; is that
16     correct?
17 A.  I'm not sure what she indicated.
18 Q.  That's why I'm asking you, as far as the second
19     opinion for the explant, the removal of the mesh,
20     did you see any other doctors for a second opinion?
21 A.  I did not.
22 Q.  Why not?
23 A.  Because I believed that Dr. Denman was actually the
24     second one because Lindsey Waugh had sent me to her
25     because that's what she does.  So I really believed

Page 168

1      that that was -- it felt like my second one.
2  Q.  Now we'll go to MDR8.  This is on October 26, 2018,
3      and this is -- it looks like your pre-op
4      appointment.
5         Does that look correct to you?
6  A.  It sounds right.
7  Q.  This is again with Dr. Denman, correct?
8  A.  Yes.
9  Q.  It says here under History of Present Illness -- do
10     you see that section?
11 A.  Yes.
12 Q.  Second sentence starts with, "She has a history of
13     an anterior mesh placed for prolapse that has
14     subsequently caused her a great deal of pain."
15        Do you see that?
16 A.  Yes.
17 Q.  Did I read that correctly?
18 A.  Yes.
19 Q.  Did you tell Dr. Denman that you had a great deal of
20     pain?
21 A.  Yes.  Over a period of time I would say the dull
22     pain leads to a great deal of pain.
23 Q.  Then the next sentence says, "She has tried to
24     manage this.  However, it is not improving and she
25     would like the mesh removed to allow for increased

Becky R. Smith

Page 169

1  vaginal mobility and the potential for improvement
2  with physical therapy."
3      Did I read that correctly?
4  A.  "For increased vaginal mobility."  Obviously you
5  read it correctly.
6  Q.  Did you tell Dr. Denman that you tried to manage
7  this pain that you -- strike that.
8      It indicates here that you had tried to manage
9  this pain.  Is that something you told Dr. Denman?
10 A.  Absolutely.
11 Q.  So that was true, correct?
12 A.  Yes.
13 Q.  How did you try to manage the pain?
14 A.  Through eating well, trying to exercise, trying not
15 to think about it.
16 Q.  When you say trying to exercise, what types of
17 exercise did you do to manage the pain?
18 A.  I tried yoga.  I tried Zumba.  I've tried just
19 stretching.  All kinds of things.  Walking.  Mostly
20 walking because that's really all I can manage.
21 Q.  When were you trying these things to manage the
22 pain?  I presume it was sometime between when you
23 had your revision to when you saw Dr. Denman?
24 A.  Since the revision I've had issues with the pain.
25 Q.  But you mention that you tried to manage it with

Page 170

1  Zumba, yoga, eating well, right?  Did I say that
2  correctly?
3  A.  Yes.
4  Q.  What was the result of trying to manage it with
5  those activities?
6  A.  It didn't work.  The pain was still there during
7  sex, just a constant friend that hung out with me.
8  Q.  Now, it says here under Plan, "PARQ," P-A-R-Q, held
9  with patient.  All risk and benefits discussed and
10 all questions answered."
11     Do you see that?
12 A.  Yes, I do.
13 Q.  I'll represent to you that PARQ indicates the
14 provider has explained the procedures, which stands
15 for P, viable alternatives for A, material risks for
16 R, and has asked if the patient has questions for Q.
17 A.  Okay.
18 Q.  Is it true that Dr. Denman held this conference with
19 you on 10-26-2018?
20 A.  Yes, I do.
21 Q.  What risks and benefits were discussed?
22 A.  One of the risks I remember was that my bladder
23 could be punctured, which would be an issue but
24 could be fixed.  The benefit would be that the pain
25 may be reduced.

Page 171

1  Q.  Did she discuss with you that your incontinence or
2  cystocele or organ prolapse could recur?
3  A.  No.
4  Q.  Did she discuss with you that you could have -- one
5  of the risks would be further pelvic and vaginal
6  pain?
7  A.  I don't recall.
8  Q.  Did she discuss that one of the risks of the surgery
9  was pain with intercourse?
10 A.  No.  I don't recall.
11 Q.  Did she discuss that one of the risks of surgery was
12 vaginal scarring?
13 A.  I don't recall.
14 Q.  Did she discuss that one of the risks of the surgery
15 was failure of the surgery?
16 A.  Yes.
17 Q.  So you recall that, but you don't recall if she
18 discussed any of the other items I mentioned?
19 A.  Those seem very specific, and I guess the failure
20 adds up to all of those.
21 Q.  Do you recall her discussing any other risks that --
22 A.  No, I don't.
23 Q.  It's true that any questions you had at the time
24 were answered?
25 A.  Yes.

Page 172

1  Q.  And you understood the risks that Dr. Denman told
2  you and consented to the surgery; is that correct?
3  A.  Yes.
4  Q.  Would you defer to Dr. Denman as to what she warned
5  you about as far as the risks of this procedure?
6  A.  Can you --
7  Q.  Yes.  I'll try to say it in more concise terms.
8      Would you defer to what Dr. Denman says as far
9  as what she warned you about the risks of this
10 procedure?
11 A.  Yes.
12 Q.  Now, do you know how long your discussion with
13 Dr. Denman lasted?
14 A.  No, I don't.
15 Q.  Prior to surgery, did you do any research of your
16 own on the course of treatment that Dr. Denman
17 outlined?
18 A.  Not that I recall.
19 Q.  Again here on page -- under Plan, the last sentence
20 there says -- this is page 8, Bates labeled 8, "She
21 will bring whatever documents and travel container
22 is required by her layer" -- I think she meant to
23 say lawyer -- "for the mesh lawsuit she is currently
24 in."
25     Do you see that?

Becky R. Smith

Page 173

1  A. Uh-huh.
2     MS. SCARCELLO:  Is that a "yes"?
3  A. Yes.
4  Q. BY MR. MANDELL:  What discussion did you have with
5     Dr. Denman at this appointment regarding your
6     lawsuit?
7  A. It's the same point, isn't it?
8  Q. This is actually October 26.
9  A. I do recall.  The surgery had to be done at a
10    different hospital because of my insurance.  She
11    only does that one day a month.  So that was going
12    to be a problem with -- she felt like it could be a
13    problem with the lab and collecting the specimen, so
14    she suggested that I bring the document or the
15    container, whatever it's going to be in.  It did not
16    work out like that, but that's -- she felt like it
17    wouldn't get lost.
18 Q. As far as these documents that she's mentioning, can
19    you tell me -- can you describe to me what these
20    documents were?
21 A. She didn't know what I would need.  She just said --
22    I don't know what it ended up to be because I
23    wasn't -- didn't have them.
24 Q. Did you ever bring her documents from your lawyers?
25 A. Absolutely not.

Page 174

1  Q. Were your lawyers present for any appointments with
2     Dr. Denman?
3  A. No.
4  Q. Now, you signed an informed consent form for the
5     surgery, right?
6  A. Yes.
7  Q. I'll just introduce this as an exhibit real quick.
8     This will be Exhibit 5.
9        (Marked Deposition Exhibit No. 5.)
10 Q. BY MR. MANDELL:  I want to confirm that's your
11    signature on this page?
12 A. Yes.
13 Q. It says here that the -- you'll see on this document
14    it says, "The procedures, benefits, material risks
15    and reasonable alternatives were explained to me.
16    All of the questions about the procedures, benefits,
17    material risks and reasonable alternatives were
18    answered to my satisfaction."
19       Do you see that part?
20 A. Yes.
21 Q. Again, as we discussed, Dr. Denman went over the
22    risks as noted here as well, and you consented,
23    right?
24 A. Yes.
25 Q. So you gave permission for this procedure to be done

Page 175

1     on you, right?
2  A. Yes.
3  Q. As indicated on this consent form, you were aware
4     that there was no guarantee that the surgery would
5     resolve your issues of pelvic or vaginal pain or
6     pain with intercourse; is that correct?
7  A. Yes.
8  Q. Now, tell me about your explant procedure.  Do you
9     know -- this occurred on November 16, 2018?
10 A. Yes.
11 Q. Do you know what specifically Dr. Denman did?
12 A. I believe she extracted five pieces of the mesh.
13    She showed me a picture of them because I asked her
14    to.  She said that they came very close to the
15    bladder, but she left pieces in that she couldn't
16    retrieve.
17 Q. Did Dr. Denman ever explain to you that she was
18    going to leave in certain mesh that wasn't causing
19    you any issues and remove the ones that she believed
20    were causing you issues?
21 A. No.
22 Q. Did Dr. Denman ever tell you she was removing mesh
23    from the Avaulta product versus the Align product?
24 A. No.
25 Q. To your understanding, do you still have mesh in

Page 176

1     you?
2  A. I believe so.
3  Q. Do you know what mesh it is, whether the Avaulta or
4     the Align?
5  A. I'm sorry.  No.
6  Q. Do you know what happened with the mesh that
7     Dr. Denman took out?
8  A. It was collected and I believe provided to my
9     lawyers.
10 Q. Did Dr. Denman or any healthcare provider have
11    anything to say about the mesh that was removed?
12 A. No.
13 Q. Let's talk about your recovery from the explant
14    procedure.  Did you speak to Dr. Denman immediately
15    following the explant?
16 A. Yes.
17 Q. What did -- what was that conversation?
18 A. She told me that she got five pieces.  She showed
19    them to me on her phone because that's what I asked
20    her to do.  She said there was still pieces in.  She
21    didn't -- she explained that my bladder was still
22    intact and that the surgery went well.
23 Q. So no complications; is that correct?
24 A. Not as far as I know.
25 Q. You were given discharge instructions, right?

Becky R. Smith

Page 177

1  A.  Yes.
2  Q.  Did you follow those instructions?
3  A.  Yes.
4  Q.  Now I want to go to your post-op appointments with
5      Dr. Denman, which will be page MDR Bates label 32.
6  A.  It's a lot of pages.
7  Q.  Here it says it's December 3, 2018, office first,
8      first post-op visit.
9         Do you see that?
10 A.  Yes.
11 Q.  I'm correct in saying this is your first post-op
12     visit with Dr. Denman?
13 A.  Uh-huh.  It's like a week after, I believe.
14 Q.  Under the Comments, do you see this section under
15     No. 6, Comments?
16 A.  Yes.
17 Q.  It says, "No urinary incontinence, minimal pain,
18     having vaginal drainage."
19 A.  Yes.
20 Q.  Did I read that correctly?
21 A.  Uh-huh.  Yes.
22 Q.  That's true?
23 A.  Can I add a little addendum to that?
24 Q.  Whatever you'd like.
25 A.  Later I found out that the medication -- the numbing

Page 178

1      medication they give you is pretty strong because a
2      week after then the pain returned.
3  Q.  What was this numbing medication?  Do you know the
4      name of it?
5  A.  No.  It's the surgery medication.  I have no idea.
6  Q.  This was --
7  A.  On the 16th.
8  Q.  This post-op is about two weeks after your surgery,
9      maybe even a little more, actually, three weeks.
10 A.  Uh-huh.
11 Q.  You wouldn't have been on numbing medication still
12     then, would you?
13 A.  I don't think so, but I'm telling you the pain
14     increased after this visit.  You'll probably see it
15     on another one.
16 Q.  Let's go to page 33.  This is still the same visit.
17     Under Exam it says, "Other."  It says, "Nontender to
18     palpation."
19        Do you see that?
20 A.  Yes.
21 Q.  Do you know what it is to palpate?
22 A.  Yes.
23 Q.  Was that true that it was nontender at that time?
24 A.  I trust that her notes are correct.
25 Q.  Now your next visit I have, which is going to be on

Page 179

1      MDR Bates label 30, this is January 2, 2019, so this
2      is about a month after your last -- the last visit
3      we were just talking about.
4  A.  Okay.
5  Q.  You'll see here it's January 2, 2019, office visit,
6      second post-op visit, correct?
7  A.  Okay.
8  Q.  That's with Dr. Denman as well, right?
9  A.  Yes.
10 Q.  It says here under No. 1, "Pain controlled:  Yes."
11        Do you see that?
12 A.  Yes.
13 Q.  Then under No. 4 it says, "Problems with voiding:
14     No."
15        Do you see that?
16 A.  Yes.
17 Q.  "Problems with leaking urine:  No."
18        Do you see that?
19 A.  Yes.
20 Q.  Just focusing on those last two that I said, you
21     were not having any stress urinary incontinence
22     issues, right?
23 A.  No.
24 Q.  You currently don't have any stress urinary
25     incontinence issues, right?

Page 180

1  A.  No, I don't.
2  Q.  That's been cured since 2008 when you had the
3      implant?
4  A.  Yes.
5  Q.  The cystocele that you had the Avaulta for, that
6      remains resolved since the 2008 implant as well,
7      right?
8  A.  Okay.  I don't know what you are talking about.  Go
9      ahead.
10 Q.  If you don't know, I don't want you to guess.
11        As far as -- here it says, "Pain controlled:
12     Yes."  I don't see any comments here about having
13     any additional pain.
14 A.  It also says there's no vaginal bleeding, and that
15     is -- you know, there's -- that has started or was
16     after that because I still have it.
17 Q.  I think -- you can correct me if I'm wrong, but it
18     says on the next page, "Plan:  Okay for intercourse
19     after two weeks."  At this point you had not had
20     intercourse.
21 A.  Okay.
22 Q.  So the vaginal bleeding, that's a correct statement
23     that you have no vaginal bleeding?
24 A.  Okay.  Great.
25 Q.  It's also a correct statement that your pain was

Becky R. Smith

Page 181

1   controlled as stated here, right, at this time?
2   A.   I believe so.
3   Q.   Again, Dr. Denman examines you.  If you go to
4       page 31, it says, "Vaginal exam:  Nontender,
5       discharge c/w postoperative change" -- "consistent
6       with postoperative changes."
7           Do you see that under Exam?
8   A.   There.  Thank you.
9   Q.   Did I read that correctly?
10  A.   Yes.
11  Q.   What did she -- as far as this vaginal exam, what
12      did she do?
13  A.   I don't -- she did a vaginal exam, looked inside,
14      touched.  You know, she could see there was a part
15      that wasn't healing, this tissue.
16  Q.   It says -- it looks like here under Instructions on
17      the same page there's an instruction to continue
18      your use of estrogen; is that correct?
19  A.   Yes.
20  Q.   Did you do that?
21  A.   Yes, I did.
22  Q.   It also indicates here under Plan on Bates label 31
23      that follow-up is needed as she is going on a
24      two-month trip.
25  A.   Yes.

Page 182

1   Q.   Did you go on this two-month trip?
2   A.   Yes, I did.
3   Q.   Where did you go to?
4   A.   I drove to Texas.
5   Q.   What did you do during this trip?
6   A.   Camped, bird watched, sat in the car a lot.
7   Q.   What sort of camping activities did you do?
8   A.   Bird watching, tried to hike.  Didn't work that
9       well.
10  Q.   What year was this?
11  A.   Just this year.
12  Q.   Do you know what month?
13  A.   January, February.
14       MS. SCARCELLO:  Can we take a break?
15       MR. MANDELL:  Yes.  Let's take a break.
16       (Recess.)
17  Q.   BY MR. MANDELL:  We're back on the record.  We're
18      discussing this two-month follow-up after your
19      explant procedure, right?
20  A.   Yes.
21  Q.   There's no indication here about you having any
22      pain; is that correct?
23  A.   During the two months?
24  Q.   At this two-month follow-up, you did not report
25      having any pain; is that correct?

Page 183

1   A.   Yes.  That's what it looks like.  I don't recall no
2       pain.  I think there was much less pain than what
3       I -- I kind of expected it to be no pain.
4   Q.   But you indeed even requested follow-up to see if
5       you can go on a two-month trip at this point?
6   A.   Absolutely.
7   Q.   So you were feeling better, right?
8   A.   I wanted to feel better.
9   Q.   Then it says you were okay for intercourse after two
10      weeks.  After these two weeks, is that when you
11      believe you first attempted that?
12  A.   I don't know where we're at here.  How long is this
13      after the surgery?
14  Q.   This is two months after.  That would be, like you
15      said, I think ten weeks after surgery.
16  A.   So this is -- so it was two weeks after we started
17      our trip.  That would be, like, the middle of
18      January.
19  Q.   That's when you first attempted to have --
20  A.   I'm just trying to make sure I have this.
21  Q.   This trip that you went on, who went on this trip to
22      Texas with you?
23  A.   My husband and I and our dog.  We have a truck, and
24      we have a travel trailer.
25  Q.   Did you guys take any photos on this trip?

Page 184

1   A.   No.  We were bird watching.
2   Q.   Have you taken any other vacations since your 2018
3       explant?
4   A.   We -- yes.  We drove to -- we went camping again.
5       We went travel trailering to Burns, Oregon, Malheur
6       Wildlife Refuge.
7   Q.   Was that for bird watching as well?
8   A.   It is.
9   Q.   Are you a big fan of bird watching?
10  A.   It's a way to get outside.  I can't do a whole lot,
11      but I can watch birds.
12  Q.   Did you do any hiking on this trip?
13  A.   Not at all.
14  Q.   But you did attempt to do some hiking on your Texas
15      trip; is that correct?
16  A.   But was unable to.
17  Q.   What was the reason why you were unable to?
18  A.   I didn't have the energy.  It hurt.  The pain was
19      just too much.
20  Q.   When you say it hurt, can you tell me where?
21  A.   My vaginal area hurt.
22  Q.   Pelvic area?
23  A.   Pelvic.
24  Q.   Can you be more precise as to where in the pelvic
25      area?

Becky R. Smith

Page 185

1  A.  The same place it always hurt.
2  Q.  When you say the same place it always hurt, are you
3     referring since the 2008 surgery place?
4  A.  Yes.  Well, not since the 2008.  It didn't hurt
5     until way after that, until after the revision.
6  Q.  When was the last time you saw Dr. Denman?  Was
7     it --
8  A.  It was June 1.
9  Q.  So you did have another visit after this January --
10 A.  Uh-huh.
11 Q.  Let me ask you this.  What did Dr. Denman tell you
12    about your recovery from the explant procedure at
13    this appointment in January 2019?  Do you recall?
14 A.  She -- I recall that I wasn't healed yet.
15 Q.  Was her -- then the next time you saw her was
16    June --
17 A.  June 1.
18 Q.  -- 2019.  What did you see her for then?
19 A.  Because I was bleeding still and wanted to know what
20    that was all about.
21 Q.  What did Dr. Denman tell you at this visit?
22 A.  I still wasn't healed.  I had an area in my vaginal
23    wall that is not healed which -- so she says that
24    could be causing the pain.  She gave me some
25    medicine, put some medicine in.  Then she said I may

Page 186

1     have to have another surgery.
2  Q.  The vaginal wall not healed that you are talking to
3     me about, did she tell you when she thinks that
4     would heal?
5        Let me strike that question?
6        Did Dr. Denman say that your vaginal wall that
7     hasn't healed yet, will eventually heal?
8  A.  She's hoping it will.  But if not, she gave me an
9     alternative what we would do.
10 Q.  What was that alternative?
11 A.  To do surgery to take the piece out that is not
12    healing, I assume somehow scar that over so that
13    it's -- so it's not bleeding anymore.  I don't know.
14 Q.  The bleeding issue, that's related to when you have
15    sex; is that correct?
16 A.  Yes.  But I have breakout bleeding as well.  Like I
17    said, it's from this part that's not healed.
18 Q.  Can you tell me location-wise where this part is
19    that's not healed?
20 A.  I haven't reached it.  I'm sorry.
21 Q.  Did Dr. Denman provide you with a prognosis?
22 A.  I'm not sure what you are asking.
23 Q.  What did Dr. Denman -- does Dr. Denman say anything
24    about how your future looks?
25 A.  She said that my vaginal tissues look great.

Page 187

1  Q.  Did Dr. Denman say anything about -- in your last
2     visit in June, did you discuss with Dr. Denman the
3     dull vaginal pain that you claim you still have and
4     your pain with intercourse?
5  A.  Yes.
6  Q.  What did Dr. Denman have to say about those two
7     things?
8  A.  She said we'll have to wait until it's healed up to
9     see if that is part of the issue or what we can do
10    next.
11 Q.  Do you have -- do you currently have any doctor
12    appointments scheduled?
13 A.  No.
14 Q.  Other than this surgery that you told me Dr. Denman
15    brought up regarding the vaginal wall that hasn't
16    healed yet, have you been recommended any other
17    future surgery?
18 A.  No.
19 Q.  You would agree with me, though, that since your
20    explant your injuries of pelvic pain and vaginal
21    pain as well as pain with sex have improved to some
22    level, correct?
23 A.  At some level.
24 Q.  In your last deposition you covered -- we covered
25    the hobbies and activities you could no longer do

Page 188

1     following the mesh implant.  To repeat those, those
2     were yoga, Zumba, aerobics, long hiking and
3     kayaking.
4        Do you recall saying that?
5  A.  I probably said that.
6  Q.  Did that remain true from the time of your
7     deposition in 2017 to your explant in 2018?
8  A.  Yes.
9  Q.  Were there any additional activities that you could
10    no longer do in that time frame?
11 A.  Not that I can think of.
12 Q.  Since your explant, have you attempted to do any of
13    these activities?  I know we discussed the hiking.
14 A.  Yes.
15 Q.  What else have you attempted?
16 A.  I tried bike riding.  I tried the hiking.  Kayaking
17    I don't do anymore just because I'm worried about --
18    you know, I'm just worried.  You know, I'm scared to
19    do things.  I did yoga at home off of my computer,
20    you know, following somebody.  Those are the ones I
21    haven't been successful with that I've attempted.
22 Q.  So my understanding is you've attempted all these,
23    but they still for you were not something that you
24    continue doing?
25 A.  Right.  Either it was painful or it just was I

Becky R. Smith

Page 189

1    couldn't keep it up, too tiring.
2    Q.  Any of these activities -- did you not do any of
3        these activities due to any of your other conditions
4        such as your carpal tunnel syndrome or depression?
5    A.  They were not the reasons.
6    Q.  Has any healthcare provider said you cannot perform
7        these activities of yoga, kayaking, riding a bike,
8        long hikes?
9    A.  No.
10   Q.  Has any healthcare provider told you to limit those
11       activities that I just mentioned?
12   A.  No.
13   Q.  Are there any additional activities or household
14       chores you cannot perform since you had the explant?
15   A.  Well, there's a lot of things I don't do because of
16       that.  I don't mow the lawn.  I don't chop wood.
17       When we go camping, I don't do any of the physical
18       activity.  I don't set up the trailer.  I don't
19       break it down.  I do basically the cooking.  That's
20       all.
21   Q.  Did you do those things from 2017 to 2018?
22   A.  No.  Before that I did.
23   Q.  Just so I understand your current condition with sex
24       just a little better, the pain with sex, can you
25       give me currently your best description of how it

Page 190

1    feels and where it's located?
2    A.  It's already written in here.
3    Q.  So it's remained the same?
4    A.  It's the same.
5    Q.  As your testimony from 2017?
6    A.  Yes.
7    Q.  And I believe you testified to this before, but I'm
8        asking you again.  It has diminished in its pain
9        level, though; is that correct?
10   A.  It has.  But it's increased in bleeding.
11   Q.  So the -- can you give me a scale on one to ten to
12       where the pain level is now after the explant when
13       you have sex?
14   A.  Six, seven.
15   Q.  Where was it just before the explant, so from 2017
16       to 2018?
17   A.  Eight or nine.
18   Q.  We're almost done here.  Have you ever received any
19       information directly from Bard regarding the Align
20       or Avaulta?
21   A.  No.
22   Q.  When you had your implant for those products, you
23       relied on the information -- when you had those
24       products implanted in you, did you rely entirely on
25       the information that Dr. Kim gave you?

Page 191

1    A.  Yes.
2        MS. SCARCELLO:  Object to the form of the
3        question.  It was -- could have been asked in 2017
4        and direct you not to answer.
5        (Instruction not to answer.)
6    Q.  BY MR. MANDELL:  You already answered as well,
7        though.
8        Do you have any type of contract with Bard?
9    A.  No.
10   Q.  Since 2017, have you posted anything related to this
11       lawsuit, the mesh or Bard on any social media
12       platform?
13   A.  No.
14   Q.  Do you recall ever at any point reading any warranty
15       language related to mesh implanted in you in 2008?
16   A.  No.
17   Q.  Other than your lawyers with whom you've discussed
18       this lawsuit, and we'll focus on the time from 2017
19       to now, has anyone other than them told you that
20       Bard did anything wrong?
21   A.  No.
22   Q.  Has anyone other than your attorneys told you that
23       Bard was negligent?
24   A.  No.
25   Q.  Has anyone other than your attorneys told you that

Page 192

1    Bard, Avaulta or Align devices implanted into you
2    were defective?
3    A.  No.
4    Q.  Has anyone other than your attorneys told you that
5        Bard did not give adequate warnings to your
6        physicians?
7    A.  No.
8    Q.  Has anyone other than your attorneys ever told you
9        that Bard did not give adequate instructions to your
10       physicians?
11   A.  (Shakes head.)
12   Q.  That was a "no"?
13   A.  I'm sorry.  No.
14   Q.  Have you shared with me now all of your complaints
15       about Bard's Align and Avaulta products since 2017
16       to the present?
17   A.  I believe so.
18   Q.  All right.  Thank you for your time, Ms. Smith.
19       MS. SCARCELLO:  I have a few follow-ups.
20
21       EXAMINATION
22   BY MS. SCARCELLO:
23   Q.  Earlier today you testified that when deciding to
24       start you on Wellbutrin that Nikki Kuehl considered
25       your ability to be physically active.

Becky R. Smith

Page 193

1    Do you recall that?
2 A. Yes.
3 Q. And your ability to be active is substantially
4    diminished due to your pelvic pain, correct?
5 A. Yes.
6    MR. MANDELL: Objection; leading.
7 Q. BY MS. SCARCELLO: Walking is your primary source of
8    exercise, right?
9    MR. MANDELL: Same objection.
10 A. Yes.
11 Q. BY MS. SCARCELLO: Has your diminished capacity for
12    physical activity due to pelvic pain caused you to
13    experience feelings of sadness?
14    MR. MANDELL: Same objection.
15 A. Yes.
16 Q. BY MS. SCARCELLO: Does it make you feel despondent?
17 A. Yes.
18    MR. MANDELL: Same objection.
19 Q. BY MS. SCARCELLO: Does the constant pain cause you
20    to feel fatigued at times?
21 A. Yes.
22    MR. MANDELL: Same objections.
23 Q. BY MS. SCARCELLO: Is it fair to say that the pelvic
24    pain you experience with physical activity and your
25    resulting inactivity has actually contributed to

Page 194

1    your depressive symptoms?
2    MR. MANDELL: Same objection.
3 A. Absolutely.
4    MS. SCARCELLO: Nothing further.
5    MR. MANDELL: I'll have some follow-ups on that.
6
7    FURTHER EXAMINATION
8 BY MR. MANDELL:
9 Q. Ms. Smith, you were diagnosed with depression prior
10    to your implant, correct?
11 A. Yes.
12 Q. That's something you've been dealing with for quite
13    a long time, correct?
14    MS. SCARCELLO: I'll object to the form of the
15    question to the extent that it calls for testimony
16    previous to 2017 and direct her not to answer.
17    (Instruction not to answer.)
18 Q. BY MR. MANDELL: Are you claiming that the mesh is
19    related in any way to your depression?
20 A. Yes.
21    MR. MANDELL: If she's going to claim that,
22    then it's open. This is a new injury that's changed
23    since her last testimony.
24    MS. SCARCELLO: I think the emotional injuries
25    are documented in here with respect to the -- okay.

Page 195

1 It's our position they are. I'll direct her not to
2 answer anything previous to 2017. Her ability to be
3 intimate with her husband -- he has brought a loss
4 of consortium claim, so I believe that the emotional
5 injuries in this case have been pled and discussed
6 in the discovery prior to the April 2017 deposition.
7    MR. MANDELL: I'm going to respectfully
8 disagree. If we aren't able to ask some of these
9 questions, we may have to keep this deposition open.
10 I'll let you decide if you want to do that. I will
11 try to frame some of these questions as best I can
12 from the 2017 time frame.
13    MS. SCARCELLO: To be clear, my line of
14 questioning was related to the Wellbutrin
15 prescription specifically, which happened in -- she
16 said she's been on that for about a year, so
17 probably sometime in 2018. That's what my questions
18 were directed to.
19 Q. BY MR. MANDELL: Your Wellbutrin prescription, that
20    was for depression, right?
21 A. Yes.
22 Q. You went to Nikki Kuehl for that prescription,
23    correct?
24 A. Yes.
25 Q. The reason was because your prior prescription of

Page 196

1 Lexapro was not fully treating your depression at
2    the time; is that right?
3 A. The reason I went to her is because I was still
4    feeling -- actually feeling very unwell in my
5    depression. I couldn't exercise, which is -- the
6    year before when we discussed it, that was the
7    biggest thing I could do for my depression. We
8    talked about another option, which would be to use a
9    different medication.
10    Since a whole year had passed, I was still very
11    unable to do the exercise, which was contributing
12    and I believe contributes to my depression. So the
13    Wellbutrin was added because I couldn't exercise
14    adequately.
15 Q. Has any physician ever told you that your increase
16    in depression was related to your mesh?
17 A. No.
18 Q. From 2017 until before you had this Wellbutrin
19    prescription, you were suffering from depression on
20    a daily basis; is that right?
21 A. That's how it works. Yes.
22 Q. Have you sought treatment from anyone else other
23    than nurse practitioner Kuehl for depression since
24    2017?
25 A. No.

Becky R. Smith

Page 197

1 Q. One of the records that we discussed earlier, and I
2    can bring it up if necessary, mentioned your husband
3    had a pulmonary embolism.
4       Do you recall that?
5 A. I recall his pulmonary embolism.  Absolutely.
6 Q. That record indicated that it was giving you a lot
7    of stress at the time.
8       Does that sound accurate?
9 A. Yes.  It's my husband.
10 Q. So this could have contributed to your depression at
11    the time as well, correct?
12 A. I don't know.
13 Q. So you don't know what exactly could have
14    contributed to your depression when you were
15    prescribed Wellbutrin in 2018; is that right?
16 A. I know I was prescribed Wellbutrin as an alternative
17    for my inactivity.
18 Q. You don't know what other causes -- let me strike
19    that.
20       Were you told by any healthcare provider of any
21    specific causes other than -- strike that.
22       Did nurse practitioner Kuehl say she was --
23    specifically say she was prescribing the Wellbutrin
24    due to your inactivity?
25 A. It's the impression I got.

Page 198

1 Q. Did nurse practitioner Kuehl tell you what was the
2    cause for why you needed Wellbutrin?
3 A. Because my original medication wasn't working well
4    enough.
5 Q. If I get this straight, the only discussion that was
6    discussed was that your prior medicine wasn't
7    working well enough, but there was no discussion as
8    to why it wasn't working?
9 A. The year before when I went to her, we discussed my
10    Lexapro and how it was working, and we discussed how
11    we could resolve those issues staying on the Lexapro
12    by using -- exercise would be great, losing weight
13    would be great, and so a whole year of that not
14    working, by the time I went to see her again, we
15    discussed -- and she had seen my vaginal discomfort.
16    She knew about that.  That's when she gave me
17    Wellbutrin.
18 Q. Again, she never said that the Wellbutrin was being
19    prescribed because of the mesh; is that correct?
20 A. Yes.  That's correct.
21 Q. How are you dealing with your depression today?
22 A. The Wellbutrin seems to be working well enough.  I
23    have to be very careful to take it very carefully.
24 Q. So since --
25 A. Don't miss any.

Page 199

1 Q. Sorry for cutting you off.
2       Since you've been prescribed the Wellbutrin,
3    you notice an improvement in your depression, is
4    that correct, your symptoms?
5 A. Uh-huh.
6 Q. Is that a "yes"?
7 A. Yes.
8 Q. Do you have any -- is there any future decision to
9    go to a doctor for additional treatment of
10    depression at this point?
11 A. It's just -- every time I go for my well woman exam,
12    it's part of the discussion.
13 Q. Basically since --
14 A. August.
15 Q. -- August of 2018 there's been nothing to complain
16    about further as far as the depression; is that
17    right?
18 A. Correct.
19 Q. I think that's all I have.  Thank you.
20       MS. SCARCELLO:  I don't have any more
21    questions.  Let's go off the record.
22       MR. MANDELL:  Off the record.
23       (Discussion off the record.)
24       MR. MANDELL:  Ms. Smith has decided to waive
25    reviewing the record and making any changes.  Thank

Page 200

1 you.
2       (DEPOSITION ADJOURNED at 4:52 p.m.)
3              * * *

Becky R. Smith

Page 201

```
1          C E R T I F I C A T E

2

3       I, Joyce Imrie, Oregon CSR No. 94-0293,

4   Washington CSR No. 2792, do hereby certify that

5   BECKY R. SMITH personally appeared before me at the

6   time and place mentioned in the caption herein; that

7   the witness was by me first duly sworn on oath and

8   examined upon oral interrogatories propounded by

9   counsel; that said examination, together with the

10  testimony of said witness, was taken down by me in

11  stenotype and thereafter reduced to typewriting; and

12  that the foregoing transcript, pages 84 to 201, both

13  inclusive, constitutes a full, true and accurate

14  record of said examination of and testimony given by

15  said witness, and of all other proceedings had

16  during the taking of said deposition and of the

17  whole thereof, to the best of my ability.

18      Witness my hand at Portland, Oregon, this ^

19  day of June, 2019.

20

21

22      _____

    JOYCE IMRIE

23  OCSR No. 94-0293, Expires 9-30-2020

    WCSR No. 2792, Expires 8-6-2019

24

25
```

Becky R. Smith

**WORD INDEX**

**< 0 >**
**00099-124**  86:8

**< 1 >**
**1**  86:3  94:17, 18  96:2  97:25  104:3  105:25  144:15  158:25  179:10  185:8, 17
**1:27**  85:3
**10**  129:1
**100**  130:9
**102**  86:9
**10-26-18**  86:13
**10-26-2018**  170:19
**103**  86:9
**104**  86:19
**105**  144:18
**10555**  85:3
**106**  97:25
**109**  96:24
**11**  96:22  123:15  125:17  157:14  158:24  161:10  162:13  163:10
**110**  86:19
**119**  86:19
**12**  84:16  85:2  123:18, 22  164:4, 21
**128**  86:11
**13**  128:10  138:13  139:22  145:10  165:11, 17
**15**  89:25  90:23  92:11  137:9  153:11  166:11
**151**  86:20
**16**  90:18  97:15  129:5  175:9
**16th**  178:7

**17**  99:13  146:19  149:3, 3
**174**  86:13
**18**  100:20  107:23  152:13
**191**  86:20
**192**  86:3
**194**  86:3, 20
**1977**  126:5

**< 2 >**
**2**  84:15  86:9  102:2, 5  103:2  125:18  138:12  145:9, 20  161:11  162:15  179:1, 5
**2:15-cv-16402**  84:9
**20**  138:20
**2005**  141:6
**2008**  89:25  90:23  93:23  125:15  147:3, 8, 20  180:2, 6  185:3, 4  191:15
**2009**  146:12, 16  147:22  157:18
**201**  201:12
**2017**  87:14  89:13, 16  91:20  97:22  98:10  99:3, 7, 10, 16, 22  100:20  104:21  105:4, 4  106:17, 20  107:23  108:7  109:6, 7  110:5, 12, 16  111:7, 13  112:16  113:17, 18, 19, 25  115:15  118:3, 18  119:8, 9, 13, 22  120:1, 4  121:9, 23  134:22  137:23, 24

**138:10**  141:8, 23  142:24  143:11, 25  144:6  148:2  151:16, 22  153:1, 2  166:25  188:7  189:21  190:5, 15  191:3, 10, 18  192:15  194:16  195:2, 6, 12  196:18, 24
**2018**  90:18  97:16  101:11  105:18  106:6  108:8, 17  109:8  110:5, 17  111:13  112:22  113:25  114:2, 6, 20  117:15, 22  118:4, 21, 25  122:2  123:20  124:17  131:24  132:9  133:17  135:24  138:13  139:22  142:4  143:22, 25  145:10  146:20  147:11  149:23  151:24  154:8  155:25  168:2  175:9  177:7  184:2  188:7  189:21  190:16  195:17  197:15  199:15
**2019**  84:16  85:2  94:25  97:2  179:1, 5  185:13, 18  201:19
**21**  153:12
**213.457.8095**  85:13
**2187**  84:4
**2-28-2019**  104:5

**23**  108:17  146:19  149:23  151:24
**26**  168:2  173:8
**2792**  85:2  201:4, 23
**29**  123:20  124:17  155:24
**2900**  85:12

**< 3 >**
**3**  86:9  103:17, 19  108:11  123:14  125:17  138:12  145:8  177:7
**30**  97:22  179:1
**300**  85:8
**31**  181:4, 22
**32**  177:5
**33**  178:16
**355**  85:12
**37**  103:21

**< 4 >**
**4**  86:11  102:4  128:7, 8  179:13
**4:52**  200:2
**4-24-17**  86:11
**4740**  85:8
**49**  128:6, 9

**< 5 >**
**5**  86:13  128:21  174:8, 9
**50**  128:20
**59**  157:15

**< 6 >**
**6**  97:12  177:15
**60**  131:7, 12, 15
**64112**  85:9
**6-4-19**  86:9

**< 7 >**
**7**  144:17

**< 8 >**
**8**  94:25  97:24  172:20, 20
**80**  131:10
**816.701.1100**  85:9
**84**  201:12
**84-201**  84:15
**85**  130:9
**8-6-2019**  201:23
**87**  86:3

**< 9 >**
**90**  130:9  131:10
**90071**  85:13
**9-30-2020**  201:23
**94**  86:3, 19
**94-0293**  85:2  201:3, 23

**< A >**
**ability**  87:18, 22  121:4, 7  136:14  140:2  192:25  193:3  195:2  201:17
**able**  118:1, 6, 10, 15  129:6, 19  140:22  148:16  156:14, 15  195:8
**absolutely**  103:7  110:20  113:21  118:5  120:9  121:12  130:2  139:6  149:17, 22  169:10  173:25  183:6  194:3  197:5
**accidents**  141:24  142:6
**accompanied**  99:6, 9, 15
**accord**  167:1

accordions
156:*19*
accurate 95:*4*
197:*8* 201:*13*
accurately
87:*18, 22*
ache 106:*9*
achieve 118:*1,*
*6, 10, 15*
aching 142:*14*
150:*18*
active 107:*17*
117:*19* 149:*18,*
*24* 150:*9*
164:*23* 165:*1*
192:*25* 193:*3*
activities 91:*8,*
*19* 121:*4*
136:*18* 140:*2,*
*5* 141:*1* 170:*5*
182:*7* 187:*25*
188:*9, 13*
189:*2, 3, 7, 11,*
*13*
activity
118:*15* 119:*5,*
*15, 17* 152:*23*
156:*7* 189:*18*
193:*12, 24*
add 95:*20*
177:*23*
added 137:*14*
196:*13*
addendum
177:*23*
adding 137:*11*
addition
139:*12*
additional
96:*8* 97:*3, 13*
140:*21* 161:*13*
180:*13* 188:*9*
189:*13* 199:*9*
address
105:*16* 142:*13*
adds 171:*20*
adequate
192:*5, 9*
adequately
196:*14*

ADJOURNED
200:*2*
Adrienne 97:*7*
Adventist
147:*3*
advice 133:*25*
aerobics 188:*2*
affect 87:*18,*
*21* 140:*1*
aggressive
159:*9, 12, 16*
ago 87:*8*
120:*17* 157:*18*
agree 110:*24*
139:*22* 140:*1,*
*12* 154:*10*
187:*19*
ahead 103:*17*
112:*6* 180:*9*
Align 89:*20*
90:*3,* 7 175:*23*
176:*4* 190:*19*
192:*1, 15*
alleging
103:*14* 104:*15*
allow 143:*8*
168:*25*
alternative
159:*20, 23, 25*
160:*3, 6, 9*
186:*9, 10*
197:*16*
alternatives
159:*18* 160:*13,*
*21* 170:*15*
174:*15, 17*
Amended 86:*9*
102:*3*
Amy 98:*17*
anemia 141:*3*
Angeles 85:*13*
animation
162:*1*
answer 86:*19*
88:*2, 14, 20*
93:*25* 94:*2, 13,*
*15* 100:*24*
102:*17* 103:*9*
104:*24, 25*
110:*14, 15*
111:*8, 10*

112:*6* 119:*10,*
*11, 16, 19*
124:*9* 127:*15*
128:*12, 17*
139:*16* 143:*8*
151:*16, 17, 19*
160:*18, 24*
164:*2* 165:*22*
166:*8* 191:*4, 5*
194:*16, 17*
195:*2*
answered
104:*21* 127:*14*
170:*10* 171:*24*
174:*18* 191:*6*
answers 88:*5*
Anterior
89:*21* 153:*16,*
*20* 154:*1, 9*
157:*21* 163:*11*
168:*13*
anus 131:*20*
anymore
136:*20* 186:*13*
188:*17*
apologize
152:*13*
APPEARANCE
S 85:*6*
appeared
201:*5*
Appearing
85:*10, 14*
appointment
132:*17* 168:*4*
173:*5* 185:*13*
appointments
132:*22* 174:*1*
177:*4* 187:*12*
approximately
157:*17*
April 87:*14*
89:*12* 91:*20*
98:*10* 99:*3, 7,*
*13, 16, 22*
106:*17, 20*
107:*23* 108:*7*
109:*6* 111:*7*
112:*16* 113:*17,*
*25* 115:*15*
118:*3, 18*

119:*8, 8, 13*
120:*1, 4* 121:*9*
138:*10* 141:*23*
143:*25* 144:*5*
148:*2* 151:*16*
153:*1, 2* 195:*6*
area 106:*9, 22*
107:*6* 124:*20*
127:*6* 147:*15*
148:*20* 157:*6*
184:*21, 22, 25*
185:*22*
arms 135:*1*
136:*23*
arrange 133:*6*
asked 96:*3*
101:*16* 104:*21*
109:*10* 110:*12*
118:*12* 119:*8*
127:*14* 128:*13,*
*21* 143:*6*
148:*15* 156:*11*
162:*24* 163:*1*
170:*16* 175:*13*
176:*19* 191:*3*
asking 95:*14*
111:*11* 130:*24*
138:*2* 140:*20*
152:*25* 154:*10*
167:*18* 186:*22*
190:*8*
asks 97:*12*
129:*1*
assist 132:*17,*
*21*
assisted 126:*1,*
*4* 133:*3*
associated
131:*16* 133:*6*
assume 88:*14*
101:*5* 122:*15*
143:*12* 186:*12*
assumes 164:*1*
assuming
121:*14*
assumption
122:*18*
attempt
114:*20* 115:*10*
116:*3* 184:*14*

attempted
116:*10* 117:*16*
118:*7* 183:*11,*
*19* 188:*12, 15,*
*21, 22*
attempts
150:*10*
attention
123:*14* 144:*15*
attorney 92:*4,*
*6, 9, 12*
attorneys 90:*3*
93:*1* 191:*22,*
*25* 192:*4, 8*
August 108:*17*
123:*20* 124:*17*
138:*13* 139:*22*
145:*9, 10*
146:*19* 149:*23*
151:*24* 154:*8*
155:*24* 199:*14,*
*15*
Avaulta 89:*20*
90:*4, 7* 153:*22*
175:*23* 176:*3*
180:*5* 190:*20*
192:*1, 15*
Avenue 85:*8,*
*12*
aware 100:*2,*
*10* 166:*22*
175:*3*

< B >
back 87:*14*
94:*22* 96:*1*
97:*19* 100:*6*
104:*6* 107:*7*
125:*17* 127:*17*
130:*11* 131:*7,*
*8, 9* 132:*12*
141:*5, 19*
142:*24* 144:*15*
145:*8* 158:*11,*
*24* 182:*17*
bad 100:*25*
banding 166:*4,*
*8*
Barbara
135:*21*

BARD 84:*3,*
*10* 86:*13* 87:*9*
89:*9, 15, 19*
93:*22* 94:*3, 8,*
*11* 190:*19*
191:*8, 11, 20,*
*23* 192:*1, 5, 9*
Bard's 93:*13,*
*20* 110:*10, 18*
113:*10* 121:*25*
123:*6* 192:*15*
baseball 91:*16*
basically
135:*18* 189:*19*
199:*13*
basis 151:*2, 10*
196:*20*
Batalden
155:*3, 11*
Bates 86:*13*
96:*23* 97:*25*
103:*20* 123:*15*
144:*17* 149:*3*
157:*13* 172:*20*
177:*5* 179:*1*
181:*22*
BECKY 84:*7,*
*11* 85:*1* 86:*3,*
*9, 9, 11, 13, 13*
87:*1* 157:*15*
201:*5*
becoming
124:*3* 125:*8*
behalf 84:*15*
belief 127:*4*
believe 96:*22*
107:*11* 111:*16*
114:*9* 115:*3,*
*22* 126:*21*
129:*15* 135:*22*
137:*10* 140:*24*
146:*25* 150:*23*
159:*24* 164:*13*
167:*10* 175:*12*
176:*2, 8*
177:*13* 181:*2*
183:*11* 190:*7*
192:*17* 195:*4*
196:*12*

believed
167:*23, 25*
175:*19*
benefit 170:*24*
benefits 170:*9,*
*21* 174:*14, 16*
best 88:*8*
95:*3* 189:*25*
195:*11* 201:*17*
better 107:*15,*
*15* 113:*22*
130:*22, 24, 25*
131:*2, 4, 5, 15*
134:*1* 183:*7, 8*
189:*24*
big 117:*5*
184:*9*
biggest 196:*7*
bike 188:*16*
189:*7*
bird 182:*6, 8*
184:*1, 7, 9*
birds 184:*11*
bit 128:*10, 15*
130:*4*
bladder 147:*2*
170:*22* 175:*15*
176:*21*
bleed 114:*10*
bleeding
114:*10* 117:*4,*
*6, 7, 23* 158:*11*
180:*14, 22, 23*
185:*19* 186:*13,*
*14, 16* 190:*10*
Blood 141:*15*
bodily 144:*20*
bones 142:*1*
bottom 96:*23*
98:*1* 103:*21*
107:*6* 123:*16*
144:*18*
bowel 105:*9,*
*20* 123:*10, 23*
124:*2, 13, 15,*
*24* 125:*22*
126:*15, 16, 22,*
*22* 127:*11*
129:*7, 12, 15,*
*20, 25* 130:*4, 7,*
*10* 131:*1*

132:*6* 144:*23*
145:*2*
bowels 131:*20*
break 88:*18,*
*20* 96:*2*
120:*24, 25*
142:*9* 144:*11*
182:*14, 15*
189:*19*
breakout
186:*16*
Breast 145:*15*
brief 96:*2*
briefly 143:*9*
bring 102:*11*
162:*19* 172:*21*
173:*14, 24*
197:*2*
brochures
161:*8*
broken 142:*1*
brought 123:*9*
187:*15* 195:*3*
bulking 126:*7,*
*19*
Burns 184:*5*
butt 107:*18*

< C >
CA 85:*13*
called 89:*20*
101:*16* 166:*3*
calls 92:*6*
109:*5* 111:*8*
151:*15, 18*
194:*15*
Camped 182:*6*
camping
91:*16* 182:*7*
184:*4* 189:*17*
Cancer 141:*13*
capacity 98:*2*
193:*11*
caption 201:*6*
car 182:*6*
cardiac 141:*9*
care 162:*11*
care, 99:*24*
cared 99:*22*
careful 198:*23*

carefully
198:*23*
carpal 134:*25*
135:*13, 17*
136:*4, 9, 20, 24,*
*25* 189:*4*
CARTMELL
85:*7*
Case 84:*9*
87:*15* 93:*8*
103:*15* 104:*15*
118:*18* 121:*15*
122:*15* 152:*15*
195:*5*
catheter 158:*4*
cause 109:*21*
193:*19* 198:*2*
caused 90:*4*
109:*15* 168:*14*
193:*12*
causes 105:*15*
197:*18, 21*
causing
108:*23* 127:*10*
175:*18, 20*
185:*24*
center 148:*21*
certain 140:*2*
175:*18*
certification
104:*4*
certify 201:*4*
change 95:*21*
96:*5* 113:*24*
126:*7* 130:*20,*
*21* 139:*19*
181:*5*
changed 89:*15*
113:*7* 126:*19*
194:*22*
changes
113:*22* 181:*6*
199:*25*
CHARLESTO
N 84:*2*
children 91:*14*
99:*9, 12*
chop 189:*16*
chores 189:*14*
City 85:*9*
Civil 85:*1*

claim 98:*1*
113:*12* 132:*4*
147:*10, 14*
152:*15* 187:*3*
194:*21* 195:*4*
claimed 144:*20*
claiming
127:*6* 145:*1*
147:*19* 194:*18*
claims 145:*1*
clarify 112:*1*
122:*18* 132:*3*
clear 161:*4*
195:*13*
client 89:*9*
103:*15* 104:*16*
111:*10*
Clinic 86:*11*
103:*18* 104:*6*
108:*16* 109:*14*
132:*18, 22*
133:*4, 7*
close 175:*14*
coat 163:*2*
coffee 91:*9*
collected 176:*8*
collecting
173:*13*
collectively
90:*7*
come 91:*12*
104:*6* 107:*9*
131:*7, 8, 9, 21*
comfortable
110:*21*
coming 124:*18*
commencing
85:*3*
Comments
177:*14, 15*
180:*12*
communicated
162:*10*
community
100:*13*
compartment
154:*13*
compartments
153:*16*
compensate
136:*19*

compensated 136:*13*
complain 199:*15*
complaining 126:*16*
complaint 105:*9*, *19*
complaints 105:*8*, *19* 192:*14*
complete 111:*18*
completed 152:*8*, *10*
completely 156:*8*
completeness 167:*6*
complications 176:*23*
computer 188:*19*
concise 172:*7*
conclusive 129:*14*
condition 110:*25* 162:*5* 189:*23*
conditions 131:*25* 132:*10* 189:*3*
conference 170:*18*
confirm 174:*10*
confused 131:*10* 138:*6* 144:*3*
consent 174:*4* 175:*3*
consented 172:*2* 174:*22*
consider 155:*4*
considered 192:*24*
consistent 181:*5*
consistently 138:*9*
consortium 195:*4*

constant 105:*14* 106:*9* 131:*21*, *22* 147:*4* 170:*7* 193:*19*
constitutes 201:*13*
consuming 135:*4*
container 172:*21* 173:*15*
continue 134:*23* 181:*17* 188:*24*
continues 137:*4* 153:*16* 154:*9*
contract 191:*8*
contributed 193:*25* 197:*10*, *14*
contributes 196:*12*
contributing 196:*11*
control 105:*10*, *20* 126:*8*
controlled 179:*10* 180:*11* 181:*1*
conversation 101:*23* 129:*8* 176:*17*
cooking 189:*19*
coordinated 162:*9*
copies 104:*5*
copy 96:*17* 104:*1*
corner 96:*24* 98:*1* 103:*22* 123:*16*
correct 87:*12*, *13, 15* 89:*25* 92:*13* 94:*25* 95:*4* 97:*20, 22* 98:*6* 104:*5, 18* 105:*7* 106:*3* 111:*1* 112:*20* 113:*2* 115:*2, 20* 116:*20*

118:*16, 17*
120:*14* 121:*17* 122:*20, 24* 124:*11, 15* 127:*7, 12* 130:*12, 15* 132:*7* 134:*13, 16* 135:*21* 137:*2, 4, 5, 17* 139:*5, 23* 145:*6* 146:*7, 8, 10, 24* 147:*12* 149:*23* 150:*11* 152:*20, 21* 154:*5* 155:*16, 20* 156:*22* 158:*18, 22* 160:*15, 22* 167:*16* 168:*5, 7* 169:*11* 172:*2* 175:*6* 176:*23* 177:*11* 178:*24* 179:*6* 180:*17, 22, 25* 181:*18* 182:*22, 25* 184:*15* 186:*15* 187:*22* 190:*9* 193:*4* 194:*10, 13* 195:*23* 197:*11* 198:*19, 20* 199:*4, 18*
correctly 106:*25* 124:*7* 145:*12* 156:*21* 157:*19* 168:*17* 169:*3, 5* 170:*2* 177:*20* 181:*9*
corresponded 162:*10*
costs 133:*6*
counsel 201:*9*
counseling 98:*11, 13* 166:*12*
counsel's 105:*2*
couple 91:*10* 95:*21* 120:*17*
course 152:*10* 172:*16*

COURT 84:*1* 88:*4* 89:*3* 98:*18*
covered 94:*1, 14* 187:*24, 24*
crazy 103:*11*
cream 151:*2, 7, 23* 152:*11* 166:*13, 14* 167:*6*
Crist 101:*1, 2, 4, 11*
C-R-I-S-T 101:*1*
CSR 201:*3, 4*
CT 120:*20*
cured 180:*2*
curious 97:*1* 104:*8*
current 91:*8* 112:*23* 113:*4, 9* 122:*3, 7, 11, 23* 123:*2, 6* 127:*10* 130:*18* 164:*22* 189:*23*
currently 91:*22, 24* 97:*20* 106:*13* 107:*4* 111:*14* 114:*13* 117:*19* 118:*6, 19* 120:*5* 129:*25* 130:*21* 131:*14* 133:*25* 137:*6* 144:*19* 147:*14* 151:*4, 12* 166:*25* 172:*23* 179:*24* 187:*11* 189:*25*
curtailed 156:*8*
cut 130:*11*
cutting 165:*13, 25* 199:*1*
cystocele 171:*2* 180:*5*

< D >
daily 196:*20*
damage 125:*24*
Dang 102:*23*

dash 138:*19*
data 159:*8*
dated 94:*25* 95:*14*
dates 98:*14, 14, 24*
day 92:*3* 137:*4* 138:*20* 173:*11* 201:*19*
days 91:*10* 107:*15, 15*
deal 117:*5* 168:*14, 19, 22*
dealing 111:*19* 194:*12* 198:*21*
Deb 99:*25*
Debbie 99:*19, 20*
December 177:*7*
decide 195:*10*
decided 124:*20* 135:*3, 19* 199:*24*
deciding 192:*23*
decision 199:*8*
Declined 145:*15, 16*
decrease 166:*19*
decreased 147:*16* 149:*19* 150:*9*
decreasing 159:*2*
deep 113:*18* 115:*21, 22* 148:*20* 150:*18*
defecating 127:*24* 128:*21* 129:*2*
defect 110:*1, 6, 7* 121:*21* 123:*2*
defective 192:*2*
Defendant 84:*11, 15* 85:*14*
defer 172:*4, 8*
degree 149:*24*

Becky R. Smith

**delivery** 126:*1, 2, 4* 165:*14* 166:*1*
**denial** 107:2
**Denman** 90:*18* 97:5 101:25 102:*1* 109:*22, 25* 116:*20, 22* 118:*21* 121:*14* 122:*13* 123:*19* 126:*15* 131:24 132:9, *12, 13, 14, 19* 134:*15* 155:*14, 15, 20, 24* 156:24 159:*18, 22* 160:*10, 12, 20* 161:7 162:9, *23* 163:*13, 24* 165:*19, 25* 166:3 167:*13, 23* 168:7, *19* 169:6, *9, 23* 170:*18* 172:*1, 4, 8, 13, 16* 173:5 174:2, *21* 175:*11, 17, 22* 176:7, *10, 14* 177:5, *12* 179:8 181:*3* 185:6, *11, 21* 186:6, *21, 23, 23* 187:*1, 2, 6, 14*
**Denman's** 161:*1*
**depends** 151:*19*
**deposed** 87:*11*
**DEPOSITION** 84:*11* 85:1 86:9, *11* 87:*10, 24* 89:*12, 13, 16* 90:6 91:20 92:*1, 13* 93:5, *11, 17* 94:*1, 4, 18* 95:*12, 15* 99:7, *10* 100:2, *9* 102:*3, 3, 5, 10, 16, 23* 103:*19* 104:*21*

105:*4* 106:*17, 21* 107:*24* 108:*8* 110:*13* 111:6 117:*24* 118:*18* 127:22 128:5, *8* 134:*23* 141:*8* 142:*11* 143:*3* 150:*24* 174:9 187:*24* 188:7 195:6, *9* 200:2 201:*16*
**depression** 134:*24* 135:*4* 137:*1, 12, 19* 138:*1, 3, 21* 139:*2, 8* 189:*4* 194:9, *19* 195:*20* 196:*1, 5, 7, 12, 16, 19, 23* 197:*10, 14* 198:*21* 199:*3, 10, 16*
**depressive** 194:*1*
**describe** 107:*19* 115:8, *13* 120:8 130:*5* 131:*18* 148:9, *19* 173:*19*
**described** 106:*20* 113:*18* 115:*15, 22* 142:*13* 165:*5*
**Description** 86:*3* 130:*17* 189:*25*
**desire** 159:*16*
**despite** 118:2
**despondent** 193:*16*
**determine** 146:6
**devices** 192:*1*
**Diabetes** 141:*17*
**diagnose** 111:*1*
**diagnosed** 137:*1* 141:5, *8* 194:9

**diagnosing** 128:*1*
**difference** 139:*21*
**different** 115:*14, 14* 140:*23* 150:*19* 153:*16* 173:*10* 196:9
**difficult** 105:9 111:*20*
**diminished** 190:8 193:*4, 11*
**dinner** 91:*10*
**direct** 93:*25* 94:*13* 104:24 110:*14* 111:*10* 119:*10* 123:*14* 151:*16* 191:*4* 194:*16* 195:*1*
**directed** 195:*18*
**directions** 162:*17*
**directly** 190:*19*
**disabled** 91:5
**disagree** 195:8
**discharge** 176:25 181:*5*
**discomfort** 166:*19* 198:*15*
**discovery** 195:6
**discuss** 103:22 130:*4* 171:*1, 4, 8, 11, 14* 187:2
**discussed** 105:*11* 125:24 126:6 132:*1* 153:15 155:*2, 3* 159:7, 7 163:*16* 170:9, *21* 171:*18* 174:*21* 188:*13* 191:*17* 195:5 196:6 197:*1* 198:6, *9, 10, 15*
**discusses** 143:*13*

**discussing** 121:2 123:*20* 125:22 148:*1* 155:*18* 171:*21* 182:*18*
**Discussion** 104:*13* 144:22 154:*15* 158:25 163:7, *18, 22* 165:24 166:6 172:*12* 173:*4* 198:5, *7* 199:*12, 23*
**discussions** 101:*10* 128:*11*
**DISTRICT** 84:*1, 1*
**DIVISION** 84:2
**dizzy** 138:6
**doctor** 90:*11, 14* 92:*16, 19, 23* 99:6, *10, 15* 101:*12, 13, 17, 18, 19, 24* 109:8 111:*17, 17, 21* 112:2, *9, 25* 113:4 114:22 116:*6, 7, 12* 119:*4, 14, 22* 120:*21* 121:*19* 122:22 123:*1* 126:25 144:7, *8* 155:*15* 187:*11* 199:9
**doctors** 92:20 93:2 96:25 97:3 108:25 110:*21, 25* 111:*4, 12, 14* 119:*16* 121:*19* 132:*15* 143:24 167:5, *20*
**DOCUMENT** 84:5 94:*19, 20, 21* 95:6, *9* 102:6 173:*14* 174:*13*
**documented** 194:25

**documents** 93:4 102:*11, 18* 103:*10* 172:*21* 173:*18, 20, 24*
**dog** 183:*23*
**doing** 133:*25* 140:6, *11, 25* 148:*4* 188:24
**Don** 98:*21*
**Donald** 85:*15* 98:5 99:*3*
**door** 163:*3*
**DOS** 162:*20*
**downplay** 108:*24*
**Dr** 90:*18, 23* 97:5, *11* 98:*20* 99:*1* 101:25 102:*1* 109:*16, 18, 20, 22, 25, 25* 116:*20, 22* 118:*21* 121:*12, 13, 14* 122:*13* 123:*19* 126:*15* 127:23 128:*11* 129:*12, 15* 131:24 132:9, *12, 13, 14, 19* 134:*15* 135:*21* 137:*13* 143:*14, 17* 144:5 146:24 147:7, *22* 148:*4, 25* 153:*21, 25* 154:8, *15, 22, 24* 155:*3, 8, 11, 14, 15, 20, 24* 156:2, *24* 157:2, *9, 10* 159:*18, 22* 160:*10, 12, 20* 161:*1, 7* 162:8, *9, 23* 163:*13, 16, 24* 165:8, *19, 25* 166:3, *23* 167:*13, 14, 15, 23* 168:7, *19* 169:6, *9, 23* 170:*18* 172:*1, 4, 8, 13, 16*

Becky R. Smith

173:5  174:2, 21  175:11, 17, 22  176:7, 10, 14  177:5, 12  179:8  181:3  185:6, 11, 21  186:6, 21, 23, 23  187:1, 2, 6, 14  190:25

**drainage** 177:18

**drew** 156:18 161:23

**drink** 134:6

**Drive** 85:4 91:1, 3  136:12

**drove** 182:4 184:4

**drugs** 87:17

**due** 123:2 149:20  189:3 193:4, 12 197:24

**dull** 147:4 168:21  187:3

**duly** 201:7

**duration** 107:25

**dysfunction** 120:2

**dyspareunia** 158:21

**< E >**

**earlier** 102:15 105:11  163:16 192:23  197:1

**earning** 98:2

**easy** 111:25

**eat** 134:5

**eating** 169:14 170:1

**effect** 121:4

**eight** 115:3 190:17

**either** 102:21 115:3, 13 121:19  188:25

**email** 102:9

**embolism** 120:14  121:3, 5  197:3, 5

**emotional** 194:24  195:4

**ended** 173:22

**ends** 96:24

**energy** 140:12, 16, 20  184:18

**entire** 158:1

**entirely** 190:24

**episiotomy** 126:1  165:13 166:1

**erosion** 154:20

**especially** 137:14  147:4

**Esquire** 85:7, 11

**estimate** 117:15  150:3

**estrogen** 134:9 142:13, 17, 23, 23  151:2, 3, 7, 9, 11, 23 152:10  160:5 164:10  166:12, 13, 18, 25 167:6  181:18

**events** 91:15 153:1

**eventually** 186:7

**evidence** 154:20  162:18 164:1

**exactly** 113:8 122:15  125:1 156:18  158:19 197:13

**exam** 145:15, 16  146:6 148:6, 7, 8, 10 149:1  154:21 156:9  161:2 178:17  181:4, 7, 11, 13 199:11

**EXAMINATIO N** 86:1, 3, 3 87:5  157:1

192:21  194:7 201:9, 14

**examined** 156:10, 24 201:8

**examines** 181:3

**excision** 109:22  146:12, 16  155:4

**excluding** 118:25  119:2, 23

**exercise** 91:22 102:25  134:6 136:14  137:14 169:14, 16, 17 193:8  196:5, 11, 13  198:12

**exercising** 140:3

**EXHIBIT** 86:3, 3, 9, 9, 11, 13  94:17, 18 96:2  97:25 102:2, 5  103:2, 17, 19  105:25 108:11  123:14 125:17  128:6, 7, 8  138:12 144:15  145:8 174:7, 8, 9

**expected** 183:3

**experience** 147:14  193:13, 24

**experienced** 110:5

**experiencing** 144:20  145:21

**Expires** 201:23, 23

**explain** 108:20 138:2  175:17

**explained** 170:14  174:15 176:21

**explant** 105:18  106:5, 13  107:23 108:4, 8, 13, 18

109:1, 8  110:9, 16, 18  112:16, 22  113:1, 20, 25  114:2, 6, 19 115:1, 11 116:4, 10 117:11, 15 118:4, 8, 11, 21, 25  119:14 121:9, 10, 24 122:2, 6  123:1, 5  130:22, 23 131:13  133:9, 17  134:19 142:3  143:25 147:11, 17 167:9, 12, 15, 19  175:8 176:13, 15 182:19  184:3 185:12  187:20 188:7, 12 189:14  190:12, 15

**explant,** 90:17

**explanting** 162:9

**explore** 114:11

**extent** 104:20 109:5  111:8 119:7  148:1 151:15  152:25 194:15

**extracted** 175:12

**extraction** 100:20

**< F >**

**fact** 86:3 94:17  96:3, 12 97:24  106:1 144:15

**factor** 126:12

**facts** 89:14 164:1

**failure** 171:15, 19

**fair** 88:16, 17 104:22  193:23

**fall** 107:18

**family** 99:24 100:3, 8, 10, 13, 15

**fan** 184:9

**far** 115:9 130:8  148:9 156:25  163:19 165:4  167:5, 18  172:5, 8 173:18  176:24 180:11  181:11 199:16

**fatigued** 193:20

**fault** 110:10, 19  113:10 121:25  123:7

**FAVD,** 125:25

**February** 94:25  97:2 144:16  182:13

**fecal** 125:19

**feel** 100:25 110:21  115:10 120:10  130:1 136:24  139:14 140:5  141:6 144:10  183:8 193:16, 20

**feeling** 118:2 122:20  139:23 140:8, 25 183:7  196:4, 4

**feelings** 193:13

**feels** 107:18 139:3, 3, 10, 10 190:1

**feet** 134:25

**felt** 106:17, 19 108:21, 22 110:9, 18 116:11  121:20, 24  139:2 140:12, 13 156:13  157:2 167:13  168:1 173:12, 16

**FI,** 125:18

**fiber** 126:7

**Fibromyalgia** 141:21

Becky R. Smith

filed 101:8
102:15
fill 95:9 96:11
filled 94:20,
21 97:2
144:16 163:5
final 103:2
finally 90:22
124:20
finances
135:18
find 102:21,
24 103:4
fine 95:24
131:23
finish 88:19
131:8, 9, 11
165:7
first 87:2, 14
95:12, 14 96:7
102:8, 23
114:11, 20
115:10 116:3
117:7, 8, 10
120:11 124:11,
23 130:14
146:10, 14
155:24 159:23
164:5, 5 177:7,
8, 11 183:11,
19 201:7
Fisher 97:7
five 107:1
108:5 125:7
175:12 176:18
fixed 170:24
flip 94:22
floor 161:12
164:14
focus 107:22
113:12 191:18
Focusing
120:4 121:9
151:21 179:20
follow 128:19
177:2
followed 116:8
167:4
following
129:4 146:16

165:12 176:15
188:1, 20
follows 87:3
follow-up
181:23 182:18,
24 183:4
follow-ups
192:19 194:5
forceps 125:25
126:4 165:13
166:1
foregoing
201:12
forget 111:25
161:21
forgot 127:16
form 110:11
111:5 112:4
127:13 137:21
152:24 160:16
163:25 165:20
174:4 175:3
191:2 194:14
forms 163:5
Forty 131:9
forward 111:7
137:23, 25
found 157:11
177:25
four 98:22
106:15 107:1
112:14, 15, 17
114:17 150:7
frame 119:7
137:23 142:25
188:10 195:11,
12
frequency
113:24 149:19,
25 150:9
165:4
friend 100:13,
15 170:7
friends 91:11
99:24 100:3, 8,
10
full 201:13
fully 87:18, 22
196:1
further 87:2, 5
161:13 164:21

171:5 194:4, 7
199:16
future 186:24
187:17 199:8

< G >
g6p6 157:15
general 93:15
102:13 112:14,
16 121:6
127:5
genital 152:16
153:10
Genitourinary
164:22
Gerken
143:14, 17
getting 125:12
159:14
give 95:19
100:22 148:16
150:3, 5 161:6
178:1 189:25
190:11 192:5,
9
given 151:21
176:25 201:14
giving 197:6
glad 104:8
116:25
go 87:25
91:12, 15, 16
95:18, 23
97:24 98:13
101:19 102:4,
11 103:8, 17,
25 104:10
110:21 111:17
112:6, 9
116:11, 13
123:22 125:17
128:15 129:5
131:21 138:12,
12 142:9
143:9, 17
144:17 145:8,
9 146:18
147:20 149:6,
11 150:16
153:12 154:18,
19 157:13

168:2 177:4
178:16 180:8
181:3 182:1, 3
183:5 189:17
199:9, 11, 21
goes 158:20
going 87:25
88:9, 13 92:22
94:16 95:18
96:23 98:22
102:23, 25, 25
105:1 107:18
108:21 115:16
118:12 124:25
125:3 126:19
127:19 128:4,
15 131:12
132:3 133:16
135:15 143:9
152:13 158:24
164:4 173:11,
15 175:18
178:25 181:23
194:21 195:7
Good 87:7
124:8 142:9,
10 148:3
156:11
gotten 130:13,
25 131:2, 3, 5
Grand 85:8, 12
grandchildren
91:12

grandchildren's
91:15
great 101:23
129:7, 20
149:8, 13
168:14, 19, 22
180:24 186:25
198:12, 13
ground 87:25
guarantee
175:4
guess 98:22
99:25 100:14
108:19 113:8
117:18 131:14
171:19 180:10

guidelines
116:9
guiding 159:8
guilty 108:22
guys 183:25
gym 91:24
gyn 143:14
Gynecologic
165:11, 17

< H >
hand 94:16
103:25 135:14,
16 201:18
handicapped
91:5
Handouts
161:11
hands 134:24
136:12
handwritten
96:12, 18
happen 111:3
133:12 135:15
137:13
happened
114:17 135:11
148:2 176:6
195:15
happening
120:21
happens 111:3
happy 134:7
hard 95:10
138:4
hate 130:1
head 88:3, 3, 4
91:18 112:10
121:18 130:11
139:3, 10
140:9 192:11
heading 163:3
heal 186:4, 7
healed 114:16
117:5, 23
185:14, 22, 23
186:2, 7, 17, 19
187:8, 16
healing 117:20,
22 119:18

Becky R. Smith

122:*16*  181:*15*
186:*12*
**Health**  86:*15*
**healthcare**
90:*12, 13*
109:*1*  118:*23*
121:*16*  122:*10*
124:*12*  127:*9*
146:*15*  176:*10*
189:*6, 10*
197:*20*
**hear**  126:*18*
127:*19, 21*
**heard**  94:*7, 10*
156:*21*
**heavier**  107:*18*
**heavy**  139:*3, 10*
**held**  159:*1*
170:*8, 18*
**help**  95:*9*
107:*20*  148:*13, 14*
**helping**  134:*11*
**herpes**  152:*16*
153:*10*
**higher**  108:*19*
**hike**  140:*17, 22*  182:*8*
**hikes**  189:*8*
**hiking**  184:*12, 14*  188:2, *13, 16*
**Hills**  135:*21*
**Hillsboro**  85:*4*
**History**
108:*14*  123:*20*
147:*1*  149:*5, 10*  152:*16*
157:*14, 16*
163:*9*  165:*11, 17*  168:*9, 12*
**hobbies**  187:*25*
**home**  98:*8*
99:*12*  130:*11*
161:*20*  188:*19*
**hoping**  186:*8*
**hospital**
120:*19*  162:*19*
173:*10*
**hour**  85:*3*

**house**  91:*11, 12*  130:*8*
**household**
189:*13*
**Huh-uh**  142:*19*
**hung**  170:*7*
**hurt**  107:*2*
148:*17*  184:*18, 20, 21*  185:*1, 2, 4*
**hurts**  157:*11*
**husband**
99:*25*  120:*10, 14, 18*  153:*4, 6, 9*  183:*23*
195:*3*  197:2, *9*
**husband's**
121:*3*
**hymenal**
154:*14*
**hysterectomy**
147:*2*

< I >
**idea**  101:*7*
110:*7*  162:*12*
178:*5*
**Illness**  108:*15*
123:*21*  147:*1*
149:*5, 10*
157:*15*  163:*9*
168:*9*
**immediately**
134:*19*  158:*3, 7*  161:*20*
176:*14*
**Imodium**
126:*7*
**implant**  90:*22*
93:*23*  94:*10*
100:*19*  108:*23*
119:*2, 3, 7*
125:*15*  137:*2*
140:*16*  180:*3, 6*  188:*1*
190:*22*  194:*10*
**implanted**
89:*24*  100:*11*
190:*24*  191:*15*
192:*1*

**implanting**
162:*8*
**important**
110:*24*
**impression**
197:*25*
**improve**  114:*3, 5*  166:*18*
**improved**
187:*21*
**improvement**
169:*1*  199:*3*
**improving**
168:*24*
**Imrie**  85:*2*
201:*3, 22*
**inactivity**
193:*25*  197:*17, 24*
**Including**
112:*25*  132:*18*
**inclusive**
201:*13*
**incontinence**
100:*4*  123:*10, 23, 25*  124:*1, 2, 24*  125:*19*
126:*15, 22*
127:*11*  128:*14*
132:*6*  144:*23*
145:*2*  157:*22*
171:*1*  177:*17*
179:*21, 25*
**incontinent**
149:*17*
**incorporate**
102:*14*
**increase**
196:*15*
**increased**
168:*25*  169:*4*
178:*14*  190:*10*
**increasing**
139:*2*
**INDEX**  86:*1, 3*
**indicated**
105:*25*  106:*1*
112:*1*  134:*8*
137:*25*  142:*11, 17*  161:*23*

**indicates**
148:*12*  164:*21*
169:*8*  170:*13*
181:*22*
**indication**
182:*21*
**information**
86:*17*  96:9, *10*
161:*13*  190:*19, 23, 25*
**information,**
96:*11*
**informed**
174:*4*
**infrequently**
150:*2*
**initial**  126:*6*
156:*21*  161:*2*
**initially**  139:*13*
**initiative**  134:*1*
**injection**
143:*14*  144:*1*
**injections**
133:*23*  143:*21*
160:*2*
**injuries**  90:*4*
92:*15*  103:*14*
104:*15*  105:*5, 16*  113:*13*
127:*6*  132:*4*
142:*6*  144:*21*
145:*3*  187:*20*
194:*24*  195:*5*
**injury**  123:*9*
126:*16*  127:*4*
194:*22*
**Inn**  85:*3*
**inside**  148:*12, 15*  157:*4*
181:*13*
**instance**  112:*7*
**Instruction**
86:*19*  94:2, *15*
104:*25*  110:*15*
119:*11*  151:*17*
181:*17*  191:*5*
194:*17*
**instructions**
89:*6*  167:*5*

**176:*25*  177:*2*
181:*16*  192:*9*
**insurance**
173:*10*
**intact**  176:*22*
**intercourse**
113:*16, 19*
114:*21*  115:*1, 11, 15*  116:*5, 11*  117:*8, 10, 12, 17*  118:*9, 11, 22*  119:*23*
147:*4*  149:*19*
150:*1*  153:*3, 6*
171:*9*  175:*6*
180:*18, 20*
183:*9*  187:*4*
**interested**
159:*9*
**interesting**
128:*12, 17*
**interfere**
150:*20*
**Internet**  93:*10*
**interrogatories**
201:*8*
**intimate**  195:*3*
**introduce**
102:*2*  103:*17*
128:*6*  174:*7*
**introduced**
87:*7*
**involved**
126:*12*  127:*8*
141:*23*  152:*14*
162:*16*
**involving**
101:*4*
**irritable**  138:*7*
139:*4, 11*
**issue**  105:*11*
112:*23*  117:*6*
122:*3, 7, 9, 11*
123:*6, 9*  124:*5, 21*  126:*12*
128:*5, 23*
129:*2*  133:*11*
147:*23*  170:*23*
186:*14*  187:*9*
**issues**  93:*8*
123:*23*  124:*2,*

Becky R. Smith

13, 15  127:11
129:12, 16, 25
130:5  131:1
132:6, 15
141:9, 11, 15,
19  158:2, 7
169:24  175:5,
19, 20  179:22,
25  198:11
**items**  171:18
**its**  190:8

**< J >**
**January**  89:25
90:23  179:1, 5
182:13  183:18
185:9, 13
**Joyce**  85:2
201:3, 22
**judgment**
154:12
**June**  84:16
85:2  97:22
102:4  185:8,
16, 17  187:2
201:19

**< K >**
**Kansas**  85:9
**kayak**  140:17,
22
**kayaking**
136:16  188:3,
16  189:7
**keep**  189:1
195:9
**Kidney**  141:11
**Kim**  90:23
127:23  128:11
129:12, 15
144:5  147:22
153:21, 25
162:8  163:16
166:23  190:25
**kind**  140:9
167:13  183:3
**kinds**  169:19
**knew**  101:12
135:15  156:2
198:16

**know**  87:24
88:9, 13, 18
92:11  93:21
95:12, 20  96:6
98:14, 14, 16,
24, 25  100:12
101:6, 8, 9, 12,
19  104:22
107:19  108:22
109:12, 13
111:3  114:14
116:7, 25
117:1, 2, 3
120:21, 22
124:22  125:2
128:3, 13, 22
129:6, 19
134:12  136:8,
12, 22  139:20
140:10  144:2
145:5, 7
146:13, 17
147:20  148:17
151:25  152:8,
11, 12  153:22
154:6  155:8
156:7, 19
158:14  162:8
163:19, 22
164:3  166:4, 8
172:12  173:21,
22  175:9, 11
176:3, 6, 24
178:3, 21
180:8, 10, 15
181:14  182:12
183:12  185:19
186:13  188:13,
18, 18, 20
197:12, 13, 16,
18
**knowledge**
95:3
**known**  101:16
**knows**  117:3
**Kuehl**  97:9
109:10  137:13,
16  138:14
142:12, 22
143:13  145:11
146:4  151:22

152:9  157:10
166:23  192:24
195:22  196:23
197:22  198:1

**< L >**
**lab**  173:13
**label**  96:23
149:3  157:14
177:5  179:1
181:22
**labeled**  103:20
144:17  172:20
**laid**  116:8
**language**
191:15
**lasted**  172:13
**lawn**  189:16
**lawsuit**  101:8
145:3  154:25
159:15  162:16,
23, 25  163:4, 7
172:23  173:6
191:11, 18
**lawyer**  96:10,
13  172:23
**lawyers**
162:19  173:24
174:1  176:9
191:17
**layer**  172:22
**laying**  107:20
**leading**  147:10
193:6
**leads**  168:22
**leaking**  149:8,
13  179:17
**leaks**  124:4
**leave**  130:7
175:18
**led**  155:20
**left**  148:21
175:15
**Legacy**  86:15
**lessened**  106:5,
8, 9, 12, 23
**level**  108:6, 6
154:13  187:22,
23  190:9, 12
**Lexapro**  137:7,
9  138:20

139:13  196:1
198:10, 11
**LIABILITY**
84:4
**lie**  111:4
**lied**  111:14, 15
**lies**  111:11
**life**  144:1
156:6
**lightheaded**
138:6
**likelihood**
159:2
**limit**  109:7
119:4, 15, 17
189:10
**limitations**
136:10
**limited**  111:7
159:8
**Lindsey**  85:7
109:13  146:23
167:24
**line**  123:22
128:10, 21
129:1, 5
150:17  154:19
163:10  164:5
195:13
**lines**  162:15
**liquid**  124:4
**list**  96:24
**listed**  97:3
**listen**  105:1
**literature**
161:7
**LITIGATION**
84:4  92:15
94:7
**little**  103:11
128:15  130:4
154:18  177:23
178:9  189:24
**live**  99:20
101:2  156:6
**lives**  98:8
99:21
**living**  159:13,
13
**LLP**  85:7, 11
**LMPMC**  86:15

**local**  100:13
166:17
**localized**
107:10
**located**  99:1
190:1
**location**
115:18  131:19
**location-wise**
186:18
**long**  92:10
95:13  96:8
107:12  137:8
138:4  139:20
142:23  143:11,
12  144:9
158:25  159:13,
14  164:11
172:12  183:12
188:2  189:8
194:13
**longer**  187:25
188:10
**look**  95:11, 17,
19  102:23
103:3, 5
161:10, 21
168:5  186:25
**looked**  93:7
102:18  117:4
156:19  161:18
181:13
**Looking**  145:1
149:3  163:9,
10
**looks**  94:20
135:23  138:19
141:5  164:6
166:11, 13
167:8  168:3
181:16  183:1
186:24
**Los**  85:13
**losing**  198:12
**loss**  195:3
**lost**  98:2, 2
173:17
**lot**  117:1
138:8  177:6
182:6  184:10
189:15  197:6

Becky R. Smith

love  117:*20*
120:*10*
Lovely  125:*21*
loving  120:*8*
low  107:*6, 9*
141:*5*  148:*22*
lower  140:*12,*
*20*
lowered  140:*16*
lscarcello@wcll
p.com  85:*8*

**< M >**
Mackie  85:*15*
98:*5*  99:*3*
making  98:*1*
199:*25*
male  149:*18*
Malheur  184:*5*
man  161:*22*
manage
168:*24*  169:*6,*
*8, 13, 17, 20, 21,*
*25*  170:*4*
management
126:*6*  133:*18*
159:*8*
Mandell  85:*11*
86:*3*  87:*6, 9*
94:*3, 16, 19*
95:*23*  96:*1, 17*
100:*6, 9*  101:*2*
102:*2, 6, 20*
103:*20*  104:*2,*
*3, 12, 14*  105:*1*
109:*7*  110:*16*
111:*11, 13*
116:*3, 20*
119:*12*  120:*25*
121:*2*  127:*17,*
*20*  128:*9*
135:*11*  136:*3*
137:*24*  139:*1*
143:*2, 9*
144:*12, 14*
148:*4*  151:*18,*
*20*  153:*2*
160:*20*  161:*1*
164:*4*  165:*24*
173:*4*  174:*10*
182:*15, 17*

191:*6*  193:*6, 9,*
*14, 18, 22*
194:*2, 5, 8, 18,*
*21*  195:*7, 19*
199:*22, 24*
**Manzanita**
98:*17*  99:*2*
**March**  142:*24*
143:*10*  151:*21*
marital  98:*10,*
*13*
**Marked**  94:*18*
102:*5*  103:*19*
128:*8*  174:*9*
marriage
120:*5*
married  98:*5*
120:*11*
**Marriott**  85:*3*
material
170:*15*  174:*14,*
*17*
matter  86:*13*
140:*7*
**MDL**  84:*4*
**MDR**  177:*5*
179:*1*
**MDR00001-37**
86:*11*
**MDR00087**
86:*15*
**MDR1**  103:*20*
**MDR11**
157:*13*  163:*10*
**MDR17**
108:*11*  146:*19*
149:*10*
**MDR2**  138:*13*
145:*10*
**MDR8**  168:*2*
mean  90:*12,*
*12*  92:*18*
99:*24*  129:*1*
131:*13*  136:*11*
143:*5*
means  125:*19*
131:*14*
meant  172:*22*
media  191:*11*

**Medical**  86:*9,*
*13*  92:*24*  93:*7*
103:*18*  145:*8*
medication
134:*4, 8, 9*
137:*6*  138:*9*
164:*18*  177:*25*
178:*1, 3, 5, 11*
196:*9*  198:*3*
medications
87:*17*  159:*23*
medicine
135:*5*  139:*7*
185:*25, 25*
198:*6*
medicines
133:*20*
meet  92:*4*
155:*11*
meeting  92:*12*
155:*2, 3*  163:*1*
member  91:*24*
99:*24*
members
100:*3*
memory
148:*13*
menorrhagia
157:*17*
mention
154:*24*  169:*25*
mentioned
171:*18*  189:*11*
197:*2*  201:*6*
mentioning
136:*22*  173:*18*
mesh  90:*8, 19*
93:*15*  100:*11*
101:*4, 8, 14, 15,*
*20*  109:*3, 9, 20*
110:*2, 6, 7*
112:*24, 25*
113:*2, 6*  117:*1*
121:*11, 21*
122:*4, 8, 12, 16,*
*17, 19, 23*
123:*3*  126:*11,*
*17, 23*  127:*5,*
*10*  129:*24*
130:*1*  132:*4*
140:*16*  145:*3,*

*21*  151:*3, 12*
154:*20, 25*
155:*4*  156:*15*
158:*1, 12, 17,*
*25*  159:*3, 19*
160:*9, 14, 21*
161:*4*  162:*6,*
*18*  163:*6*
167:*19*  168:*13,*
*25*  172:*23*
175:*12, 18, 22,*
*25*  176:*3, 6, 11*
188:*1*  191:*11,*
*15*  194:*18*
196:*16*  198:*19*
met  92:*9, 14*
155:*14*
**Michael**  85:*11*
87:*9*
middle  183:*17*
milligrams
138:*20*
mind  124:*18*
minimal
177:*17*
minutes  92:*11*
misstate  112:*2*
misstated
111:*15*
misstates  112:*5*
mmandell@ree
dsmith.com
85:*12*
**MO**  85:*9*
mobility  169:*1,*
*4*
moment  87:*8*
95:*19*  112:*12*
**Monday**  102:*9*
month  114:*23*
142:*18*  150:*5*
173:*11*  179:*2*
182:*12*
months  95:*21*
108:*3, 13, 17*
114:*24, 25*
182:*23*  183:*14*
morning  87:*7*
motor  141:*24*
move  106:*11*
moved  99:*12*

movement
129:*7, 20*
130:*7, 10*
mow  189:*16*

**< N >**
name  87:*8*
99:*18*  100:*21*
178:*4*
nature  117:*25*
150:*18*  152:*14*
**NE**  85:*4*
necessary
197:*2*
neck  141:*19*
need  88:*18*
97:*16*  109:*12*
142:*9*  145:*18,*
*19*  158:*3*
163:*5*  173:*21*
needed  142:*6*
181:*23*  198:*2*
negligent
191:*23*
**Nehalem**  101:*3*
nerve  125:*24*
nervous
108:*21*  112:*12*
120:*22*
never  158:*21*
161:*18*  167:*15*
198:*18*
new  91:*19, 19*
144:*7*  194:*22*
**Nikki**  97:*7, 9*
109:*10*  142:*12*
145:*11*  151:*22*
192:*24*  195:*22*
nine  157:*17*
190:*17*
nodding  88:*3*
**Nods**  121:*18*
**Nontender**
178:*17, 23*
181:*4*
**Nope**  89:*7*
90:*5*
noted  139:*23*
174:*22*

Becky R. Smith

**notes** 93:*17*
111:*24* 138:*19*
166:*3* 178:*24*
**notice** 86:9
102:*3, 10, 14,*
*16* 107:*17*
117:*7* 199:*3*
**noticed** 117:*8*
**noticing**
130:*14*
**November**
90:*18* 97:*15*
107:*23* 108:*8*
113:*25* 114:*2,*
*15, 20* 117:*22*
122:*2* 143:*22*
147:*11* 175:*9*
**number**
117:*16*
**numbers**
86:*13* 103:*21*
**numbing**
177:*25* 178:*3,*
*11*
**numbness**
134:*24* 135:*6*
**nurse** 90:*13*
137:*16* 138:*14*
142:*12, 22*
145:*10* 151:*22*
152:*9* 196:*23*
197:*22* 198:*1*

**< O >**
**oath** 87:*2*
88:*23* 89:*2*
201:*7*
**ob** 143:*14*
**object** 93:*24*
94:*12* 102:*13*
104:*19* 109:*4*
110:*11* 111:*5*
112:*4* 119:*6*
127:*13* 137:*21*
142:*25* 147:*25*
151:*14* 152:*24*
160:*16* 163:*25*
165:*20* 191:*2*
194:*14*

**objection**
160:*23* 193:*6,*
*9, 14, 18* 194:*2*
**objections**
102:*15, 17*
193:*22*
**obtaining**
162:*17*
**Obviously**
169:*4*
**occurred**
89:*15* 97:*14,*
*22* 99:*7* 115:*8*
124:*16* 125:*10*
135:*23, 23*
175:*9*
**occurring**
105:*20* 125:*10*
**OCSR** 85:*2*
201:*23*
**October** 168:*2*
173:*8*
**offered** 143:*24*
**offers** 161:*18*
**office** 146:*23*
148:*5* 177:*7*
179:*5*
**oftentimes**
130:*8*
**Oh** 161:*22*
**okay** 88:*10, 21,*
*22* 89:*17* 97:*6*
102:*20, 22*
103:*12, 13*
105:*17* 106:*24*
113:*14* 119:*21*
127:*20* 143:*4*
158:*16* 161:*1*
170:*17* 179:*4,*
*7* 180:*8, 18, 21,*
*24* 183:*9*
194:*25*
**old** 157:*15*
**once** 101:*20*
124:*4* 150:*6*
**ones** 175:*19*
188:*20*
**ongoing** 143:*7*
**open** 194:*22*
195:*9*

**Operating**
158:*15*
**opinion**
167:*11, 19, 20*
**optimal** 126:*8*
**option** 156:*12,*
*22* 196:*8*
**options** 155:*5,*
*8*
**oral** 201:*8*
**order** 110:*25*
**OREGC** 86:*11*
**Oregon** 85:*1,*
*4* 86:*11* 99:*2,*
*21* 103:*18*
104:*6* 108:*16*
109:*13* 132:*18,*
*22* 133:*4, 7*
184:*5* 201:*3,*
*18*
**organ** 171:*2*
**orgasm** 118:*1,*
*7, 10, 15*
150:*20*
**original** 198:*3*
**originate** 107:*5*
**outbreak**
152:*23* 153:*4,*
*7, 9*
**outlined**
172:*17*
**outside** 184:*10*
**over-the-counte**
**r** 152:*5*

**< P >**
**p.m** 85:*3*
200:*2*
**PA** 97:*10*
**Page** 86:*2, 3*
94:*22* 96:*22*
97:*12, 24*
103:*21* 104:*3*
123:*15, 15, 18,*
*22* 125:*17*
128:*6, 9, 20, 20*
138:*12* 144:*17*
145:*9, 14, 20*
146:*19* 149:*3*
152:*13* 153:*12*
157:*13* 158:*24*

161:*10* 162:*13*
163:*10* 164:*4,*
*21* 165:*11, 16,*
*17* 166:*11*
172:*19, 20*
174:*11* 177:*5*
178:*16* 180:*18*
181:*4, 17*
**Pages** 84:*15*
86:*19* 103:*2*
177:*6* 201:*12*
**pain** 101:*16*
104:*17, 17*
105:*6, 6, 13, 14,*
*14, 19, 19, 24,*
*25* 106:*2, 2, 14,*
*16, 22* 107:*3, 5,*
*8, 12, 22, 25*
108:*2, 6, 7, 12,*
*19, 24* 109:*3, 9,*
*11, 21* 110:*1, 5,*
*9, 18* 111:*21*
112:*8, 9, 12, 19,*
*20, 24* 113:*5, 5,*
*7, 10, 10, 12, 16,*
*18* 114:*3, 6, 8,*
*8* 115:*10, 15,*
*17, 22* 116:*11,*
*16, 23* 118:*2,*
*22* 121:*11, 20,*
*24* 122:*4, 7, 11,*
*18, 20, 23*
123:*2, 6*
131:*16, 17*
132:*5, 5*
133:*18, 20*
134:*25* 136:*22*
141:*5* 145:*21,*
*23* 146:*7, 9, 11,*
*15* 147:*4, 8, 8,*
*10, 14, 15, 16,*
*19, 21* 149:*20*
150:*17, 18*
155:*4, 19, 19*
156:*5* 158:*25*
159:*2, 13, 22*
164:*18* 168:*14,*
*20, 22, 22*
169:*7, 9, 13, 17,*
*22, 24* 170:*6,*
*24* 171:*6, 9*

175:*5, 6*
177:*17* 178:*2,*
*13* 179:*10*
180:*11, 13, 25*
182:*22, 25*
183:*2, 2, 3*
184:*18* 185:*24*
187:*3, 4, 20, 21,*
*21* 189:*24*
190:*8, 12*
193:*4, 12, 19,*
*24*
**painful** 156:*17*
161:*5* 188:*25*
**palpate** 157:*4*
178:*21*
**palpated**
148:*12, 15*
157:*6, 9*
**palpation**
178:*18*
**pap** 145:*18*
**paragraph**
149:*6, 11*
159:*6*
**Pardon** 139:*9*
**parking** 91:*5*
**PARQ** 170:*13*
**P-A-R-Q** 170:*8*
**PARQ,** 170:*8*
**part** 129:*7*
144:*19* 145:*2*
156:*15, 16, 20*
174:*19* 181:*14*
186:*17, 18*
187:*9* 199:*12*
**partner**
149:*19* 152:*15,*
*23*
**passed** 196:*10*
**patient** 144:*10*
161:*8* 166:*11*
170:*9, 16*
**paying** 133:*3*
**PELVIC** 84:*3*
104:*17* 105:*5,*
*13, 19, 24*
106:*2, 9*
107:*22, 25*
109:*2, 9, 21*
110:*1, 4, 8, 17*

Becky R. Smith

112:*19*, *24*
113:5, *10*
132:5 145:*15*, *16* 146:*15*
155:*19* 161:*12*
164:*14* 171:5
175:5 184:*22*, *23*, *24* 187:*20*
193:*4*, *12*, *23*
**pelvis** 142:*14*
**penalty** 95:2
**pending**
154:*25*
**penetration**
150:*18*
**people** 112:9
**percent** 130:9,
*10* 131:*7*, 9, *11*,
*12*, 15
**Perfect** 158:*16*
**perform** 146:6
148:*25* 163:*16*
189:6, *14*
**performed**
147:*11* 163:*23*
167:*12*
**performing**
161:2
**period** 111:9
125:9 151:*12*,
25 168:*21*
**perjury** 95:2
**permission**
174:*25*
**person** 91:5
101:*1* 109:22
**personal**
152:*14*
**personally**
201:5
**person's**
100:*21*
**pertains** 89:*19*
**PFS** 86:8
**phone** 92:6
176:*19*
**photographs**
162:*3*
**photos** 183:*25*
**physical**
111:*21* 121:4

133:*10*, *14*
136:*10* 156:25
159:25 164:*15*
169:2 189:*17*
193:*12*, *24*
**physically**
111:*19* 156:*24*
192:*25*
**physician**
92:*17* 110:4, 8,
*17* 112:22
113:9 121:*10*,
*23* 122:*3*, *6*
123:5 132:*25*
133:*1* 134:*1*
147:23 151:8
162:8, 9
196:*15*
**physician,**
90:*1*
**physicians**
132:*18* 192:6,
*10*
**picture** 156:*18*
161:*23* 175:*13*
**piece** 186:*11*
**pieces** 175:*12*,
15 176:*18*, 20
**pillow** 106:*12*
**place** 115:*19*
157:*11* 185:*1*,
*2*, *3* 201:6
**placed** 147:2
158:*1* 168:*13*
**places** 91:*11*
**Plaintiff** 84:8
85:*10* 86:*3*, 9
94:*17* 96:*3*, *12*
97:*24* 105:*25*
144:*15*
**Plan** 125:*18*
153:*12* 155:6
158:*25* 161:*11*
162:*14* 170:8
172:*19* 180:*18*
181:22
**planning** 136:6
**platform**
191:*12*
**please** 88:*13*

122:5 166:*12*
**pled** 195:5
**Plus** 89:*20*
**point** 126:4
133:22 143:*21*
148:*17* 159:9
160:2 167:*1*
173:7 180:*19*
183:5 191:*14*
199:*10*
**Portland**
133:7 201:*18*
**position** 143:4,
5 195:*1*
**positions**
150:*19*
**possible** 126:7
**possibly** 161:6
**posted** 191:*10*
**Posterior**
154:*13* 157:*21*
163:*12*, *14*, *17*,
*23*

**postmenopausal**
166:*17*
**post-op** 119:*1*,
*3*, *24* 158:*3*, 8
177:*4*, *8*, *11*
178:8 179:6
**postoperative**
181:5, 6
**potential** 169:*1*
**practiced**
114:*14*
**practitioner**
137:*16* 138:*14*
142:*12*, 22
145:*10* 151:22
152:9 196:*23*
197:22 198:*1*
**precise** 184:*24*
**pre-op** 168:*3*
**preparation**
93:*4*
**prepare** 92:*1*
93:*10*, *17*
**prescribed**
134:*15*, *21*
137:*16* 142:22,
*24* 143:*10*, *12*

152:*4*, 9
197:*15*, *16*
198:*19* 199:2
**prescribes**
166:*13*
**prescribing**
197:*23*
**prescription**
152:8 195:*15*,
*19*, *22*, *25*
196:*19*
**prescriptions**
167:2
**present** 85:*15*
108:*14* 123:*21*
147:*1* 149:*5*,
*10* 150:*19*
157:*14* 163:9
168:9 174:*1*
192:*16*
**preserve** 163:*6*
**preserved**
162:*18* 163:6
**pressure**
105:9, *20*
123:*10* 124:24
125:22 126:*16*,
22 127:*11*
131:*17*, 18, *21*
132:6 141:*15*
144:23 145:2
**presume**
169:22
**pretty** 178:*1*
**prevent** 140:6
**prevented**
140:25
**previous** 94:*1*
194:*16* 195:2
**previously**
106:*16* 113:*16*
135:*13* 140:*15*
**primary** 97:*10*
193:7
**Prior** 94:7, *10*
108:*13* 111:9
118:*11* 125:*14*
137:*1* 148:2
153:*1* 172:*15*
194:9 195:*6*,
25 198:6

**private** 100:*25*
117:25
**probably**
104:*20* 107:*1*
131:7 138:7
140:*14* 156:*14*
178:*14* 188:5
195:*17*
**problem**
103:*12* 120:*23*
130:2 173:*12*,
13
**problems**
101:*14* 108:24
127:23 128:*21*
179:*13*, 17
**Procedure**
85:*1* 113:*1*
130:22, 23
145:22 157:*23*
158:*1*, *10*
167:9 172:5,
*10* 174:*25*
175:8 176:*14*
182:*19* 185:*12*
**procedures**
97:*13* 170:*14*
174:*14*, 16
**proceedings**
85:*3* 201:*15*
**process** 108:22
**product** 90:*3*
101:*6* 175:*23*,
23
**PRODUCTS**
84:*4* 89:*20*, 24
90:*7* 93:*13*
190:22, 24
192:*15*
**prognosis**
186:*21*
**progressively**
130:*13*
**prolapse**
100:*3* 153:*15*,
*16*, *20* 154:*1*, *4*,
9 157:*17*, 22
168:*13* 171:2
**pronounce**
157:*16*

Becky R. Smith

properly 111:1  114:16
propounded 201:8
provide 159:18  160:2, 12  161:7  186:21
provided 109:6  134:4  160:20  161:12  176:8
provider 90:12, 13  109:2  122:10  124:12  127:9  146:15  170:14  176:10  189:6, 10  197:20
providers 118:23  121:16  166:23
PT, 164:14
Pulitzer 98:17, 19, 20  99:1
P-U-L-I-T-Z-E-R 98:19
pull 144:14
pulmonary 120:14  121:3, 5  141:9  197:3, 5
punctured 170:23
purpose 89:13
purse 163:2
pursuant 85:1
pushed 148:17, 19
put 96:9  97:18  136:10  142:12  166:3  185:25

< Q >
quality 166:19
quarter 150:6
quarterly 150:10
question 88:12, 14, 19  93:24

94:12  100:5, 7  104:19, 23, 23  109:4  110:12  111:6, 8  119:19  127:14, 16, 18  133:13  137:22  139:12  143:1  145:14  147:25  151:14  152:25  154:6  160:17, 19  163:21  164:1  165:21  186:5  191:3  194:15
questioning 195:14
questions 88:2  89:6  143:6  170:10, 16  171:23  174:16  195:9, 11, 17  199:21
quick 88:1  128:5  174:7
quickly 95:17
quite 147:15  151:18  194:12

< R >
Rae 86:9
reached 186:20
read 100:6, 7  124:7  127:17, 18  128:4  150:16  157:14  168:17  169:3, 5  177:20  181:9
reader 124:8
reading 93:13, 15  157:19  191:14
real 88:1  128:5  174:7
realize 96:7
really 95:13, 17  96:8  100:25  101:22, 23  107:3  112:12, 13  124:19  130:6

139:14  144:9  152:3  167:25  169:20
reason 87:21  95:14  129:24  137:11  140:17, 21  144:4  159:1  184:17  195:25  196:3
reasonable 174:15, 17
reasoning 112:3
reasons 189:5
Reassurance 126:11
recall 102:8  125:12, 14  127:3, 22, 25  128:1, 4  140:18  142:15, 18  143:15  145:16  146:17  148:4  149:2  150:24  152:3  154:15, 22  155:10, 23  156:13  157:6  158:9  159:21, 22  160:8  161:9  163:15, 17, 18, 22  165:19, 24  166:6, 9  171:7, 10, 13, 17, 17, 21  172:18  173:9  183:1  185:13, 14  188:4  191:14  193:1  197:4, 5
receive 92:24
received 102:10  190:18
Recess 95:25  121:1  144:13  182:16
recollection 127:9  163:19
recommendation 105:2  161:2

recommended 92:23  133:9, 13, 15, 17, 20, 22  187:16
record 86:13  87:8, 8  95:19, 23  104:3, 10, 13  108:10  120:13, 13  123:19  126:21  143:2, 5, 13  145:20  146:18  158:7  165:8  182:17  197:6  199:21, 22, 23, 25  201:14
recorded 108:13
records 86:9  93:7  103:18  104:4, 6  134:22  145:8  197:1
recovery 119:1, 3, 24  176:13  185:12
rectocele 128:2
recur 171:2
reduced 170:25  201:11
reduction 155:4
REED 85:11
refer 90:22
reference 102:14
referred 92:16, 19  93:1  97:11  156:2
referring 90:6, 17, 22  101:24  135:6  150:10  155:9  185:3
refresh 148:13
Refuge 184:6
regarding 154:25  159:1  161:12  167:11  173:5  187:15  190:19
regards 153:15

regimen 142:17  160:5
regular 151:2, 10
related 92:15  101:8  109:3, 9  110:1, 6  112:24  113:6  121:11, 21  122:4, 8, 11, 19, 23  126:17, 23  127:4  132:4  144:20  145:3  186:14  191:10, 15  194:19  195:14  196:16
RELATES 84:5
relation 92:13
relationship 120:8
relied 190:23
relief 161:6
rely 190:24
remain 188:6
remained 190:3
remains 180:6
remember 106:25  116:7  128:25  143:20  160:25  161:15, 15  170:22
REMEMBERED 85:1
removal 159:3, 19  160:9  167:19
remove 113:2  160:14, 21  175:19
removed 90:19  156:12  162:6  168:25  176:11
removing 161:5  175:22
REPAIR 84:3  101:4  157:22  163:12, 14, 17, 23

Becky R. Smith

**repeat** 100:*5*
160:*19* 188:*1*
**rephrase**
88:*13* 113:*1*
119:*12*
**report** 116:*12*,
*15* 163:*13*
182:*24*
**reported** 85:*3*
118:22 124:*12*
146:*3, 11*
150:*8, 13*
163:*24*
**reporter** 88:*4*
98:*18* 100:*7*
127:*18*
**represent** 87:*9*
125:*19* 170:*13*
**represents**
164:*15*
**request** 156:22
**Requested**
86:*17* 183:*4*
**requests** 103:*1*,
*10*
**required**
172:22
**requires** 88:*23*
**research**
93:*10* 172:*15*
**Residence** 85:*3*
**resolve** 145:22
162:*5* 175:*5*
198:*11*
**resolved**
158:*21* 159:*21*
180:*6*
**resources**
161:*13*
**respect** 93:*8*
194:*25*
**respectfully**
195:*7*
**response**
102:*16* 116:22
148:*16*
**responses**
102:*15*
**responsible**
162:*17*

**responsive**
103:*4*
**rest** 156:*6*
**result** 170:*4*
**resulting**
193:*25*
**retired** 97:*20*
**retrieve** 175:*16*
**return** 144:*4*
**returned** 178:*2*
**review** 93:*4*
96:*2* 161:*16*
**reviewed** 95:*6*
162:*14, 16*
**reviewing**
199:*25*
**revision** 119:*3*
158:*12, 18*
169:*23, 24*
185:*5*
**revisit** 108:*1*
**riding** 188:*16*
189:*7*
**right** 95:*7*
105:*16* 116:*14*
117:*12, 13*
126:*3* 129:*25*
130:*3, 18*
131:*12, 14, 23*
135:*24* 136:*4*
139:*18* 146:*4,
24* 147:*8, 17*
148:*21* 149:*3,
17* 155:*16*
158:*8* 161:*11,
19, 24* 165:*9*
166:*15* 167:*9*
168:*6* 170:*1*
174:*5, 23*
175:*1* 176:*25*
179:*8, 22, 25*
180:*7* 181:*1*
182:*19* 183:*7*
188:*25* 192:*18*
193:*8* 195:*20*
196:*2, 20*
197:*15* 199:*17*
**right-hand**
96:*24* 98:*1*
103:*22* 123:*16*

**ring** 154:*14*
**risk** 170:*9*
**risks** 170:*15,
21, 22* 171:*5, 8,
11, 14, 21*
172:*1, 5, 9*
174:*14, 17, 22*
**road** 127:*24*
128:*23* 129:*2,
13*
**room** 158:*15*
**Rules** 85:*1*
87:*25*

**< S >**
**sadness** 193:*13*
**sat** 182:*6*
**satisfaction**
174:*18*
**saw** 90:*13*
98:*21, 23*
103:*11* 116:*15*
120:*13* 146:*14*
169:*23* 185:*6,
15*
**saying** 106:*14*
108:*20* 122:*17*
124:*11, 15*
127:*8* 128:*17,
25* 140:*15, 18*
151:*24* 154:*8*
177:*11* 188:*4*
**says** 96:22
97:*25* 108:*11,
11* 121:*12*
123:*18, 22*
125:*18, 24*
126:*6, 11*
128:*9, 20*
138:*13* 139:*1,
10* 144:*19*
145:*15* 146:*23*
147:*19* 149:*5,
7, 18* 150:*16,
17* 151:*1, 11*
152:*15, 19*
153:*12, 15*
154:*13, 18, 19,
20* 155:*2, 3*
157:*15* 158:*7,
10, 25* 159:*6, 7*

161:*11* 162:*13,
15* 163:*11*
164:*14, 23, 23*
165:*12, 13*
166:*12, 17*
168:*9, 23*
170:*8* 172:*8,
20* 174:*13, 14*
177:*7, 17*
178:*17, 17*
179:*10, 13*
180:*11, 14, 18*
181:*4, 16*
183:*9* 185:*23*
**scale** 106:*13*
108:*3* 114:*12*
190:*11*
**scan** 120:*20*
**scar** 186:*12*
**Scarcello** 85:*7*
86:*3* 93:*24*
94:*12* 95:*24*
96:*15* 100:*24*
102:*13* 104:*1,
10, 19* 109:*4*
110:*11* 111:*5*
112:*4* 115:*25*
116:*18* 119:*6*
120:*24* 127:*13*
135:*9* 136:*1*
137:*21* 138:*24*
142:*25* 143:*4*
144:*11* 147:*25*
151:*14* 152:*24*
160:*16, 23*
163:*25* 165:*20*
173:*2* 182:*14*
191:*2* 192:*19,
22* 193:*7, 11,
16, 19, 23*
194:*4, 14, 24*
195:*13* 199:*20*
**scared** 188:*18*
**scarring** 159:*2*
171:*12*
**schedule** 167:*8*
**scheduled**
187:*12*
**scheduling**
132:*17, 21*

**search** 102:*11*
103:*9*
**second** 87:*11*
104:*11* 149:*11*
154:*19* 163:*10*
167:*11, 13, 18,
20, 24* 168:*1,
12* 179:*6*
**second-to-last**
164:*22*
**second-to-the-la
st** 151:*1*
**section** 168:*10*
177:*14*
**see** 91:*9* 96:*4,
6* 97:*10, 12*
98:*16, 20*
101:*21* 103:*1*
108:*14* 116:*14*
123:*15, 24*
125:*17* 126:*9,
13* 128:*24*
129:*3, 9, 14*
132:*12* 134:*22*
138:*15, 22*
139:*12, 19*
143:*17* 144:*22,
23* 145:*24*
147:*5, 20, 22,
22* 149:*7, 14*
152:*17* 153:*13,
18* 155:*6, 20*
156:*1, 4*
157:*24* 158:*5,
13* 159:*4, 10*
162:*14, 21*
164:*8, 24*
165:*15* 166:*20*
167:*20* 168:*10,
15* 170:*11*
172:*25* 174:*13,
19* 177:*9, 14*
178:*14, 19*
179:*5, 11, 15,
18* 180:*12*
181:*7, 14*
183:*4* 185:*18*
187:*9* 198:*14*
**seeing** 101:*17*
102:*8* 126:*21*

Becky R. Smith

142:*12*  143:*13*
151:*8*  155:*15*
**seek**  131:*25*
132:*10*  167:*11*
**seen**  92:*20*
94:*19*  95:*13*
96:*7*  97:*4*
102:*6*  118:*24*
122:*14*  132:*15*
144:*9*  167:*14*
198:*15*
**self**  150:*13*
**send**  96:*10, 11*
**sensation**
106:*19*  107:*25*
115:*20*
**sent**  96:*13*
109:*13*  167:*24*
**sentence**  139:*1*
149:*6, 11*
151:*1*  154:*19*
159:*7*  164:*5, 6*
168:*12, 23*
172:*19*
**separated**  99:*4*
**separately**
98:*21*  105:*16*
**September**
135:*24*
**serious**  101:*14*
**served**  102:*4*
**set**  189:*18*
**seven**  190:*14*
**severe**  105:*15*
165:*13, 25*
**sew**  136:*11*
**sex**  104:*17*
105:*6, 15*
113:*12, 24*
114:*3, 7, 17*
116:*16*  121:*7,
11, 20, 24*
122:*4, 7, 11, 19,
23*  123:*2, 6*
132:*5*  147:*8*
149:*23*  155:*19*
159:*14*  170:*7*
186:*15*  187:*21*
189:*23, 24*
190:*13*

**sexual**  105:*14,
19*  117:*16*
118:*15, 22*
119:*5, 15, 17*
120:*2*  152:*22*
153:*3, 6*  156:*7*
**sexually**
117:*19*  149:*18,
24*  150:*8*
164:*23*  165:*1*
**Shakes**  192:*11*
**shaking**  88:*3*
**shared**  192:*14*
**sharp**  113:*18*
115:*22*  121:*20*
**sheet**  86:*3*
94:*17*  96:*3*
97:*24*  106:*1*
144:*16*
**sheets**  96:*12*
**shop**  91:*10*
**short**  130:*11*
**showed**
175:*13*  176:*18*
**shown**  166:*18*
**side**  97:*18*
148:*21*
**signature**
94:*23*  174:*11*
**signed**  174:*4*
**significant**
142:*3*
**signing**  95:*6*
**similar**  157:*2*
**simply**  127:*5*
**single**  149:*18*
**sister**  99:*17,
25*  101:*15*
**sister's**  99:*18*
**sit**  106:*11*
107:*7*
**sitting**  106:*11*
112:*11*
**situation**
111:*16*
**six**  98:*22*
107:*1*  108:*5*
117:*18*  118:*7*
190:*14*
**skip**  128:*15*

**slightly**  114:*9,
12*  115:*16, 16*
147:*18*
**sling**  147:*2*
149:*7, 7, 13*
**sloughed**
156:*16*
**sluggish**  139:*3,
10, 23*  140:*5, 8,
13*
**sluggishness**
140:*1, 24*
**smear**  145:*18*
**SMITH**  84:*7,
11*  85:*1, 11*
86:*3, 9, 11, 11,
15*  87:*1, 7*
89:*8*  96:*1*
99:*19*  104:*7,
14*  192:*18*
194:*9*  199:*24*
201:*5*
**SMITHB**  86:*8,
11, 15*
**Smith's**  104:*5*
**smoke**  134:*7*
**social**  91:*8*
191:*11*
**solid**  124:*4*
**somebody**
100:*12*  188:*20*
**sore**  106:*10*
**Sorry**  96:*16*
98:*15, 24*
100:*20*  104:*2*
107:*19*  117:*25*
118:*20*  127:*16*
132:*20*  135:*10*
149:*2*  165:*16*
176:*5*  186:*20*
192:*13*  199:*1*
**sort**  141:*1*
182:*7*
**sought**  196:*22*
**sound**  197:*8*
**sounds**  129:*23*
160:*12*  168:*6*
**source**  193:*7*
**SOUTHERN**
84:*1*

**speak**  93:*22*
100:*18*  176:*14*
**speaking**
110:*22*
**specific**  107:*5,
10*  111:*23*
157:*6*  171:*19*
197:*21*
**specifically**
89:*19*  109:*11*
116:*9*  118:*12*
122:*22*  175:*11*
195:*15*  197:*23*
**specifics**
148:*23*
**specify**  99:*23*
111:*12*
**specimen**
173:*13*
**spell**  98:*18*
**spend**  91:*14*
**spine**  141:*19*
**spoke**  94:*6*
**spoken**  94:*3*
100:*16, 17*
113:*8*
**spot**  157:*10*
**spouse**  120:*1*
**spread**  107:*8*
**stab**  156:*4*
**standing**  130:*6*
**stands**  125:*25*
170:*14*
**start**  103:*14*
104:*14*  105:*24*
108:*2*  114:*11,
19*  124:*23*
131:*18*  134:*18*
166:*12, 14*
192:*24*
**started**  130:*14*
134:*18*  147:*8*
158:*20*  180:*15*
183:*16*
**starting**
123:*15*  149:*6*
**starts**  164:*7*
168:*12*
**state**  111:*6*
**stated**  104:*23*
181:*1*

**statement**
149:*21*  150:*21*
151:*5, 6*
154:*11*  165:*7*
180:*22, 25*
**STATES**  84:*1*
147:*1, 1*
**stating**  145:*12*
**stay**  130:*23*
**staying**  198:*11*
**stenotype**
201:*11*
**step**  167:*8*
**steroid**  143:*14,
21*  144:*1, 3*
**sticker**  91:*6*
**stills**  137:*4*
**stitches**  142:*7*
**stool**  124:*4*
**stop**  126:*3*
140:*11*  151:*7*
166:*25*
**stopped**  167:*2*
**straight**  198:*5*
**stress**  179:*21,
24*  197:*7*
**stretching**
169:*19*
**strike**  94:*6*
103:*16*  115:*9*
119:*1*  155:*22*
169:*7*  186:*5*
197:*18, 21*
**strong**  120:*6,
7*  178:*1*
**struggle**  120:*7,
7*
**study**  135:*2, 6,
12, 13, 16, 23*
**stuff**  118:*1*
120:*20*  135:*20*
143:*10*
**Subject**
102:*17*  143:*7*
**subsequently**
168:*14*
**substantially**
193:*3*
**successful**
188:*21*

Becky R. Smith

**Sue** 101:*1*
**sued** 89:*8*
**suffer** 106:*1*
135:*19*
**suffering**
196:*19*
**suggest** 95:*18*
**suggested**
101:*18* 134:5
144:8 159:22
173:*14*
**suit** 89:*14, 19*
**Suite** 85:8, *12*
**super** 108:*21*
**support** 161:*14*
**supported**
153:*17* 154:*10*
**supporting**
154:*4*
**supposed**
111:7 114:*18*
151:9
**sure** 88:2
104:*12* 105:*10*
115:*4* 116:*13*
120:25 122:*14,*
*25* 124:*19*
129:*17, 23, 23,*
*24* 140:*19*
144:*12* 151:*18*
152:7 167:*17*
183:*20* 186:22
**surgeries**
97:*13* 99:23
142:*3* 164:*11*
**surgery** 90:*18,*
*23* 97:*16*
106:6 114:*2, 6,*
*20* 115:*1, 11*
117:*15, 21, 22*
119:*18* 131:24
132:9 134:*19*
135:*14* 136:7
143:22, *25*
156:*12, 22, 23*
159:*1, 19*
160:*6, 25*
162:*4* 171:*8,*
*11, 14, 15*
172:2, *15*
173:9 174:5

175:*4* 176:22
178:5, *8*
183:*13, 15*
185:*3* 186:*1,*
*11* 187:*14, 17*
**surrounding**
89:*14* 93:*8*
**swearing** 95:2
**switch** 136:*12*
**sworn** 87:2
201:7
**symptom**
139:7, *8*
**symptoms**
106:5 113:*17*
114:*3* 124:24
125:*14* 130:*4,*
*18, 20, 22*
136:*3* 137:*12,*
*19, 20* 138:*1, 3,*
*5* 139:6
144:*20* 155:*18*
156:*3* 164:22
194:*1* 199:*4*
**syndrome**
134:*25* 136:*4,*
*9, 20* 189:*4*
**SYSTEM** 84:*3*

**< T >**
**take** 87:*10*
88:*20* 89:2
97:*19* 101:*20*
111:*24* 120:*24,*
*25* 134:5
137:*6, 7* 138:5
142:*23* 143:*11*
144:*11* 156:*20*
162:*3* 166:6
182:*14, 15*
183:*25* 186:*11*
198:*23*
**Taken** 84:*15*
85:2 87:*24*
88:*23* 89:*12*
152:2 184:2
201:*10*
**talk** 88:*8*
124:*20* 176:*13*
**talked** 101:*15*
133:*11, 15*

137:*13* 143:*16*
156:*3, 10*
196:*8*
**talking** 106:22
111:*24* 112:*11,*
*19* 117:*12*
128:*18* 130:*3*
131:*1* 132:2
137:*23, 24*
179:*3* 180:8
186:2
**talks** 158:*24*
**Tanasbourne**
85:*4*
**T-ball** 91:*15*
**tearing** 165:*13,*
*25*
**tell** 88:*23*
92:*18* 104:8
108:*10* 109:2,
*25* 110:*4, 8, 17,*
*24* 111:*17, 21*
112:*14* 119:*4,*
*14* 121:*10, 19,*
*23* 125:*25*
128:*10* 135:*11*
138:*4, 5*
148:22 151:*12*
155:*23* 157:*8*
162:*5, 13, 23*
168:*19* 169:6
173:*19* 175:*8,*
*22* 184:*20*
185:*11, 21*
186:*3, 18*
198:*1*
**telling** 154:22
178:*13*
**Ten** 92:*11*
106:*14* 108:*3,*
*12* 114:*12*
115:*3, 5, 6, 11*
116:*3, 10*
117:*11* 125:*10*
137:9 138:*20*
183:*15* 190:*11*
**tend** 108:*24*
**tender** 106:*10*
**term** 90:*11, 17*
164:*11*

**terms** 137:*22,*
*22* 172:7
**terrible** 139:*15*
**testified** 87:2
106:*16* 107:*24*
113:*16* 117:*24*
129:*18* 140:*15*
150:*23* 190:7
192:*23*
**testify** 87:*18,*
*22* 89:*3*
**testifying**
127:*22*
**testimony**
109:5 112:5
129:*21* 151:*15,*
*19* 190:5
194:*15, 23*
201:*10, 14*
**tests** 148:*25*
**Texas** 182:*4*
183:22 184:*14*
**Thank** 95:22
103:*24* 116:2
142:*10* 181:8
192:*18* 199:*19,*
*25*
**theirs** 91:*13*
**therapy**
133:*10, 14, 18*
159:25 164:*15*
169:2
**thereof** 201:*17*
**thing** 88:*18*
136:*25* 196:7
**things** 91:*16*
103:*4, 5* 112:2
138:*8* 152:*14*
169:*19, 21*
187:7 188:*19*
189:*15, 21*
**think** 88:9
91:*18* 101:22
104:22 105:*23*
106:*25* 107:*17*
111:*2, 20*
112:9 115:*4, 4,*
*5* 118:*20*
120:22 125:8
129:*5, 18, 22*
131:*3, 23*

138:8 139:*17*
140:*10* 152:2
161:*20* 164:*1*
169:*15* 172:22
178:*13* 180:*17*
183:2, *15*
188:*11* 194:24
199:*19*
**thinking**
112:*10, 13*
138:7
**thinks** 147:*3*
186:*3*
**third** 105:8
123:9, *22*
138:*19* 145:*14*
149:*6, 11*
164:6
**thought** 129:2
156:*11*
**three** 103:*2*
105:*18* 106:*15*
108:*3, 13, 17*
112:*15, 17*
114:*7* 125:*3,*
*5* 132:*3* 150:7
162:*15* 178:9
**thyroid** 141:*11*
**time** 87:*11, 14*
88:*12* 89:7
91:*14* 95:*4, 11,*
*13* 96:8 98:*23*
100:*18, 19*
105:*13* 108:7
111:9, *19, 22*
117:8, *10*
118:*25* 119:*2,*
*7, 13, 17* 120:*4*
124:*11, 17*
125:9 130:*9,*
*10* 131:*7, 9, 11,*
*12* 137:*23*
139:*20, 22*
140:*21, 25*
142:*18, 25*
143:*3, 7* 144:*5,*
*9* 145:*17*
146:*6, 10, 14*
149:*16, 25*
150:*20* 151:*9,*
*13, 25* 152:*4*

Becky R. Smith

153:7  154:4,
24  155:24
157:21  163:11
164:10, 16
165:2  168:21
171:23  178:23
181:1  185:6,
15  188:6, 10
191:18  192:18
194:13  195:12
196:2  197:7,
11  198:14
199:11  201:6
**timeline** 154:7
**times** 98:20,
22  107:16
114:17  117:16
118:7  150:3, 5,
6, 7  152:22
153:3  193:20
**tingling**
134:24, 25
135:7  136:23
**tired** 138:7
140:7
**tiring** 189:1
**tissue** 166:18
181:15
**tissues** 186:25
**today** 87:10,
19, 22  89:8
91:3  92:2, 9
93:18  102:4,
12  120:10
134:13  136:4,
10  138:10
141:6  192:23
198:21
**today's** 92:13
93:11
**told** 90:2
101:18  112:23
113:9  119:22
122:3, 6, 10, 22
123:5  126:15,
25  127:10, 21,
23  136:18
146:8  147:7
156:1, 3  160:8,
10  169:9
172:1  176:18

187:14  189:10
191:19, 22, 25
192:4, 8
196:15  197:20
**top** 91:18
97:6  107:9
**touched**
181:14
**trailer** 183:24
189:18
**trailering**
184:5
**transcript**
128:5  201:12
**travel** 133:6
172:21  183:24
184:5
**treated** 120:2,
18, 19  129:6,
12, 15, 19, 22
132:13  134:23
135:2  141:9
153:21, 25
**treating** 92:16
196:1
**treatment**
92:21, 24
114:15, 17
131:25  132:10
133:3, 7
135:19  136:6
143:7  144:5
152:10  172:16
196:22  199:9
**tried** 161:21
168:23  169:6,
8, 18, 18, 18, 25
182:8  188:16,
16
**trigger** 133:22
160:2
**trimmed**
145:21
**trip** 181:24
182:1, 5  183:5,
17, 21, 21, 25
184:12, 15
**troublesome**
124:3
**truck** 183:23

**true** 95:3, 16
98:3, 4  104:4
118:3  126:17
149:16, 21
150:21  151:5,
6  158:8, 23
164:12, 16, 17,
19  165:1
169:11  170:18
171:23  177:22
178:23  188:6
201:13
**trust** 154:12
178:24
**truth** 88:24,
24, 24  111:18
**try** 88:8
116:4  126:19
133:10  134:5,
6, 7  142:13
156:20  169:13
172:7  195:11
**trying** 106:18
159:22  169:14,
14, 16, 21
170:4  183:20
**tunnel** 134:25
135:14, 17
136:4, 9, 20, 24,
25  189:4
**turn** 108:11
123:18  128:9,
20
**TVH** 157:16
**two** 99:25
104:17  105:6,
8  108:12, 19
112:8, 10, 13
114:23, 25
116:6  121:16
178:8  179:20
180:19  182:23
183:9, 10, 14,
16  187:6
**two-month**
181:24  182:1,
18, 24  183:5
**type** 92:24
106:19  107:24
124:13  133:18,
20, 22  136:6

148:7  162:1
191:8
**types** 118:14
169:16
**typewriting**
201:11

**< U >**
**Uh-huh** 89:18
96:14  98:17
103:24  109:17
115:24  116:17,
21  117:12, 14
123:11, 25
126:10  127:1
129:10  130:16
132:8  134:10
135:8, 25
138:16, 23
145:25  149:15
150:12  152:18
159:5  173:1
177:13, 21
178:10  185:10
199:5
**unable** 184:16,
17  196:11
**understand**
88:6, 12, 25
89:4, 10, 14, 22,
24  90:9, 15, 20,
24  103:23
106:18  111:2
125:23  139:17
150:13  153:20
154:6  163:21
189:23
**understanding**
103:3, 8
104:16  105:5
118:14  129:11,
21  153:24
167:4  175:25
188:22
**understated**
111:16
**understood**
88:14  152:6
172:1
**UNITED** 84:1
**unwell** 196:4

**update** 96:4
97:16  104:22
**urinary**
177:17  179:21,
24
**urine** 123:25
124:1  179:17
**use** 90:11, 17
151:2  166:18
181:18  196:8
**usually** 111:23

**< V >**
**vacations**
184:2
**vagina** 148:13,
16  157:4
**vaginal** 104:17
105:6, 24
106:2  107:6,
22, 24  109:2, 9,
21  110:1, 5, 9,
18  112:20, 24
113:5, 10
126:1  132:5
145:21  146:11,
15  147:7
148:8, 10, 20
149:1  155:19
158:11  164:7,
10  169:1, 4
171:5, 12
175:5  177:18
180:14, 22, 23
181:4, 11, 13
184:21  185:22
186:2, 6, 25
187:3, 15, 20
198:15
**vaginally**
158:2
**vague** 137:22
**vehicle** 91:6
141:24
**verbally** 88:2
**verbatim**
126:18
**version** 96:18
**versus** 155:4
175:23

viable 170:*15*
videos 162:*1*
**VIRGINIA**
84:*1*
visit 109:*14*
138:*14* 145:*10*
146:*23* 148:*5*
151:*21* 177:*8*,
*12* 178:*14*, *16*,
*25* 179:*2*, *5*, *6*
185:*9*, *21*
187:*2*
visited 155:*24*
visits 99:*6*, *10*,
*15*
voided 158:*3*
voiding 179:*13*
**Volume** 84:*15*
vs 84:*9* 86:*13*

< W >
wages 98:*2*
**WAGSTAFF**
85:*7*
wait 187:*8*
waited 114:*25*
waive 199:*24*
walk 130:*6*, *11*
131:*6*, *8*, *11*
134:*5* 140:*7*, *8*
walking
105:*10* 124:*5*
130:*6* 134:*6*
169:*19*, *20*
193:*7*
wall 185:*23*
186:*2*, *6*
187:*15*
want 95:*20*
100:*6*, *14*
101:*21* 108:*1*
111:*12* 123:*14*
128:*19* 145:*8*
151:*25* 157:*14*
159:*12* 163:*6*
174:*10* 177:*4*
180:*10* 195:*10*
wanted 101:*12*
111:*25* 144:*7*,
*14* 183:*8*
185:*19*

warned 172:*4*,
*9*
warnings
192:*5*
warranty
191:*14*
**Washington**
201:*4*
watch 184:*11*
watched 182:*6*
watching
182:*8* 184:*1*, *7*,
*9*
**Waugh** 97:*11*
109:*13*, *16*, *18*,
*19*, *20*, *25*
121:*12*, *13*
146:*23*, *24*
147:*7* 148:*4*,
*25* 154:*8*, *15*,
*22*, *24* 155:*8*
156:*2* 157:*2*, *9*
165:*8* 167:*14*,
*15*, *24*
**W-A-U-G-H**
97:*11* 109:*19*
way 114:*4*
119:*16* 130:*24*
136:*25* 145:*5*,
*7* 162:*10*
163:*19* 184:*10*
185:*5* 194:*19*
**WCSR** 85:*2*
201:*23*
website 93:*20*,
*21* 161:*12*
**Wednesday**
85:*2*
week 91:*10*
124:*4* 150:*4*
177:*13* 178:*2*
weeks 115:*3*, *5*,
*6*, *11* 116:*3*, *6*,
*10* 117:*11*
178:*8*, *9*
180:*19* 183:*10*,
*10*, *15*, *16*
weight 198:*12*
well 101:*22*
108:*19* 117:*2*
118:*3*, *19*

124:*21* 128:*22*
134:*5* 139:*19*
140:*10* 150:*16*
153:*17* 154:*9*
156:*7*, *9* 157:*2*,
*22* 158:*3*
164:*19* 169:*14*
170:*1* 174:*22*
176:*22* 179:*8*
180:*6* 182:*9*
184:*7* 185:*4*
186:*16* 187:*21*
189:*15* 191:*6*
197:*11* 198:*3*,
*7*, *22* 199:*11*
**Wellbutrin**
137:*7*, *10*, *11*,
*15* 138:*2*
139:*18* 192:*24*
195:*14*, *19*
196:*13*, *18*
197:*15*, *16*, *23*
198:*2*, *17*, *18*,
*22* 199:*2*
went 98:*16*
101:*19* 109:*10*
116:*6*, *13*
120:*19* 128:*13*
132:*12* 135:*16*
139:*13*, *17*
147:*20*, *22*, *23*
156:*1* 158:*11*,
*17* 174:*21*
176:*22* 183:*21*,
*21* 184:*4*, *5*
195:*22* 196:*3*
198:*9*, *14*
we're 89:*8*
101:*24* 106:*22*
111:*23* 112:*19*
117:*12* 125:*22*
130:*3* 131:*1*
137:*24* 148:*1*
149:*3*, *10*
151:*21*, *23*
154:*7*, *8*
157:*13* 163:*10*
164:*4* 182:*17*,
*17* 183:*12*
190:*18*
**WEST** 84:*1*

**We've** 132:*3*
133:*15* 155:*18*
whatnot
108:*25*
**Wheeler** 99:*21*
**Wildlife** 184:*6*
wish 95:*10*
witness 201:*7*,
*10*, *15*, *18*
woman 199:*11*
women 166:*17*
wood 189:*16*
word 166:*9*
words 113:*8*
119:*13* 122:*15*
work 91:*9*
92:*3* 114:*23*
170:*6* 173:*16*
182:*8*
working 149:*7*,
*13* 198:*3*, *7*, *8*,
*10*, *14*, *22*
works 196:*21*
worried 117:*4*
188:*17*, *18*
worse 113:*22*
114:*5* 125:*8*, *8*,
*13*, *13* 130:*14*,
*23*
worsens
150:*18*
wrist 144:*2*
written 190:*2*
wrong 130:*12*
180:*17* 191:*20*

< Y >
**Yeah** 92:*19*
115:*7* 128:*14*
131:*2* 140:*10*
year 98:*25*
137:*10* 139:*2*
144:*16* 145:*22*
150:*7* 158:*10*,
*17*, *19* 182:*10*,
*11* 195:*16*
196:*6*, *10*
198:*9*, *13*
years 120:*17*
124:*25* 125:*1*,
*3*, *5*, *7*, *11*

137:*9*, *9*
138:*21* 153:*11*
157:*15*, *18*
yoga 169:*18*
170:*1* 188:*2*,
*19* 189:*7*
younger
159:*14*

< Z >
zero 150:*6*
**Zumba** 169:*18*
170:*1* 188:*2*

# EXHIBIT 4

Case 2:15-cv-16402   Document 42-1   Filed 08/14/19   Page 141 of 299 PageID #: 446





U.S. Food and Drug Administration

Home > Medical Devices > Medical Device Safety > Alerts and Notices (Medical Devices)

## Medical Devices

### FDA Public Health Notification: Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence

For updated information about Surgical Mesh for Pelvic Organ Prolapse, see: UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse [1], released July 13, 2011.

Issued: October 20, 2008

Dear Healthcare Practitioner:

This is to alert you to complications associated with transvaginal placement of surgical mesh to treat Pelvic Organ Prolapse (POP) and Stress Urinary Incontinence (SUI). Although rare, these complications can have serious consequences. Following is information regarding the adverse events that have been reported to the FDA and recommendations to reduce the risks.

**Nature of the Problem**

Over the past three years, FDA has received over 1,000 reports from nine surgical mesh manufacturers of complications that were associated with surgical mesh devices used to repair POP and SUI. These mesh devices are usually placed transvaginally utilizing tools for minimally invasive placement.

The most frequent complications included erosion through vaginal epithelium, infection, pain, urinary problems, and recurrence of prolapse and/or incontinence. There were also reports of bowel, bladder, and blood vessel perforation during insertion. In some cases, vaginal scarring and mesh erosion led to a significant decrease in patient quality of life due to discomfort and pain, including dyspareunia.

Treatment of the various types of complications included additional surgical procedures (some of them to remove the mesh), IV therapy, blood transfusions, and drainage of hematomas or abscesses.

Specific characteristics of patients at increased risk for complications have not been determined. Contributing factors may include the overall health of the patient, the mesh material, the size and shape of the mesh, the surgical technique used, concomitant procedures undertaken (e.g. hysterectomy), and possibly estrogen status.

**Recommendations**

Physicians should:

- Obtain specialized training for each mesh placement technique, and be aware of its risks.
- Be vigilant for potential adverse events from the mesh, especially erosion and infection.
- Watch for complications associated with the tools used in transvaginal placement, especially bowel, bladder and blood vessel perforations.
- Inform patients that implantation of surgical mesh is permanent, and that some complications associated with the implanted mesh may require additional surgery that may or may not correct the complication.
- Inform patients about the potential for serious complications and their effect on quality of life, including pain during sexual intercourse, scarring, and narrowing of the vaginal wall (in POP repair).
- Provide patients with a written copy of the patient labeling from the surgical mesh manufacturer, if available.

Additional patient information [2] can be found on the following FDA Consumer website.

**Reporting Adverse Events to FDA**

FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices. If you suspect that a reportable adverse event was related to the use of surgical mesh, you should follow the reporting procedure established by your facility.

We also encourage you to report adverse events related to surgical mesh that do not meet the requirements for mandatory reporting. You can report directly to MedWatch, the FDA Safety Information and Adverse Event Reporting program online [3], by phone at 1-800-FDA-1088, or obtain the fillable form online [4], print it out and fax to 1-800-FDA-0178 or mail to MedWatch, 5600 Fishers Lane, Rockville, MD 20852-9787.

**Getting More Information**

If you have questions about this Notification, please contact FDA's Office of Surveillance and Biometrics by e-mail at phann@fda.hhs.gov or by phone at 301-796-6640.

FDA Medical Device Public Health Notifications [5] are available on the Internet. You can also be notified through email each time a new Public Health Notification is added to our web page. To subscribe, visit: http://service.govdelivery.com/service/subscribe.html?code=USFDA_39 [6].

Sincerely,

Daniel G. Schultz, MD
Director
Center for Devices and Radiological Health
Food and Drug Administration

Links on this page:

1. /MedicalDevices/Safety/AlertsandNotices/ucm262435.htm
2. /MedicalDevices/Safety/AlertsandNotices/ucm142636.htm
3. /Safety/MedWatch/default.htm
4. /Safety/MedWatch/HowToReport/DownloadForms/default.htm

5. /MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/default.htm

6. http://service.govdelivery.com/service/subscribe.html?code=USFDA_39

# EXHIBIT 5



U.S. Department of Health & Human Services

**U.S. Food and Drug Administration**

Home > Medical Devices > Medical Device Safety > Alerts and Notices (Medical Devices)

## Medical Devices

### FDA Safety Communication: UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse

**Date Issued:** July 13, 2011

**Audience:**

- Health care providers who implant surgical mesh to repair pelvic organ prolapse and/or stress urinary incontinence
- Health care providers involved in the care of patients with surgical mesh implanted to repair pelvic organ prolapse and/or stress urinary incontinence
- Patients who are considering or have received a surgical mesh implant to repair pelvic organ prolapse and/or stress urinary incontinence

**Medical Specialties:** gynecology, urogynecology, urology, general surgery, internal medicine, family practice, emergency medicine

**Device:**
Surgical mesh is a medical device that is generally used to repair weakened or damaged tissue. It is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat urinary incontinence.

**Background:**
**Pelvic Organ Prolapse**
Pelvic organ prolapse (POP) occurs when the tissues that hold the pelvic organs in place become weak or stretched. Thirty to fifty percent of women may experience POP in their lifetime with 2 percent developing symptoms. When POP happens, the organs bulge (prolapse) into the vagina and sometimes prolapse past the vaginal opening. More than one pelvic organ can prolapse at the same time. Organs that can be involved in POP include the bladder, the uterus, the rectum, the top of the vagina (vaginal apex) after a hysterectomy, and the bowel.

**Stress Urinary Incontinence**
Stress urinary incontinence (SUI) is a leakage of urine during moments of physical activity, such as coughing, sneezing, laughing, or exercise.

**Purpose:**
On Oct. 20, 2008, the FDA issued a Public Health Notification and Additional Patient Information on serious complications associated with surgical mesh placed through the vagina (transvaginal placement) to treat POP and SUI.

Based on an updated analysis of adverse events reported to the FDA and complications described in the scientific literature, the FDA identified surgical mesh for transvaginal repair of POP as an area of continuing serious concern.

The FDA is issuing this update to inform you that serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**. This is a change from what the FDA previously reported on Oct. 20, 2008. Furthermore, it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk. This Safety Communication provides updated recommendations for health care providers and patients and updates the FDA's activities involving surgical mesh for the transvaginal repair of POP.

*The FDA continues to evaluate the effects of using surgical mesh to repair SUI and will communicate these findings at a later date.*

For detailed information, please see: Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse.[1]

**Summary of Problem and Scope:**
In the Oct. 20, 2008 FDA Public Health Notification, the number of adverse events reported to the FDA for surgical mesh devices used to repair POP and SUI for the previous 3-year period (2005 – 2007) was "over 1,000." Since then, from Jan. 01, 2008 through Dec. 31, 2010, the FDA received 2,874 additional reports of complications associated with surgical mesh devices used to repair POP and SUI, with 1,503 reports associated with POP repairs and 1,371 associated with SUI repairs. Although it is common for adverse event reporting to increase following an FDA safety communication, we are concerned that the number of adverse event reports remains high.

From 2008 – 2010, the most frequent complications reported to the FDA for surgical mesh devices for POP repair include mesh erosion through the vagina (also called exposure, extrusion or protrusion), pain, infection, bleeding, pain during sexual intercourse (dyspareunia), organ perforation, and urinary problems. There were also reports of recurrent prolapse, neuro-muscular problems, vaginal scarring/shrinkage, and emotional problems. Many of these complications require additional intervention, including medical or surgical treatment and hospitalization.

In order to better understand the use of surgical mesh for POP and SUI, the FDA conducted a systematic review of the published scientific literature from 1996 – 2011 to evaluate its safety and effectiveness. The review showed that transvaginal POP repair with mesh does not improve symptomatic results or quality of life over traditional non-mesh repair. The FDA continues to evaluate the literature for SUI surgeries using surgical mesh and will report about that usage at a later date.

In particular, the literature review revealed that:

- Mesh used in transvaginal POP repair introduces risks not present in traditional non-mesh surgery for POP repair.
- Mesh placed abdominally for POP repair appears to result in lower rates of mesh complications compared to transvaginal POP surgery with mesh.
- There is no evidence that transvaginal repair to support the top of the vagina (apical repair) or the back wall of the vagina (posterior repair) with mesh provides any added benefit compared to traditional surgery without mesh.
- While transvaginal surgical repair to correct weakened tissue between the bladder and vagina (anterior repair) with mesh augmentation may provide an anatomic benefit compared to traditional POP repair without mesh, this anatomic benefit may not result in better symptomatic results.

The FDA's literature review found that *erosion* of mesh through the vagina is the *most common and consistently reported mesh-related complication* from transvaginal POP surgeries using mesh. Mesh erosion can require multiple surgeries to repair and can be debilitating for some women. In some cases, even multiple surgeries will not resolve the complication.

*Mesh contraction* (shrinkage) is a *previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA since the Oct. 20, 2008 *FDA Public Health Notification*. Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain.

Both mesh erosion and mesh contraction may lead to severe pelvic pain, painful sexual intercourse or an inability to engage in sexual intercourse. Also, men may experience irritation and pain to the penis during sexual intercourse when the mesh is exposed in mesh erosion.

The complications associated with the use of surgical mesh for POP repair have not been linked to a single brand of mesh.

Recommendations for Health Care Providers:

As stated in the Oct. 20, 2008 Public Health Notification, the FDA continues to recommend that health care providers should:

- Obtain specialized training for each mesh placement technique, and be aware of the risks of surgical mesh.
- Be vigilant for potential adverse events from the mesh, especially erosion and infection.
- Watch for complications associated with the tools used in transvaginal placement, especially bowel, bladder and blood vessel perforations.
- Inform patients that implantation of surgical mesh is permanent, and that some complications associated with the implanted mesh may require additional surgery that may or may not correct the complication.
- Inform patients about the potential for serious complications and their effect on quality of life, including pain during sexual intercourse, scarring, and narrowing of the vaginal wall in POP repair using surgical mesh.
- Provide patients with a copy of the patient labeling from the surgical mesh manufacturer if available.

In addition, the FDA also recommends that health care providers:

- Recognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications.
- Choose mesh surgery only after weighing the risks and benefits of surgery with mesh versus all surgical and non-surgical alternatives.
- Consider these factors before placing surgical mesh:
  - Surgical mesh is a permanent implant that may make future surgical repair more challenging.
  - A mesh procedure may put the patient at risk for requiring additional surgery or for the development of new complications.
  - Removal of mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible and may not result in complete resolution of complications, including pain.
  - Mesh placed abdominally for POP repair may result in lower rates of mesh complications compared to transvaginal POP surgery with mesh.
- Inform the patient about the benefits and risks of non-surgical options, non-mesh surgery, surgical mesh placed abdominally and the likely success of these alternatives compared to transvaginal surgery with mesh.
- Notify the patient if mesh will be used in her POP surgery and provide the patient with information about the specific product used.
- Ensure that the patient understands the postoperative risks and complications of mesh surgery as well as limited long-term outcomes data.

## Recommendations for Patients:
### Before Surgery
Be aware of the risks associated with surgical mesh for transvaginal repair of POP. Know that having a mesh surgery may put you at risk for needing additional surgery due to mesh-related complications. In a small number of patients, repeat surgery may not resolve complications.

Ask your surgeon about all POP treatment options, including surgical repair with or without mesh and non-surgical options, and understand why your surgeon may be recommending treatment of POP with mesh.

In addition, ask your surgeon these questions before you agree to have surgery in which surgical mesh will be used:

- Are you planning to use mesh in my surgery?
- Why do you think I am a good candidate for surgical mesh?
- Why is surgical mesh being chosen for my repair?
- What are the alternatives to transvaginal surgical mesh repair for POP, including non-surgical options?
- What are the pros and cons of using surgical mesh in my particular case? How likely is it that my repair could be successfully performed without using surgical mesh?
- Will my partner be able to feel the surgical mesh during sexual intercourse? What if the surgical mesh erodes through my vaginal wall?
- If surgical mesh is to be used, how often have you implanted this particular product? What results have your other patients had with this product?
- What can I expect to feel after surgery and for how long?
- Which specific side effects should I report to you after the surgery?
- What if the mesh surgery doesn't correct my problem?
- If I develop a complication, will you treat it or will I be referred to a specialist experienced with surgical mesh complications?
- If I have a complication related to the surgical mesh, how likely is it that the surgical mesh could be removed and what could be the consequences?
- If a surgical mesh is to be used, is there patient information that comes with the product, and can I have a copy?

### After Surgery

- Continue with your annual and other routine check-ups and follow-up care. There is no need to take additional action if you are satisfied with your surgery and are not having complications or symptoms.
- Notify your health care provider if you have complications or symptoms, including persistent vaginal bleeding or discharge, pelvic or groin pain or pain with sex, that last after your follow-up appointment.
- Let your health care provider know you have surgical mesh, especially if you plan to have another surgery or other medical procedures.
- Talk to your health care provider about any questions you may have.

If you had POP surgery, but do not know whether your surgeon used mesh, ask your health care provider at your next scheduled visit.

### FDA Activities:
The FDA is working in several areas to assess and improve the safety and effectiveness of urogynecologic mesh products. The FDA will:

- Convene the Obstetrics-Gynecology Devices Panel of the Medical Device Advisory Committee, on September 8-9, 2011.The panel will discuss and make recommendations regarding the safety and effectiveness of transvaginal surgical mesh for POP and SUI.
- Explore regulatory solutions to answer questions about the safety and effectiveness of urogynecologic mesh products that are now being marketed and those that will be reviewed for marketing in the future.
- Continue to monitor adverse events reported to FDA associated with surgical mesh used to repair POP and SUI, as well as assessing any and all data as it becomes available.

### Reporting Problems to the FDA:
Prompt reporting of adverse events can help the FDA identify and better understand the risks associated with medical devices. If you suspect a problem with surgical mesh, we encourage you to file a voluntary report through MedWatch, the FDA Safety Information and Adverse Event Reporting program[2]. Health care personnel employed by facilities that are subject to the FDA's user facility reporting requirements[3] should follow the reporting procedures established by their facilities. Device manufacturers must comply with the Medical Device Reporting (MDR) regulations[4].

To help us learn as much as possible about the adverse events associated with surgical mesh to repair POP and SUI, please include the following information in your reports, if available:

- Manufacturer's name
- Product name (brand name)
- Catalog number
- Lot number
- Size
- Date of implant
- Date of explant (if mesh was removed)
- Details of the adverse event and medical and/or surgical interventions (if required)
- Type of procedure (e.g., anterior or posterior repair, sacral colpopexy, sling procedure for SUI)
- Surgical approach: (e.g., vaginal, abdominal, laparoscopic)
- Reason for mesh implantation: (e.g., POP of the uterus, bladder, rectum, vaginal apex or bowel, SUI)
- Specific postoperative symptoms experienced by the patient with time of onset and follow-up treatment

**Contact Information:**
If you have questions about this communication, please contact the Division of Small Manufacturers, International and Consumer Assistance (DSMICA) at DSMICA@FDA.HHS.GOV, 800-638-2041 or 301-796-7100.

*This document reflects the FDA's current analysis of available information, in keeping with our commitment to inform the public about ongoing safety reviews of medical devices.*

## Additional Information

- Urogynecologic Surgical Mesh Implants [5]
- Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse (July 2011) (PDF - 243KB) [6]
- Press Release: Surgical placement of mesh to repair pelvic organ prolapse poses risks [7]
- Federal Register Notice: Urogynecologic Surgical Mesh [8]
- Federal Register Notice Ammendment: Urogynecologic Surgical Mesh [9]

Links on this page:

1. /downloads/MedicalDevices/Safety/AlertsandNotices/UCM262760.pdf
2. http://www.fda.gov/Safety/MedWatch/HowToReport/default.htm
3. /MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm
4. /MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm
5. /MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/UroGynSurgicalMesh/default.htm
6. /downloads/MedicalDevices/Safety/AlertsandNotices/UCM262760.pdf
7. /NewsEvents/Newsroom/PressAnnouncements/ucm262752.htm
8. http://www.gpo.gov/fdsys/pkg/FR-2011-07-14/pdf/2011-17695.pdf
9. http://www.gpo.gov/fdsys/pkg/FR-2011-08-15/pdf/2011-20644.pdf

# EXHIBIT 6



*Polymer Science & Material Chemistry*

**Expert Report of**

**Dr. Maureen Reitman**

**This document relates to:**
*C.R. Bard, Inc., Pelvic
System Products Liability
Litigation*

*United States District Court for the
Southern District of West Virginia;
Charleston Division
Bard Wave 9 Cases*

**CONFIDENTIAL**
**Subject to Protective Order**

E*ponent®

**Expert Report of**

**Dr. Maureen Reitman**

**This document relates to:**
*C.R. Bard, Inc., Pelvic*
*System Products Liability*
*Litigation*

*United States District Court for the*
*Southern District of West Virginia;*
*Charleston Division*
*Bard Wave 9 Cases*

Prepared by:

Exponent
9 Strathmore Rd
Natick, MA 01760

June 24, 2019
© Exponent, Inc.

# Contents

|  | Page |
|---|---|
| **List of Figures** | **6** |
| **List of Tables** | **9** |
| **List of Appendices** | **10** |
| **Limitations** | **11** |
| **Executive Summary** | **12** |
| **1    Scope of Report** | **15** |
| 1.1    Scope of work | 15 |
| 1.2    Qualifications and Disclosures | 15 |
| 1.3    Information Considered | 16 |
| **2    Document Review and Analysis** | **18** |
| 2.1    Bard TVM Mesh Materials | 18 |
| 2.1.1    Overview of Surgical Mesh History | 18 |
| 2.1.2    Mesh Characteristics | 19 |
| 2.1.3    Vaginal/Pelvic Tissue Repair Products | 19 |
| 2.2    Wound Healing and Biocompatibility | 21 |
| 2.2.1    Healing Processes and Implanted Devices | 21 |
| 2.2.2    Biocompatibility | 22 |
| 2.3    Avaulta Solo and Avaulta Plus Products | 27 |
| 2.3.1    Similarities with Predicate Products | 27 |
| 2.3.2    Avaulta Solo and Avaulta Plus Product Development | 28 |
| 2.3.3    Avaulta Products Manufacturing Process | 32 |
| 2.3.4    Avaulta Products Regulatory Overview | 32 |
| 2.3.5    Avaulta Products Risk Analysis | 33 |
| 2.3.6    Avaulta Products Postmarket Surveillance and Postmarket Risk Analysis | 33 |
| 2.3.7    Avaulta Product Instructions for Use | 34 |
| 2.4    Align Product | 34 |
| 2.4.1    Similarities of Align to Predicate Products | 35 |
| 2.4.2    Align Product Development | 35 |
| 2.4.3    Product Evaluation by Industry and Scientifically Accepted Standards | 36 |
| 2.4.4    Align Manufacturing Process | 37 |

2.4.5    Align Regulatory Overview                                                           38

2.4.6    Align Risk Analysis                                                                 39

2.4.7    Align Post-Market Surveillance and Risk Analysis                                    39

2.4.8    Align Instructions for Use                                                          40

2.5    Align and Avaulta Product Development Activities                                      40

**3    Mesh Testing and Analysis                                                             41**

3.1    Cleaning                                                                              42

3.2    Visual and Microscopic Condition                                                      49

3.2.1    Exemplar Materials                                                                  49

3.2.2    Explant Mesh                                                                        50

3.3    Antioxidant Analysis                                                                  56

3.4    Spectroscopic Evaluation                                                             58

3.4.1    Exemplar Materials                                                                 58

3.4.2    Explanted Materials                                                                58

3.5    Thermal Evaluation                                                                  60

3.5.1    Exemplar Materials                                                                 60

3.6    Resistance to Chemical and Forced Oxidative Degradation                             62

3.6.1    Oxidative Induction Time for Exemplar Materials                                    62

3.6.2    Chemical Exposure of Exemplar Materials                                            62

3.6.3    Exposure of Exemplar Mesh to QUV Testing                                           63

**4    General Response to Previous Plaintiffs' Testing and Opinions Related
to Bard's TVM Products                                                                      70**

4.1    Marlex HGX 030-01 polypropylene is a reasonable and stable biomaterial              71

4.1.1    MSDS language does not mean the material is incompatible or unsuitable for
use in humans as part of qualified, finished implantable medical products.                 72

4.1.2    Literature references to the potential for polypropylene oxidation do not
provide specific scientific support for the hypothesis that the Plaintiffs' meshes are
oxidized *in vivo*                                                                         74

4.2    Mesh explants are not oxidized                                                      77

4.2.1    SEM does not show oxidation of the mesh explants                                  77

4.2.2    FTIR does not show oxidation of mesh explants                                     78

4.3    Bard TVM products are not defectively designed or manufactured                      79

4.4    Responses to Plaintiffs' Experts                                                    80

**5    Opinions**                                                                                   **81**

**Bibliography**                                                                              **85**

# List of Figures

Page

Figure 1. SEM of Smith explant prior to cleaning reagent exposure.    44

Figure 2. SEM from the same explant as Figure 1, after partial cleaning (25 minutes) in bleach.  The crust is peeling and curling away from the fiber as a broken layer, revealing a smooth fiber surface consistent with pristine mesh.    44

Figure 3. Figure from De Tayrac (2011) showing crust around a pristine PP fiber    45

Figure 4 Comparison of first cleaning and last cleaning of the Katsiafas explant.  The majority of the crust has been removed, revealing the uncracked fiber, including typical extrusion line features of a pristine fiber, underneath the crust.  (Images from the same location at different points in the cleaning process).    47

Figure 5  FTIR Comparison of an explant showing FTIR spectra after the first cleaning step (blue) and after the final cleaning step (red).  The peaks in the 1600-1800 cm$^{-1}$ range and 3000-3700 cm$^{-1}$ range are significantly reduced or no longer present, indicating removal of the source of the related functional groups.    47

Figure 6 EDS map of three different explants after the first bleach cleaning step illustrating compositional differences between the cracked crust and the underlying smooth fiber.  EDS maps of an exemplar and an intentionally oxidized exemplar (QUV) after the first bleach cleaning step do not contain atomic species like sodium, chlorine, sulfur, etc. that may be associated with explants.    48

Figure 7 SEM image of an explant showing areas of exposed, uncracked polypropylene.    51

Figure 8 Image of an explant showing areas of visible surface deposit, exposed, uncracked surface underneath and the crust layer peeling off the pristine surface.    52

Figure 9 Images of explants from previous reports (A, 1.5 years implanted), (B, 2.6 years implanted), (C, 5.9 years implanted), and (D, 5.4 years implanted).  A, B, and C show similar thicknesses of the deposited layer and uncracked fiber underneath.  A, B, and C explant images are after all cleaning steps from Wave 3 Minwave 1 cases in the MDL 2187 litigation. D, is after an initial cleaning with bleach and did not have an observable brittle crust, despite its 5.4 years of implantation.    53

Figure 10  Evidence of ductile mechanical behavior (yellow arrows) in various explants.  Images A,B,D,E at 250x.  Images C,F at 500x.    53

Figure 11 Images of explants showing differences in crust morphology and presence depending on mesh location. Top Row: 4.3 years implantation. Bottom Row: 10 years implantation. (Images were taken after initial bleach soak).     54

Figure 12 Comparison of cross-section images created using a FIB.  The two left images are of an explant from a previous report and the two right images are of a sample intentionally oxidized for 7 days.  Paired images have the same magnification.     55

Figure 13. Comparison of intentionally oxidized PP mesh by QUV (left) and an explanted mesh after the 1st cleaning step (right).  Red arrows indicate obvious sites of damage associated degradation, which are not present on the explant.  Yellow arrows indicate areas where crust is not present, a condition not observed in the oxidized PP.     56

Figure 14. SEM Images of intentionally oxidized exemplar mesh irradiated at 0.89 W/m$^2$ at 60ºC after 3 days with (left) with a 1 lb load attached and (right) with no attached load.  After three days with load, numerous cracks can be seen as well as signs of major degradation.  Cracking is observed with no load, although in less amount.     64

Figure 15. SEM images of before and after the full cleaning procedure of (left) an intentionally oxidized exemplar mesh, (middle) an explanted mesh (previous report), and (right) a pristine exemplar.  Cleaning intensifies cracking in an oxidized fiber, but cleaning the explant reveals smooth fiber similar to the exemplar.     65

Figure 16 Comparison of intentionally oxidized samples from QUV radiation with an exemplar material.  Observation times and load conditions are noted in legend.  Sample Avaulta 3 fractured after day 3, and was removed from QUV testing by day 5.     66

Figure 17 SEM image of exemplar mesh after 10 days QUV irradiation of 0.89 W/m2 at 60ºC     67

Figure 18 TGA comparison of intentionally oxidized samples by QUV irradiation with exemplar materials.  (Top) Weight Change vs Temperature, (bottom) Weight Percent Loss vs Temperature     68

Figure 19. TGA derivative plots comparing literature data and Exponent's data with intentionally oxidized samples     69

Figure 20.  SEM images of surface features of polypropylene mesh after forced oxidation through ROS or UV light in comparison to surface features on explants.  Top Row: SEM images obtained after immersion in 20 wt% $H_2O_2$ for 5 weeks at 37°C. Devices: A – TVT, B – Advantage, C – Lynx.  Bottom Row: (left) SEM images obtained after 10 days of UV light exposure at elevated temperature (60°C).  Bottom Row: (right) Images of explants. Top Row (*in vitro ROS*) images adapted from Talley et al. (2015).     75

7

Figure 21 Exemplar mesh after being soaked in human serum for 7 days, mechanically flexed and allowed to dry in air.  The deposited film is brittle.                    77

## List of Tables

                                                                              Page

Table 1. Avaulta Solo and Avaulta Plus catalog numbers                         27

Table 2  Catalog Numbers for Align Products                                    34

# List of Appendices

Appendix A.                    CV of Maureen Reitman, Sc.D.
Appendix B.                    Testimony List of Maureen Reitman, Sc.D.
Appendix C.                    List of Materials Considered
Appendix D.                    Plaintiff Specific Information
Appendix E.                    Tissue Repair Materials
Appendix F.                    Mesh Characteristics
Appendix G.                    Vaginal/Pelvic Tissue Repair Products
Appendix H.                    Wound Healing and Tissue Repair
Appendix I.                    Evaluation of Surgical Mesh Biocompatibility
Appendix J.                    Avaulta Overview and Similarities with Predicate Products
Appendix K.                    Avaulta Solo and Avaulta Plus Product Development
Appendix L.                    Avaulta Biocompatibility and Animal Studies
Appendix M.                    Avaulta Regulatory Overview
Appendix N.                    Avaulta Risk Analysis
Appendix O.                    Avaulta Postmarket Surveillance and Risk Analysis
Appendix P.                    Avaulta Instructions for Use
Appendix Q.                    Align Similarities with Predicate Products
Appendix R.                    Align Product Development
Appendix S.                    Align Biocompatibility and Animal Studies
Appendix T.                    Align Regulatory Overview
Appendix U.                    Align Risk Analysis
Appendix V.                    Align Postmarket Surveillance and Risk Analysis
Appendix W.                    Align Instructions for Use
Appendix X.                    Align and Avaulta Development Activities
Appendix Y.                    Mesh Characteristics of Bard Products
Appendix Z.                    Avaulta and Align Manufacturing Processes
Appendix AA.                   Focused Ion Beam (FIB) Analysis
Appendix BB                    Polypropylene Pellet Anti-Oxidant Analysis
Appendix CC.                   Historical FTIR Analysis
Appendix DD.                   Thermal Analysis
Appendix EE.                   Oxidation Induction Time Testing
Appendix FF.                   Resistance to Chemically-Induced Oxidation
Appendix GG.                   Forced Oxidation From Temperature and UV Radiation
Appendix HH.                   Xylene Testing of Explants

# Limitations

Exponent, Inc. ("Exponent") was retained by counsel for C.R. Bard to review documents, perform objective scientific analysis and provide opinions related to the Avaulta Pelvic Support System and Align Urethral Support System product liability litigation.  This report summarizes work performed to-date and presents the findings resulting from that work.  The findings presented herein are made to a reasonable degree of scientific and engineering certainty and/or probability.  Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material (e.g., additional medical records and defense expert reports) as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

This report, and accompanying appendices, contains a summary of my opinions and the basis of my opinions, but should not be construed as complete or verbatim statement of my opinions or the basis thereto.  I expect to answer questions related to my opinions and bases at deposition.

# Executive Summary

The Avaulta Solo and Avaulta Plus pelvic mesh products and Align urethral sling (described herein collectively as "Bard TVM products") are implantable polypropylene meshes used for the repair of pelvic organ prolapse and stress urinary incontinence, respectively.  The Align sling is provided as a strip of polypropylene mesh with characteristics similar to the arms of the Avaulta products.  The shaped designs of the Avaulta meshes enable anterior or posterior repair, and the Avaulta Plus includes a porcine collagen-based layer in the organ-contact areas to provide the surgeon additional choices when addressing patient repair needs.

Implantable polypropylene mesh products have been used for the repair of soft tissue with clinical success since the 1960's; use in urogynecological applications has particularly increased since the 1990's.  Review of design and manufacturing documents, regulatory submissions, and other material related to the Bard TVM products reveal medical devices developed and produced in accordance with accepted scientific, engineering and regulatory expectations for implantable medical devices.  The development processes for both the Avaulta meshes and the Align sling synthesized prior experience, existing data, and product-specific information in a manner that reflected the state of the art in implantable medical product development, and generated information that formed the basis for FDA clearance and subsequent release to the market in June 2007.  The three Bard TVM products have been engineered to have combinations of physical characteristics related to monofilament size, mesh structure, texture and porosity, as well as graft geometry and assembly, and are associated with effective repair and low recurrence rates.

Plaintiffs' experts allege that the Bard TVM products are defective in materials, design and manufacture.  Specifically, Plaintiffs' experts allege that the polypropylene mesh degrades in the body, making it an unacceptable biomaterial.  Plaintiffs' experts have previously asserted that the specific polypropylene used by Bard, Phillips Marlex HGX-030-01, is unacceptable because polypropylene may degrade by oxidation and because data sheet statements for the raw material indicate that the raw material supplier does not support its use in implantable medical devices.  Plaintiffs' experts have previously associated adverse clinical outcomes with the

alleged oxidative degradation of the polypropylene in implanted Bard TVM products. However, no evidence of fracture or physical failure of implanted meshes has been provided, and these potential modes of failure are not identified in the complaint.

Polypropylene has been well characterized chemically and physically in the published literature and has a long history of safe use as a permanently implanted biomaterial. More specifically, Bard mesh products made from Phillips Marlex polypropylene homopolymer have been repeatedly evaluated for biocompatibility using standardized and accepted laboratory methods and animal models. Documents and literature confirm that polypropylene mesh products made in Bard-validated processes from Phillips Marlex polypropylene homopolymer resins have consistently demonstrated biocompatibility and functional performance for soft tissue repair in both abdominal and urogynecological procedures.

Plaintiffs' experts have previously reported that some portion of the subject explanted polypropylene meshes exhibit a brittle surface texture that includes predominantly circumferential cracking and assert that this texture is evidence of oxidation or, alternatively, environmental stress cracking (ESC) resulting from the interaction of cholesterol and the resin. However, direct examination and testing of explanted Bard's TVM and comparison to as-manufactured, intentionally oxidized and chemically challenged exemplar mesh, as well as review of related data from other sources, provides no evidence of oxidative degradation of the polypropylene in the body. While a brittle surface is visible on some portion of the subject explanted polypropylene meshes, it is not from polypropylene oxidation. Plaintiffs' experts' previous data can be reasonably explained by the presence of a surface deposit (e.g., a biofilm) that is more brittle than the polypropylene filaments, rather than the development of a brittle filament surface due to oxidation of the polypropylene. The presence of deposited biofilm is supported by data, such as chemical signatures distinct from those of polypropylene or oxidized polypropylene and non-combustible residues, as well as qualitative observations of film and crack morphology and depth. The presence of deposited biofilm also is consistent with expected biological processes in which proteins and cells adsorb to implanted surfaces, and the effect of post-explant fixatives such as formalin. Thus, Plaintiffs' experts have not provided a reasonable scientific basis for their previous assertion that the polypropylene is oxidized or

failing due to ESC, or that the alleged oxidation or ESC is associated with adverse clinical outcomes.  It is my opinion to a reasonable degree of scientific and engineering certainty and/or probability that the cracked surface is actually a layer of a different material of biological origin, and not the alleged oxidized polypropylene.

Based on the information reviewed and my education, training and experience in the fields of materials science, polymer science and medical device product development, it is my opinion to a reasonable degree of scientific and engineering certainty that polypropylene, including Phillips Marlex HGX-030-01, is a reasonably selected biomaterial exhibiting appropriate biocompatibility.  It is further my opinion to a reasonable degree of scientific and engineering certainty and/or probability that Bard TVM products based on Phillips Marlex HGX-030-01 polypropylene, exhibit the ability to perform as intended for tissue repair, including the repair of pelvic organ prolapse and stress urinary incontinence.  It is also my opinion to a reasonable degree of scientific and engineering certainty and/or probability that the Avaulta Solo, Avaulta Plus and Align mesh characteristics, including geometric structure, pore characteristics, the incorporation of collagen and marking fibers, and biomaterial attributes, are reasonable for use in tissue repair, including pelvic organ and stress urinary incontinence repair, and are consistently described according to a reasonable method.  There is no evidence of defective material, design, or manufacturing in Avaulta Solo, Avaulta Plus or Align implants, including those implanted in the Plaintiffs.  Thus, it is my opinion to a reasonable degree of scientific and engineering certainty and/or probability that there is no evidence that the Avaulta or Align implants, or any action or inaction on the part of Bard related to these products, caused the alleged injuries for the Plaintiffs.  All of my opinions expressed in this report are provided from the perspective of a biomaterials scientist and product development engineer, and are held to a reasonable degree of scientific and engineering certainty and/or probability.

The Executive Summary cannot encompass all of Exponent's technical evaluation, analysis, and conclusions.  Hence, the main part of this report, supported by the various appendices, is at all times the controlling document.

# 1   Scope of Report

## 1.1   Scope of work

This report describes the materials, design, development, and performance of Avaulta Solo and Avaulta Plus meshes (Avaulta products), and the Align Urethral Support System (Align sling) sold by C.R. Bard for pelvic floor repair.  Exponent has reviewed extensive documentation and testimony, and evaluated numerous explanted and exemplar meshes to investigate these topics in light of Plaintiffs' allegations that defects in Bard TVM material or design affect mesh performance.  This report is provided for all associated Plaintiffs involved with this litigation.  Throughout this report the term 'Plaintiffs' will be used to refer generally to any Plaintiff involved in this litigation.

## 1.2   Qualifications and Disclosures

I am a Principal Engineer, the Director of the Polymer Science and Materials Chemistry Practice, and a Corporate Vice President at Exponent.  I hold two academic degrees: (1) a Bachelor of Science in Materials Science and Engineering from the Massachusetts Institute of Technology (MIT), and (2) a Doctor of Science in Materials Science and Engineering, with a thesis in the field of polymers, from MIT.  I am a licensed Professional Engineer in the state of Maryland and am a Fellow of the Society of Plastics Engineers.  I have been practicing in the field of polymer science and engineering for more than 25 years as a researcher at MIT, in a variety of technical roles at the 3M Company, and as a consultant with Exponent.  I provide consulting engineering services in all aspects of polymer science and engineering including, but not limited to material selection, material characterization and documentation for regulatory compliance, product design and development, mechanical and chemical testing, microscopy and non-destructive imaging, failure analysis, polymer chemistry, polymer physics, and polymer processing.

I have experience in evaluation and testing of the physical properties and durability of polymers, in the determination of the formulation and chemistry that control these properties, and in the selection and specification of polymers for different applications.  I have experience formulating

and evaluating polymer compositions, testing their properties and developing documentation, including material safety data sheets, associated with their use.   I have been directly involved in product development, product line extensions, transfer of new products to manufacturing, qualification of alternative materials and manufacturing equipment, evaluating customer complaints, and performing root cause investigations.  I have specific experience with the design, manufacturing and evaluation of medical devices made from polymeric materials; oxidation and oxidative stability of polyolefins including polypropylene; and the materials and manufacturing methods used for the Avaulta Solo, Avaulta Plus and Align products.  I regularly work with clients to address questions related to medical device design, validation, and testing, and have presented my work in meetings with the Food and Drug Administration (FDA) as well as in training and lecture settings for members of the medical, medical device and plastics communities.  I have lectured on the topics of material selection, plastics failure analysis, medical device failure analysis, advances in materials for medical devices, the materials science of polypropylene meshes, and aspects of medical device manufacturing.  I am a past chairman and continue to serve as a member of the board of directors of the Medical Plastics Division of the Society of Plastics Engineers.

My *curriculum vita* is provided in Appendix A.  A list of previous testimony is provided in Appendix B.

Exponent currently charges a rate of $710 per hour for my time.  Other Exponent staff members with different bill rates have assisted me.  No portion of our compensation is dependent on the outcome of this matter.

## 1.3  Information Considered

In the course of my analysis, Exponent has reviewed and relied upon documents, testimony, and examination of physical items, including portions of explanted materials, and a variety of exemplar meshes.  A list of materials considered is provided in Appendix C, and a summary of Plaintiff-specific information is provided in Appendix D.  I also relied on my education, general experience in the field, and knowledge acquired through years of research and consulting work

in the field of polymeric materials and medical devices. Specific documents and materials that I relied upon in reaching the opinions in this report are referenced throughout the text.

I have previously provided reports, data, analyses and testimony related to Bard's pelvic repair products litigation (MDL No 2187) and incorporate these by reference.

Although I have not prepared trial exhibits at this time, I may use any and all of the information described or referenced in this report.  Additionally, I may use existing materials for demonstrative purposes.

# 2   Document Review and Analysis

This dispute is related to the materials, design, development, manufacture and performance of Avaulta Solo and Avaulta Plus meshes (Avaulta products), and the Align Urethral Support System (Align sling) sold by Bard for pelvic floor repair.  Exponent has reviewed extensive documentation and testimony related to these topics in light of Plaintiffs allegations that defects in Bard TVM material, design or manufacture, and not factors related to individual surgical procedures and patient-specific characteristics and responses, are the cause of patient adverse outcomes.  An overview of Exponent's analysis of the materials, design, development, manufacture and performance of the Bard TVM products is provided in this section, and supported by more detailed analyses in the attached appendices.  The text and references are not intended to be exhaustive, but rather to disclose the bases for my opinions.

## 2.1  Bard TVM Mesh Materials

### 2.1.1  Overview of Surgical Mesh History

Surgical meshes are currently used in many different applications, including abdominal, urological, urogynecological, cardio-thoracic, and orthopedic applications (Pandit and Henry 2004).  In traditional tissue defect repair, surgical techniques utilized the patient's own tissue to close the defect.  These repairs, in the past, were performed using sutures under tension, but a mesh repair with little or no tension on the patient's tissue is preferred because of better overall outcomes (Cobb, Kercher et al. 2005).  A synthetic mesh product is therefore employed as an integral part of the repair.  The appropriate characteristics of a surgical mesh for tissue repair include numerous parameters such as chemical inertness and biocompatibility (Cobb, Kercher et al. 2005), resistance to infection, maintenance of long-term tensile strength, rapid incorporation into the tissue, adequate flexibility to prevent fragmentation, non-carcinogenic response, and the capability to restore natural movements of the anatomical area being treated (Pandit and Henry 2004).

Bard manufactures polypropylene meshes, which are appreciated for their excellent tensile and burst strength, resistance to infections, retention of physical properties, and ease of processing,

for soft tissue repair.  The Bard product systems for stress urinary incontinence (SUI) and pelvic organ prolapse (POP) repair have a history that dates back to the early 1960s with the introduction of Marlex mesh, a simple monofilament polypropylene (PP) knit that could be cut to size by the physician (Usher 1963).  Since its introduction as an implantable biomaterial in the form of sutures and mesh products in the 1960s, polypropylene has become one of the most widely used surgical polymers in the United States. (Usher, Allen et al. 1962, Usher 1963, Northey 1967, Pandit and Henry 2004, Hollinsky, Sandberg et al. 2008)  Additional information on polymer surgical meshes and the design and materials of said meshes is provided in Appendices E, F, and G.

## 2.1.2  Mesh Characteristics

Meshes are generally described by their weight per unit area, pore size, and filament characteristics.  Most of the test methods for evaluation of implantable meshes have been adopted from the American Society for Testing and Materials International (ASTM) specifications for the textiles industry (Cobb, Peindl et al. 2009), although there are aspects of mesh characterization (e.g., pore size) for which there are no standardized methods.  The physical properties and handling characteristics of a mesh–based product depend on its "weight", as well as the material, the knit pattern (if applicable), and the construction of the mesh.  An FDA guidance document for surgical meshes from 1999 describes additional properties to characterize the mechanical performance of meshes, including tensile strength of the mesh, device stiffness, suture pullout strength, burst strength, and tear resistance.[1]  See Appendix F for additional information on mesh characteristics.

## 2.1.3  Vaginal/Pelvic Tissue Repair Products

The first synthetic polymeric mesh used for urogynecological applications was made from nylon (polyamide) and was reported to have been introduced in the 1960s (Choe 2003, Winters, Fitzgerald et al. 2006).  The use of polypropylene in surgical meshes dates back to the 1960s,

---

[1] Guidance for the Preparation of a Premarket Notification Application for a Surgical Mesh, issued March 2, 1999

when Usher and the Phillips Corporation described the use of Marlex polypropylene woven mesh for hernia repair (Usher 1963).  This was followed by additional reports of the efficacious use of polypropylene mesh, including Marlex polypropylene knitted mesh, for abdominal and urogynecological repairs (Morgan 1970, Morgan, Farrow et al. 1985).  Subsequently, the use of prosthetic meshes, including those made of polypropylene, has become more popular for the treatment of POP (Julian 1996, Debodinance, Cosson et al. 2006) and SUI with the introduction of Tension Free Vaginal Tape (TVT) in the 1990s (Ethicon 1997).  In 2014, 2016, and again in 2018, the American Urogynecology Society (AUGS) and Society of Urodynamics, Female Pelvic Medicine and Urogenital Reconstruction (SUFU) issued a position statement about mesh midurethral slings including the Bard Align stating, "The monofilament polypropylene mesh mid urethral sling is the most extensively studied anti-incontinence procedure in history," and "Polypropylene mesh midurethral slings are a standard of care for the surgical treatment of SUI and represent a great advance in the treatment of this condition for our patients."  The paper expands on this further, noting that polypropylene mesh is widely studied and recognized as safe and effective as a surgical implant(AUGS 2014, AUGS 2016, AUGS 2018).

In the treatment of both SUI and POP, surgical approaches including the use of mesh for tissue reinforcement have been aimed at improving the durability of the pelvic floor repair (Moore and Miklos 2009), while also enhancing the quality of life of the patient with the correction of any anatomical and functional derangements (Silva and Karram 2006).  Similar to the mesh products used for hernia repair, meshes used in urogynecology have evolved to include additional layers such as collagen along with the polymer material, as well as the development and use of "vaginal mesh kits" for both POP and SUI indications.  The wide variety of materials and products are tools for surgeons to provide options in light of the technique, personal preference, and patient-specific factors.  Additional information on the evolution of surgical mesh products in urogynecology can be found in Appendix G.

Prospective, randomized, and controlled clinical studies comparing traditional approaches versus tension free vaginal tape use for the treatment of SUI provide perspective on the short-term and long-term outcomes of these procedures, complications, and the evolution of the surgical approaches toward the widespread adoption of these devices.  These studies reflect

beneficial outcomes, complications that reflect the impact of a range a factors, and expected evolution in surgical approach and adoption. As would be expected for any surgically implanted device, the studies reported some complications (e.g., erosion, bladder injury, vaginal injury, urethral perforation, bladder obstruction, voiding difficulties, pain, hematoma, abscess, overactive bladder, infection, bowel injury, de novo urgency, and dyspareunia), as well as the effect of patient and surgical factors on the surgical outcomes.  For example, there are studies on the positive outcomes (i.e. cure rates) following the implantation of Uretex (the predicate device to the Align), which also describe potential complications.  The finding of a complication, such as erosion, is not indicative of a defective product.  Specific complication rates in clinical literature need to be analyzed while considering the study type (retrospective, prospective, etc.), patient factors, and surgical factors before generalizations can be made from a single reported complication rate in the scientific literature.  Additionally, prospective and retrospective studies provide an overview of clinical outcomes for the Align sling, as well as description of the potential complications, and how patient factors can impact the procedure's outcome.  Similarly, prospective, randomized, and controlled clinical studies as well as retrospective studies comparing traditional approaches versus mesh use for POP have shown high success rates for mesh repair using Avaulta Solo, Avaulta Plus, and predicate devices.  As with SUI, patient factors and surgical techniques have also been noted to be important factors in clinical outcomes for POP mesh repair.  Additional information on SUI and POP repair outcomes, including outcomes of studies utilizing Avaulta Solo, Avaulta Plus and Align mesh products and other mesh and collagen products can be found in Appendix G.

## 2.2  Wound Healing and Biocompatibility

### 2.2.1  Healing Processes and Implanted Devices

When a medical device is placed in the body, the body elicits a cascade of responses, resulting from the injury to the tissues or organs involved, as well as the foreign body reaction to the implanted materials (Lin, Hirko et al. 1997, Portnoy 1998).  Some level of foreign body response is anticipated and desired in soft tissue repair, and this is considered in the assessment of biocompatibility and device function.  Protein adsorption is one expected and normal part of the foreign body response.  Biofilms containing proteins and other biological materials develop

during normal healing processes, even in the absence of infections.  The wound healing process for surrounding tissue includes a continuum of cellular events, including inflammation and the deposit of various biological materials.  This process is known to be affected by patient-specific factors, including device placement, adequacy of tissue, and comorbidities.  These factors can affect the nature of the interface between the device and repaired tissue structure, the rate and extent of tissue ingrowth, and the resulting geometric configuration of the device.

The extent and nature of scarring in a patient will affect the shape of the implant, as the implant will follow movement and contracture of the tissue.  Any mesh implanted for tissue repair may exhibit shrinkage or contracture as a result of normal healing action on the implant, and identical products can exhibit widely varying levels of contracture because of implantation and patient-specific factors. Indeed, the literature reports an extremely wide range of results, even for identical meshes.  Implantation factors include the initial placement shape, potential intraoperative folding during placement, the continuity of the surface that provides a foundation for tissue ingrowth, as well as the physician's approach for fixation.  Patient factors include repair site location, previous medical history, geometry and access, as well as tissue quality.  As a result, a reliable correlation between degree of shrinkage and mesh material or construction has not and cannot be made.  For a more complete discussion on the wound healing process including contracture, please refer to Appendix H.

## 2.2.2  Biocompatibility

Biocompatibility has been defined as "the ability of a material to perform with an appropriate host response in a specific situation" (Boulanger, Boukerrou et al. 2008). Medical research has suggested an ideal biocompatible material to be inert, noncarcinogenic, strong, non-allergenic, non-inflammatory, capable of sterilization, convenient, and affordable.  A well-accepted biocompatible material may still generate variations in response, including adverse reactions for some patients, because of the differences in the response to the same material between humans. Since its introduction for these purposes in the 1960s, polypropylene has been shown repeatedly to be a functional biomaterial according to these definitions (Usher 1963, Northey 1967, Frank 1968).  Notably, polypropylene is recognized as an appropriate 'negative control' material for biocompatibility testing according to the International Standard ISO 10993.

Polypropylene is available in many grades, which typically differ in molecular weight (a property associated with flow and mechanical properties) and additives. When a particular grade is considered for use in food contact or medical devices, the grade is evaluated for leachables and extractables, and the response of the bulk and extracted materials are characterized in various laboratory tests. These *in vitro* tests are then followed by *in vivo* animal and clinical testing as necessary to provide an understanding of the physiological response to the material.

The FDA considers all available biocompatibility information, including history of clinical use, when reviewing medical device filings. Permanently implantable medical products incorporating Phillips Marlex polypropylene homopolymer have been repeatedly evaluated in these ways for decades.[2] Phillips[3] documents for Marlex HGX-030-01 confirm that the specific grade used in Bard's TVM products has been assessed for a variety of regulatory purposes and is manufactured in accordance with Good Manufacturing Practices (GMP) (CP-0088). Phillips reminds purchasers that "it is the responsibility of the customer to check compliance of the final articles with the relevant legislative and applicable regulatory requirements including restrictions" (CP-00090).

Additionally, the cleared use of Marlex HGX-030-01 polypropylene in a 2008 Boston Scientific 510k submission further supports the reasonableness of use of this material in a permanent implant for urogynecological repair. The submission included Phillip's Material Safety Data Sheet (MSDS), including the caution language related to permanent implants, and was reviewed by the FDA. The FDA made specific requests to Boston Scientific about the material, received historical and testing information, and ultimately cleared the device.[4] Phillips had entered into

---

2 Usher, F. C. (1963). Hernia Repair with Knitted Polypropylene Mesh." Surg Gynecol Obstet 117: 239-240., DID-03-4663-1_Rev2_AVA2E0695015-AVA2E0695039 (Design input document for Align Sling), Trial Testimony of Roger Darois, p. 100 ll. 25 through pg. 101 ll. 10 (Trial Proceedings for MDL. No. 2:10-MD-2187, C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation, as related to Donna and Dan Cisson)

3 Over time, Marlex has been manufactured by Phillips, Chevron Phillips, and Phillips Sumika. For purposes of this report, all of these entities will be called "Phillips"

4 See memo Michelle Berry to the FDA, dated July 18, 2008, subject: Premarket Notification – Abbreviated 510(k) – K081048 – Amendment 1

supply agreements with Boston Scientific to provide Marlex HGX-030-01 for their products. As part of the Pinnacle Pelvic Floor Repair Kit 510k process, Phillips also participated in discussions with Boston Scientific and was made aware of this end use.  While Bard performed its own analysis and dealt directly with the FDA to obtain clearance for its specific products, this demonstrates the reasonableness of use of the Marlex HGX-030-01 for urogynecological repairs, and illustrates the secondary role of Phillips as a raw material supplier.

An MSDS[5] is not a biocompatibility document.  It is an industrial communication related to occupational exposure to raw materials that is regulated by the Occupational Safety and Health Administration.[6]  As part of the Department of Labor, OSHA's stated mission is "to assure safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance."[7]  This stated mission is related to working conditions, and exposures that may occur while working, rather than in relation to the specific qualities of finished goods/articles[8], or exposures associated with the normal use of finished goods/articles including medical devices such as Bard TVM products.

Finished goods/articles do not require an MSDS for several reasons, including that the characteristics and performance of an end product (e.g., an implantable medical device) must be more comprehensively and differently assessed than by review of an MSDS regarding a raw material, and because the conditions of occupational use of the raw material (e.g., during bulk transport, storage, while extrusion processing, after sterilization, etc.) are not representative of the conditions of use of a converted or finished product.  MSDS language does not affect the biocompatibility or function of the material.

_____

[5] Also known as a Safety Data Sheet (SDS)

[6] https://www.osha.gov/Publications/OSHA3514.pdf; https://www.osha.gov/enforcement/directives/cpl-02-02-038

[7] https://www.osha.gov/about.html

[8] Article is defined in 29 CFR 1910.1200(c) as "a manufactured item other than a fluid or particle: (i) which is formed to a specific shape or design during manufacture; (ii) which has end use function(s) dependent in whole or in part upon its shape or design during end use; and (iii) which under normal conditions of use does not release more than very small quantities, *e.g.*, minute or trace amounts of a hazardous chemical (as determined under paragraph (d) of this section), and does not pose a physical hazard or health risk to employees."  Articles are considered exempt from the Hazard Communication Standard (HCS): https://www.osha.gov/laws-regs/standardinterpretations/1999-11-01-1

MSDS language is intended to present potential industrial hazards that are not necessarily associated with end use.  For example, the MSDS for table salt states that it is mutagenic for mammalian somatic cells and that one of the main precautions is "Do not ingest".[9]  MSDS for phosphoric acid, a component of common sodas, contain statements such as "Very Hazardous in case of skin contact (irritant), of eye contact (irritant), or ingestion".[10]  Warnings for bone cement, an accepted implantable polymer, state "May cause damage to organs through prolonged or repeated exposure".[11]  These examples, among others[12], illustrate the importance of assessing specific exposure conditions and specific uses when considering risks and suitability for an application.  In this case, Bard performed extensive testing, and had direct experience with performance in humans from years of use.

Similarly, raw material designations or labels such as "medical grade" are not a substitute for biocompatibility testing of a polymer, nor do the absence of these designations or labels preclude the material from being biocompatible, or preclude additional testing to confirm a specific product made from a raw material is biocompatible.  Stated another way, the use of the term "medical grade" or MSDS language regarding implant use of raw materials does not inherently define the biocompatibility of the material, or the finished product using that raw material component.  "Medical grade" is a market and/or business designation, not an industry-standard term with a specific meaning, and thus it means different things to different raw material suppliers and purchasers. For example, there are no industry-recognized standards that define the required characteristics of polypropylene marketed as "medical grade".  Regardless of the designation or non-designation of a raw material as "medical grade", that material must undergo the stringent, aforementioned biocompatibility testing to support its use and clearance by the FDA as a component in a medical device.  Furthermore, biocompatibility assessment of a medical device must consider more than just raw material characteristics including end use testing and evaluation of the device for regulatory approval or clearance.

---

[9] Science Lab MSDS, updated 05/2013

[10] Science Lab MSDS, https://rsc.aux.eng.ufl.edu/_files/msds/332.pdf

[11] Stryker MSDS for  Surgical Simplex® P Radiopaque Bone Cement, created October, 2014

[12] For example, water, play sand, sodium citrate, etc.

The FDA requires that the evaluation of any new device intended for human use include data from systematic biocompatibility testing to ensure that the benefits provided by the product will exceed any potential health and safety risks produced by device materials. The evaluation of biocompatibility includes a variety of tests, such as acute, subchronic and chronic toxicity, irritation to skin, eyes and mucosal surfaces, sensitization, hemocompatibility, genotoxicity, carcinogenicity, and effects on reproduction including developmental effects.[13]

According to the FDA's guidance on International Standard ISO 10993 (Biological evaluation of medical devices),[14] the biocompatibility or biological evaluation of medical devices is performed to determine the potential toxicity resulting from contact of the component materials of the device with the body.  ISO 10993 (Biological Evaluation of Medical Devices) is a global consensus standard developed based on decades of experience and relevant clinical history, and recognized by the FDA.[15]  It provides an objective framework for testing and a recognized structure for communicating scientific information about biocompatibility.  Other standardized methods for assessment of biocompatibility exist and are recognized as providing applicable information about biocompatibility.  Product- and company-specific biocompatibility assessment programs use these objective tools to assemble relevant information for a particular product.

For a discussion on the evaluation of biocompatibility of materials, the FDA's guidance on the biocompatibility of medical devices and specifics to polypropylene biocompatibility, refer to Appendix I.  Additional information related to biocompatibility of polypropylene and Bard

---

[13] Blue Book Guidance G95-1, Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing', FDA, May 1, 1995; ISO 10993-1:2003 -  Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing; ISO 10993-1:2009 -  Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing within a Risk Management Process

[14] Blue Book Guidance G95-1, Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing', FDA, May 1, 1995

[15] ISO 10993-1:2003 - Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing; ISO 10993-1:2009 -  Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing within a Risk Management Process

mesh products based on Marlex HGX-030-01 polypropylene is provided in other Appendices, including J, K, L, and Z.

## 2.3  Avaulta Solo and Avaulta Plus Products

The Bard mesh-based products for tissue repair have a history that dates back to the 1960s, with the introduction of the Bard mesh, a simple monofilament polypropylene knit that could be cut to size by the physician.  Building on Bard's experience and history with synthetic and animal-based tissue repair products, including Parietex Composite, Parietene, Pelvitex,[16] Collamend, and Avaulta Classic, Bard introduced the Avaulta Solo and Avaulta Plus products in the U.S. in June 2007.[17]  While marketed, both products (hereby named as "Avaulta products") were available in two configurations for anterior and posterior repairs (Table 1).[18]

Table 1. Avaulta Solo and Avaulta Plus catalog numbers

| Catalog No. | Description |
|---|---|
| 486100 | Avaulta Solo Support System, Anterior |
| 486200 | Avaulta Solo Support System, Posterior |
| 486101 | Avaulta Plus Biosynthetic Support System, Anterior |
| 486201 | Avaulta Plus Biosynthetic Support System, Posterior |

### 2.3.1  Similarities with Predicate Products

The Avaulta Solo and Avaulta Plus products share many similarities in design with the predicate surgical mesh products, which includes the Avaulta Classic.  These design similarities include the shapes, materials (polypropylene, porcine collagen), mesh fibers, and mesh knit structure. Specifically, the Avaulta Solo and Avaulta Plus products are shaped for the anterior and

---

[16] Also known as Sofradim's Ugytex

[17] AVA20010818-AVA20010819 (Authorization for release, AFR-03-4661-1 Rev 0)

[18] AVA20151469-AVA20151498 (International dossier, URO-07-005, dated Jun 28, 2007); AVA20023641-AVA20023683 (Customer preference evaluation and design - Validation summary report, CPE-03-4541-3 Rev 0); AVA20023525-AVA20023550 Avaulta Classic End Item product structure

posterior pelvic regions, building on the four-armed shapes of the anterior and posterior Avaulta Classic designs.  The Avaulta products also utilize the same polypropylene resin as Bard's numerous surgical mesh products for hernia and pelvic tissue repairs.  The addition of the acellular porcine collagen layer for the Avaulta Plus product also builds on the experience with porcine collagen on the Avaulta Classic and the collagen sheet of the Collamend product. Similar to the Avaulta Classic, the Avaulta Solo and Avaulta Plus products have dual knit structures.  For a more complete review of the Avaulta Classic[19], refer to Appendix J.

### 2.3.2  Avaulta Solo and Avaulta Plus Product Development

#### 2.3.2.1  Pre-Market Release

In November 2005, Bard initiated development of the concept and design for the Avaulta Solo and Avaulta Plus. This design comprises pre-shaped anterior and posterior implants for vaginal prolapse repair, utilizing previously demonstrated variable knit technology for the polypropylene components of the Avaulta Solo and Avaulta Plus.  The Avaulta Plus also incorporated Bard's experience with combining collagen material and polypropylene in a composite implant. The development process benefited from the evaluation and known performance of existing designs, existing product specifications, manufacturing and test protocols, and insights developed from clinical experience with their own pelvic mesh floor reconstruction products, as well as those of their competitors. Validation of the design was based on feedback from the surgeons regarding the softness, flexibility, and smooth texture of the proposed Avaulta products compared to other mesh products, as well as observed functional anchoring of the mesh in cadaver tissue. The development process also included design qualification assessment, biocompatibility testing, and pre-clinical animal studies.  For a more complete description of Bard's pre-market release development work, refer to Appendix K.

---

[19] Bard's Avaulta Classic products are pre-shaped meshes based on the Sofradim Ugytex dual knit mesh

## 2.3.2.2  Product Evaluation by Industry and Scientifically Accepted Standards

As part of the development process of the Avaulta Solo and Avaulta Plus products, risk management activities included a risk assessment conducted in accordance with ISO 14971 (Medical devices – application of risk management to medical devices) to assess potential risks associated with the use of the device and to ensure that benefits of the device outweigh the potential risks.[20]  Risk assessment was also conducted in accordance with other international standards, such as the Medical Devices Directive (MDD 93/42/EEC) and ISO 13485 (Medical devices - Quality management systems - Requirements for regulatory purposes). [21]

The biocompatibility of the Avaulta Solo and Avaulta Plus implants built on the history of clinical use of Bard Soft Mesh, Avaulta Classic, Pelvitex (Ugytex), Collamend, and from testing of key biological parameters in accordance with industry wide and scientifically accepted standards.  The evaluation of biocompatibility includes a variety of tests, such as acute, subchronic and chronic toxicity, irritation to skin, eyes and mucosal surfaces, sensitization, hemocompatibility, genotoxicity, carcinogenicity, and effects on reproduction including developmental effects.[22]  The selection of tests is dependent on the intended uses of the device and the nature of contact (e.g., contact with tissue, bone, mucosal membrane, etc.), as well as the duration of contact (limited (<24 hours), prolonged (24 hours to 30 days), or permanent (>30 days)).[23] Accordingly, some of these tests are intended to evaluate short-term effects (e.g., acute toxicity, sensitization, and irritation to the skin, eye and mucosal surfaces), while others serve to

---

[20] AVA20151469-AVA20151498 (International dossier; URO-07-005)

[21] AVA20152026-AVA20152071 (Checklist of essential requirements and standards (MDD 93/42/EEC) and checklist of essential principals, dated Jun 20, 2007, ERC030075 Rev 1); the MDD lists requirements regarding medical device design and involves a review of the essential requirements and standards, as well as essential principals. ISO 13485 is associated with the MDD in that it recommends procedures for a quality system that complies with the MDD.

[22] Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'; ISO 10993-1:2003 - Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing; ISO 10993-1:2009 - Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing within a Risk Management Process

[23] Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'.

assess long-term or specific toxic effects (e.g., subchronic and chronic toxic effects, sensitization, genotoxicity, and carcinogenicity (tumorigenicity)).[24] As identified in ISO 10993, these tests may involve the use of extracts of the device's component materials or representative samples taken from the finished device, rather than the finished device itself.[25]  For materials that have been well characterized physically and chemically, and have extended clinical history of safe use, demonstration of substantial equivalence is generally accepted by the industry and scientific community in lieu of all descriptive test methods contained within ISO 10993. Relying on biocompatibility evaluations of related devices, provided they include the same material, and are conducted in accordance with the guiding principles of ISO 10993 is typical and accepted industry practice.  The assessment and interpretation of the outcome of these studies is conducted by expert assessors using suggested criteria as outlined in the respective standards for each test.

Thus, Bard acted as a reasonably prudent manufacturer by testing its products per ISO 10993, with these tests including cytotoxicity, sensitization, irritation and/or intracutaneous reactivity, acute systemic toxicity, genotoxicity, histological evaluation, hemolysis, pyrogenicity, subchronic toxicity, and chronic toxicity.  Additional standardized testing on collagen products included viral inactivation, protein, lipid, and carbohydrate content (gravimetric method per ASTM D2257), chemical residuals analysis, tissue analysis (H&E Staining), crosslinking analysis, and the effect of in-process holding durations.  Confirmatory biocompatibility testing on the final finished and sterilized product further included standardized USP[26] physico-chemical analysis, and gas chromatography-mass spectrometry,[27] as well as sensitization and

---

[24] ISO 10993-1:2003 - Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing.

[25] ISO 10993-1:2003 - Biological Evaluation of Medical Devices – Part 1: Evaluation and Testing (Section 5.1).

[26] United States Pharmacopeia

[27] AVA20153181-AVA20153183, AVA20153404-AVA20153405 (Summit anterior hybrid grafts (LR-6017) memo re: USP physico-chemical and cytotoxicity MEM elution testing, dated Oct 10, 2006, BIO-03-4661-5 and CHEM-03-4661-1); AVA20153208-AVA20153211, AVA20153213-AVA20153216, AVA20153407-AVA20153409 (Summit anterior hybrid grafts (LR-6040) memo re: USP physico-chemical and cytotoxicity (MEM elution and Toxikon protocol) testing, dated Apr 10, 2007, BIO-03-4661-11, BIO-03-4661-12, and CHEM-03-4661-5)

mucosal irritation studies,[28] which all demonstrated acceptable results and conformance with the test requirements. Animal studies were performed using rat, rabbit and sheep models, all providing results indicating the Avaulta Solo and Avaulta Plus products were acceptable and viable biomaterials.

Bard relied on existing clinical history and data from existing polypropylene mesh products to support the development and launch of the Avaulta Solo and Avaulta Plus products. While prototypes and specific experimental measurements were part of the development process, as would be expected, at no point were these products considered experimental.  Indeed, given Bard's extensive history with polypropylene meshes and in pelvic soft tissue repair with existing products, these products were a reasonable extension of existing knowledge and demonstrated function, and had been appropriately validated prior to their commercial production.  For a more complete description of the biocompatibility and animal studies, refer to Appendix L.

### 2.3.2.3  Post-Market Release Activities

Bard continued to be responsive to the market demands and clinical needs by iteratively evaluating the Avaulta Solo and Avaulta Plus products via complaint reviews.  Bard learned of the potential for sterile abscesses that may occur upon exposure of porcine tissue to non-vascularized areas.  Bard initialized a Corrective and Preventative Action (CAPA) investigation and determined that over-trimming of the graft in the distal-apical direction could potentially result in contact of the porcine collagen with the ischiorectal fossa.  Bard implemented clarifications regarding implant trimming and adjustments.  To assess any risks associated with this change, Bard reasonably and appropriately conducted a process failure mode and effects analysis (PFMEA)[29] as well as a design FMEA[30]  (DFMEA).[31] Bard also evaluated potential

---

[28] AVA20153185-AVA20153195, AVA20153197-AVA20153206 (Summit anterior hybrid grafts (LR-6013) memo re: sensitization (local lymph node assay) and vaginal mucosal irritation testing, dated Nov 1, 2006, BIO-03-4661-6 and BIO-03-4661-7)

[29] AVA20154258-AVA20154286 (RA-03000648 Rev 2, dated June 8, 2007 (PFMEA for Sling Integration))

[30] Failure Modes and Effects Analysis.

[31] AVA20154208-AVA20154257 (RA-03000615 Rev 2, dated June 11, 2007 (DFMEA for Sling Integration))

risks associated with the introduction of a new colorant, (phthalocyaninato (2-) copper), and slightly modified mesh fiber diameters.  For a full review of postmarket release activities of the Avaulta Plus and Avaulta Solo, refer to Appendix O.

### 2.3.3  Avaulta Products Manufacturing Process

The manufacturing supply chain for the Avaulta Solo and Avaulta Plus products share many elements with broader Bard product lines; therefore, direct experience with both material and with manufacturing processes was available to draw upon.  The Avaulta mesh is primarily constructed from Phillips Marlex HGX-030-01 monofilament polypropylene[32] supplied by Red Oak (Denver, NC) according to Bard's specifications.[33]  The manufacturing process is a detailed, documented process that involves subprocesses such as filament and mesh manufacture, the addition of acellular porcine collagen for the Avaulta Plus, sterilization, and the assembly of the completed product.  The process does not subject the polypropylene to unusual or uncontrolled temperature or shear profiles, and does not compromise the intended use or durability of the Bard TVM products.  Prior to market release, Bard conducted manufacturing process validation testing and package qualification testing of the Avaulta Solo and Avaulta Plus products to verify that the manufacturing process meets the product specifications and requirements.[34]  For a detailed description of the Avaulta Solo and Avaulta Plus manufacturing processes, please refer to Appendix Z.

### 2.3.4  Avaulta Products Regulatory Overview

On December 8, 2006, Bard filed a 510(k) premarket notification with the Food and Drug Administration (FDA) for the Avaulta Support System (Avaulta Solo Support System and

_____

[32] Phillips Marlex polypropylene mesh material has a long history of successful clinical use in hernia repair prostheses.

[33] AVA20016481-AVA20016487 (Davol certification/yarn traceability form for 0.0043″ fiber (RM3791147)); AVA2E0046846-AVA2E0046848 (Monofilament polypropylene, .0033″ diameter – raw material specification, RM0300703 Rev 1); AVA2E1040494-AVA2E1040495 (Polypropylene fiber, clear, 4.3 mil fiber – raw material specification, RM0300829 Rev 0/RM3791147)

[34] AVA20010785-AVA20010814 (Project requirements operating plan, Summit Anterior/Posterior Support System, dated Jun 25, 2007, PROP-03-4661-1 Rev 1)

Avaulta Plus Biosynthetic Support System) (K063712) and received clearance to market the devices on March 12, 2007. The materials and composition of the Avaulta Solo and Avaulta Plus products were stated to be similar to those used in Bard's Ugytex Dual Knit Mesh (K051503) and Bard/Davol Collamend Implant (K052322). A more complete description of the regulatory process followed and implemented by Bard, including references to all documentation, can be found in Appendix M.

### 2.3.5  Avaulta Products Risk Analysis

The Avaulta Solo and Avaulta Plus products were developed in accordance with internal procedures, which incorporate design input, output, review, verification, and validation. These procedures conform to the principles and intent of the FDA's design control guidance and Quality Systems Regulations (QSR; 21 CFR Part 820); the latter which incorporates Current Good Manufacturing Practice (cGMP). As previously mentioned, risk management activities included a risk assessment conducted in accordance with ISO 14971 (Medical devices – application of risk management to medical devices) to assess potential risks associated with the use of the device and to ensure that benefits of the device outweigh the potential risks. Risk assessment was also conducted in accordance with other international standards, such as the Medical Devices Directive (MDD 93/42/EEC) and ISO 13485 (Medical devices - Quality management systems - Requirements for regulatory purposes). This risk analysis for Avaulta Solo and Avaulta Plus products, which indicated that clinical trials before product marketing were not required, was appropriate and in accordance with the industry expectations for this type of medical device. For a more complete description of the Risk Analysis performed, refer to Appendix N.

### 2.3.6  Avaulta Products Postmarket Surveillance and Postmarket Risk Analysis

Post-product launch, Bard continued to monitor and perform diligent design review of the Avaulta Solo and Avaulta Plus products. From June 2007 through October 2008, Bard performed a review of complaints received of the Avaulta Solo implants and concluded that the Avaulta Solo continued to meet clinical expectations based on the reported complaint rate. Additionally, Bard performed a complaint review for the Avaulta Plus during the development

of a sewing pattern change to mitigate any potential new risks.  Bard also conducted a risk assessment, which included a review of the design and process FMEAs, to identify potential new risks associated with the sewing change.  A more complete description of the post market surveillance and risk analysis can be found in Appendix O.

### 2.3.7  Avaulta Product Instructions for Use

The instructions for use (IFUs) for each of the Avaulta Solo and Avaulta Plus reflect the intended use, contraindications, and potential risks of the products, as identified through the design process and risk assessment.  The IFUs provide information to the surgeons regarding appropriate placement of the products, warn of potential adverse reactions and provide recommendations for post-operative actions to be avoided by patients.  A more complete description of the instructions for use can be found in Appendix P.

## 2.4  Align Product

The Bard Align Urethral Support System is indicated for the treatment of female SUI resulting from urethral hypermobility and/or intrinsic sphincter deficiency.[35]  While marketed, multiple kits were offered (Table 2), and each kit contained introducer needles specific to the surgical approach being used and a polypropylene mesh sling implant within an assembly sheath.  The implantable mesh sling is constructed of knitted polypropylene mesh and the sheath assembly is a removable polytetrafluoroethylene tube with a Peel-Away tab. [36]

Table 2  Catalog Numbers for Align Products

| Catalog No. | Description |
|---|---|
| BRD100R | Retropubic Kit |
| BRD200S | Suprapubic Kit |
| BRD300RS | Retropubic and Suprapubic Kit |

---

[35] See AVA20155684 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)
[36] See AVA20155689 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)

| BRD400HK | TO Hook Kit |
| BRD500HL | TO Halo Kit |
| BRD600HH | TO Hook and Halo Kit |
| BRD301RS | Retropubic suprapubic non-dilating |
| BRD601HH | Hook and Halo non dilating |

### 2.4.1  Similarities of Align to Predicate Products

The Align Urethral Support System shares many similarities with its predicate surgical mesh product, the Uretex® TO Trans-Obturator Urethral Support System (510(k) K041176), including indications for use, intended use, fundamental technology, and design.[37]  For a more complete comparison of the Align to predicate devices as well as a comparison of changes made upon submission of the Special 510(k) K093474 regarding design modifications, refer to Appendix Q.

### 2.4.2  Align Product Development

In February 2006,[38] Bard initiated development of the concept and design for the Align Urethral Support System.  In the process of product development, Bard performed competitive product analysis to determine complaints and complications associated with competitor products and obtained surgeon feedback on multiple implant designs during defined design feasibility studies. Bard instituted product requirements based on specified material characteristics, conducted design verification and qualification on each component of the Align Urethral Support System and validated their final design with activities reflecting the types of validation studies outlined by the FDA.  Upon release of the Align Urethral Support System, Bard received feedback about some connectors breaking due to technique as well as difficulty in removing the protective sheath from the mesh.  Bard demonstrated its dedication to continuous improvement and

---

[37] See AVA20155687 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)
[38] See AVA20120232 in AVA20119742-AVA20120234 (Align DHF Volume 16)

addressed this feedback by modifying the design.  For a more complete description of the Align Urethral Support System product development, refer to Appendix R.

### 2.4.3  Product Evaluation by Industry and Scientifically Accepted Standards

As part of the development process of the Align and Align TO products, risk management activities included a risk assessment conducted in accordance with ISO 14971 (Medical devices – application of risk management to medical devices) to assess potential risks associated with the use of the device and to ensure that benefits of the device outweigh the potential risks.[39] The risk assessment was also conducted in accordance with other international standards, such as the Medical Devices Directive (MDD 93/42/EEC) and ISO 13485 (Medical devices - Quality management systems - Requirements for regulatory purposes).[40]

Bard also performed a biocompatibility assessment per industry-wide and scientifically accepted standards.  The Align mesh is made from the same resin as the Large Pore Soft Mesh and is manufactured using the same process, thus the biocompatibility assessment of the Align Urethral Support System was based on information related to Bard/Davol's Large Pore Soft Mesh, which incorporated testing of the Spermatex mesh.  As previously discussed, reliance on predicate devices with equivalent materials of construction and a prior history of clinical utility is an industry-wide and scientifically accepted practice.  The biocompatibility tests were performed in accordance with ISO 10993 and included intracutaneous reactivity, cytotoxicity, sensitization, chronic toxicity, hemolysis, muscle implantation, systemic toxicity, mutagenicity, and genotoxicity.

Additional testing was performed on the Align mesh and the introducer system according to ISO 10993-1.  These tests showed the Align mesh and introducer systems are acceptable materials

---

[39] See AVA20153846-AVA20153847 in AVA20153835-AVA20154203 (URO-07-004: Align Urethral Support System International Dossier, dated June 15, 2007)

[40] See AVA20154166-AVA20154189 in AVA20153835-AVA20154203 (URO-07-004: Align Urethral Support System International Dossier, dated June 15, 2007)

for contact with and implantation into the body.  Further testing included USP physiochemical analysis (nonvolatile residues, residue on ignition, heavy metals, buffering capacity), GC/MS characterization, and infrared spectroscopy.  Bard also performed animal studies to evaluate the tissue ingrowth and histological response resulting from implantation.  For example, Bard performed an *in vivo* assessment of the Align in New Zealand White rabbits for 30 days and compared the results to the Uretex (the predicate to the Align) and the IVS Tunneller offered by Tyco Healthcare.  Results showed similar neovascularization and minimal to no inflammatory cells surrounding the individual implants, demonstrating the biocompatibility of the Align.

Bard relied on existing clinical history and data from existing polypropylene mesh products to support the development and launch of the Align products. While prototypes and specific experimental measurements were part of the development process, as would be expected, at no point were these products considered experimental.  Indeed, given Bard's extensive history with polypropylene meshes and in pelvic soft tissue repair with existing products, these products were a reasonable extension of existing knowledge and demonstrated function, and had been appropriately validated prior to their commercial production.. For further information regarding the biocompatibility testing and animal studies associated with the Align products, refer to Appendix S.

## 2.4.4  Align Manufacturing Process

The manufacturing process for the Align Urethral Support System shares many elements with broader Bard product lines and the Avaulta product lines.  Just as with the Avaulta mesh products, the Align is constructed from Phillips Marlex HGX-030-01 monofilament polypropylene supplied by Red Oak according to Bard Specifications.  The manufacturing process is a detailed, documented process that involves subprocesses including filament and mesh production, creation of the polytetrafluoroethylene sheath, kit assembly and sterilization. For a more complete description of the Align manufacturing processes, please refer to Appendix Z.

## 2.4.5  Align Regulatory Overview

On January 5, 2007, Bard submitted a 510(k) premarket notification to the Food and Drug Administration (FDA) for the Align Urethral Support System (K070073)[41] and received clearance to market the devices on March 21, 2007.[42]  The Align shares the same indications for use, intended use, fundamental technology, and design with the Uretex TO Trans-Obturator Urethral Support System manufactured by Sofradim Production (K041176).[43]  Within the regulator overview, Bard performed physicochemical and biocompatibility testing in accordance with ISO 10993 (Biological Evaluation of Medical Devices),[44] as well as functional device testing in accordance with FDA Guidance for the Preparation of a Premarket Notification Application for a Surgical Mesh (March 2, 1999).[45]  On December 2, 2009, Bard submitted a Special 510(k) premarket notification (K093747) to notify the FDA of design changes to the predicate Align Urethral Support System (K070073),[46] and received clearance to market the device with the modifications on May 7, 2010.[47]  For a more complete description of the regulatory process undertaken by Bard in the development and release of the Align Urethral Support System, refer to Appendix T.

---

[41] See AVA20155669 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)

[42] See AVA20155841 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)

[43] See AVA20155687 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)

[44] See AVA20155694-AVA20155695 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System); the polypropylene used for the Align is the same material used in Bard's Large Pore Soft Mesh with the same ISO 10993 contact profile so only chemical assay confirmation tests were done to confirm bioequivalence of the material.

[45] See AVA20155696-AVA20155708 in AVA20155659-AVA20155931 (510(k) K070073 Align™ Urethral Support System)

[46] See AVA20162165 in AVA20162160-AVA20162416 (Special Premarket 510(k) Notification K093747: Align® Urethral Support System Dilator)

[47] See AVA20162407 in AVA20162160-AVA20162416 (Special Premarket 510(k) Notification K093747: Align® Urethral Support System Dilator)

### 2.4.6  Align Risk Analysis

The Align and Align TO products were developed in accordance with internal procedures, which incorporate design input, output, review, verification, and validation.[48]  These procedures conform to the principles and intent of the FDA's design control guidance[49] and Quality Systems Regulations (QSR; 21 CFR Part 820); the latter which incorporates Current Good Manufacturing Practice (cGMP).  As part of the risk assessment, Bard considered the complaints associated with the Uretex product, and conducted a process failure mode and effects analysis (PFMEA)[50] as well as a design FMEA (DFMEA)[51] during the development of the Align and Align TO products.  Bard implemented design improvements based on the results of these analyses.  This risk analysis for the Align products, which indicated that clinical trials before product marketing were not required, was appropriate and in accordance with the industry expectations for this type of medical device. For a more complete review of the Align risk analysis, refer to Appendix U.

### 2.4.7  Align Post-Market Surveillance and Risk Analysis

Following market release in June 2007, Bard continued to review field response to the product, including complaint information for the Align sling.[52]  Complaints were principally (approximately 80%) associated with the connectors, with the majority of other complaints associated with handle and sheath removal.  Bard also reviewed complaints associated with predicate and competitor products, as demonstrated by the updated complaint summaries in April 2008,[53] 10 months after product launch.  Through this review process and subsequent implementation of design changes, Bard was able to cut in half the number of complaints per 10,000 units regarding the connector design.  The review did not indicate a need for

---

[48] AVA20113826-AVA20113850 (PROP-03-4663-1 Rev 2, dated June 15, 2007)

[49] Design control guidance for medical device manufacturers, issued March 11, 1997

[50] AVA20154258-AVA20154286 (RA-03000648 Rev 2, dated June 8, 2007 (PFMEA for Sling Integration))

[51] AVA20154208-AVA20154257 (RA-03000615 Rev 2, dated June 11, 2007 (DFMEA for Sling Integration))

[52]  See AVA20120741 in AVA20120732-AVA20120754 (DID-03-4663-1 Rev 0, dated Oct 27, 2006)

[53] See AVA2E0080598, AVA2E0080609-AVA2E0080610 in AVA2E0080598-AVA2E0080620 (DID-03-4900-1 Rev 1, dated April 21, 2008)

modification of the implanted mesh.  For a more complete review of the post-market surveillance, refer to Appendix V.

### 2.4.8  Align Instructions for Use

The instructions for use (IFU) of the Align and Align TO Urethral Support Systems reflect the intended use, contraindications, and potential risks of the product, as identified through the design process and risk assessment.  They include warning language and surgical techniques specific to the insertion kit.  Additionally, Bard continued to provide periodic updates to the IFU's to address the design modifications made post-market release.  For a more complete description of the IFU's, refer to Appendix W.

## 2.5  Align and Avaulta Product Development Activities

The Bard TVM products were developed in parallel, with significant overlap in aspects of product development including concept, feasibility studies, development, and product launch.[54] The products shared Bard's long history of clinical success with polypropylene mesh products for soft tissue repair, including those based on Phillips Marlex HGX-030-01.  Many features of the Bard TVM products were shared, including the same resin, the same mesh production process, shared direct and associated project personnel, and company knowledge of materials, manufacturing, and testing.  Additionally, the Align knit construction is the same as that used in the arms of the Avaulta Solo and Avaulta Plus.  All of the Bard TVM products (Avaulta Solo, Avaulta Plus and Align) received FDA clearance and were released to market in June 2007.  Additional information on the Align and Avaulta crossover, including a graphical representation of the timeline, can be found in Appendix X.

---

[54] Documents that recorded the initiation of the various phases of the medical device development process were included in the Align DHF volume 16 and Avaulta DHF volume 6; for example, see AVA20011083-AVA20011089 in AVA20010672-AVA20011100 (Avaulta DHF volume 6: PIF-03-4661-1 Rev 0); AVA20120232-AVA20120234 in AVA20119742-AVA20120234 (Align DHF volume 16: PIF-03-4663-1 Rev 0); AVA20011090-20011093 in AVA20010672-AVA20011100 (Avaulta DHF volume 6: PIF-03-4661-2 Rev 0); AVA20120229-AVA20120231 in AVA20119742-AVA20120234 (Align DHF volume 16: PIF-03-4663-2 Rev 1)

# 3   Mesh Testing and Analysis

Exponent has systematically evaluated the characteristics and condition of explanted and exemplar materials associated with the Avaulta and Align products in light of the allegations of oxidative degradation and lack of stability asserted by the Plaintiffs.  Materials evaluated included polypropylene pellets,[55] mesh stock,[56] exemplar Avaulta Solo, Avaulta Plus and Align meshes,[57] as well as explanted mesh from this litigation and prior litigation.[58]  Materials were evaluated in the as-received condition, and after being subjected to various treatments designed to remove tissue[59] as well as after treatments designed to provide chemical, thermal and radiation challenges to the material stability. Companion analyses, such as analysis of the cleaning solutions and intentionally dissolved portions of the mesh, were also performed.  The materials were destructively and non-destructively evaluated according to test protocols developed from standardized methods, and compared to pristine and intentionally oxidized controls prepared from exemplar mesh.  In some cases, comparative analyses were limited by the amount of available material and/or the condition in which the material was provided.  To date, Exponent has directly evaluated explants from at least 99 individuals, and repeatedly tested portions of at least 10 lots of exemplar TVM products for control and reference purposes. Through the course of this test program, Exponent has found no evidence of *in vivo* oxidation of Marlex polypropylene or the Bard products made from them.

Exponent evaluated materials visually, microscopically, chemically, and thermally using techniques including optical microscopy (OM), Scanning Electron Microscopy (SEM), energy dispersive spectroscopy (EDS), Focused Ion Beam (FIB) milling, Fourier transform infrared spectroscopy (FTIR), gas chromatography-flame ionization detection (GC-FID), liquid

---

[55] HGX-030-01 resin

[56] Greige Goods, lot #SA0300122, Exp: 2039-12-30

[57] Numerous exemplars have been evaluated in various ways.  Lots include HUXG1273, HUXG1273, BMUD0023,BMUF0017, BMWB0002, BMWB0001, HUUC0511, HUWD1725, HUUC0510, HUWD1725, HUWE0592

[58] Evidence and reference or control items were received and tracked according to chain of custody procedures.

[59] Cleaning procedures are described in various Appendices.

chromatography (LC),  differential scanning calorimetry (DSC), gas chromatography-mass spectroscopy (GC-MS), thermogravimetric analysis (TGA), oxidation induction time testing (OIT), as well as by chemical immersion, QUV exposure, dissolution testing, and immersion in biological serum.  Data was collected at Exponent or at Exponent's direction, and all analysis was performed or verified by Exponent.

## 3.1  Cleaning

While this section of the report discusses the general cleaning procedures and analysis of explants performed by Exponent, more detailed plaintiff specific information in relation to this litigation is provided in Appendix D.[60]  In all cases, mesh arrived embedded with tissue and other biological matter.  Explant samples were generally received in formalin, a disinfectant and fixative that chemically alters the tissues associated with the explant, although some explants were previously received in a dry condition.  Formalin will crosslink the tissue, creating tissues that are more difficult to remove; the difficulty increases with formalin exposure time (Putchler 1985; Fox 1985, Shelby 2017).

Exponent has previously evaluated a range of cleaning solutions and conditions in an iterative manner to attempt to fully remove the biological materials attached to the explant surfaces.[61] The cleaning chemicals and protocols were developed from available protocols, standards and literature information,[62] and performed according to standard protocols similar to that described by Thames, et al.[63] and as detailed in reports submitted previously for MDL Waves 4-8.

─────────────────────

[60] Exponent received and analyzed an explant from two plaintiffs in this litigation (Plaintiffs: Becky Smith and Gladys Katsiafas).  The results of this analysis are provided in Appendix D.  Additionally, Exponent understands that an explant exists for Plaintiff Donna Chrastecky.  Exponent reserves the right to analyze the explant from Donna Chrastecky and supplement this report at a later date with the results of that analysis.

[61] Mesh was evaluated after immersion in sodium hypochlorite (bleach), hydrogen peroxide, nitric acid, sodium hydroxide, xylene, hexane, isopropyl alcohol, dimethyl sulfoxide, Proteinase K, Tergazyme, deionized water, iodine, betadine and hydrochloric acid as well as Aqua Regia and potassium iodide solutions.

[62] 2011; Choma et al., J Spinal Disord Tech, 2009; Baxter et al., J Biomed Materials Res Part B: Applied Biomaterials, 2009; Guidoin et al., Biomaterials, 2000; de Tayrac and Letouzey 2011

[63] Thames, SF, White, JB, Ong, KL *The myth: in vivo degradation of polypropylene-based meshes*, Int Urogynecol J, 2016, 1-13.

Briefly, the explants were repeatedly immersed in sodium hypochlorite (NaOCl) solution (bleach, which is a solution of 10-15% NaOCl in water) followed by immersion in deionized water to remove the bulk tissue. The explanted mesh material was then soaked in a 0.8 mg/mL solution of Proteinase K in tris-buffered saline (TBS) to further break down biological material present as a crust or other debris on the surface of the mesh fibers, followed by a final cleaning in an NaOCl solution. Explanted mesh and associated materials were visually examined, photodocumented, and analyzed via gravimetry, attenuated total reflectance Fourier transform infrared spectroscopy (ATR-FTIR), optical microscopy, scanning electron microscopy[64] (SEM), and Energy-Dispersive X-ray spectroscopy (EDS) throughout the cleaning process. Exemplar materials were also subjected to this protocol and as expected, the polypropylene was highly resistant to damage by the cleaning protocols.

Methods of tissue removal vary between experts and have differing levels of success. Although portions of the mesh fibers may be visible in as-received explants, attached tissue must be removed to properly observe the implanted mesh fibers. Immersion of samples in bleach, as has been shown in previous Exponent reports and literature (Thames, White et al. 2017), is a generally effective method to remove bulk tissue. Some explants, especially explants with shorter implantation times (e.g., less than about one year), are readily cleaned to reveal the intact fiber originally obscured by biological materials. Experience has shown that longer water soaking does increase the amount of crust removal, which is consistent with that reported by Thames and colleagues. Figure 1 is an example of a portion of mesh prior to cleaning; biologic tissue is visibly present. Shown in Figure 2 is this same mesh after 15 minutes of cleaning via immersion in bleach on an orbital shaker. The surface crust is partially intact and curling away from the underlying fiber, providing some insight into the mechanical properties of this crust. Notably, the fiber underneath has the appearance of pristine mesh.

---

[64] Within the limitation created by tissue presence and mechanical handling, SEM images were taken at multiple identical locations throughout the cleaning process.

**Zoom**



Figure 1. SEM of Smith explant prior to cleaning reagent exposure.

**Zoom**



Figure 2. SEM from the same explant as Figure 1, after partial cleaning (25 minutes) in bleach. The crust is peeling and curling away from the fiber as a broken layer, revealing a smooth fiber surface consistent with pristine mesh.

Removal of the biological materials requires a combination of time, solvent action, and mechanical assistance.  To provide a more complete cleaning the bulk tissue removal step should be combined with sonication, as this appears to assist in the removal of the distinct surface layer covering portions of the mesh.  The importance of cleaning was highlighted by de Tayrac (de Tayrac and Letouzey 2011), who was able to mimic the cracked surface appearance of polypropylene mesh filaments reported by other authors by inducing the development of a

brittle film on mesh fibers and then remove the film to reveal the intact filaments after proper cleaning (Figure 3).[65]



Figure 3. Figure from De Tayrac (2011) showing crust around a pristine PP fiber

Exponent's cleaning protocols incorporate exposure to bleach (10-15% sodium hypochlorite solution) under orbital shaking and sonication, incubation in distilled water at 80 ˚C, and a second step that includes exposure to proteinase K under incubation at 58 ˚C.  Interim observations and testing of explants and associated solutions demonstrates that gross soft tissue removal is relatively straightforward, and the majority of softer materials can be removed with a few hours of cleaning in a sodium hypochlorite solution (i.e., bleach).  When cleaning was performed by plaintiffs' experts in the previous litigation[66], they generally followed this procedure.  However, evidence of biological material on the surface of the mesh fibers (i.e. a crust and in some cases additional softer tissue) remains on previous plaintiffs' samples.

---

[65] In light of the observation that a brittle film on the polypropylene surface may appear similar in some ways to the brittle surface that can result from oxidation of polypropylene, it is important to carefully consider the capabilities and limitations of test methods used to characterize explants.  Exponent's analysis incorporates multiple complementary techniques in order to assess the explant surface for evidence that oxidation caused the observed cracking, or if the cracking was present in a deposited material that had not been removed by the applied cleaning methods.

[66] Plaintiffs' experts did not perform explant cleaning/analysis for the aforementioned plaintiffs, thus, reference is made to previous analysis performed by Plaintiffs' experts.

Additional cleaning actions through extended immersion in bleach and Proteinase K as well as repeated sonication as in Exponent's cleaning protocols continue to remove the biological deposits, though the amount of material to be removed and rate of removal vary by plaintiff and are not directly associated with implantation time. When cleaned, the original, uncracked morphology of the fibers is visible including extrusion lines and pristine, smooth surfaces. No evidence of dissolution or degradation of the polypropylene resin is found by analysis of the fibers or the cleaning solutions. In most cases, however, a portion of the deposit is more resistant to removal and remains as a cracked crust on the surface. Figure 4 below is a comparison of identical locations on an explant that has been successively cleaned. The left image is after the first NaOCl cleaning, the right is after the final NaOCl cleaning step. Clearly the majority of the crust has been removed with extrusion lines and pristine fiber visible after the final cleaning step.

The removal of additional biological materials after cleaning steps beyond a short bleach immersion can be observed physically and chemically. For example, the coating coverage and apparent thickness is reduced (Figure 4), and this is reflected in chemical measurements after the first bleach step of functional groups by FTIR and elements by EDS. For example, the relative intensity of amide-type FTIR absorbance bands decreases after increased bleach immersion (Figure 5) while EDS (Figure 6) shows that the crust portion of an explant contains multiple atomic species (e.g., sodium, sulfur, and chlorine), that are not associated with pristine mesh and are not present on the exposed, smooth fiber underneath despite similar bleach exposure.



Figure 4 Comparison of first cleaning and last cleaning of the Katsiafas explant.  The majority of the crust has been removed, revealing the uncracked fiber, including typical extrusion line features of a pristine fiber, underneath the crust.  (Images from the same location at different points in the cleaning process).



Figure 5  FTIR Comparison of an explant showing FTIR spectra after the first cleaning step (blue) and after the final cleaning step (red).  The peaks in the 1600-1800 $cm^{-1}$ range and 3000-3700 $cm^{-1}$ range are significantly reduced or no longer present, indicating removal of the source of the related functional groups.



Figure 6 EDS map[67] of three different explants after the first bleach cleaning step illustrating compositional differences between the cracked crust and the underlying smooth fiber.  EDS maps of an exemplar and an intentionally oxidized exemplar (QUV) after the first bleach cleaning step do not contain atomic species like sodium, chlorine, sulfur, etc. that may be associated with explants.

---

[67] Percentages of elements detected are semi-quantitative due to sample geometry, analysis area, and possible compositional differences throughout the sample.

Visual, FTIR, and GC-MS analysis of cleaning solutions do not indicate the presence of oxidized polypropylene in the sample.  Instead, particulate can be observed in the initial cleaning step solutions, indicative of the bulk tissue removed from the explanted mesh, while later solutions are free of particles or detectible films of polypropylene-based material.

## 3.2  Visual and Microscopic Condition

### 3.2.1  Exemplar Materials

When examined visually and microscopically, the pristine pellets, greige goods (GG), and mesh products exhibit the typical and expected appearance of polypropylene in these various stages of manufacture.  Optically, filaments in the mesh are clear.  When examined at higher magnification, the normal surface effects of extrusion and the expected effects of heat setting, such as extrusion lines, are visible on the greige goods and mesh products.  These features have no functional effect on the strength or durability of the filaments as used in the Bard TVM products.  The range of normal features is not specific to a lot and is representative of the condition demonstrated by any Marlex polypropylene mesh produced by or for Bard.  Photographs, optical micrographs, and SEM micrographs are provided throughout the Appendices.

The mesh products do not exhibit any evidence of improper manufacturing, excessive heat history, or non-conformance with the qualified manufacturing process.  Thus, to the extent that variations in surface striations, surface nicks, peels or distortions, or changes in fiber roundness are present, they would have been functionally assessed during Bard's various product development activities, including biocompatibility, physical property evaluation and functional testing.  They are considered normal and not detrimental to the capability and function of the product.  There is no evidence of material changes that would alter the biocompatibility or performance of the material from that assessed during qualification and use of this polypropylene and the Bard TVM products.

The material also dissolves in boiling xylenes as expected, and when dried from solution, exemplar material creates an opaque film with a visible crystalline structure. Similar treatment

of cleaned explants results in an opaque film with larger crystallites and an overall different appearance.  EDS analysis in the SEM reveals the presence of foreign nucleating material in the explant samples.  A more detailed description of the xylene dissolution results is provided in Appendix HH.

## 3.2.2  Explant Mesh

When examined visually and microscopically after various gross tissue removal procedures, explanted mesh products exhibit the same basic configuration as pre-implant mesh and are physically intact except where cut or otherwise altered during placement or removal of the mesh.  No signs of physical overload failures are present.  As noted above, variability in the extent of material removal accomplished by the standardized cleaning methods is observed.

Optically, the filaments in the mesh are cloudy or opaque in most areas after cleaning.  When examined at higher magnification, a surface texture that is not present on the exemplar, never-implanted mesh is observed.  This texture is consistent with the presence of an outer layer that is more brittle than the underlying polypropylene filament.  The layer can be inferred to be brittle based on the cracking, with reduced resistance to elongation compared to the underlying fiber, though the deformation reflected by curled or rolled portions indicates a level of physical integrity not typically associated with an oxidized polypropylene layer.  Importantly, the morphology alone is not sufficient to determine the chemical composition of the outer layer, and therefore cannot be used as a stand-alone basis for determining that the observed surface texture is the result of fiber degradation or consists of oxidized polypropylene.

EDS spectra collected during SEM imaging are likewise not capable of providing molecular composition.  EDS provides elemental (not molecular) information, and does not measure the presence of all types of atoms.  Thus, the presence of oxygen is not sufficient to determine if the material is oxidized polypropylene or some other material with brittle properties.  For example, oxygen is also present in amide-containing materials such as those present in biological materials. As a result, a simple ratio of carbon and oxygen peaks is not a reliable measure of oxidation of the polypropylene mesh.

SEM provides a number of insights about the crust based on morphology of the surfaces, cracks, and underlying material morphology.  Bare sections of undamaged polypropylene are seen under the crust. Bare sections can result from cleaning or mechanical dislodgement (Figure 7) of the surface deposit, though in some areas, shielding due to mesh geometry may have reduced or prevented the formation of the layer.  These bare spots do not have the appearance or distribution that would be expected if the observed cracking were associated with oxidative degradation.  The revealed fiber surface does not exhibit checking or crack tip penetration as would be expected if it were oxidized, while the cracked layer is observed to curl back on itself (Figure 8), a behavior not observed in intentionally oxidized polypropylene fibers.  Notably, the brittle crust layer on explants is generally well defined (Figure 7-Figure 9), and the fibers of the cleaned explants show evidence of ductility that would not be found in embrittled, oxidized polypropylene (Figure 10).  Furthermore, the brittle layer on explanted filaments does not exhibit the expected variable crack depth that would be associated with progressively oxidized material (Figure 12 and discussed further below).



Figure 7 SEM image of an explant showing areas of exposed, uncracked polypropylene.



Figure 8 Image of an explant showing areas of visible surface deposit, exposed, uncracked surface underneath and the crust layer peeling off the pristine surface.

The thickness of the layer does not appear to correlate with implant duration in the body (Figure 9) as would be expected for oxidative degradation. In some implants, the layer is characterized by relatively wide bands with parallel edges that appear to have fractured in a brittle manner before peeling from the surface. In other implants, the layer appears to have an "expanded" structure, suggesting the thickness of the layer had more leathery behavior when stretched to create the observed cracks. Still in other explants, no visible crust is observed after more than 5 years of implantation. Variable crust appearance and presence also exists within a single patient explant (Figure 11). For those explants with visible crust, the layer morphology is consistent with the presence of a deposited material and not oxidized polypropylene.



1.5 years implantation    2.6 years implantation    5.9 years implantation    5.4 years implantation

Figure 9 Images of explants from previous reports (A, 1.5 years implanted), (B, 2.6 years implanted), (C, 5.9 years implanted), and (D, 5.4 years implanted).  A, B, and C show similar thicknesses of the deposited layer and uncracked fiber underneath. A, B, and C explant images are after all cleaning steps from Wave 3 Minwave 1 cases in the MDL 2187 litigation. D, is after an initial cleaning with bleach and did not have an observable brittle crust, despite its 5.4 years of implantation.



Figure 10  Evidence of ductile mechanical behavior (yellow arrows) in various explants. Images A,B,D,E at 250x.  Images C,F at 500x.





Figure 11 Images of explants showing differences in crust morphology and presence depending on mesh location. Top Row: 4.3 years implantation. Bottom Row: 10 years implantation. (Images were taken after initial bleach soak).

Further confirmation of the defined crust layer was revealed through examination and comparison of cross sectional images created by focused ion beam (FIB) milling followed by SEM imaging of explant and intentionally oxidized (QUV exposed) exemplar materials. Figure 12 is a FIB created cross-sectional comparison of an explant from a previous report with a sample oxidized by seven days QUV exposure (Sample Avaulta 5). Figure 13 is a comparison of an intentionally oxidized sample with an explant, showing the differences in cracking and appearance. Surface and cross-sectional views of the explant and intentionally oxidized exemplar material illustrate differences in typical crack spacing, while cross sectional views illustrate differences in crack depth and morphology. These crack characteristics are markedly different from those observed in the intentionally oxidized exemplar. The explant cross sections

reveal crack morphology that is consistent with presence of an interface between two dissimilar materials where a crack propagating in one material (e.g. the outer crust) would become arrested and/or blunted.  Unlike the uniform depth of cracking in the explant, the cracks in the UV exposed fiber are of non-uniform depths and do not show blunting or bifurcation; they remain sharp.  These characteristics are consistent with surface-initiated cracks progressing in a material without secondary phases or interfaces.  For a more detailed description of the FIB process and an assembly of FIB-related images of exemplar, exemplar oxidized, and explant samples, refer to Appendix AA.



Figure 12 Comparison of cross-section images created using a FIB.  The two left images are of an explant from a previous report and the two right images are of a sample intentionally oxidized for 7 days.  Paired images have the same magnification.



Intentionally oxidized by QUV          Explanted material

Figure 13. Comparison of intentionally oxidized PP mesh by QUV (left) and an explanted mesh after the 1st cleaning step (right).  Red arrows indicate obvious sites of damage associated degradation, which are not present on the explant.  Yellow arrows indicate areas where crust is not present, a condition not observed in the oxidized PP.

## 3.3  Antioxidant Analysis

The stabilizer chemistry present in the polypropylene was assessed using a series of standard separations and analysis methods on the resin pellets.[68] Essentially, the resin was dissolved to free the stabilizers for characterization.  The analysis showed that the raw plastic material is formulated by the resin manufacturer to include hindered phenol and phosphite- based stabilizers.  Under the conditions of the test, 0.155 wt% stabilizer were detected in the Marlex HGX-030-01.  The nature and amount of stabilizers detected is consistent with the testimony of Phillip's corporate witness and confidential documents produced by Phillips related to Marlex

---

[68] Testing was performed according to K&N lab protocol LC-010, GPC-010, GC-011 & IR-010.  Pellets were fully dissolved and the polymer precipitated from solution to allow examination and characterization of the complete additive package.

HGX-030-01 polypropylene.[69]   A summary of the data associated with this analysis is provided in Appendix BB.

The primary antioxidant, Irganox 3114, is commonly selected because of its low migratory behavior and effective protection of polyolefins (e.g., polypropylene).  The secondary antioxidant, Irgafos 168, is one of the most common secondary antioxidants used in polyolefins. Phillips has also confirmed that "all raw materials used in the manufacture (of Marlex HGX-030-01) meet the standards of the Federal Food, Drug and Cosmetics Act and the rules and regulations promulgated."  While they manufactured HGX 0-303-01, Phillips maintained a quality control process and change control process in conformance with FDA regulations and requirements.

The specific additives present in the Marlex HGX-030-01 are commonly used to stabilize polypropylene and have been tested for extractability and toxicity by Phillips (CP-00087-90). However, Phillips does not report having performed specific biocompatibility tests for implantable end products; as expected, they instead ran characterization and tests to affirm production quality and conformance with specified raw material attributes.  As repeatedly affirmed by Phillips' corporate witness, the testing specific to an end use and determination of suitability for end use is the responsibility of the resin user, not the resin supplier.[70]  The Phillips testimony is consistent with my own experience in selecting and specifying raw materials for an application, my experience in the development of MSDS content, and my work for both a material supplier and for purchasers of materials for various end uses, including implantable medical devices.  In this case, Bard performed additional extraction testing to test and verify that any stabilizers or other additives would not be available or able to adversely impact biocompatibility.

---

[69] Testing for the presence of stabilizing additives was also previously performed by plaintiffs' experts, who likewise confirmed the presence of the expected Irganox 3114 and Igrafos 168 antioxidants.

[70] Deposition of Frank Zakrzewski, March 7, 2014; pg. 170, ll. 19-pg. 172, ll. 7, pg. 218, ll. 4-9

## 3.4  Spectroscopic Evaluation

### 3.4.1  Exemplar Materials

FTIR is a suitable method for assessing the surface of a sample for the presence or absence of chemical functional groups, but is not a direct confirmation of molecular composition.  While different techniques, sensitivity, and penetration depths are associated with the various measurements presented by previous Plaintiffs' experts and collected by Exponent, the overall FTIR analyses associated with these products provides an understanding of the chemistry of fiber and explant surfaces.  A summary of this data and associated testing conditions is provided in Appendix CC.

Pristine fibers demonstrate the characteristics of isotactic PP homopolymer, and the same spectra as reference pellets of Phillips Marlex HGX-030-01 polypropylene. When exemplar fibers are intentionally oxidized, as described elsewhere in this report, the polypropylene spectrum is altered by the addition of absorbances from carbon-oxygen functional groups and the associated broad absorption band.[71]  Over 100 spectra associated with pristine exemplars and exemplars exposed to various chemical and oxidation treatments have been collected and used for comparison and reference purposes in this analysis.

### 3.4.2  Explanted Materials

Explants, which generally are visually whiter than pristine mesh and exhibit microscopic surface cracking, provide a range of FTIR spectra that generally differ from the underlying PP fiber by the presence of one or more additional functional group resonances.  The round and cracked surfaces of explant fibers provide some experimental challenges, but acceptable spectra have been collected via different techniques, including single fiber testing using standard and micro-ATR sampling, and standard ATR sampling of multiple fibers.  Many explants exhibit peaks

---

[71] As described later, the FTIR absorbance is broad and increasing in magnitude with increased exposure time. Within the peak, the greater relative intensity is first seen in the 1710 cm$^{-1}$ region and shifts to higher wavenumbers with increased exposure.

associated with amide bonds (e.g., from proteins), and most exhibit some combination of carbon-oxygen functional groups.  Amides and functional groups containing nitrogen in addition to carbon and oxygen are not related to polypropylene or oxidized polypropylene.

Although carbon-oxygen groups are present in oxidized PP (as demonstrated by the data for intentionally oxidized mesh presented later in this report and in Appendix CC), FTIR is not capable of determining if the carbon-oxygen groups in a sample are part of the PP or from another source without additional information.[72]   Indeed, previous plaintiffs' experts and the literature have suggested that explanted fibers may have esterified fatty acids, triglycerides, or cholesterol at or on the surface, and we have demonstrated that surface-deposited materials on the polypropylene fibers can contribute carbon-oxygen absorbance peaks to the measured FTIR spectrum.[73]  Furthermore, if the FTIR peaks were due to oxidation, one would expect that they would develop in relative intensity over time as oxidation progresses, as demonstrated with the intentionally oxidized mesh.  However, increasing oxidative change with increasing implant time is not observed in the explant spectra.

There is no single profile of absorbance peaks associated with explants,[74] no trend in peak development or intensity that correlates with implant time, and no reliable match of explant spectra to spectra of intentionally oxidized reference mesh.  However, absorbances associated with carbon-oxygen bonds on the surface of explants decrease with cleaning.  The FTIR and associated visual and microscopic observations of explants indicate that the chemistry of the explant surfaces varies by patient and that the surface composition differs from oxidized polypropylene.  In light of other available information, including morphology and thermal decomposition behavior, it is more appropriate to describe the surface composition as a non-

---

[72] For example, spectra from exemplar fibers were typical of polypropylene, but could be modified to show a carbon-oxygen absorption peak (a sharp peak in the 1730 cm$^{-1}$ region) by the transfer of acrylate-based adhesive to the surface. This peak addition was observed in samples visually exhibiting localized areas of adhesive transfer associated with sample mounting for imaging in the SEM prior to FTIR analysis.

[73] In some historical explant samples a sharp peak is seen near the 1730 cm$^{-1}$ region, which is attributed to the carbon tape used to adhere the mesh samples to mounting stubs for viewing in the SEM.

[74] The varying spectral features, including resonances associated with amides, are also present in FTIR spectra previously collected by plaintiffs' experts

polypropylene deposit.  Based on sample history and the observed chemical characteristics (e.g., amides that can be associated with proteins, esters that can be associated with lipids including cholesterol, inorganic elements such as calcium, etc.), this deposit is of biological origin.  For a more complete review of FTIR analysis and historical data, refer to Appendix CC.

## 3.5  Thermal Evaluation

### 3.5.1  Exemplar Materials

Thermal analysis via DSC and TGA was performed to assess compositional and microstructural aspects of the Bard TVM products.  The Marlex HGX-030-01 polypropylene exhibits the expected melting and crystallization behavior of isotactic polypropylene fibers as measured by DSC during heating, cooling and reheating, including the effects normally associated with processing[75] and material lot variability.  The collagen layer and blue fiber were also evaluated for melting, crystallization and other thermal events.  The behavior of each material was unremarkable and consistent with expectations for each materials type.

Heating well above the melting and processing temperatures, particularly in oxygen, leads to eventual decomposition and weight loss, which can be measured by TGA.  Clear Marlex HGX-030-01 polypropylene decomposes completely in TGA testing, leaving essentially no non-combusted residue at the end of the test.[76]  Blue fibers tested in this way decomposed in a similar manner, but a residue consistent with the copper phthalocyanine pigment used to create the blue color is observed in the sample pan.  The protein-based collagen, which is a fully opaque white sheet of material, forms a char or residue after decomposition.

Thermal analysis by DSC reveals differences in melting peaks and the energy of melting between exemplar materials and explants, and observed variability amongst explants.  The differences are likely related to normal annealing and aging due to exposure to body

---

[75] For example, the fiber geometry as well as the type and degree of crystallinity developed during fiber drawing and heat setting can contribute to changes in peak shape and position during melting.

[76] Polypropylene is not a char-forming polymer under these test conditions.

temperature and may also be related to the constraining effect of the crust during melting. The observed differences are not confirmation of degradation or a defective change in the material. For example, if the material were degraded, crystallization would be expected to occur at higher temperatures than is observed. Furthermore, the presence of a foreign material typically affects heat flow measurements in DSC and this appears to be the case with explanted samples. Available DSC data does not support the assertion that polypropylene in explants is degraded. To the extent that GPC data has been presented and interpreted to show a loss of molecular weight in implants compared to non-implanted mesh, I note that the data fails to account for lot-to-lot variability in molecular weight, incorrectly analyzes data that is consistent with the presence of a second material, and improperly includes a different flow grade of polypropylene from a different manufacturer as a reference. For at least these reasons, the GPC data does not provide evidence of loss of molecular weight due to oxidation.

TGA testing provides important insights into the composition of the explanted mesh. As noted above, the clear Marlex HGX-030-01 polypropylene in Bard TVM products decomposes completely during TGA analysis; however, this full decomposition is not observed in explants. Although the main decomposition profiles mimic exemplar materials, a shriveled film-like residue remains in the pan after TGA testing of explants. The amount of the residue varies between explants and is less commonly observed the more the cleaning process removes the crust, but is distinct from the residue associated with blue fibers or the collagen layer, the effect of residual carbon tape from prior SEM imaging, and the scratches or haze sometimes associated with the pans after use. When viewed in the SEM, the residue is three-dimensional and contains some inorganic components (e.g., calcium, phosphorous and other elements that are found in the body) not associated with the HGX-030-01 polypropylene. As explained in a later section, this residue is not consistent with oxidized polypropylene. The residue is consistent with the presence of a layer of material of biological origin deposited on the filament surfaces and adhered sufficiently to resist standard cleaning methods. Furthermore, comparison of the decomposition profiles for exemplar, explant and intentionally oxidized mesh demonstrate that the explant material is consistent with exemplar polypropylene and not the shifted profile due to degradation observed when mesh is intentionally oxidized. A summary of the thermal analysis data is provided in Appendix DD.

## 3.6  Resistance to Chemical and Forced Oxidative Degradation

### 3.6.1  Oxidative Induction Time for Exemplar Materials

Stabilizer effectiveness was assessed during forced degradation testing, including TGA and oxidation induction time (OIT), of pellets, greige goods, and mesh products.  When heating profiles, test duration, and oxygen concentrations are sufficiently intense, the stabilizers are depleted and the polypropylene oxidizes, generating a measureable heat of reaction and a visible change in the appearance of the material.  Testing demonstrates the antioxidant activity and effectiveness of the stabilizers in the formulation, including protection of the polypropylene in the finished product.  For example, there is no measurable oxidation for over 16 hours at 160°C in pure oxygen.  There is no evidence of excessive loss of stabilizer from processing.

The resistance to oxidation observed in OIT testing provides a measure of the antioxidant protection in the material.  The OIT testing confirms that Bard TVM meshes made from HGX-030-01 are well stabilized against oxidation, and not reasonably expected to suffer from oxidation during use.  This testing addresses the potential for initiation of oxidation during processing, as sometimes alleged by Plaintiffs, and shows that the temperatures and conditions of materials conversion (e.g. extrusion, knitting and heat setting) and device manufacture (e.g., sterilization) do not lead to degradation of the mesh during the expected lifetime of the product.  This testing also demonstrates the durability of the mesh in the face of a highly oxidizing environment that is more challenging to the material than would be encountered in use.  Data associated with OIT testing is summarized in Appendix EE.

### 3.6.2  Chemical Exposure of Exemplar Materials

Plaintiffs assert that the mesh is chemically degraded via oxidation when implanted in the body.  To test this hypothesis, Exponent subjected exemplar samples to various potential oxidizing agents including 10% sodium hydroxide (NaOH), 3% and 30% hydrogen peroxide ($H_2O_2$), 10-15% sodium hypochlorite (bleach), 5% iodine in water, 10 % betadine and 6M hydrochloric acid (HCl) at ambient and elevated temperatures.  Exposure to these chemicals was accelerated (e.g., in duration, concentration, temperature, etc.) compared to any reasonable biological condition, and was designed to produce an oxidative response of the polypropylene.  Two

solutions were specifically selected to intentionally induce oxidative degradation in an accelerated fashion based on publicly available literature: immersion in the 10% NaOH (pH 13) at 50°C[77] and immersion in a cobalt (II) chloride buffered 30% hydrogen peroxide at 37ºC.[78] When evaluated visually and by FTIR after this testing, little or no alteration of the appearance or surface chemistry of the mesh was observed, and no sample exhibited the cracked surface morphology of an explant.  Particularly noteworthy is the observation that aggressive peroxide exposure failed to induce oxidation or a morphology similar to that observed in explants. Images and a summary of data associated with chemical exposure testing are provided in Appendix FF.

### 3.6.3  Exposure of Exemplar Mesh to QUV Testing

Exponent was able to force the oxidation and surface degradation of Bard TVM products by exposure to intense photo-oxidative challenge at elevated temperature.  While UV oxidation is not an expected nor realistic mechanism for mesh degradation within the body, this testing produced materials with known composition and history that could be used for experimental controls and comparison of explant materials to polypropylene mesh known to be oxidized.

Exemplar materials were subjected to QUV testing, a combination of elevated temperature and ultra-violet (UV) radiation, using a UVA 340 bulb.  Several exposure studies were conducted, including under dry, continuous exposure for up to 10 days, irradiance up to 0.89 W/m$^2$, temperatures up to 60ºC, with and without imposed loads.  After sufficient time, fibers were measurably oxidized visually (Figure 14) and as indicated by a distinct broad peak in FTIR (Figure 16).  The broad FTIR oxidation peak increases in magnitude with increased exposure time.  Within the peak, the greater relative intensity of the apparent subpeak first seen in the 1710 cm$^{-1}$ region shifts to higher wavenumbers with increased exposure as different types of carbon-oxygen groups develop (e.g., acids, ketones, aldehydes, esters). Cracking appeared

---

[77] These conditions were selected based on PP oxidative damage images in the text Ehrenstein, G., et al. (2011). SEM of plastics failure. Munich, Germany, Carl Hanser Verlag.

[78] Conditions were selected based on oxidative damage studies of implantable polyurethanes such as those found in Christenson et al (2005), which was 20% hydrogen peroxide solution at 37C.

sooner in samples under load, and penetrated to varying depths within the fiber.  When portions of the oxidized surface were broken some penetrating cracks were still visible on the underlying surface.  Notably, the FTIR peak associated with oxidation was clearly present when the surface was minimally cracked, a condition that is dissimilar to the explants.

 

Figure 14. SEM Images of intentionally oxidized exemplar mesh irradiated at 0.89 W/m² at 60ºC after 3 days with (left) with a 1 lb load attached and (right) with no attached load.  After three days with load, numerous cracks can be seen as well as signs of major degradation.  Cracking is observed with no load, although in less amount.

Qualitatively, cracking intensity and average crack depth also increased with exposure time. For more extensively oxidized materials, crack depth varied throughout the material providing a structure dissimilar to that of the crust layer found on explanted materials (Figure 17).  Cracking from oxidation corresponded to a loss of mechanical strength, which can be observed when handling the samples, and was demonstrated by samples placed under 1 lb of load that fractured after approximately three days of QUV exposure.  Notably, no core/shell or layer structure similar to explanted mesh morphology was observed in the QUV samples via fracture analysis or FIB cross sectioning, and as reported previously, no mechanical failure has been reported for the explants.  Further, surface cracking intensified when intentionally oxidized samples were progressively cleaned in the same manner as explants (i.e., the combined action of sequential sonication and soaking in DI water, NaOCl, and Proteinase K).  This is in direct contrast to the

behavior of explants, where cleaning reveals the original fiber underneath.  Figure 15 below is a comparison of the intentionally oxidized samples before and after cleaning, with that of an explant, before and after cleaning. Additionally, the cleaning solutions, post-cleaning, were tested by GC-MS and did not identify molecules indicative of PP degradation, refer to Appendix GG.



Figure 15. SEM images of before and after the full cleaning procedure of (left) an intentionally oxidized exemplar mesh, (middle) an explanted mesh (previous report), and (right) a pristine exemplar.  Cleaning intensifies cracking in an oxidized fiber, but cleaning the explant reveals smooth fiber similar to the exemplar.

This testing demonstrated that the combination of appearance, mechanical properties, and broad FTIR absorbance around 1735 cm$^{-1}$ that result from oxidation of the Marlex HGX-030-01 PP was different than the combination of appearance, mechanical properties and assorted FTIR absorbance exhibited by explants.



Figure 16 Comparison of intentionally oxidized samples from QUV radiation with an exemplar material.  Observation times and load conditions are noted in legend.  Sample Avaulta 3 fractured after day 3, and was removed from QUV testing by day 5.



Figure 17 SEM image of exemplar mesh after 10 days QUV irradiation of 0.89 W/m2 at 60ºC

Thermal analysis also showed distinct differences resulting from oxidation.  This included the loss of high melting point crystals and the development of crystals with additional melting points more than 10°C lower as measured by DSC, as well as notably different decomposition behavior in TGA (Figure 18).  When pristine, cleaned and oxidized controls from the same lot are compared, the shift to lower decomposition onset is readily observed, which is consistent with the expected loss of molecular weight from oxidation.  Figure 19 compares our controlled data with literature data.  Clearly, the explant peak shifts in the opposite direction of the oxidized material.  Additionally, like exemplar polypropylene and unlike the explants, the oxidized sample did not leave a residue after TGA testing.  This data provides objective comparative data that contradicts Plaintiffs' hypothesis that the Marlex HGX-030-01 polypropylene in Bard TVM meshes oxidizes and degrades to a brittle crust in use.  It supports other data that indicates that the morphology of explant surfaces is associated with a deposited layer and not the oxidation of polypropylene.  For a more complete review of the QUV exposure, refer to Appendix GG.



Figure 18 TGA comparison of intentionally oxidized samples by QUV irradiation with exemplar materials.  (Top) Weight Change vs Temperature, (bottom) Weight Percent Loss vs Temperature



Figure 19. TGA derivative plots comparing literature[79] data and Exponent's data with intentionally oxidized samples

Based on the data and observations associated with the Marlex HGX-030-01 polypropylene in Bard TVM mesh materials, including repeated assessments of microscopic condition and morphology, as well as testing by FTIR, DSC, OIT, TGA, EDS, stabilizer chemistry assessment, and resistance to thermal, radiation and chemical oxidation, these materials are stable under conditions of intended use and do not exhibit evidence of oxidative degradation due to manufacturing. There is no evidence of material changes that would alter the biocompatibility or performance of the material from that assessed during qualification and use of this polypropylene and the Avaulta and Align products.

---

[79] Costello, C. R., S. L. Bachman, S. A. Grant, D. S. Cleveland, T. S. Loy and B. J. Ramshaw (2007). "Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient." Surg Innov 14(3): 168-176.

# 4   General Response to Previous Plaintiffs' Testing and Opinions Related to Bard's TVM Products

Previous Plaintiffs' experts have reported that some portion of explanted polypropylene meshes exhibit a brittle surface texture that includes predominantly circumferential cracking and assert that this texture is evidence of oxidation. However, direct examination and testing of explanted Bard TVM products and comparison to as-manufactured, intentionally oxidized and chemically challenged exemplar mesh, as well as review of related data from other sources, does not support Plaintiffs' hypothesis of oxidative degradation of the polypropylene of the TVM products in the body.

Plaintiffs experts have also previously suggested that the observed cracking is due to environmental stress cracking (ESC) from exposure to lipids such as cholesterol. ESC results from the combined action of stress and a chemical with marginal compatibility such that local plasticization and local advancement of crack fronts occur. Notably, the polymer itself is not chemically altered in ESC, so assertions of oxidation and molecular degradation are inconsistent with this mechanism. ESC cracking will occur everywhere that sufficient stress and chemical exposure is encountered, and more aggressive local combinations will lead to preferential crack advancement. As a general matter, polypropylene is recognized for ESC resistance, and compatibility with lipids. The location and extent of cracking on explants is inconsistent with the exposure and stress profile expected for implanted mesh, indicating ESC is not the cracking mechanism. Additionally, cross-sectional images from the FIB showing the blunted cracking indicative of a defined brittle layer on the fiber surface are strong evidence that ESC is not a factor in the cracking seen with the explants (Figure 12).

While a brittle surface is visible on some portion of the subject explanted polypropylene meshes, it is not from polypropylene oxidation of from ESC. Previous Plaintiffs' experts' data can be reasonably explained by the presence of a surface deposit (e.g., a biofilm) that is more brittle than the polypropylene filaments, rather than the development of a brittle filament surface due to oxidation of the polypropylene. The presence of deposited biofilm is supported by data, such as non-combustible residues and chemical signatures distinct from those of polypropylene

or oxidized polypropylene as well as qualitative observations of surface and cross sectional appearance, crack morphology and crack depth, and mechanical properties. The presence of deposited biofilm is also consistent with expected biological processes in which proteins and cells adsorb to implanted surfaces. Thus, previous plaintiffs' experts have not provided a reasonable scientific basis for their assertion that the polypropylene is oxidized *in vivo*, or that the alleged oxidation is associated with adverse clinical outcomes. It is my opinion to a reasonable degree of scientific and engineering certainty and/ or probability that the cracked surface is actually a layer of a material of biological origin, and not the alleged oxidized polypropylene.

Plaintiffs' experts have essentially advanced the position that clinical complaints are because of the incompatibility of polypropylene mesh, which previous Plaintiffs' experts have stated is the result of oxidation of the polypropylene. Specifically, they assert that the Bard TVM products exhibited *in vivo* oxidative degradation, that polypropylene is not inert, and that oxidative degradation led to a reduction in molecular weight of the polypropylene, which in turn caused a reduction in mechanical properties. Plaintiffs' experts have also suggested that the information reflected in the Bard's 510k regulatory documentation related to the physical characteristics of the mesh products demonstrates the products were defectively designed. As I have outlined elsewhere and explained further here, those opinions are without reasonable scientific support.

## 4.1  Marlex HGX 030-01 polypropylene is a reasonable and stable biomaterial

Plaintiffs' experts have suggested that the Phillips Marlex HGX-030-01 polypropylene used in the Bard TVM products is a defective material that is not biocompatible or suitable as an implantable biomaterial. I disagree. I have provided a basis for my opinion here and in the analyses outlined elsewhere in my report.

Polypropylene including Marlex HGX-030-01 is a recognized biocompatible material, with a decades-long history of successful clinical use. This history is complemented by Bard's research and analysis related to implantable polypropylene mesh, and Bard's direct history of testing and use of Marlex polypropylene homopolymer since the 1960s.

### 4.1.1  MSDS language does not mean the material is incompatible or unsuitable for use in humans as part of qualified, finished implantable medical products.

A standard form of communication about raw materials is through data sheets, including the Material Safety Data Sheet (MSDS) and Technical Data Sheet (TDS).  These commonly are written to apply to more than one grade of a resin, and therefore may contain information that is not specific to each grade covered.  They are intended to provide general information, and are not a substitute for specific analysis to be defined and performed by the purchasers of the resin in light of their intended use.  For example, the 2004 MSDS for Marlex HGX-030-01 states "information provided herein relates only to the specific product designated and may not be valid where such product is used in combination with any other materials or in any process" (CP00041).  The data sheets also include disclaimers with language such as "[b]efore using this product, the user is advised and cautioned to make its own determination and assessment of the safety and suitability of the product for the specific use in question and further advised against relying on the information contained herein as it may relate to any specific use or application" (CP-00016).

While a later MSDS for Marlex HGX-030-01cautions about implanting the material in the human body, nowhere does it state that the material would do harm if it were implanted.  In fact, Phillips "makes no representation, promise, express warranty or implied warranty concerning the suitability of this material for use in the human body or in contact with internal body fluids or tissues" (CP-00087-90).  As indicated earlier, "medical grade" is a market designation, not an industry-standard term, and it means different things to different raw material suppliers and purchasers.  It does not assure a material will perform or fail to perform in a medical application.  Furthermore, raw material supplier information is subordinate to testing and evaluation related to a finished medical device.  Bard appropriately assessed biocompatibility and function and reported its findings and experience to the FDA in the manner of a reasonable medical device manufacturer.

A Material Safety Data Sheet or MSDS is not a biocompatibility document.  It is an industrial communication related to occupational exposure to raw materials.  The MSDS does not pertain to finished products that will be implanted in the body, and does not address testing,

characterization, or assessment of suitability for specific applications.  Phillips' testimony confirms that suitability is to be determined by the end user.  This is consistent with the intent of the Biomaterials Access Assurance Act of 1998, which was enacted to encourage material suppliers to continue to sell to medical device manufacturers.[80]

In this case, Bard demonstrated the biocompatibility of its TVM products through a multitude of cellular and animal tests in accordance with ISO 10993.  This is consistent with the expectations expressed in sworn deposition testimony by Phillips' designated corporate witness in regards to material and product testing.[81]  The biocompatibility of the Bard TVM products also builds on the efficacious clinical history of polypropylene and animal-based collagen as materials for surgical meshes, including uses for vaginal tissue repair, and for other medical products (e.g. surgical sutures), Bard's own experience with related and predicate products, and its core material set (e.g. Phillips HGX-030-01, Collamend collagen).  The Bard TVM products are made from materials that have been well characterized chemically and physically and have a long history of safe use.  The biocompatibility of the component materials of the Bard TVM products has been established in that the predicate products (including those manufactured by Bard) include the same materials, manufacturing, sterilization, and tissue contact profiles.

Plaintiffs' experts previously claimed that Marlex polypropylene was "incompatible" with oxygen and oxidizing agents when, in fact, the MSDS merely states that polypropylene "may react with oxygen and strong oxidizing agents, such as chlorates, nitrates, peroxides, etc" (CP-00047). Nearly all materials react with oxygen and strong oxidizing agents under certain conditions.  However, common compatibility charts indicate polypropylene is actually resistant to many chemical oxidants like chromic acid, hydrogen peroxide, and potassium permanganate that produce conditions much harsher than those observed in the human body.  More importantly, direct testing of exemplars demonstrates that the Bard TVM products resist

_____

[80] In the wake of certain high profile medical device litigation, many raw material suppliers took steps to minimize sales of their materials into medical device applications, especially for implantable devices.  The act was a response to concerns about raw material availability and its impact on innovation and access to medical devices.

[81] Deposition of Frank Zakrzewski, dated March 7, 2014, with exhibits 1-26

oxidizing conditions more aggressive than would be expected in the body, while direct testing of explants demonstrates that this polypropylene is not oxidized during use.

There are certain conditions under which polypropylene can oxidize, but these are not the conditions encountered by Bard's TVM products.  Phillips' designated witness was unaware if the potential oxidizing reactions listed on the MSDS would occur in finished medical devices in the human body.[82]  I have not seen data that scientifically supports these statements, either.  In contrast, there is substantial data in the literature and Bard documents supporting the medical use of Marlex polypropylene and use of Marlex HGX-030-01 polypropylene in implants that contradicts the data sheet statement.[83]  Indeed, mesh manufactured by Bard from Marlex polypropylene resin has been implanted safely in millions of patients for over four decades.[84]  Furthermore, I have investigated this by evaluating explants and performing challenge testing with strong oxidizers, including peroxide solution and concentrated mineral acids, and found that they do not degrade via oxidation *in vivo*.  Thus, oxidative degradation *in vivo* is not a foreseeable risk for the Bard TVM products.

## 4.1.2  Literature references to the potential for polypropylene oxidation do not provide specific scientific support for the hypothesis that the Plaintiffs' meshes are oxidized *in vivo*

Publications have identified a cracked surface on explanted polypropylene mesh and suggest that the cause is oxidation of polypropylene, although the limited associated compositional analysis has been inconclusive (Costello, Bachman et al. 2007, Costello, Bachman et al. 2007, Clave, Yahi et al. 2010, Cozad, Grant et al. 2010, Ostergard 2011, Sternschuss, Ostergard et al. 2012, Iakovlev et al. 2015, Imel et al. 2015, Talley et al. 2017). These publications principally rely on the visual observation of a cracked surface morphology and do not provide conclusive evidence that polypropylene meshes undergo oxidation *in vivo*.  Furthermore, allegations of *in*

---

[82] Deposition of Frank Zakrzewski, dated March 7, 2014, with exhibits 1-26

[83] Boston Scientific also assessed the biocompatibility of Marlex HGX-03-01 in its Pinnacle device.  It provided the MSDS as part of its regulatory filing, responded to related questions from the FDA after discussions with Phillips, and received clearance for the product.

[84] Deposition of Roger Darois, dated June 19, 2013, at pp. 40-41

*vivo* oxidation are based on theories of reactive oxygen species (ROS) causing oxidative degradation of fiber surfaces.  However, *in vitro* studies with supra-physiological conditions of ROS have not produced physical surface features that replicate surface features found on explants (Figure 20).  When oxidation is forced by UV exposure, brittle cracking can generally be created but does not share key aspects of explant morphology, indicating the UV-based cracking is of a different origin than the crust cracking (Figure 12, Figure 13, Figure 15, Figure 20 ).



Figure 20.  SEM images of surface features of polypropylene mesh after forced oxidation through ROS or UV light in comparison to surface features on explants.  Top Row: SEM images obtained after immersion in 20 wt% $H_2O_2$ for 5 weeks at 37°C. Devices: A – TVT, B – Advantage, C – Lynx.  Bottom Row: (left) SEM images obtained after 10 days of UV light exposure at elevated temperature (60°C).  Bottom Row: (right) Images of explants. Top Row (*in vitro ROS*) images adapted from Talley et al. (2015).

The discrete nature of the cracking layer observed on explants supports its association with a deposited coating or crust, rather than the gradient of embrittlement, varying crack depth, and the cracking features that are typically observed with oxidation.  Oxidation occurs progressively inward from the surface.  Notably, the surface of the explants has a distinct layer that can be mechanically removed, or gradually decomposed by appropriate cleaning solutions (Figure 4).  Such a shell/core characteristic is not associated with oxidation.

A study published by De Tayrac and Letouzey (De Tayrac 2001), showed that surface features similar to those on the explants could be created by the intentional deposit of a brittle biofilm (Figure 3).  In the study, the biofilm was created through infection, though the same principles would apply to any coating of similar mechanical properties.   This deposited biofilm exhibited cracking and a general surface appearance similar to that identified by previous Plaintiffs' experts as possibly indicating oxidation.  The authors were able to combine sonication with a solvent to remove the biofilm and reveal the undamaged fiber beneath it (de Tayrac and Letouzey 2011).   Another study  (Thames, White et al. 2017) focused specifically on transvaginal mesh explanted from numerous individuals.   The Thames analysis showed polypropylene meshes did not degrade *in vivo,* but rather were coated in a biologic crust that was sepcifically adherent due to the formalin fixative process.

Exponent demonstrated a similar principal by soaking exemplar mesh in human serum for 7 days and allowing it to dry to a coating. The deposited film fractured in a brittle fashion when the fibers were flexed revealing the pristine fiber beneath the crust (Figure 21).[85]

---

[85] The cracking pattern in this demonstration is different than that of an explanted mesh, for reasons likely related to specific exposure conditions, duration, fixation and specific mechanical forces.  However, the principle of a composite structure and associated behavior is the same.



Figure 21 Exemplar mesh after being soaked in human serum for 7 days, mechanically flexed and allowed to dry in air.  The deposited film is brittle.

## 4.2  Mesh explants are not oxidized

Previous Plaintiffs' experts have suggested that mesh explants may be oxidized *in vivo*, and that this is a defect that causes various health risks and adverse outcomes.  I disagree with this opinion from the perspective of a polymer scientist and researcher in the field of polymers and biomaterials.  I have provided a basis for my opinion here and in the analyses outlined elsewhere in my report.

Polypropylene can degrade by oxidation, and previous Plaintiffs' experts suggest that the conditions necessary for this to occur are present during manufacturing and while the Bard TVM products are implanted.  However, direct evaluation of explanted mesh and challenge testing of exemplar materials demonstrate that the necessary conditions are not present, and that mesh explants are not oxidized.

### 4.2.1  SEM does not show oxidation of the mesh explants

A primary basis for previous Plaintiffs' experts' assertions of oxidation degradation is the cracked morphology of explants viewed by SEM.  A careful review of the images, the sample preparation methods, associated data and the peer-reviewed literature, however, all indicate that the surface features are more likely to be artifacts of normal foreign body responses and insufficient cleaning of deposited material prior to imaging.  Other observed features are common for extruded and knitted filaments, or are artifacts of handling and implantation.

SEM, particularly as used and described by Plaintiffs, is not a recognized means of characterizing organic material composition, including the chemistry associated with polypropylene oxidation.  It is useful for assessing morphology, and in this case the morphology is of a brittle coating.  Complementary data, including FTIR, TGA, and other studies indicate there is a coating deposited on the surface, and that it is not oxidized polypropylene. The layer-like aspect of the coating is visible in many SEM images.  In light of this, any coating spalling or particulate from the explants cannot be attributed to degraded polypropylene. To the extent the biofilm coating creates adverse health effects,[86] the outcomes are not because of a defective material, or the defective use of Marlex HGX-030-01 polypropylene.

## 4.2.2  FTIR does not show oxidation of mesh explants

Exponent's FTIR measurements and analysis indicate the presence of foreign material on the surface of explants, and that remnants of this material can remain after cleaning.  This material is not oxidized polypropylene.  Plaintiffs' own data shows likewise the presence of the deposited biological material, and indicates variability that is likely related to patient-specific factors.  For example, FTIR spectra collected by Polymer Solutions from the explants of three previous plaintiffs and FTIR spectra collected by Jordi labs from the explant of other previous plaintiffs contain peaks associated with functional groups not in polypropylene.  Because of the limitations of the technique and the nature of the spectra presented, these peaks are not diagnostic for oxidation, and may more reasonably represent the presence of another material, such as an amide-containing material.  Furthermore, the collected spectra indicate the samples are not uniform in composition with varying features in the 1500-1700 $cm^{-1}$ range. Noticeable chemical changes can be seen by analysis of the surface after successive cleaning steps, including repeated rinsing in sodium hypochlorite solution (Align Appendix FF).

There are also variations within a given explant, and between samples obtained from different patients.  These variations can be reasonably explained by patient- and site-specific deposits.  If these peaks were due to the inherent chemical composition of the material, one would expect

---

[86] Health effects are beyond the scope of this report.

them to be in each spectrum, regardless of sampling location.  Similarly, if these peaks are attributed to a changed chemical composition of the device resulting from use in general, one would expect all explanted samples to have the same peaks.  Thus, FTIR data does not provide a sufficient basis to conclude the cracking morphology is from oxidized polypropylene.

## 4.3  Bard TVM products are not defectively designed or manufactured

Plaintiffs' experts generally have suggested that the Bard TVM products were defective in design or manufacture for reasons that include the materials, knit structure (e.g. pore size and mesh weight), product geometry, and intended surgical approach.  I disagree.  I have provided a basis for my opinion here and in the analyses outlined elsewhere in my report.

The Bard TVM products are a subset of Bard's larger offering of mesh-based product for soft tissue repair, including the repair of POP and SUI.  The materials are biocompatible and stable.  The knit structures and product geometries were selected based on testing, surgeon input, clinical history, and institutional knowledge.  The devices were manufactured in a reasonable, controlled process.  And, from an engineering perspective, the intended surgical approach is one of many options to be selected by a surgeon, not the device manufacturer, based on patient factors and surgeon preference.

The adoption of mesh materials in vaginal repair has evolved from its widespread use in the repair of abdominal wall hernias (Lucente, Murphy et al. 2012).  Abdominal hernia repairs with synthetic meshes have been proven to be substantially superior to suture-based repairs, leading to significantly lower recurrence rates.  It has been stated that although the female pelvis is different in several aspects when compared with the abdominal wall, nonetheless, similar challenges are faced for non-mesh repair of the pelvic floor as for abdominal wall hernias.  A large amount of information has been compiled indicating the reported complications of pain, scarification, dyspareunia, infection, etc. are not the result of defective design or manufacture (See Appendices E-H).  The mesh was designed and developed with appropriate pore sizes and mechanical compatibility, which provide adequate function of the mesh.

## 4.4  Responses to Plaintiffs' Experts

To the extent that Plaintiffs' experts have expressed specific opinions,[87] I have addressed them herein and in prior reports, including by virtue of my findings and conclusions contradicting and refuting those experts' opinions, and my same analysis applies.

---

[87] Plaintiffs' have disclosed the following experts: Dr. John Miklos, Urogynecology (adoption of reports previously served on 10/9/14 in Wave 1 and 2 and 2/17/15 in Miniwave, updated reliance list served on 05/08/2017 on Waves 4 and 5, and reports previously served on 05/12/2017 in Waves 4 and 5); Dr. Alan Garely, Urogynecology (adoption of reports previously served on 10/9/14 in Wave 1 and 2 and 2/17/15 in Miniwave, updated reliance list served on 5/08/2017, and reports previously served on 05/12/2017 in Waves 4 and 5); Dr. Brian Raybon, Urogynecology (adoption of reports previously served on 10/9/14 in Wave 1 and 2 and 2/16/15 in Miniwave and updated reliance list served on 05/08/2018 in Waves 4 and 5); Dr. Lennox Hoyte, Urogynecology (adoption of reports previously served on 10/9/14 in Wave 1 and 2 and 2/16/15 in Miniwave and updated reliance list served on 05/08/2018 in Waves 4 and 5); Dr. Robert Moore, Urogynecology (adoption of reports previously served on 5/12/2017 in Waves 4 and 5); Dr. Stacey Wallach, Urogynecology (adoption of reports previously served on 10/13/14 in Wave 3 and updated reliance list served on 05/08/2017 in Waves 4 and 5); Ahmed El-Ghannam, Ph.D., Biomaterials (adoption of reports previously served on 10/9/14 in Waves 1 and 2 and 2/17/15 in Miniwave); Julia Babensee, Ph.D., Biomedical Engineer (adoption of reports previously served on 10/9/14 in Waves 1 and 2 and 2/17/15 in Miniwave); Jerry G. Blaivas, M.D., Urologist (adoption of report previously served on 10/9/14 in Waves 1 and 2); Keith O. Reeves, M.D., F.A.C.O.G, Gynecologist (adoption of report previously served on 10/9/14 in Waves 1 and 2); Bruce Rosenzweig, M.D., Urogynecologist (adoption of report previously served on 10/9/14 in Waves 1 and 2).

# 5   Opinions

Based on the information reviewed and my education, training, and experience in the fields of materials science, polymer science, and medical device product development, it is my opinion to a reasonable degree of scientific and engineering certainty that polypropylene, including Phillips Marlex HGX-030-01, is a reasonably selected biomaterial exhibiting appropriate biocompatibility.  It is further my opinion to a reasonable degree of scientific and engineering certainty and/or probability that Bard TVM products based on Phillips Marlex HGX-030-01 polypropylene, exhibit the ability to perform as intended for tissue repair, including the repair of pelvic organ prolapse and stress urinary incontinence.  It is also my opinion to a reasonable degree of scientific and engineering certainty and/or probability that the Avaulta Solo, Avaulta Plus and Align mesh characteristics, including geometric structure, pore characteristics, the incorporation of collagen and marking fibers, and biomaterial attributes, are reasonable for use in tissue repair, including pelvic organ and stress urinary incontinence repair, and are consistently described according to a reasonable method.  There is no evidence of defective material, design, or manufacturing in Avaulta Solo, Avaulta Plus or Align implants, including those implanted in Plaintiffs.  Thus, it is my opinion to a reasonable degree of scientific and engineering certainty and/or probability that there is no evidence that the Avaulta or Align implants, or any action or inaction on the part of Bard related to these products, caused the alleged injuries to the Plaintiffs.  All of my opinions expressed below are held to a reasonable degree of scientific and engineering certainty and/or probability.

- Polypropylene, including Phillips Marlex HGX-030-01, is a reasonably selected biomaterial exhibiting appropriate biocompatibility.

- Bard transvaginal mesh products based on Phillips Marlex HGX-030-01 polypropylene, including the Bard TVM products implanted in Plaintiffs, exhibit the ability to perform as intended for tissue repair, including the repair of pelvic organ prolapse and stress urinary incontinence.

- The Bard TVM characteristics, including geometric structure, pore characteristics, and biomaterial attributes, are reasonable for use in tissue repair, including stress urinary incontinence repair, and are consistently described according to a reasonable method.

- There is no evidence of defective material, design, or manufacturing for the Bard TVM implants, including the Bard TVM products implanted in Plaintiffs.

- Polypropylene is a well-accepted biomaterial with a long history of clinical use as a permanent implant.

- Raw material manufacturers' designations or labels such as "medical grade" are not a substitute for biocompatibility testing of a polymer, nor do these designations or labels preclude the material from being biocompatible, or preclude additional testing to confirm a specific product made from a raw material is biocompatible.

- The Bard TVM products made of Marlex HGX -030-01 polypropylene and collagen are biocompatible, and have been repeatedly tested to confirm biocompatibility according to objective and scientific methods accepted by the FDA and other regulatory agencies.

- MSDS language does not affect the biocompatibility or function of the polypropylene material.  The Bard TVM products are not defective because of their use of Marlex HGX-030-01 polypropylene.

- The polypropylene mesh used in the Bard TVM products, including the device implanted in the Plaintiff, does not oxidatively degrade in the body.  Pathology and histology assessment of tissues are not a means of assessing the presence of polypropylene oxidation.  The material is stable against anticipated oxidative challenge by heat and peroxides, including from processing and inflammation.  The cracked surfaces of explanted Bard TVM mesh are not due to oxidized polypropylene.

- Plaintiffs' adverse outcomes are not the result of oxidized polypropylene because the polypropylene is not oxidized *in vivo*.

- Synthetic meshes, including polypropylene meshes, are expected to cause a mild inflammatory response for tissue in-growth to occur, but remain essentially inert and stable in the body and exhibit excellent biocompatibility as shown through extensive studies.  The extent of inflammatory response varies among patients and is related to patient-specific factors including repair site location, previous medical history, tissue quality, and surgeon skill.

- Any tissue repair mesh may exhibit shrinkage or contracture as a result of normal healing action on the implant and identical products can exhibit widely varying levels of tissue contracture because of implantation and patient-specific factors.  As a result, a reliable correlation between the degree of shrinkage and mesh material or construction has not and cannot be made.

- The Bard TVM products, including the product implanted in Plaintiffs, were constructed of widely-accepted biomaterials with a successful history of clinical use in many applications, including tissue repair.  The materials were reasonably selected and were appropriate.

- The polypropylene mesh used in the Bard TVM products, including the Bard TVM products implanted in Plaintiffs, was reasonable, biocompatible, and acceptable.

- The design and development process associated with the Bard TVM products, including the Bard TVM products implanted in Plaintiffs, was performed in accordance with accepted and expected engineering and scientific practices.  The process built on Bard's prior experience, testing, and history with Bard's polypropylene meshes and collagen products. This process included identification of required and desirable attributes based on the reasonably anticipated and foreseeable use of the product, review of available information related to design and performance attributes of similar products, testing according to standard and customized test methods, and iterative evaluation of the product.

- The Bard TVM products consistently met or exceeded specifications for product strength and durability.  The Plaintiffs' meshes were manufactured in accordance with the product specifications and did not fail to provide the intended soft tissue support.

- Bard's designs, manufacturing procedures, and product offerings reflect ongoing assessment of technical capabilities, physician behavior, and market preferences.  Bard continued to evaluate and improve its manufacturing processes and existing product designs.  Bard also sought to incorporate new materials and implement new manufacturing techniques as they became commercially available or viable.

- Bard acted as a reasonably prudent medical device company in the design, manufacture, and testing of the Bard TVM products, including the meshes implanted in Plaintiffs.

- Bard TVM products, including the Bard TVM products implanted in Plaintiffs, are not defective in design. The designs of the Bard TVM products were state of the art at the time of their development and were appropriate and in compliance with normal scientific, engineering, and regulatory expectations.

- The Bard TVM products implanted in Plaintiffs were not defectively manufactured. The Bard TVM products are assembled from acceptable and validated materials in a specified manner and tested according to quality control procedures. The available information indicates that the Bard TVM products implanted in Plaintiffs met all design and manufacturing specifications.

- There is no evidence of oxidative degradation of the polypropylene in the Bard TVM products implanted in Plaintiffs, therefore to the extent that Plaintiffs alleges injuries are caused by oxidatively degraded polypropylene, this cannot be true.

This report summarizes the results of my document review, inspection, and analysis related to the subject matter.  My findings are based on my education, training and experience as well as information presently provided and discovery progresses.  My findings may be updated if new information becomes available.  I reserve the right to respond to opinions provided by Plaintiffs' experts and to information that is provided as discovery proceeds, including but not limited to

case-specific discovery, medical records, expert reports, and witness testimony, and to supplement this report if necessary or appropriate.

Maureen T.F. Reitman, Sc.D., P.E.

June 24, 2019

# Appendix D

## Plaintiff Specific Information

| PLAINTIFF | Explant |
|---|---|
| Chrastecky, Donna | No |
| Katsiafas, Gladys | Yes |
| Smith, Becky | Yes |

# Smith, Becky

The following table contains a summary of the devices implanted in Becky Smith.

| Device 1 Implanted | Align TO hook |
|---|---|
| Reference Number | BRD400HK |
| Lot Number | CVRK0017 |
| Expiration Date | November 2009 |
| Final Lot Size | 400 |
| Final Inspection Date | 12/14/2007 |

| Device 2 Implanted | Avaulta Plus Anterior |
|---|---|
| Reference Number | CVRI0022 |
| Lot Number | 486101 |
| Expiration Date | August 2008 |
| Final Lot Size | 666 |
| Final Inspection Date | 9/13/2007 |

| Implant Surgeries | January 15, 2008 |
|---|---|
| Revision Procedures/Surgeries | January 20, 2009; November 16, 2018 |

# EXHIBIT 7

Daniel S. Elliott, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION
-  -  -

IN RE: C. R. BARD, INC.,     : MDL NO. 2187
PELVIC  REPAIR SYSTEM        :
PRODUCTS LIABILITY           :
LITIGATION                   :


THIS DOCUMENT RELATES TO     :

Becky Smith and Donald      :Case No. 2:15-cv-16402
Mackie,                      :
Plaintiffs,                  :
        v.                   :
C. R. BARD, INC.             :
        Defendant.           :


-  -  -
JULY 29, 2019
-  -  -


Videotape deposition of
DANIEL S. ELLIOTT, MD, taken pursuant to
notice, was held at the law offices of
Reed Smith LLP, 136 Main Street, Suite
250, Princeton Forrestal Village,
Princeton, New Jersey 08540, beginning at
1:27 p.m., on the above date, before
Amanda Dee Maslynsky-Miller, a Certified
Realtime Reporter in and for the State of
New Jersey.


-  -  -


GOLKOW LITIGATIONS SERVICES
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

Daniel S. Elliott, M.D.

Page 2

```
 1    APPEARANCES:
 2
 3        WAGSTAFF & CARTMELL, LLP
          BY: LINDSEY N. SCARCELLO, ESQUIRE
 4        4740 Grand Avenue,
          Suite 300
 5        Kansas City, Missouri 64112
          (816) 701-1100
 6        Lscarcello@wcllp.com
          Representing the Plaintiff
 7
 8
 9
          REED SMITH
10        BY: DEVIN J. GRIFFIN, ESQUIRE
          136 Main Street
11        Suite 250
          Princeton Forrestal Village
12        Princeton, New Jersey, 08540
          (609) 987-0050
13        Dgriffin@reedsmith.com
14        - and-
15        VIA TELECONFERENCE
          BY: ERIC J. BUHR, ESQUIRE
16        355 South Grand Avenue
          Suite 2900
17        Los Angeles, California, 90071
          (213) 457-8000
18        Ebuhr@reedsmith.com
          Representing the Defendant
19
20
21
          ALSO PRESENT:
22        Dan Lawlor, Videographer
23            - - -
24
```

Page 3

```
 1            - - -
 2          I N D E X
 3            - - -
 4    Testimony of:  DANIEL S. ELLIOTT, MD
 5
 6      By Mr. Buhr            7
 7
 8          - - -
        E X H I B I T S
 9          - - -
10
11    NO.      DESCRIPTION       PAGE
12    Elliott-1  Notice of Videotaped
          Deposition of Dr. Daniel
          S. Elliott      9
13
      Elliott-2  Case-Specific Expert
14        Report        16
15    Elliott-3  List of Previous
          Witness Testimony    27
16
      Elliott-4  11/15/07 Dr. Julie
17        Crawford Medical Note    44
18    Elliott-5  11/20/17 Dr. Kim Medical
          Record        50
19
      Elliott-6  1/10/08 Dr. Julie
20        Crawford Medical Record  52
21    Elliott-7  1/11/08 Consent Form    67
22    Elliott-8  Hospital Record    76
23    Elliott-9  8/8/13 Hoth Note    93
24
```

Page 4

```
 1            - - -
 2        E X H I B I T S
 3            - - -
 4
      NO.      DESCRIPTION       PAGE
 5
      Elliott-10  2/16/12 Hoth Office
 6        Visit        96
 7    Elliott-11  The Oregon Clinic
          Records      105
 8
      Elliott-12  6/13/19 Deposition
 9        Testimony of Dr.
          Mary Denman      121
10
      Elliott-13  1/2/19 Dr. Mary Denman
11        Report      131
12    Elliott-14  Placeholder      165
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1            - - -
 2      DEPOSITION SUPPORT INDEX
 3            - - -
 4
 5    Direction to Witness Not to Answer
 6    Page Line    Page Line    Page Line
 7    None
 8
 9
10    Request for Production of Documents
11    Page Line    Page Line    Page Line
12    None
13
14
15    Stipulations
16    Page Line    Page Line    Page Line
17    6    1
18
19
20    Question Marked
21    Page Line    Page Line    Page Line
22    None
23
24
```

2 (Pages 2 to 5)

Daniel S. Elliott, M.D.

Page 6

1           - - -
2           (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9           - - -
10          VIDEO TECHNICIAN:  We are
11   now on the record.  My name is Dan
12   Lawlor, I'm a videographer with
13   Golkow Litigation Services.
14   Today's date is July 29th, 2019,
15   and the time is 1:27 p.m.
16          This video deposition is
17   being held in Princeton, New
18   Jersey, in the Matter of Becky
19   Smith versus C.R. Bard, Inc.,
20   Pelvic Mesh.  The deponent is
21   Daniel Elliott.  Counsel will be
22   noted on the stenographic record.
23          The court reporter is Amanda
24   Miller and will now swear in the

Page 7

1    witness.
2           - - -
3           DANIEL S. ELLIOTT, MD, after
4    having been duly sworn, was
5    examined and testified as follows:
6           - - -
7           VIDEO TECHNICIAN:  Please
8    proceed.
9           - - -
10          EXAMINATION
11          - - -
12   BY MR. BUHR:
13          Q.   Good afternoon, Doctor.  My
14   name is Eric Buhr, I represent the
15   defendant in this case.
16          Can you please state your
17   full name for the record?
18          A.   Daniel Stephen Elliott.
19          Q.   And you understand you're
20   here today as a retained expert for Becky
21   Smith in her case against C.R. Bard?
22          A.   Correct.
23          Q.   Is there any reason you
24   cannot understand and answer my questions

Page 8

1    to the best of your ability today?
2           A.   As long as they're stated
3    clearly, no.
4           Yes.
5           Q.   Fair enough.
6           You've been deposed several
7    times in the past; is that right?
8           A.   Correct.
9           Q.   You feel comfortable with
10   the deposition process and the rules we
11   typically like to follow?
12          A.   Yes.
13          Q.   So I won't go over the
14   typical admonitions, then.
15          But I will say that with the
16   video conference here with the slight
17   delay, make a special effort, and I'll do
18   the same, to let each other finish and
19   not talk over each other for the sake of
20   the court reporter and just understanding
21   each other.
22          Is that fair?
23          A.   Yes, it is.
24          Q.   Let's start with just

Page 9

1    housekeeping and attach as Exhibit A a
2    copy of the deposition notice.
3           - - -
4           (Whereupon, Exhibit
5    Elliott-1, Notice of Videotaped
6    Deposition of Dr. Daniel S.
7    Elliott, was marked for
8    identification.)
9           - - -
10   BY MR. BUHR:
11          Q.   Doctor, have you seen this
12   deposition notice before today?
13          A.   Yes, I have.
14          Q.   It includes a long list of
15   document requests.  And I won't go
16   through each one of them.
17          I understand from our
18   discussion off the record that you've
19   already produced most or all of the
20   records that would be responsive, except,
21   perhaps, invoices regarding this case.
22          Is that a correct
23   understanding?
24          A.   That is what I understand as

3 (Pages 6 to 9)

Daniel S. Elliott, M.D.

Page 10

1    well.
2        Q.   So just to be clear, you
3    haven't brought anything with you?
4        A.   No.
5            You cut out on us a little
6    bit.  I think I understood your question,
7    but there was a little bit of a gap
8    there.  You may just want to repeat it so
9    I know.
10       Q.   Just to be clear, you didn't
11   bring anything with you today to produce?
12       A.   That is correct, I did not
13   bring anything.
14       Q.   You've been retained on
15   behalf of Wagstaff Cartmell to provide
16   expert testimony in this case; is that
17   right?
18       A.   Correct.
19       Q.   And you previously provided
20   expert reports and provided expert
21   testimony in this MDL against C.R. Bard;
22   is that right?
23       A.   Correct.
24       Q.   And, in fact, you previously

Page 11

1    provided a generic report on the involved
2    products and were deposed on those
3    generic opinions; is that right?
4        A.   Correct.  Several years ago,
5    yes.
6        Q.   So we'll try not to tread
7    any old ground on those generic opinions.
8            So today we're specifically
9    discussing your opinions regarding Becky
10   Smith.  Is that consistent with your
11   understanding?
12       A.   Yes, exactly.
13       Q.   Do you recall when you were
14   first retained by the Wagstaff firm to
15   provide expert opinion in Bard cases?
16       A.   I don't recall the exact
17   time.  I know I gave a general report and
18   deposition four, five years ago.  But I
19   don't have the exact timeframe of that,
20   though.
21       Q.   Do you know how many Bard
22   cases you have provided expert opinion
23   in?
24       A.   Off the top of my head,

Page 12

1    without a -- I would say three or four
2    perhaps.
3        Q.   Do you know the total amount
4    of time that you've spent in this
5    litigation against Bard?
6            MS. SCARCELLO:  Object to
7        the extent it calls for testimony
8        about general opinions.
9            THE WITNESS:  No, I don't.
10       I don't have that number.
11   BY MR. BUHR:
12       Q.   Do you have any general
13   estimate of the amount of hours you spent
14   on the C.R. Bard cases?
15           MS. SCARCELLO:  Same
16       objection.
17           THE WITNESS:  I don't keep
18       any record.
19   BY MR. BUHR:
20       Q.   You don't keep invoices that
21   you submitted to the Wagstaff firm?
22       A.   No, I do not.
23       Q.   And am I correct that you
24   charge $700 per hour for case review and

Page 13

1    testimony?
2        A.   Correct.
3        Q.   Am I correct that you've
4    also provided expert testimony in a
5    number of pelvic mesh cases against
6    Ethicon?
7        A.   Correct.
8        Q.   And are you retained through
9    the Wagstaff firm for those cases as
10   well?
11       A.   Yes.
12       Q.   Do you recall approximately
13   how many Ethicon cases you've provided
14   expert testimony in?
15       A.   I don't have an exact
16   number.  The majority of the work would
17   be done with Ethicon as opposed to Bard,
18   though.
19       Q.   Have you provided expert
20   testimony in any other pelvic mesh
21   litigation other than Ethicon and C.R.
22   Bard?
23       A.   There was work done early on
24   against -- with the Cook product, which

4 (Pages 10 to 13)

Daniel S. Elliott, M.D.

Page 14

1    is a non-mesh.  And then a little bit of
2    work with the AMS products.  I don't know
3    how far those extended, but I didn't do
4    any patient case-specific reviews, and I
5    do not believe I turned in any general
6    expert report.  But I looked at issues
7    originally.
8        Q.   Do you have any estimate for
9    how much time you spent specifically on
10   the Becky Smith case?
11       A.   I don't have an exact
12   number.  That work was done in May of
13   this year and sent to the Wagstaff firm.
14   So they have that, which I've been told
15   will be provided to you.
16           Generally, they take several
17   hours or more.  But I don't have a
18   specific recollection of this one.
19       Q.   So when you say "they have
20   that," are you referring to an invoice
21   for your time?
22       A.   That is correct.
23           MR. BUHR:  And then,
24   counsel, I know we mentioned this

Page 15

1        prior to the deposition, but for
2        the record, you'll agree to
3        produce those to our offices,
4        whatever invoices you have
5        specific to this Becky Smith case?
6           MS. SCARCELLO:  Yes.
7    BY MR. BUHR:
8        Q.   Have you spent additional
9    time since the submission of those
10   invoices, or invoice, around the May
11   timeframe?
12           Do you have an estimate for
13   how much additional time, if any, you've
14   spent on this case?
15       A.   It's been several hours
16   spent this month alone.  So since May,
17   there's been none until this month, July.
18   And, again, that would be several hours
19   reviewing depositions and expert reports.
20       Q.   So, then, would it be
21   approximately six hours you spent in
22   total on this case, if I'm understanding
23   what you said, in your time spent in May
24   and your time spent in July?

Page 16

1           MS. SCARCELLO:  Object to
2    the form of the question.
3           THE WITNESS:  I would
4    just -- I would have to be
5    guessing, because I have not seen
6    that May invoice.  I would suspect
7    the May invoice would be around
8    the four- to seven-hour range.
9    Again, that's very much of a
10   guess.
11           And then in July, it's
12   around the same amount of time.
13   BY MR. BUHR:
14       Q.   I assume you haven't
15   submitted your -- an invoice for your
16   July time; is that right?
17       A.   That's correct.  That will
18   be done at the end of the month.  So in a
19   few days.
20           MR. BUHR:  Let's go ahead
21   and attach your case-specific
22   expert report as Exhibit-2, I
23   believe it would be.
24           - - -

Page 17

1           (Whereupon, Exhibit
2    Elliott-2, Case-Specific Expert
3    Report, was marked for
4    identification.)
5           - - -
6    BY MR. BUHR:
7        Q.   So what we've attached as
8    Exhibit-2, does that appear to be your
9    complete expert report in this case?
10       A.   It appears to be signed and
11   dated May 24th, 2019.  It includes my
12   report, my -- and my C.V. and my reliance
13   list.
14       Q.   And does this report contain
15   all of the opinions that you intend to
16   offer in this case specific to Becky
17   Smith?
18       A.   Up to this point, yes.  If
19   new material becomes available,
20   obviously, that would change.  But as of
21   today, July 29th, this is complete.
22       Q.   And can you generally
23   describe for me how you go about forming
24   your opinions?

5 (Pages 14 to 17)

Daniel S. Elliott, M.D.

Page 18

1    A.   Forming my opinions on this
2  case or anything I do in my normal daily
3  work would be the same.  It would be
4  reviewing the outside medical records,
5  talking with the patient usually, though
6  in this case I can't talk to her,
7  obviously, and based upon my experience,
8  my review of the medical literature,
9  discussions with colleagues, et cetera,
10 come up with an opinion ruling in or
11 ruling out various different pathologies.
12     Q.   And so Exhibit B to your
13 expert report is your reliance list.
14       And that's everything you
15 relied on in forming your opinions at the
16 time of your expert report, correct?
17     A.   Correct.
18     Q.   And how did you go about
19 compiling these materials?
20     A.   As part of my usual, I ask
21 whatever law firm it happens to be, this
22 time, obviously, it's Wagstaff and
23 Cartmell, give me all medical records
24 that are available, all depositions, all

Page 19

1  expert reports, everything.  And then I
2  review whatever they give me.
3     Q.   Did you feel you had
4  adequate materials to form your opinion
5  at that time?
6     A.   Yeah, at that time.  Yes.
7  There's been added on since that time,
8  with depositions of the implanting doctor
9  and one of the revision surgeons, and
10 then the -- what would you call it?  The
11 defense expert witness.  I've reviewed
12 that since then.
13     Q.   What do you mean by --
14     A.   But my opinions did not --
15       Sorry, go ahead.
16     Q.   I didn't want to cut you off
17 if you were still finishing your answer.
18     A.   I was going to finish by
19 saying the reviewing of those further
20 documents, the deposition and expert
21 report did not change my opinions
22 significantly, it mainly supported them.
23     Q.   Did you request any
24 additional medical records?

Page 20

1    A.   Well, I request all medical
2  records that are available.  And so I'm
3  at the mercy of the law firm of giving me
4  whatever they can get ahold of.
5       If I find an operative note
6  or something that I don't have, I ask
7  them for it.  But that wasn't in this
8  particular case.  So as far as I know,
9  I've been given all of the records.
10     Q.   And you kind of alluded to
11 this a little bit already, but just to be
12 clear, at the time you formed your
13 opinions and signed your report, you
14 didn't have the depositions of any of the
15 treating physicians in this case; is that
16 right?
17     A.   That is correct.
18     Q.   And did you feel that you
19 could form your opinions without the
20 testimony of the implanting and
21 explanting physicians?
22     A.   I can essentially form my
23 opinions based upon the medical records,
24 and then augment that with the

Page 21

1  deposition.
2       Had the depositions shown a
3  significant opinion difference or changed
4  my opinion one way or the other
5  significantly, then I would have asked
6  for a supplemental report to be filed.
7     Q.   So several times, I believe,
8  you used the term "significantly."
9       Did reviewing those
10 depositions after your expert report
11 change your opinions in any way?
12     A.   No, they just reinforced
13 them.  So it didn't change.  Reinforced.
14     Q.   Did you review the entirety
15 of those depositions or just excerpts?
16     A.   No, as per my usual, I asked
17 for the entire deposition, all
18 however-many-hundreds of pages they are,
19 and then I go through them.  So I do not
20 get ever a summary.
21     Q.   Do you get a summary, any
22 type of summary, of the medical records,
23 or do you review those in their entirety
24 as well?

6 (Pages 18 to 21)

Daniel S. Elliott, M.D.

Page 22

1    A.   I review them in their
2  entirety.  I found that chronologies as
3  provided, they weren't provided in this
4  case, but if they are provided, they
5  tended to not be very accurate.  So I did
6  it all myself, every single page.
7    Q.   So, then, just to be clear,
8  even though you reviewed additional
9  materials since you signed your expert
10 report, you still feel it's complete and
11 accurate?
12    A.   Yes.
13    Q.   And it contains all of the
14 opinions you intend to offer and your
15 basis for those opinions?
16    A.   As I stated before, unless
17 new information were to be provided
18 that's not available as of July 29th,
19 2019.  But right now it is complete.
20    Q.   I believe you mentioned
21 reviewing an expert report from the
22 defense.
23         What specifically are you
24 referring to?

Page 23

1    A.   There was a Dr. -- I won't
2  pronounce his name correctly, so I have
3  to apologize -- Guidice, Guidice,
4  something like that.
5    Q.   I say Guidice, but I don't
6  know if that's correct either, to be
7  honest.
8         So you reviewed his report?
9    A.   Correct.
10    Q.   Did you have any significant
11 disagreements with his report?
12    A.   Yeah, that's a -- we'd have
13 to go through point by point of his
14 report.  But, yes, I have some major
15 disagreements.
16    Q.   Did you do anything to
17 specifically prepare for the deposition
18 today?
19    A.   Other than just on my own,
20 reviewing my expert report, as I said --
21 mentioned earlier, reviewing the
22 depositions from the two physicians and
23 then the expert report, Dr. Guidice, and
24 I had a 15-minute meeting with counsel

Page 24

1  this afternoon.
2    Q.   You had a 15-minute meeting
3  with counsel today?
4    A.   Correct.
5    Q.   And was that with the
6  counsel that's here at the deposition
7  today?
8    A.   Correct.
9    Q.   There was also a subsequent
10 deposition of plaintiff Becky Smith that
11 took place maybe a month and-a-half ago.
12         Did you review that
13 deposition transcript?
14    A.   I have not seen that one.
15    Q.   So the only deposition of
16 the plaintiff that you've reviewed is the
17 deposition that took place in 2017; is
18 that right?
19    A.   Correct.
20    Q.   Is that something you would
21 like to review, her new deposition?
22    A.   Yes.
23    Q.   And you have not personally
24 examined Becky Smith; is that right?

Page 25

1    A.   Correct.
2    Q.   I believe in some prior Bard
3  cases you performed examinations, what we
4  sometimes refer to as an IME.
5         Do you recall that?
6    A.   Yes.
7    Q.   And why did you not do an
8  IME or any type of examination with Becky
9  Smith?
10    A.   I was under the
11 understanding that there was an agreement
12 that if this case, or whatever you call
13 it, were to proceed forward, then I would
14 do one prior to any trial case.
15    Q.   So is that something you
16 think would be helpful in forming your
17 opinions?
18    A.   Yes.
19    Q.   Have you spoken with Becky
20 Smith?
21    A.   No.
22    Q.   Have you spoken with any of
23 her doctors?
24    A.   No.

7  (Pages 22 to 25)

Daniel S. Elliott, M.D.

Page 26

1    Q.   Can you describe generally
2  for me your method in drafting this
3  expert report?
4    A.   It would be the same as all
5  reports I do.  I review all of the
6  medical records, write down a chronology
7  with key comments made within the
8  records.  From there, formulate a
9  differential diagnosis ruling in or
10  ruling out various different pathologies.
11         And then I write the report
12  up and then come to conclusions, based
13  upon the information I had at that point
14  in time.
15    Q.   So would you personally take
16  notes as you're reviewing the medical
17  records?
18    A.   No.  I do it -- as I go, I
19  write it.  So there's no separate set of
20  notes.
21    Q.   And does the report contain
22  everything you ruled in and ruled out in
23  your differential diagnosis?
24    A.   Correct.  As what is

Page 27

1  indicated on Page 4 of my report going to
2  Page 5, that would be my standard
3  differential diagnosis.
4    Q.   Did you have any assistance
5  preparing your report?
6    A.   None.
7         Other than the reliance
8  list.  Sorry, I should -- I did not type
9  up the reliance list.  I typed up the
10  medical billing records, the depositions
11  and then the Wagstaff firm provided the
12  other.  So I did not personally type that
13  up.
14    Q.   I'd like to attach, just for
15  the record, your list of previous
16  testimony that was provided to us.  This
17  wasn't attached to your expert report, it
18  was provided to us separately.
19         MR. BUHR: So I just want to
20    make sure it was attached for the
21    record.  Let's do it as Exhibit-3.
22         - - -
23         (Whereupon, Exhibit
24    Elliott-3, List of Previous

Page 28

1         Witness Testimony, was marked for
2         identification.)
3         - - -
4  BY MR. BUHR:
5    Q.   So is this an accurate list
6  of your previous testimony?
7    A.   Well, I don't keep a list of
8  my testimony, so this would have come
9  from the Cartmell firm.  So I cannot
10  attest to the accuracy or completeness of
11  it.
12         It looks fairly complete.
13  But, again, I don't -- in retrospect,
14  can't say if it's complete.
15    Q.   Can you tell by looking at
16  it what time period this covers?
17    A.   It would cover roughly 2011
18  to the present.
19    Q.   Does it appear to be roughly
20  in chronological order, to the best you
21  can tell?
22    A.   Well, the very first one
23  says Coloplast versus Generical Medical
24  Devices and the very last one is the same

Page 29

1  thing.  So, I don't know, it says, In
2  regards to Mentor ObTape, that was --
3  wait, I'm sorry, that's different.
4         I would have to say, yes, it
5  does look accurate.  I just don't know
6  why that Mentor -- the last one is Mentor
7  ObTape.  I don't know how that fits in
8  there.  But it looks fairly accurate.
9    Q.   Do you recall roughly when
10  you last testified?
11    A.   Well, "testified," do you
12  mean -- does that mean a deposition?
13    Q.   Yes.
14    A.   Or a trial, in the
15  courtroom?
16    Q.   Either one.
17    A.   Last deposition I gave was
18  last weekend.  Last time I was in a
19  courtroom was February of 2018.
20    Q.   Is your deposition last
21  weekend listed on this report?
22    A.   No.
23    Q.   So what case was that in?
24    A.   That was a deposition --

8  (Pages 26 to 29)

Daniel S. Elliott, M.D.

Page 30

1    case-specific depositions on three Bard
2    cases -- excuse me, three Ethicon cases
3    and one Bard case.
4         Q.   What was the product at
5    issue in the Bard case?
6         A.   Avaulta.  And the individual
7    also had an AMS sling, but that was not
8    part of the deposition.
9         Q.   And what were the Ethicon
10   products involved in those cases?
11        A.   Two Prolift?s and one TVT-O.
12        Q.   Is the Prolift? a product to
13   treat pelvic organ prolapse?
14        A.   Correct.
15        Q.   And the TVT-O is a pelvic
16   mesh product to treat stress urinary
17   incontinence?
18        A.   Correct.
19        Q.   And you provided expert
20   opinion that those products were
21   defective and caused injury; would that
22   be right?
23        A.   Correct.
24        Q.   And with respect to your

Page 31

1    courtroom testimony in February 2018, do
2    you recall what case that was and what it
3    involved?
4         A.   It was a Prolift? case with
5    Wagstaff Cartmell in Indiana, if that
6    helps.
7         Q.   Are there additional Ethicon
8    products that you provided expert opinion
9    on?
10        A.   TVT as well, and TVT-Secur.
11        Q.   And your opinion is all
12   those products were defective and caused
13   injury?
14        A.   Correct.
15             MS. GRIFFIN:  Eric, just for
16        the record, that came in a little
17        spotty, in case you want to repeat
18        that.
19             MR. BUHR:  Thank you for
20        that.
21   BY MR. BUHR:
22        Q.   So you provided expert
23   opinion that all the products you just
24   listed from Ethicon were defective and

Page 32

1    caused injury; is that right?
2         A.   Correct.
3         Q.   So turning more specifically
4    to Becky Smith, you referenced your
5    general differential diagnosis list on
6    Pages 4 and 5 of your report, correct?
7         A.   Yes.
8         Q.   And you were able to rule
9    all of those out as potentiality
10   alternative causes?
11        A.   Well, no, I don't rule them
12   all out, because some of those include
13   mesh complications.  So some of them are
14   ruled in, some of them are ruled out.
15   The majority are ruled out.
16        Q.   So you ruled out everything
17   other than those related to mesh?
18        A.   Well, we would have to go --
19   sure, I don't want to make a blanket
20   statement and miss something here, but
21   either mesh or mesh-specific
22   complications, yes, I ruled them out.
23        Q.   So just to be clear as a
24   starting point, that I understand the

Page 33

1    opinions that you intend to offer here,
2    with respect to Becky Smith's specific
3    injuries, am I correct that you're
4    offering an opinion that the Bard mesh
5    implants caused plaintiff, Becky Smith,
6    pelvic pain and dyspareunia and mesh
7    extrusion?
8         A.   As summarized on Page 18 of
9    my report, starting on Page 18, yes,
10   pelvic pain, vaginal pain and dyspareunia
11   resulting from the complications caused
12   by the presence of the mesh in her body.
13        Q.   So just to be clear, you're
14   not offering an opinion that she has any
15   other injuries such as voiding
16   dysfunction or anything like that, right?
17        A.   Well, voiding dysfunction
18   can be caused by the presence of the
19   mesh, the removal of the mesh, or
20   dysfunction caused by.  So we would have
21   to be very specific.
22             From what I understand, as
23   of now she was not complaining of
24   significant voiding dysfunction.  But if

9 (Pages 30 to 33)

Daniel S. Elliott, M.D.

Page 34

1   you had something, I'd have to see it in
2   the records.  I didn't see that.
3        Q.   Well, I didn't see anything
4   either.  I just want to make sure that
5   what you're alleging her injuries are
6   related to the mesh is encompassed by
7   pelvic pain, dyspareunia and extrusion
8   requiring removal of the mesh, correct?
9        A.   Correct.  As of right now,
10  yes.
11       Q.   You're aware that plaintiff
12  has complained of fecal incontinence; is
13  that right?
14       A.   Yes.
15       Q.   And you're not offering an
16  opinion that that was caused by the mesh;
17  is that right?
18       A.   As of what I know right now,
19  it is very difficult to draw a logical
20  physiologic relationship between the
21  presence or absence of the mesh or
22  surgery for the mesh causing fecal
23  incontinence.
24       Q.   So you are not offering an

Page 35

1   opinion that her fecal incontinence was
2   caused by the mesh?
3        A.   Well, as I stated, as of
4   what I know right now, I cannot draw a
5   logical connection between the mesh and
6   the surgery to remove the mesh with fecal
7   incontinence.
8        Q.   And you would agree that
9   plaintiff's treating physician, Dr.
10  Denman, also concluded that the -- her
11  fecal incontinence was not related to the
12  mesh; is that right?
13       A.   Yes.
14       Q.   Is it your opinion that both
15  the Avaulta and the Align are responsible
16  for her injuries?
17       A.   They are both contributing.
18       Q.   Can you say what percentage
19  of her injuries are related to the
20  Avaulta versus the Align?
21       A.   It's very difficult to
22  assign a percentage.  However, due to the
23  significantly enlarged volume of the
24  Avaulta mesh, the multiple arms and the

Page 36

1   collagen coating, it is going to be more
2   responsible than the TVT-O -- excuse me,
3   the Align.
4        Q.   But you intend to offer an
5   opinion that the Align is responsible for
6   her pelvic pain and dyspareunia?
7        A.   It will be a contributing
8   factor.  Since the mesh is identical and
9   it's going in the same obturator foramen,
10  it is not going to be helping any.
11            What I'm saying is, I cannot
12  assign a percentage.  More likely, the
13  Avaulta is going to be the much greater
14  percentage, just, as I mentioned, due to
15  the volume and the presence of the
16  collagen coating.
17       Q.   And you're saying that the
18  mesh of the Align and the Avaulta are
19  identical?
20            MS. SCARCELLO:  Object to
21       the form.
22            THE WITNESS:  No, they are
23       not identical.  The meshes are
24       quite similar.  But the Align does

Page 37

1   not have a collagen coating like
2   the Avaulta Plus, which Ms. Smith
3   has, or had.
4   BY MR. BUHR:
5        Q.   Are you offering an opinion
6   that the extrusion was related to the
7   Align product as opposed to the Avaulta?
8        A.   From what I understand at
9   this point, the Avaulta product was the
10  product that had extruded, not the Align.
11       Q.   I understand, from your
12  prior testimony -- well, let me confirm
13  if my understanding is correct.
14            Have you ever implanted a
15  transvaginal mesh for pelvic organ
16  prolapse?
17       A.   No.  I have chosen not to do
18  that.
19       Q.   Have you implanted
20  midurethral slings made out of
21  polypropylene?
22       A.   Yes.
23       Q.   Have you ever implanted the
24  Align?

10 (Pages 34 to 37)

Daniel S. Elliott, M.D.

Page 38

1    A.   No.
2    Q.   What midurethral slings have
3  you implanted?
4    A.   I've gone through a series
5  of them and had problems, and that's why
6  there's been a series.
7       I started with the Mentor
8  ObTape in the early 2000s, probably 2002
9  or '03, around that time.  We obviously
10 had major problems with that.  Then I
11 switched to the AMS product called the
12 Monarc, used that for a couple of years.
13 But we had a significant amount of
14 problems of pain for the patient for
15 that, so I stopped that.  And then used
16 the Coloplast product, their
17 transobturator sling.
18    Q.   And is that made of
19 polypropylene?
20    A.   Correct.
21    Q.   And it's implanted
22 transobturally -- through the
23 transobturator, sorry, similar to the
24 Align sling; is that right?

Page 39

1    A.   Correct.  It's a
2  transobturator sling, correct.
3    Q.   And would you agree that all
4  of those products have a risk of pelvic
5  pain and dyspareunia?
6    A.   All the mesh slings, to a
7  varying degree, have a problem with
8  dyspareunia, scarring, mesh contraction,
9  foreign body reaction; so yes.
10    Q.   And that includes the
11 Coloplast sling?
12    A.   Correct.
13    Q.   And you still implant that
14 today?
15    A.   Very rarely.  I used to, and
16 then as of 2011 or so, the numbers
17 plummeted to one or two a year from a
18 high of about 100 to 150.  And now
19 there's maybe a few a year I do.  I can't
20 give you an exact number, roughly 5 out
21 of 100 a year for unique patient
22 situations.
23    Q.   Do you agree that the
24 midurethral slings made of polypropylene

Page 40

1  are within the standard of care?
2    A.   In the properly consented
3  patient and with a surgeon who knows what
4  they're doing and can handle the
5  complications, it is within the standard
6  of care.
7    Q.   Are they generally
8  considered safe and effective in the
9  medical community?
10    A.   The general community?  I
11 can't speak for everybody.  But there
12 have been position statements making
13 that, that's what they state.
14    Q.   Are you referring to the
15 AUGS position statement?
16    A.   That's one of them.
17    Q.   Are you a member of AUGS?
18    A.   Yes.
19    Q.   Do you agree with that
20 position statement?
21    A.   I agree that it has been
22 the -- that statement is long, with
23 multiple points to it.  So I can't give a
24 blanket yes or no to it.  We'd have to go

Page 41

1  through each point.
2       But I agree it has been
3  studied, and I agree that there have been
4  advances with that product.  But there
5  have also been significant complications
6  associated with it.  And that's where the
7  problem occurs with me.
8    Q.   So at the time of Ms.
9  Smith's implant in 2008, you agree it was
10 within the standard of care for Dr. Kim
11 to implant the Align midurethral sling to
12 treat her stress urinary incontinence; is
13 that right?
14    A.   Correct.  I have no fault
15 with Dr. Kim for implanting that at that
16 point in time.
17    Q.   Right.  And one of the
18 opinions listed in your report is that
19 the treating doctor, including Dr. Kim,
20 acted within the standard of care.
21       Is that an opinion that you
22 intend to offer?
23    A.   Yes, I agree with that, in
24 2008 when it was put in.

11 (Pages 38 to 41)

Daniel S. Elliott, M.D.

Page 42

1    Q.   Do you also agree that it
2  was within the standard of care in 2008
3  to implant mesh for treatment of pelvic
4  organ prolapse?
5    A.   Correct.  As of January of
6  2008, I agree that was within the
7  standard of care.
8    Q.   So you agree it was within
9  the standard of care to implant the
10  Avaulta Plus in 2008?
11    A.   Well, in 2008, we were in
12  our very infancy of knowing what was
13  going on with meshes.  I had chosen not
14  to implant meshes, I didn't see a benefit
15  for them, but I didn't feel they would be
16  wrong.  We were seeing increases in
17  complications slowly rolling in.
18          But as of January 2008, when
19  that was implanted, I would find no fault
20  in that, it was within the standard of
21  care.  So I agree with what I've stated
22  in my report.
23    Q.   Would it be within the
24  standard of care to implant mesh to treat

Page 43

1  pelvic organ prolapse -- well, strike
2  that.
3          Would it be within the
4  standard of care in 2008 to implant the
5  Avaulta Plus if the patient did not have
6  pelvic organ prolapse?
7    A.   Well, it is -- the Avaulta
8  or the Avaulta Plus, Avaulta Solo, is
9  defined for prolapse.  If a woman has
10  absolutely no prolapse, you would not
11  want to implant it, because it's designed
12  to treat prolapse.
13    Q.   What if the patient had a
14  mild prolapse but was asymptomatic, would
15  it be within the standard of care to
16  implant the Avaulta mesh?
17    A.   That becomes a judgment
18  call.  That one has to be a discussion
19  with the patient.  If you are going in to
20  operate already for another indication,
21  and they have a low-grade prolapse, it
22  depends what grade you're talking, we
23  have to use specifics.
24          Technically, for the female

Page 44

1  pelvic mesh and reconstructive surgery
2  exam, if you have a grade 2 and above,
3  it's acceptable to treat.  But it has to
4  be a discussion with the patient.
5    Q.   The doctor that performed a
6  hysterectomy at the same time the mesh
7  was implanted was Dr. Crawford; is that
8  right?
9    A.   Correct.
10    Q.   Were you aware that Dr.
11  Crawford found that Becky Smith did not
12  have any significant cystocele?
13    A.   That's what I've heard, yes.
14          MR. BUHR:  And let's just go
15      ahead and attach that record as
16      Exhibit-4, just to make sure we're
17      looking at the specifics.
18          - - -
19          (Whereupon, Exhibit
20      Elliott-4, 11/15/07 Dr. Julie
21      Crawford Medical Note, was marked
22      for identification.)
23          - - -
24  BY MR. BUHR:

Page 45

1    Q.   Do you have that record in
2  front of you, Doctor?
3    A.   Yes, I do.  I have, as you
4  said, Exhibit-4.  And this is dated
5  November 15th, 2007.  It's a note by Dr.
6  Kim -- no, I'm sorry, Dr. Crawford, Julie
7  Crawford.
8    Q.   And if you turn to -- well,
9  before we get there.  On Page Bates
10  number 8, they list the past surgical
11  history.
12          Number 2 is, Prior bilateral
13  tubal ligation.
14          Can you explain what that
15  is?
16    A.   That's for -- most likely,
17  for sterility.  So they ligate the tubes,
18  analogous to a vasectomy in a male.  It
19  was done laparoscopically.
20    Q.   Is that a procedure that can
21  lead to any type of pelvic pain or
22  dyspareunia?
23    A.   It would be exceedingly
24  rare.  That's a small procedure done

12 (Pages 42 to 45)

Daniel S. Elliott, M.D.

Page 46

1  laparoscopically with small cameras. So
2  I'm sure we can find a case report here
3  or there, but this would be an
4  exceedingly small risk.
5      Q.  Is it possible to develop
6  adhesions following that type of
7  procedure?
8      A.  Adhesions could happen up in
9  the abdomen.
10     Q.  And adhesions are
11 essentially scar tissue, right?
12     A.  They are a type of scar
13 tissue.
14     Q.  And they can lead to pain?
15     A.  There have been reports of
16 that, yes.
17     Q.  Is this something you
18 considered in your differential diagnosis
19 of Becky Smith's pelvic pain and
20 dyspareunia?
21     A.  Correct.  And prior to her
22 surgery, her implant surgery on January
23 15th, 2008, I did not see any record of
24 pelvic pain.

Page 47

1      Q.  So you ruled it out because
2  she didn't complain of any pelvic pain at
3  that time?
4      A.  Correct.  Following the
5  surgery, adhesions, et cetera, you're
6  going to have -- it's not a delayed
7  development like we see in the meshes;
8  it's immediate.  And there's no record of
9  anybody attributing any abdominal pain,
10 pelvic pain, attributing it to any
11 adhesions.
12         If you have those records,
13 I'd like to see it.  I did not see
14 anything in the records.
15     Q.  They also list a 2003
16 endometrial ablation.
17         Can you describe for the
18 jury what that is?
19     A.  Well, that falls definitely
20 into the benign GYN land, which I do not
21 do these procedures.  Usually, this is
22 done for uterine fibroids; usually.  And
23 it's to help reduce the severity or
24 bleeding, abnormal bleeding, caused by

Page 48

1  the fibroids.
2      Q.  Are you familiar with the
3  potential complications from that type of
4  procedure?
5      A.  I do not do that procedure,
6  but I am familiar with the types of pain
7  that they could have.  Same thing with
8  fibroids.
9         And, again, as I mentioned
10 before, I didn't see anything documented
11 in the records attributing any of her
12 conditions, prior to her 2008 surgery, to
13 procedures such as that.
14     Q.  Under medications, she's
15 taking Lexapro.
16         And I think you note in your
17 record that she had preexisting
18 depression prior to the implant meshes,
19 right?
20     A.  Correct.
21     Q.  Going on to the next page,
22 Dr. Crawford performed an exam, right?
23     A.  Correct.  Starting on the
24 Bates number 8 going to, it looks like,

Page 49

1  just 9.
2      Q.  And the vaginal exam notes,
3  No evidence of a significant cystocele or
4  rectocele, appears well supported.
5         Is that right?
6      A.  That is what she states as
7  of November 15th, 2007.
8      Q.  And that was just a month
9  prior to her implant surgery, right?
10     A.  Well, technically, like two
11 and-a-half months.  But it was close.
12 Because her surgery was -- actually, it
13 was, like, two months.
14         Not to be difficult, just
15 for specifics here.  January 15, '08 was
16 her surgery.
17     Q.  You're right.
18         So about two months prior to
19 her surgery, Dr. Crawford did not find
20 any evidence of a significant cystocele
21 or rectocele?
22     A.  Correct.  On her exam on
23 that day, that's what she reported.
24     Q.  And then she sees Dr. Kim a

13 (Pages 46 to 49)

Daniel S. Elliott, M.D.

Page 50

1    few weeks later, on November 30th.
2             MR. BUHR:  And let's go
3    ahead and attach Dr. Kim's records
4    as Exhibit-5.
5             - - -
6             (Whereupon, Exhibit
7             Elliott-5, 11/20/17 Dr. Kim
8             Medical Record, was marked for
9             identification.)
10            - - -
11   BY MR. BUHR:
12        Q.   Do you have those records in
13   front of you now, Doctor?
14        A.   Yes, I do.
15        Q.   So on Page -- if you go to
16   Page 12 and 13 of the Bates numbers, this
17   is the visit with Dr. Kim on November
18   30th, 2007.
19        A.   Correct.
20        Q.   And under assessment --
21   actually, under examination, it says she
22   does have a grade 1 to 2 cystocele and a
23   mild rectocele.
24             Do you see that?

Page 51

1        A.   Yes, I do.
2        Q.   And what symptoms can
3    cystocele and rectocele cause?
4        A.   Fullness, pressure,
5    sensation of something falling out;
6    asymptomatic, retention of urine,
7    retention of stool.
8             Again, I think I mentioned
9    pelvic pressure.  Symptoms such as that,
10   or those.
11        Q.   Prolapse can cause pelvic
12   pain and dyspareunia, too, right?
13        A.   Well, pelvic pain, not
14   necessarily.  Pelvic pain would be
15   different.
16             Pelvic pressure can -- it
17   can interfere with sexual activity,
18   depending upon the severity of the
19   prolapse.  They should be very specific.
20             Pelvic pain is not something
21   we normally attribute, unless it's a
22   major, major prolapse where the vagina
23   has everted itself and it's irritating on
24   the clothing and things.

Page 52

1        Q.   And Dr. Kim did not repair
2    the mild rectocele, right?
3        A.   Correct.
4        Q.   So would you agree that the
5    grade 1 to 2 cystocele is a mild
6    cystocele?
7        A.   Grade 1 is mild.  Grade 2 is
8    not.  It's in the realm of more
9    significant.  And prolapses vary from
10   day-to-day depending how the woman is,
11   the time of day, how much standing they
12   have been doing.  So it's not uncommon to
13   have a variable exam.
14        Q.   Going back to Dr. Crawford's
15   records --
16             MR. BUHR:  Actually, do we
17   have her January 10th, 2008
18   record?
19             MS. GRIFFIN:  We do.  And
20   that can be marked as Exhibit
21   Number 6.
22             - - -
23             (Whereupon, Exhibit
24             Elliott-6, 1/10/08 Dr. Julie

Page 53

1             Crawford Medical Record, was
2             marked for identification.)
3             - - -
4    BY MR. BUHR:
5        Q.   Do you have that record,
6    Doctor?
7        A.   Yes, I do.
8        Q.   On Bates number ending in
9    27, under the physical examination, about
10   three or four sentences above the end of
11   that paragraph, it says, On my exam,
12   there is no evidence of significant
13   cystocele or rectocele and she appears
14   apically supported.  However, on exam by
15   Dr. Kim, she has a mild rectocele and
16   cystocele.
17             Do you see that language?
18        A.   Yes, I do.
19        Q.   So do you have any criticism
20   of implanting the Avaulta product in a
21   patient with only mild cystocele and is
22   asymptomatic?
23        A.   I have criticism of
24   implanting the Avaulta product.  However,

14  (Pages 50 to 53)

Daniel S. Elliott, M.D.

Page 54

1   on Dr. Kim's examination, grade 1 is low,
2   grade 2 is acceptable.  And so that
3   becomes a judgment call by the doctor who
4   is there.  And, as I mentioned, prolapses
5   vary from day-to-day.
6           If I were operating with a
7   doctor who I felt was doing something
8   wrong, I wouldn't operate with him.  I
9   wouldn't do a combined case.  Dr.
10  Crawford just mentions it, so I don't
11  have a criticism, really.  If it were
12  only a grade 1, that would be different.
13  But it reports grade 2.
14      Q.   And you agree she was
15  asymptomatic at this time with respect to
16  her cystocele?
17      A.   I didn't see anything in the
18  records indicating significant prolapse
19  symptoms.
20          But they were going to be
21  doing an anti-incontinence procedure, so
22  it's quite common to do a combined repair
23  when you're doing that, because otherwise
24  it will affect your incontinence

Page 55

1   procedure.
2       Q.   So you stand by your opinion
3   that Dr. Kim acted within the standard of
4   care?
5       A.   I would -- if I were in the
6   same situation, I would not have done an
7   Avaulta product.  I would have done the
8   anterior repair at the time of the sling
9   surgery.
10          Because when you're
11  repairing incontinence, if you don't
12  repair concurrent prolapse, if you find a
13  grade 2, that can affect your repair.  So
14  it's not uncommon to do a prophylactic
15  either incontinence procedure or a
16  prolapse repair.
17          If Dr. Kim had repaired the
18  posterior, I would have a major problem
19  with that.  But anterior compartment,
20  it's a judgment call, so I don't
21  criticize it.
22      Q.   Would you agree that there
23  are risks associated with any implanted
24  product?

Page 56

1       A.   Well, it depends what type
2   of implanted product we're talking about,
3   and the severity and the progressive
4   nature of them can vary tremendously.
5   But procedures do have risks.
6       Q.   And we talked about some of
7   the other transvaginal mesh products
8   where you provided specific opinions in
9   other litigation.
10          Would you agree that all
11  transvaginal mesh products for pelvic
12  organ prolapse and stress urinary
13  incontinence have risks?
14      A.   So I just want to make sure
15  I heard your question correctly.
16          You stated all pelvic organ
17  meshes for prolapse and slings have
18  risks; is that -- am I correct?
19      Q.   Yes, essentially.
20      A.   Okay.
21          Yes.  To varying degrees,
22  yes, they do.
23      Q.   And they all have the risk
24  of extrusion, pelvic pain and

Page 57

1   dyspareunia?
2       A.   Yes, to varying degrees; as
3   long as we're still talking about pelvic
4   organ meshes and slings, they all do to
5   varying degrees.
6       Q.   Would you agree that these
7   are common and well-known risks?
8       A.   I agree that they are
9   common.  I disagree that they are well
10  known, the true incidence is not usually
11  disclosed.  It is becoming much more well
12  known since 2011.
13      Q.   And if I understand your
14  report correctly, you intend to offer an
15  opinion that Dr. Kim was not advised of
16  all the potential risks?
17      A.   What I'm saying is as far as
18  the level of disclosure of the known
19  risks with the Avaulta, the Avaulta Plus,
20  and the Align, that was not fully
21  disclosed, so Dr. Kim would not be able
22  to know those full risks, as I do, having
23  read internal documents, e-mails, et
24  cetera, as outlined in my general report.

15 (Pages 54 to 57)

Daniel S. Elliott, M.D.

Page 58

```
 1      Q.   Would you agree that Dr. Kim
 2  is the better authority on what she knows
 3  and what she doesn't know?
 4      A.   No.  She knows only what she
 5  knows, but she doesn't know what I know.
 6      And important -- an
 7  important part of that is, I've had a
 8  chance to review internal documents,
 9  which I'm under a confidentiality
10  agreement, so I can't discuss that, even
11  with my own colleagues, I can't
12  discuss -- or, I don't know if I can
13  discuss it so I don't.  So they don't
14  know what was known at the launch of the
15  product and everything.
16      Dr. Kim knows everything she
17  knows.  But, again, she doesn't know what
18  else there is out there to know.  The old
19  phrase "you don't know what you don't
20  know" type of thing.  That's very
21  confusing, however, it's very accurate.
22      Q.   She may not know everything
23  that you know, and it's equally true that
24  you may not know everything that she
```

Page 59

```
 1  knows; is that fair?
 2      A.   Yes, to a certain extent.  I
 3  have an advantage of being at a large
 4  teaching institution, attend meetings
 5  nationally, internationally, speak on
 6  this subject, and have read internal
 7  documents from, essentially, all of the
 8  producers of meshes.
 9      There is the chance she
10  knows something I don't.  This is not a
11  criticism of her by any means, but that's
12  unlikely.  So I am playing the
13  overwhelming odds I have -- I've had an
14  opportunity to know and learn more than
15  she has.
16      But, again, that's not a
17  criticism of her, by any means.
18      Q.   I guess the point I'm trying
19  to get at is, if she says that she's
20  aware of the risk of extrusion, you're
21  not in a position to disagree with her;
22  is that fair?
23      A.   We would have to ask her
24  what percentage.  It's a vague, are you
```

Page 60

```
 1  aware of the risk of a fuel pump going
 2  out in a Mustang?  Well, I don't know, I
 3  think I do.
 4      But specifics.  Is she going
 5  to be able to say, yeah, it's 12 to 22
 6  percent, based upon e-mails that we've
 7  seen from internal documents; or is she
 8  going to go on the literature or is she
 9  going to go off the IFU, which doesn't
10  tell us any risks?
11      So we would have to ask her
12  specifically, what are -- what percentage
13  of individuals have mesh contraction,
14  extrusion, et cetera, progressive nature.
15  And if she gave me a percentage, then I
16  would be more likely to agree or disagree
17  with your comment.
18      Q.   So is it your position that
19  she can't understand the risks of the
20  product sufficiently if she doesn't know
21  the exact percentage of every potential
22  risk?
23      MS. SCARCELLO:  Objection to
24  form.
```

Page 61

```
 1      THE WITNESS:  Yeah.  With
 2  patients, I feel we have an
 3  obligation to tell them, you have
 4  a 1 in 5 percent risk of X, Y or Z
 5  complication.
 6      The word significant, minor,
 7  rare, don't mean anything to an
 8  individual patient.  That's been
 9  studied; that's, you know, in some
10  of my reports.  I think we have to
11  give numbers to those.
12      So Dr. Kim has a good
13  education, I don't doubt anything
14  like that.  But, again, I just
15  don't think she -- she never had a
16  chance to know all that could go
17  wrong with the product.
18  BY MR. BUHR:
19      Q.   Did you read her deposition
20  testimony when she talked about her
21  knowledge of the risks?
22      A.   Yes.
23      Q.   Do you agree that she
24  testified she was aware of the risk of
```

16 (Pages 58 to 61)

Daniel S. Elliott, M.D.

Page 62

1    extrusion?
2         A.   Yes.  And I also know that a
3    doctor is not going to tell you that they
4    did not know, because they're opening
5    themselves up.  So I agree that's what
6    she stated.
7         Q.   And she also testified that
8    she was aware of the risk of chronic
9    pelvic pain at the time she implanted
10   these products?
11        A.   Correct, that's what she
12   stated.
13        Q.   And she also testified that
14   she was aware of the risk of chronic
15   dyspareunia associated with these
16   products at the time she implanted them
17   in Ms. Smith?
18        A.   That is -- that is what she
19   states.
20        Q.   If Plaintiff would have
21   received a different transvaginal mesh
22   product, would you agree that she still
23   may have had pelvic pain and dyspareunia?
24        MS. SCARCELLO:  Object to

Page 63

1    form.
2         THE WITNESS:  Well, as I've
3    stated before, the various
4    different mesh products all have
5    different sets of complications,
6    depending upon the composition of
7    the mesh, plus or minus having a
8    collagen -- or a, excuse me, a
9    protein coat to them.
10        But there is significant
11   level of risk with all of them.
12   BY MR. BUHR:
13        Q.   So you're not saying that if
14   she used a different product it would
15   have eliminated her risk of pelvic pain
16   or dyspareunia; is that fair?
17        A.   Well, Avaulta is unique --
18   the Avaulta Plus, excuse me.  It is
19   unique with that extra layer on it, which
20   has never been shown to have any
21   potential benefit.
22        So I can't state that she
23   would have had more or less with the
24   other ones, but the other ones don't have

Page 64

1    that coating to it.  So you're not going
2    to be lowering the risk any.
3         Q.   Would you agree that a
4    hysterectomy can cause pelvic pain and
5    dyspareunia?
6         A.   In specific locations, in
7    varying severity and progressive nature
8    of it, it can be associated with pelvic
9    discomfort.
10        Q.   Is that something you
11   considered in your differential
12   diagnosis?
13        A.   Yes.
14        Q.   Is that listed anywhere in
15   your report as something you considered
16   in your differential diagnosis?
17        A.   When I review the location
18   and the descriptions of the other
19   doctors, and their palpation of mesh
20   contraction, I am going to automatically
21   rule out hysterectomy-related pain,
22   because that's not going to cause -- or
23   be associated with mesh contraction and
24   palpation tenderness.

Page 65

1         Q.   Is it possible that some of
2    her pain is related to the hysterectomy?
3         A.   On the anterior vault and
4    obturator space, no.
5         It's going to be in varying
6    degrees.  So I can't completely, 100
7    percent, rule out everything.  I have to
8    look at the data and my experience, and
9    that's what points to the mesh.
10        Because the vaginal vault
11   discomfort after a hysterectomy is
12   different, it's treated differently.  We
13   have different successes with it than
14   with the meshes.  So that's why I have
15   to -- we have to look at the totality of
16   the patient for that answer.
17        Q.   And would you agree that
18   nowhere in your report do you discuss the
19   hysterectomy as a possible alternative
20   cause or how you ruled it out?
21        A.   I didn't feel I needed to,
22   because I talk about the specific mesh
23   contraction, mesh exposure, tenderness on
24   palpation on the anterior vault.  That's

17 (Pages 62 to 65)

Daniel S. Elliott, M.D.

Page 66

1  away from where the hysterectomy was
2  performed.
3      So my experience, on a daily
4  basis dealing with women who have had
5  hysterectomies, we don't see discomfort
6  in that region.  So we're talking about a
7  different region.
8      Similar, I don't talk about
9  ovarian pain or ovarian cysts, because
10 it's a different location, different
11 intensity.
12     So I don't specifically
13 state it that way, and I didn't feel I
14 needed to.
15     Q.  Did you review the consent
16 form from Dr. Kim?
17     A.  Yes.  And I have -- I
18 believe, the consent form, I make a
19 reference to on November 30th, 2007.
20 It's on Page 11 of my report, where it
21 states, at the very last sentence -- it's
22 the middle paragraph, very last sentence,
23 and it says, A full PARQ conference was
24 held regarding the procedure.

Page 67

1      Q.  Did you review the actual
2  consent form for the operation?
3      A.  I don't recall -- I mean, I
4  reviewed whatever was there.  I'd have to
5  go look.  I don't recall the specific
6  page.  I'd have to look at it.
7      MR. BUHR:  Let's attach as
8      the next exhibit, I think is
9      Exhibit-7, the consent form.
10         -  -  -
11     (Whereupon, Exhibit
12     Elliott-7, 1/11/08 Consent Form,
13     was marked for identification.)
14         -  -  -
15 BY MR. BUHR:
16     Q.  Do you have that in front of
17 you now, Doctor?
18     A.  Yes, I do, dated January
19 11th, 2008.
20     Q.  And under the risks section,
21 do you agree it discusses the risks of
22 further procedures, pain, scarring, wound
23 problems, sexual dysfunction,
24 dyspareunia, malfunction of implanted

Page 68

1  devices?
2      Those are all risks included
3  on this form, correct?
4      A.  Yes.  This is a generic
5  form.  They also have cure cancer,
6  persistent stones.  This is just a
7  generic consent, not a specific one.
8      But they mentioned the
9  things you mentioned.  They also talk
10 about impotence, women don't have
11 impotence.  And ejaculatory dysfunction.
12 Well, women don't have that either.
13     So this is just a
14 cookie-cutter form.
15     Q.  But it does include the
16 risks of dyspareunia and pelvic pain that
17 we discussed?
18     A.  With no description of the
19 severity, the progressive nature of it,
20 the inability to cure it.  Those things
21 are mentioned in a generic form --
22 generic fashion, excuse me.
23     Q.  Are you also intending to
24 offer an opinion on the adequacy of the

Page 69

1  IFU warnings?
2      A.  For a general report, not
3  for a case-specific.  I don't know how
4  that legal stuff goes.  It depends what
5  I'm asked.
6      The IFU, in my opinion, is
7  incomplete, as we discussed in my general
8  deposition several years ago.
9      Q.  And I don't want to re-tread
10 all that testimony.
11     But I do want to confirm
12 that specifically related to the alleged
13 injuries by Ms. Smith that it
14 specifically warns of dyspareunia and
15 scarification and contraction and
16 extrusion, correct?
17     A.  Correct.  That is stated in
18 there in those words that you use,
19 correct.
20     Q.  And did you see Dr. Kim's
21 testimony that she doesn't rely on
22 instructions for use?
23     A.  Correct.
24     Q.  So you're not going to offer

18 (Pages 66 to 69)

Daniel S. Elliott, M.D.

Page 70

1    an opinion in this case, then, that a
2    different warning on the IFU would have
3    made any difference to Dr. Kim; is that
4    fair?
5         A.   Well, what I state is
6    regardless of what Dr. Kim relied upon,
7    the IFU has to be complete with the
8    severity, the frequency, the inability to
9    cure the problems, et cetera, as known by
10   the company.
11        Q.   Right.  But in terms of
12   Becky Smith's specific case, you're not
13   offering an opinion that Dr. Kim would
14   have done anything different if a
15   different warning had been provided?
16             You have to rely on Dr. Kim
17   for that, right?
18        A.   Well, yeah, you're --
19   ultimately you're right.  I can't state
20   what Dr. Kim would have known.
21             However, had the IFU been
22   fully complete in the severity, the
23   frequency, the inability to fix the
24   problem, Dr. Kim may have heard about

Page 71

1    that.  So I can't speak -- so that would
2    be best addressed to Dr. Kim once she
3    knows all the risks of the procedure.
4         Q.   And did you see her
5    testimony that she had good clinical
6    outcomes implanting both the Align and
7    the Avaulta Plus?
8         A.   I saw that that's what she
9    reported.
10        Q.   And you've never implanted
11   either of these products, correct?
12        A.   I have chosen not to.
13        Q.   Would you agree that Ms.
14   Smith initially healed well following the
15   implant surgery?
16        A.   Correct, as that's what is
17   the usual.
18        Q.   She did not have any
19   extrusion until approximately one year
20   after the implant; is that right?
21        A.   I see, in my records,
22   February 13th, 2008.  So you are correct,
23   it's a year and one month later was, I
24   believe, the -- no, excuse me, that's

Page 72

1    incorrect.
2             It's April of 2008 that I
3    believe the records state the first mesh
4    exposure.  So a year and, what, three
5    months, something like that.
6         Q.   Well, that's one of the
7    things I wanted to talk to you about.
8             Because I think -- so April
9    9, 2008 is only a few months after the
10   implant surgery, right?
11        A.   You are correct.
12        Q.   And so I think the date on
13   that is wrong, and we'll pull that out in
14   a second.
15        A.   Okay.
16        Q.   So in her follow-up, her
17   first post-op visits with Dr. Kim,
18   everything seemed to be healing properly,
19   right?
20        A.   That is correct.
21        Q.   There was no sign of any
22   mesh extrusion on January 23rd, 2008 or
23   February 13th, 2008, right?
24        A.   That is correct.

Page 73

1         Q.   And she was noted to be
2    doing extremely well by Dr. Kim, right?
3         A.   That is correct.
4         Q.   And at this point, the Align
5    had corrected her stress urinary
6    incontinence?
7         A.   In the records, I believe it
8    states something that she's doing very
9    well without any problems.  So the answer
10   to that would be yes.
11        Q.   And the Avaulta had
12   corrected her cystocele?
13        A.   Correct.  Completely gone is
14   what Dr. Kim notes on February 13th of
15   2008.
16        Q.   On what date?  I'm sorry.
17        A.   February 13th, 2008,
18   cystocele, quote/unquote, what I have
19   down here is, completely gone.  That's on
20   Page 13 of my report.
21        Q.   Right.
22             And on that date, and I
23   think it's part of, if you wanted to turn
24   to the records, part of Exhibit-5, and

19 (Pages 70 to 73)

Daniel S. Elliott, M.D.

Page 74

1  Dr. Kim notes that the anterior vaginal
2  wall has healed very nicely; is that
3  right?
4      A.   I don't have those records.
5  But that's, from my recollection,
6  correct.
7      Q.   Then turning to this April
8  9th, 2008 note that you have of possible
9  mesh extrusion.  And that would be on
10  Exhibit-5, ending in Bates number 11.
11          MS. SCARCELLO:  Exhibit-5.
12          THE WITNESS:  I'm sorry,
13      Exhibit-5.  I thought you were
14      going to hand me something, turns
15      out I already have it.
16          You said Exhibit-5?
17      MR. BUHR:  Yes.
18          THE WITNESS:  Okay, I'm
19      sorry.  And then Bates number?
20      MR. BUHR:  11.
21          THE WITNESS:  Okay, I'm
22      there.
23  BY MR. BUHR:
24      Q.   So is this the record you're

Page 75

1  referring to in your report for April
2  9th, 2008?
3      A.   Correct.
4      Q.   Is it possible that that
5  handwritten date is actually January
6  19th, 2008 -- or 2009, rather, and that
7  it was a mistake that's often made in
8  January by writing the prior year, 2008?
9      A.   So you're saying --
10      Q.   1/19 instead of 4/9?
11      A.   I'm not a, what do you call
12  it, writer expert.  I'm just looking at
13  it.  I see a 4 and then a 1 with a little
14  slash up, 9, and the slash and up again,
15  08.
16          To me it looks like 4/1 -- I
17  mean, we can't be definitive.  But, I
18  mean, it looks like my date of April 9th,
19  and you're telling -- you're suggesting
20  what again?  1 --
21      Q.   1/19 and that they
22  mistakenly wrote 2008 instead of 2009?
23      A.   Well, I -- I don't want to
24  be difficult.  To me, it looks like a

Page 76

1  4/1/9 -- I mean, I don't know.  If we did
2  1 --
3      Q.   And I think we do have
4  another copy of this that was in the
5  hospital records.
6          MR. BUHR:  Can we attach it
7      as the next exhibit?  Is that
8      Exhibit-8, then?
9          MS. GRIFFIN:  Correct.
10          - - -
11      (Whereupon, Exhibit
12  Elliott-8, Hospital Record, was
13  marked for identification.)
14          - - -
15          THE WITNESS:  If you look
16  down in the history of present
17  illness, 49-year-old female
18  underwent cystocele/Avaulta
19  repair, 1/15/08.  Now with mesh
20  extrusion.
21          So, I mean, it -- I'm going
22  to hold with 4/9/08, unless you
23  have something to be definitive.
24  I'm not going to be --

Page 77

1  BY MR. BUHR:
2      Q.   And the plan there is
3  excision of the mesh, right?
4      A.   Correct.
5      Q.   And you're not aware of any
6  excision of the mesh at that time, in
7  April of 2008?
8      A.   I'm not aware of any, no.
9      Q.   And this is written by Dr.
10  Kim's physician assistant; is that right?
11      A.   I don't know whose assistant
12  it is, but it's a physician assistant.
13          MR. BUHR:  Did we mark
14      Exhibit-8?
15          MS. GRIFFIN:  We did, yes.
16  BY MR. BUHR:
17      Q.   And you see, Doctor, at the
18  top there, how it lists typewritten,
19  1/19/2009?
20      A.   Sure.
21      Q.   So just keep that in mind
22  and let me know in a minute if the timing
23  of January 19th, 2009 makes more sense
24  with the subsequent reports by Ms. -- by

20  (Pages 74 to 77)

Daniel S. Elliott, M.D.

Page 78

```
 1    Dr. Kim.
 2        A.   Well --
 3        Q.   And so, specifically, on --
 4    go ahead.
 5        A.   I'm sorry, I did interrupt
 6    you.  That was my fault.  My bad.
 7        Q.   So specifically on January
 8    16th, 2009 she returned to see Dr. Kim,
 9    right?
10        A.   Yes.
11        Q.   And even according to your
12    report, it says, With a new complaint of
13    vaginal mesh exposure beginning roughly
14    one month prior.
15        A.   Yeah, that's what -- yeah, I
16    must have gotten that from the records.
17        Q.   Right.  So this is what
18    she's reporting to Dr. Kim on January
19    16th, 2009.  And you even quote, in your
20    report, About a month ago, her husband
21    noticed some evidence of mesh during
22    sexual intercourse, and this is becoming
23    progressively worse.
24             Is that right?
```

Page 79

```
 1        A.   Yeah.  That's what the
 2    report says, yes.
 3        Q.   And if you actually look at
 4    that report, which is at -- again, it's
 5    on Exhibit-5, Bates number ending in 07.
 6             Do you have Bates number 7
 7    in front of you?
 8        A.   Yes, I do.
 9        Q.   So in there in that first
10    paragraph is the language that's quoted
11    in your report that I just read.
12             And the subsequent sentence
13    says, The patient states that up until a
14    month ago, she did not feel anything at
15    all.
16             Do you see that?
17        A.   Yes.
18        Q.   So would you agree that that
19    conflicts with the suggestion that the
20    prior report, from Dr. Wyndham, was on
21    January -- sorry.  Let me start over.
22             Would you agree that that
23    conflicts with the suggestion that the
24    report from Dr. Wyndham was April 9th,
```

Page 80

```
 1    2008, where she had a plan of mesh
 2    excision?
 3             MS. SCARCELLO:  Objection to
 4    form.
 5             THE WITNESS:  Yeah, there's
 6    a conflict there.
 7             First of all, this is not to
 8    be picky, it's a physician
 9    assistant, so it's not a
10    physician.
11             But, yeah, there is -- there
12    is a discrepancy as far as the
13    dates go.  I won't argue with
14    that.
15    BY MR. BUHR:
16        Q.   So at least according to Dr.
17    Kim's report, she did not feel anything
18    until about a month prior to this January
19    16th, 2009 report, correct?
20        A.   Correct, that's what Dr. Kim
21    reports.
22        Q.   And then Dr. Kim recommended
23    mesh excision, which took place a few
24    days later on January 20th, 2009?
```

Page 81

```
 1        A.   Correct.
 2        Q.   And had she stopped using
 3    her Estrace cream at this point?
 4        A.   I believe I saw a mention of
 5    that.
 6        Q.   Can that increase your risk
 7    for mesh extrusion?
 8        A.   Well, I'm not aware of
 9    anywhere it states that with the Avaulta
10    product you have to be on it permanently.
11             Estrogen can potentially
12    help reduce that risk.  But, again, I'm
13    not -- I've never seen where you're
14    supposed to be on it.
15        Q.   No.  But Dr. Kim had
16    prescribed estrogen cream following the
17    implant, correct?
18        A.   Correct.  And it's not
19    uncommon for women not to like it for
20    some reason, concerns about breast
21    cancer, blood clots and those types of
22    things, to stop taking -- or it's just
23    plain messy.  But he did prescribe it
24    afterwards.
```

21 (Pages 78 to 81)

Daniel S. Elliott, M.D.

Page 82

1    Q.   And having a hysterectomy at
2  the same time, would she have had
3  postmenopausal changes after the surgery?
4    A.   No.
5    Q.   Was she found to have
6  vaginal atrophy and thinning tissue?
7    A.   Yes.  But she still has her
8  ovaries in place.  They were not removed,
9  by her request.  So we don't know the
10  volume of estrogen being produced.  A
11  49-year-old female, you don't know.
12    Q.   But Dr. Kim recommended
13  restarting the Estrace cream on January
14  16th, 2009, based on her complaints; is
15  that right?
16    A.   Yeah.  As I have in my -- on
17  Page 13, third paragraph, Dr. Kim
18  recommended restarting Estrace cream.
19  But because of the extent of the erosion,
20  I think this needs to be treated
21  surgically, end quote.
22    Q.   Are there factors that can
23  increase a woman's risk for having mesh
24  extrusion?

Page 83

1    A.   I've never read in the IFU
2  factors, which if they are known, they
3  should be in there.
4       I have seen internal
5  documents that if you have a hysterectomy
6  at the same time, you're increasing your
7  risk for exposure.  But, again, that's
8  not in the IFU.
9       Advanced age probably would
10  increase it.  But, again, that's not in
11  the IFU.  And presence of an infection
12  would do it.
13       So there are going to be
14  factors there.  But I'm not aware of the
15  company disclosing that they knew of
16  factors.  If they did, they should report
17  it.
18    Q.   Well, there's also certain
19  factors that are generally known in the
20  medical community.
21       For example, would you agree
22  that smoking can increase the risk of
23  extrusion?
24    A.   Excellent point.  No.  If

Page 84

1  smoking were a risk factor, then that has
2  to be in the IFU, and it's nowhere.  At
3  least I haven't seen it.  We can pull it
4  out and show it, and I'll change my
5  opinion.  But I'm not aware of that.
6       In fact, some will say the
7  mesh kits are better because a smoker has
8  a chronic cough, so it needs to be a
9  stronger repair.  So I'd have to -- I'd
10  have to disagree with you.
11    Q.   I guess my question is more
12  that smoking can have an effect on a
13  patient's tissue quality, right?
14    A.   Yes.
15    Q.   And if a patient has poor
16  tissue quality, that can increase their
17  likelihood for something like extrusion;
18  is that right?
19    A.   I suppose, in theory, that
20  is possible.
21       As far as I know, Ms. Smith
22  is a nonsmoker, so it's a moot point
23  here.  But, again, if meshes have an
24  increased risk of complication like

Page 85

1  exposure with smoking, then that's got to
2  be on the IFU.
3    Q.   Turning more specifically to
4  Ms. Smith, if she has thinning of the
5  vaginal tissue and vaginal atrophy, can
6  that increase her risk for extrusion?
7    A.   Well, we're talking
8  theoretically here.  But the presence of
9  the mesh inside of her body will cause
10  thinning of the vaginal tissue and
11  atrophy appearance, because it is slowly
12  causing a necrosis.  So you can't say
13  which comes first.
14       She's, at this point in
15  time, a 49-year-old female.
16  Theoretically, she should be producing
17  estrogen still.  Her ovaries are still in
18  place.  So I can't completely agree with
19  you on what's coming first.
20       Prior to her surgery, there
21  was -- one year prior, there was no
22  indication of vaginal atrophy.  Then she
23  has surgery, a mesh is put in with
24  foreign body reaction, inflammation,

22 (Pages 82 to 85)

Daniel S. Elliott, M.D.

Page 86

1    she's getting exposure, which means
2    thinning out.  So I would say a logical
3    conclusion, that's due to the presence of
4    the mesh, not due to her.
5         Q.   I think my question was, if
6    a patient has vaginal atrophy, can that
7    increase their risk for extrusion?
8         A.   I know -- I hear what you're
9    saying.
10        And not to be difficult,
11   we're talking about a theoretical
12   patient, how severe that is, and we're
13   not talking about Ms. Smith.
14        So we would have to have a
15   specific individual we're talking about
16   how bad this atrophy is.  And, again,
17   let's say you are correct, then that's
18   not on the IFU and it's not warned at
19   all.  So if that is a known risk, that
20   will be very important to know.
21        Q.   And so are you agreeing with
22   me that it's a factor to consider?
23        A.   Vaginal atrophy would be,
24   definitely, something that you would want

Page 87

1    to consider if it's severe prior to
2    putting in a mesh.
3         You don't have to worry
4    about that with nonmesh repairs.  But in
5    a mesh repair, you would.  And it would
6    be a woman's right to know that her body
7    could be permanently harmed if this
8    product is put in.  So, for me, it
9    becomes under a woman's rights issue.
10        Q.   Did you consider vaginal
11   atrophy in your differential diagnosis?
12        A.   Yes, I did.  By the reasons
13   I have already explained in the last
14   couple of questions ago; 49 year old, she
15   was 48, I believe, at the time of her
16   surgery, she was premenopausal, her
17   ovaries are still in, there's no vaginal
18   atrophy prior to her surgery.
19        One year later, with her
20   ovaries still in place, we have mesh
21   exposure, thinning and atrophy.  And in
22   my opinion, based upon my experience,
23   vaginal atrophy due to menopause takes
24   years and years to develop, it's not

Page 88

1    going to happen in over one year's time.
2    So, then, the culprit becomes the
3    presence of the Avaulta and the
4    inflammatory process it causes.
5         Q.   In the list of examples of
6    your differential diagnosis on Page 4 and
7    5, you do not list vaginal atrophy or
8    postmenopausal changes in that list; is
9    that right?
10        A.   It is not listed there, no.
11        Q.   In the excision procedure
12   performed by Dr. Kim, she was able to
13   remove the exposed mesh quite easily,
14   right?
15        A.   Yes, she uses those words,
16   "quite easily."
17        Q.   And I believe you said
18   earlier that this extrusion relates to
19   the Avaulta and not the Align; is that
20   right?
21        A.   I'd have to go back and look
22   at the specific operative note.  But, as
23   I recall, this is specifically due to the
24   Avaulta, where it is located.  It was

Page 89

1    well away from the Align.
2         Q.   And she healed well
3    following this procedure; is that right?
4         A.   Correct.
5         Q.   The anterior vaginal wall
6    completely healed?
7         A.   Yes.  As of the note, April
8    16th, 2009, I believe she uses that word,
9    The anterior vaginal wall has healed up
10   completely.  I do not feel any mesh
11   exposure -- extrusion.  End quote.
12        Q.   And Dr. Kim prescribed
13   Vagifem tablets on that date?
14        A.   I did not make a record of
15   that.  I would have to see the record.
16        Q.   I think it's the first page
17   on Exhibit-5.
18        A.   He gave -- she gave Ms.
19   Smith samples of Vagifem.  So she didn't
20   give a prescription, she gave some
21   samples.
22        Q.   And what is Vagifem, for the
23   record?
24        A.   Vagifems are actually

23 (Pages 86 to 89)

Daniel S. Elliott, M.D.

Page 90

1    estrogen tablets that go into the vagina.
2    They are usually, for most patients,
3    easier to use. They are cleaner. The
4    Premarin cream tends to be quite messy,
5    has an applicator that women don't like.
6            So Vagifem is just an easier
7    way to insert the estrogen. The problem
8    with it is, it doesn't necessarily stay
9    where you want it to go. But just think
10   of it as a different form of estrogen.
11       Q.   And do you have an
12   understanding as to why Dr. Kim was
13   prescribing estrogen at this time?
14           MS. SCARCELLO: Object to
15   form.
16           You can answer.
17           THE WITNESS: Trying to heal
18   up the vaginal wall or continue to
19   heal it up.
20   BY MR. BUHR:
21       Q.   Is that something that is
22   needed in order to heal the vaginal wall?
23       A.   Not necessarily, but she was
24   having trouble with the Estrace cream, it

Page 91

1    was causing irritation. So that could be
2    part of the reason why she stopped it
3    before.
4        Q.   And Dr. Kim obviously felt
5    like it was important for her to have
6    some estrogen cream or estrogen tablets?
7        A.   That would be the standard
8    party line of what you do after a mesh
9    exposure, is to give vaginal estrogen.
10           But, again, some women can't
11   tolerate it, for multiple different
12   reasons. And if she had trouble with the
13   Estrace cream, which is just a form of
14   Premarin cream, she could also have
15   trouble with the Vagifem, because, it's,
16   again, the same thing, it's just
17   estrogen.
18       Q.   And would you agree at this
19   point in the records there's no
20   documented complaint of pelvic pain or
21   dyspareunia?
22       A.   For her, Ms. Smith, there
23   was no documented pelvic pain or
24   dyspareunia. Her partner had noticed

Page 92

1    discomfort prior.
2        Q.   And would you agree that
3    the -- she did not complain to a doctor
4    about any problems after this until 2017?
5        A.   I did not have anything in
6    the records from 2009 until March 21,
7    2017. So I agree with you.
8        Q.   And, in fact, during that
9    period of time, she saw Ms. Hoth for her
10   annual exams and reported no complaints
11   of dyspareunia; is that right?
12       A.   That is correct.
13       Q.   You reference an August 8th,
14   2013 record from Ms. Hoth where she had
15   bothersome arm pain but no other
16   complaints on that day.
17       A.   That is correct.
18       Q.   Did you see that Ms. Smith
19   actually asked Ms. Hoth on that day about
20   advertisements for vaginal mesh
21   litigation?
22       A.   I remember seeing a
23   reference about that somewhere. I
24   don't -- I'd have to see the specific

Page 93

1    note.
2            MR. BUHR: Let's attach as,
3    I believe it's Exhibit-9 we're on
4    now, the record from Ms. Hoth on
5    February 16th -- actually, no.
6    Let's attach the record from
7    August 8th, 2013.
8                - - -
9            (Whereupon, Exhibit
10   Elliott-9, 8/8/13 Hoth Note, was
11   marked for identification.)
12               - - -
13           THE WITNESS: I have it.
14   BY MR. BUHR:
15       Q.   And if you'd go to the Bates
16   number that ends in 08.
17       A.   Okay. I'm there.
18       Q.   The top of the next page.
19           But has no other complaints
20   today. Although has a mesh and is
21   concerned about this, given the current
22   TV ads for, Do you have a mesh, you could
23   be due compensation. Has had sling and
24   had mesh put in when she had the

24 (Pages 90 to 93)

Daniel S. Elliott, M.D.

Page 94

1  hysterectomy.  And then they had to trim
2  it up.
3          Do you see that?
4      A.  Yes, I do.
5      Q.  So she was specifically
6  asking her doctor about concerns about
7  the mesh, but at this point she was not
8  complaining of any symptoms of pelvic
9  pain or dyspareunia or extrusion or
10  anything like that, right?
11      A.  You are correct.
12      Q.  Just to be clear, your
13  report includes a reference to a February
14  16th, 2012 report?
15      A.  Yes.
16      Q.  Where you have a reference
17  to pelvic pain with exercise.
18      A.  Correct.
19      Q.  You're not offering an
20  opinion that that pain is anywhere
21  related to the mesh at this point; is
22  that right?
23      A.  I'm just stating what the
24  records stated.  The record,

Page 95

1  unfortunately, and what I deal with all
2  the time, is incomplete.  It just makes a
3  reference to it.
4          So I put it down as
5  documentation.  But I'm not making a
6  conclusion at that point in time.
7      Q.  So at what point in time are
8  you making a conclusion that she's having
9  pain related to the mesh?  Is that in
10  March 2017?
11      A.  Well, I have to go off of
12  the records.  All I saw in there, and we
13  can maybe go to that February 16th, 2012
14  note, if it's there, and that was just in
15  there.  That's all it stated.
16          If it stated more, like it's
17  lifting or a pelvic exam confirms it --
18  I'm just stating that it is there for
19  completeness sake.  But I'm not stating
20  that is due to mesh.  All I've got is a
21  statement there.  That's all I've got.
22          So, like, for a differential
23  diagnosis, I don't have enough
24  information to make a conclusion.  I'm

Page 96

1  just documenting that that's what's in
2  the records.
3      Q.  Okay.  Fair enough.
4          MR. BUHR:  And let's for
5  completeness just go ahead and
6  attach that record as Exhibit-10.
7          - - -
8          (Whereupon, Exhibit
9  Elliott-10, 2/16/12 Hoth Office
10  Visit, was marked for
11  identification.)
12          - - -
13  BY MR. BUHR:
14      Q.  Do you have that in front of
15  you now, Doctor?
16      A.  Yes.  The first page is
17  2017, so it must be before that.
18      Q.  I think that's the printing
19  date.
20          If you look on the left
21  side, it should be 2/16/2012 office visit
22  with Ms. Hoth.
23      A.  I have February 16th of '12.
24  Is that --

Page 97

1      Q.  Yes.
2      A.  Yes, I have it then.
3      Q.  So towards the bottom of
4  that page, it says, Is pain an issue
5  needing to be addressed today?  And it
6  says, No.
7          Right?
8      A.  Yeah, that's what it states.
9      Q.  And then on Bates number
10  ending in 225, about halfway down the
11  page, it has a list for dyspareunia and
12  then it says no.
13          Do you see that?
14      A.  Correct, that's what it
15  states.
16      Q.  And then a little bit
17  further down is what I believe you were
18  referring to in your record, under
19  musculoskeletal, where she says, Pelvis
20  with exercise hurts and put back out this
21  Christmas.
22          Is that what you were
23  referring to in your report?
24      A.  Correct.

25 (Pages 94 to 97)

Daniel S. Elliott, M.D.

Page 98

1      Q.   And then if you go onto the
2  next page -- well, she does -- she does
3  an exam?
4      A.   Correct.
5           - - -
6      (Whereupon, a discussion off
7      the record occurred.)
8           - - -
9  BY MR. BUHR:
10     Q.   And her assessment for the
11 GYN assessment is normal exam, correct?
12     A.   Correct.  Note, With
13 fullness, no masses or tenderness.  A
14 negative exam.
15     Q.   So then at this point, it's
16 pretty clear she is not complaining of
17 any pain or dyspareunia related to the
18 mesh, correct?
19     A.   Well, as before, she has
20 pelvic -- quote/unquote, Pelvis with
21 exercise hurts and puts -- and put back
22 out this Christmas.
23          So, again, I am not stating
24 it's due to the mesh.  I'm not

Page 99

1  eliminating mesh as an option.  I'm not
2  including it.  It's just a statement
3  that's there.
4           But in the physical exam,
5  there was no pain on exam.
6      Q.   So, then, in March of 2017,
7  as we've discussed, is her first real
8  complaint of pelvic pain and dyspareunia
9  related to the mesh.
10          And she saw a doctor -- or,
11 sorry, a nurse practitioner, Shawn Cool;
12 is that right?
13     A.   Correct.
14     Q.   And this doctor also -- or
15 this nurse practitioner also advised on
16 starting vaginal estrogen cream; is that
17 right?
18     A.   Correct.
19     Q.   And why would she prescribe
20 that at the time?
21     A.   Well, I can't speak for this
22 individual, a nurse practitioner.  It's
23 pretty much the standard thing, knee-jerk
24 response, to give estrogen.

Page 100

1           It's not going to change
2  pain.  It's for a vaginal extrusion.  So
3  I can't vouch for the correctness of that
4  decision.
5      Q.   And you state in your
6  report, Said will trial for two months
7  and see if it provides relief.
8      A.   Correct.  And vaginal
9  estrogen in two months is not going to do
10 any good, you need much longer than that.
11          So that's, reading between
12 the lines, somebody who doesn't deal with
13 meshes.  It's not a criticism.
14     Q.   She had no -- sorry?
15     A.   I interrupted.
16     Q.   She had no evidence of mesh
17 extrusion at this time; is that right?
18     A.   All I have down is, on Page
19 14, during the vaginal exam, Ms. Cool
20 noted that, quote, bladder sling
21 palpable anteriorly during bimanual exam,
22 end quote.
23          So there's -- I don't know
24 what that means.  Is that exposure or

Page 101

1  what?  We can't put a lot into that,
2  because this is a nurse practitioner not
3  experienced in this.
4           So I can't say, is that
5  exposure?  Is that just that you could
6  feel the scarring and the contraction?  I
7  put that in there for thoroughness sake.
8           She needs -- the patient,
9  Ms. Smith, needs somebody more advanced
10 to be able to give us specifics if we
11 want accuracy.
12     Q.   Do you know if she continued
13 using the estrogen cream?
14     A.   I don't recall.  I
15 remember -- I know she's used it on and
16 off.  But, again, she had vaginal
17 irritation with it, so I don't -- I can't
18 say how well she used it.
19     Q.   In terms of your
20 differential with respect to dyspareunia
21 and the pelvic pain, did you consider the
22 vaginal atrophy that she was having at
23 this point?
24     A.   Yeah.  Vaginal atrophy will

26 (Pages 98 to 101)

Daniel S. Elliott, M.D.

Page 102

1  cause diffuse -- can cause diffuse
2  irritation of the vagina, thinning of the
3  vagina.  It's not going to cause specific
4  pinpoint pain or palpation of a mesh
5  causing pain.
6        It can cause some burning
7  with sexual activity.  It does not cause,
8  usually, discomfort with normal, daily
9  activities.
10       So that is always in the
11  differential diagnosis.  I ruled it out
12  in this one, again, because the suspicion
13  on exam of palpating the sling.
14    Q.   Are you saying that vaginal
15  atrophy isn't playing any type of role
16  here?
17    A.   It can be a very mild
18  complicating factor.  If vaginal atrophy
19  is the source for the problem, estrogen
20  can help repair it.  But it's not going
21  to cause pain along a mesh.
22    Q.   But you can't rule it out
23  completely as a mild complicating factor?
24    A.   I can rule it out 99.9

Page 103

1  percent, based upon my experience, my
2  attendance at national/international
3  meetings, giving lectures on the subject,
4  and daily exposure to patients.
5    Q.   Did she have a rectocele at
6  this point?  Well, let me rephrase that.
7        She had a mild rectocele at
8  the time of the implant; had the
9  rectocele progressed?
10    A.   I'd have to go over -- the
11  notes are classic for a general
12  practitioner family practice-type, but
13  they don't give specifics.
14       The first note with the
15  nurse practitioner, in March of '17, does
16  not tell me anything of specifics of
17  concurrent prolapse.
18       Follow-up note with the same
19  practitioner, August 13th, 2018, does not
20  state of the posterior -- it does not
21  state of any prolapse, which is an
22  incomplete note and not acceptable with
23  advanced-level-of-care individual.
24       And the physical exam by Dr.

Page 104

1  Denam, Mary Denam, on -- unfortunately, I
2  don't think I have a date here on this
3  one.  Page 15, starting with the bottom
4  paragraph -- for some reason I don't have
5  a date on that, there needs to be a
6  date -- there's no mention of a posterior
7  prolapse.
8        MR. BUHR:  We've been going
9  for a while, Doctor.  How about we
10  take a five-minute break and then
11  come back and finish up with the
12  rest?
13       THE WITNESS:  I'm good, if
14  you want to keep going.
15       MR. BUHR:  I'd like a
16  five-minute break, if you don't
17  mind.
18       THE WITNESS:  That's no
19  problem.
20       VIDEO TECHNICIAN:  We're
21  going off record.  The time is
22  3:14.
23          - - -
24    (Whereupon, a brief recess

Page 105

1  was taken.)
2          - - -
3        VIDEO TECHNICIAN:  We're
4  going back on the record.
5  Beginning of Media File 2.  The
6  time is 3:24.
7  BY MR. BUHR:
8    Q.   I'd like to attach some of
9  the records from The Oregon Clinic as
10  Exhibit-11, I believe.  These are the
11  Bates numbers that end in 7 -- well,
12  sorry, from 11 to 22.
13          - - -
14       (Whereupon, Exhibit
15       Elliott-11, The Oregon Clinic
16       Records, was marked for
17       identification.)
18          - - -
19       THE WITNESS:  Okay, I have
20  it.
21  BY MR. BUHR:
22    Q.   If you go to Bates number
23  that ends in 17, it should be an office
24  visit with Lindsey Waugh, if I'm

27 (Pages 102 to 105)

Daniel S. Elliott, M.D.

Page 106

1  pronouncing that correctly, dated August
2  23rd, 2018.
3      A.    Okay.  I'm there.
4      Q.    And this is one of the
5  reports that you reference in -- or one
6  of the records you reference in your
7  report on Page 15; is that right?
8      A.    That is correct.
9      Q.    And it states at this point
10  that she's having a constant, dull pain
11  with intercourse?
12      A.    Well, constant, dull pain,
13  especially with intercourse.
14      Q.    And it notes that the pain
15  level is 2 on a scale of 1 to 10.
16          Would you agree with me that
17  that's not severe pain that you describe
18  in your report?
19      A.    Well, on a scale of 1 to 10,
20  it doesn't rank up as severe.  It's worse
21  than a 1, but it is not in the highest
22  scores, obviously.
23      Q.    And then in the third
24  paragraph on that page, it says, The

Page 107

1  sling is working great, no leaking.
2          So her stress urinary
3  incontinence has still been corrected by
4  the Align product, right?
5      A.    That is correct.
6      Q.    Do you see the note that
7  says, Does not use estrogen cream on a
8  regular basis?
9      A.    Correct.
10      Q.    And this is despite being
11  prescribed estrogen cream the prior year
12  by Nurse Practitioner Cool, right?
13      A.    That is correct.
14          The vaginal estrogen would
15  be for the health of the vaginal tissue,
16  for lubrication during sexual activity.
17  And so it states, And does not have
18  issues with vaginal lubrication.
19          So the only reason to give
20  her -- or for her to take it would be for
21  a mesh complication.  And she's not
22  having exposure, so there's really no
23  reason to be on it.
24          But that's what it states,

Page 108

1  she does not use it despite what was
2  given to her.
3      Q.    And if you can turn to the
4  notes of physical exam on Bates number
5  21.
6      A.    Okay.  I'm there.
7      Q.    So the external genitalia,
8  it notes, Postmenopausal with moderate
9  atrophy; is that right?
10      A.    Correct.
11      Q.    And then, actually, inside
12  the vagina is postmenopausal atrophic
13  appearance; is that right?
14      A.    That's what it states.
15      Q.    And the estrogen cream would
16  be helpful for that type of atrophy,
17  would you agree with that?
18      A.    If she's making the right
19  call that it's due to atrophy, that would
20  theoretically help, if she can tolerate
21  it.
22      Q.    And then it notes, The
23  posterior compartment prolapse to level
24  of the hymenal ring.

Page 109

1      A.    Correct.
2      Q.    What stage prolapse is that?
3      A.    Stage 2.
4      Q.    It's a stage 2 rectocele she
5  has now, right?
6      A.    Correct.  It's to the level
7  of the hymenal ring.  It doesn't say it
8  goes beyond.  That would be a stage 2.
9      Q.    And under impression it
10  notes that she has symptomatic posterior
11  compartment prolapse.
12          What symptoms was she having
13  related to that prolapse?
14      A.    Well, from the note, she
15  denies feeling a vaginal bulge.  She does
16  feel some pressure towards her rectum.
17          So that would be the
18  posterior prolapse symptoms.
19      Q.    Can posterior prolapse cause
20  pelvic pain and dyspareunia?
21      A.    It can cause a sense of
22  fullness and pressure, but it would not
23  cause a tender-to-palpation issue like
24  she had on her exam.

28 (Pages 106 to 109)

Daniel S. Elliott, M.D.

Page 110

1      Q.   And that rectocele hasn't
2  been repaired at any time subsequent to
3  this; is that right?
4      A.   I have not reviewed any
5  records stating that it has been
6  repaired, correct.
7      Q.   So she would still be
8  expected to have symptoms related to that
9  posterior prolapse, right?
10     A.   Prolapse symptoms tend not
11 to go away, so I would expect for her to
12 still have symptoms.
13     Q.   And even though she states
14 that she doesn't believe she has any
15 trouble with lubrication, vaginal atrophy
16 can cause painful sex, right?
17     A.   It can cause irritation and
18 burning with sexual activity, which is
19 usually treated with a lubricant -- or
20 can be successfully treated with
21 lubricant or the vaginal estrogen.
22        But, again, it won't cause
23 tender-to-palpation or specific pinpoint
24 pain.

Page 111

1      Q.   There is no evidence of mesh
2  extrusion at this visit, right?
3      A.   There is no report of mesh
4  exposure.
5      Q.   And then she's referred to
6  Denman.
7        And I think that's what you
8  were referring to prior to our break?
9      A.   Correct.
10     Q.   And that's when Dr. Denman
11 notes that she has pelvic pain with
12 intercourse and feels a bulge with and
13 after a bowel movement, right?
14     A.   Correct.
15     Q.   And so could some of that be
16 related to her rectocele?
17     A.   That's why you would need
18 the physical exam to confirm it.  A
19 physical exam will tell you if she has
20 the rectocele, palpation in certain
21 areas, pelvic floor, et cetera.
22        Again, that's why the
23 physical exam is so important.
24     Q.   And Dr. Denman even notes

Page 112

1  that she was on vaginal estrogen for a
2  period of time but not long-term --
3      A.   Correct.
4      Q.   -- correct?
5      A.   Yes.
6      Q.   And she has not had any
7  pelvic floor physical therapy?
8      A.   Correct.
9      Q.   Is that something that can
10 help with pelvic pain?
11     A.   It depends what type of
12 pelvic pain it is.  In my experience,
13 pelvic floor myalgia which is de novo,
14 you can have some benefit from it.
15        Secondary to mesh, I have
16 never had a patient get significant
17 reduction of pain with physical therapy.
18     Q.   Would you agree that Dr.
19 Denman felt that physical therapy was an
20 important part of her plan for Ms. Smith?
21     A.   Well, not really, because
22 she recommended going to surgery fairly
23 soon afterwards.  So it was not a serious
24 consideration.  She gives it as an

Page 113

1  option.
2      Q.   Let's turn to Dr. Denman's
3  report from August 29th, 2018, which is
4  actually part of that last exhibit.
5        Do you have that record in
6  front of you?
7      A.   Yes, I do.  You're talking
8  Exhibit-11?
9        MS. GRIFFIN:  Correct.
10        MR. BUHR:  Yes.
11        THE WITNESS:  And what
12 page -- I'm sorry, Bates number?
13        MR. BUHR:  The Bates number
14 11.  So the first page of that
15 exhibit.
16        THE WITNESS:  I'm there.
17 BY MR. BUHR:
18     Q.   So about halfway through the
19 paragraph, under plan, it says, Discussed
20 need for PT -- which I assume is physical
21 therapy -- after surgery to help decrease
22 scar tissue formation as well as decrease
23 pain.
24     A.   Correct.  That's what she

29 (Pages 110 to 113)

Daniel S. Elliott, M.D.

Page 114

1    states.
2        Q.   Do you agree that that's --
3    do you agree that that's part of her
4    plan, then, and she thought that would
5    help?
6        A.   Well, she discusses it after
7    surgery.  It won't have any bearing on
8    scar tissue, but it may help decrease the
9    pain.  In my experience, it does not.
10       Q.   Will it help --
11       A.   I'm sorry.
12       Q.   Would it help decrease the
13   formation of scar tissue after the
14   surgery?
15       A.   No, absolutely not.  It has
16   nothing to do with that.  Unless she's
17   talking about vaginal dilators to help
18   prevent scarring of the vagina.  But
19   physical therapy alone does not help with
20   that.
21       Q.   So you think she's just
22   wrong on this?
23       A.   I didn't say that.  The note
24   is not clear.

Page 115

1        Who knows what she's
2    thinking.  If she's talking about vaginal
3    dilators, sometimes they'll use various
4    different vaginal procedures and
5    stretching.  If they're talking about
6    that physical therapy, yes.  But that
7    falls into the pelvic floor rehab.
8        So I can't state what she's
9    talking about here.  And if she's
10   referring to the vaginal dilators, then,
11   yes, that will help reduce the narrowing
12   and aggressive scarring of the vagina.
13       Q.   And Ms. Smith hasn't done
14   any type of PT after the surgery, right?
15       A.   I'm not aware of her doing
16   any, no.
17       Q.   Then she also states,
18   Discussed need for perioperative vaginal
19   estrogen to improve healing.
20       Do you have any disagreement
21   with that part of the plan?
22       A.   For mesh exposure, I think
23   it probably plays a role.  For mesh
24   scarring, mesh arm contraction, it will

Page 116

1    have no benefit.
2        Q.   She refers to the -- her
3    impression -- well, strike that.
4        You can have vaginal
5    scarring after any type of vaginal
6    procedure; would you agree with that?
7        A.   In varying degrees,
8    severity, progression, permanence,
9    inability to fix, that can happen with
10   procedures.
11       But, again, there's going to
12   be variables with each procedure.
13       Q.   Right.  But it's something
14   that's well known and expected, correct?
15       A.   Well, no.  It depends upon
16   who you're talking to, their level of
17   knowledge, their level of experience.
18   And then, again, in varying degrees.
19       Not all doctors read the
20   same books, attend the same meetings.
21   There's variable --
22       Q.   You agree that Dr. Kim
23   testified that she was aware of the risk
24   of scarring and scarification?

Page 117

1        A.   She was aware of what she
2    knew but not the full extent of it, as
3    we've talked about before.
4        Q.   Well, again, you don't know
5    the full extent of what she knows?
6        A.   I don't.  I'm playing odds
7    that she has not reviewed what I've
8    reviewed.  And she knows what she knows,
9    and I have no argument against that.
10       Q.   But there's expected to be a
11   certain amount of scarring around any
12   type of pelvic mesh that's implanted;
13   would you agree with that?
14       A.   All meshes have been shown
15   to increase fibrosis and scarring.  Not
16   all meshes are the same, so there would
17   be varying degrees of mesh scarring with
18   a specific product.
19       Q.   And how do you define banded
20   as you refer to it in your report?  Is
21   that related to scarring?
22       A.   That is a function of
23   scarring and the product design.  And
24   that's referring to, usually, the mesh

30 (Pages 114 to 117)

Daniel S. Elliott, M.D.

Page 118

1    arms, as when they're pulled through,
2    they roll and contract and cause banding.
3    They are palpable, you can feel it.
4    There's a very classic feel to it.
5         Q.   Here, Dr. Denman advised
6    against removing the arms, she doesn't
7    feel there's any problems related to the
8    arms.
9              Would you agree with that?
10        A.   No, I disagree -- I mean, I
11   agree not to remove the arms, that is a
12   risky, dangerous surgery without any
13   clear benefit.
14             Now, some surgeons around
15   the United States still do that, or are
16   trying to do it.  We still don't know if
17   that's the right way to go.  I personally
18   do not remove the arms.  Again, it's a
19   very, very difficult, morbid procedure
20   with the risk/benefit ratio more on the
21   risk.
22             So it's not that Dr. Denman
23   didn't think that was the source of the
24   problem, she didn't feel that it would

Page 119

1    cure the problem.
2         Q.   Well, did you read her
3    deposition testimony where she
4    specifically testified that there was no
5    pain at the arms of the mesh?
6         A.   Correct.
7         Q.   And do you have any reason
8    to disagree with that assessment?
9         A.   Based upon the physical exam
10   at that point in time, she touched the
11   right area, I have no reason to doubt it.
12        Q.   So there's no evidence that
13   she has pain related to the arms of the
14   mesh, right?
15        A.   Well, she had -- she was
16   tender to palpation and she had the thick
17   banding on the anterior wall painful to
18   palpation, 2 centimeters in width at max
19   with lateral arms obturator.  So that, to
20   me, tells it's -- the arms are a
21   component to this.
22        Q.   But she specifically
23   testified there was no pain at the arms
24   of the mesh?

Page 120

1         A.   I'm just going off of what
2    her note is here.  And it seems pretty
3    clear here.  Again, thick banding
4    anterior wall painful to palpation,
5    approximately 2 centimeters in width at
6    max with lateral arms, question mark,
7    obturator.
8              And so I don't know -- we'd
9    have to look at her exact testimony,
10   which may be helpful.  But this, to me,
11   seems pretty clear.
12             But, again, if I were her in
13   her situation, I would not go after
14   removing those mesh arms.
15        Q.   Let's look at her deposition
16   testimony.  If you can hand him Dr.
17   Denman's transcript from June 13th, 2019.
18        MS. GRIFFIN:  I'm sorry,
19   Eric, that came in spotty.  But we
20   will mark Dr. Denman's deposition
21   testimony from June 13th, 2019.
22   And that will be Exhibit-12.
23             - - -
24        (Whereupon, Exhibit

Page 121

1    Elliott-12, 6/13/19 Deposition
2    Testimony of Dr. Mary Denman, was
3    marked for identification.)
4              - - -
5         THE WITNESS:  Okay, I have
6    it.
7    BY MR. BUHR:
8         Q.   If you'd go to Page 79.
9         A.   You cut out.
10        Q.   If you'd go to Page 79.
11        A.   Oh, 79.
12        Q.   And this is the individual
13   page number.  Because on Page -- because
14   there's four pages per page.
15        A.   Sure.  I'm there.
16        Q.   So Page 79, Line 5:  So
17   going back to the plan on Page 11, it
18   states here that you didn't find any
19   issues with the arms of the mesh; is that
20   right?
21             Denman responds:  Correct.
22             And then further down, Line
23   14:  And when you say there were no
24   issues, that's because on examination it

31 (Pages 118 to 121)

Daniel S. Elliott, M.D.

Page 122

1    was not tender there, right?
2         Her answer is:  Correct.
3         She was not reporting pain
4    there, right?
5         She responds:  Correct.
6         So would you agree, then,
7    that she wasn't having any pain at the
8    site of the arms?
9         A.   That's what she states.  I'm
10   just going off -- we have a discrepancy
11   between her that-day exam and then what
12   she testifies, you know, a year or so
13   later.
14        But that's what she states.
15   There's a discrepancy here.
16        Q.   Right.  Her sworn testimony
17   as she's reviewing her records.
18        A.   Correct, that's what she
19   states.
20        Q.   Are you going to disagree
21   with her assessment?
22        A.   No, that's what she states
23   under oath.  I have no reason to
24   disagree.  I was just going off of the

Page 123

1    physical exam at the time.  But, you
2    know, that's what she states later.
3         Q.   Dr. Denman, in her report,
4    there's a reference to that she discussed
5    likely nerve damage from FAVD, which I
6    believe is forceps-assisted vaginal
7    delivery; is that right?
8         A.   Yes.  I would assume so.
9    That's not an abbreviation -- I don't do
10   any OB, so I assume that.
11        Q.   Then it goes on, Episiotomy
12   with delivery.  Reassurance there's not a
13   mesh factor involved with this issue,
14   speaking of the fecal incontinence.
15        And you don't have any
16   disagreement with that, do you?
17        A.   No.  A vaginal delivery and
18   episiotomy and, I believe, she had four
19   or five, maybe even six children, which
20   were all decent-sized babies, that,
21   logically, is going to cause fecal
22   incontinence.  And it is -- in my
23   opinion, the Avaulta and Align are not
24   associated with fecal incontinence.

Page 124

1         Q.   Excuse me for a second.
2         Are there any more
3    conservative options Dr. Denman should
4    consider before removing the mesh?
5         A.   No.  Dr. Denman did a nice
6    job.
7         Your two options, which we
8    still do not know, I don't know, even
9    though I see this every day, is, what do
10   you do with these individuals?  Do you
11   operate or let them be?  And then if you
12   do operate, how aggressive do you get?
13   It still remains to be defined.
14        So I think she did a nice
15   job.  She felt this -- she felt the mesh,
16   so she felt surgery to get rid of the
17   mesh was a viable option.  So I have no
18   criticism.  I think she did a nice job.
19        Q.   Ms. Smith wasn't on any pain
20   medications at this point, was she?
21        A.   No, she was not.
22        Q.   And she had not done any
23   physical therapy, correct?
24        A.   I am not aware of her doing

Page 125

1    any physical therapy.
2         Q.   And she was periodically on
3    estrogen but not consistently, correct?
4         A.   Correct.  As I stated
5    before, it won't help with mesh-related
6    pain.  But you are correct, she took it
7    intermittently.
8         Q.   Can trigger point injections
9    help pelvic pain like this?
10        A.   Due to the mesh, no.  Due to
11   pelvic floor myalgia muscle spasms, they
12   may play a role and have shown some
13   success.
14        Q.   Then they proceeded to the
15   explant on November 15th, 2018.
16        A.   Okay.
17        Q.   And she was noted to have
18   moderate scarring; is that right?
19        A.   That is what she states,
20   Moderate scarring of contracted mesh at
21   the level of the trigone/UBJ.
22        Q.   And, again, you're going to
23   have scarring with any type of vaginal
24   mesh procedure, right?

32 (Pages 122 to 125)

Daniel S. Elliott, M.D.

Page 126

1    A.   In varying degrees,
2  dependent upon the specific mesh, you
3  will have some.
4    Q.   It notes that she removed,
5  quote, blue mesh; is that right?
6    Do you see that?
7    A.   Yes.  She makes a
8  specific -- midline blue mesh was noted,
9  meaning that in the middle of that, there
10  was some that was blue.
11    Q.   And you would agree with me
12  that that would be the Avaulta mesh?
13    A.   That is correct.
14    Q.   And Dr. Denman noted that
15  the tissue was really thin, the vaginal
16  tissue.
17    Is that possibly due to not
18  using estrogen cream consistently?
19    A.   It's due to the presence of
20  the mesh causing chronic inflammation and
21  pending erosion -- excuse me, exposure.
22  And there's granulation tissue, meaning
23  poor healing.
24    Q.   Every patient heals

Page 127

1  differently, would you agree with that?
2    A.   Well, no.  I mean, there can
3  be certain patient factors that can slow
4  it down or speed it up.  There can be
5  variations there.
6    Q.   And what patient factors --
7  what patient factors are those?
8    A.   Chronic steroid use,
9  perhaps; markedly advanced age, perhaps.
10    But we're talking with --
11  the vagina is different than with
12  abdominal procedures.  So the vaginal
13  estrogen content would probably be one.
14    But there's, also, of a
15  foreign body in there is the main factor.
16    Q.   And vaginal atrophy can be a
17  factor.
18    But if I understand your
19  testimony right, you believe that vaginal
20  atrophy itself was caused by the mesh in
21  some fashion?
22    A.   Well, I'm saying that's a
23  contributing factor, a major contributing
24  factor.

Page 128

1    If vaginal atrophy, just
2  using logic here, were a major aspect of
3  poor vaginal healing, then all of the
4  hundreds of transvaginal repairs I do
5  without a foreign body would also be
6  breaking down and having exposure, and
7  they're not.  I don't get any, zero.
8    We watch our patients very
9  closely with questionnaires, telephone
10  follow-ups, seeing them back in clinic,
11  wound breakdowns in the vagina.
12    With meshes, you know, there
13  is the known risk of the granulation
14  tissue -- granulation tissue, poor
15  healing, inflammatory process.
16    So I'm saying in Ms. Smith,
17  looking at all the factors, the presence
18  of the foreign bodies and the
19  inflammation is causing her thin tissue
20  breaking down and the scarring is causing
21  the pain.
22    Q.   But would you agree with me
23  that not every patient that has
24  transvaginal mesh results in vaginal

Page 129

1  atrophy and thinning of the vaginal wall?
2    A.   You are correct.  Not every
3  patient has bad outcomes like Ms. Smith.
4    Q.   Right.  So in some fashion,
5  it's a patient factor?
6    A.   Well, no, I disagree with
7  that.  I mean, if there's a known risk
8  factor that we can point at in Ms. Smith
9  that the Bard people know about, then
10  it's got to be in the IFU.  But there's
11  nothing in there.
12    They have some
13  contraindications, I believe, it's just
14  for pregnancy, bleeding problems.  But
15  that's it.  So to blame her is to be
16  blaming, what, 20, 30 percent of the
17  patients who have Avaulta?  So I don't
18  think that's right.  I don't have any
19  logic to go off of for that.
20    Q.   The fact is that some
21  patients have complications from
22  surgeries and some patients don't?
23    A.   That is a fact, yes.
24    Q.   Right?

33 (Pages 126 to 129)

Daniel S. Elliott, M.D.

Page 130

1    A.   Correct.
2    Q.   So, then, after the
3  procedure -- well, first, let me confirm,
4  the Align sling is still performing as
5  intended in correcting the stress urinary
6  incontinence, correct?
7    A.   From everything I know at
8  this point, you are correct.
9    Q.   And I believe her last --
10  well, let's look at your report.
11       You reference a visit with
12  Dr. Denman on December 3rd, 2018 on Page
13  17 of your report.
14    A.   Correct.
15    Q.   And I think that might be an
16  incorrect date.
17       MR. BUHR:  Let's attach as
18       Exhibit-12 the report from Dr.
19       Denman, January 2nd, 2019.
20       MS. GRIFFIN:  Okay.  We will
21       be attaching this as Exhibit-13.
22       - - -
23       (Whereupon, Exhibit
24       Elliott-13, 1/2/19 Dr. Mary Denman

Page 131

1    Report, was marked for
2    identification.)
3       - - -
4       THE WITNESS:  Okay, I have
5    it.
6  BY MR. BUHR:
7    Q.   So not that it's a
8  controversial issue, but just for the
9  accuracy of the report, what you
10  reference here as December 3rd, 2018
11  appears to be from this January 1st -- I
12  might be corrected.
13    A.   I think it's correct.  If we
14  look at Bates Number 32, that's 12 --
15  it's, what, two pages in?  12/3/18, first
16  post-op exhibit.  Then if you go to Page
17  33, exam, vaginal incision.  And then
18  that's less than 5 centimeters
19  separation.  So I think that date is
20  correct.
21    Q.   You're right.
22       In your report, you don't
23  have the January 2nd, 2019 report, right?
24    A.   That is correct, yes.

Page 132

1    Q.   Okay.  So for the December
2  3rd, you have a, quote, Small area of
3  midline granulation tissue.
4       Well, actually, I think the
5  quote is that there was a separation
6  along the incision with good granulation
7  tissue.
8       Do you see that on Page 33?
9    A.   Yes, I do.  I -- yeah, so
10  the December 3rd quote -- well, there's
11  not a quote.  It says, Small separation
12  of vaginal incision measuring less than
13  .5 centimeters.
14       And then I do quote the
15  follow-up visit on January 2nd, that's
16  what you were referring to.  But I don't
17  see the physical exam on that one.
18    Q.   Okay.  We'll just -- that
19  makes sense.  Sticking with Page 33.
20       Do you know what she means
21  by "good granulation tissue"?  What does
22  that mean to you as a doctor?
23    A.   This is a fresh post-op.
24  This is two weeks after surgery.  You

Page 133

1  expect to see granulation tissue there.
2       It just means that it's in
3  the very early healing periods.  It's
4  healing appropriately.
5    Q.   And it was nontender to
6  palpation on December 3rd, 2018?
7    A.   That is correct.
8    Q.   And then going to January
9  2nd, 2019, which is the last report we
10  have -- is that right?  This is the last
11  report we have from the doctor?
12    A.   That's the last that I have,
13  yes.
14    Q.   And her vaginal exam is
15  nontender?
16    A.   Correct.
17    Q.   And there's a small area of
18  midline granulation tissue?
19    A.   Correct.  That's in my
20  report and on this -- from this date.
21    Q.   And she prescribes estrogen
22  again for her?
23    A.   I don't know if she
24  prescribed it.  But it states, Estrace to

34 (Pages 130 to 133)

Daniel S. Elliott, M.D.

Page 134

1    vagina, which would be an estrogen cream.
2         Q.    And that would be to help
3    with the healing?
4         A.    Correct.
5         Q.    And she okays her for
6    intercourse after two weeks.
7              Do you have any criticism of
8    that, based on what the exam showed?
9         A.    I personally would wait
10   until it's completely, 100 percent,
11   healed up.  So I don't go by a date.  Six
12   weeks out is usual timeframe.   And so
13   she's postponing it another two weeks.
14             So Dr. Denman's assessment
15   was that it would be safe at that point
16   in time.
17        Q.    But she doesn't examine her
18   and confirm that the healing is complete
19   before authorizing intercourse; is that
20   fair?
21        A.    I do not see that in the
22   records anywhere.
23        Q.    And if Ms. Smith had vaginal
24   intercourse before the -- her vaginal

Page 135

1    wall had completely healed, could that
2    contribute to continued problems healing?
3              MS. SCARCELLO:  Objection.
4         You can answer.
5              THE WITNESS:  Well, I would
6         need to know -- I mean, we're
7         talking in theory here.
8              With this small area of
9         midline granulation tissue, I
10        don't know how extensive that is.
11        I feel that Dr. Denman, in her
12        experience, must have felt it was
13        mild.  And then two weeks would
14        have been safe.
15             If she went -- preceded
16        those two weeks, or within that
17        two weeks had intercourse, that
18        might not be the ideal.  If she
19        waited until afterwards, Dr.
20        Denman felt it was safe.
21   BY MR. BUHR:
22        Q.    Thank you.  But I think my
23   question was, if you have sexual
24   intercourse before the vaginal wall is

Page 136

1    completely healed, can that contribute to
2    continued healing problems?
3              MS. SCARCELLO:  Same
4         objection.
5              THE WITNESS:  I would agree
6         with you.  It's definitely not
7         going to help.
8    BY MR. BUHR:
9         Q.    And you, in your report, are
10   offering certain opinions about Ms.
11   Smith's likely prognosis; is that right?
12        A.    That is correct.
13        Q.    And you describe her
14   prognosis as poor?
15        A.    That is correct.
16        Q.    And you wrote this report
17   before reading Dr. Denman's testimony; is
18   that right?
19        A.    That is -- yes, that is
20   correct.
21        Q.    And Dr. Denman testified
22   that her pain and dyspareunia is markedly
23   improved since the 2018 surgery; is that
24   right?

Page 137

1         A.    That is correct.
2              And that is also my
3    experience on early post-ops after
4    meshes.  You usually have a period that
5    the pain is less and it comes back, in my
6    experience, and in the experience of
7    individuals who have written papers on
8    this subject.
9              I hope it doesn't, but it
10   usually comes back.
11        Q.    So are you saying -- are you
12   offering an opinion, to a reasonable
13   degree of medical certainty, that her
14   pain is going to return?
15        A.    Based upon my experience, my
16   attendance at national/international
17   meetings and my giving lectures on the
18   subject, my dealing with patients, and
19   I've operated on these types of patients,
20   that the odds are greatly that pain will
21   come back.
22        Q.    So can you state, with a
23   reasonable degree of medical certainty,
24   that the pain will come back?

35 (Pages 134 to 137)

Daniel S. Elliott, M.D.

Page 138

1    A.   Just as I already stated,
2  with all those aforementioned criteria,
3  that pain usually does come back.
4        And that's why I have chosen
5  to stop operating for these conditions
6  for pain.  And that's also based upon a
7  paper by Ho, et al., H-O, et al., where
8  the poor success of operating for pain,
9  because it doesn't work.
10    Q.   But you would at least agree
11  that at this point it's markedly
12  improved?
13    A.   Correct.  And that is
14  wonderful.  And I hope I'm wrong.  And if
15  I'm wrong, that's wonderful for Ms.
16  Smith.
17        I just -- in my experience,
18  it doesn't last.
19    Q.   So it may come back but it
20  may not; is that fair?
21    A.   The odds are, based, again,
22  the Ho, et al. -- I believe it's Ho, it's
23  a Zimmerman -- Phillipe, Zimmerman, at UT
24  Southwestern, talks about roughly a 70

Page 139

1  percent chance that the pain comes back
2  or is not cured by surgery.
3        Again, if I'm wrong, that
4  would be wonderful for her.  But,
5  unfortunately, experience has told me
6  otherwise.  I've had many patients.  I do
7  surgery on it, and they have great pain
8  relief, and we're thrilled, and then
9  disappointed months later or years later.
10    Q.   In Dr. Denman's testimony,
11  she describes some more -- a more recent
12  visit with Dr. -- I'm sorry, let me start
13  over.
14        In Dr. Denman's testimony,
15  she discusses a more recent visit with
16  Ms. Smith where she had some lateral
17  muscle pain.
18        Are you offering any opinion
19  about the cause of that lateral muscle
20  pain?
21    A.   I would have to see that
22  actual report before I could state
23  definitively.  Lateral is very worrisome
24  for the arm pain, mesh contraction.

Page 140

1    Q.   Did you see Denman's
2  testimony that she could not conclude the
3  cause of it?
4    A.   Yeah, we would have to look
5  at the specific report.  I recall her
6  stating that.
7    Q.   And she didn't note any
8  muscle pain prior to the explant in the
9  same area; is that right?
10    A.   Again, we need to look at
11  the specifics.  I would be going off of
12  memory, so it wouldn't be fair.  I have
13  the report here.
14    Q.   Well, we don't have the
15  report from --
16    A.   I'm sorry, deposition.  I'm
17  sorry, you said deposition, I thought.
18    Q.   I think it's on Page 55.
19    A.   Okay.  I'm there.
20    Q.   So she was having a little
21  increased pain?
22    A.   Correct.  That's what I'm --
23  that's what I'm describing.  In my
24  experience, that fits perfectly.

Page 141

1        You have an initial good
2  response, and then it comes back.  Again,
3  I wish I were wrong, but that's what
4  happens.
5    Q.   But do you see how she
6  describes this as muscle pain on Line 9?
7    A.   Correct.
8    Q.   And then says she does
9  not -- she does not know what's causing
10  that muscle pain?
11    A.   Yeah.  I agree she doesn't
12  know what's causing it.
13    Q.   So I'm saying, to a
14  reasonable degree of medical certainty,
15  she doesn't know what's causing it, can
16  you state -- you can't state, to a
17  reasonable degree of medical certainty,
18  what's causing it without examining the
19  patient, correct?
20    A.   An exam would be very
21  beneficial.  I can state, based upon my
22  experience of doing probably hundreds of
23  these, that she has pain that's coming
24  back.  It's in the muscles due to the

36 (Pages 138 to 141)

Daniel S. Elliott, M.D.

Page 142

1   presence of the arms; going through the
2   various different muscles from the
3   obturator foramen bilaterally.
4          Dr. Denman, no criticism to
5   her at all, doesn't know because she just
6   hasn't done these.  This is probably her
7   one and only time she's done this.  So I
8   don't criticize her.  She doesn't know,
9   she admits it, which is very admirable.
10         And I'm saying, with a
11  reasonable degree of medical certainty,
12  it's due to the presence of the mesh
13  arms.
14     Q.   If you'd turn to Page 35 of
15  her deposition.
16     A.   Okay, I'm there.
17     Q.   The very last -- Lines 24
18  and 25, where it says she didn't have any
19  muscle pain, so this was prior to the
20  explant, she didn't have pain in the same
21  area where she's complaining of pain now.
22         So wouldn't that make it
23  less likely to be related to the mesh?
24     A.   It's a progression of the

Page 143

1   fibrosis and scarring.  They know from
2   animal models, from, like, Closter,
3   Hoffin and others, that the mesh
4   extraction continues indefinitely.  They
5   have dog studies 15 years, 20 years out.
6   So this is the natural progression of it.
7      Q.   After the mesh -- the
8   central part of the mesh connecting the
9   arms has been removed?
10     A.   Yes.  But the mesh arms are
11  still going through the obturator foramen
12  connected to -- off the top of my head I
13  would say it's six or seven different
14  muscles.  So the mesh continues to
15  contract, and you get continued pain.
16     Q.   Does Ms. Smith have back
17  pain, lower back pain?
18     A.   Yes, she does.
19     Q.   Can that radiate into the
20  pelvis area?
21     A.   Not causing specific
22  pinpoint pain.  That's where an exam
23  would help sort that out.
24         But back pain is in the

Page 144

1   back.  You can have radiculopathies going
2   down the legs.  Again, it just depends
3   upon where this pelvic pain is.
4          If it's mid vault, is it
5   obturator foramen versus if it's in the
6   low back -- if it's in the low back, I
7   agree with you, it's not due to the mesh.
8      Q.   And we just don't have the
9   detailed descriptions, as we sit here
10  today, to completely rule out pain
11  radiating from her back?
12     A.   Well, I have no medical
13  records describing her back pain and
14  where that pain is and where it radiates
15  to.  If we had that, that would help sort
16  out the issue.
17         I'm saying that when you put
18  all the factors together of having a
19  large volume of mesh put through the
20  obturator foramen, having mesh
21  contraction and pain, removing it, and in
22  my experience, in the literature, 50 to
23  70 -- 30 to 50 percent mesh arm
24  contraction rate, everything fits as far

Page 145

1   as it being with mesh.
2          But definitively answering
3   the question would require either an IME
4   or an advanced expert to examine her and
5   telling us otherwise.
6      Q.   But you would agree that the
7   pain is still markedly improved over
8   prior to the explant?
9      A.   I can't say that.  She says
10  it's increased.  But it's -- there's no
11  indication that it's back to where it
12  was.  I forget, we were on Page 35, I
13  believe.
14     Q.   55.
15     A.   55.
16     Q.   She describes it as having a
17  little increase in pain.
18     A.   Yeah.  So that would imply,
19  to answer your question, yes.  As of
20  that -- the last exam, which I don't have
21  the records that, that she states she was
22  having a little increase in pain.  You're
23  correct.
24     Q.   Do you have any opinion on

37 (Pages 142 to 145)

Daniel S. Elliott, M.D.

Page 146

1  what future care Ms. Smith may need?
2      A.   In my opinion, the only
3  chance for some improvement would be very
4  aggressive advanced-level physical
5  therapy, biofeedback, bladder retraining;
6  questionable injections into the mesh,
7  around the mesh.  In my experience, that
8  has worked very poorly.
9          The other option is surgery
10 to remove the mesh arms.  In my
11 experience, that tends not to work very
12 well and can make the pain worse.  There
13 are surgeons around the nation who do go
14 after that.  I have just felt the risk
15 outweighs the benefit.
16         So she has options, none of
17 them are really good options.
18     Q.   That would depend on whether
19 her pain returns and, if so, how much --
20     A.   Correct.
21     Q.   -- right?
22     A.   Correct.
23     Q.   So as of today, you're not
24 offering an opinion that she's going to

Page 147

1  require any further surgeries; is that
2  fair?
3      A.   I'm saying that I would have
4  to wait and watch with time.  If she only
5  now, or whenever this last exam was, has
6  a little increase in pain, then she
7  should not undergo surgery.
8      Q.   Do you have any opinion as
9  to whether she will require future
10 surgery to repair her rectocele?
11     A.   Well, a rough estimate is
12 that roughly a third of women have their
13 prolapse progress to needing surgery.  So
14 that's just a rough idea.
15         But it would be immaterial
16 to the Avaulta.  It's a separate problem.
17     Q.   Right.  But further
18 surgeries related to -- for an unrelated
19 rectocele could result in more pelvic
20 pain and dyspareunia, correct?
21     A.   Well, we're talking, in
22 theory, she could.  But she wouldn't have
23 any mesh-related pain.  Again, we're
24 talking in theory.

Page 148

1          Right now she doesn't
2  warrant it.  So I don't have specifics
3  where I can give an answer to that one.
4      Q.   But, in general, in terms of
5  the known risks of repair of pelvic organ
6  prolapse, it can result in pelvic pain
7  and dyspareunia, right?  Even without
8  mesh?
9      A.   You have to put qualifiers
10 on there.  There's varying degrees,
11 severity, progression, inability to fix
12 it.  But the posterior prolapse can be
13 associated with it.  But, again, it's not
14 to the severity that we see with the
15 meshes.
16     Q.   And if she would have had --
17 one of -- well, let me start over.
18         One of the safer
19 alternatives that you allege in your
20 report is repair with biologics.  And
21 that's both for stress urinary
22 incontinence and pelvic organ prolapse.
23         But those types of repairs
24 also include the risk of pelvic pain and

Page 149

1  dyspareunia, right?
2      A.   Not to the degree that we
3  see with the meshes and the severity and
4  the progressive nature of it.  So no.
5      Q.   But there's risks and
6  benefits to both of those procedures,
7  right?  And the doctor has to make that
8  risk/benefit analysis?
9      A.   If that physician, he or she
10 knows all of the risks known to the
11 company, the severity, the progressive
12 nature of it, and the inability to repair
13 it with the meshes -- again, there's too
14 many variables to give a blanket
15 statement to.
16     Q.   Let me say it this way:
17 Using a biologic -- which, first of all,
18 a biologic is not a similar product; it's
19 a completely different product, right?
20     A.   It is a non-mesh product,
21 yes.
22         With her situation,
23 biologics would be way down the list.  It
24 would just be use of standard absorbable

38 (Pages 146 to 149)

Daniel S. Elliott, M.D.

Page 150

1  sutures that cost $5, would be what I
2  would do with her.
3      Q.    For the treatment of her
4  pelvic organ prolapse?
5      A.    Correct.  With the stage 2
6  anterior prolapse like she had, a
7  standard suture repair of five or six
8  sutures, or less, that cost all of,
9  again, $5, would be what I'd do.
10          I would not go down the
11  route of biologics.  They are
12  theoretically an option.  But she had a
13  relatively mild prolapse, so I wouldn't
14  do that.  It's an option, but it wouldn't
15  be what I would do.
16      Q.    So, again, that's not
17  utilizing any type of transvaginal mesh,
18  then?
19      A.    Correct.
20      Q.    What about for treatment of
21  stress urinary incontinence?
22      A.    Then you can use her own
23  tissue.  You can use tissue from a tissue
24  bank.  Then you could use biologics.

Page 151

1  Others are available.  Using her own
2  tissue is the easiest and cheapest.
3      Q.    And the use of biologics
4  wouldn't completely eliminate her risk of
5  pelvic pain and dyspareunia, correct?
6      A.    As we mentioned before, I go
7  based upon my previous testimony,
8  depending on the severity, the frequency,
9  the progressive nature of it and the
10  inability to repair it is going to be
11  different with the biologics.
12          You don't see those problems
13  with it.  You see recurrence, but you
14  don't see those other chronic, lifelong
15  problems.
16      Q.    But recurrence is a major
17  consideration in determining what
18  procedure is best for the patient, would
19  you agree?
20      A.    It is a consideration.  If
21  you asked the patient, would you rather
22  have a recurrence of your prolapse or
23  lifelong pain and inability to have
24  intercourse, those are two different

Page 152

1  things.
2      Q.    The main reason the
3  community, medical community, was looking
4  towards polypropylene mesh was to
5  increase -- or, rather, decrease the risk
6  of recurrence, correct?
7      A.    That was the goal, which is
8  an admirable goal.  However, it didn't
9  pan out that way.  And so the anatomic
10  repair rate was possibly better in the
11  anterior vaginal vault.  But apical and
12  posterior, there was no benefit.  So the
13  reoperation rate was the same.
14          So you increase the
15  complications for the woman without
16  giving her a significant benefit.
17      Q.    Plaintiff's implant
18  procedure was in January 2008, right?
19      A.    Correct.
20      Q.    The only safer alternative
21  that you list that's specific to vaginal
22  mesh is a lighter-weight, larger-pore
23  polypropylene mesh, right?
24      A.    Correct.

Page 153

1      Q.    And are you aware of a
2  midurethral sling, at that time, that
3  meets the description in your report?
4      A.    Well, I talked about POP
5  repair.  I didn't mention anything as far
6  as a sling.
7          So that Point Number 3 on
8  Page 19 is a POP repair using a
9  lighter-weight, large-pore mesh.  So
10  that's not pertinent to the sling.
11      Q.    What about Number 4 on Page
12  20?
13      A.    Correct.  I am not aware of
14  there being an on-the-market, available,
15  a lightweight, large-pore mesh sling.
16  There were trials of them, but they were
17  never released.
18      Q.    But you believe there was a
19  POP, pelvic organ prolapse, mesh that's
20  lighter weight and larger pore --
21      A.    Ethicon had --
22      Q.    -- in 2008?
23      A.    I'm sorry, I interrupted
24  you.

39 (Pages 150 to 153)

Daniel S. Elliott, M.D.

Page 154

1   I cannot specifically state
2   to 2008. Ethicon did have a product that
3   was out there, but didn't have the arms.
4   The arms are what causes a significant
5   component of the problem with pain.
6       That's what I'm saying, is
7   that this particular patient, Ms. Smith,
8   did not need those advanced-level
9   repairs. It was a first-time surgery
10  with a low-grade prolapse.
11      Q.   And even if there was a
12  lighter-weight, larger-pore mesh
13  available at the time, it wouldn't have
14  eliminated her risk for pelvic pain or
15  dyspareunia or extrusion, correct?
16      A.   Let's break that down.
17  That's a -- what I call a compound
18  question. I don't know what you guys
19  call it.
20      We have to define the type
21  of mesh we're doing. If all you're doing
22  is a mesh without the arms -- see, the
23  arms are a major source of the problem --
24  so your risk of extrusion would

Page 155

1   theoretically be the same, as long as it
2   doesn't have the, you know, like the
3   Avaulta Plus has that confounding factor
4   of the extra layer of tissue on it.
5       And then you said pelvic
6   pain. Pelvic pain may be less because
7   you don't have the arms.
8       And I think you said a third
9   thing there, I forget what that was. You
10  had three.
11      Q.   Dyspareunia.
12      A.   Dyspareunia. Dyspareunia
13  has a chance of being less when you don't
14  have the arms, because you don't have the
15  mesh contraction and the pulling that you
16  get with those things.
17      So that would -- I know
18  surgeons who still will put in those
19  grafts without the arms. I personally
20  don't. I don't think there's a need for
21  it.
22      And, again, in Ms. Smith's
23  situation, she didn't need it. She just
24  needs standard sutures.

Page 156

1       Q.   But to answer my question,
2   it wouldn't have eliminated her risk of
3   pelvic pain or dyspareunia or extrusion?
4       A.   Correct. It would lower it,
5   but not eliminate it.
6       Q.   I don't want to retread
7   grounds from your generic deposition, but
8   you're not aware of any more recent
9   literature finding that the Bard mesh,
10  the Avaulta, has a higher risk of any
11  complications as compared to any other
12  transvaginal mesh; is that fair?
13      A.   As I'm sitting here right
14  now, I cannot recall off the top of my
15  head a document such as that. But I
16  would have to look through the literature
17  for it. And since it's been pulled off
18  the market, no one is researching it.
19      Q.   So it's possible, if she had
20  a different pelvic organ prolapse mesh,
21  that she would have had dyspareunia and
22  pelvic pain and extrusion, correct?
23      MS. SCARCELLO: Object to
24  form.

Page 157

1       THE WITNESS: Well, it
2   depends what we're talking about.
3       Are we talking about, like,
4   the Prolift? anterior? Are we
5   talking about the Monarc product?
6   Excuse me, not Monarc, American
7   Medical Systems, the Apogee and
8   the Perigee? There's a lot out
9   there. All of them have their
10  known risks to it.
11      Again, with -- Avaulta is a
12  unique one with having that outer
13  coating to it, which throws in
14  another variable in a situation.
15      But the risk with all meshes
16  is there in varying degrees.
17  BY MR. BUHR:
18      Q.   Looking back at the opinions
19  in your report, on Page 18, we talked
20  earlier about Dr. Kim's testimony that
21  she was aware of the risks of erosion,
22  extrusion, pelvic pain, dyspareunia.
23      You recall that discussion,
24  right?

40 (Pages 154 to 157)

Daniel S. Elliott, M.D.

Page 158

1    A.   Yes, I do.
2    Q.   In your report here, you
3  specifically refer to foreign body
4  reaction and chronic inflammatory
5  response related to the Bard products.
6    A.   Correct.
7    Q.   Would you agree that Dr. Kim
8  specifically testified that she was aware
9  of those risks?
10    A.   As I've already stated, she
11  was aware of what she knows, but does not
12  know the full extent of it.
13    Q.   You also reference painful
14  contracture and banding of the mesh.
15        Would you agree that Dr. Kim
16  testified that she was aware of those
17  risks as well?
18    A.   As I stated previously, and
19  I'll rely on the previous testimony, she
20  stated what she knew, and she doesn't
21  know the full extent, as I do and others
22  involved in this, what's going on behind
23  the scenes with the company.
24    Q.   So I understand that that's

Page 159

1  your testimony, that she didn't know the
2  full extent.
3        But there's no risks that
4  she wasn't aware of that are relevant for
5  Ms. Smith?
6    A.   She knew about risks.  But
7  she didn't know about the severity, the
8  frequency and the progressive nature of
9  those risks.
10    Q.   But she was aware of each of
11  the risks and complications that you're
12  opining Ms. Smith had as a result of the
13  Bard products, right?
14    A.   Well, as I've stated, she
15  knew of risks.  But she didn't know of
16  the severity, the frequency, the
17  progressive nature and the inability to
18  fix those complications.
19    Q.   Her anterior prolapse that
20  was corrected by the Avaulta, that has
21  still not returned, correct?
22    A.   Based upon the January 2nd,
23  2019, so, what, six, seven months ago,
24  there was no record of the prolapse

Page 160

1  coming back.
2    Q.   So both the Align and the
3  Avaulta corrected the conditions for
4  which they were implanted for, right?
5    A.   At a certain cost, you are
6  correct.
7        MR. BUHR:  That may be all
8    the questions I have.  If we can
9    just take a quick break and then
10    come back.
11        THE WITNESS:  Sure.
12        VIDEO TECHNICIAN:  We're
13    going off record.  The time is
14    4:25.
15        - - -
16        (Whereupon, a brief recess
17    was taken.)
18        - - -
19        VIDEO TECHNICIAN:  We're
20    going back on record.  Media File
21    Number 3.  The time is 4:27.
22  BY MR. BUHR:
23    Q.   So we talked earlier that
24  Ms. Smith had preexisting depression; is

Page 161

1  that right?
2    A.   She was on medication for
3  depression.  I don't know how severe it
4  was.
5    Q.   Can there be a psychological
6  component to dyspareunia?
7    A.   Possibly.  However, it's not
8  going to cause pinpoint pain and pain at
9  the site of the mesh.  That's not --
10  that's not a component of depression.
11        And if depression is a major
12  factor in causing complications with
13  meshes, it needs to be on the IFU, which
14  it's not.
15        So she had a preexisting
16  condition.  And that's worrisome if it's
17  not on the IFU, that worsens things.
18    Q.   Well, I wasn't suggesting
19  that it was relevant to the mesh.
20        But even without mesh, a
21  patient can have dyspareunia due to
22  psychological issues and depression?
23    A.   Well, that's a broad
24  statement.  If there's a history of

41 (Pages 158 to 161)

Daniel S. Elliott, M.D.

Page 162

1    physical trauma, rape, abuse of some
2    sort, that's a different story.  That
3    becomes very complicated.
4            But she reported nothing
5    prior to the surgery.  This all happened
6    years later.  So I don't see a logical
7    connection between the two.
8        Q.   Because she didn't have
9    similar complaints prior to the implant?
10       A.   Well, the location of the
11   pain, the progressive nature of it, the
12   severity all happen years later.  So,
13   again, I don't see a logical connection
14   between the depression and this.
15           Again, if it is a known
16   issue, that's got to be on the IFU.
17       Q.   Can depression and general
18   wellbeing affect the healing process in
19   an individual?
20       A.   As far as it relates to the
21   vagina, I've never heard of anything
22   related to that.
23       Q.   Have we discussed all the
24   opinions you intend to offer in this

Page 163

1    case?
2        A.   All my opinions are included
3    in my report.  I don't recall if we've
4    discussed every one.
5            We've discussed all the
6    opinions you've asked me.  Not to be a
7    smart-mouth about it, but I don't know if
8    there's something else here we haven't
9    discussed.
10       Q.   And at this point, you don't
11   have any intention of performing an
12   examination on Ms. Smith?  But you
13   might -- you would like to have the
14   opportunity to do that if the case were
15   to go to trial; is that how I understand
16   your testimony?
17           MS. SCARCELLO:  Object to
18   form.
19           You can answer.
20           THE WITNESS:  Yes.  If this
21   case were to go to trial, then I
22   would have to perform an IME
23   prior, to further support or
24   refute my opinions at this point.

Page 164

1    I'll keep an open mind, based upon
2    what's going on.
3            And the farther she goes out
4    from her revision surgery, it
5    would be important to have a
6    documented exam, too.
7            MR. BUHR:  All right,
8    Doctor, I think that's all the
9    questions I have today.
10           MS. SCARCELLO:  Nothing from
11   me.
12           VIDEO TECHNICIAN:  This
13   concludes today's --
14           MR. BUHR:  Hold on.  Before
15   we go off the record.
16           I just want to make sure we
17   have a placeholder exhibit for the
18   invoices that will be provided by
19   counsel's office.
20           - - -
21           (Whereupon, Exhibit
22   Elliott-14, Placeholder, was
23   marked for identification.)
24           - - -

Page 165

1            MR. BUHR:  With that, I
2    think we're done.  Thank you.
3            MS. SCARCELLO:  Thank you.
4            VIDEO TECHNICIAN:  This
5    concludes today's deposition.
6    We're going off the record.  The
7    time is 4:31.
8            - - -
9            (Whereupon, the deposition
10   concluded at 4:31 p.m.)
11           - - -

42  (Pages 162 to 165)

Daniel S. Elliott, M.D.

| Page 166 |
| --- |

```
 1              CERTIFICATE
 2
 3
 4        I HEREBY CERTIFY that the
 5   witness was duly sworn by me and that the
 6   deposition is a true record of the
 7   testimony given by the witness.
 8
 9
10
11        Amanda Maslynsky-Miller
          Certified Realtime Reporter
          Dated:  August 12, 2019
12
13
14
15
16
17        (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
```

| Page 168 |
| --- |

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

| Page 167 |
| --- |

```
 1      INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8        After doing so, please sign
 9   the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

| Page 169 |
| --- |

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3      I,_____, do
     hereby certify that I have read the
     foregoing pages,  1 - 165, and that the
 4   same is a correct transcription of the
     answers given by me to the questions
 5   therein propounded, except for the
     corrections or changes in form or
 6   substance, if any, noted in the attached
     Errata Sheet.
 7
 8   _____
     DANIEL S. ELLIOTT, MD          DATE
 9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24
```

Daniel S. Elliott, M.D.

Page 170

| | LAWYER'S NOTES |
|---|---|
| 1 | |
| 2 | PAGE LINE |

3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____

44 (Page 170)

Daniel S. Elliott, M.D.

**A**

**abbreviation**
123:9
**abdomen** 46:9
**abdominal** 47:9
127:12
**ability** 8:1
**ablation** 47:16
**able** 32:8 57:21
60:5 88:12
101:10
**abnormal** 47:24
**absence** 34:21
**absolutely** 43:10
114:15
**absorbable** 149:24
**abuse** 162:1
**acceptable** 44:3
54:2 103:22
**accuracy** 28:10
101:11 131:9
**accurate** 22:5,11
28:5 29:5,8 58:21
167:20
**acknowledgment**
169:1
**acted** 41:20 55:3
**activities** 102:9
**activity** 51:17
102:7 107:16
110:18
**actual** 67:1 139:22
**added** 19:7
**additional** 15:8,13
19:24 22:8 31:7
**addressed** 71:2
97:5
**adequacy** 68:24
**adequate** 19:4
**adhesions** 46:6,8
46:10 47:5,11
**admirable** 142:9
152:8
**admits** 142:9
**admonitions** 8:14
**ads** 93:22

**advanced** 83:9
101:9 127:9
145:4
**advancedlevel**
146:4 154:8
**advancedlevelof...**
103:23
**advances** 41:4
**advantage** 59:3
**advertisements**
92:20
**advised** 57:15
99:15 118:5
**affect** 54:24 55:13
162:18
**aforementioned**
138:2
**afternoon** 7:13
24:1
**age** 83:9 127:9
**aggressive** 115:12
124:12 146:4
**ago** 11:4,18 24:11
69:8 78:20 79:14
87:14 159:23
**agree** 15:2 35:8
39:3,23 40:19,21
41:2,3,9,23 42:1
42:6,8,21 52:4
54:14 55:22
56:10 57:6,8 58:1
60:16 61:23 62:5
62:22 64:3 65:17
67:21 71:13
79:18,22 83:21
85:18 91:18 92:2
92:7 106:16
108:17 112:18
114:2,3 116:6,22
117:13 118:9,11
122:6 126:11
127:1 128:22
136:5 138:10
141:11 144:7
145:6 151:19
158:7,15

**agreed** 6:3
**agreeing** 86:21
**agreement** 25:11
58:10
**ahead** 16:20 19:15
44:15 50:3 78:4
96:5
**ahold** 20:4
**al** 138:7,7,22
**align** 35:15,20 36:3
36:5,18,24 37:7
37:10,24 38:24
41:11 57:20 71:6
73:4 88:19 89:1
107:4 123:23
130:4 160:2
**allege** 148:19
**alleged** 69:12
**alleging** 34:5
**alluded** 20:10
**alternative** 32:10
65:19 152:20
**alternatives**
148:19
**amanda** 1:17 6:23
166:10
**american** 157:6
**amount** 12:3,13
16:12 38:13
117:11
**ams** 14:2 30:7
38:11
**analogous** 45:18
**analysis** 149:8
**anatomic** 152:9
**andahalf** 24:11
49:11
**angeles** 2:17
**animal** 143:2
**annual** 92:10
**answer** 5:5 7:24
19:17 65:16 73:9
90:16 122:2
135:4 145:19
148:3 156:1
163:19

**answering** 145:2
**answers** 169:4
**anterior** 55:8,19
65:3,24 74:1 89:5
89:9 119:17
120:4 150:6
152:11 157:4
159:19
**anteriorly** 100:21
**antiincontinence**
54:21
**anybody** 47:9
**apical** 152:11
**apically** 53:14
**apogee** 157:7
**apologize** 23:3
**appear** 17:8 28:19
**appearance** 85:11
108:13
**appearances** 2:1
**appears** 17:10 49:4
53:13 131:11
**applicator** 90:5
**apply** 166:18
**appropriate** 167:6
**appropriately**
133:4
**approximately**
13:12 15:21
71:19 120:5
**april** 72:2,8 74:7
75:1,18 77:7
79:24 89:7
**area** 119:11 132:2
133:17 135:8
140:9 142:21
143:20
**areas** 111:21
**argue** 80:13
**argument** 117:9
**arm** 92:15 115:24
139:24 144:23
**arms** 35:24 118:1
118:6,8,11,18
119:5,13,19,20
119:23 120:6,14

121:19 122:8
142:1,13 143:9
143:10 146:10
154:3,4,22,23
155:7,14,19
**asked** 21:5,16 69:5
92:19 151:21
163:6
**asking** 94:6
**aspect** 128:2
**assessment** 50:20
98:10,11 119:8
122:21 134:14
**assign** 35:22 36:12
**assistance** 27:4
**assistant** 77:10,11
77:12 80:9
**associated** 41:6
55:23 62:15 64:8
64:23 123:24
148:13
**assume** 16:14
113:20 123:8,10
**asymptomatic**
43:14 51:6 53:22
54:15
**atrophic** 108:12
**atrophy** 82:6 85:5
85:11,22 86:6,16
86:23 87:11,18
87:21,23 88:7
101:22,24 102:15
102:18 108:9,16
108:19 110:15
127:16,20 128:1
129:1
**attach** 9:1 16:21
27:14 44:15 50:3
67:7 76:6 93:2,6
96:6 105:8
130:17
**attached** 17:7
27:17,20 167:12
169:6
**attaching** 130:21
**attend** 59:4 116:20

**attendance** 103:2 137:16
**attest** 28:10
**attorney** 167:16
**attribute** 51:21
**attributing** 47:9,10 48:11
**augment** 20:24
**augs** 40:15,17
**august** 92:13 93:7 103:19 106:1 113:3 166:11
**authority** 58:2
**authorizing** 134:19
**automatically** 64:20
**available** 17:19 18:24 20:2 22:18 151:1 153:14 154:13
**avaulta** 30:6 35:15 35:20,24 36:13 36:18 37:2,7,9 42:10 43:5,7,8,8 43:16 53:20,24 55:7 57:19,19 63:17,18 71:7 73:11 76:18 81:9 88:3,19,24 123:23 126:12 129:17 147:16 155:3 156:10 157:11 159:20 160:3
**avenue** 2:4,16
**aware** 34:11 44:10 59:20 60:1 61:24 62:8,14 77:5,8 81:8 83:14 84:5 115:15 116:23 117:1 124:24 153:1,13 156:8 157:21 158:8,11 158:16 159:4,10

**B**

**b** 3:8 4:2 18:12
**babies** 123:20
**back** 52:14 88:21 97:20 98:21 104:11 105:4 121:17 128:10 137:5,10,21,24 138:3,19 139:1 141:2,24 143:16 143:17,24 144:1 144:6,6,11,13 145:11 157:18 160:1,10,20
**bad** 78:6 86:16 129:3
**banded** 117:19
**banding** 118:2 119:17 120:3 158:14
**bank** 150:24
**bard** 1:3,9 6:19 7:21 10:21 11:15 11:21 12:5,14 13:17,22 25:2 30:1,3,5 33:4 129:9 156:9 158:5 159:13
**based** 18:7 20:23 26:12 60:6 82:14 87:22 103:1 119:9 134:8 137:15 138:6,21 141:21 151:7 159:22 164:1
**basis** 22:15 66:4 107:8
**bates** 45:9 48:24 50:16 53:8 74:10 74:19 79:5,6 93:15 97:9 105:11,22 108:4 113:12,13 131:14
**bearing** 114:7
**becky** 1:7 6:18 7:20 11:9 14:10 15:5 17:16 24:10

24:24 25:8,19 32:4 33:2,5 44:11 46:19 70:12
**becoming** 57:11 78:22
**beginning** 1:16 78:13 105:5
**behalf** 10:15
**believe** 14:5 16:23 21:7 22:20 25:2 66:18 71:24 72:3 73:7 81:4 87:15 88:17 89:8 93:3 97:17 105:10 110:14 123:6,18 127:19 129:13 130:9 138:22 145:13 153:18
**beneficial** 141:21
**benefit** 42:14 63:21 112:14 116:1 118:13,20 146:15 149:8 152:12,16
**benefits** 149:6
**benign** 47:20
**best** 8:1 28:20 71:2 151:18
**better** 58:2 84:7 152:10
**beyond** 109:8
**bilateral** 45:12
**bilaterally** 142:3
**billing** 27:10
**bimanual** 100:21
**biofeedback** 146:5
**biologic** 149:17,18
**biologics** 148:20 149:23 150:11,24 151:3,11
**bit** 10:6,7 14:1 20:11 97:16
**bladder** 100:20 146:5
**blame** 129:15
**blaming** 129:16

**blanket** 32:19 40:24 149:14
**bleeding** 47:24,24 129:14
**blood** 81:21
**blue** 126:5,8,10
**bodies** 128:18
**body** 33:12 39:9 85:9,24 87:6 127:15 128:5 158:3
**books** 116:20
**bothersome** 92:15
**bottom** 97:3 104:3
**bowel** 111:13
**break** 104:10,16 111:8 154:16 160:9
**breakdowns** 128:11
**breaking** 128:6,20
**breast** 81:20
**brief** 104:24 160:16
**bring** 10:11,13
**broad** 161:23
**brought** 10:3
**buhr** 2:15 3:5 7:12 7:14 9:10 12:11 12:19 14:23 15:7 16:13,20 17:6 27:19 28:4 31:19 31:21 37:4 44:14 44:24 50:2,11 52:16 53:4 61:18 63:12 67:7,15 74:17,20,23 76:6 77:1,13,16 80:15 90:20 93:2,14 96:4,13 98:9 104:8,15 105:7 105:21 113:10,13 113:17 121:7 130:17 131:6 135:21 136:8 157:17 160:7,22

164:7,14 165:1
**bulge** 109:15 111:12
**burning** 102:6 110:18

**C**

**c** 1:3,9 6:19 7:21 10:21 12:14 13:21 17:12
**california** 2:17
**call** 19:10 25:12 43:18 54:3 55:20 75:11 108:19 154:17,19
**called** 38:11
**calls** 12:7
**cameras** 46:1
**cancer** 68:5 81:21
**cant** 18:6 28:14 39:19 40:11,23 58:10,11 60:19 63:22 65:6 70:19 71:1 75:17 85:12 85:18 91:10 99:21 100:3 101:1,4,17 102:22 115:8 141:16 145:9
**care** 40:1,6 41:10 41:20 42:2,7,9,21 42:24 43:4,15 55:4 146:1
**carefully** 167:4
**cartmell** 2:3 10:15 18:23 28:9 31:5
**case** 1:7 7:15,21 9:21 10:16 12:24 14:10 15:5,14,22 17:9,16 18:2,6 20:8,15 22:4 25:12,14 29:23 30:3,5 31:2,4,17 46:2 54:9 70:1,12 163:1,14,21
**cases** 11:15,22 12:14 13:5,9,13

25:3 30:2,2,10
**casespecific** 3:13
  14:4 16:21 17:2
  30:1 69:3
**cause** 51:3,11 64:4
  64:22 65:20 85:9
  102:1,1,3,6,7,21
  109:19,21,23
  110:16,17,22
  118:2 123:21
  139:19 140:3
  161:8
**caused** 30:21 31:12
  32:1 33:5,11,18
  33:20 34:16 35:2
  47:24 127:20
**causes** 32:10 88:4
  154:4
**causing** 34:22
  85:12 91:1 102:5
  126:20 128:19,20
  141:9,12,15,18
  143:21 161:12
**centimeters**
  119:18 120:5
  131:18 132:13
**central** 143:8
**certain** 59:2 83:18
  111:20 117:11
  127:3 136:10
  160:5
**certainty** 137:13
  137:23 141:14,17
  142:11
**certificate** 166:1
**certification** 6:4
  166:17
**certified** 1:17
  166:11
**certify** 166:4 169:3
**certifying** 166:21
**cetera** 18:9 47:5
  57:24 60:14 70:9
  111:21
**chance** 58:8 59:9
  61:16 139:1

146:3 155:13
**change** 17:20
  19:21 21:11,13
  84:4 100:1 168:3
**changed** 21:3
**changes** 82:3 88:8
  167:11 169:5
**charge** 12:24
**charleston** 1:2
**cheapest** 151:2
**children** 123:19
**chosen** 37:17 42:13
  71:12 138:4
**christmas** 97:21
  98:22
**chronic** 62:8,14
  84:8 126:20
  127:8 151:14
  158:4
**chronological**
  28:20
**chronologies** 22:2
**chronology** 26:6
**city** 2:5
**classic** 103:11
  118:4
**cleaner** 90:3
**clear** 10:2,10 20:12
  22:7 32:23 33:13
  94:12 98:16
  114:24 118:13
  120:3,11
**clearly** 8:3
**clinic** 4:7 105:9,15
  128:10
**clinical** 71:5
**close** 49:11
**closely** 128:9
**closter** 143:2
**clothing** 51:24
**clots** 81:21
**coat** 63:9
**coating** 36:1,16
  37:1 64:1 157:13
**collagen** 36:1,16
  37:1 63:8

**colleagues** 18:9
  58:11
**coloplast** 28:23
  38:16 39:11
**com** 1:23 2:6,13,18
**combined** 54:9,22
**come** 18:10 26:12
  28:8 104:11
  137:21,24 138:3
  138:19 160:10
**comes** 85:13 137:5
  137:10 139:1
  141:2
**comfortable** 8:9
**coming** 85:19
  141:23 160:1
**comment** 60:17
**comments** 26:7
**commission**
  169:12
**common** 54:22
  57:7,9
**community** 40:9
  40:10 83:20
  152:3,3
**company** 70:10
  83:15 149:11
  158:23
**compared** 156:11
**compartment**
  55:19 108:23
  109:11
**compensation**
  93:23
**compiling** 18:19
**complain** 47:2
  92:3
**complained** 34:12
**complaining** 33:23
  94:8 98:16
  142:21
**complaint** 78:12
  91:20 99:8
**complaints** 82:14
  92:10,16 93:19
  162:9

**complete** 17:9,21
  22:10,19 28:12
  28:14 70:7,22
  134:18
**completely** 65:6
  73:13,19 85:18
  89:6,10 102:23
  134:10 135:1
  136:1 144:10
  149:19 151:4
**completeness**
  28:10 95:19 96:5
**complicated** 162:3
**complicating**
  102:18,23
**complication** 61:5
  84:24 107:21
**complications**
  32:13,22 33:11
  40:5 41:5 42:17
  48:3 63:5 129:21
  152:15 156:11
  159:11,18 161:12
**component** 119:21
  154:5 161:6,10
**composition** 63:6
**compound** 154:17
**concerned** 93:21
**concerns** 81:20
  94:6
**conclude** 140:2
**concluded** 35:10
  165:10
**concludes** 164:13
  165:5
**conclusion** 86:3
  95:6,8,24
**conclusions** 26:12
**concurrent** 55:12
  103:17
**condition** 161:16
**conditions** 48:12
  138:5 160:3
**conference** 8:16
  66:23
**confidentiality**

58:9
**confirm** 37:12
  69:11 111:18
  130:3 134:18
**confirms** 95:17
**conflict** 80:6
**conflicts** 79:19,23
**confounding** 155:3
**confusing** 58:21
**connected** 143:12
**connecting** 143:8
**connection** 35:5
  162:7,13
**consent** 3:21 66:15
  66:18 67:2,9,12
  68:7
**consented** 40:2
**conservative** 124:3
**consider** 86:22
  87:1,10 101:21
  124:4
**consideration**
  112:24 151:17,20
**considered** 40:8
  46:18 64:11,15
**consistent** 11:10
**consistently** 125:3
  126:18
**constant** 106:10,12
**contain** 17:14
  26:21
**contains** 22:13
**content** 127:13
**continue** 90:18
**continued** 101:12
  135:2 136:2
  143:15
**continues** 143:4,14
**contract** 118:2
  143:15
**contracted** 125:20
**contraction** 39:8
  60:13 64:20,23
  65:23 69:15
  101:6 115:24
  139:24 144:21,24

155:15
**contracture**
158:14
**contraindications**
129:13
**contribute** 135:2
136:1
**contributing** 35:17
36:7 127:23,23
**control** 166:20
**controversial**
131:8
**cook** 13:24
**cookiecutter** 68:14
**cool** 99:11 100:19
107:12
**copy** 9:2 76:4
**correct** 7:22 8:8
9:22 10:12,18,23
11:4 12:23 13:2,3
13:7 14:22 16:17
18:16,17 20:17
23:6,9 24:4,8,19
25:1 26:24 30:14
30:18,23 31:14
32:2,6 33:3 34:8
34:9 37:13 38:20
39:1,2,12 41:14
42:5 44:9 46:21
47:4 48:20,23
49:22 50:19 52:3
56:18 62:11 68:3
69:16,17,19,23
71:11,16,22
72:11,20,24 73:3
73:13 74:6 75:3
76:9 77:4 80:19
80:20 81:1,17,18
86:17 89:4 92:12
92:17 94:11,18
97:14,24 98:4,11
98:12,18 99:13
99:18 100:8
106:8 107:5,9,13
108:10 109:1,6
110:6 111:9,14

112:3,4,8 113:9
113:24 116:14
119:6 121:21
122:2,5,18
124:23 125:3,4,6
126:13 129:2
130:1,6,8,14
131:13,20,24
133:7,16,19
134:4 136:12,15
136:20 137:1
138:13 140:22
141:7,19 145:23
146:20,22 147:20
150:5,19 151:5
152:6,19,24
153:13 154:15
156:4,22 158:6
159:21 160:6
169:4
**corrected** 73:5,12
107:3 131:12
159:20 160:3
**correcting** 130:5
**corrections** 167:5
167:7 169:5
**correctly** 23:2
56:15 57:14
106:1
**correctness** 100:3
**cost** 150:1,8 160:5
**cough** 84:8
**counsel** 6:3,21
14:24 23:24 24:3
24:6
**counsels** 164:19
**couple** 38:12 87:14
**court** 1:1 6:23 8:20
167:20
**courtroom** 29:15
29:19 31:1
**cover** 28:17
**covers** 28:16
**crawford** 3:17,20
44:7,11,21 45:6,7
48:22 49:19 53:1

54:10
**crawfords** 52:14
**cream** 81:3,16
82:13,18 90:4,24
91:6,13,14 99:16
101:13 107:7,11
108:15 126:18
134:1
**criteria** 138:2
**criticism** 53:19,23
54:11 59:11,17
100:13 124:18
134:7 142:4
**criticize** 55:21
142:8
**culprit** 88:2
**cure** 68:5,20 70:9
119:1
**cured** 139:2
**current** 93:21
**cut** 10:5 19:16
121:9
**cystocele** 44:12
49:3,20 50:22
51:3 52:5,6 53:13
53:16,21 54:16
73:12,18 76:18
**cysts** 66:9

---

**D**

**d** 3:2
**daily** 18:2 66:3
102:8 103:4
**damage** 123:5
**dan** 2:22 6:11
**dangerous** 118:12
**daniel** 1:14 3:4,12
6:21 7:3,18 9:6
169:8
**data** 65:8
**date** 1:17 6:14
72:12 73:16,22
75:5,18 89:13
96:19 104:2,5,6
130:16 131:19
133:20 134:11
167:9 169:8

**dated** 17:11 45:4
67:18 106:1
166:11
**dates** 80:13
**day** 49:23 52:11
92:16,19 124:9
169:11
**days** 16:19 80:24
167:16
**daytoday** 52:10
54:5
**de** 112:13
**deal** 95:1 100:12
**dealing** 66:4
137:18
**december** 130:12
131:10 132:1,10
133:6
**decentsized** 123:20
**decision** 100:4
**decrease** 113:21,22
114:8,12 152:5
**dee** 1:17
**deemed** 167:19
**defective** 30:21
31:12,24
**defendant** 1:10
2:18 7:15
**defense** 19:11
22:22
**define** 117:19
154:20
**defined** 43:9
124:13
**definitely** 47:19
86:24 136:6
**definitive** 75:17
76:23
**definitively** 139:23
145:2
**degree** 39:7 137:13
137:23 141:14,17
142:11 149:2
**degrees** 56:21 57:2
57:5 65:6 116:7
116:18 117:17

126:1 148:10
157:16
**delay** 8:17
**delayed** 47:6
**delivery** 123:7,12
123:17
**denam** 104:1,1
**denies** 109:15
**denman** 4:9,10
35:10 111:6,10
111:24 112:19
118:5,22 121:2
121:21 123:3
124:3,5 126:14
130:12,19,24
135:11,20 136:21
142:4
**denmans** 113:2
120:17,20 134:14
136:17 139:10,14
140:1
**depend** 146:18
**dependent** 126:2
**depending** 51:18
52:10 63:6 151:8
**depends** 43:22
56:1 69:4 112:11
116:15 144:2
157:2
**deponent** 6:20
169:1
**deposed** 8:6 11:2
**deposing** 167:16
**deposition** 1:14
3:12 4:8 5:2 6:16
8:10 9:2,6,12
11:18 15:1 19:20
21:1,17 23:17
24:6,10,13,15,17
24:21 29:12,17
29:20,24 30:8
61:19 69:8 119:3
120:15,20 121:1
140:16,17 142:15
156:7 165:5,9
166:6 167:3,13

167:17,19
**depositions** 15:19
18:24 19:8 20:14
21:2,10,15 23:22
27:10 30:1
**depression** 48:18
160:24 161:3,10
161:11,22 162:14
162:17
**deps** 1:23
**describe** 17:23
26:1 47:17
106:17 136:13
**describes** 139:11
141:6 145:16
**describing** 140:23
144:13
**description** 3:10
4:4 68:18 153:3
**descriptions** 64:18
144:9
**design** 117:23
**designed** 43:11
**despite** 107:10
108:1
**detailed** 144:9
**determining**
151:17
**develop** 46:5 87:24
**development** 47:7
**devices** 28:24 68:1
**devin** 2:10
**dgriffin** 2:13
**diagnosis** 26:9,23
27:3 32:5 46:18
64:12,16 87:11
88:6 95:23
102:11
**didnt** 10:10 14:3
19:16 20:14
21:13 34:2,3
42:14,15 47:2
48:10 54:17
65:21 66:13
89:19 114:23
118:23,24 121:18

140:7 142:18,20
152:8 153:5
154:3 155:23
159:1,7,15 162:8
**difference** 21:3
70:3
**different** 18:11
26:10 29:3 51:15
54:12 62:21 63:4
63:5,14 65:12,13
66:7,10,10 70:2
70:14,15 90:10
91:11 115:4
127:11 142:2
143:13 149:19
151:11,24 156:20
162:2
**differential** 26:9
26:23 27:3 32:5
46:18 64:11,16
87:11 88:6 95:22
101:20 102:11
**differently** 65:12
127:1
**difficult** 34:19
35:21 49:14
75:24 86:10
118:19
**diffuse** 102:1,1
**dilators** 114:17
115:3,10
**direct** 166:20
**direction** 5:5
**disagree** 57:9
59:21 60:16
84:10 118:10
119:8 122:20,24
129:6
**disagreement**
115:20 123:16
**disagreements**
23:11,15
**disappointed**
139:9
**disclosed** 57:11,21
**disclosing** 83:15

**disclosure** 57:18
**discomfort** 64:9
65:11 66:5 92:1
102:8
**discrepancy** 80:12
122:10,15
**discuss** 58:10,12
58:13 65:18
**discussed** 68:17
69:7 99:7 113:19
115:18 123:4
162:23 163:4,5,9
**discusses** 67:21
114:6 139:15
**discussing** 11:9
**discussion** 9:18
43:18 44:4 98:6
157:23
**discussions** 18:9
**district** 1:1,1
**division** 1:2
**doctor** 7:13 9:11
19:8 41:19 44:5
45:2 50:13 53:6
54:3,7 62:3 67:17
77:17 92:3 94:6
96:15 99:10,14
104:9 132:22
133:11 149:7
164:8
**doctors** 25:23
64:19 116:19
**document** 1:6 9:15
156:15
**documentation**
95:5
**documented** 48:10
91:20,23 164:6
**documenting** 96:1
**documents** 5:10
19:20 57:23 58:8
59:7 60:7 83:5
**doesnt** 58:3,5,17
60:9,20 69:21
90:8 100:12
106:20 109:7

110:14 118:6
134:17 137:9
138:9,18 141:11
141:15 142:5,8
148:1 155:2
158:20
**dog** 143:5
**doing** 40:4 52:12
54:7,21,23 73:2,8
115:15 124:24
141:22 154:21,21
167:8
**donald** 1:7
**dont** 11:16,19 12:9
12:10,17,20
13:15 14:2,11,17
20:6 23:5 28:7,13
29:1,5,7 32:11,19
54:10 55:11,20
58:12,13,13,19
58:19 59:10 60:2
61:7,13,15 63:24
66:5,8,12 67:3,5
68:10,12 69:3,9
74:4 75:23 76:1
77:11 82:9,11
87:3 90:5 92:24
95:23 100:23
101:14,17 103:13
104:2,4,16 117:4
117:6 118:16
120:8 123:9,15
124:8 128:7
129:17,18,22
131:22 132:16
133:23 134:11
135:10 140:14
142:8 144:8
145:20 148:2
151:12,14 154:18
155:7,13,14,20
155:20 156:6
161:3 162:6,13
163:3,7,10
**doubt** 61:13
119:11

**dr** 3:12,16,18,19
4:9,10 9:6 23:1
23:23 35:9 41:10
41:15,19 44:7,10
44:20 45:5,6
48:22 49:19,24
50:3,7,17 52:1,14
52:24 53:15 54:1
54:9 55:3,17
57:15,21 58:1,16
61:12 66:16
69:20 70:3,6,13
70:16,20,24 71:2
72:17 73:2,14
74:1 77:9 78:1,8
78:18 79:20,24
80:16,20,22
81:15 82:12,17
88:12 89:12
90:12 91:4
103:24 111:10,24
112:18 113:2
116:22 118:5,22
120:16,20 121:2
123:3 124:3,5
126:14 130:12,18
130:24 134:14
135:11,19 136:17
136:21 139:10,12
139:14 142:4
157:20 158:7,15
**drafting** 26:2
**draw** 34:19 35:4
**due** 35:22 36:14
86:3,4 87:23
88:23 93:23
95:20 98:24
108:19 125:10,10
126:17,19 141:24
142:12 144:7
161:21
**dull** 106:10,12
**duly** 7:4 166:5
**dysfunction** 33:16
33:17,20,24
67:23 68:11

Daniel S. Elliott, M.D.

**dyspareunia** 33:6
  33:10 34:7 36:6
  39:5,8 45:22
  46:20 51:12 57:1
  62:15,23 63:16
  64:5 67:24 68:16
  69:14 91:21,24
  92:11 94:9 97:11
  98:17 99:8
  101:20 109:20
  136:22 147:20
  148:7 149:1
  151:5 154:15
  155:11,12,12
  156:3,21 157:22
  161:6,21

**E**

**e** 3:2,8 4:2 168:1
**earlier** 23:21 88:18
  157:20 160:23
**early** 13:23 38:8
  133:3 137:3
**easier** 90:3,6
**easiest** 151:2
**easily** 88:13,16
**ebuhr** 2:18
**education** 61:13
**effect** 84:12
**effective** 40:8
**effort** 8:17
**either** 23:6 29:16
  32:21 34:4 55:15
  68:12 71:11
  145:3
**ejaculatory** 68:11
**eliminate** 151:4
  156:5
**eliminated** 63:15
  154:14 156:2
**eliminating** 99:1
**elliott** 1:14 3:4,12
  6:21 7:3,18 9:7
  169:8
**elliott1** 3:11 9:5
**elliott10** 4:5 96:9
**elliott11** 4:7

105:15
**elliott12** 4:8 121:1
**elliott13** 4:10
  130:24
**elliott14** 4:12
  164:22
**elliott2** 3:13 17:2
**elliott3** 3:15 27:24
**elliott4** 3:16 44:20
**elliott5** 3:18 50:7
**elliott6** 3:19 52:24
**elliott7** 3:21 67:12
**elliott8** 3:22 76:12
**elliott9** 3:23 93:10
**emails** 57:23 60:6
**encompassed** 34:6
**endometrial** 47:16
**ends** 93:16 105:23
**enlarged** 35:23
**entire** 21:17
**entirety** 21:14,23
  22:2
**episiotomy** 123:11
  123:18
**equally** 58:23
**eric** 2:15 7:14
  31:15 120:19
**erosion** 82:19
  126:21 157:21
**errata** 167:6,9,12
  167:15 169:6
**especially** 106:13
**esquire** 2:3,10,15
**essentially** 20:22
  46:11 56:19 59:7
**estimate** 12:13
  14:8 15:12
  147:11
**estrace** 81:3 82:13
  82:18 90:24
  91:13 133:24
**estrogen** 81:11,16
  82:10 85:17 90:1
  90:7,10,13 91:6,6
  91:9,17 99:16,24
  100:9 101:13

102:19 107:7,11
  107:14 108:15
  110:21 112:1
  115:19 125:3
  126:18 127:13
  133:21 134:1
**et** 18:9 47:5 57:23
  60:14 70:9
  111:21 138:7,7
  138:22
**ethicon** 13:6,13,17
  13:21 30:2,9 31:7
  31:24 153:21
  154:2
**everted** 51:23
**everybody** 40:11
**evidence** 49:3,20
  53:12 78:21
  100:16 111:1
  119:12
**exact** 11:16,19
  13:15 14:11
  39:20 60:21
  120:9
**exactly** 11:12
**exam** 44:2 48:22
  49:2,22 52:13
  53:11,14 95:17
  98:3,11,14 99:4,5
  100:19,21 102:13
  103:24 108:4
  109:24 111:18,19
  111:23 119:9
  122:11 123:1
  131:17 132:17
  133:14 134:8
  141:20 143:22
  145:20 147:5
  164:6
**examination** 7:10
  25:8 50:21 53:9
  54:1 121:24
  163:12
**examinations** 25:3
**examine** 134:17
  145:4

**examined** 7:5
  24:24
**examining** 141:18
**example** 83:21
**examples** 88:5
**exams** 92:10
**exceedingly** 45:23
  46:4
**excellent** 83:24
**excerpts** 21:15
**excision** 77:3,6
  80:2,23 88:11
**excuse** 30:2 36:2
  63:8,18 68:22
  71:24 124:1
  126:21 157:6
**exercise** 94:17
  97:20 98:21
**exhibit** 9:1,4 17:1
  18:12 27:23
  44:19 50:6 52:20
  52:23 67:8,11
  76:7,11 93:9 96:8
  105:14 113:4,15
  120:24 130:23
  131:16 164:17,21
**exhibit10** 96:6
**exhibit11** 105:10
  113:8
**exhibit12** 120:22
  130:18
**exhibit13** 130:21
**exhibit2** 16:22
  17:8
**exhibit3** 27:21
**exhibit4** 44:16
  45:4
**exhibit5** 50:4
  73:24 74:10,11
  74:13,16 79:5
  89:17
**exhibit7** 67:9
**exhibit8** 76:8
  77:14
**exhibit9** 93:3
**expect** 110:11

133:1
**expected** 110:8
  116:14 117:10
**experience** 18:7
  65:8 66:3 87:22
  103:1 112:12
  114:9 116:17
  135:12 137:3,6,6
  137:15 138:17
  139:5 140:24
  141:22 144:22
  146:7,11
**experienced** 101:3
**expert** 3:13 7:20
  10:16,20,20
  11:15,22 13:4,14
  13:19 14:6 15:19
  16:22 17:2,9
  18:13,16 19:1,11
  19:20 21:10 22:9
  22:21 23:20,23
  26:3 27:17 30:19
  31:8,22 75:12
  145:4
**expires** 169:12
**explain** 45:14
**explained** 87:13
**explant** 125:15
  140:8 142:20
  145:8
**explanting** 20:21
**exposed** 88:13
**exposure** 65:23
  72:4 78:13 83:7
  85:1 86:1 87:21
  89:11 91:9
  100:24 101:5
  103:4 107:22
  111:4 115:22
  126:21 128:6
**extended** 14:3
**extensive** 135:10
**extent** 12:7 59:2
  82:19 117:2,5
  158:12,21 159:2
**external** 108:7

Daniel S. Elliott, M.D.

**extra** 63:19 155:4
**extraction** 143:4
**extremely** 73:2
**extruded** 37:10
**extrusion** 33:7
  34:7 37:6 56:24
  59:20 60:14 62:1
  69:16 71:19
  72:22 74:9 76:20
  81:7 82:24 83:23
  84:17 85:6 86:7
  88:18 89:11 94:9
  100:2,17 111:2
  154:15,24 156:3
  156:22 157:22

**F**

**fact** 10:24 84:6
  92:8 129:20,23
**factor** 36:8 84:1
  86:22 102:18,23
  123:13 127:15,17
  127:23,24 129:5
  129:8 155:3
  161:12
**factors** 82:22 83:2
  83:14,16,19
  127:3,6,7 128:17
  144:18
**fail** 167:18
**fair** 8:5,22 59:1,22
  63:16 70:4 96:3
  134:20 138:20
  140:12 147:2
  156:12
**fairly** 28:12 29:8
  112:22
**falling** 51:5
**falls** 47:19 115:7
**familiar** 48:2,6
**family** 103:12
**far** 14:3 20:8 57:17
  80:12 84:21
  144:24 153:5
  162:20
**farther** 164:3
**fashion** 68:22

127:21 129:4
**fault** 41:14 42:19
  78:6
**favd** 123:5
**fax** 1:22
**february** 29:19
  31:1 71:22 72:23
  73:14,17 93:5
  94:13 95:13
  96:23
**fecal** 34:12,22 35:1
  35:6,11 123:14
  123:21,24
**feel** 8:9 19:3 20:18
  22:10 42:15 61:2
  65:21 66:13
  79:14 80:17
  89:10 101:6
  109:16 118:3,4,7
  118:24 135:11
**feeling** 109:15
**feels** 111:12
**felt** 54:7 91:4
  112:19 124:15,15
  124:16 135:12,20
  146:14
**female** 43:24 76:17
  82:11 85:15
**fibroids** 47:22 48:1
  48:8
**fibrosis** 117:15
  143:1
**file** 105:5 160:20
**filed** 21:6
**filing** 6:4
**find** 20:5 42:19
  46:2 49:19 55:12
  121:18
**finding** 156:9
**finish** 8:18 19:18
  104:11
**finishing** 19:17
**firm** 11:14 12:21
  13:9 14:13 18:21
  20:3 27:11 28:9
**first** 11:14 28:22

72:3,17 79:9 80:7
  85:13,19 89:16
  96:16 99:7
  103:14 113:14
  130:3 131:15
  149:17
**firsttime** 154:9
**fits** 29:7 140:24
  144:24
**five** 11:18 123:19
  150:7
**fiveminute** 104:10
  104:16
**fix** 70:23 116:9
  148:11 159:18
**floor** 111:21 112:7
  112:13 115:7
  125:11
**follow** 8:11
**following** 46:6
  47:4 71:14 81:16
  89:3
**follows** 7:5
**followup** 72:16
  103:18 132:15
**followups** 128:10
**foramen** 36:9
  142:3 143:11
**forceps assisted**
  123:6
**foregoing** 166:17
  169:3
**foreign** 39:9 85:24
  127:15 128:5,18
  158:3
**forget** 145:12
  155:9
**form** 3:21 6:6 16:2
  19:4 20:19,22
  36:21 60:24 63:1
  66:16,18 67:2,9
  67:12 68:3,5,14
  68:21 80:4 90:10
  90:15 91:13
  156:24 163:18

169:5
**formation** 113:22
  114:13
**formed** 20:12
**forming** 17:23
  18:1,15 25:16
**formulate** 26:8
**forrestal** 1:16 2:11
**forward** 25:13
**found** 22:2 44:11
  82:5
**four** 11:18 12:1
  16:8 53:10
  121:14 123:18
**frequency** 70:8,23
  151:8 159:8,16
**fresh** 132:23
**front** 45:2 50:13
  67:16 79:7 96:14
  113:6
**fuel** 60:1
**full** 7:17 57:22
  66:23 117:2,5
  158:12,21 159:2
**fullness** 51:4 98:13
  109:22
**fully** 57:20 70:22
**function** 117:22
**further** 19:19
  67:22 97:17
  121:22 147:1,17
  163:23
**future** 146:1 147:9

**G**

**gap** 10:7
**general** 11:17 12:8
  12:12 14:5 32:5
  40:10 57:24 69:2
  69:7 103:11
  148:4 162:17
**generally** 14:16
  17:22 26:1 40:7
  83:19
**generic** 11:1,3,7
  68:4,7,21,22
  156:7

**generical** 28:23
**genitalia** 108:7
**getting** 86:1
**give** 18:23 19:2
  39:20 40:23
  61:11 89:20 91:9
  99:24 101:10
  103:13 107:19
  148:3 149:14
**given** 20:9 93:21
  108:2 166:7
  169:4
**gives** 112:24
**giving** 20:3 103:3
  137:17 152:16
**go** 8:13 9:15 16:20
  17:23 18:18
  19:15 21:19
  23:13 26:18
  32:18 40:24
  44:14 50:2,15
  60:8,9 61:16 67:5
  78:4 80:13 88:21
  90:1,9 93:15
  95:11,13 96:5
  98:1 103:10
  105:22 110:11
  118:17 120:13
  121:8,10 129:19
  131:16 134:11
  146:13 150:10
  151:6 163:15,21
  164:15
**goal** 152:7,8
**goes** 69:4 109:8
  123:11 164:3
**going** 19:18 27:1
  36:1,9,10,13
  42:13 43:19 47:6
  48:21,24 52:14
  54:20 60:1,4,8,9
  62:3 64:1,20,22
  65:5 69:24 74:14
  76:21,24 83:13
  88:1 100:1,9
  102:3,20 104:8

104:14,21 105:4
112:22 116:11
120:1 121:17
122:10,20,24
123:21 125:22
133:8 136:7
137:14 140:11
142:1 143:11
144:1 146:24
151:10 158:22
160:13,20 161:8
164:2 165:6
**golkow** 1:22,23
6:13
**good** 7:13 61:12
71:5 100:10
104:13 132:6,21
141:1 146:17
**gotten** 78:16
**grade** 43:22 44:2
50:22 52:5,7,7
54:1,2,12,13
55:13
**grafts** 155:19
**grand** 2:4,16
**granulation**
126:22 128:13,14
132:3,6,21 133:1
133:18 135:9
**great** 107:1 139:7
**greater** 36:13
**greatly** 137:20
**griffin** 2:10 31:15
52:19 76:9 77:15
113:9 120:18
130:20
**ground** 11:7
**grounds** 156:7
**guess** 16:10 59:18
84:11
**guessing** 16:5
**guidice** 23:3,3,5,23
**guys** 154:18
**gyn** 47:20 98:11

**H**

**h** 3:8 4:2

**halfway** 97:10
113:18
**hand** 74:14 120:16
**handle** 40:4
**handwritten** 75:5
**happen** 46:8 88:1
116:9 162:12
**happened** 162:5
**happens** 18:21
141:4
**harmed** 87:7
**hasnt** 110:1 115:13
142:6
**havent** 10:3 16:14
84:3 163:8
**head** 11:24 143:12
156:15
**heal** 90:17,19,22
**healed** 71:14 74:2
89:2,6,9 134:11
135:1 136:1
**healing** 72:18
115:19 126:23
128:3,15 133:3,4
134:3,18 135:2
136:2 162:18
**heals** 126:24
**health** 107:15
**hear** 86:8
**heard** 44:13 56:15
70:24 162:21
**held** 1:15 6:17
66:24
**help** 47:23 81:12
102:20 108:20
112:10 113:21
114:5,8,10,12,17
114:19 115:11
125:5,9 134:2
136:7 143:23
144:15
**helpful** 25:16
108:16 120:10
**helping** 36:10
**helps** 31:6
**high** 39:18

**higher** 156:10
**highest** 106:21
**history** 45:11
76:16 161:24
**ho** 138:7,7,22,22
**hoffin** 143:3
**hold** 76:22 164:14
**honest** 23:7
**hope** 137:9 138:14
**hospital** 3:22 76:5
76:12
**hoth** 3:23 4:5 92:9
92:14,19 93:4,10
96:9,22
**hour** 12:24
**hours** 12:13 14:17
15:15,18,21
**housekeeping** 9:1
**howevermanyhu...**
21:18
**hundreds** 128:4
141:22
**hurts** 97:20 98:21
**husband** 78:20
**hymenal** 108:24
109:7
**hysterectomies**
66:5
**hysterectomy** 44:6
64:4 65:2,11,19
66:1 82:1 83:5
94:1
**hysterectomyrel...**
64:21

**I**

**id** 27:14 34:1 47:13
67:4,6 84:9,9
88:21 92:24
103:10 104:15
105:8 150:9
**idea** 147:14
**ideal** 135:18
**identical** 36:8,19
36:23
**identification** 9:8
17:4 28:2 44:22

50:9 53:2 67:13
76:13 93:11
96:11 105:17
121:3 131:2
164:23
**ifu** 60:9 69:1,6
70:2,7,21 83:1,8
83:11 84:2 85:2
86:18 129:10
161:13,17 162:16
**ill** 8:17 84:4 158:19
164:1
**illness** 76:17
**im** 6:12 15:22 20:2
29:3 36:11 45:6
46:2 57:17 58:9
59:18 69:5 73:16
74:12,18,21
75:11,12 76:21
76:24 77:8 78:5
81:8,12 83:14
84:5 93:17 94:23
95:5,18,19,24
98:24 99:1
104:13 105:24
106:3 108:6
113:12,16 114:11
115:15 117:6
120:1,18 121:15
122:9 127:22
128:16 138:14,15
139:3,12 140:16
140:16,19,22,23
141:13 142:10,16
144:17 147:3
153:23 154:6
156:13
**ime** 25:4,8 145:3
163:22
**immaterial** 147:15
**immediate** 47:8
**imperative** 167:14
**implant** 39:13 41:9
41:11 42:3,9,14
42:24 43:4,11,16
46:22 48:18 49:9

71:15,20 72:10
81:17 103:8
152:17 162:9
**implanted** 37:14
37:19,23 38:3,21
42:19 44:7 55:23
56:2 62:9,16
67:24 71:10
117:12 160:4
**implanting** 19:8
20:20 41:13
53:20,24 71:6
**implants** 33:5
**imply** 145:18
**important** 58:6,7
86:20 91:5
111:23 112:20
164:5
**impotence** 68:10
68:11
**impression** 109:9
116:3
**improve** 115:19
**improved** 136:23
138:12 145:7
**improvement**
146:3
**inability** 68:20
70:8,23 116:9
148:11 149:12
151:10,23 159:17
**incidence** 57:10
**incision** 131:17
132:6,12
**include** 32:12
68:15 148:24
**included** 68:2
163:2
**includes** 9:14
17:11 39:10
94:13
**including** 41:19
99:2
**incomplete** 69:7
95:2 103:22
**incontinence** 30:17

34:12,23 35:1,7
35:11 41:12
54:24 55:11,15
56:13 73:6 107:3
123:14,22,24
130:6 148:22
150:21
**incorrect** 72:1
130:16
**increase** 81:6
82:23 83:10,22
84:16 85:6 86:7
117:15 145:17,22
147:6 152:5,14
**increased** 84:24
140:21 145:10
**increases** 42:16
**increasing** 83:6
**indefinitely** 143:4
**index** 5:2
**indiana** 31:5
**indicated** 27:1
**indicating** 54:18
**indication** 43:20
85:22 145:11
**individual** 30:6
61:8 86:15 99:22
103:23 121:12
162:19
**individuals** 60:13
124:10 137:7
**infancy** 42:12
**infection** 83:11
**inflammation**
85:24 126:20
128:19
**inflammatory** 88:4
128:15 158:4
**information** 22:17
26:13 95:24
**initial** 141:1
**initially** 71:14
**injections** 125:8
146:6
**injuries** 33:3,15
34:5 35:16,19

69:13
**injury** 30:21 31:13
32:1
**insert** 90:7
**inside** 85:9 108:11
**institution** 59:4
**instructions** 69:22
167:1
**intend** 17:15 22:14
33:1 36:4 41:22
57:14 162:24
**intended** 130:5
**intending** 68:23
**intensity** 66:11
**intention** 163:11
**intercourse** 78:22
106:11,13 111:12
134:6,19,24
135:17,24 151:24
**interfere** 51:17
**intermittently**
125:7
**internal** 57:23 58:8
59:6 60:7 83:4
**international**
103:2 137:16
**internationally**
59:5
**interrupt** 78:5
**interrupted**
100:15 153:23
**invoice** 14:20
15:10 16:6,7,15
**invoices** 9:21 12:20
15:4,10 164:18
**involved** 11:1
30:10 31:3
123:13 158:22
**irritating** 51:23
**irritation** 91:1
101:17 102:2
110:17
**isnt** 102:15
**issue** 30:5 87:9
97:4 109:23
123:13 131:8

144:16 162:16
**issues** 14:6 107:18
121:19,24 161:22
**ive** 14:14 19:11
20:9 38:4 42:21
44:13 58:7 59:13
63:2 81:13 83:1
95:20,21 117:7
137:19 139:6
158:10 159:14
162:21

---
### J
**j** 2:10,15
**january** 42:5,18
46:22 49:15
52:17 67:18
72:22 75:5,8
77:23 78:7,18
79:21 80:18,24
82:13 130:19
131:11,23 132:15
133:8 152:18
159:22
**jersey** 1:16,18 2:12
6:18
**job** 124:6,15,18
**judgment** 43:17
54:3 55:20
**julie** 3:16,19 44:20
45:6 52:24
**july** 1:12 6:14
15:17,24 16:11
16:16 17:21
22:18
**june** 120:17,21
**jury** 47:18

---
### K
**kansas** 2:5
**keep** 12:17,20 28:7
77:21 104:14
164:1
**key** 26:7
**kim** 3:18 41:10,15
41:19 45:6 49:24
50:7,17 52:1

53:15 55:3,17
57:15,21 58:1,16
61:12 66:16 70:3
70:6,13,16,20,24
71:2 72:17 73:2
73:14 74:1 78:1,8
78:18 80:20,22
81:15 82:12,17
88:12 89:12
90:12 91:4
116:22 158:7,15
**kims** 50:3 54:1
69:20 77:10
80:17 157:20
**kind** 20:10
**kits** 84:7
**kneejerk** 99:23
**knew** 83:15 117:2
158:20 159:6,15
**know** 10:9 11:17
11:21 12:3 14:2
14:24 20:8 23:6
29:1,5,7 34:18
35:4 57:22 58:3,5
58:5,12,14,17,18
58:19,20,22,23
58:24 59:14 60:2
60:20 61:9,16
62:2,4 69:3 76:1
77:11,22 82:9,11
84:21 86:8,20
87:6 100:23
101:12,15 117:4
118:16 120:8
122:12 123:2
124:8,8 128:12
129:9 130:7
132:20 133:23
135:6,10 141:9
141:12,15 142:5
142:8 143:1
154:18 155:2,17
158:12,21 159:1
159:7,15 161:3
163:7
**knowing** 42:12

**knowledge** 61:21
116:17
**known** 57:10,12,18
58:14 70:9,20
83:2,19 86:19
116:14 128:13
129:7 148:5
149:10 157:10
162:15
**knows** 40:3 58:2,4
58:5,16,17 59:1
59:10 71:3 115:1
117:5,8,8 149:10
158:11

---
### L
**land** 47:20
**language** 53:17
79:10
**laparoscopically**
45:19 46:1
**large** 59:3 144:19
**largepore** 153:9,15
**larger** 153:20
**largerpore** 152:22
154:12
**lateral** 119:19
120:6 139:16,19
139:23
**launch** 58:14
**law** 1:15 18:21
20:3
**lawlor** 2:22 6:12
**lawyers** 170:1
**layer** 63:19 155:4
**lead** 45:21 46:14
**leaking** 107:1
**learn** 59:14
**lectures** 103:3
137:17
**left** 96:20
**legal** 69:4
**legs** 144:2
**level** 57:18 63:11
106:15 108:23
109:6 116:16,17
125:21

lexapro 48:15
liability 1:4
lifelong 151:14,23
lifting 95:17
ligate 45:17
ligation 45:13
lighter 153:20
lighterweight
   152:22 153:9
   154:12
lightweight 153:15
likelihood 84:17
lindsey 2:3 105:24
line 5:6,6,6,11,11
   5:11,16,16,16,21
   5:21,21 91:8
   121:16,22 141:6
   168:3 170:2
lines 100:12
   142:17
list 3:15 9:14 17:13
   18:13 27:8,9,15
   27:24 28:5,7 32:5
   45:10 47:15 88:5
   88:7,8 97:11
   149:23 152:21
listed 29:21 31:24
   41:18 64:14
   88:10
lists 77:18
literature 18:8
   60:8 144:22
   156:9,16
litigation 1:5 6:13
   12:5 13:21 56:9
   92:21
litigations 1:22
little 10:5,7 14:1
   20:11 31:16
   75:13 97:16
   140:20 145:17,22
   147:6
llp 1:15 2:3
located 88:24
location 64:17
   66:10 162:10

locations 64:6
logic 128:2 129:19
logical 34:19 35:5
   86:2 162:6,13
logically 123:21
long 8:2 9:14 40:22
   57:3 155:1
longer 100:10
longterm 112:2
look 29:5 65:8,15
   67:5,6 76:15 79:3
   88:21 96:20
   120:9,15 130:10
   131:14 140:4,10
   156:16
looked 14:6
looking 28:15
   44:17 75:12
   128:17 152:3
   157:18
looks 28:12 29:8
   48:24 75:16,18
   75:24
los 2:17
lot 101:1 157:8
low 54:1 144:6,6
lower 143:17 156:4
lowering 64:2
lowgrade 43:21
   154:10
lscarcello 2:6
lubricant 110:19
   10:21
lubrication 107:16
   107:18 110:15

──── M ────
m 1:17 6:15 165:10
mackie 1:8
main 1:15 2:10
   127:15 152:2
major 23:14 38:10
   51:22,22 55:18
   127:23 128:2
   151:16 154:23
   161:11
majority 13:16

32:15
making 40:12 95:5
   95:8 108:18
male 45:18
malfunction 67:24
march 92:6 95:10
   99:6 103:15
mark 77:13 120:6
   120:20
marked 5:20 9:7
   17:3 28:1 44:21
   50:8 52:20 53:2
   67:13 76:13
   93:11 96:10
   105:16 121:3
   131:1 164:23
markedly 127:9
   136:22 138:11
   145:7
market 156:18
mary 4:9,10 104:1
   121:2 130:24
maslynskymiller
   1:17 166:10
masses 98:13
material 17:19
materials 18:19
   19:4 22:9
matter 6:18
max 119:18 120:6
md 1:14 3:4 7:3
   169:8
mdl 1:3 10:21
mean 19:13 29:12
   29:12 61:7 67:3
   75:17,18 76:1,21
   118:10 127:2
   129:7 132:22
   135:6
meaning 126:9,22
means 59:11,17
   86:1 100:24
   132:20 133:2
   166:19
measuring 132:12
media 105:5

160:20
medical 3:17,18,20
   18:4,8,23 19:24
   20:1,23 21:22
   26:6,16 27:10
   28:23 40:9 44:21
   50:8 53:1 83:20
   137:13,23 141:14
   141:17 142:11
   144:12 152:3
   157:7
medication 161:2
medications 48:14
   124:20
meeting 23:24 24:2
meetings 59:4
   103:3 116:20
   137:17
meets 153:3
member 40:17
memory 140:12
menopause 87:23
mention 81:4
   104:6 153:5
mentioned 14:24
   22:20 23:21
   36:14 48:9 51:8
   54:4 68:8,9,21
   151:6
mentions 54:10
mentor 29:2,6,6
   38:7
mercy 20:3
mesh 6:20 13:5,20
   30:16 32:13,17
   32:21 33:4,6,12
   33:19,19 34:6,8
   34:16,21,22 35:2
   35:5,6,12,24 36:8
   36:18 37:15 39:6
   39:8 42:3,24
   43:16 44:1,6 56:7
   56:11 60:13
   62:21 63:4,7
   64:19,23 65:9,22
   65:23 72:3,22

74:9 76:19 77:3,6
   78:13,21 80:1,23
   81:7 82:23 84:7
   85:9,23 86:4 87:2
   87:5,20 88:13
   89:10 91:8 92:20
   93:20,22,24 94:7
   94:21 95:9,20
   98:18,24 99:1,9
   100:16 102:4,21
   107:21 111:1,3
   112:15 115:22,23
   115:24 117:12,17
   117:24 119:5,14
   119:24 120:14
   121:19 123:13
   124:4,15,17
   125:10,20,24
   126:2,5,8,12,20
   127:20 128:24
   139:24 142:12,23
   143:3,7,8,10,14
   144:7,19,20,23
   145:1 146:6,7,10
   148:8 150:17
   152:4,22,23
   153:9,15,19
   154:12,21,22
   155:15 156:9,12
   156:20 158:14
   161:9,19,20
meshes 36:23
   42:13,14 47:7
   48:18 56:17 57:4
   59:8 65:14 84:23
   100:13 117:14,16
   128:12 137:4
   148:15 149:3,13
   157:15 161:13
meshrelated 125:5
   147:23
meshspecific 32:21
messy 81:23 90:4
method 26:2
mid 144:4
middle 66:22

126:9
**midline** 126:8
132:3 133:18
135:9
**midurethral** 37:20
38:2 39:24 41:11
153:2
**mild** 43:14 50:23
52:2,5,7 53:15,21
102:17,23 103:7
135:13 150:13
**miller** 6:24
**mind** 77:21 104:17
164:1
**minor** 61:6
**minus** 63:7
**minute** 77:22
**missouri** 2:5
**mistake** 75:7
**mistakenly** 75:22
**models** 143:2
**moderate** 108:8
125:18,20
**monarc** 38:12
157:5,6
**month** 15:16,17
16:18 24:11 49:8
71:23 78:14,20
79:14 80:18
**months** 49:11,13
49:18 72:5,9
100:6,9 139:9
159:23
**moot** 84:22
**morbid** 118:19
**movement** 111:13
**multiple** 35:24
40:23 91:11
**muscle** 125:11
139:17,19 140:8
141:6,10 142:19
**muscles** 141:24
142:2 143:14
**musculoskeletal**
97:19
**mustang** 60:2

**myalgia** 112:13
125:11

---

## N

**n** 2:3 3:2
**name** 6:11 7:14,17
23:2
**narrowing** 115:11
**nation** 146:13
**national** 103:2
137:16
**nationally** 59:5
**natural** 143:6
**nature** 56:4 60:14
64:7 68:19 149:4
149:12 151:9
159:8,17 162:11
**necessarily** 51:14
90:8,23
**necessary** 167:4
**necrosis** 85:12
**need** 100:10
111:17 113:20
115:18 135:6
140:10 146:1
154:8 155:20,23
**needed** 65:21
66:14 90:22
**needing** 97:5
147:13
**needs** 82:20 84:8
101:8,9 104:5
155:24 161:13
**negative** 98:14
**nerve** 123:5
**never** 61:15 63:20
71:10 81:13 83:1
112:16 153:17
162:21
**new** 1:16,18 2:12
6:17 17:19 22:17
24:21 78:12
**nice** 124:5,14,18
**nicely** 74:2
**nonmesh** 14:1 87:4
149:20
**nonsmoker** 84:22

**nontender** 133:5
133:15
**normal** 18:2 98:11
102:8
**normally** 51:21
**notary** 169:14
**note** 3:17,23 20:5
44:21 45:5 48:16
74:8 88:22 89:7
93:1,10 95:14
98:12 103:14,18
103:22 107:6
109:14 114:23
120:2 140:7
**noted** 6:22 73:1
100:20 125:17
126:8,14 167:11
169:6
**notes** 26:16,20
49:2 73:14 74:1
103:11 106:14
108:4,8,22
109:10 111:11,24
126:4 170:1
**notice** 1:15 3:11
9:2,5,12
**noticed** 78:21
91:24
**november** 45:5
49:7 50:1,17
66:19 125:15
**novo** 112:13
**number** 12:10 13:5
13:16 14:12
39:20 45:10,12
48:24 52:21 53:8
74:10,19 79:5,6
93:16 97:9
105:22 108:4
113:12,13 121:13
131:14 153:7,11
160:21
**numbers** 39:16
50:16 61:11
105:11
**nurse** 99:11,15,22

101:2 103:15
107:12

---

## O

**oath** 122:23
**ob** 123:10
**object** 12:6 16:1
36:20 62:24
90:14 156:23
163:17
**objection** 12:16
60:23 80:3 135:3
136:4
**objections** 6:6
**obligation** 61:3
**obtape** 29:2,7 38:8
**obturator** 36:9
65:4 119:19
120:7 142:3
143:11 144:5,20
**obviously** 17:20
18:7,22 38:9 91:4
106:22
**occurred** 98:7
**occurs** 41:7
**odds** 59:13 117:6
137:20 138:21
**offer** 17:16 22:14
33:1 36:4 41:22
57:14 68:24
69:24 162:24
**offering** 33:4,14
34:15,24 37:5
70:13 94:19
136:10 137:12
139:18 146:24
**office** 4:5 96:9,21
105:23 164:19
**offices** 1:15 15:3
**oh** 121:11
**okay** 56:20 72:15
74:18,21 93:17
96:3 105:19
106:3 108:6
121:5 125:16
130:20 131:4
132:1,18 140:19

142:16
**okays** 134:5
**old** 11:7 58:18
87:14
**once** 71:2
**ones** 63:24,24
**onthemarket**
153:14
**open** 164:1
**opening** 62:4
**operate** 43:20 54:8
124:11,12
**operated** 137:19
**operating** 54:6
138:5,8
**operation** 67:2
**operative** 20:5
88:22
**opining** 159:12
**opinion** 11:15,22
18:10 19:4 21:3,4
30:20 31:8,11,23
33:4,14 34:16
35:1,14 36:5 37:5
41:21 55:2 57:15
68:24 69:6 70:1
70:13 84:5 87:22
94:20 123:23
137:12 139:18
145:24 146:2,24
147:8
**opinions** 11:3,7,9
12:8 17:15,24
18:1,15 19:14,21
20:13,19,23
21:11 22:14,15
25:17 33:1 41:18
56:8 136:10
157:18 162:24
163:2,6,24
**opportunity** 59:14
163:14
**opposed** 13:17
37:7
**option** 99:1 113:1
124:17 146:9

150:12,14
**options** 124:3,7
  146:16,17
**order** 28:20 90:22
**oregon** 4:7 105:9
  105:15
**organ** 30:13 37:15
  42:4 43:1,6 56:12
  56:16 57:4 148:5
  148:22 150:4
  153:19 156:20
**original** 167:15
**originally** 14:7
**outcomes** 71:6
  129:3
**outer** 157:12
**outlined** 57:24
**outside** 18:4
**outweighs** 146:15
**ovarian** 66:9,9
**ovaries** 82:8 85:17
  87:17,20
**overwhelming**
  59:13

**P**

**p** 1:17 6:15 165:10
**page** 3:10 4:4 5:6,6
  5:6,11,11,11,16
  5:16,16,21,21,21
  22:6 27:1,2 33:8
  33:9 45:9 48:21
  50:15,16 66:20
  67:6 73:20 82:17
  88:6 89:16 93:18
  96:16 97:4,11
  98:2 100:18
  104:3 106:7,24
  113:12,14 121:8
  121:10,13,13,14
  121:16,17 130:12
  131:16 132:8,19
  140:18 142:14
  145:12 153:8,11
  157:19 168:3
  170:2
**pages** 21:18 32:6

121:14 131:15
  169:3
**pain** 33:6,10,10
  34:7 36:6 38:14
  39:5 45:21 46:14
  46:19,24 47:2,9
  47:10 48:6 51:12
  51:13,14,20
  56:24 62:9,23
  63:15 64:4,21
  65:2 66:9 67:22
  68:16 91:20,23
  92:15 94:9,17,20
  95:9 97:4 98:17
  99:5,8 100:2
  101:21 102:4,5
  102:21 106:10,12
  106:14,17 109:20
  110:24 111:11
  112:10,12,17
  113:23 114:9
  119:5,13,23
  122:3,7 124:19
  125:6,9 128:21
  136:22 137:5,14
  137:20,24 138:3
  138:6,8 139:1,7
  139:17,20,24
  140:8,21 141:6
  141:10,23 142:19
  142:20,21 143:15
  143:17,17,22,24
  144:3,10,13,14
  144:21 145:7,17
  145:22 146:12,19
  147:6,20,23
  148:6,24 151:5
  151:23 154:5,14
  155:6,6 156:3,22
  157:22 161:8,8
  162:11
**painful** 110:16
  119:17 120:4
  158:13
**palpable** 100:21
  118:3

**palpating** 102:13
**palpation** 64:19,24
  65:24 102:4
  111:20 119:16,18
  120:4 133:6
**pan** 152:9
**paper** 138:7
**papers** 137:7
**paragraph** 53:11
  66:22 79:10
  82:17 104:4
  106:24 113:19
**parq** 66:23
**part** 18:20 30:8
  58:7 73:23,24
  91:2 112:20
  113:4 114:3
  115:21 143:8
**particular** 20:8
  154:7
**partner** 91:24
**party** 91:8
**pathologies** 18:11
  26:10
**patient** 14:4 18:5
  38:14 39:21 40:3
  43:5,13,19 44:4
  53:21 61:8 65:16
  79:13 84:15 86:6
  86:12 101:8
  112:16 126:24
  127:3,6,7 128:23
  129:3,5 141:19
  151:18,21 154:7
  161:21
**patients** 61:2 84:13
  90:2 103:4 128:8
  129:17,21,22
  137:18,19 139:6
**pelvic** 1:4 6:20
  13:5,20 30:13,15
  33:6,10 34:7 36:6
  37:15 39:4 42:3
  43:1,6 44:1 45:21
  46:19,24 47:2,10
  51:9,11,13,14,16

51:20 56:11,16
  56:24 57:3 62:9
  62:23 63:15 64:4
  64:8 68:16 91:20
  91:23 94:8,17
  95:17 98:20 99:8
  101:21 109:20
  111:11,21 112:7
  112:10,12,13
  115:7 117:12
  125:9,11 144:3
  147:19 148:5,6
  148:22,24 150:4
  151:5 153:19
  154:14 155:5,6
  156:3,20,22
  157:22
**pelvis** 97:19 98:20
  143:20
**pending** 126:21
**people** 129:9
**percent** 60:6 61:4
  65:7 103:1
  129:16 134:10
  139:1 144:23
**percentage** 35:18
  35:22 36:12,14
  59:24 60:12,15
  60:21
**perfectly** 140:24
**perform** 163:22
**performed** 25:3
  44:5 48:22 66:2
  88:12
**performing** 130:4
  163:11
**perigee** 157:8
**period** 28:16 92:9
  112:2 137:4
**periodically** 125:2
**periods** 133:3
**perioperative**
  115:18
**permanence** 116:8
**permanently**
  81:10 87:7

**persistent** 68:6
**personally** 24:23
  26:15 27:12
  118:17 134:9
  155:19
**pertinent** 153:10
**ph** 1:22
**phillipe** 138:23
**phrase** 58:19
**physical** 53:9 99:4
  103:24 108:4
  111:18,19,23
  112:7,17,19
  113:20 114:19
  115:6 119:9
  123:1 124:23
  125:1 132:17
  146:4 162:1
**physician** 35:9
  77:10,12 80:8,10
  149:9
**physicians** 20:15
  20:21 23:22
**physiologic** 34:20
**picky** 80:8
**pinpoint** 102:4
  110:23 143:22
  161:8
**place** 24:11,17
  80:23 82:8 85:18
  87:20
**placeholder** 4:12
  164:17,22
**plain** 81:23
**plaintiff** 2:6 24:10
  24:16 33:5 34:11
  62:20
**plaintiffs** 1:8 35:9
  152:17
**plan** 77:2 80:1
  112:20 113:19
  114:4 115:21
  121:17
**play** 125:12
**playing** 59:12
  102:15 117:6

**plays** 115:23
**please** 7:7,16 167:3
  167:8
**plummeted** 39:17
**plus** 37:2 42:10
  43:5,8 57:19 63:7
  63:18 71:7 155:3
**point** 17:18 23:13
  23:13 26:13
  32:24 37:9 41:1
  41:16 59:18 73:4
  81:3 83:24 84:22
  85:14 91:19 94:7
  94:21 95:6,7
  98:15 101:23
  103:6 106:9
  119:10 124:20
  125:8 129:8
  130:8 134:15
  138:11 153:7
  163:10,24
**points** 40:23 65:9
**polypropylene**
  37:21 38:19
  39:24 152:4,23
**poor** 84:15 126:23
  128:3,14 136:14
  138:8
**poorly** 146:8
**pop** 153:4,8,19
**pore** 153:20
**position** 40:12,15
  40:20 59:21
  60:18
**possible** 46:5 65:1
  65:19 74:8 75:4
  84:20 156:19
**possibly** 126:17
  152:10 161:7
**posterior** 55:18
  103:20 104:6
  108:23 109:10,18
  109:19 110:9
  148:12 152:12
**postmenopausal**
  82:3 88:8 108:8

108:12
**postop** 72:17
  131:16 132:23
**postops** 137:3
**postponing** 134:13
**potential** 48:3
  57:16 60:21
  63:21
**potentiality** 32:9
**potentially** 81:11
**practicetype**
  103:12
**practitioner** 99:11
  99:15,22 101:2
  103:12,15,19
  107:12
**preceded** 135:15
**preexisting** 48:17
  160:24 161:15
**pregnancy** 129:14
**premarin** 90:4
  91:14
**premenopausal**
  87:16
**prepare** 23:17
**preparing** 27:5
**prescribe** 81:23
  99:19
**prescribed** 81:16
  89:12 107:11
  133:24
**prescribes** 133:21
**prescribing** 90:13
**prescription** 89:20
**presence** 33:12,18
  34:21 36:15
  83:11 85:8 86:3
  88:3 126:19
  127:14 128:17
  142:1,12
**present** 2:21 28:18
  76:16
**pressure** 51:4,9,16
  109:16,22
**pretty** 98:16 99:23
  120:2,11

**prevent** 114:18
**previous** 3:15
  27:15,24 28:6
  151:7 158:19
**previously** 10:19
  10:24 158:18
**princeton** 1:16,16
  2:11,12 6:17
**printing** 96:18
**prior** 15:1 25:2,14
  37:12 45:12
  46:21 48:12,18
  49:9,18 75:8
  78:14 79:20
  80:18 85:20,21
  87:1,18 92:1
  107:11 111:8
  140:8 142:19
  145:8 162:5,9
  163:23
**probably** 38:8 83:9
  115:23 127:13
  141:22 142:6
**problem** 39:7 41:7
  55:18 70:24 90:7
  102:19 104:19
  118:24 119:1
  147:16 154:5,23
**problems** 38:5,10
  38:14 67:23 70:9
  73:9 92:4 118:7
  129:14 135:2
  136:2 151:12,15
**procedure** 45:20
  45:24 46:7 48:4,5
  54:21 55:1,15
  66:24 71:3 88:11
  89:3 116:6,12
  118:19 125:24
  130:3 151:18
  152:18
**procedures** 47:21
  48:13 56:5 67:22
  115:4 116:10
  127:12 149:6
**proceed** 7:8 25:13

**proceeded** 125:14
**process** 8:10 88:4
  128:15 162:18
**produce** 10:11
  15:3
**produced** 9:19
  82:10
**producers** 59:8
**producing** 85:16
**product** 13:24 30:4
  30:12,16 37:7,9
  37:10 38:11,16
  41:4 53:20,24
  55:7,24 56:2
  58:15 60:20
  61:17 62:22
  63:14 81:10 87:8
  107:4 117:18,23
  149:18,19,20
  154:2 157:5
**production** 5:10
**products** 1:4 11:2
  14:2 30:10,20
  31:8,12,23 39:4
  56:7,11 62:10,16
  63:4 71:11 158:5
  159:13
**prognosis** 136:11
  136:14
**progress** 147:13
**progressed** 103:9
**progression** 116:8
  142:24 143:6
  148:11
**progressive** 56:3
  60:14 64:7 68:19
  149:4,11 151:9
  159:8,17 162:11
**progressively**
  78:23
**prolapse** 30:13
  37:16 42:4 43:1,6
  43:9,10,12,14,21
  51:11,19,22
  54:18 55:12,16
  56:12,17 103:17

103:21 104:7
  108:23 109:2,11
  109:13,18,19
  110:9,10 147:13
  148:6,12,22
  150:4,6,13
  151:22 153:19
  154:10 156:20
  159:19,24
**prolapses** 52:9
  54:4
**prolift** 30:11,12
  31:4 157:4
**pronounce** 23:2
**pronouncing**
  106:1
**properly** 40:2
  72:18
**prophylactic** 55:14
**propounded** 169:5
**protein** 63:9
**provide** 10:15
  11:15
**provided** 10:19,20
  11:1,22 13:4,13
  13:19 14:15 22:3
  22:3,4,17 27:11
  27:16,18 30:19
  31:8,22 56:8
  70:15 164:18
**provides** 100:7
**psychological**
  161:5,22
**pt** 113:20 115:14
**public** 169:14
**pull** 72:13 84:3
**pulled** 118:1
  156:17
**pulling** 155:15
**pump** 60:1
**pursuant** 1:14
**put** 41:24 85:23
  87:8 93:24 95:4
  97:20 98:21
  101:1,7 144:17
  144:19 148:9

155:18
puts 98:21
putting 87:2

**Q**

qualifiers 148:9
quality 84:13,16
question 5:20 6:7
10:6 16:2 56:15
84:11 86:5 120:6
135:23 145:3,19
154:18 156:1
questionable 146:6
questionnaires
128:9
questions 7:24
87:14 160:8
164:9 169:4
quick 160:9
quite 36:24 54:22
88:13,16 90:4
quote 73:18 78:19
82:21 89:11
98:20 100:20,22
126:5 132:2,5,10
132:11,14
quoted 79:10

**R**

r 1:3,9 6:19 7:21
10:21 12:14
13:21 168:1,1
radiate 143:19
radiates 144:14
radiating 144:11
radiculopathies
144:1
range 16:8
rank 106:20
rape 162:1
rare 45:24 61:7
rarely 39:15
rate 144:24 152:10
152:13
ratio 118:20
reaction 39:9
85:24 158:4

read 57:23 59:6
61:19 79:11 83:1
116:19 119:2
167:3 169:3
reading 100:11
136:17
real 99:7
really 54:11
107:22 112:21
126:15 146:17
realm 52:8
realtime 1:18
166:11
reason 7:23 81:20
91:2 104:4
107:19,23 119:7
119:11 122:23
152:2 167:5
reasonable 137:12
137:23 141:14,17
142:11
reasons 87:12
91:12
reassurance
123:12
recall 11:13,16
13:12 25:5 29:9
31:2 67:3,5 88:23
101:14 140:5
156:14 157:23
163:3
receipt 167:17
received 62:21
recess 104:24
160:16
recollection 14:18
74:5
recommended
80:22 82:12,18
112:22
reconstructive
44:1
record 3:18,20,22
6:11,22 7:17 9:18
12:18 15:2 27:15
27:21 31:16

44:15 45:1 46:23
47:8 48:17 50:8
52:18 53:1,5
74:24 76:12
89:14,15,23
92:14 93:4,6
94:24 96:6 97:18
98:7 104:21
105:4 113:5
159:24 160:13,20
164:15 165:6
166:6
records 4:7 9:20
18:4,23 19:24
20:2,9,23 21:22
26:6,8,17 27:10
34:2 47:12,14
48:11 50:3,12
52:15 54:18
71:21 72:3 73:7
73:24 74:4 76:5
78:16 91:19 92:6
94:24 95:12 96:2
105:9,16 106:6
110:5 122:17
134:22 144:13
145:21
rectocele 49:4,21
50:23 51:3 52:2
53:13,15 103:5,7
103:9 109:4
110:1 111:16,20
147:10,19
rectum 109:16
recurrence 151:13
151:16,22 152:6
reduce 47:23 81:12
115:11
reduction 112:17
reed 1:15 2:9
reedsmith 2:13,18
refer 25:4 117:20
158:3
reference 66:19
92:13,23 94:13
94:16 95:3 106:5

106:6 123:4
130:11 131:10
158:13
referenced 32:4
referred 111:5
referring 14:20
22:24 40:14 75:1
97:18,23 111:8
115:10 117:24
132:16
refers 116:2
refute 163:24
regarding 9:21
11:9 66:24
regardless 70:6
regards 29:2
region 66:6,7
regular 107:8
rehab 115:7
reinforced 21:12
21:13
related 32:17 34:6
35:11,19 37:6
65:2 69:12 94:21
95:9 98:17 99:9
109:13 110:8
111:16 117:21
118:7 119:13
142:23 147:18
158:5 162:22
relates 1:6 88:18
162:20
relationship 34:20
relatively 150:13
released 153:17
relevant 159:4
161:19
reliance 17:12
18:13 27:7,9
relied 18:15 70:6
relief 100:7 139:8
rely 69:21 70:16
158:19
remains 124:13
remember 92:22
101:15

removal 33:19
34:8
remove 35:6 88:13
118:11,18 146:10
removed 82:8
126:4 143:9
removing 118:6
120:14 124:4
144:21
reoperation
152:13
repair 1:4 52:1
54:22 55:8,12,13
55:16 76:19 84:9
87:5 102:20
147:10 148:5,20
149:12 150:7
151:10 152:10
153:5,8
repaired 55:17
110:2,6
repairing 55:11
repairs 87:4 128:4
148:23 154:9
repeat 10:8 31:17
rephrase 103:6
report 3:14 4:11
11:1,17 14:6
16:22 17:3,9,12
17:14 18:13,16
19:21 20:13 21:6
21:10 22:10,21
23:8,11,14,20,23
26:3,11,21 27:1,5
27:17 29:21 32:6
33:9 41:18 42:22
46:2 57:14,24
64:15 65:18
66:20 69:2 73:20
75:1 78:12,20
79:2,4,11,20,24
80:17,19 83:16
94:13,14 97:23
100:6 106:7,18
111:3 113:3
117:20 123:3

130:10,13,18
131:1,9,22,23
133:9,11,20
136:9,16 139:22
140:5,13,15
148:20 153:3
157:19 158:2
163:3
**reported** 49:23
71:9 92:10 162:4
**reporter** 1:18 6:23
8:20 166:11,21
**reporting** 78:18
122:3
**reports** 10:20
15:19 19:1 26:5
46:15 54:13
61:10 77:24
80:21 106:5
**represent** 7:14
**representing** 2:6
2:18
**reproduction**
166:19
**request** 5:10 19:23
20:1 82:9
**requests** 9:15
**require** 145:3
147:1,9
**requiring** 34:8
**researching**
156:18
**reserved** 6:7
**respect** 30:24 33:2
54:15 101:20
**responds** 121:21
122:5
**response** 99:24
141:2 158:5
**responsible** 35:15
36:2,5
**responsive** 9:20
**rest** 104:12
**restarting** 82:13
82:18
**result** 147:19

148:6 159:12
**resulting** 33:11
**results** 128:24
**retained** 7:20
10:14 11:14 13:8
**retention** 51:6,7
**retraining** 146:5
**retread** 69:9 156:6
**retrospect** 28:13
**return** 137:14
167:15
**returned** 78:8
159:21
**returns** 146:19
**review** 12:24 18:8
19:2 21:14,23
22:1 24:12,21
26:5 58:8 64:17
66:15 67:1
**reviewed** 19:11
22:8 23:8 24:16
67:4 110:4 117:7
117:8
**reviewing** 15:19
18:4 19:19 21:9
22:21 23:20,21
26:16 122:17
**reviews** 14:4
**revision** 19:9 164:4
**rid** 124:16
**right** 8:7 10:17,22
11:3 16:16 20:16
22:19 24:18,24
30:22 32:1 33:16
34:9,13,17,18
35:4,12 38:24
41:13,17 44:8
46:11 48:19,22
49:5,9,17 51:12
52:2 70:11,17,19
71:20 72:10,19
72:23 73:2,21
74:3 77:3,10 78:9
78:17,24 82:15
84:13,18 87:6
88:9,14,20 89:3

92:11 94:10,22
97:7 99:12,17
100:17 106:7
107:4,12 108:9
108:13,18 109:5
110:3,9,16 111:2
111:13 115:14
116:13 118:17
119:11,14 121:20
122:1,4,16 123:7
125:18,24 126:5
127:19 129:4,18
129:24 131:21,23
133:10 136:11,18
136:24 140:9
146:21 147:17
148:1,7 149:1,7
149:19 152:18,23
156:13 157:24
159:13 160:4
161:1 164:7
**rights** 87:9
**ring** 108:24 109:7
**risk** 39:4 46:4
56:23 59:20 60:1
60:22 61:4,24
62:8,14 63:11,15
64:2 81:6,12
82:23 83:7,22
84:1,24 85:6 86:7
86:19 116:23
118:20,21 128:13
129:7 146:14
148:24 149:8
151:4 152:5
154:14,24 156:2
156:10 157:15
**risks** 55:23 56:5,13
56:18 57:7,16,19
57:22 60:10,19
61:21 67:20,21
68:2,16 71:3
148:5 149:5,10
157:10,21 158:9
158:17 159:3,6,9
159:11,15

**risky** 118:12
**role** 102:15 115:23
125:12
**roll** 118:2
**rolling** 42:17
**rough** 147:11,14
**roughly** 28:17,19
29:9 39:20 78:13
138:24 147:12
**route** 150:11
**rule** 32:8,11 64:21
65:7 102:22,24
144:10
**ruled** 26:22,22
32:14,14,15,16
32:22 47:1 65:20
102:11
**rules** 8:10
**ruling** 18:10,11
26:9,10

_____

**S**

**s** 1:14 3:4,8,12 4:2
7:3 9:6 30:11
169:8
**safe** 40:8 134:15
135:14,20
**safer** 148:18
152:20
**sake** 8:19 95:19
101:7
**samples** 89:19,21
**saw** 71:8 81:4 92:9
95:12 99:10
**saying** 19:19 36:11
36:17 57:17
63:13 75:9 86:9
102:14 127:22
128:16 137:11
141:13 142:10
144:17 147:3
154:6
**says** 28:23 29:1
50:21 53:11
59:19 66:23
78:12 79:2,13
97:4,6,12,19

106:24 107:7
113:19 132:11
141:8 142:18
145:9
**scale** 106:15,19
**scar** 46:11,12
113:22 114:8,13
**scarcello** 2:3 12:6
12:15 15:6 16:1
36:20 60:23
62:24 74:11 80:3
90:14 135:3
136:3 156:23
163:17 164:10
165:3
**scarification** 69:15
116:24
**scarring** 39:8
67:22 101:6
114:18 115:12,24
116:5,24 117:11
117:15,17,21,23
125:18,20,23
128:20 143:1
**scenes** 158:23
**scores** 106:22
**sealing** 6:4
**second** 72:14 124:1
**secondary** 112:15
**section** 67:20
**see** 34:1,2,3 42:14
46:23 47:7,13,13
48:10 50:24
53:17 54:17 66:5
69:20 71:4,21
75:13 77:17 78:8
79:16 89:15
92:18,24 94:3
97:13 100:7
107:6 124:9
126:6 132:8,17
133:1 134:21
139:21 140:1
141:5 148:14
149:3 151:12,13
151:14 154:22

162:6,13
**seeing** 42:16 92:22
128:10
**seen** 9:11 16:5
24:14 60:7 81:13
83:4 84:3
**sees** 49:24
**sensation** 51:5
**sense** 77:23 109:21
132:19
**sent** 14:13
**sentence** 66:21,22
79:12
**sentences** 53:10
**separate** 26:19
147:16
**separately** 27:18
**separation** 131:19
132:5,11
**series** 38:4,6
**serious** 112:23
**services** 1:22 6:13
**set** 26:19
**sets** 63:5
**seven** 143:13
159:23
**sevenhour** 16:8
**severe** 86:12 87:1
106:17,20 161:3
**severity** 47:23
51:18 56:3 64:7
68:19 70:8,22
116:8 148:11,14
149:3,11 151:8
159:7,16 162:12
**sex** 110:16
**sexual** 51:17 67:23
78:22 102:7
107:16 110:18
135:23
**shawn** 99:11
**sheet** 167:7,9,12,15
169:6
**shes** 48:14 59:19
73:8 78:18 85:14
86:1 95:8 101:15

106:10 107:21
108:18 111:5
114:16,21 115:1
115:2,8,9 122:17
134:13 142:7,21
146:24
**show** 84:4
**showed** 134:8
**shown** 21:2 63:20
117:14 125:12
**side** 96:21
**sign** 72:21 167:8
**signed** 17:10 20:13
22:9
**significant** 21:3
23:10 33:24
38:13 41:5 44:12
49:3,20 52:9
53:12 54:18 61:6
63:10 112:16
152:16 154:4
**significantly** 19:22
21:5,8 35:23
**signing** 167:10
**similar** 36:24
38:23 66:8
149:18 162:9
**single** 22:6
**sit** 144:9
**site** 122:8 161:9
**sitting** 156:13
**situation** 55:6
120:13 149:22
155:23 157:14
**situations** 39:22
**six** 15:21 123:19
134:11 143:13
150:7 159:23
**slash** 75:14,14
**slight** 8:16
**sling** 30:7 38:17,24
39:2,11 41:11
55:8 93:23
100:20 102:13
107:1 130:4
153:2,6,10,15

**slings** 37:20 38:2
39:6,24 56:17
57:4
**slow** 127:3
**slowly** 42:17 85:11
**small** 45:24 46:1,4
132:2,11 133:17
135:8
**smartmouth** 163:7
**smith** 1:7,15 2:9
6:19 7:21 11:10
14:10 15:5 17:17
24:10,24 25:9,20
32:4 33:5 37:2
44:11 62:17
69:13 71:14
84:21 85:4 86:13
89:19 91:22
92:18 101:9
112:20 115:13
124:19 128:16
129:3,8 134:23
138:16 139:16
143:16 146:1
154:7 159:5,12
160:24 163:12
**smiths** 33:2 41:9
46:19 70:12
136:11 155:22
**smoker** 84:7
**smoking** 83:22
84:1,12 85:1
**solo** 43:8
**somebody** 100:12
101:9
**soon** 112:23
**sorry** 19:15 27:8
29:3 38:23 45:6
73:16 74:12,19
78:5 79:21 99:11
100:14 105:12
113:12 114:11
120:18 139:12
140:16,17 153:23
**sort** 143:23 144:15
162:2

**source** 102:19
118:23 154:23
**south** 2:16
**southern** 1:1
**southwestern**
138:24
**space** 65:4 167:6
**spasms** 125:11
**speak** 40:11 59:5
71:1 99:21
**speaking** 123:14
**special** 8:17
**specific** 14:18 15:5
17:16 33:2,21
51:19 56:8 64:6
65:22 67:5 68:7
70:12 86:15
88:22 92:24
102:3 110:23
117:18 126:2,8
140:5 143:21
152:21
**specifically** 11:8
14:9 22:23 23:17
32:3 60:12 66:12
69:12,14 78:3,7
85:3 88:23 94:5
119:4,22 154:1
158:3,8
**specifics** 43:23
44:17 49:15 60:4
101:10 103:13,16
140:11 148:2
**speed** 127:4
**spent** 12:4,13 14:9
15:8,14,16,21,23
15:24
**spoken** 25:19,22
**spotty** 31:17
120:19
**stage** 109:2,3,4,8
150:5
**stand** 55:2
**standard** 27:2 40:1
40:5 41:10,20
42:2,7,9,20,24

43:4,15 55:3 91:7
99:23 149:24
150:7 155:24
**standing** 52:11
**start** 8:24 79:21
139:12 148:17
**started** 38:7
**starting** 32:24 33:9
48:23 99:16
104:3
**state** 1:18 7:16
40:13 63:22
66:13 70:5,19
72:3 100:5
103:20,21 115:8
137:22 139:22
141:16,16,21
154:1 167:5
**stated** 8:2 22:16
35:3 42:21 56:16
62:6,12 63:3
69:17 94:24
95:15,16 125:4
138:1 158:10,18
158:20 159:14
**statement** 32:20
40:15,20,22
95:21 99:2
149:15 161:24
**statements** 40:12
**states** 1:1 49:6
62:19 66:21 73:8
79:13 81:9 97:8
97:15 106:9
107:17,24 108:14
110:13 114:1
115:17 118:15
121:18 122:9,14
122:19,22 123:2
125:19 133:24
145:21
**stating** 94:23 95:18
95:19 98:23
110:5 140:6
**stay** 90:8
**stenographic** 6:22

stephen 7:18
sterility 45:17
steroid 127:8
sticking 132:19
stipulated 6:2
stipulations 5:15
stones 68:6
stool 51:7
stop 81:22 138:5
stopped 38:15 81:2
  91:2
story 162:2
street 1:15 2:10
stress 30:16 41:12
  56:12 73:5 107:2
  130:5 148:21
  150:21
stretching 115:5
strike 43:1 116:3
stronger 84:9
studied 41:3 61:9
studies 143:5
stuff 69:4
subject 59:6 103:3
  137:8,18 167:10
submission 15:9
submitted 12:21
  16:15
subscribed 169:10
subsequent 24:9
  77:24 79:12
  110:2
substance 169:6
success 125:13
  138:8
successes 65:13
successfully
  110:20
sufficiently 60:20
suggesting 75:19
  161:18
suggestion 79:19
  79:23
suite 1:15 2:4,11
  2:16
summarized 33:8

summary 21:20,21
  21:22
supervision 166:21
supplemental 21:6
support 5:2 163:23
supported 19:22
  49:4 53:14
suppose 84:19
supposed 81:14
sure 27:20 32:19
  34:4 44:16 46:2
  56:14 77:20
  121:15 160:11
  164:16
surgeon 40:3
surgeons 19:9
  118:14 146:13
  155:18
surgeries 129:22
  147:1,18
surgery 34:22 35:6
  44:1 46:22,22
  47:5 48:12 49:9
  49:12,16,19 55:9
  71:15 72:10 82:3
  85:20,23 87:16
  87:18 112:22
  113:21 114:7,14
  115:14 118:12
  124:16 132:24
  136:23 139:2,7
  146:9 147:7,10
  147:13 154:9
  162:5 164:4
surgical 45:10
surgically 82:21
suspect 16:6
suspicion 102:12
suture 150:7
sutures 150:1,8
  155:24
swear 6:24
switched 38:11
sworn 7:4 122:16
  166:5 169:10
symptomatic

109:10
symptoms 51:2,9
  54:19 94:8
  109:12,18 110:8
  110:10,12
system 1:4
systems 157:7

## T

t 3:8 4:2 168:1
tablets 89:13 90:1
  91:6
take 14:16 26:15
  104:10 107:20
  160:9
taken 1:14 105:1
  160:17
takes 87:23
talk 8:19 18:6
  65:22 66:8 68:9
  72:7
talked 56:6 61:20
  117:3 153:4
  157:19 160:23
talking 18:5 43:22
  56:2 57:3 66:6
  85:7 86:11,13,15
  113:7 114:17
  115:2,5,9 116:16
  127:10 135:7
  147:21,24 157:2
  157:3,5
talks 138:24
teaching 59:4
technically 43:24
  49:10
technician 6:10 7:7
  104:20 105:3
  160:12,19 164:12
  165:4
teleconference
  2:15
telephone 128:9
tell 28:15,21 60:10
  61:3 62:3 103:16
  111:19
telling 75:19 145:5

tells 119:20
tend 110:10
tended 22:5
tender 119:16
  122:1
tenderness 64:24
  65:23 98:13
tendertopalpation
  109:23 110:23
tends 90:4 146:11
term 21:8
terms 70:11
  101:19 148:4
testified 7:5 29:10
  29:11 61:24 62:7
  62:13 116:23
  119:4,23 136:21
  158:8,16
testifies 122:12
testimony 3:4,15
  4:9 10:16,21 12:7
  13:1,4,14,20
  20:20 27:16 28:1
  28:6,8 31:1 37:12
  61:20 69:10,21
  71:5 119:3 120:9
  120:16,21 121:2
  122:16 127:19
  136:17 139:10,14
  140:2 151:7
  157:20 158:19
  159:1 163:16
  166:7
thank 31:19
  135:22 165:2,3
thatday 122:11
thats 16:9,17 18:14
  22:18 23:6,12
  24:6 29:3 38:5
  40:13,16 41:6
  44:13 45:16,24
  49:23 58:20
  59:11,16 61:8,9
  62:5,11 64:22
  65:9,14,24 71:8
  71:16,24 72:6

73:19 74:5 75:7
  78:15 79:1,10
  80:20 83:7,10
  85:1 86:3,17
  95:15,21 96:1,18
  97:8,14 99:3
  100:11 104:18
  106:17 107:24
  108:14 111:7,10
  111:17,22 113:24
  114:2,3 116:14
  117:12,24 118:17
  121:24 122:9,14
  122:18,22 123:2
  123:9 127:22
  129:15,18 131:14
  131:18 132:15
  133:12,19 138:4
  138:6,15 140:22
  140:23 141:3,23
  143:22 147:14
  148:21 150:16
  152:21 153:10,19
  154:6,17 158:24
  161:9,10,16,23
  162:2,16 164:8
theoretical 86:11
theoretically 85:8
  85:16 108:20
  150:12 155:1
theory 84:19 135:7
  147:22,24
therapy 112:7,17
  112:19 113:21
  114:19 115:6
  124:23 125:1
  146:5
theres 15:17 19:7
  26:19 38:6 39:19
  47:8 80:5 83:18
  87:17 91:19
  100:23 104:6
  107:22 116:11,21
  117:10 118:4,7
  119:12 121:14
  122:15 123:4,12

126:22 129:7,10
132:10 133:17
145:10 148:10
149:5,13 155:20
157:8 159:3
161:24 163:8
**theyll** 115:3
**theyre** 8:2 40:4
62:4 115:5 118:1
128:7
**thick** 119:16 120:3
**thin** 126:15 128:19
**thing** 29:1 48:7
58:20 91:16
99:23 155:9
**things** 51:24 68:9
68:20 72:7 81:22
152:1 155:16
161:17
**think** 10:6 25:16
48:16 51:8 60:3
61:10,15 67:8
72:8,12 73:23
76:3 82:20 86:5
89:16 90:9 96:18
104:2 111:7
114:21 115:22
118:23 124:14,18
129:18 130:15
131:13,19 132:4
135:22 140:18
155:8,20 164:8
165:2
**thinking** 115:2
**thinning** 82:6 85:4
85:10 86:2 87:21
102:2 129:1
**third** 82:17 106:23
147:12 155:8
**thirty** 167:16
**thoroughness**
101:7
**thought** 74:13
114:4 140:17
**three** 12:1 30:1,2
53:10 72:4

155:10
**thrilled** 139:8
**throws** 157:13
**time** 6:8,15 11:17
12:4 14:9,21 15:9
15:13,23,24
16:12,16 18:16
18:22 19:5,6,7
20:12 26:14
28:16 29:18 38:9
41:8,16 44:6 47:3
52:11 54:15 55:8
62:9,16 77:6 82:2
83:6 85:15 87:15
88:1 90:13 92:9
95:2,6,7 99:20
100:17 103:8
104:21 105:6
110:2 112:2
119:10 123:1
134:16 142:7
147:4 153:2
154:13 160:13,21
165:7
**timeframe** 11:19
15:11 134:12
**times** 8:7 21:7
**timing** 77:22
**tissue** 46:11,13
82:6 84:13,16
85:5,10 107:15
113:22 114:8,13
126:15,16,22
128:14,14,19
132:3,7,21 133:1
133:18 135:9
150:23,23,23
151:2 155:4
**today** 7:20 8:1
9:12 10:11 11:8
17:21 23:18 24:3
24:7 39:14 93:20
97:5 144:10
146:23 164:9
**todays** 6:14 164:13
165:5

**told** 14:14 139:5
**tolerate** 91:11
108:20
**top** 11:24 77:18
93:18 143:12
156:14
**total** 12:3 15:22
**totality** 65:15
**touched** 119:10
**transcript** 24:13
120:17 166:18
167:17,19
**transcription**
169:4
**transobturally**
38:22
**transobturator**
38:17,23 39:2
**transvaginal** 37:15
56:7,11 62:21
128:4,24 150:17
156:12
**trauma** 162:1
**tread** 11:6
**treat** 30:13,16
41:12 42:24
43:12 44:3
**treated** 65:12
82:20 110:19,20
**treating** 20:15 35:9
41:19
**treatment** 42:3
150:3,20
**tremendously** 56:4
**trial** 6:8 25:14
29:14 100:6
163:15,21
**trials** 153:16
**trigger** 125:8
**trigone** 125:21
**trim** 94:1
**trouble** 90:24
91:12,15 110:15
**true** 57:10 58:23
166:6
**try** 11:6

**trying** 59:18 90:17
118:16
**tubal** 45:13
**tubes** 45:17
**turn** 45:8 73:23
108:3 113:2
142:14
**turned** 14:5
**turning** 32:3 74:7
85:3
**turns** 74:14
**tv** 93:22
**tvt** 31:10
**tvto** 30:11,15 36:2
**tvtsecur** 31:10
**two** 23:22 30:11
39:17 49:10,13
49:18 100:6,9
124:7 131:15
132:24 134:6,13
135:13,16,17
151:24 162:7
**type** 21:22 25:8
27:8,12 45:21
46:6,12 48:3 56:1
58:20 102:15
108:16 112:11
115:14 116:5
117:12 125:23
150:17 154:20
**typed** 27:9
**types** 48:6 81:21
137:19 148:23
**typewritten** 77:18
**typical** 8:14
**typically** 8:11

---

**U**

**ubj** 125:21
**ultimately** 70:19
**uncommon** 52:12
55:14 81:19
**undergo** 147:7
**understand** 7:19
7:24 9:17,24
32:24 33:22 37:8
37:11 57:13

60:19 127:18
158:24 163:15
**understanding**
8:20 9:23 11:11
15:22 25:11
37:13 90:12
**understood** 10:6
**underwent** 76:18
**unfortunately** 95:1
104:1 139:5
**unique** 39:21
63:17,19 157:12
**united** 1:1 118:15
**unquote** 73:18
98:20
**unrelated** 147:18
**urinary** 30:16
41:12 56:12 73:5
107:2 130:5
148:21 150:21
**urine** 51:6
**use** 43:23 69:18,22
90:3 107:7 108:1
115:3 127:8
149:24 150:22,23
150:24 151:3
**uses** 88:15 89:8
**usual** 18:20 21:16
71:17 134:12
**usually** 18:5 47:21
47:22 57:10 90:2
102:8 110:19
117:24 137:4,10
138:3
**ut** 138:23
**uterine** 47:22
**utilizing** 150:17

---

**V**

**v** 1:9 17:12
**vagifem** 89:13,19
89:22 90:6 91:15
**vagifems** 89:24
**vagina** 51:22 90:1
102:2,3 108:12
114:18 115:12
127:11 128:11

Daniel S. Elliott, M.D.

134:1 162:21
**vaginal** 33:10 49:2
65:10 74:1 78:13
82:6 85:5,5,10,22
86:6,23 87:10,17
87:23 88:7 89:5,9
90:18,22 91:9
92:20 99:16
100:2,8,19
101:16,22,24
102:14,18 107:14
107:15,18 109:15
110:15,21 112:1
114:17 115:2,4
115:10,18 116:4
116:5 123:6,17
125:23 126:15
127:12,16,19
128:1,3,24 129:1
131:17 132:12
133:14 134:23,24
135:24 152:11,21
**vague** 59:24
**variable** 52:13
116:21 157:14
**variables** 116:12
149:14
**variations** 127:5
**various** 18:11
26:10 63:3 115:3
142:2
**vary** 52:9 54:5
56:4
**varying** 39:7 56:21
57:2,5 64:7 65:5
116:7,18 117:17
126:1 148:10
157:16
**vasectomy** 45:18
**vault** 65:3,10,24
144:4 152:11
**versus** 6:19 28:23
35:20 144:5
**viable** 124:17
**video** 6:10,16 7:7
8:16 104:20

105:3 160:12,19
164:12 165:4
**videographer** 2:22
6:12
**videotape** 1:14
**videotaped** 3:11
9:5
**village** 1:16 2:11
**virginia** 1:1
**visit** 4:6 50:17
96:10,21 105:24
111:2 130:11
132:15 139:12,15
**visits** 72:17
**voiding** 33:15,17
33:24
**volume** 35:23
36:15 82:10
144:19
**vouch** 100:3

---

### W

**wagstaff** 2:3 10:15
11:14 12:21 13:9
14:13 18:22
27:11 31:5
**wait** 29:3 134:9
147:4
**waited** 135:19
**waived** 6:5
**wall** 74:2 89:5,9
90:18,22 119:17
120:4 129:1
135:1,24
**want** 10:8 19:16
27:19 31:17
32:19 34:4 43:11
56:14 69:9,11
75:23 86:24 90:9
101:11 104:14
156:6 164:16
**wanted** 72:7 73:23
**warned** 86:18
**warning** 70:2,15
**warnings** 69:1
**warns** 69:14
**warrant** 148:2

**wasnt** 20:7 27:17
122:7 124:19
159:4 161:18
**watch** 128:8 147:4
**waugh** 105:24
**way** 21:4,11 66:13
90:7 118:17
149:16,23 152:9
**wcllp** 2:6
**wed** 23:12 40:24
120:8
**weekend** 29:18,21
**weeks** 50:1 132:24
134:6,12,13
135:13,16,17
**weight** 153:20
**wellbeing** 162:18
**wellknown** 57:7
**went** 135:15
**west** 1:1
**weve** 17:7 60:6
99:7 104:8 117:3
163:3,5
**whats** 85:19 96:1
141:9,12,15,18
158:22 164:2
**width** 119:18
120:5
**wish** 141:3
**witness** 3:15 5:5
7:1 12:9,17 16:3
19:11 28:1 36:22
61:1 63:2 74:12
74:18,21 76:15
80:5 90:17 93:13
104:13,18 105:19
113:11,16 121:5
131:4 135:5
136:5 157:1
160:11 163:20
166:5,7 167:1
**woman** 43:9 52:10
152:15
**womans** 82:23
87:6,9
**women** 66:4 68:10

68:12 81:19 90:5
91:10 147:12
**wonderful** 138:14
138:15 139:4
**wont** 8:13 9:15
23:1 80:13
110:22 114:7
125:5
**word** 61:6 89:8
**words** 69:18 88:15
**work** 13:16,23
14:2,12 18:3
138:9 146:11
**worked** 146:8
**working** 107:1
**worrisome** 139:23
161:16
**worry** 87:3
**worse** 78:23
106:20 146:12
**worsens** 161:17
**wouldnt** 54:8,9
140:12 142:22
147:22 150:13,14
151:4 154:13
156:2
**wound** 67:22
128:11
**write** 26:6,11,19
**writer** 75:12
**writing** 75:8
**written** 77:9 137:7
**wrong** 42:16 54:8
61:17 72:13
114:22 138:14,15
139:3 141:3
**wrote** 75:22
136:16
**wyndham** 79:20
79:24

---

### X

**x** 3:2,8 4:2 61:4

---

### Y

**y** 61:4
**yeah** 19:6 23:12

60:5 61:1 70:18
78:15,15 79:1
80:5,11 82:16
97:8 101:24
132:9 140:4
141:11 145:18
**year** 14:13 39:17
39:19,21 71:19
71:23 72:4 75:8
85:21 87:14,19
107:11 122:12
**years** 11:4,18
38:12 69:8 87:24
87:24 88:1 139:9
143:5,5 162:6,12
**youd** 93:15 121:8
121:10 142:14
**youll** 15:2
**youre** 7:19 26:16
33:3,13 34:5,11
34:15 36:17
43:22 47:5 49:17
54:23 55:10
59:20 63:13 64:1
69:24 70:12,18
70:19 74:24 75:9
75:19,19 77:5
81:13 83:6 86:8
94:19 113:7
116:16 125:22
131:21 145:22
146:23 154:21
156:8 159:11
**youve** 8:6 9:18
10:14 12:4 13:3
13:13 15:13
24:16 71:10
163:6

---

### Z

**z** 61:4
**zero** 128:7
**zimmerman**
138:23,23

---

### 0

**03** 38:9

Daniel S. Elliott, M.D.

**07** 3:16 44:20 79:5
**08** 3:19,21 49:15
  52:24 67:12
  75:15 76:19,22
  93:16
**08540** 1:16 2:12

---

**1**

**1** 1:17 3:19,21 4:10
  5:17 6:15 50:22
  52:5,7,24 54:1,12
  61:4 67:12 75:10
  75:13,16,20,21
  76:1,2,19 77:19
  106:15,19,21
  130:24 169:3
**10** 3:19 52:24
  106:15,19
**100** 39:18,21 65:6
  134:10
**105** 4:7
**10th** 52:17
**11** 3:16,18,21
  44:20 50:7 66:20
  67:12 74:10,20
  105:12 113:14
  121:17
**11th** 67:19
**12** 4:5 50:16 60:5
  96:9,23 131:14
  131:15 166:11
**121** 4:9
**13** 3:23 4:8 50:16
  73:20 82:17
  93:10 121:1
**131** 4:11
**136** 1:15 2:10
**13th** 71:22 72:23
  73:14,17 103:19
  120:17,21
**14** 100:19 104:22
  121:23
**15** 3:16 44:20
  49:15 76:19
  104:3 106:7
  143:5
**150** 39:18

**15cv16402** 1:7
**15minute** 23:24
  24:2
**15th** 45:5 46:23
  49:7 125:15
**16** 3:14 4:5 96:9,21
**165** 4:12 169:3
**16th** 78:8,19 80:19
  82:14 89:8 93:5
  94:14 95:13
  96:23
**17** 3:18 50:7
  103:15 105:23
  130:13
**18** 33:8,9 131:15
  157:19
**19** 4:8,10 75:10,21
  77:19 121:1
  130:24 153:8
**19th** 75:6 77:23
**1st** 131:11

---

**2**

**2** 1:7 4:5,10 44:2
  45:12 50:22 52:5
  52:7 54:2,13
  55:13 96:9,21
  105:5 106:15
  109:3,4,8 119:18
  120:5 130:24
  150:5
**20** 3:18 50:7
  129:16 143:5
  153:12 169:11
**2000s** 38:8
**2002** 38:8
**2003** 47:15
**2007** 45:5 49:7
  50:18 66:19
**2008** 41:9,24 42:2
  42:6,10,11,18
  43:4 46:23 48:12
  52:17 67:19
  71:22 72:2,9,22
  72:23 73:15,17
  74:8 75:2,6,8,22
  77:7 80:1 152:18

153:22 154:2
**2009** 75:6,22 77:19
  77:23 78:8,19
  80:19,24 82:14
  89:8 92:6
**2011** 28:17 39:16
  57:12
**2012** 94:14 95:13
  96:21
**2013** 92:14 93:7
**2017** 24:17 92:4,7
  95:10 96:17 99:6
**2018** 29:19 31:1
  103:19 106:2
  113:3 125:15
  130:12 131:10
  133:6 136:23
**2019** 1:12 6:14
  17:11 22:19
  120:17,21 130:19
  131:23 133:9
  159:23 166:11
**20th** 80:24
**21** 92:6 108:5
**213** 2:17
**2187** 1:3
**22** 60:5 105:12
**225** 97:10
**23rd** 72:22 106:2
**24** 105:6 142:17
**24th** 17:11
**25** 142:18 160:14
**250** 1:16 2:11
**27** 1:17 3:15 6:15
  53:9 160:21
**29** 1:12
**2900** 2:16
**29th** 6:14 17:21
  22:18 113:3
**2nd** 130:19 131:23
  132:15 133:9
  159:22

---

**3**

**3** 104:22 105:6
  131:15 153:7
  160:21

**30** 129:16 144:23
  167:16
**300** 2:4
**30th** 50:1,18 66:19
**31** 165:7,10
**32** 131:14
**33** 131:17 132:8,19
**3377** 1:22
**35** 142:14 145:12
**355** 2:16
**370** 1:22
**3rd** 130:12 131:10
  132:2,10 133:6

---

**4**

**4** 27:1 32:6 75:10
  75:13,16 76:1,22
  88:6 153:11
  160:14,21 165:7
  165:10
**44** 3:17
**4578000** 2:17
**4740** 2:4
**48** 87:15
**49** 87:14
**49yearold** 76:17
  82:11 85:15

---

**5**

**5** 27:2 32:6 39:20
  61:4 88:7 121:16
  131:18 132:13
  150:1,9
**50** 3:18 144:22,23
**52** 3:20
**55** 140:18 145:14
  145:15
**5672** 1:22
**591** 1:22

---

**6**

**6** 4:8 5:17 52:21
  121:1
**609** 2:12
**64112** 2:5
**67** 3:21

---

**7**

**7** 3:5 79:6 105:11
**70** 138:24 144:23
**700** 12:24
**7011100** 2:5
**76** 3:22
**79** 121:8,10,11,16

---

**8**

**8** 3:23,23 45:10
  48:24 93:10,10
**816** 2:5
**877** 1:22
**8th** 92:13 93:7

---

**9**

**9** 3:12 49:1 72:9
  75:10,14 76:1,22
  102:24 141:6
**90071** 2:17
**917** 1:22
**93** 3:23
**96** 4:6
**9870050** 2:12
**99** 102:24
**9th** 74:8 75:2,18
  79:24