EXHIBIT 3

In The Matter Of:

## *In Re: CR Bard 200*

---

## *Daniel Elliott, M.D.*

November 15, 2014

---

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  C.R. BARD, INC.,
PELVIC REPAIR SYSTEM PRODUCTS
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL
CASES IN MDL NO. 2187 AND
SPECIFICALLY TO:
_____
ROSAIDA ALONSO,
Plaintiff,          Civil Action File
                    No. 2:14-cv-07112
vs.

C.R. BARD, INC.,
Defendant.
_____
PATRICIA BOLYARD, et al.,
Plaintiffs,         Civil Action File
                    No. 2:12-cv-00126
vs.

C.R. BARD, INC.,
Defendant,
_____
MARTINA WHEELER,
Plaintiff,          Civil Action File
                    No. 2:12-cv-04580
vs.

C.R. BARD, INC.,
Defendant.

The videotaped deposition of DANIEL S. ELLIOTT, M.D.,

November 15, 2014

Wexler Wallace, 55 West Monroe Street, Suite

3300, Chicago, Illinois, commencing at 9:23 a.m.

Reporter: Jennifer L. Bernier

.

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 2

```
 1   APPEARANCES:
 2       WAGSTAFF & CARTMELL
         MR. THOMAS CARTMELL
 3       MR. JEFFREY M. KUNTZ
         4740 Grand Avenue
 4       Suite 300
         Kansas City, Missouri  64112
 5       Phone:  (816) 701-1100
         E-Mail: tcartmell@wcllp.com
 6               jkuntz@wcllp.com
 7           -AND-
 8       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         MS. P. ANN GAYLE
 9       MR. BRANDON S. MORRIS
         17 East Main Street
10       Suite 200
         Pensacola, Florida  32502
11       Phone:  (850) 202-1010
         E-mail:  agayle@awkolaw.com
12               bmorris@awkolaw.com
13           On behalf of the Plaintiffs;
14       REED SMITH
         MS. MELISSA GEIST
15       136 Main Street
         Suite 250
16       Princeton Forrestal Village
         Princeton, New Jersey  08540
17       Phone:  (609) 514-5978
         E-mail:  Mgeist@reedsmith.com
18
             On behalf of the Defendant.
19
20
     ALSO PRESENT:
21
     John Doody, Videographer
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   WITNESS                            PAGE
 3   DANIEL S. ELLIOTT, M.D.
 4       Examination by Ms. Geist         4, 139
         Examination By Mr. Cartmell      347
 5
 6           E X H I B I T S
 7   ELLIOTT DEPOSITION EXHIBITS        PAGE
 8
 9   No. #1    Notice                     5
     No. #2    Expert Report              5
10   No. #3    Blandon Article          118
     No. #4    Linder Article           171
10   No. #5    AJOG Accepted Manuscript 180
11   No. #6    Position Statement       187
     No. #7    Abed Article             198
12   No. #8    Withagen Article         203
     No. #9    Carey Article            216
13   No. #10   Nieminen Article         223
     No. #11   Nieminen Article         230
14   No. #12   Nygaard Article          249
     No. #13   Murphy Article           253
15   No. #14   Public Citizen           267
     No. #15   Elliott Current Opinion  273
16   No. #16   Elliott Letter to Gov Agency 279
     No. #17   Levin Papantonio Web Page 283
17   No. #18   Jane Akre                285
     No. #19   Mayo Clinic POP          287
18   No. #20   De Tayrac Article        311
     No. #21   Clifton Article          314
19   No. #22   Nilsson Article          316
     No. #23   AUGS Position Statement  319
20   No. #24   Dora Article             324
     No. #25   Krambeck Article         329
21   No. #26   Dietz Article            332
     No. #27   Reliance Documents       358
22   No. #28   Notice                   358
23
24
25
```

Page 4

```
 1       VIDEO TECHNICIAN:  We're now on the record.  The
 2   time is approximately 9:23 a.m.  This is the beginning
 3   of Disc 1 for the video deposition of Dr. Daniel S.
 4   Elliot.
 5           Will counsel please identify yourselves for
 6   the record and state who you represent.
 7       MR. CARTMELL:  Tom Cartmell for the plaintiffs.
 8       MR. KUNTZ:  Jeff Kuntz for the plaintiffs.
 9       MS. GEIST:  Melissa Geist for the defendant, C.R.
10   Bard.
11       VIDEO TECHNICIAN:  Would the court reporter please
12   swear in the witness.
13           (Witness sworn.)
14   WHEREUPON:
15           DANIEL S. ELLIOT, M.D.,
16   called as a witness herein, having been first duly
17   sworn, was examined and testified as follows:
18           DIRECT EXAMINATION
19   BY MS. GEIST:
20   Q.   Good morning, Dr. Elliott.
21   A.   Good morning.
22   Q.   We met just before the deposition, correct?
23   A.   Correct.
24   Q.   As I told you then, my name is Melissa Geist.
25   I'm with the law firm of Reed Smith and we represent
```

Page 5

```
 1   C.R. Bard in the MDL proceeding in West Virginia
 2   entitled C.R. Bard Repair System Products Liability
 3   Litigation.  And you've been designated by the
 4   plaintiffs in that litigation as an expert witness with
 5   respect to certain general liability opinions, correct?
 6   A.   Correct.
 7   Q.   And you understand we're here today to take
 8   your deposition in that litigation?
 9   A.   Correct.
10   Q.   And it's my understanding that today, Doctor,
11   we'll focus on your general liability report, and then
12   tomorrow we'll focus on your case-specific opinions that
13   you've rendered in three cases.  Is that your
14   understanding as well?
15   A.   Yes.
16           (Elliott Exhibit Nos. 1 & 2 were
17           marked for identification.)
18   BY MS. GEIST:
19   Q.   I've marked, as Exhibit 1 to your deposition,
20   Doctor, the notice for today's deposition.  Do you see
21   that?
22   A.   Yes, I do.
23   Q.   And I've also marked, as Exhibit 2, a copy of
24   your general liability expert report in this litigation.
25   And do you see that as well?
```

Page 6

1 A. Yes, I do.

2 Q. That -- that expert report you have in front

3 of you, Doctor, that's the only expert report you've

4 provided in this litigation other than the three

5 case-specific reports, correct?

6 A. Correct.

7 Q. Does it contain a complete statement of all of

8 the opinions you hold in the litigation?

9 A. As of this point right now.

10 Q. Do you intend to offer any opinions that are

11 not set forth in your expert report that's been marked

12 as Exhibit 2?

13 A. Only if new information were to become

14 available to me.

15 Q. But at least as of this point, as we're

16 sitting here today, all of the opinions that you intend

17 to give, if you were called as a witness in this trial,

18 for example, are contained in that report; is that fair

19 to say?

20 A. Correct. And, again, unless you ask another

21 question that has not been addressed in this, yes.

22 Q. Are all of the facts and the data that you

23 considered in reaching your opinions in this litigation

24 also contained in that report or in the Materials Relied

25 section of that report?

Page 7

1 A. As far as the internal documentation, yes.

2 That's all. I've read all of those documents. However,

3 as far as experience, personal conversations, surgical

4 experience, you know, that's not going to necessarily be

5 accurately reflected in the -- in my CV or in these

6 reliance issues.

7 Q. Yep, and that's fair, Doctor. But my question

8 really is, all of the documents, the literature and

9 other documents that you considered in reaching your

10 opinions, are all of those set forth in the reliance

11 list that's attached to your report?

12 A. I'd say that's a fairly accurate issue. I

13 can't attest that there hasn't been some other document,

14 medical research literature, that I've read at some

15 point in time that's not included in here. But as far

16 as to answer your question, this is a very complete list

17 of medical literature.

18 Q. Yesterday or the day before yesterday -- well,

19 certainly in the last couple of days -- we received an

20 updated reliance list containing another 120-or-so

21 medical articles that counsel stated also formed --

22 helped you form the opinions you reached in this

23 litigation. Are you aware of that?

24 A. Yes, I am.

25 Q. And do you have that updated list with you?

Page 8

1 A. Yes, I do.

2 Q. Is that there on your laptop?

3 A. No. The laptop has the Dropbox accounts of

4 all of the internal documents. The document I brought

5 here, which is the updated bibliography, is exactly what

6 you have.

7 Q. Okay. So you have it there in front of you in

8 paper copy?

9 A. Correct.

10 Q. So why was there an update in the last couple

11 of days?

12 A. Because I'm constantly doing research. I'm

13 constantly going to meetings. I'm constantly in

14 conversations with colleagues. So there's constant

15 progression of knowledge.

16 Q. So when did you read all of the new materials

17 that are set forth in your updated reliance list?

18 A. At some point in time between when this was

19 turned in until now. So that was October 8th, when this

20 was turned in originally, until -- well, I'm constantly

21 doing research just as part of my normal workday.

22 Q. So between October 8th and now, which is

23 November 15th, right?

24 A. Yes.

25 Q. So in the last four or five weeks or so, you

Page 9

1 reviewed an additional, by my count, at least 120 new

2 articles?

3 A. Sounds about right. But I'm a reviewer for 15

4 different journals, national/international journals, and

5 I attended a meeting between that time. So that's about

6 average.

7 Q. So I just want to make sure you answered my

8 question. All of the articles that were included in

9 your updated reliance list, and, by my count -- and this

10 is an estimate. I'll let you know that, Doctor --

11 there's about, at least, 120 new articles?

12 A. Again, that sounds about right, but the total

13 is 509 articles.

14 Q. So for the 120-or-so new articles, you read

15 those in the last four weeks or so?

16 A. Yes.

17 Q. How did you come across the new articles?

18 A. PubMed searches or as journals come out, the

19 International Urogyn Journal comes out, the Journal of

20 Urology comes out. I looked an article and that has

21 references. A good example of that would have been the

22 Zimmerman article, because then that spurs more ideas in

23 looking at what their references are.

24 Q. So you'll agree with me, I'm sure, Doctor,

25 that some of the 120 or so new articles are not new

In Re: CR Bard 200                     Daniel Elliott, M.D.                     11/15/2014

Page 10

1 publications, right?
2    A. Correct.
3    Q. They go back to 2006, 2008, and earlier for
4 some of them?
5    A. Correct.
6    Q. Did -- and you said you did this during your
7 own PubMed search?
8    A. Correct.
9    Q. And did you do a PubMed search prior to the
10 time you rendered your expert opinions in this report?
11   A. Oh, absolutely. I've used PubMed. There's 24
12 million articles in it, so we're using it. That's my
13 main search engine.
14   Q. So I'm trying to understand why all of the new
15 articles weren't included on your original reliance
16 list.
17   A. Because I'm constantly working on this. This
18 is what I do day in and day out as far as taking care of
19 patients. Patients come in with new problems. I attend
20 meetings. I just got back from a meeting, the South
21 Central Section of Urology. There's presentations. So
22 it's not a stagnant. We are constantly trying to learn
23 to better handle this problem.
24   Q. So let me make sure I understand that. Like
25 we just agreed, some of the articles date back a long

Page 11

1 time ago, right?
2    A. Correct.
3    Q. Did you miss them during your original PubMed
4 review?
5    A. No. That's a very unfair statement to say,
6 I've missed something. These are new articles that have
7 come out. Like Dr. Zimmerman's article, Mickey Karram's
8 article. And they make references to other articles,
9 and so we go back and look at that literature.
10   Q. So all of the new articles that were added to
11 your updated list are here because they were all
12 referenced in brand-new publications that you hadn't
13 found during your first search.
14   A. That's not what I'm saying. As far as this is
15 a vast topic, a lot of people are writing on it,
16 national and international. And so we can't, on the
17 first search through, get every single article. Also,
18 as we go along, we start learning about pain. I wasn't
19 going into -- I'm a member of the International Pelvic
20 Pain Society, okay. So that gets more articles and more
21 reading.
22   Q. Did you focus on any particular topic or
23 subject area when you did your updated PubMed search?
24   A. Pelvis, pelvic pain, pelvic pain management,
25 pelvic mesh management, pelvic complications. So each

Page 12

1 time you do one of those searches -- remember, search 24
2 million articles, okay. So each time I do a variant of
3 that search, just like you do a Google search with
4 different changing words, different articles will pop
5 up.
6    Q. Well, did the search terms you used during
7 this recent PubMed search differ from the original
8 search terms you used?
9    A. There may be different ones there. But if
10 PubMed is screening all journals from around the world,
11 journal articles will be popping up differently. So
12 it's not a stagnant. Knowledge is not stagnant. It's
13 constantly progressing forward.
14   Q. Well, you would agree with me, Doctor, that
15 the knowledge, as you say, included in some of these
16 articles date back more than ten years ago, right?
17   A. Some date back to the '70s. Some date back
18 probably even earlier than that.
19   Q. Did your review of the additional publications
20 change or amend or revise your opinions in this
21 litigation in any way?
22   A. They probably will reinforce or further --
23 further deepen the knowledge of the subject. But the
24 human pelvis is incredibly complicated. The neurologic
25 aspects are incredibly complicated. So, again, it's a

Page 13

1 deepening of the knowledge.
2    Q. Did -- did you feel that you had missed
3 anything the first time around?
4    A. No. I wouldn't say I missed anything; but,
5 again, it's adding to that, the body of knowledge.
6    Q. Do you feel that you needed to go back and do
7 additional research or reading on any particular topic
8 or subject area?
9    A. I wouldn't say that, but I'm always open. If
10 there's new data that comes out, I'm always open. I'm
11 not going to keep a closed mind about anything.
12   Q. Did you review all of the articles and
13 literature that are contained on your original and
14 updated reliance list?
15   A. Yes.
16   Q. And there is also some depositions listed on
17 your reliance list, correct, Doctor?
18   A. Yes.
19   Q. Did you review the entirety of those
20 depositions or did you review excerpts?
21   A. I would scan over the entire documents.
22 Certain aspects of them are applicable to me, and then
23 also these documents are, some of them, 500-or-more
24 pages long. So I can't say I read every single word,
25 but I would scan through them or find keywords that I

In Re: CR Bard 200   Daniel Elliott, M.D.   11/15/2014

Page 14

1  was searching for.
2 Q.  So you didn't read the entirety of the
3  deposition transcripts that are listed on your reliance
4  list?
5 A.  I can say I scanned over every single page of
6  those documents.  Did I read every single word?  The
7  answer to that is, no.
8 Q.  But when you say scan, what are we talking
9  about?  You flipped through and you looked for certain
10  keywords?
11 A.  I'm saying I have it on the desktop and I go
12  through the keywords.  I search for keywords.  I search
13  for various different phrases.  As you know, certain of
14  these depositions, they will go on for 20 or 30 pages
15  talking about this type of stuff, which I don't -- I
16  don't read every word of.
17 Q.  So you didn't actually sit down and review or
18  read the transcripts.  You used your computer and you
19  picked out certain search terms.  And then when those
20  search terms hit in the transcript, those are the pages
21  you looked at?
22 MR. CARTMELL:  Object to the form.
23  BY THE WITNESS:
24 A.  Yeah.  That's not what I said.  I said I sat
25  down.  Whether I do it with a paper copy or on a

Page 15

1  computer -- I suspect you don't print out every single
2  deposition and neither do I.  So I go through every
3  single page.
4 Q.  And were you given the entirety of the
5  transcripts?
6 A.  As far as I know.  I see a beginning and an
7  end and where they sign off.
8 Q.  How about the exhibits to the depositions?
9  Did you review all of the exhibits to the depositions?
10 A.  Yeah.  Either I have reviewed the exact
11  document or where it's referenced in the deposition
12  where they discuss it.
13 Q.  So are you telling me you didn't necessarily
14  review the exhibit, itself, if it was referenced in the
15  deposition testimony?
16 A.  If all there is is a quick reference to
17  something, a manuscript, well, then I'll review that one
18  in detail.  If it's an e-mail where they're using a
19  specific quote, I'll review that, the e-mail before and
20  the e-mail afterwards, so I can't pick.  You know, as
21  you know, there's thousands of pages of depositions
22  there.  Okay.  I have looked at them all.  I can't
23  remember them all by any means.
24 Q.  So my question actually referred to the
25  exhibits.

Page 16

1 A.  Correct.
2 Q.  So did you read every single exhibit for all
3  of the depositions listed on your reliance list, or no?
4 A.  I can't recall.  There's too many there.
5 Q.  You don't remember if you read every single
6  one or not?
7 A.  No, I can't recall that.
8 Q.  That was something that was added to your
9  updated reliance list, correct, the list of exhibits?
10 A.  Correct.  Yes.  And the added ones I know
11  because they came in relatively recently.  I've gone
12  through every single one.  I can't speak to all of them
13  in the entirety of this whole project, though.
14 Q.  Well, before you originally provided your
15  expert report with your reliance list, you didn't
16  include, as part of the documents you relied on, the
17  exhibits to the depositions, right?
18 A.  Again, I have not gone back and compared the
19  one prior to October 8th and then the present.  So I
20  don't know which ones were there.  So I can't answer
21  your question accurately.
22 MR. CARTMELL:  And just so you know, Melissa, that,
23  I believe, was because obviously we, as lawyers, helped
24  put that together, and that was, I think, an omission by
25  us.

Page 17

1 MS. GEIST:  So -- thank you, Counsel.
2  BY MS. GEIST:
3 Q.  So let me ask you that, Doctor.  How did your
4  reliance list come to be prepared?  Did you prepare it
5  yourself?
6 A.  The bibliography, the manuscripts reviewed, I
7  completed that one completely myself.  The documents,
8  the internal documents with the Bates numbers, those
9  were provided to me.  And then how they organized them,
10  I did not do that.
11 Q.  Okay.  Well, you have it in front of you,
12  don't you, Doctor?
13 A.  Yes.
14 Q.  Let's -- and you can look at your updated one.
15  It doesn't matter to me which one you look at.
16 A.  The reliance list I don't have with me.  I'll
17  go off of this copy here.
18 Q.  Okay.  Let's just go through it sort of
19  methodically, shall we?  Do you have it there in front
20  of you, Doctor?
21 A.  Yes, I do.  Yeah.  I have the reliance list
22  starting with the Bard documents.
23 Q.  Great.  Okay.  So the reliance list starts
24  with a list of Bard documents, as you've just indicated,
25  and most of them are preceded with what we call a Bates

In Re: CR Bard 200                  Daniel Elliott, M.D.                  11/15/2014

Page 18

1   stamp, right, an AVA number?
2      A.   Correct.
3      Q.   Do you see that?  And the list goes on for a
4   few pages, right?
5      A.   Correct.
6      Q.   So all of the -- all of the documents that are
7   reflected here, on this part of your reliance list, were
8   provided to you by counsel, correct?
9      A.   Well, yes.  It has a Bates number on it.  I
10  would have no access to that otherwise.
11     Q.   Okay.
12     A.   So, yeah, that was provided by the lawyers.
13  Q.   Okay.  So fair to say that the lawyers
14  selected which of the Bard documents that you were
15  reviewing in order to inform your opinions?
16     A.   No.  That would be incorrect.  I asked -- I
17  was very clear with the lawyers.  I wanted provided all
18  information, pro and con, concerning the situation at
19  hand with the mesh product, the Avaulta mesh.  These
20  were provided to me by the lawyers.  So I can't say.
21  Again, that's what I asked.  This is what was provided.
22     Q.   After you reviewed the documents that were
23  selected for your review by counsel, did you ask for any
24  additional Bard documents?
25     A.   Absolutely.

Page 19

1      Q.   And do you know, from looking at this list,
2   which of the documents you asked for?
3      A.   Well, no.  Not -- based upon these numbers,
4   no, I would not be able to tell that.
5      Q.   Okay.  How about generally speaking?  Do you
6   remember sitting here today, after you reviewed the
7   initial set of Bard documents that were provided to you
8   by the plaintiffs' lawyers, what else did you ask to
9   look at?
10     A.   Again, this has been going on for, what, four
11  or five months now, so I can't speak specifically to all
12  that I asked for.  Most specifically, from my expert
13  report concerning the MSDS, I wanted to review in detail
14  all of the internal documents pertaining to the e-mails
15  exchanged concerning the resin toxin, et cetera.  So
16  that's the one I can think of off the top of my head.  I
17  can't think of all of the others.  This has been going
18  on too long to know all of the specifics, but that one I
19  know I did ask for.
20     Q.   All right.  So you asked for additional
21  information, internal e-mails, on the MSDS issue?
22     A.   I asked for all of the available information
23  on this situation.  So let's put it that way.  And that
24  was what was provided to me.
25     Q.   Okay.  So just so I understand, you saw the

Page 20

1   MSDS issues, so to speak, in some of the documents you
2   were provided initially, correct?
3      A.   Correct.
4      Q.   And then, in response to that, you said, Hey,
5   Counsel, give me everything on this issue.  I want to
6   review the whole topic.  Is that fair to say?
7      A.   Partially.  I reviewed the issue.  I wanted to
8   make sure I had all of the documents, whether or not
9   more were there and not provided yet or if I did have
10  all of the documents, because I never know if I'm
11  getting all of the documents.  I don't know what else is
12  out there.  That's why I always ask for all.
13     Q.   Right.  So that was my question.  You don't
14  know if you have all of the documents on the issue,
15  correct?
16     A.   Well, of course not.  I don't know if I have
17  all, but I have asked for all.
18     Q.   You've asked for all?
19     A.   Correct.
20     Q.   Okay.  Any other topics, like the MSDS topic,
21  that you can think of that you asked for additional
22  information about?
23     A.   Actually, yes.  I can think of another one
24  pertaining to pore size.  Again, it was the same as the
25  other issue.  I asked for all documents, what they had,

Page 21

1   based upon the internal documentation of the pore size
2   of the mesh of the Avaulta Plus, the Avaulta Solo.
3   Also, on the -- what was known.  I wanted to know all of
4   the issues.  There's biocompatibility studies pertaining
5   to the products, all of the Bard products.
6           And as I go down my list -- oh, and, also, the
7   last one, as far as the IFUs, I wanted to be provided
8   all of the IFUs, not just a specific year.  Because,
9   again, I don't know what versions of IFUs are out there,
10  so I asked for all of the IFUs regardless of date.
11     Q.   So just to recap, in addition to the MSDS
12  issue, you wanted to make sure, before you informed your
13  opinions, that you had all of the documents on the pore
14  size issue, correct?
15     A.   Well, on that one specific issue, yes.  I just
16  wanted to be provided with everything.
17     Q.   And the same with biocompatibility?  You
18  wanted to look at all of the studies relating to
19  biocompatibility for the Bard products?
20     A.   Correct, related to its 510(k) submission.
21     Q.   And the same thing with the IFUs, Doctor?  You
22  wanted to see all versions of the IFUs for both the
23  Avaulta anterior and posterior products?
24     A.   Yeah, all of the Avaulta products, yes.  And
25  the ones that I listed there are the ones I can think of

Page 22

1 off the top of my head. If I were to go through the
2 entire expert report, we'd probably come up with more.
3     Q.   And were you provided additional information
4 as you asked for it?
5     A.   If it had been available. Sometimes I already
6 had all of the information.
7     Q.   Now, flipping with me, Doctor, to the section
8 of your reliance list entitled Depositions-Testimony.
9     A.   I have the section. It doesn't have a page
10 number, but it just says, Depositions.
11     Q.   Okay. And, Doctor, you're looking at what
12 we've marked as Exhibit 2, which is your generic expert
13 report, correct?
14     A.   Correct.
15     Q.   And with that report came the original
16 reliance list, right?
17     A.   Correct.
18     Q.   And you have in front of you there a paper
19 version of the updated reliance list, correct?
20     A.   What you've provided me today, yeah. I don't
21 have a personal copy of the updated one.
22     Q.   Oh, I thought you said you had it there.
23     A.   No, no. My records, that I brought with me, I
24 do not have an updated reliance. I have what you
25 provided today, or whoever provided it. I don't know

Page 23

1 who provided it.
2     Q.   Okay. So --
3     MR. CARTMELL: Does Exhibit --
4     THE WITNESS: Exhibit 2.
5     MR. CARTMELL: -- 2 have an updated reliance list?
6     MS. GEIST: It does not. Exhibit 2 is the
7 originally provided expert report with the original
8 reliance list.
9 BY THE WITNESS:
10     A.   Then I do not have an updated reliance list.
11     Q.   Okay. I misunderstood. I thought you said
12 you had it there.
13     A.   No. I'm sorry. I have my bibliography, but
14 the reliance list -- well, which is part of the reliance
15 list, obviously. But I did not bring the Bates numbers,
16 depositions, exhibits, I did not bring an updated one of
17 those.
18     Q.   Okay. Well, let me ask you this. So, in your
19 original Materials Relied list, there is a list of
20 depositions that you're looking at there, right, Doctor?
21     A.   That is correct.
22     Q.   And it doesn't have with that a list of any
23 exhibits to those depositions, correct?
24     A.   Well, it has exhibits listed down below from
25 Dr. Ross's deposition. But Dr. Ross -- that appears

Page 24

1 that's the only exhibits that are listed with this one.
2     Q.   Did you ask for any of the exhibits that were
3 marked at all of the other depositions?
4     A.   Oh, I can't, I mean --
5     MR. CARTMELL: Well, again, I think I told you, for
6 your clarification, that I think not including the
7 exhibits in the first round was the lawyers' fault.
8 That's my understanding.
9 BY MS. GEIST:
10     Q.   Okay. So let me just ask you. When you
11 originally formed your opinions in this case and
12 provided your expert report, had you already had all of
13 the exhibits to the depositions that are listed here?
14     A.   Yes. I had what is listed here; and in the
15 various different depositions, I would have used those.
16     Q.   And it appears to me, from looking at the
17 updated reliance list, Dr. Elliott, that you also looked
18 at one additional transcript from the time you provided
19 your expert report; is that right?
20     A.   I don't understand what you mean a transcript.
21 You mean a deposition?
22     Q.   Yeah. Well, let me -- let me ask it
23 differently. After you reviewed the depositions that
24 are listed on your reliance list, did you ask to see any
25 other depositions that were taken in the Bard

Page 25

1 litigation?
2     A.   I did ask. I can't recall who it was.
3 Because as I read depositions, in there they will make
4 reference to other depositions. I would be able to
5 think of a specific example of that one back to SDMS
6 (sic) issue where they made a reference to a Chevron or
7 Phillips employee. I wanted to see what his comments
8 were, so I requested that.
9     Q.   Okay. That employee's name is Frank. And
10 I'll --
11     A.   Zakrzewski, or something like that, yeah.
12     Q.   Right, Z-A-K-R-Z-E-W-S-K-I. So that was on
13 your updated reliance list?
14     A.   Correct. That was just an example of it.
15 Again, I can't -- because, you know, these are hundreds
16 of pages long. There's references around, so I'll ask
17 for clarification. I might not ask for the entire
18 document. I might say, Pertaining to this specific,
19 what was said?
20     Q.   So when you asked for the deposition of the
21 Phillips Sumika representative on the MSDS issue, did
22 you review the entire transcript?
23     A.   No. I asked -- I wanted to know the specific
24 comments that were made, so I did not review the entire
25 document.

In Re: CR Bard 200                  Daniel Elliott, M.D.                  11/15/2014

Page 26

1    Q.  So did you get the entire document or did you
2    just get excerpts?
3        **A.  I got excerpts.**
4    Q.  Did you ask to see the entire document?
5        **A.  I don't recall what I asked for.  I had a**
6    **specific question about a specific reference from a**
7    **deposition, so I wanted to know specifically what was**
8    **going on.  So I didn't ask for the entire document, I**
9    **don't recall.**
10   Q.  Do you know what pages you got from that
11   deposition?
12       **A.  No, I do not.**
13   Q.  You have your laptop here with you, right?
14       **A.  Yes, I do.**
15   Q.  Do you have it there on your laptop?
16       **A.  I would have, probably, an e-mail, an internal**
17   **correspondence with the lawyers, but then it wouldn't**
18   **have any -- it would have, again, the specifics.  I**
19   **don't know if it would have a date on there or anything.**
20   Q.  So you don't have the excerpts of the --
21       **A.  Oh, I have the excerpts.  I have the expert**
22   **was -- here, I can provide that for you, if you'd like**
23   **that.**
24   Q.  Well, I'm trying to find out, Doctor, what
25   portions of that Phillips Sumika witness testimony you

Page 27

1    reviewed.
2        **A.  Okay.  I'll give it to you.  Zakrzewski,**
3    **Z-A-K-R-Z-E-W-S-K-I, deposition.  I don't have the date,**
4    **but page No. 204 and 205.**
5    Q.  So you reviewed two pages of the deposition
6    from the Phillips Sumika representative on the MSDS
7    topic?
8        **A.  That is correct.**
9    Q.  Do you think that was enough for you to get
10   the full picture of what that company representative had
11   to say on the issue?
12       **A.  I don't know.  If you have more information on**
13   **it, I would like to hear it.**
14   MR. CARTMELL:  Just so you know, he was provided
15   the whole deposition.
16   MS. GEIST:  Well, I -- I'm going to object to any
17   testimony by counsel.  I mean, he's already said he
18   looked at two pages.
19   MR. CARTMELL:  Do you want him to be accurate on
20   what he was provided?  He can tell you what he's
21   reviewed; but, I mean, I think you would want it to be
22   accurate on what he was provided.
23       I'm just telling you he was given the
24   entire deposition.  He may not remember it, but he
25   was.

Page 28

1    BY MS. GEIST:
2    Q.  Did you only review the two pages of the
3    deposition?
4        **A.  That's all I recall reviewing.**
5    Q.  And then, Doctor, the -- what I'll call the
6    third part of your reliance list relates to literature,
7    articles, or I think you called it your bibliography,
8    right?
9        **A.  Correct.**
10   Q.  And when you say bibliography -- and you have
11   a hard copy there in front of you?
12       **A.  That's correct, yes.**
13   Q.  -- we're talking about the same thing, right?
14       **A.  The same -- same thing.  That is correct.  I**
15   **just called it a bibliography, though.**
16   Q.  All right.  And you already told me that, for
17   each and every article cited here, there are a total of
18   509?
19       **A.  Correct.**
20   Q.  And you read all of them?
21       **A.  I read most every bit of all of**
22   **them.**
23   Q.  Every page of every article?
24       **A.  I said most every bit of all of them.**
25   Q.  Do you know which articles you skimmed and

Page 29

1    which you thoroughly reviewed?
2        **A.  I do not recall.**
3    Q.  Do you know what percentage of the articles
4    listed here you reviewed in their entirety versus
5    skimming?
6        **A.  As I said, I'm a reviewer for 15 journals.**
7    **Two years in a row I was best reviewer for Journal of**
8    **Urology and Female Urology section.  So I do this for a**
9    **living.  And so I read almost everything of almost all**
10   **of the articles.  All of them I can't recall the**
11   **specifics.**
12   Q.  So almost everything of almost all of the
13   articles; is that your answer?
14       **A.  That is correct.**
15   Q.  Doctor, we'll obviously talk a lot today about
16   your opinions that you've rendered in this litigation on
17   behalf of the plaintiffs, but let me ask you a couple of
18   questions about what you're not going to opine about.
19   Okay?
20       **A.  Okay.**
21   Q.  You're not offering any opinions relating to
22   Bard's products as being less safe or more risky than
23   any other manufacturer's product used to treat pelvic
24   organ prolapse; is that correct?
25   MR. CARTMELL:  Object to the form.

Page 30

1  BY THE WITNESS:
2     A.  I'd have to kind of, maybe, have you rephrase
3  the question.  I don't quite understand.
4     Q.  Sure.
5     A.  Please just ask it again.
6     Q.  Sure.  Are you offering any opinions that
7  Bard's Avaulta products are less safe or more risky than
8  any other manufacturer's mesh product used to treat
9  pelvic organ prolapse?
10    MR. CARTMELL:  Same objection.
11  BY THE WITNESS:
12     A.  Okay.  I would have to say that I would offer
13  an opinion that it would be at a higher risk for further
14  complications based upon the product design and
15  implantation.
16     Q.  So that's not in your expert report anywhere.
17    MR. CARTMELL:  Object to the form.
18  BY MS. GEIST:
19     Q.  Do you have any statements, in your expert
20  report, that Bard's Avaulta products are more risky or
21  less safe than another manufacturer's pelvic organ
22  prolapse product?
23     A.  Not directly.  Indirectly it is.
24     Q.  So what's your opinion on that?
25     A.  That they're at higher risk based upon the

Page 31

1  design of the product.  And it's in my expert report,
2  specifically in -- starting on page 21 where I talk
3  about the arms of the Avaulta Solo and the Avaulta Plus
4  being unreasonably dense.  That is one section.  Those
5  arms are more dense than the other available products.
6       Number two, on the mesh design where collagen
7  is implanted, that makes it a different product than the
8  other ones.  It makes it unique.  So I discuss it in
9  there.  I have what's on page 23, using the porcine
10  collagen greater inflammatory response.
11       Off the top of my head, those are the two
12  issues that would say, I would say, that it is at higher
13  risk for complications than the other available
14  products.
15     Q.  So when you talk about the other available
16  products, what products are you talking about
17  specifically?
18     A.  The -- well, to the best of my knowledge, none
19  of them are available anymore.  But AMS Apogee/Perigee,
20  Boston Scientific Pinnacle, the Ethicon's Prolift
21  Anterior/Posterior Total.
22     Q.  So it's your opinion that the Bard Avaulta
23  products are more risky and less safe than the AMS,
24  Boston Scientific, and Ethicon products?
25     A.  That's what I've indicated in my report, yes.

Page 32

1     Q.  And the basis for that opinion is, one, that
2  the Bard products have four arms; is that right?
3     A.  No.  Again, that's a summary of what is in my
4  report.  The report gives it more generally -- more
5  specifically.  But the arms are more dense, there is no
6  plastic covering over the arms causing sawing is another
7  one that's in there, and then the porcine collagen.  And
8  off the top of my head, without reviewing it page by
9  page, those are the ones that come to mind.
10     Q.  Well, Doctor, you just said it's in my report.
11  But there's nowhere in your report, is there, where you
12  provide the opinion that Bard's products, Bard's Avaulta
13  products, are more risky or less safe than the AMS,
14  Boston Scientific, and Ethicon's pelvic organ prolapse
15  products?
16     A.  Well --
17     Q.  It's nowhere in the report, correct?
18    MR. CARTMELL:  Object to form.
19  BY THE WITNESS:
20     A.  That's because I'm not providing an opinion
21  today on those other products.  We're not doing a
22  comparative.  We're just doing --
23     Q.  Well, that's what I'm asking you.
24     A.  Well, number one, you interrupted me.
25     Q.  I apologize.  I don't mean to do that.

Page 33

1     A.  I was still talking.
2     Q.  Hold on.  Hold on.  We can't talk over one
3  another.  You're a fast talker, Doctor, and sometimes so
4  am I.  So I don't mean to be rude.  I do apologize.  I
5  do want to let you finish your testimony, and I will try
6  my best not to step on your words.  So go ahead.
7     A.  Can you read back where I was?
8     Q.  Well, why don't we just start with a new
9  question.  I think it's the same question.
10       What I was saying to you, Doctor, is, let me
11  make sure you understand the process.  Okay?  In
12  litigation when somebody is an expert witness, they give
13  what's called the expert report.  And you've been an
14  expert witness before, correct?
15     A.  Yes.
16     Q.  You're sort of familiar with this process?
17     A.  On the periphery.  I'm not a lawyer.
18     Q.  Understood.  But us lawyers have certain
19  rules, and we are entitled to notice about the issues
20  and the opinions that an expert is going to give at a
21  trial in the case.  Do you understand that?
22     A.  Yes.
23     Q.  And the report --
24    MR. CARTMELL:  I would just object to the form.
25

In Re: CR Bard 200                 Daniel Elliott, M.D.                 11/15/2014

Page 34

1 BY MS. GEIST:
2     Q.  The report is supposed to contain all of the
3 opinions that an expert is going to talk about at a
4 trial.  Okay.  That's sort of the rules of the game, if
5 you will.  Do you understand that?
6     MR. CARTMELL:  Object to the form.  And I'll move
7 to strike the legal statements of counsel.  Go ahead.
8 BY MS. GEIST:
9     Q.  So that's what -- that's what I'm getting at,
10 Doctor.  I'm trying to understand, if you hold any
11 opinions that the Bard Avaulta products are more risky
12 or less safe than the AMS, Boston Scientific, and
13 Ethicon products also used to repair pelvic organ
14 prolapse.
15     MR. CARTMELL:  Okay.  Is that a question?
16     MS. GEIST:  Yes.
17     MR. CARTMELL:  Okay.  You've asked him that
18 question and he's answered it.  So objection, asked and
19 answered.
20 BY MS. GEIST:
21     Q.  So do you have an opinion, Doctor, that you
22 plan on giving in this litigation that the Bard Avaulta
23 products are more risky or less safe than the AMS,
24 Boston Scientific, and Ethicon products?
25     MR. CARTMELL:  Same objection.  Asked and answered.

Page 35

1 BY THE WITNESS:
2     **A.  If I am asked that question, I will render**
3 **that opinion.  If I'm not asked that question, I won't.**
4     MR. CARTMELL:  And you just asked him that.
5 BY MS. GEIST:
6     Q.  So what I'm trying to find out now, okay,
7 because this wasn't in your report -- it's not in your
8 report, right, these statements you're telling me now?
9     MR. CARTMELL:  Object to the form.
10 BY THE WITNESS:
11     **A.  I've already answered that.  It is -- it is**
12 **stated in there.  It's not stated in the exact words**
13 **you're talking about.  But we're saying in there,**
14 **specifically, on page 23, Avaulta Plus porcine collagen**
15 **caused even greater response than synthetic**
16 **polypropylene mesh alone.**
17     **Okay.  That is an opinion against Avaulta**
18 **that -- Avaulta Plus that causes higher complications**
19 **than the other polypropylene meshes.  So I have stated**
20 **it.  I just didn't use the exact words you want me to**
21 **use.**
22     Q.  Well, I don't want you to use any words,
23 Doctor.  I'm trying to understand exactly what your
24 testimony would be at the trial.  There is nowhere in
25 your report that says Bard's products are less safe or

Page 36

1 more risky than the AMS, Boston Scientific, and Ethicon
2 products?  There's nowhere in the report that says that.
3 There's no comparative analysis, correct?
4     MR. CARTMELL:  Object to the form.
5 BY THE WITNESS:
6     **A.  If you want -- I disagree.  I wholeheartedly**
7 **disagree.**
8     Q.  Well, show me in your report where --
9     **A.  You interrupted me again when you said you**
10 **weren't.**
11     Q.  I thought you were finished.
12     MR. CARTMELL:  Just let him finish.
13 BY THE WITNESS:
14     **A.  I'm right in the middle of a sentence.**
15     MR. CARTMELL:  Just let him finish.  Go ahead.
16 BY THE WITNESS:
17     **A.  Avaulta Plus porcine causes even greater**
18 **response, inflammatory response, than the synthetic**
19 **polypropylene mesh alone; AMS, synthetic mesh alone;**
20 **Ethicon, synthetic mesh alone; Boston Scientific,**
21 **synthetic mesh alone.  That is a statement saying there**
22 **is even greater inflammatory response.**
23     Q.  Are you finished?
24     **A.  Yes.**
25     Q.  So that relates only to the Avaulta Plus

Page 37

1 product, correct, the collagen polypropylene product?
2     **A.  Correct.  As stated there, yes.**
3     Q.  What sort of comparative analysis have you
4 done, Doctor, comparing Bard's Avaulta Plus porcine
5 collagen product to other products?
6     **A.  I compare it to the available literature out**
7 **there; specifically, with the Prolift product because**
8 **there is the most literature on that.  Unfortunately,**
9 **there is very, very little Avaulta data out there.  But**
10 **I also compare it to the available literature and**
11 **experience dealing with porcine and collagen when placed**
12 **transvaginally or in the abdominal wall for that matter,**
13 **too.**
14     Q.  So can you point me to any study where the
15 Avaulta Plus collagen polypropylene product was compared
16 to another mesh product?
17     **A.  Paraiso, et al., Rectocele Repair:  A**
18 **Randomized Trial of Three Surgical Techniques Including**
19 **Graft Augmentation, from 2006, where there they had a**
20 **collagen graft with an increased failure rate that it**
21 **was theorized due to impaired healing.**
22     Q.  And which products were involved in that
23 study?
24     **A.  That was a collagen graft.  I would have to go**
25 **back and look at the exact study to find out what**

In Re: CR Bard 200        Daniel Elliott, M.D.        11/15/2014

Page 38

1 that -- what were involved.

2     Q. Well, was it the Avaulta product?

3     **A. Again, I would have to -- I would have to go**

4 **back and look at that study.**

5     Q. You can't tell me sitting here now?

6     **A. I cannot tell you sitting here now, no.**

7     Q. I'm looking for any study, Doctor, where the

8 Avaulta product was specifically compared to the AMS,

9 Boston Scientific, or Ethicon product and they did a

10 comparative analysis of incident rates.

11     **A. When I searched PubMed, which is 24 million**

12 **articles, and searched Avaulta, I don't believe I was**

13 **able to find any study where that was done, which would**

14 **have been a very nice study to have been done, to see if**

15 **it was a better product.**

16     Q. Is there any study out there that looked at

17 the comparative incident rates between the Bard products

18 and these other products that you mentioned to me that

19 you say are less safe or more risky?

20     **A. I do not recall, in those specific words, a**

21 **randomized controlled trial of the other products with**

22 **the Avaulta Plus.**

23     Q. So, in other words, Doctor, there is no study

24 that has compared the incident rates, for example, of

25 erosion, pain, or dyspareunia, of the Avaulta products

Page 39

1 to other mesh products; is that true?

2     **A. I am unaware, as we sit here now, of any**

3 **randomized, controlled, non-industry-sponsored trial**

4 **comparing those two products head to head.**

5     Q. How about any trial? Forget about randomized

6 or industry sponsored. How about any trial? Can you

7 point me to any study, whatsoever, that did this type of

8 comparative analysis, the Bard product versus the other

9 products, and concluded that the Bard products were less

10 safe or more risky? Can you point me to one single

11 solitary study?

12     **A. The studies I can quote to you are not a**

13 **head-to-head comparison. They are either comparing the**

14 **native tissue, native repairs, the Avaulta Plus, or just**

15 **Avaulta Plus, period. You then have to look at the body**

16 **of knowledge out there and the data and could then**

17 **compare those to the erosion rate, the infection rate,**

18 **the pain rate, delayed healing rate, the other products**

19 **with the Avaulta Plus.**

20     Q. All right. So let me ask it a different way.

21 Since there's no -- we know there's no head-to-head

22 study that looked at the Bard products versus these

23 other products that you say are more safe or less risky.

24 There's no study out there. This is just your opinion

25 unsupported by any single article or medical literature,

Page 40

1 correct?

2     MR. CARTMELL: Okay. Object to the form. That's

3 argumentative and completely misstates his prior

4 testimony related to the literature on that.

5 BY MS. GEIST:

6     Q. Correct?

7     MR. CARTMELL: Same objection.

8 BY THE WITNESS:

9     **A. Incorrect. I disagree completely. I can**

10 **point you to many studies talking about the Avaulta Plus**

11 **or anything containing collagen transvaginal showing a**

12 **higher impaired healing rate.**

13     Q. That's not my question, Doctor. My question

14 is this. I asked you to tell me about a single solitary

15 study, industry-sponsored or otherwise, that looked at

16 the comparative incident rates of adverse events between

17 the Avaulta Plus products and other mesh manufacturers'

18 products and concluded that the Avaulta products were

19 less safe or more risky. And you can't point me to a

20 single solitary study that does that; isn't that true?

21     MR. CARTMELL: Okay. Object to the form. Just for

22 clarification, are you talking about a head-to-head RCT

23 Avaulta Plus versus another product?

24     MS. GEIST: I think my question is clear, and you

25 have made your objection. It doesn't have to be a

Page 41

1 randomized controlled trial. Any study, any.

2     MR. CARTMELL: Well, okay, it's been asked and

3 answered.

4 BY THE WITNESS:

5     **A. I think I can do better than that and compare**

6 **it to the literally hundreds of pages of articles out**

7 **there on other products and then comparing it to the**

8 **very few on Avaulta Plus. To isolate it to just one**

9 **randomized controlled trial, it would be helpful, but it**

10 **does not exclude the knowledge gathered from the other**

11 **studies.**

12     Q. Doctor, you're not answering my question. You

13 know, I've asked it now three different times. And if

14 you're having a hard time understanding me, then let me

15 know.

16     MR. CARTMELL: We're not --

17 BY MS. GEIST:

18     Q. I want to know --

19     MR. CARTMELL: Melissa --

20 BY MS. GEIST:

21     Q. -- and I'd like to move on the articles --

22     MR. CARTMELL: Listen -- no, no, no.

23     MS. GEIST: You're interrupting me. You're

24 interrupting me.

25     MR. CARTMELL: I am interrupting you because here

Page 42

1  is the problem.  Your statements by counsel, okay, that
2  he's not answering your question, when you've asked
3  multiple different questions, you keep saying it's the
4  same one, but it's not, is unfair to the witness and
5  harassing.  All right.  So he's answered your question
6  multiple times.  And I'll let you ask it one more time
7  and then we're moving on.  I'm not going to let him
8  answer it.
9  BY MS. GEIST:
10     Q.  So my question is, Doctor, you can't point me
11  to a single study, whether it's industry-sponsored or
12  otherwise, a single study that looked at the Avaulta
13  Plus products compared to other mesh manufacturer
14  products and concluded that the Avaulta products were
15  more risky or less safe; isn't that true?
16     MR. CARTMELL:  Objection.  Asked and answered.
17  BY THE WITNESS:
18  **   A.  I can quote to you studies -- if you limit me**
19  **as far as limiting all of the available knowledge in**
20  **that fashion, then it would probably be difficult, but**
21  **that's --**
22     Q.  Well, Doctor --
23  **   A.  You're interrupting me again.**
24     MR. CARTMELL:  Let him finish.
25  BY MS. GEIST:

Page 43

1     Q.  I would like to move on.  It's a yes or no.
2  Is there a study or not?
3     MR. CARTMELL:  You want it to be a yes or no, but
4  what -- he needs to answer your question and then you
5  can move to strike it.  Okay.  Go ahead.
6  BY MS. GEIST:
7     Q.  Doctor, I would like a yes or no.  If you can
8  point me to a study, let's talk about the study.  If
9  there is no such study, would you please just tell me
10  there is no such study and then we can move on.
11     MR. CARTMELL:  Objection.  Asked and answered.  You
12  can answer it again.
13  BY THE WITNESS:
14  **   A.  There will be no yes-or-no answer.  It's far**
15  **more complicated than that.  To limit the fund of**
16  **knowledge out there to a yes or no is wrong and**
17  **shortchanges the available knowledge.  I can point you**
18  **to studies -- I have them here -- showing that Avaulta**
19  **Plus has higher inflammatory reaction, delayed healing.**
20  **I can point you to other studies with polypropylene mesh**
21  **that has a less reaction.**
22     Q.  You're not going to answer my question,
23  Doctor?
24     MR. CARTMELL:  Object to the form.  It's
25  argumentative.

Page 44

1  BY MS. GEIST:
2     Q.  You can't point me to a single study, can you?
3     MR. CARTMELL:  Object to the form.  It's been asked
4  and answered.  He's just answered it.  No more questions
5  like that, please.
6  BY MS. GEIST:
7     Q.  Well, I'm going to move on.  I think it's
8  pretty clear, from the record, you can't point me to a
9  single study.
10     MR. CARTMELL:  Object to the statement of counsel
11  and move to strike it.
12  BY MS. GEIST:
13     Q.  How about -- how about this one?  When we're
14  talking about adverse events resulting from a
15  complication from mesh, generally speaking, we're
16  talking about things like erosion, inflammatory
17  response, pain, and dyspareunia; fair summary?  It's not
18  supposed to be a complete summary, but those are some of
19  the more frequent adverse events we're talking about,
20  correct?
21  **   A.  Incorrect.  I take care of patients daily with**
22  **a myriad of complications.  To even limit one time the**
23  **number of complications these patients experience and**
24  **the life-changing effects is unfair to them.  So I'll**
25  **disagree with your comment.**

Page 45

1     Q.  All right.  I'm trying to summarize, Doctor,
2  the adverse events or potential complications that a
3  patient may experience after having mesh implanted for
4  pelvic organ prolapse.  I was trying to give you a
5  summary.
6        So my question is this, is there any study
7  that looked at the incident rates of dyspareunia for
8  patients experiencing that problem after having
9  implanted -- after having been implanted with an Avaulta
10  product versus a Boston Scientific or Ethicon product?
11     MR. CARTMELL:  Object and move to strike the
12  statement of counsel before the question.
13  BY THE WITNESS:
14  **   A.  I'm sorry.  You're asking for a study**
15  **comparing Avaulta versus native tissues or are you going**
16  **back to the Avaulta versus the other mesh products?**
17     Q.  I'm going by adverse events.  So let me go --
18  let me ask it again.
19        Is there any study that looked at the adverse
20  event of dyspareunia and concluded that there was a
21  higher incident rate of dyspareunia with the Bard
22  products compared to the AMS, Boston Scientific, and
23  Ethicon products?
24  **   A.  You're going back to the same question we**
25  **already went over and over and over.**

1    Q.  I'm asking specifically about dyspareunia.  Is
2 there any study that looked at that particular adverse
3 event, potential complication resulting from a mesh
4 implant, and concluded that there was a higher incident
5 rate of dyspareunia with the Bard products compared to
6 other mesh manufacturers' products?
7    **A.  I have studies stating that the Bard product**
8 **has higher complications than the native tissues.**
9    Q.  I'm not talking about native tissues.
10    **A.  And then limiting it to one of those**
11 **randomized control looking at dyspareunia alone, I don't**
12 **have that data with me.**
13    Q.  Is there any data that looked at dyspareunia
14 and said there is a higher incident rate with the Bard
15 products compared to other mesh manufacturers' products?
16    **A.  Well, I would have to say there probably is**
17 **not because, if you had that data, Bard would have**
18 **provided it for me.  And this would be a very good**
19 **format, because you asked if I had been provided all of**
20 **the information available.  I did the PubMed research.**
21 **I am taking care of patients on a daily basis.  I'm**
22 **going to meetings and I'm asking for all of the data**
23 **available.  That would have been a very nice piece of**
24 **data to have provided to me.**
25    Q.  So you don't -- you don't have that data,

1 Doctor, and you've never seen that data, correct?
2    **A.  Well, I have also had the opportunity of**
3 **reviewing the Bard depositions, and nowhere did they**
4 **present this data being available either.**
5    Q.  You don't have that data, Doctor, and you've
6 never seen that data, correct?
7    **A.  I've already answered this.**
8    Q.  Okay.  That's fine.  How about things like
9 pelvic pain?  Pelvic pain is a known complication that a
10 woman may experience after having a mesh implant,
11 correct?
12    **A.  Correct.**
13    Q.  Any study out there that has looked at the
14 incident rates of pelvic pain associated with the
15 Avaulta products and concluded that the incident rates
16 were greater with the Avaulta products compared to any
17 other mesh manufacturers' products?
18    **A.  No.  I can quote to you many studies showing**
19 **that the incidence of pelvic pain and dyspareunia is**
20 **higher.  But when you limit it to comparing it to the**
21 **other products, there is no -- we can't have a**
22 **quality head-to-head comparison.  We have to go based**
23 **upon the studies that are available.**
24    Q.  Okay.  So the answer to my question is
25 correct?  No study that's looked at the Bard product,

1 compared it to other mesh manufacturers' product and
2 said that there is an incident -- greater incident rate
3 of pain associated with the Bard products?
4    MR. CARTMELL:  Objection.  Asked and answered.
5 BY MS. GEIST:
6    Q.  Correct?
7    MR. CARTMELL:  You can answer it again.
8 BY THE WITNESS:
9    **A.  Okay.  Limiting it, in the severe fashion that**
10 **you're doing, I do not know of, right now, any study**
11 **that compared the head-to-head comparison of these, any**
12 **randomized, controlled, industry-sponsored, et cetera.**
13    Q.  The same thing with erosion rates, Doctor?
14 There is no study out there or article that concluded
15 that the Bard products have more incident rates of
16 erosion compared to other manufacturers' mesh products
17 used for pelvic organ prolapse?
18    **A.  There are plenty of studies out there showing**
19 **it has a higher extrusion rate.  You said erosion, which**
20 **would be the incorrect word, but extrusion rate compared**
21 **to the native tissues.  I am unaware, sitting here now,**
22 **of any randomized controlled trial stating it has a**
23 **higher rate compared to other mesh products.**
24    Q.  Do you consider yourself to be an expert on
25 Bard's Avaulta products, Doctor?

1    **A.  Yes, I do.**
2    Q.  How does a doctor like yourself, who is a
3 practicing urologist, how should a doctor like yourself
4 go about becoming an expert in a medical device product?
5    MR. CARTMELL:  I object to the form.
6 BY THE WITNESS:
7    **A.  You have to look at the totality of training:**
8 **six years of pelvic surgery training; one year of**
9 **advanced surgical training in pelvic floor dysfunction,**
10 **including surgery; and then becoming certified in female**
11 **pelvic medicine and reconstructive surgery, which is**
12 **approved by the American Board of GYN and American Board**
13 **of Urology; and then practicing for 15 years at a higher**
14 **level, a high-volume tertiary care center.**
15    Q.  And how about, Doctor, if you want to become
16 an expert on this specific product, what should you do
17 to do that?
18    **A.  Be aware of the FDA regulations involved in**
19 **submission and clearance of a product, be involved**
20 **looking at the warnings, the regulations, the labels of**
21 **that product, be involved in teaching residents or staff**
22 **how to implant or how to more -- more appropriately for**
23 **me taking care of the complications, also being daily**
24 **taking care of patients that deal with this.  That**
25 **provides expertise that most don't have.**

In Re: CR Bard 200                 Daniel Elliott, M.D.                 11/15/2014

Page 50

1    Q.  So you should become familiar with how to
2 implant the actual product.  Is that what you said?
3    **A.  I didn't say that.  You need to be -- you need**
4 **to be familiar with how the product goes in, you know,**
5 **reviewing of videos, surgical videos, seminars at our**
6 **national/international meetings, and then be familiar**
7 **with transvaginal surgery.**
8    Q.  Reviewing a video relating to the implantation
9 of a medical device is not the same thing as actually
10 doing it?
11   **A.  No.  And I've also been involved in cadaveric**
12 **labs as far as implantation of meshes, polypropylene,**
13 **pelvic organ prolapse meshes.**
14   Q.  You agree with me, though, that reviewing a
15 video instructing how to implant an Avaulta product is
16 not the same thing as actually implanting an Avaulta
17 product?
18   **A.  Well, I said I did it in cadaverics, also.**
19   Q.  How about in a live patient?
20   **A.  Well, if you -- if you limit me to**
21 **implantation only in living human beings, I have never**
22 **once implanted transvaginally pelvic organ prolapse**
23 **meshes by choice.**
24   Q.  So you never once implanted the Bard products
25 for which you're giving an opinion, correct?

Page 51

1    **A.  I have never implanted the Bard mesh; however,**
2 **I have significant experience taking out the Bard mesh.**
3    Q.  You've never implanted any type of pelvic
4 organ prolapse kit from any manufacturer, true?
5    **A.  Well, asking the way you did now, that is**
6 **incorrect.**
7    Q.  So which pelvic organ prolapse kit have you
8 actually implanted in your career?
9    **A.  That would be the AMS Interpro.**
10   Q.  And when did you do that?
11   **A.  The last one would have been about a week or**
12 **two -- no, three weeks ago, something like that.**
13   Q.  And that's a transvaginal procedure?
14   **A.  No.**
15   Q.  What type of procedure is that?
16   **A.  A robotic sacrocolpopexy.**
17   Q.  Is that -- is that product manufactured using
18 polypropylene mesh?
19   **A.  Yes.**
20   Q.  How about reviewing public literature relating
21 specifically to the product in which you're giving an
22 opinion.  Would it be a good idea to do that?
23   **A.  By public literature, you mean, like, patient**
24 **brochures?  I just want clarification.**
25   Q.  No.  I mean, any literature or articles

Page 52

1 published relating to that particular product.  Do you
2 agree with me it would be a good idea to review all of
3 the literature out there on that particular product?
4    MR. CARTMELL:  Object to the form.
5 BY THE WITNESS:
6    **A.  I only just -- I just want to make sure I'm**
7 **clear on what you're asking as far as the medical**
8 **literature, medical manuscripts, abstract presentations**
9 **at meetings, if that's what you're asking, then, by all**
10 **means, it is essential as one of the components of**
11 **gaining experience with the product.**
12   Q.  It's essential to read all of the public
13 literature about that product?
14   MR. CARTMELL:  Object to form.
15 BY MS. GEIST:
16   Q.  Is that what you're telling me?
17   **A.  I would never use the word all.  I would say**
18 **you better have a good grasp of the available trends of**
19 **thought on a product.**
20   Q.  Well, when you say a good grasp, what do you
21 mean by that?
22   **A.  A good grasp is going to be relative.  Okay?**
23 **I'm at a high-volume institution, a tertiary care**
24 **center, so I'm taking care of these patients on a daily**
25 **basis, so -- and with national and international**

Page 53

1 **meetings, I just got back from a meeting in Stockholm**
2 **dealing with mesh problems, okay.  So my grasp of it is**
3 **a daily interaction.**
4    **If you're talking about an individual out in**
5 **private practice, in the middle of somewhere else,**
6 **that's going to take a little bit more work to become**
7 **involved, to have a good grasp of available knowledge.**
8 **So, again, that's a relative statement.**
9    Q.  Okay.  Let me try and bring it back, Doctor,
10 because what I'm talking about is, you told me you
11 believe you're an expert on the Bard Avaulta product,
12 correct?
13   **A.  I am an expert on the Avaulta product, yes.**
14   Q.  Okay.  So my question is, is it a good idea to
15 read all of the literature, the published literature,
16 about the actual product in which you're claiming to be
17 an expert?
18   MR. CARTMELL:  Object to the form.  It's vague and
19 ambiguous.
20 BY THE WITNESS:
21   **A.  I can state, without any shadow of a doubt,**
22 **absolutely I have read all of the available documents**
23 **that I know of, medical literature published and some in**
24 **abstract form, on the Avaulta products.**
25   Q.  How many published articles are there relating

In Re: CR Bard 200  Daniel Elliott, M.D.  11/15/2014

Page 54

1   to the Avaulta products specifically, do you know?
2   **A.   Yes.**
3    MR. CARTMELL:  Object to the form.  Go ahead.
4   BY THE WITNESS:
5    **A.   I can state of what I did on my search.  This**
6   **was not provided to me by counsel.  This is my search**
7   **that I came up with 17 articles.**
8    Q.   And are all of those listed on your reliance
9   list?
10    **A.   Yes.  And some of those will be from meetings**
11   **where the general public won't have access to those**
12   **because they're abstract forms that I have access to.**
13    Q.   How about reviewing the regulatory submissions
14   for the clearance to market a medical device?  Is that a
15   good idea to review that in order to become an expert on
16   that device?
17    MR. CARTMELL:  Object to form.
18   BY THE WITNESS:
19    **A.   I think you have to have a good working**
20   **knowledge of the requirements, regulations, the**
21   **warnings, and the labels for a product.**
22    Q.   I appreciate that answer, Doctor.  But my
23   question is, is it a good idea to read the regulatory
24   submission to the FDA in order to become an expert about
25   that medical device?

Page 55

1    MR. CARTMELL:  Object to the form.  Asked and
2   answered.  He just answered that exact question.
3    MS. GEIST:  No, he didn't.
4    MR. CARTMELL:  You can answer it again.  Yes, he
5   did.
6    MS. GEIST:  No, he didn't.
7    MR. CARTMELL:  Well, see, what you want to do
8   is you want to --
9    MS. GEIST:  No, no, no.
10    MR. CARTMELL:  No, no.
11    MS. GEIST:  We're not -- hold on.  Hold on.  Wait
12   for the record.
13    MR. CARTMELL:  Step out of the room.
14    **THE WITNESS:  I'll step out.**
15    MR. CARTMELL:  Go ahead and step out.  Go ahead and
16   step out.
17    (Exit the witness.)
18    MS. GEIST:  We're not going to proceed today with
19   speaking objections.
20    MR. CARTMELL:  We're not going to proceed like
21   you're doing right now.  Okay.
22    MS. GEIST:  Wait.  Hold on.  You have to let me
23   finish.
24    MR. CARTMELL:  No.  I'm talking right now.  Go
25   ahead.  We are not going to proceed today --

Page 56

1    MS. GEIST:  All right.  You go first and then I
2   will go.
3    MR. CARTMELL:  We're not going to proceed today
4   where you ask a question and he answers it and you don't
5   like his answer because it's not your yes or no, you
6   know, in a question that can't be answered yes or no.
7   So you do your little harassment statement like, Doctor,
8   you haven't answered my question.  I'm going to answer
9   (sic) it again in hopes that he gives you exactly the
10   answer you want.  We're not going to do that for hour
11   after hour after hour.
12    We've been going for an hour now and you've
13   done it about 30 percent of the time.  So I want to make
14   the record clear that you can ask him a question.  I'm
15   fine with it.  If he gives you an answer, then you need
16   to move on.  If he doesn't answer it, I'm fine with you
17   re-asking it.  But when he does, in fairness to the
18   witness, don't try to harass him into giving an answer
19   that you think is right even though he's answered it
20   already.  That's my record.
21    MS. GEIST:  So my record is this, the objections
22   during this type of deposition, like any other
23   deposition taken according to the Federal Rules, are
24   objections to form, not speaking objections.  We've been
25   going, I guess, about an hour and you have made multiple

Page 57

1   speaking objections, which are against the rules.  So
2   I'd ask you to stop doing it.
3    MR. CARTMELL:  Okay.
4    MS. GEIST:  Make your objections to form for the
5   record.  The doctor -- and just for the -- just for the
6   record about this last question, he did not answer my
7   question.
8    MR. KUNTZ:  Let's go back and read that.
9    MS. GEIST:  I asked him --
10    MR. KUNTZ:  He absolutely did.  Let's go -- let's
11   go back and look at it.
12    MS. GEIST:  You're interrupting me.
13    MR. CARTMELL:  No.
14    MR. KUNTZ:  Because you're wrong.  Pull it up and
15   look at it while he's out of the room.  You're not even
16   close he answered it.
17    MR. CARTMELL:  Right.
18    MR. KUNTZ:  You're not even close.
19    MS. GEIST:  You're interrupting me.  I asked him
20   specifically about whether he should review, somebody
21   who is claiming to be an expert on the product, whether
22   they should review the regulatory submissions for that
23   product.  And he gave me a whole answer about you should
24   be familiar with regulatory rules and everything else.
25   The answer (sic) was, did he review the regulatory

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 58

1  submission for this product or not?  He hasn't answered
2  that question.
3       MR. KUNTZ:  And he said, yes, three questions
4  before that.
5       MS. GEIST:  No, he didn't.
6       MR. CARTMELL:  You didn't ask him if he reviewed
7  the regulatory submission for this product.
8       MS. GEIST:  I said, would it be a good idea --
9       MR. CARTMELL:  Hold on.
10      MS. GEIST:  -- to review the regulatory submission
11  for the product in which you're claiming to be an
12  expert.
13      MR. CARTMELL:  Okay.  And his response was you need
14  to have a working knowledge of the regulatory
15  requirements for the product.  He answered your
16  question.
17      MS. GEIST:  No, that's not the -- let --
18      MR. CARTMELL:  If you --
19      MS. GEIST:  -- answer --
20      MR. CARTMELL:  Don't interrupt me.
21      MS. GEIST:  You guys are interrupting me.  It's
22  like a tag team here.
23      MR. CARTMELL:  If you then ask him, Well, did you
24  review the regulatory submission for this product,
25  Doctor --

Page 59

1       MS. GEIST:  I will.
2       MR. CARTMELL:  -- then that would be a different
3  question.  But he answered your first question.
4       MS. GEIST:  No, he didn't.
5       MR. CARTMELL:  And you wanted him to say, yes, and
6  he told you that it was -- it would be required to have
7  a working knowledge.  Now you're entitled to then
8  explore that, Melissa.  I'm fine with that.  But, you
9  know, the problem is you ask these questions that are
10  not precise, he answers them part -- you know,
11  particularly the way he can based on your question
12  that's not precise, and you're offended by that and you
13  ask the exact same question.
14          That's the problem I have with it.  That's it.
15  Now he's out of the room.  That's why he's out of the
16  room, because I didn't want to do this, all of this
17  speaking stuff, in front of him.  And I will continue to
18  send him out of the room when we get to situations where
19  you're just not being fair to the witness.  That's the
20  only reason I want to make it clear on the record is my
21  speaking objections are going to be when he's out of the
22  room, but I am going to continue to do them as long as
23  you're unfair to the witness.
24      MS. GEIST:  Well, I appreciate your comments.
25  You've been making plenty of speaking objections while

Page 60

1  he's been in this room.  This is the first time he's
2  been out of the room.  So we'll just continue it and see
3  how it goes.
4       MR. CARTMELL:  Okay.  You can come in.
5          (Enter the witness.)
6       MR. CARTMELL:  Can we, for the record, read your
7  last question and his response?
8       MS. GEIST:  I agree with that.
9       MR. CARTMELL:  Okay.
10         (Record read as requested.)
11      MS. GEIST:  Right.
12      MR. CARTMELL:  Thank you.
13  BY MS. GEIST:
14      Q.  And I appreciate that, Doctor.  But my
15  question is, should you review the regulatory
16  submission -- the submission, not the regulations that
17  you talked about and the other things you talked
18  about -- in order to become an expert on a particular
19  medical device, would it be a good idea to review the
20  submission to FDA for that product to be cleared?
21      MR. CARTMELL:  Object to the form.
22  BY THE WITNESS:
23      **A.  Specifically, the 510(k) submission you're**
24  **referring to?**
25      Q.  Yes.

Page 61

1       **A.  Yes.**
2       Q.  And did you do that in this case?
3       **A.  Yes, all 506 pages of it.**
4       Q.  Thank you.  Is that 510(k) submission on your
5  reliance list, Doctor?
6       **A.  I'd have to look at the reliance list.  I'm**
7  **not sure.**
8       Q.  But it's your testimony that you reviewed the
9  510(k) submission for the Avaulta products in its
10  entirety?
11      MR. CARTMELL:  Object.  Asked and answered.
12  BY MS. GEIST:
13      Q.  I'm just trying to understand your testimony.
14      **A.  Okay.  The document, as I recall, was,**
15  **roughly, 506 pages.  I may be off on that, plus or minus**
16  **10 or 20 here and there.  I went through and read over**
17  **almost every single page of that.  I scanned every**
18  **single page.  Some of them were duplicates.  Some it was**
19  **regulatory data.  So, yes, to answer your question.**
20      Q.  Thank you.  Doctor, I know we just went off --
21  well, we didn't go off the record, but you left the room
22  for a little bit on a break.  Are you okay to keep going
23  right now, or do you need a --
24      **A.  No.  No.  Keep going.**
25      Q.  -- bio break or anything?  Okay.  Great.

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 62

1       Let me have you look at your deposition notice
2   for a second, Doctor, which we've marked as Exhibit 1 to
3   your deposition.  Have you seen this before --
4       A.  Yes.
5       Q.  -- Dr. Elliott?
6       A.  Yes.
7       Q.  Okay.  It asks you to bring a number of things
8   with you here to your deposition.  Do you see that?
9       A.  Yes.
10      Q.  They're listed on Exhibit A?
11      A.  Correct.
12      Q.  The first thing is a copy of your CV.  Do you
13   see that, Doctor?
14      A.  Yes.  Yes.
15      Q.  That's contained as part of your expert
16   report, correct?
17      A.  Yes.
18      Q.  Is that an up-to-date version of your
19   curriculum vitae and bibliography?
20      A.  It appears to be within the past month or so,
21   so it would be fairly accurate.
22      Q.  Do you need to add anything or provide any
23   addendum to that CV sitting here now?
24      A.  As I sit here now quickly going over it, I
25   don't think anything significant needs to be added.

Page 63

1   I've given some recent talks at Minnesota's Urology's
2   Society.  That might not be on here, but that would be
3   not pertaining to mesh products.  The most important one
4   is I sit on the education committee for Society of
5   Urodynamics and Female Urology, and I need to make sure
6   that's on here.
7       Q.  Okay.  If it's not, as long as you just
8   testified to that, that's fine.
9       A.  Yeah.
10      Q.  Anything else?
11      A.  And that would be -- and then papers, it
12   appears to be accurate.
13      Q.  Referring to your papers for a minute, do you
14   have any particular area of research that you
15   concentrate on?
16      A.  The pelvis.
17      Q.  The pelvis, in general?
18      A.  Well, I mean, as far as research and
19   incontinence, pelvic organ prolapse is where I focus on.
20      Q.  If someone were to ask you, well, you know,
21   Doctor, what are you best known for, what's your claim
22   to fame, what would you say?
23      A.  Probably dealing with mesh organ
24   complications, dealing with complications, the surgical
25   correction of those, male incontinence, being the first

Page 64

1   in the world to perform a robotic sacrocolpopexy and
2   writing on that.
3       Q.  The robotic-assisted laparoscopic
4   sacrocolpopexy?
5       A.  Correct.
6       Q.  That's one of the prime areas of your
7   research; fair to say?
8       A.  I focus quite a bit on that, yeah.
9       Q.  How many times have you published on the area
10   of mesh complications?
11      A.  One that I know of, that I can think of off
12   the top of my head, and then another one is submitted
13   but it has not been published yet.
14      Q.  And where on your CV is the one publication
15   that you've done relating to mesh complications?
16      A.  Well, as far as specific -- excuse me.  Let me
17   go to my -- this is not in the format I'm usually used
18   to looking at it.
19      Q.  Take your time.
20      A.  Speaking of mesh complications and papers that
21   involve mesh complications, that would be No. 37,
22   Robotics and Laparoscopy for Vaginal Prolapse and
23   Incontinence.
24      Q.  That paper has to do with mesh complications?
25      A.  Correct.

Page 65

1       Q.  Okay.  And what else?
2       A.  Then --
3       Q.  Is there anything else?
4       A.  Yes.  And then No. 43, Shimko, Umbreit -- oh,
5   it's my paper.  I'm the senior author -- Long-Term
6   Outcomes of Robotic-Assisted Laparoscopic
7   Sacrocolpopexy.  And then --
8       Q.  I'm sorry.  That paper also has to do with
9   complications associated with mesh implantation?
10      A.  Absolutely.
11      Q.  And what else?
12      A.  And I'm trying to get to the first article we
13   wrote on this.  I will get there in just one second.
14   Here we go.  Number 24, which I am the senior author,
15   Robotic-Assisted Laparoscopic Sacrocolpopexy With
16   Treatment of Vaginal Vault Prolapse.
17      Q.  All three of those articles focus primarily on
18   your work and research relating to robotic-assisted
19   laparoscopic sacrocolpopexy, correct?
20      A.  What I've mentioned so far has been, but I
21   haven't gone through my CV completely.
22      Q.  Okay.
23      A.  Okay.  Number 25 is, Time-Dependent Variations
24   in Biochemical Properties of Cadaveric, Porcine Dermis,
25   Porcine Small Intestine, and Polypropylene Mesh, and

Page 66

1 **Autologous Fascia in a Rabbit Model. Number,**
2 **Gynecologic Use of Robotic-Assisted Laparoscopic**
3 **Sacrocolpopexy For the Treatment of High Vaginal Vault**
4 **Prolapse.**
5    Q. Those -- those two articles, 25 and 26, have
6 to do with mesh explant procedures?
7    **A. Mesh complications, mesh inflammatory process.**
8 **Number 27, where I am the senior author, time --**
9 **time-dependent variations in inflammation and scar**
10 **formation in six different pubovaginal sling materials**
11 **in a rabbit model, which polypropylene was one of those.**
12    Q. These three studies you just cited to me, 25,
13 26, and 27, these were all animal studies, correct?
14    **A. No. Incorrect. One of those was human. 24**
15 **was human.**
16    Q. Sorry. I was talking about 25, 26, and 27?
17    **A. Okay. 25, no. 26 is human. 28, Current**
18 **Status of Robotics in Female Urology and Gynecology,**
19 **focused on the complications and the management of**
20 **complications.**
21    Q. For mesh?
22    **A. For mesh. Number 30, Long-Term Results of**
23 **Robotic-Assisted Laparoscopic Sacrocolpopexy For the**
24 **Treatment of High-Grade Vaginal Vault Prolapse.**
25 **Number -- do you want me to go through the whole list,**

Page 67

1 **because it keeps going here.**
2    Q. Well, I'm sort of -- I'm sort of bewildered,
3 Doctor, because I read all of these articles and they
4 all deal with robotic-assisted laparoscopic
5 sacrocolpopexy primarily. There may be a line or two in
6 here about mesh complications. But I think it's a
7 stretch to say any of these articles deal with mesh
8 complications; do you disagree?
9    MR. CARTMELL: Object. It's argumentative.
10 BY THE WITNESS:
11    **A. I I--**
12    Q. I'm not trying to be argumentative. I'm
13 asking if you disagree.
14    **A. I completely disagree. Is it mesh? Yes. Is**
15 **it for vaginal prolapse? Yes. Is there complications?**
16 **Yes. So, unequivocally, yes, this is dealing with**
17 **complications.**
18    Q. So maybe my question wasn't precise. Do any
19 of these articles deal with mesh complications resulting
20 from a transvaginal implant of polypropylene mesh?
21    **A. Yes. Number 54, does risk -- repeat risk --**
22 **excuse me. Risk of Repeat Anti-Incontinence Surgery**
23 **Following Sling Release, a review of 93 patients, which**
24 **the majority of those were mesh obstructions and**
25 **treatments.**

Page 68

1    Q. And that was -- that article relates to mesh
2 implanted to treat stress urinary incontinence, right?
3    **A. Correct.**
4    Q. Or the sling procedure, in other words?
5    **A. Sling is a generic term for it; but, by and**
6 **large, you're correct, yes.**
7    Q. Okay. And I am using a generic term. Have
8 you implanted, Doctor, in the area of mesh complications
9 resulting from transvaginal implant of mesh for the
10 purpose of repairing pelvic organ prolapse?
11    **A. We have submitted manuscripts dealing with**
12 **laser resection of pelvic -- of pelvic organ erosion**
13 **from meshes involving not just incontinence procedures,**
14 **but also pelvic organ prolapse. And I have been invited**
15 **to speak at the SUFU meeting in February speaking with**
16 **laser management of these complications. And that paper**
17 **has also been submitted to the American Urologic**
18 **Association meeting in May this year.**
19    Q. So you have a pretty extensive publication
20 list on your CV. You agree with me on that, Doctor, I
21 assume? We're not going to argue about that?
22    **A. I work hard on it.**
23    Q. Yeah. And you've done some pretty good and
24 cutting-edge work in the areas of robotic-assisted
25 laparoscopic sacrocolpopexy. Fair to say?

Page 69

1    **A. We were the first in the world to do it and**
2 **publish on it, yes.**
3    Q. Yep. But you don't have a single article yet
4 published relating to mesh complications resulting from
5 the use of transvaginal mesh for pelvic organ prolapse;
6 is that true?
7    **A. Not yet. But we've spoken on it in national**
8 **and international meetings and have manuscripts**
9 **submitted.**
10    Q. Okay.
11    **A. But you are -- you are correct, limited to**
12 **publications, no, I do not.**
13    Q. And you told me you have something in
14 submission?
15    **A. Correct.**
16    Q. Does it have a title?
17    **A. Well, yes, it does have a title. I can't**
18 **quote it exactly. It will be Holmium Laser Management**
19 **of Transvaginal Mesh Erosion.**
20    Q. I'm sorry. What did -- what laser management?
21 Can you say that for me?
22    **A. A Holmium, H-O-L-I-U-M (sic), Laser Management**
23 **of Transvaginal Mesh Erosion. So that includes in there**
24 **the pelvic organ prolapse erosions into the -- into the**
25 **bladder, urethra.**

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 70

1    Q.   What is holium (sic) laser management?
2    A.   Holmium, it's just a type of laser.  It's a
3  specific product of laser.  There's different types of
4  lasers, green light laser, all of these different types
5  of lasers.  This happens to be one specific type of
6  laser that we have found works quite well on dealing
7  with some of these mesh problems.
8    Q.   Are you the lead author on the paper?
9    A.   I am the senior author.
10   Q.   Is there a difference?
11   A.   Lead author -- well, it depends how we were
12  defining it.
13   Q.   I don't know.  How are you defining it?
14 Senior meaning old or --
15   A.   We have first author -- you have first author,
16  second author, third author, fourth author, or however
17  many authors there are, and then a lead or senior
18  author.  Lead or senior one means they're the boss.
19  First author is the one who does the most as far as the
20  data gathering or work on it.
21   Q.   And what -- what journal or journals have you
22  submitted the article to?
23   A.   The Journal of Urology.
24   Q.   And who else was involved in the research on
25  this article?

Page 71

1    A.   Well, we have a resident involved with it.
2    Q.   Is it you and a resident?
3    A.   Yeah.  Myself and a resident, yeah.  But there
4  has been multiple residents over the years who have
5  gathered data and things like that.
6    Q.   And, in a nutshell, what's the summary and
7  conclusions of the paper?
8    A.   It is meant to address the problem of the mesh
9  erosions, which early on in my career, we were -- I was
10  doing a lot of major transabdominal procedures to get
11  the mesh out.  It was a very morbid or bloody and
12  painful procedure.  A colleague of mine uses holmium
13  lasers to break apart stones, and we did some research
14  and found that it works on polypropylene.
15       So we had a woman who originally came in to us
16  with a mesh that went through the urethra, which is very
17  difficult to deal with, to take out.  It's scarred in
18  like crazy.  So we decided to try it with her consent.
19  That we -- it may or may not work.  But if it works, it
20  will save her major surgery.  And so we were able to,
21  with the laser, go in and cut the mesh off as it went
22  through and through the urethra.
23   Q.   So is this a one-patient case study?
24   A.   No.  That was a patient that prompted the
25  dealing with it.  But, again, the traditional way of

Page 72

1  doing that is transvaginal and the urethra is shredded
2  apart.  The women is usually or can be totally
3  incontinent the rest of her life.  So we wanted to try a
4  different way.  So that was the impetus, the initial
5  patient one.  And then since then I've seen a fair
6  number of these.  We're up to about 15 or 20 of these
7  types of --
8    Q.   Sorry.  Let me interrupt you purposefully.
9  When you said 15 or 20, so you've performed the holmium
10  laser procedure on 15 or 20 patients?
11   A.   Correct.
12   Q.   Okay.  Sorry.  Go ahead.
13   A.   But we submit the paper and then we continued
14  to gather data, so I can never remember what the numbers
15  are because, again, we continue to add.  So it's roughly
16  20, and that's involving mainly -- well, it is
17  essentially just the bladder and urethral injuries.
18   Q.   We're talking about women who have experienced
19  visceral erosion?
20   A.   Well, into the bladder.  The gynecologists at
21  my institution will deal with the perforations -- well,
22  actually, I'm sorry.  I take that back.  There was one
23  woman who had a rectal perforation, so we dealt with
24  that one, too.  So -- but, mainly, mine our bladder and
25  urethra.  The gynecologists at my institution are

Page 73

1  dealing with the ones involving other organs.  We kind
2  of agreed to divide up the -- so we can have more
3  expertise in dealing with this.
4    Q.   So what was the outcome of using the
5  holmium -- holmium laser to excise the mesh?
6    A.   We have, roughly, a 75 percent success with
7  one treatment.  Unfortunately, the ones who come back
8  with a recurrent erosion, it requires multiple
9  treatments to try and get those fixed and some of them
10  we can't get fixed.  I just saw one of them back last
11  week and she has, now, a recurrence of her erosion into
12  the bladder.  The problem has continued to get worse.
13   Q.   Is this the only pending publication or
14  manuscript submitted for publication relating to mesh
15  extraction?
16   A.   I believe so, yes.
17   Q.   And is the laser procedure, I assume, a
18  minimally invasive procedure?
19   A.   Well, minimally invasive is a relative term,
20  also.  It is less invasive than doing this with an
21  incision.  It is -- there are significant risks when we
22  do this because any woman -- any woman who has an
23  erosion, whether it be urethra or vagina into the
24  bladder, the tissues are thin.  And so, as we resect
25  this, we can get into the vagina through and through and

Page 74

1 cause a fistula. So there are major risks with it. So
2 I would be very hesitant to call it -- it's relative.
3 It's relative to open surgery, it is minimally invasive.
4 Relative to doing a bladder biopsy, it's significantly
5 invasive. That's not to be evasive in the answer. It's
6 just that it's subjective.
7     Q. No. Understood. Okay. Doctor, going back,
8 now, to Exhibit 1, which is your notice of deposition --
9     A. Yes.
10     Q. -- it asks you also for a list of all cases in
11 which you have, during the past four years, served as an
12 expert essentially?
13     A. Correct.
14     Q. So, in the past four years, have you served as
15 an expert other than here in the Bard pelvic mesh
16 litigation?
17     A. Yes.
18     Q. And can you let me know about those
19 circumstances, please?
20     A. Yes. What are we, 2014? So 2011 or '12, with
21 Ethicon on the Prolift, I wrote up an expert report;
22 however, I did not go to trial, or however you phrase --
23 however you phrase that.
24     Q. Have you ever testified at trial as an expert
25 witness?

Page 75

1     A. One time.
2     Q. And when was that?
3     A. That was not related to mesh. That was a
4 patent infringement case of generic medical devices
5 versus Coloplast for their transobturator mesh sling.
6 Well, I guess it was a mesh. It was a mesh sling. But
7 that was patent infringement. It had nothing to do with
8 complications. It was patent infringement. And that
9 took place in Tacoma District Court, I believe.
10     Q. How many times have you given a deposition as
11 an expert witness?
12     A. Three.
13     Q. And were those all on behalf of the plaintiffs
14 in a litigation?
15     A. Correct.
16     Q. And were those all against mesh manufacturers?
17     A. Manufacturer, Ethicon.
18     Q. So, prior to this, you gave three depositions
19 on behalf of plaintiffs and against Ethicon in a mesh
20 proceeding?
21     A. I'm going to have to take that back. There
22 was a deposition in November of '11 or '12, and then
23 there was a deposition a few weeks ago. Both of those
24 were with Ethicon and then you. So actually it's three
25 total.

Page 76

1     Q. When did you start getting involved working as
2 an expert for plaintiffs in the mesh litigation; do you
3 remember?
4     A. I believe -- well, actually, I do know. It
5 was in September or so of 2011.
6     Q. And were you retained by plaintiff's counsel
7 at that time in cases pending against Ethicon?
8     A. I don't know the legal nomenclature. I mean,
9 they -- I was contacted. They wanted to know my opinion
10 on subjects, I told them, and then we went from there.
11 So, as far as retained, I don't know that term.
12     Q. Okay. I apologize for that. Let me just ask
13 it this way. You started working with plaintiff's
14 counsel back in September of 2011 in litigation or cases
15 pending against Ethicon; is that a fair summary?
16     A. Correct.
17     Q. And who did you start working with?
18     A. Mr. Ben Anderson.
19     Q. And what firm is he with, do you know?
20     A. Anderson Law Firm in Cleveland.
21     Q. Had you had any prior experience with that law
22 firm?
23     A. None.
24     Q. How about for the --
25     VIDEO TECHNICIAN: Can you repeat that? Sorry.

Page 77

1 BY THE WITNESS:
2     A. Just the Anderson Law Firm in Cleveland, and I
3 had had no prior contact with them.
4     Q. And how about for the Bard litigation? When
5 did you start working for plaintiffs in the Bard
6 litigation as an expert?
7     A. Summer of 2014.
8     Q. So pretty recent?
9     A. Well, June or so, so five months ago.
10     Q. And who approached you to work on this
11 litigation?
12     A. Mr. Anderson.
13     Q. The same guy?
14     A. Correct.
15     Q. Did you bring, as requested in your deposition
16 notice, any invoices or records relating to your
17 compensation as an expert in the litigation?
18     A. I don't have those with me, no.
19     Q. What did you bring with you today, Doctor, in
20 response to the notice? We already -- you have your
21 bibliography, right?
22     A. I have paper copies of my expert report, my
23 bibliography, then the case-specific reports. And then
24 I have electronic copies of -- as far as everything
25 that's on my reliance list, and then most manuscripts.

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 78

1  Not all, but most manuscripts.
2      Q.  Okay.  So sort of in front of you you have
3  paper copies of your reports, your bibliography, and
4  your reliance list.  Everything else is accessible on
5  your laptop?
6      A.  Correct.  And, to be technical, in front of me
7  includes Dropbox.  I have everything.
8          (Brief interruption.)
9      MR. CARTMELL:  Uh-ooh.
10     MS. GEIST:  How about can we take a five-minute bio
11 break?
12     MR. CARTMELL:  Sure.
13     MS. GEIST:  Thanks.
14     VIDEO TECHNICIAN:  We're off the record.  The time
15 is 10:51 a.m.
16         (A recess was had.)
17     VIDEO TECHNICIAN:  We're back on the record.  The
18 time is 11:06 a.m.
19 BY MS. GEIST:
20     Q.  Doctor, referring again to the notice of
21 deposition --
22     VIDEO TECHNICIAN:  Counsel, sorry, I can barely
23 hear you.
24     MS. GEIST:  I'm sorry.  I forgot to put on my
25 microphone.

Page 79

1  BY MS. GEIST:
2      Q.  Doctor, you got your microphone on?
3      A.  (No verbal response.)
4      Q.  All right.  I'm the only one who forgot.
5          Doctor, referring, again, to your notice of
6  deposition, if you flip with me to the second page, it
7  looks like, of the notice, it asks you to bring with you
8  correspondence or e-mails between you and plaintiffs'
9  lawyers that relate to your compensation.  Did you bring
10 any of that with you here today?
11     A.  I don't have any e-mails related to
12 compensation.  I guess I don't -- what do you mean?
13     Q.  So are you being compensated for being an
14 expert witness, I assume?
15     A.  Yes, I am.
16     Q.  You're being paid for your time?
17     A.  Yes.
18     Q.  Have you submitted any invoices so far for
19 work on the cases?
20     A.  Yes.
21     Q.  How many invoices?
22     A.  Well, it started in the summer, this summer.
23 I submit them at the end of the month.  So I don't know
24 exactly what month I submitted it, but there would be
25 three or four invoices.

Page 80

1      Q.  Did you tell me earlier you started working on
2  the litigation in or about June of 2014; is that right?
3      A.  More or less.  It was during the summer.  I
4  don't recall exactly.
5      Q.  Okay.  That's fine.  And you invoice after
6  every 30 days?
7      A.  At the end of the month, correct.
8      Q.  So there would be invoices from approximately
9  July, August, September, October?
10     A.  Correct.
11     Q.  You don't have copies of those with you today?
12     A.  I do not, no.
13     Q.  Can you tell me how much time you spent
14 working on the litigation so far?
15     A.  I don't recall an exact number, no.
16     Q.  How about an approximation?
17     A.  Greater than a hundred.
18     Q.  Greater than a hundred hours?
19     A.  Correct.
20     Q.  So are we talking a thousand hours or
21 somewhere between a hundred and 200 hours?
22     A.  Again, this is pure speculation.  I don't
23 know.  I can't recall the exact numbers.  It would be
24 greater than a hundred, less than two or 300.
25     Q.  All right.  So somewhere between 100 to 300

Page 81

1  hours; is that a fair summary?
2      A.  Probably closer to 200 hours.
3      Q.  Okay.  So somewhere between 100 to 200 hours?
4      A.  Correct.
5      Q.  And that time was spent reviewing all of those
6  500-plus articles that are on your bibliography?
7      A.  That's --
8      MR. CARTMELL:  Object to form.
9  BY THE WITNESS:
10     A.  That's part of what I was doing.
11     Q.  And what else?
12     A.  Reviewing patient records, reviewing internal
13 documents.
14     Q.  So does the 100 to 200 hours include the work
15 you did to form your opinions contained in your generic
16 report as well as your case-specific reports?
17     A.  Correct.
18     Q.  Okay.  Did you break your invoices out
19 separately, invoices for the specific cases versus the
20 invoices for the generic opinions?
21     A.  I submit to Mr. Anderson's office my hours
22 spent.  I don't know if it gets broken down after that.
23     Q.  So do you have detail about what you did in
24 those hours, or is it just an invoice that says I spent
25 50 hours?

In Re: CR Bard 200        Daniel Elliott, M.D.        11/15/2014

Page 82

1   **A. No. It -- no, it will have a daily breakdown**
2 **of each day, deposition review, manuscript review.**
3   MS. GEIST: Can we go off the record a second?
4   VIDEO TECHNICIAN: We're off the record. The time
5 is 11:10 a.m.
6        (A recess was had.)
7   VIDEO TECHNICIAN: We're back on the record. The
8 time is 11:11 a.m.
9 BY MS. GEIST:
10   Q. So, Doctor, just going back to your invoices
11 to plaintiffs' counsel, so there is sort of a narrative
12 for your time spent?
13   **A. There is a brief description of what**
14 **activities; deposition review, manuscript review,**
15 **patient record review.**
16   MS. GEIST: Okay. And, Counsel, I'll just ask that
17 those be provided to us since they were included in the
18 notice of deposition and they're not here today.
19   MR. CARTMELL: Okay. We'll track them down.
20   MS. GEIST: Thank you.
21 BY MS. GEIST:
22   Q. How much money have you made so far on the
23 litigation, Doctor?
24   **A. Because I don't know the number of hours, I**
25 **can't tell you how much I've earned. So I don't have**

Page 83

1 **even a ballpark figure.**
2   Q. Are you being paid as the invoices go in?
3   **A. Yeah. I get paid a month to two months after**
4 **the invoice is submitted.**
5   Q. And you don't know how much you've made so
6 far?
7   **A. I don't keep record, no.**
8   Q. Do you have a ballpark?
9   **A. No, I don't, because I -- I don't even know**
10 **the number of hours I've spent, so I can't even**
11 **extrapolate from that.**
12   Q. So you can't even give me an estimation of how
13 much money you've made and how much you've been
14 compensated for your work on behalf of plaintiffs in
15 this litigation?
16   **A. Again, I can't. The invoices will spell it**
17 **out exactly, but I don't keep records like that.**
18   Q. Well, Is it more than $100,000?
19   **A. Again, I don't -- I don't know. I know that**
20 **I've spent more than a hundred hours working on it.**
21 **But, again, I don't know how much. I don't have -- have**
22 **any way of accurate records pertaining to that.**
23   Q. So let me just look at your fee schedule, and
24 that was part of your expert report, right?
25   **A. Correct.**

Page 84

1   Q. And it just says fee schedule is 700 an hour,
2 right?
3   **A. Correct.**
4   Q. Is the 700-dollar-an-hour fee for anything you
5 do in order to prepare your expert report? In other
6 words, does that cover review of medical records, review
7 of literature, research?
8   **A. Correct.**
9   Q. Do you have a different hourly rate for
10 testimony?
11   **A. No, 700 flat fee.**
12   Q. So, sitting here today, however long we're
13 here together today, it's 700 an hour?
14   **A. Correct.**
15   Q. You don't have a flat fee for an appearance at
16 a deposition or anything like that?
17   **A. No, I do not.**
18   Q. How about trial testimony?
19   **A. 700 flat fee.**
20   Q. How about travel?
21   **A. $700 an hour.**
22   Q. So it's $700 an hour whether you're
23 testifying, traveling, or reviewing medical records?
24   **A. Correct.**
25   Q. Was that the same rate that you charged

Page 85

1 plaintiffs' counsel when you were working as an expert
2 in the Ethicon litigation?
3   **A. Correct. It's always been 700 hours -- $700**
4 **an hour.**
5   Q. Can you tell me how much you were compensated
6 for your work as an expert witness against Ethicon in
7 their pelvic mesh litigation?
8   **A. Same answer, I don't know the number of hours.**
9 **It would be more than Bard, but -- because it was a lot**
10 **longer process, but I don't know the amount.**
11   Q. Are we coming anywhere near a million dollars?
12   MR. CARTMELL: Object to form.
13 BY THE WITNESS:
14   **A. I wouldn't think so, no; but, again, I don't**
15 **keep records like that.**
16   Q. So you don't have any sense at all, even to
17 give me a ballpark estimate, of how much money you've
18 made as an expert witness on behalf of plaintiffs in the
19 pelvic mesh litigation?
20   **A. No. It's been going on three years, and I**
21 **don't keep records.**
22   Q. Can you tell me what percentage of your annual
23 income is derived from work as a plaintiff's expert in
24 the pelvic mesh litigation?
25   **A. That would probably vary from year to year, a**

Page 86

1 third, maybe.

2    Q.   Meaning?

3    A.   Again, I don't even know how much I get on my

4 salary from my day job.

5    Q.   When you say your day job, you're talking

6 about your job as an associate professor of urology?

7    A.   Correct.

8    Q.   At Mayo?

9    A.   Correct.  I don't have records.  It's a bank

10 deposit and I don't even look at it.  I don't know what

11 my benefits are.  I know what my retirement is, but

12 I don't know what my daily salary is or monthly

13 salary.

14    Q.   You don't know how much money you get from

15 Mayo Clinic as an associate professor?

16    A.   No.

17    Q.   Really?

18    A.   It's -- the data is retrievable.  I don't

19 worry about it.

20    Q.   What about, a third of your income over the

21 last three years has been from work as an expert witness

22 on behalf of plaintiffs; is that right?

23    MR. CARTMELL:  Object to the form.

24 BY MS. GEIST:

25    Q.   Well, is that what you just told me?

Page 87

1    A.   That would be rough.  You know, going back to

2 2011, it's probably going to be closer to 25 percent.

3 But, again, that's a ballpark figure, because I don't --

4 that's not something I keep track of.

5    Q.   Dr. Elliott, in reaching your opinions that

6 you've rendered in this litigation, did you rely on any

7 facts or data that were provided to you by counsel for

8 plaintiffs?

9    MR. CARTMELL:  Object to the form.  I don't

10 understand the question.

11 BY THE WITNESS:

12    A.   I mean, I thought that's data they had

13 provided me.  They provided me with what's on the

14 reliance list as far as internal documents.

15    Q.   Did you rely on any summaries or information

16 provided to you prepared by counsel?

17    A.   Well, they didn't provide me any summaries.

18 They provided me documents.

19    Q.   Did -- did any of your opinions that you've

20 reached in this litigation, were any of them based on

21 assumptions that were provided to you by counsel?

22    MR. CARTMELL:  Object to the form.

23 BY THE WITNESS:

24    A.   No.  I had strong opinions regarding

25 transvaginal mesh starting back prior to 2011, starting

Page 88

1 back in 2005, really.  And so what they provided me

2 would augment or increase my knowledge and

3 understanding, but it didn't alter.

4    Q.   You already were sort of out there as a

5 well-known doctor speaking against transvaginal mesh; is

6 that fair to say?

7    MR. CARTMELL:  Object to the form.

8 BY THE WITNESS:

9    A.   I was -- I was one of those speaking out

10 against meshes, that's correct, the anti-mesh group.

11    Q.   You're one of leaders of the anti-mesh group?

12    MR. CARTMELL:  Object to form.

13 BY THE WITNESS:

14    A.   Well, I don't know how you justify it.  I may

15 not quantify if I'm a leader or not.  I've made --

16    Q.   Well, you're one of the -- I'm sorry.  Go

17 ahead.

18    A.   I've made public statements.

19    Q.   So you're one of the most outspoken physicians

20 in terms of the anti-mesh group?

21    MR. CARTMELL:  Object to the form.

22 BY MS. GEIST:

23    Q.   Is that fair to say?

24    A.   No.  I wouldn't say I'm one of the most.  I

25 think there's some others out there who have been much

Page 89

1 louder in speaking against meshes.

2    Q.   Who has been much louder than you?

3    MR. CARTMELL:  Object to the form.

4 BY THE WITNESS:

5    A.   Shlomo Raz at UCLA, Philippe Zimmern at UT

6 Southwestern, Louis Wahl at St. Louis, Ostergard.  I

7 don't know where he's at, California somewhere.  But I'm

8 not denying it.  I've been anti-mesh from the beginning.

9 I'm not saying I'm not, but I'm not the only one out

10 there.

11    Q.   Did you review any of the expert reports

12 provided from some of the other doctors rendering

13 reports on behalf of the plaintiffs?

14    A.   I'd have to look in the reliance list for all

15 that I've reviewed.  I have reviewed expert reports.  I

16 can't recall all of the ones I have reviewed.

17    Q.   Well, for this particular litigation, your

18 opinions here, did you rely on any of the other experts

19 provided on behalf of plaintiffs by other experts?

20    A.   It depends on how you're defining rely.  I'm

21 looking at them with an open mind seeing what they have

22 to say and if it's consistent or inconsistent with my

23 opinions.  So, yes, I've looked at the materials

24 expert's report.  I don't recall his name.  I'm not very

25 good with names.  So, again, my reliance report would

In Re: CR Bard 200                     Daniel Elliott, M.D.                          11/15/2014

Page 90

1  have that on there. I don't know if we have an updated
2  copy of that. That might be nice, too.
3      Q. You understand there's a separate materials or
4  biomaterials expert who has provided opinions in the
5  litigation, correct?
6      A. Correct. Yes.
7      Q. And you're not a biomaterials expert, correct?
8      MR. CARTMELL: Object to the form.
9  BY THE WITNESS:
10     A. Well, I wouldn't say that's correct. I have
11  deal -- I deal with meshes. I deal with mesh
12  complications. I've done research on meshes. I deal
13  with the complications and transvaginal management of
14  those things. I have two animal studies -- three animal
15  studies, excuse me. I take that back. Two animal
16  studies dealing with meshes. So I have basic science
17  and human research on this.
18         So I am a materials expert. Am I a Ph.D. or
19  an engineer in biomaterials, no. But I do consider
20  myself, from the urologic-GYN perspective, a
21  biomaterials expert.
22     Q. So that's a little different than what you
23  said when you were deposed in the Ethicon proceeding; do
24  you remember that?
25     A. I don't recall.

Page 91

1      Q. Do you remember admitting, in that deposition,
2  that you were not a biomaterials expert?
3      A. I would have to --
4      MR. CARTMELL: Object to form.
5  BY THE WITNESS:
6      A. I would have to see what I said. If you have
7  that, I would like to see that.
8      Q. You know what, Doctor, I can't find it right
9  this minute, but I don't want to waste time. So I'll
10  pull it up and look again.
11         But do you recall giving a deposition in the
12  litigation against Ethicon here at Wexler Wallace's
13  office a couple months ago on September 13th, 2014?
14     A. Yeah. I remember giving a deposition, yeah.
15     Q. Do you remember that? And do you remember
16  being asked about whether or not you were a biomaterials
17  expert?
18     A. I don't recall that specific question.
19     Q. But it's your testimony here today that you
20  are a biomaterials expert?
21     MR. CARTMELL: Objection. Asked and answered. He
22  just answered that same question.
23  BY THE WITNESS:
24     A. I agree with exactly what I just said this
25  time with those qualifiers.

Page 92

1      Q. So do you have a background in polymer
2  science?
3      A. Well, I've taken organic chemistry and
4  physics, so I do have a background in dealing with those
5  products.
6      Q. Do you consider yourself an expert in polymer
7  science?
8      A. As it pertains to the transvaginal application
9  and the complications, I have a better working knowledge
10  than the average with it.
11     Q. No. That wasn't my question. Are you an
12  expert in polymer science?
13     A. Define --
14     MR. CARTMELL: Object to the form.
15  BY THE WITNESS:
16     A. Define expert then.
17     Q. So do you have any degrees in either polymer
18  science or biomaterials?
19     A. With those qualifiers, no, I do not have an
20  advanced degree in polymer science.
21     Q. Do you have any particular education in
22  polymer science or biomaterials?
23     A. I have a significant amount of education
24  pertaining to those issues.
25     Q. Tell me about that.

Page 93

1      A. Okay. As far as dealing with meshes and their
2  complications, reviews of the medical literature, both
3  basic science and human research in vivo and in vitro.
4  I would have to say in reviewing the internal documents,
5  both with Bard and also with Ethicon.
6      Q. So other than being engaged in explant
7  procedures and reviewing documents, do you have any
8  particular training or education in the area of
9  biomaterials or polymer science?
10     A. Oh, yeah. I've written two papers on that
11  specifically dealing with the polypropylene meshes in
12  the rabbit model, dealing with the forces involved with
13  fracturing, the inflammation, dealing with the
14  pathologists and engineers.
15     Q. Did -- and it's those two papers on which you
16  rely for your expertise on polymer science and
17  biomaterials?
18     A. Well, that's two of the ones that I rely upon,
19  yeah, but that was pretty extensive work done.
20     Q. Have you ever been qualified as a biomaterials
21  or polymer science expert?
22     A. I guess I don't understand that question.
23  Again, I am not a Ph.D. in the subject. I'm not a Ph.D.
24  in the subject. I don't carry that, but I am an expert
25  dealing with the ramifications when implanted in the

In Re: CR Bard 200     Daniel Elliott, M.D.     11/15/2014

Page 94

1 **female body.**
2    Q.  Do -- have you ever been qualified by a judge
3 at a trial as an expert in polymer science or
4 biomaterials?
5    A.  I have no way of answering.  I don't know if I
6 have it or have not.
7    Q.  Do you hold yourself out to your colleagues as
8 an expert in polymer science or biomaterials?
9    **A.  In biomaterials and mesh and mesh**
10 **complications, I do hold myself out as an expert in it**
11 **and they also hold me out as an expert by inviting me to**
12 **speak this year at the National Female Urology Meeting** 13   on
13 **mesh complications and management of them, and that's** 14   all
14 **dealing with the biomaterials and complications.**
15    Q.  Did -- have you conducted any type of
16 laboratory or other type of testing on the Avaulta
17 polypropylene mesh products?
18    **A.  Not specific on the Avaulta polypropylene.**
19 **I've done it on collagen, but not on polypropylene.**
20    Q.  You've never tested the Avaulta products,
21 correct?
22    **A.  If you're talking -- you're meaning a basic**
23 **science research?  I guess, I don't know what you mean**
24 **by that.  Clarify what you mean.**
25    Q.  Well, did you -- have you done -- have you

Page 95

1 published any paper relating to the Avaulta products?
2    **A.  Okay.  Specifically with the Avaulta product,**
3 **yeah, our laser -- our laser resection paper is going to**
4 **have an Avaulta product in it.**
5    Q.  Have -- you've never done a study on Avaulta
6 products, though, have you?
7    **A.  Not limiting it to just Avaulta products, no.**
8    Q.  Well, what studies have you done that involved
9 Avaulta products?
10    **A.  Well, I'm talking about the laser resection**
11 **paper.**
12    Q.  That's the one that you've submitted for
13 publication?
14    **A.  Correct.**
15    Q.  It hasn't been approved or accepted for
16 publication yet, correct?
17    **A.  Correct.**
18    Q.  And the extent of the discussion of the
19 Avaulta products in that paper relate to the explant
20 procedures you did -- you did using a laser?
21    **A.  Correct.**
22    Q.  And how many women, again, were involved in
23 that paper?
24    **A.  15 to 20.**
25    Q.  And how many of the 15 to 20 women had Avaulta

Page 96

1 products that were explanted?
2    **A.  For that paper, roughly, a third.**
3    Q.  And how do you know that it was the Avaulta
4 products you were involved in explanting using the
5 laser?
6    **A.  Because prior to me seeing any patient, I have**
7 **to have the outside records, outside implantation**
8 **records.**
9    Q.  So you have them for all of the third of the
10 15 to 20 women?
11    **A.  Correct.  I have them for all of the women and**
12 **a third of them, roughly, were Avaulta products.**
13    Q.  Other than this experience with the Avaulta
14 products, have you done any testing or analysis on the
15 Avaulta products?
16    **A.  No.  I've reviewed the testing of others.**
17    MR. CARTMELL:  Sorry.
18 BY MS. GEIST:
19    Q.  You haven't actually conducted any tests on
20 the Avaulta products yourself, correct?
21    **A.  Other than what I mentioned as far as the**
22 **study, I personally, to the best of my knowledge, have**
23 **not done a basic science study on it like you mentioned.**
24    Q.  Okay.  And we already talked before you've
25 never implanted an Avaulta product, right?

Page 97

1    A.  Correct.
2    Q.  Do you know any of the plaintiffs' experts in
3 this litigation?
4    **A.  I don't know who the plaintiffs' experts are**
5 **other than, I believe, Dr. Wilkes.  I think I saw his**
6 **name, but I don't know him.  But I don't know who their**
7 **other experts are.**
8    Q.  Did -- other than plaintiffs' counsel, did you
9 talk to any other physicians about your opinions in this
10 case?
11    **A.  No.**
12    Q.  Did you meet with any of the other plaintiffs'
13 experts and talk about your opinions in this case?
14    **A.  I don't even know who the other plaintiffs'**
15 **experts are.**
16    Q.  You understand that you're not being put
17 forward as a biomaterials expert here, correct?
18    MR. CARTMELL:  Well, I object to the extent I don't
19 think that's a correct statement.  I mean --
20    MS. GEIST:  Well, you told me before --
21    MR. CARTMELL:  -- he -- he's clearly, in his
22 report, giving biomaterials expert opinions.  So I'm
23 going to instruct him not to answer that question.
24 That's based on a fact that's not true.
25

Page 98

1 BY MS. GEIST:
2    Q.  You understand there is a separate
3 biomaterials-designated expert on behalf of plaintiffs
4 in this litigation as you've told me before, correct?
5    **A.  I believe Dr. Wilkes is a biomaterials expert;**
6 **but, again, I don't know.**
7    Q.  Didn't you tell me that you reviewed some of
8 the other expert reports and you reviewed the report of
9 the biomaterials expert, whoever that may be?
10    **A.  No.  For clarification with that, I reviewed**
11 **Wilkes' report.  I don't know if I've reviewed any**
12 **others in the process of this.**
13    Q.  Did you review a report from a biomaterials
14 expert?
15    **A.  Well, I don't know what Dr. Wilkes' role is.**
16 **So I would have to look up and see what his role is.**
17 **That report I reviewed.**
18    Q.  And what did that report talk about?
19    **A.  It talked about the meshes, the complications,**
20 **the pore sizes, the inflammation, collagen, interplay.**
21    Q.  From a materials standpoint?
22    **A.  That's what I'm saying.  I don't know.  I also**
23 **talk about the same things.**
24    Q.  In any of the reports that you reviewed, did
25 you disagree with any of the conclusions reached by any

Page 99

1 of the other experts?
2    **A.  Again, the only report that I recall reviewing**
3 **was Wilkes'.  I don't recall reviewing the others.  I**
4 **may have.  And with Mr. Wilkes or Dr. Wilkes -- again, I**
5 **don't know what his title is -- I had no objection with**
6 **what he had to say.**
7    Q.  You're board-certified, Doctor, in urology,
8 correct?
9    **A.  Correct.**
10    Q.  And female pelvic medicine and reconstructive
11 surgery?
12    **A.  Subspecialized in female pelvic mesh and**
13 **reconstructive surgery by the Board of GYN and the Board**
14 **of Urology.**
15    Q.  So are you board-certified in female pelvic
16 medicine reconstructive surgery?
17    **A.  Correct.  They don't really call it -- you**
18 **would be technically correct.  They don't really call it**
19 **that.  You're board-certified in urology or GYN.  You**
20 **then do subspecialty certification in female pelvic mesh**
21 **and reconstructive surgery.  That is a new development**
22 **in this field in the past five to eight years.  So those**
23 **of us who did -- did residency and fellowship prior to**
24 **the starting of that -- that subspecialty, then we had**
25 **to go back and get further testing.**

Page 100

1    Q.  Didn't they offer board certification in
2 female pelvic medicine and reconstructive surgery
3 beginning in 2013?
4    **A.  Yeah.  That's when I took the exam.  Again, I**
5 **just don't know if you --**
6    Q.  So -- all right.  So I don't understand why my
7 question is difficult.  So you took the exam in 2013?
8    **A.  And passed.  I mean, technically, you're right**
9 **as far as calling it board certification.  We don't go**
10 **around saying we're board-certified in this.  We're**
11 **board-certified in urology.  We're board-certified in**
12 **GYN or dermatology, whatever.  There is subspecialty**
13 **certification that is approved by the board.  So if we**
14 **want to just for -- I'm not trying to be difficult, but**
15 **you can call it board-certified by urology and GYN in**
16 **female pelvic mesh and reconstructive surgery.**
17    Q.  So you're not a board-certified
18 urogynecologist, correct?
19    **A.  Correct.  I am not.**
20    Q.  That's a subspecialty of obstetrics and
21 gynecology?
22    **A.  Correct.**
23    Q.  What's the difference between a
24 urogynecologist and a urologist?
25    **A.  Well, a urogynecologist and a urologist is not**

Page 101

1 a fair comparison.  I am a female urologist, okay.
2 That's the comparison you want because both of us have
3 advanced training in the female pelvis, and in urology
4 we also have it in the male pelvis, too.  So there's
5 very -- once you have passed that female pelvic mesh and
6 reconstructive certificate, you have that certificate,
7 in the eyes of the boards, you are identical.
8    Q.  That's your opinion?
9    **A.  That's the boards' opinion, the boards of**
10 **urology and the boards of GYN.**
11    Q.  You told me earlier that, in this study that's
12 pending approval relating to the laser that you used to
13 explant mesh, that about a third of the women had been
14 implanted with Avaulta products; is that right?
15    **A.  That's a rough estimate, yes.**
16    Q.  Okay.  So, I guess, five to six women based on
17 the total women involved in the study; is that --
18    **A.  Well, it's 15 to 20 patients.**
19    Q.  Right.  So I'm saying five to six --
20    **A.  So five to seven.**
21    Q.  Five to six, five to seven?
22    **A.  Five to seven -- yeah, five to six, that's**
23 **fair.**
24    Q.  That's fine.  We don't have to argue about
25 those numbers.

Page 102

1   What has been the totality of your experience
2 in explanting mesh from women who were implanted with
3 the Bard Avaulta products?
4   **A. I'm sorry, the -- from this --**
5   Q. How many?
6   **A. From this study?**
7   Q. Yeah. No, no, no. Not just the study.
8   **A. Oh.**
9   Q. So how many. Because you told --
10   **A. Sure.**
11   Q. -- we've already talked about the fact that
12 you've never implanted an Avaulta product yourself,
13 correct?
14   **A. Correct. Yep.**
15   Q. But part of the basis for your statement that
16 you're an expert on the Avaulta product is based on your
17 experience explanting the product, true?
18   **A. That's only partially true. That is part of**
19 **my experience.**
20   Q. And that's what I meant to say.
21   **A. Okay.**
22   Q. So if I misspoke, that's fine. But part of
23 the basis for you saying that you're an expert on the
24 Avaulta product is due to your experience explanting the
25 product, correct?

Page 103

1   **A. Correct. That is one segment of my**
2 **experience.**
3   Q. Got it. How many times?
4   **A. I see, in a given week, four to five, six**
5 **patients with mesh complications that started roughly in**
6 **2007 or thereabouts, and then -- it started off slow and**
7 **then it's increased. So I can't give you how many**
8 **numbers, but then not all of those, in fact, the**
9 **minority, are going to surgery because what I am seeing**
10 **them mainly for is pelvic pain. And so I'm operating on**
11 **only a minority of those individuals.**
12   **So if you look at just the surgical, that's**
13 **going to be a smaller number. If you look at the --**
14 **you're just looking at the numerator. You have to look**
15 **at the denominator, which is four to five patients a**
16 **week. Let's just round it up to five patients a week.**
17 **It's going to be, roughly, 60 -- let's see -- 60**
18 **percent, roughly, are going to be AMS products, and then**
19 **it's -- excuse me, 40 percent are AMS products, and,**
20 **roughly, 30, 30 are, excuse me, Ethicon and Bard, and**
21 **then I will see a smattering of the other percentages of**
22 **the other products. The Boston Scientific we don't see**
23 **very many. Also, the Cook product, I see those, also.**
24 **So hundreds would be the answer to that.**
25   Q. So how do you know that? What's the basis for

Page 104

1 that statement?
2   **A. Because I keep track. I keep records of these**
3 **things. And I keep track of who we're seeing on my**
4 **clinic schedule, and I also have operative notes on**
5 **essentially every single patient that comes through. I**
6 **demand it before I see them.**
7   Q. So that's getting more to my question. For
8 every patient that's referred to the Mayo Clinic that
9 you see, do you determine which manufacturer's mesh
10 product they had implanted?
11   **A. Well, I determine it because we review the**
12 **medical records.**
13   Q. Are they all required to come with the medical
14 records?
15   **A. Before. They're supposed to have it before**
16 **they show up. And if they show up without it, then**
17 **before we do anything we need to have them fax us the**
18 **records.**
19   Q. And did you perform some sort of analysis or
20 compilation to determine that 30 percent of the patients
21 you've seen have had one of the Bard products implanted?
22   **A. Yeah. That's -- that's going to be a rough**
23 **estimate because, also, we're going back to 2007, which**
24 **was a smaller number of individuals, but we're keeping**
25 **records then. And so I'm extrapolating that, but that**

Page 105

1 is going to be a rough and fair estimate. AMS
2 Apogee/Perigee is going to be the predominant product
3 that I see. As I mentioned, they're roughly 40 percent.
4 That's because AMS is based 100 miles north of
5 Rochester. So we get a lot more patients who have that
6 implanted.
7   Q. So from 2007 to 2014, has it always been about
8 the same number of referrals per week? You told me four
9 to six or rounded to five patients per week?
10   **A. Start off slow starting in, roughly, 2007.**
11 **Again, that's an estimate. That's looking back. We**
12 **started seeing an uptick in patients. And then, as time**
13 **progressed, then we started seeing more and more and**
14 **more. And then in 2011, after that FDA release, that's**
15 **when we really saw the increase. So, now, the four to**
16 **five or four to six per week is current for the past**
17 **three years. I can't speak with any accuracy going back**
18 **to 2010 and prior.**
19   Q. What do you think was the reason why, in the
20 last three years, you started getting more referrals?
21   **A. Very clear, because patients tell me,**
22 **knowledge that this is occurring to other people besides**
23 **themselves. That's the most common comment I get.**
24   Q. And where do they get that knowledge?
25   **A. Because they -- they read about and heard**

In Re: CR Bard 200     Daniel Elliott, M.D.     11/15/2014

Page 106

1 about the FDA warning, and then they are sitting out
2 thinking they're alone, and then, all of a sudden, they
3 find out there's more people who have the same problem.
4   Q. Well, they're coming to you because they see
5 lawyer advertisements on TV, right?
6   MR. CARTMELL: Object to the form.
7 BY MS. GEIST:
8   Q. Isn't that how they get the knowledge?
9   MR. CARTMELL: Object to the form. He's already
10 answered that question.
11 BY MS. GEIST:
12   Q. Can you answer my question, Doctor?
13   A. Yeah. I can't speak to where they're getting
14 the information, but they're getting the information.
15   Q. Do you ask them?
16   A. I usually do not.
17   Q. You just suddenly since 2011, since there has
18 been a lot of advertising on television, you've had a
19 huge uptick in plaintiffs coming or patients coming with
20 mesh-related complications?
21   MR. CARTMELL: Object to the form. I think he just
22 told you about the FDA 2011 statement.
23   MS. GEIST: You've got to stop with the statements.
24   MR. CARTMELL: Well, when you totally leave out
25 what he --

Page 107

1   MS. GEIST: Let the witness --
2   MR. CARTMELL: Hold on. When you totally leave out
3 what he just told you, change the question to include
4 something else, that's unfair. So, in that
5 circumstance, I'm not going to let you do it.
6   MS. GEIST: You've got to make an objection to
7 form; and, otherwise, you have to stop.
8 BY THE WITNESS:
9   A. Can you repeat the question? I'm sorry. Oh,
10 I know your question. I can answer it without it.
11   No. That's actually quite ridiculous to think
12 that they're doing it based upon lawyers. We're seeing
13 time progressing, so we're now having time for the
14 complications to happen. Patients are becoming aware of
15 it and, more importantly, I think doctors are becoming
16 aware of it. Doctors did not know this was happening to
17 the extent it was happening. And they're realizing that
18 being a situation. We're also starting to write papers
19 on it. So the knowledge is coming to the forefront.
20   Q. How -- you told me, I think, before that the
21 women coming to the Mayo Clinic that you've seen
22 specifically do not all require some sort of excision or
23 explant procedure; is that right?
24   A. Well, to say require, that's not the right
25 word. That means I can't fix them --

Page 108

1   Q. All right.
2   A. -- with surgery. I don't think surgery will
3 fix it. Because when we have an individual who has
4 devastating pelvic pain all over, okay, they can't sit,
5 they can't walk, they can't lie down, and we do an exam
6 and everything hurts, I do not -- I do not recommend
7 surgery on them because I don't think it will fix it. I
8 think it will make them worse.
9   Q. How many of the patients that are referred to
10 the Mayo Clinic that you've been treating, Doctor, how
11 many of them are actually undergoing an explant or
12 excision procedure?
13   A. A percentage. Let's say -- let's say we see
14 five a week times, what, 42 weeks a year. That's going
15 to be difficult. That's too much math. A rough
16 estimate would be about 20 percent of the individuals I
17 see I feel are candidates for surgery. I have become
18 more conservative in my surgeries. They have to meet
19 very specific criteria because, otherwise, I don't think
20 I do them any good.
21   My GYN colleagues in the past have been much
22 more aggressive than I am doing transabdominal repairs,
23 and they have some success and have a lot of others that
24 are not. Philippe Zimmerman (sic), a good friend of
25 mine at UT Southwestern, was showing something like 35

Page 109

1 to 40 percent persistent pain after removal of pelvic
2 meshes, and so I am very careful in who I select.
3   Q. So how many times have you done an explant or
4 excision procedure since 2007 that involved a patient
5 who had a Bard Align -- pardon me, a Bard Avaulta
6 product implanted?
7   A. Well, that would be more starting with Bard
8 starting in 2008, 2009, because we didn't see them
9 initially. The same thing with Prolift. We didn't see
10 those in 2005. We saw them in 2007.
11   Again, we're going to look at it, if you do
12 the math, we're roughly five patients a week, 30 percent
13 of those are going to be a Bard product, and I'm going
14 to be operating on 25 percent of those. So, again, we'd
15 have to do the math of whatever those numbers are. But,
16 again, that is not -- that's not counting all of the
17 ones I see that I don't operate on. So just looking at
18 the surgical numbers is unrealistic as far as the true
19 nature of the extent of the problem.
20   Q. Well, I'm trying to understand, if you can
21 tell me sitting here today, how many times you've
22 explanted mesh from a patient that you can tell me was
23 from one of the Bard products?
24   MR. CARTMELL: You mean just --
25

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 110

1  BY MS. GEIST:
2      Q.  To the best of his --
3      MR. CARTMELL:  -- Solo or Plus.
4      MS. GEIST:  To the best of his estimate, right.
5      MR. CARTMELL:  Do you mean any Bard product?
6      MS. GEIST:  Well, we're talking about the Avaulta
7  products.
8  BY MS. GEIST:
9      Q.  And I can see, Doctor, you're sitting there
10 doing some math calculations; is that right?
11     **A.  310, estimate.**
12     Q.  That's based on the mouth -- math calculations
13 you just did now?
14     **A.  Correct.  Roughly, five per week times,**
15 **roughly, 45 weeks per year, times, roughly, five or six**
16 **years, and then, roughly, that's how many we're seeing**
17 **as far as Avaulta products.  And then, roughly, as far**
18 **as surgeries, it comes out to, roughly, 312 surgeries if**
19 **you want exact -- or if you want an educated, accurate**
20 **answer.**
21     Q.  So my question was, had you ever gone back
22 before doing what you just did now here, some quick math
23 based on assumptions, did you ever go back and take a
24 look and say, Let me see if I can determine how many
25 explant procedures I did that involved the Bard Avaulta

Page 111

1  products?
2      **A.  Well, yeah.  We keep -- as I mentioned, we**
3  **didn't initially keep track.  As the mesh problems**
4  **started to manifest themselves, we were all caught**
5  **off -- unaware because we were unfamiliar with this type**
6  **of thing coming along, so we didn't initially keep**
7  **track.  And then prior to 2011 is when we started doing**
8  **this math, and that's when we started realizing we've**
9  **got a big problem here.  So, yeah, that was -- again,**
10 **that was before any of this litigation process was**
11 **going.**
12     Q.  Right.  But that's my question.  Before you
13 sat here today and did that quick math that you just did
14 for me, did you ever go back, in preparation for this
15 deposition or in your expert report, and determine how
16 many times you've done an explant or excision procedure
17 that involved the Bard Avaulta product?
18     **A.  Well, that's what I -- that's what I just told**
19 **you.  I said that, roughly, 30 percent of the patients**
20 **that I see are Avaulta.**
21     Q.  Right.  But you told me -- you also told me
22 that the 30 percent of the patients you see that are
23 Avaulta product users do not all go through an explant
24 or excision procedure, right?
25     **A.  Correct.**

Page 112

1      Q.  All right.  So what percentage of the 30
2  percent actually have an explant or excision of the
3  mesh?
4      **A.  That's what I said, 25 percent of those.**
5      Q.  So 25 percent of the 30 percent that you see
6  have some sort of explant or excision procedure?
7      **A.  Correct, that I feel meet, that their pain is**
8  **isolated.  Just like the woman I saw two weeks ago, the**
9  **pain was isolated to the arms of the mesh in the**
10 **transobturator region.  She had pinpoint pain.  I could**
11 **touch it.  I could feel a knot in there consistent with**
12 **scarring and inflammation.  Those are the individuals**
13 **that will repair.  I feel that can go for it for pain.**
14 **But that's not also counting the extrusions.  See, we**
15 **see -- we have just many, many extrusions.**
16     Q.  Is the -- is the 25 percent your best
17 guesstimate sitting here today?
18     **A.  Yes, and that's a fairly accurate estimate.**
19     Q.  What's --
20     **A.  Because, you know, we keep --**
21     Q.  -- it based on?
22     **A.  Our medical records, because I have a track of**
23 **every single patient that I see, and then we have it**
24 **broken down.  I get -- every year I get a computer**
25 **printout of every single patient and tallying those**

Page 113

1  patients up.  I also get a record of every surgery that
2  I do and tally them up.  So I can't give you exact
3  numbers, but I can give you very accurate numbers.
4      Q.  And -- and I assume you would agree with me,
5  Doctor, that you don't have a denominator, if you will,
6  for the women who were implanted with the Avaulta
7  product, correct?
8      MR. CARTMELL:  Object to the form.
9  BY MS. GEIST:
10     Q.  You don't know, in other words, how many women
11 were implanted with the Avaulta product during this time
12 period that you were excising or extracting mesh,
13 correct?
14     **A.  In my review of the Avaulta records, I have**
15 **not seen a specific number.  In my review of other**
16 **companies' records, they have always refused to give**
17 **those numbers out.  So I would actually like to see.**
18 **That would be very helpful for me to see because usually**
19 **they won't tell me.  They'll say we don't know.**
20     Q.  So the answer to my question is, you don't
21 know what the denominator is, so you can't determine
22 what the incidence rate is, for example, for women
23 requiring an explant or excision procedure after being
24 implanted with the Avaulta product?
25     MR. CARTMELL:  Well, object to the form.  Can I ask

Page 114

1  for clarification?
2  BY MS. GEIST:
3      Q.  Right.  So, Dr. Elliott --
4      MR. CARTMELL:  Are you saying you want him to
5  create an incidence rate nationwide from his own
6  practice with a denominator?
7  BY MS. GEIST:
8      Q.  I'm asking you, Dr. Elliott, you can't tell me
9  what percentage of women that you are seeing represents
10 women who have been implanted with the Avaulta product?
11     A.  I see patients from all over the world, and so
12 we have -- it's a unique practice that I have.  I have
13 yet to see, and I would like to see, Bard's numbers of
14 exactly how many have been put in.  That would be very
15 helpful.  But my practice is not going to reflect, you
16 know, what that true incidence is.  That just reflects
17 what comes into my clinic.
18     Q.  Right.  So you don't know what the incidence
19 rate is, whether it's high, whether it's low, whether
20 it's someplace in between, for the complications
21 relating to the Bard Avaulta products?
22     MR. CARTMELL:  Object to the form.
23 BY MS. GEIST:
24     Q.  You don't know what that incidence rate is,
25 true?

Page 115

1      MR. CARTMELL:  Object to the form.
2  BY THE WITNESS:
3      A.  I have papers on Avaulta, Avaulta Plus,
4  describing their complication rate, and so that's all I
5  can go off of.  If they're talking 11, 20, 30 percent on
6  short-term studies, if we extrapolate that, and those
7  are in the hands of highly trained individuals, so if we
8  just take those conservative numbers on short-term
9  studies, then I can give an estimate.  But, again, we
10 need to provide the denominator.
11     Q.  And we don't have that, correct?
12     A.  Oh, it's available.  Bard has not given it to
13 us.
14     Q.  Well, I'll just move to strike that.  I don't
15 know what that's based on.
16         How do you know that it's available?
17     A.  You're telling me that a company in the United
18 States that is designed to make money does not know how
19 many products they sell and they're going to implant it?
20 Then that sounds like a company that's not following
21 their data very well.  Cadillac knows how many cars move
22 off their showroom.
23     Q.  So you're making certain assumptions about
24 what Bard knows; is that fair to say, Doctor?  You don't
25 have any basis for saying that?

Page 116

1      MR. CARTMELL:  Object to the form.
2  BY MS. GEIST:
3      Q.  Is that an assumption?
4      A.  An assumption based upon experience, and I
5  would -- I would really hope that Bard did the
6  responsibility -- responsible thing and know how many
7  products moved.
8      Q.  Based on what experience?  Have you ever
9  worked for a medical device company?
10     A.  I've been a consultant for some, yes.
11     Q.  Have you ever worked as an employee for a
12 medical device company?
13     A.  Well, no.  I've been a consultant for some in
14 the past, so...
15     Q.  Have you ever been a consultant for a
16 manufacturer of a pelvic mesh product?
17     A.  As a consultant, yeah.  But we can just leave
18 it on the table that it's acceptable for Bard not to
19 know how many products have moved and have been
20 implanted in women, if that's what you're telling me.
21     Q.  No.  That's not what I'm telling you, Doctor.
22 I'm asking you what your basis is for your statement
23 that you think Bard can just give you the denominator?
24     A.  Bard knows how much money they made.  Every
25 company knows how much money they've made in the United

Page 117

1  States.  They file tax returns.  They know how much
2  money is made.  They would know.  They'd be able to
3  follow their subsections.  There's a line, Avaulta, et
4  cetera.  And they're going to know what products make
5  money.
6          Also, I read, in one of the depositions, that
7  one of the individuals, when they're asked to file a 522
8  for the federal government, that he said it's not making
9  enough money to go through the extra work, so they know.
10     Q.  Do you -- do you understand, Doctor, there is
11 a difference between products sold and products used or
12 implanted?
13     A.  Mm-hmm.  Yes, I do.
14     Q.  Do you know if Bard has the data you're
15 talking about to even come up with the denominator?
16     A.  If they --
17     Q.  Do you know?
18     A.  Absolutely, they do.
19     Q.  What do you base that on?
20     A.  Experience, because I'm also involved with the
21 buying and selling of products at my institution.  And
22 if a company sells a product to an institution and the
23 hospital buys a certain number of products and then five
24 months later they have to sell more products back, that
25 means the product moved.

In Re: CR Bard 200                     Daniel Elliott, M.D.                     11/15/2014

Page 118

1    (Elliott Deposition Exhibit No. 3 was
2    marked for identification.)
3 BY MS. GEIST:
4    Q.  Let me show you what I've marked as Exhibit 3
5 to your deposition, Dr. Elliott.  And let me show it to
6 counsel first because, for whatever reason -- I
7 apologize -- I don't have another copy.
8        And, just for the record, Doctor, as Exhibit
9 3, I've handed you an article by Blandon and others
10 published in the Journal of International Urogynecology
11 in 2009.  Do you see that?
12    **A.  Correct.**
13    Q.  And this was on your reliance list?
14    **A.  Correct.**
15    Q.  And, in this study, Doctor, this was actually
16 a Mayo Clinic study, correct?
17    **A.  Correct.**
18    Q.  And who are Dr. Blandon, Gebhart, Trabuto,
19 T-R-A-B-U--
20    **A.  Trabuco.**
21    Q.  Oh, I'm sorry.  That's a C.  T-R-A-B-U-C-O,
22 and --
23    **A.  Klingele.**
24    Q.  Yeah, thank you.  K-L-I-N-G-E-L-E.
25    **A.  Blandon was a fellow, John Gebhart is the --**

Page 119

1 **in charge of urogyn.  He's the chair of urogyn.  Manny**
2 **Trabuco is a former Mayo fellow and urogyn and then**
3 **staff, and the same thing with Chris Klingele.**
4    Q.  So one of the lead authors of the article was
5 the chair of the urogynecology department at Mayo?
6    **A.  Correct.**
7    Q.  Is he still the chair of the department?
8    **A.  I think Klingele is now.**
9    Q.  And this paper is entitled, Complications From
10 Vaginally Placed Mesh in Pelvic Reconstructive Surgery,
11 correct?
12    **A.  Correct.**
13    Q.  And it refers to the experience these
14 physicians had with women who were referred to the Mayo
15 Clinic from all across the country, correct?
16    **A.  I can't speak to where they all came from.**
17    Q.  Referrals to the Mayo Clinic, I thought you
18 just told me earlier, come from all over the country?
19    **A.  That is correct.**
20    Q.  Okay.  And this paper looked at a number of
21 different products that were used to correct pelvic
22 organ prolapse, correct?
23    **A.  Correct.**
24    Q.  And what the authors did in this paper was to
25 go back and take a look at women referred to the Mayo

Page 120

1 Clinic from January 2003 through September 2007,
2 correct?
3    **A.  Incorrect.**
4    Q.  I'm sorry?
5    **A.  Incorrect.**
6    Q.  How is that incorrect?
7    **A.  You said these women were referred to the Mayo**
8 **Clinic.  This is -- I mean, this is just into one**
9 **department and a few of the staff.  So it's not**
10 **reflecting all of the patients that were sent in.**
11    Q.  Well, if you look at -- if you look at the
12 article, it states, We retrospectively identified
13 patients referred to our institution from January 2003
14 through September 2007 who had complications after
15 vaginal placement of mesh.  Did I read that correctly?
16    **A.  Correct.**
17    Q.  So it's saying the institution.  It's not
18 talking about a particular department, is it?
19    **A.  It is, because that's just reflecting their**
20 **practice and that were referred into their department.**
21    Q.  So this is -- this is limited to the
22 urogynecology division?
23    **A.  Pretty much, though I believe there is one**
24 **patient of mine in there.  But most -- this does not**
25 **reflect my practice or the other female urologists in**

Page 121

1 **our department.**
2    Q.  And over the four and a half -- approximate
3 four-and-a-half time period, there were 21 patients, in
4 that four and a half years, identified who had
5 complications after vaginal placement of mesh?
6    **A.  Correct.**
7    Q.  Is that right?
8    **A.  That's what they report, yes.**
9    Q.  So more than four years and only about 21
10 patients, so maybe five per year, referred to the Mayo
11 Clinic urogynecology department with mesh complications,
12 correct?
13    **A.  Yeah.  Somewhat, but that's somewhat very**
14 **misleading.**
15    Q.  Well, is my math wrong?
16    MR. CARTMELL:  Let him finish.  Let him finish.  Go
17 ahead.
18 BY THE WITNESS:
19    **A.  This is 2003 to 2007.  Avaulta wasn't even on**
20 **the market.  Most of the other ones weren't on the**
21 **market.  It's only Prolift.  Prolift came out on the**
22 **market in 2005.  So this is dealing with the IVS tunnel**
23 **and all of those type of things.  And this is --**
24 **remember I mentioned there is delayed effect of the**
25 **complications.  So this is right when 2007, 2008, when**

Page 122

1 we're starting to see this uptick, and that's what this
2 is reflecting.
3     Q.  So there is nothing inaccurate about what I
4 just said, in terms of over a four-and-a-half-year
5 period, there were 21 patients referred to Mayo for
6 complications of mesh, approximately five per year
7 during this time period?
8     MR. CARTMELL:  Object to form.
9 BY THE WITNESS:
10     A.  That is still incorrect.  It's from 2003 to
11 2007.  That does not reflect today's numbers.
12     Q.  I didn't say it did.  I'm talking about a
13 four-and-a-half-year time period, acknowledging it's
14 2003 to 2007, there were approximately five patients per
15 year referred to the urogynecology department at Mayo
16 for mesh complications.  Isn't that what this paper is
17 looking at?
18     A.  Well, I don't know.  I would have to look over
19 the paper again.  Is this reflecting all of the patients
20 they saw during that or just the ones that went to
21 surgery?  So that would require me to read the paper.
22     Q.  Well, it's on your reliance list.  Had you
23 read it before?
24     A.  Of course I've read it.  I've read it multiple
25 times, but I can't remember every word that I read.  So

Page 123

1 in order to answer your question carefully -- and this
2 is actually a very important point -- this may just
3 reflect 21 that went to the OR.
4     Q.  Well, Doctor, it actually doesn't.  And if you
5 look with me on the results section on the very first
6 page, it provides a nice summary.  And, it says,
7 Complications included mesh erosions in 12 women,
8 dyspareunia in 10, and recurrent prolapse in nine?
9     A.  Okay.  That still is not saying the
10 denominator.
11     MR. CARTMELL:  Do you want him to read the whole
12 thing and let you know the answer?
13 BY THE WITNESS:
14     A.  Because it's going to be in the paper.  That's
15 a very important issue.  Because you just raised the
16 issue about Bard not knowing the denominator and the
17 numerator.  This, I don't know if this is the
18 denominator, all patients who came in during that time
19 period or just the ones that went to the OR, because
20 that's completely different.  Because, remember, in my
21 practice, only 25 percent of the patients I see end up
22 going to the OR because I can't fix the other ones.
23     Q.  Doctor, if you look at the results section --
24     A.  That's not the results section.  You're
25 reading the abstract.  Okay.  That's the quick and

Page 124

1 dirty.  In order to read a paper correctly, you have to
2 read the entire paper.
3     Q.  Okay.  Well, I'm trying to be efficient and
4 move us along.  If you think that that section, the
5 quick-and-dirty section of the article, says something
6 different than what's in the text --
7     MR. CARTMELL:  Just have him read it.
8 BY MS. GEIST:
9     Q.  -- let me know.
10     A.  I will read the paper because, again, you
11 can't just quote one line and then extrapolate.  That's
12 why you need to know the whole thing.  So if you want, I
13 can review it.
14     MR. CARTMELL:  Just go ahead and read it.
15 BY MS. GEIST:
16     Q.  Well, let me ask you one question before you
17 start reading it because I don't want to waste too much
18 time.  Under the Results section, it says, 16 patients
19 were managed surgically.
20     A.  Okay.  Again, that's the abstract.  That's not
21 the results section.  That's the abstract section.
22 That's the results section of the abstract.  That's
23 different.  Remember, I'm on 16 journals that I review,
24 and I was best reviewer two years in a row for female
25 urology.  This is what I do for a living.

Page 125

1     Q.  Yeah.  I understand that.  But how many times
2 have you -- have you seen an abstract provide a summary
3 like that specifically telling you 16 patients were
4 managed surgically --
5     A.  Yeah.
6     Q.  -- and there's something different in the
7 actual body of the paper?
8     A.  No.  That part, one line, 16 managed
9 surgically, is correct.  But you're only given,
10 probably, 150, 200 words to do it.  So, again, I don't
11 know what the denominator is going to be.
12     And I'm more than happy to read the paper, and
13 it's a very good paper.  This is one of the first ones
14 out there.  But now there's been subsequent others, you
15 know, Karram and Zimmerman and things like that, which
16 have larger numbers than this.  But this is one of the
17 first ones to raise the awareness of this problem.
18     Q.  So my question is, Doctor, the paper, if you
19 go to the discussion section of the paper, the authors
20 conclude that the incidence rate of the complications is
21 unknown, correct?
22     A.  I don't -- I don't know.  I would have to see
23 that line.  It sounds like it would be -- you read
24 accurately.  I just want to know where you are, though.
25     Q.  Sure.  I'm on page 527 under Discussion?

In Re: CR Bard 200                 Daniel Elliott, M.D.                    11/15/2014

Page 126

1    A.  Okay.
2    Q.  I'm not in the abstract.  I'm in the body of
3  the paper.
4    A.  Okay.
5    Q.  The authors of the paper conclude that the
6  incidence of the complications are unknown, correct?
7    A.  Yeah.  Although -- let's see.  I have to read
8  the sentence before it.  Okay.  Yeah.  As the use of
9  synthetic materials in the pelvic reconstructive surgery
10  increases, this is right when they came out and right
11  when there is a big increase in numbers, so do the
12  complications specific to their use.  Although the
13  incidence of these complications is unknown, our series
14  demonstrates that, when they occur, multiple
15  interventions may be required and bothersome and
16  occasionally life-changing symptoms may persist.
17    Q.  And, at this point in time, there were four
18  trocar-based implant systems marketed in the U.S.,
19  including Bard's Avaulta product, correct, as noted in
20  this paper on page 524?
21    MR. CARTMELL:  Is that Sofradim's Avaulta?  Is that
22  the one that Bard -- because I don't think Bard's
23  product was on the market at that time.
24  BY MS. GEIST:
25    Q.  Doctor, will you look with me at the second

Page 127

1  page of the article on page 524?
2    A.  I'm there.
3    Q.  If you go down towards the middle of that
4  paragraph --
5    A.  Which column?
6    Q.  I'm on the --
7    A.  The first or second column?
8    Q.  I'm on the left-hand side, second paragraph,
9  beginning with the word Options?
10    A.  Okay.
11    Q.  Okay.  Are you with me?
12    A.  Yes, I am.
13    Q.  All right.  In the middle of the paper, in the
14  middle of that paragraph, rather, it says, Four trocar
15  systems are currently marketed in the U.S.  Do you see
16  that?  Doctor, do you see that?
17    A.  I'm looking.
18    Q.  And it lists the Gynecare product?
19    A.  I'm not there yet.  Four -- okay.  Four.  Four
20  trocar systems are currently marketed, correct.
21    Q.  And there's the Prolift product from Gynecare,
22  right?
23    A.  Correct.
24    Q.  The Apogee product from AMS?
25    A.  Correct.

Page 128

1    Q.  And the Avaulta product from Bard, correct?
2    A.  Correct.
3    Q.  And the authors of the paper did a
4  retrospective study of all women referred to the
5  urogynecology division from January 2003 to September
6  2007 who had complications after procedures using
7  transvaginal mesh.  That's what this paper looked like,
8  correct -- looked at, correct?
9    A.  That's what they state, yes.
10    Q.  And the paper also notes that the authors of
11  the paper didn't perform the actual implant procedures.
12  The women were referred from outside institutions,
13  correct?
14    A.  Correct.
15    Q.  And the authors' review of the database, this
16  retrospective review, identified 22 women who were
17  referred to the department during that time period with
18  complications, correct?
19    A.  Correct.
20    Q.  And if you look at Table 2 of the study, are
21  you there with me, Doctor?
22    A.  Yes, I am.
23    Q.  It lists the type of mesh products that the
24  women who experienced complications had implanted.  Do
25  you see that?

Page 129

1    A.  Yes, I do.
2    Q.  And of the 21 women listed who were referred
3  to the Mayo Clinic, there is not a single patient on
4  this list who had the Bard Avaulta product implanted; is
5  that right?
6    A.  By the way they have it listed here, that is
7  correct.
8    Q.  If you go with me to page 530 of the article,
9  Doctor --
10    A.  Okay.  I'm there.
11    Q.  -- the authors note that the questions of what
12  degree of training is sufficient and who should be
13  performing these types of procedures remain highly
14  debated.  Do you see that?
15    A.  Yes.
16    Q.  And do you agree with that?
17    A.  Yes.
18    Q.  Would you agree, Doctor, that such a surgical
19  technique and surgeon training and experience are
20  critically important in a good outcome for any surgical
21  procedure?
22    A.  The -- within limits, the more expertise the
23  data has shown that the results are better.  That is
24  correct.
25    Q.  And what about with transvaginal mesh in

Page 130

1  particular?  Would you agree with me that surgical
2  technique and skill plays a very critical role in
3  determining whether or not a woman may have
4  complications?
5      A.  I would somewhat disagree because there are
6  some high-volume, world class surgeons, I can think of
7  the French group and others for specifically with
8  prolapse who have implanted, you know, 700, 800, and
9  they still have an unacceptably high complication rate.
10     Q.  Are you aware that there are very skilled and
11 highly reputable pelvic floor reconstructive surgeons
12 who still use transvaginal mesh today?
13     MR. CARTMELL:  Object to the form.
14 BY THE WITNESS:
15     A.  I'm not familiar.  As far as the transvaginal
16 mesh are or are you talking about the transvaginal kits?
17     Q.  Transvaginal kits?
18     A.  Transvaginal kits?  Well, prolapse -- Prolift
19 is off the market, Avaulta is off the market,
20 Apogee/Perigee are off the market.  I don't know about
21 Boston Scientific.  So if they are still putting them
22 in, you know, I can't speak if they are.  I have not
23 heard of anybody.
24     Q.  You're not aware of anyone still using these
25 types of products?

Page 131

1      A.  No.
2      Q.  Would you agree with the conclusion by the
3  authors from the Mayo Clinic and this study, Doctor,
4  that there seems to be an inconsistency in the
5  techniques by implanters?
6      A.  Yeah.  I can't speak to that.  I think it's a
7  valid point.  Again, I can't speak to that with any
8  accuracy.
9      Q.  You don't have any opinion on that?
10     A.  Well, no.  I do have an opinion.  If they're
11 going to be following the IFU correctly and they're not
12 told how high to dissect or how deep to go in the
13 tissues, where to put the trocars, how much tension to
14 put the trocars in, there is going to be some
15 variability.  So it seems to behoove the company to make
16 sure it's very, very clear on an innovative product like
17 this.
18     Q.  At least based on this review from the doctors
19 at the Mayo Clinic, at this point in time, the other
20 products available on the market from Gynecare and other
21 manufacturers were presenting with more complications,
22 at least for women referred to Mayo?
23     A.  Well, I mean, there is going to be a selection
24 bias here.  This is just the people that have come in
25 with a retrospective view.  I'd have to look back and

Page 132

1  see when Avaulta came onto the market.  Because,
2  remember, the Prolift was 2005 and a lot more of those
3  got implanted.  So I would have to see when Avaulta was
4  released and started to put in.  Because then you have
5  to look at the study two, three, four years on down the
6  road.  That's when we start seeing the complications.
7  Like Mickey Karram's paper and Philippe Zimmerman's
8  paper, okay, those ones would be a little bit more
9  reflective of complications.
10     Q.  At least, based on this paper, though, Doctor,
11 there were no complications specific to the Avaulta
12 product that was seen by Mayo at this point in time,
13 correct?
14     A.  Putting the qualifiers on there from January
15 2003, before it was even available, any of the mesh
16 products were available, as far as the large ones, to
17 2007, you are correct.  Of the 21 selected individuals
18 who came in, there was not an Avaulta product on there.
19     Q.  Well, and you keep saying available, Doctor.
20 But if we go back and we look at the page, the second
21 page of the article, the author specifically notes that
22 the four trocar systems currently marketed included the
23 Avaulta product; do you see that?
24     A.  That is correct.  They state that, but I don't
25 know when that was available.  Because, remember, they

Page 133

1  wrote this in 2009.  So, again, you have to tell me when
2  Avaulta was released and the first product was sold, and
3  that would help me out tremendously.
4      Q.  I'm just sticking with what the authors found
5  in this paper, Doctor.
6      MR. CARTMELL:  Can I tell him the date it was
7  released?
8      MS. GEIST:  No.  If you want to do your own
9  examination, feel free --
10     MR. CARTMELL:  Okay.
11     MS. GEIST:  -- when I'm done.
12     MR. CARTMELL:  All right.
13 BY MS. GEIST:
14     Q.  Okay.  Doctor, you can put that aside.
15     Let me -- let me move, Doctor, to your expert
16 report and just start by asking you generally about
17 pelvic organ prolapse.  And you have a discussion, don't
18 you, Doctor, generally of pelvic organ prolapse and some
19 of the different treatment options for women
20 experiencing that condition, approximately, page 5 to 12
21 of your report; is that right?
22     A.  Correct.  I wrote up a synopsis of 100 years
23 of knowledge about pelvic organ prolapse, the etiology,
24 et cetera, going through those pages you mentioned
25 there.

In Re: CR Bard 200                    Daniel Elliott, M.D.                      11/15/2014

Page 134

1    Q.   And is it a fair summary that pelvic organ
2    prolapse is a condition where the organs of the pelvic
3    floor drop down from the usual supported positions into
4    or through the areas of weakness in the pelvic floor?
5    **A.   For women, yes.**
6    Q.   And we are speaking about women, right?
7    **A.   Correct.**
8    Q.   Typically, the organs that we're talking about
9    that prolapse are the bladder, the uterus, and the
10   rectum?
11   **A.   And intestines.**
12   Q.   And intestines.  And pelvic floor damage
13   occurs, generally speaking, due to childbirth, correct?
14   **A.   Childbirth, age, obesity, chronic cough.**
15   **There are multiple factors that all play a role, but**
16   **childbirth would probably be the number one.**
17   Q.   Physical labor or chronic issues with
18   straining or constipation as well could be risk factors
19   for prolapse, true?
20   **A.   Correct.  Anything that would be under the**
21   **criteria of Valsalva effort, which just means straining.**
22   Q.   And that results in a deficiency in the
23   support of the organs that we just finished talking
24   about, right?
25   **A.   It means that the musculature, the tendon**

Page 135

1    **support, so to speak, are weakened with childbirth, and**
2    **then with time, age, et cetera, all of the factors we**
3    **mentioned, the structures slowly descend.**
4    Q.   Okay.  And that's because, as I said, there is
5    sort of a deficiency in the support for those organs; is
6    that a fair summary?
7    **A.   I wouldn't say -- well, the fact that there is**
8    **a problem reflects that there is a deficiency, if you**
9    **want to call it that.  But I wouldn't call it that.**
10   **It's that there is a weakness or a tearing.  With**
11   **childbirth, there is an extreme amount of tearing.**
12   **That's why it hurts.  Okay.  If childbirth didn't hurt,**
13   **there wouldn't be the tearing of the muscles.  So the**
14   **muscles are also a big part of the support of this, too.**
15   Q.   Okay.  So there's -- the muscles are not as
16   strong, if you will, as before a woman had experienced
17   childbirth?
18   **A.   There's -- and, again, it's damage of the**
19   **whole pelvic structure, the support.  So we can't think**
20   **of it in just muscles, just tendons, just collagen, et**
21   **cetera.  It's the whole unit has been damaged.**
22   Q.   And do you treat women in your practice who
23   experience pelvic organ prolapse?
24   **A.   Daily.**
25   Q.   And has that always been part of your

Page 136

1    practice?
2    **A.   Yes.  Since 2000, yes.**
3    Q.   And what percentage of your practice is
4    devoted to clinical experience in treating women versus
5    teaching?
6    **A.   Well, I'm -- I always have a resident with me.**
7    **So I'm 100 percent teacher, but I am 100 percent**
8    **clinical.  So every other day I'm in the clinic and the**
9    **next day I'm in the operating room.**
10   Q.   And, based on your own experience, I assume
11   that you would agree with me that pelvic organ prolapse
12   can negatively affect a woman's life?
13   **A.   The quality of life can at times be impaired**
14   **with this, but it's important to stress that it is a**
15   **quality of life issue.**
16   Q.   It's not a life-threatening condition,
17   correct?
18   **A.   In the United States, that is exceedingly rare**
19   **for it to be life-threatening.  I've only seen that one**
20   **time.**
21   Q.   But it can impact a woman in many different
22   ways in terms of symptomatology?
23   **A.   Correct.**
24   Q.   It's a very prevalent condition in the United
25   States, somewhere between 30 to 50 percent of all women

Page 137

1    are affected by some degree of prolapse; is that a fair
2    summary?
3    **A.   Well, that's going to be difficult to say**
4    **because there are -- it depends on how the study is run,**
5    **if it's anatomic prolapse versus subjective symptomatic**
6    **prolapse again.**
7    **So I don't know if we need to stop for out**
8    **there.**
9    MR. CARTMELL:  We don't.  Go ahead.
10   BY THE WITNESS:
11   **A.   So I almost have to start over with that,**
12   **because that's very, very important, because just the**
13   **fact that there is an anatomic prolapse does not mean**
14   **there is a problem.  You have to look at the subject of**
15   **everything.  So I would be hesitant to say the number is**
16   **up to 30 to 50 percent.  That would be pretty on the**
17   **high side.  But, to answer your question, it is a**
18   **prevalent problem.**
19   Q.   Would you agree with me that, at least what
20   the literature tells us, is that maybe 300,000 women
21   undergo surgery a year for the repair of pelvic organ
22   prolapse?
23   **A.   Yeah.  I have not heard.  I have no reason to**
24   **doubt the accuracy of that.  I have not heard a specific**
25   **number.  It's a large number.**

Page 138

1    Q.  Well, what are some of the signs and symptoms
2  that a woman may experience if she has pelvic organ
3  prolapse?
4    A.  We have to break it down into -- well, there
5  is a lot of different types of symptoms and things:
6  fullness; something falling out; pressure, potentially;
7  pain very, very rarely.  Pain is usually the exact
8  opposite.  The higher the prevalence of pain, the lower
9  the incidence of pelvic organ prolapse.  So pain is not
10  one of them usually.
11    Q.  Pain usually indicates something other?
12    A.  Something else, correct.  I said fullness.
13  Can we stop?  Because whatever is going on out there is
14  distracting me a whole bunch, the noise.
15    MS. GEIST:  Yeah.  Let's go off the record for a
16  minute.
17    VIDEO TECHNICIAN:  We are off the record.  The time
18  is 12:20 p.m.
19         (Whereupon, at 12:20 p.m., a recess
20             was had for lunch.)
21
22
23
24
25

Page 139

1        A F T E R N O O N   S E S S I O N
2    VIDEO TECHNICIAN:  We're back on the record.  The
3  time is 12:58 p.m.
4  WHEREUPON:
5             DANIEL S. ELLIOT, M.D.,
6  called as a witness herein, having been previously duly
7  sworn, was examined and testified as follows:
8        DIRECT EXAMINATION (Continued)
9  BY MS. GEIST:
10    Q.  Dr. Elliott, before we took a break, we were
11  talking about the signs and symptoms that a woman might
12  experience when she's having pelvic organ prolapse.  Do
13  you remember that?
14    A.  Yes, I do.
15    Q.  And you started telling me about some of the
16  signs and symptoms and said that pain is probably
17  indicative of some other medical problem or condition,
18  correct?
19    A.  Pain -- pain is usually not consistent with
20  pelvic organ prolapse.
21    Q.  And we talked about the feeling of like
22  something falling out?
23    A.  Fullness, pressure, falling-out sensation.
24    Q.  Falling-out sensation, we're specifically
25  talking about a woman's vagina, correct?  She feels like

Page 140

1  something is actually falling out of her body?
2    A.  Correct.  With standing, lifting, as the day
3  goes on, that's the most common thing I hear is, again,
4  something is falling out.
5    Q.  In some women who have a more severe type of
6  prolapse, you can actually visibly see something
7  extruding beyond the entrance of the vagina, correct?
8    A.  Correct.  In severe cases, it can actually
9  look like a baby's head crowning.
10    Q.  And then some women have also -- I'm sure
11  you've heard in your own experience and practice -- talk
12  about a feeling of heaviness as well?
13    A.  Yeah.  That's the fullness, pressure.
14    Q.  And some women, I'm sure you have known from
15  your practice, also have issues with being able to
16  urinate or void or defecate as well because of pelvic
17  organ prolapse?
18    A.  Not necessarily.  Urination symptoms, like not
19  being able to urinate, has been reported.  That's rare.
20  Frequency, urgency, usually the bladder actually works
21  fairly well.  Defecation, usually they're going to have
22  a problem -- the constipation is going to cause the
23  prolapse, not the prolapse cause the constipation.
24    Q.  And some women, Doctor, I'm sure you've seen
25  in your practice, have issues with sexual intimacy,

Page 141

1  being able to experience sexual intercourse or wanting
2  to experience sexual intercourse with their partners,
3  true?
4    A.  Correct.  There could be physical barriers and
5  also psychological barriers with the prolapse,
6  embarrassment and things like that.
7    Q.  And often, Doctor, but not always, there's
8  some sort of incontinence associated with pelvic organ
9  prolapse; is that also true?
10    A.  There can be incontinence present before
11  surgery and also if it's not corrected after surgery.
12  It's called occult incontinence.
13    Q.  And when a woman presents with these symptoms
14  and signs of pelvic organ prolapse, what are her options
15  to resolve the problem?
16    A.  It depends upon the severity of the condition,
17  the health of the patient.  There's multiple different
18  factors.
19    Q.  So there is nonsurgical options, correct?
20    A.  Correct.  Nonsurgical, and there's
21  observation, nonsurgical and then surgical.
22    Q.  So the observation is sort of the wait-and-see
23  approach, live with it, and see if you can deal with it
24  in your daily life on a daily basis?
25    A.  If it's minimally symptomatic, there's nothing

Page 142

1  wrong with observation.
2  Q.  And some women choose that, correct?
3  **A.  A large number do, yes.**
4  Q.  After consultation and discussion with their
5  physician?
6  **A.  Yes.  It should always be offered to the**
7  **patient, yes.**
8  Q.  And it's her decision ultimately?
9  **A.  I can only speak to my personal practice, but**
10  **I always leave it up to the woman to decide.**
11  Q.  And then a nonsurgical option would be the use
12  of a pessary; is that correct?
13  **A.  Pessaries, pelvic floor strengthening**
14  **exercises, vaginal estrogen replacement, the**
15  **conservative options.**
16  Q.  And what are sort of the -- pardon me.  Strike
17  that.
18     What are some of the problems or potential
19  side effects if a woman chooses to use a pessary?
20  **A.  A pessary can have -- first of all, probably**
21  **the most common thing is the pessary can fall out.**
22  **There has to be maintenance for it.  It has to be**
23  **changed.  It has to be cleaned, doctor visits, those**
24  **types of things.  If it's not taken care of**
25  **appropriately, there could be vaginal erosion,**

Page 143

1  discomfort.
2  Q.  Pain as well?
3  **A.  Pain, yeah.**
4  Q.  For some women?
5  **A.  No, that definitely can happen.**
6  Q.  And in terms of surgical options, Doctor, the
7  goal of any surgical repair of pelvic organ prolapse is
8  to provide some sort of support for the organs that have
9  less support than they used to have?
10  **A.  No.  The goal of surgery is symptom relief.**
11  Q.  The goal of pelvic organ prolapse is not to
12  lift up or put the organs back to where they were
13  originally?
14  **A.  I think, if you look at studies out there,**
15  **what the patient wants is they want relief of their**
16  **symptoms that may be achieved either through counseling**
17  **and reassurance or through surgery.  Then when you do**
18  **surgery, that will usually mean elevating the organs**
19  **back up to a normal or closer to normal position, but it**
20  **does not have to be anatomically perfect repair.**
21  Q.  But, in order to relieve the symptoms and
22  problems that a woman experiences, which is why she goes
23  to see a doctor, you are trying to correct the anatomic
24  defect; is that true?
25  **A.  My goal is to relieve the symptoms.  I may do**

Page 144

1  that through an anatomic repairing the prolapse and
2  getting back to a normal anatomic position.  But I
3  achieve just anatomic success, that does not necessarily
4  correlate to subjective is the patient happy or not.
5  Q.  Is anatomic success important or not in terms
6  of the goal of the pelvic organ prolapse surgery, repair
7  surgery?
8  **A.  For me, not to belabor the issue, but the goal**
9  **is subjective relief.  If I do a surgery and I take a**
10  **woman with a Grade 4 prolapse and six months later she**
11  **comes back and she has a Grade 2 prolapse, but she's**
12  **thrilled with the results, she's relieved, that's a**
13  **success.**
14  Q.  So you're looking at both improvement in the
15  anatomic structure as well as improvement in the
16  symptomatology?
17  **A.  I do it the other way around.  Improvement of**
18  **symptomatology, is the patient happy; and then,**
19  **secondly, if the -- if there is an anatomic repair that**
20  **is pleasing, the anatomic repair is pleasing to the**
21  **surgeon, not necessarily to the patient.**
22  Q.  Would you agree with me that both are goals of
23  a pelvic organ prolapse procedure, a surgical procedure?
24  **A.  This is a quality-of-life problem.  So the**
25  **goal is to improve the quality of life.  If I've**

Page 145

1  **improved the anatomy but the patient is not happy,**
2  **that's not successful surgery.**
3  Q.  Well, the way to improve the quality of life,
4  as you've just indicated, is to address and improve the
5  symptoms, correct?
6  **A.  Correct.**
7  Q.  And in order to do that, you need to be
8  addressing the anatomic defect or problem, true?
9  **A.  Correct.**
10  Q.  That's what you're doing in a surgery,
11  correct?
12  **A.  We are -- we are improving the support for the**
13  **organs.**
14  Q.  And there is different methods to go about
15  improving the support of the organs, correct?
16  **A.  Correct.**
17  Q.  There's a number of different options?
18  **A.  There are quite a few options, yes.**
19  Q.  So let's talk about some of those options
20  briefly.  Native tissue repair is one of the options?
21  **A.  Correct.**
22  Q.  And have you done that in your own practice?
23  **A.  That's the majority of what I do.**
24  Q.  And has that always been the majority of what
25  you've done in response to a woman who decides to have

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

---

Page 146

1  surgery to repair organ prolapse?

2    **A.  Correct.**

3    Q.  The majority of the prolapse cases that you've
4  seen, Doctor, I assume relate to bladder prolapse or a
5  cystocele?

6    **A.  No.  There's going to be a mix.  There's going
7  to be -- we won't necessarily call it cystocele.  It
8  would be an anterior, apical, or posterior prolapse.
9  The only prolapse I do not do is when there is a
10  concurrent uterine prolapse.  My GYN colleagues take
11  care of those.**

12    Q.  It seems, based on my review of the
13  literature, Doctor, that the anterior prolapse is the
14  more prevalent or more frequently seen type of prolapse;
15  is that right?

16    **A.  That's probably fair.  It's probably a little
17  bit more symptomatic.**

18    Q.  It's the reason why more women go to the
19  doctor for any other type of prolapse, true?

20    **A.  I would say that that's fair.  The anterior
21  compartment is the more problematic one.**

22    Q.  It seems to be more susceptible to prolapse
23  for whatever reason?

24    **A.  Correct.**

25    Q.  And what are some of the potential adverse

---

Page 147

1  events or risks or side effects if a woman chooses to
2  have a native tissue repair for an anterior defect?

3    **A.  An anterior repair, she could have
4  postoperative bleeding is a possibility, development of
5  urinary incontinence, recurrence of her prolapse is
6  probably the most common ones.**

7    Q.  So she could actually develop de novo
8  incontinence after an anterior repair done natively?

9    **A.  Not necessarily de novo.  It's what's called
10  occult incontinence, O-C-C-U-L-T.  It means the
11  incontinence was there prior to surgery.  But because
12  the bladder was falling down, it's not manifested.  And
13  then when you put the bladder up into a more anatomic
14  position, incontinence is discovered.  So it's not like
15  we're causing it.  We just uncover it.**

16    Q.  Or sort of exacerbating it using the native
17  tissue repair?

18    **A.  No.  We're just uncovering it.  It was there.
19  Because when the urethra is down like this, the woman
20  doesn't leak.  When we put it back up like this, the
21  woman can leak.  So it was there.  That's what you're
22  testing before surgery to make sure that does not happen
23  after surgery.**

24    Q.  So are there circumstances where there is de
25  novo incontinence after an anterior repair done

---

Page 148

1  natively?

2    **A.  It can happen, but that's why almost always
3  I'm doing a concurrent sling at the same time of the
4  anterior prolapse.**

5    Q.  But it can happen, true?

6    **A.  It can happen, yes.**

7    Q.  In terms of other potential adverse events or
8  complications from native tissue repair, I assume you
9  would agree with me that there is also a risk of
10  infection with any type of surgery we've been talking
11  about?

12    **A.  Vaginal infection you're referring to?
13  Because I've never seen that with my patients.**

14    Q.  Is that sort of well-established in the
15  literature that there is a risk of infection with any
16  surgery?

17    **A.  Well, with any surgery, that's a possibility.
18  Transvaginal surgery is a unique surgery with the vagina
19  usually being fairly vascular.  So an infection of the
20  vaginal tissue is exceedingly rare.  It could possibly
21  happen.  In my 15 years at a tertiary center, I've never
22  had one patient develop a vaginal infection after one of
23  my repairs.**

24    Q.  But you're not disagreeing with me that
25  infection is a potential adverse event of a pelvic -- of

---

Page 149

1  a native tissue repair just like any other surgery?

2    **A.  I'm saying that I'm not disagreeing with you,
3  but I'm saying it can happen very, very rarely.**

4    Q.  Okay.

5    **A.  And I've never seen it.**

6    Q.  And how about complications such as pelvic
7  pain and dyspareunia?  Can those also develop after a
8  woman undergoes a native tissue repair?

9    **A.  It's a possibility.  I mean, in my experience
10  in my personal practice, 15 years at a tertiary care
11  center, I've had one patient, because we watch our
12  patients very closely, with de novo dyspareunia
13  afterwards, and we were able to then go after surgery
14  and trim a suture and that resolved her dyspareunia.**

15    Q.  But you're not disagreeing with me, Doctor,
16  that pelvic pain and dyspareunia are known potential
17  complications from a native tissue repair to improve
18  pelvic organ prolapse?

19    **A.  In the very rare circumstance and mild, it
20  could possibly occur with those caveats.**

21    Q.  Would you agree with me, Doctor, that, if a
22  woman has diabetes or is a long-term smoker or has
23  chronic obstructive pulmonary disease, among other
24  comorbidities, she may be facing greater challenges with
25  healing after a native tissue repair?

---

Page 150

1  A. Well, you mentioned multiple different factors
2  there. So we have to go one by one.
3  Q. Okay. Let's go one by one.
4  A. Diabetes, I don't know of anything in the
5  literature relative to transvaginal surgery of increased
6  risks or complications. I've never seen that, never
7  heard it reported, never in any meetings or discussion
8  with colleagues. COPD, COPD has an increased risk for
9  recurrence of the prolapse, but not infections.
10  Smoking, for native repairs, I've never seen one
11  document saying that increases the risk for infection.
12  Q. Do diabetics or smokers generally have more
13  challenges or issues relating to healing after any type
14  of surgery?
15  A. Well, when you include any type of surgery,
16  that's a different story. If you're talking
17  transabdominal surgery with a major -- a morbidly obese
18  patient who smokes, that's different than transvaginal
19  surgery because then you have an extensive fat, adipose
20  tissue, that does not heal well and then, by all means,
21  they are at increased risk for infection. But
22  transvaginal surgery, we don't have to deal with the fat
23  and the poor healing.
24  Q. So you don't agree with me that somebody who
25  is a smoker, for example, or somebody who is a diabetic

Page 151

1  would have more challenges or problems healing after a
2  vaginal surgery?
3  A. I think that there is going to be limited data
4  as far as a significant impact upon healing with native
5  transvaginal repair with smoking, and I forget what the
6  other one you said. It was COPD was -- COPD would be a
7  nonfactor in that. COPD would be caused by the smoking.
8  COPD has an increased risk for recurrence of prolapse.
9  Oh, you said diabetes. I can't think, off the top of my
10  head of a paper that shows an increased risk for vaginal
11  infection.
12  Q. Well, how about just a general healing? I'm
13  trying to see if you agree with me that, as a general
14  statement, smokers or diabetics have more challenges and
15  problems healing after, for example, a native tissue
16  repair?
17  A. I'd disagree with that. I have no experience
18  of ever seeing that, and 40 percent of my patients are
19  obese with diabetes. And so I have not seen that with
20  vaginal. But, again, if you open -- if you do an
21  abdominal incision, that's a different story. Then I
22  will agree with you, but not for transvaginal work.
23  Q. In addition to native tissue repair, there is
24  also the abdominal sacrocolpopexy, correct?
25  A. That is another one of the options from an

Page 152

1  abdominal route, yes.
2  Q. And have you used that option yourself in your
3  practice?
4  A. Yes. That's what I was originally trained to
5  do starting in 1999.
6  Q. And that procedure involves the placement of a
7  biologic or synthetic mesh via the abdominal route,
8  correct?
9  A. Correct. Though most of the time they're not
10  using biologics anymore. They were shown not to work
11  well.
12  Q. So, in this particular discussion, biologics
13  don't work as well as synthetic or polypropylene mesh;
14  is that right?
15  A. Well, no. I say that biologics do not work as
16  well. There is a very nice paper from a Dr. Brubaker
17  from 1999 or 2000 talking about using cadaveric tissue
18  or biologics for sacrocolpopexy, and the failure rate
19  was quite high. It wasn't strong enough to hold things
20  up.
21  Q. Right. They're not as strong as synthetic or
22  polypropylene mesh, true?
23  A. No. That is correct.
24  Q. And that's borne out in the literature?
25  A. That's a fair statement.

Page 153

1  Q. And then you need strength because you're
2  trying to augment the lack of strength or the weakness
3  in the ligature in the pelvic floor, correct?
4  A. I would disagree. It needs strength because,
5  when you do this procedure, you're holding the vagina up
6  and sewing it to the sacrum. So you need to have
7  strength to be able to hold that up. That's a
8  completely different dynamic than the transvaginal work,
9  which is working on suturing in different locations.
10  This is holding up almost literally straight up to the
11  sacrum.
12  Q. Do you continue to place polypropylene mesh
13  through the ASC procedure in your patients?
14  A. The abdominal sacrocolpopexy route I still do.
15  I have one on Monday, but it is the minority of my
16  patients. Now, the majority are being done robotically.
17  It's the same -- it's the same procedure, just with a
18  different way of gaining access to the vagina and the
19  sacrum.
20  Q. And you also do that procedure
21  laparoscopically, correct?
22  A. Not anymore. It's -- originally the first
23  one, when we started doing, it was
24  laparoscopic-assisted. That was just a technical
25  aspect. It's pure robotic now.

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 154

1   Q.  You moved on from the traditional ASC -- ASC
2   repair -- and I'm shortcutting just so I don't have to
3   say it 5,000 times.  You moved on from the traditional
4   ASC repair to the laparoscopic approach to the robotic
5   approach; is that a fair statement?
6       A.  No.  When I was trained in 1999, I trained
7   with a GYN department at Baylor College of Medicine in
8   Houston.  At that point in time, the standard of care
9   was to do this abdominally.  And, as I was fellow, I
10  felt that this would be very amenable to doing this
11  robotically.  Other people had tried it
12  laparoscopically, but it was very technically difficult,
13  challenging work.  But the robot bypasses that.
14          So when I got back on staff in 2002, I
15  approached my colleague who does robotics.  So he's
16  fellowship trained in robotics.  And together we did the
17  first one.  The laparoscopic-assisted laparoscopy was
18  only to gain access.  It was kind of a -- it's
19  essentially a nonentity in this procedure.  It's pure --
20  it's robotic.
21          So I never had that laparoscopic middle point
22  like you mentioned.  And so now the overwhelming
23  majority of them I do is robotic sacrocolpopexy unless
24  there is factor that we can't do it robotically.
25      Q.  Okay.  Understood.  And would you agree with

Page 155

1   me, Doctor, that, at one point in time for surgeons
2   practicing in the area of pelvic reconstructive --
3   female pelvic reconstructive surgery, most surgeons
4   moved on from a native tissue approach to the ASC
5   approach, the abdominal approach?
6       A.  I think there's going to be two big schools of
7   treatment for prolapse, and it depends upon -- probably
8   upon where you trained and the expertise of the people
9   you trained under.  Where I trained they felt that
10  certain of the transvaginal repairs, sacro- --
11  sacrospinous fixation maneuvers were dangerous and they
12  wanted to do a transabdominal.  Other GYNs will say the
13  opposite.  So I just happened to come up with one who
14  did it transabdominally.
15      Q.  There is a number -- just by way of summary,
16  there's a number of different surgical approaches to
17  treating pelvic organ prolapse.  Would you agree with
18  that?
19      A.  There are quite a few, yes.
20      Q.  Different doctors use different approaches
21  depending on their own experience, their own skill, and
22  their preference, true?
23      A.  That is a fair statement.
24      Q.  And the transvaginal mesh was also developed
25  as one of these options for doctors to use?

Page 156

1       A.  That's true.
2       Q.  Like the ASC procedure, that was developed
3   because of some of the problems that doctors were seeing
4   with native tissue repair in terms of recurrence rates?
5       MR. CARTMELL:  Object to the form.
6   BY THE WITNESS:
7       A.  I partially agree with that.  You are correct,
8   but some of it was the perceived problems of native
9   repairs.  But it was addressed to try and reduce the
10  risk of recurrence.
11      Q.  All right.  So let me make sure I understand.
12  You agree with me that originally most doctors used the
13  native tissue repair, and that goes back some time?
14      A.  The native tissue repairs have been around
15  since surgeons have tried to fix vaginal prolapse.
16      Q.  And then, at some point in the mid-1990s, the
17  ASC procedure became what I will refer to as the gold
18  standard in repairing pelvic organ prolapse through
19  surgery?
20      A.  I wouldn't be able to tell you.  I mean, gold
21  standards are relative.  If you talk to somebody else,
22  it won't be a gold standard.  But in the 1990s, I don't
23  know.  There's work by Timmons and Addison at Duke going
24  back to the '50s and '60s looking at sacrocolpopexies.
25  So I think it is very fair to say that ASC is considered

Page 157

1   the highest anatomic success rate procedure.  When that
2   happened, I can't give you a date on that.
3       Q.  And then would you agree with me that doctors
4   wanted to try and explore other options that were less
5   invasive and had better outcomes than the ASC?
6       A.  I think it's fair to say that the ASC is a --
7   it's a large surgery.  There's a large incision made.
8   There's a fair bit of recovery.  The trans- -- and then,
9   when people try transvaginal, there was a perceived --
10  perceived higher failure rate with it.  So some of the
11  transvaginal mesh kits were designed to introduce that
12  to hopefully reduce the morbidity or avoid the morbidity
13  of the ASC.
14      Q.  And you understand that, that was the reason
15  and the purpose behind the development of that type of
16  technology in order to reduce the morbidities and issues
17  seen with the ASC approach?
18      A.  Correct.  And that's a laudable goal to be
19  searching for a different way of doing it.
20      Q.  It's a good thing for medical device companies
21  to explore other options for surgeons to use to treat
22  their patients with pelvic organ prolapse?
23      A.  Yeah.  I encourage innovation, safe
24  innovation.
25      Q.  With -- we talked about some of the risks and

Page 158

1 side effects associated with native tissue. Is there
2 also the potential side effect that a native tissue
3 repair could create or cause a shortening and a
4 narrowing of the vagina?
5      **A. If you're doing just an isolated compartment,**
6 **an anterior repair or posterior repair, that's unlikely.**
7 **If you're doing an anterior and a posterior repair, that**
8 **could happen. There could be some forced shortening of**
9 **the vagina. Other procedures, like a sacrospinous**
10 **fixation which is done transvaginally, the vagina would**
11 **not be shortened. And then -- I can't recall if you**
12 **asked this -- ASC does not shorten the vagina either.**
13      Q. The ASC procedure, while it may have been more
14 successful in terms of anatomic success compared to the
15 native tissue, it was associated with more significant
16 complications because of the abdominal approach?
17      **A. Yeah. It's a bigger surgery, abdominal**
18 **incision. So you could have abdominal wall infections**
19 **and problems with that, bowel problems. It's rare. In**
20 **our series of, now, almost exactly 100, we haven't had a**
21 **single one of those types of problems. But, yes, that**
22 **could happen.**
23      Q. And there is a risk of mesh erosion associated
24 with the ASC procedure?
25      **A. That has been reported in our series. And, as**

Page 159

1 **I mentioned, 100 patients, which we're writing up the**
2 **series on right now, we had, I believe, three in our**
3 **first ten patients and then none after that with**
4 **follow-up up to 12 years, 13 years now.**
5      Q. So if a woman chooses the ASC procedure in
6 consultation with her doctor versus the transvaginal
7 mesh procedure, she could still experience an erosion of
8 mesh, true?
9      **A. As I mentioned, in our experience, it is**
10 **highly unlikely, but something like that could happen.**
11      Q. Similarly, there is a risk of pelvic pain and
12 dyspareunia and infection associated with the ASC
13 procedure as well, true?
14      **A. It depends where you define it as far as**
15 **infection goes.**
16      Q. Well, let's stick with pelvic pain and
17 dyspareunia.
18      **A. Okay.**
19      Q. The woman has the ASC procedure to treat her
20 pelvic organ prolapse. There's also a risk of pelvic
21 pain and dyspareunia associated with that procedure,
22 correct?
23      **A. I assume something could be possible; but in**
24 **our series of now exactly 100, or almost 100 patients,**
25 **with follow-up as of right now, we have not seen that**

Page 160

1 one time.
2      Q. Have you seen that in the literature, though,
3 setting aside your own personal experience?
4      **A. Yes. There is an extensive amount of**
5 **literature out there on the ASC procedure, and vaginal**
6 **pain or dyspareunia has been reported in a minority of**
7 **patients.**
8      Q. And then, Doctor, I think, you know, in terms
9 of sort of a chronology, we saw sort of a movement
10 towards the laparoscopic sacrocolpopexy?
11      **A. Well, the laparoscopic sacrocolpopexy is a**
12 **relatively minor, minorly (sic) performed procedure**
13 **because it is quite complicated. The robotic now is**
14 **doing the lion's share of those procedures.**
15      Q. Are there complications, adverse events, risks
16 associated with either the laparoscopic sacrocolpopexy
17 and the robotic sacrocolpopexy?
18      **A. Yeah. There are risks with those procedures.**
19      Q. What are some of the risks, potential risks
20 and side effects associated with those procedures?
21      **A. We warn individuals about the potential for**
22 **skin infections, injury to the bladder during**
23 **implantation, the potential for bleeding during the**
24 **procedure itself.**
25      Q. And you're using mesh in these procedures, as

Page 161

1 well, right, Doctor?
2      **A. We are using a Y-shaped polypropylene mesh.**
3      Q. So it's polypropylene mesh as you've just
4 said, right?
5      **A. Correct.**
6      Q. And you're still doing that today. I think
7 you told me you put one in last week, correct?
8      **A. A couple weeks ago.**
9      Q. I apologize if I asked you this, Doctor. Even
10 though you're using the Y-shaped polypropylene mesh, as
11 you've just told me, for these procedures, is there
12 still a risk of mesh erosion associated with the
13 procedure?
14      **A. In our hands, in the last 90, the answer would**
15 **be, no. In the first ten, yes. But that was a**
16 **technical issue. We were dissecting too thin.**
17      Q. So --
18      **A. And then because -- I'm sorry to interrupt**
19 **you.**
20      Q. No. That's all right.
21      **A. And because the mesh is a Y-shape, it does not**
22 **have arms and we're able to lay it flat and it is**
23 **through sterile ports, I believe that's why we're not**
24 **seeing those problems.**
25      Q. So in your first ten patients where you

In Re: CR Bard 200                   Daniel Elliott, M.D.                    11/15/2014

Page 162

1  implanted Y-shaped polypropylene mesh using -- were
2  these all the robotic approach or the laparoscopic?
3      A.  Robotic.
4      Q.  Robotic?
5      A.  Yeah, but it's there are a few in there that
6  were robotic-assisted.  But, again, robotic-assisted
7  laparoscopic, but the laparoscopic, again, was just to
8  gain access.  So it's really -- the easiest way to think
9  about it is just pure robotic.
10     Q.  Okay.  So using the robotic approach to
11 implant Y-shaped polypropylene mesh, the first ten
12 patients experienced mesh erosion?
13     A.  No.  No.  Three out of those ten did.
14     Q.  Okay.
15     A.  And that was because --
16     Q.  So three -- I'm sorry.  Go ahead.
17     A.  That was a surgical -- it was technical issue.
18 We were dissecting too thin on the vagina.  Because as I
19 mentioned, we were the first in the world to do it, so
20 we had to somewhat figure it out.  But then, since then,
21 zero, and that's with, again, with nearly 13 years of
22 follow-up.
23     Q.  So just so I'm clear, out of the first ten
24 patients, three out of the first ten experienced mesh
25 erosion?

Page 163

1      A.  Correct.
2      Q.  I assume you obtain informed consents from
3  your patients when you performed these procedures?
4      A.  Correct.
5      Q.  Do you include mesh erosion as a potential
6  side effect or adverse event or complication associated
7  with the procedure?
8      A.  Yes.  We discuss it with them.  I tell them
9  exactly what I just told you now.  Because we look at
10 our data very, very closely and follow these patients
11 long-term, that, in the first ten, we had three and,
12 since then, zero.
13     Q.  Notwithstanding your improvement in erosion
14 incidents since you first started, you still include it
15 as a potential side effect or complication when you
16 inform your patients, true?
17     A.  We discuss it with the caveat of giving
18 actually specific numbers and the risks.
19     Q.  So you still tell them about it?
20     A.  I tell them they have, in our series, you
21 know, roughly, a 3 percent chance of it; however, if we
22 look at the last 90, 0 percent chance.
23     Q.  You're not excluding the possibility that any
24 one of your patients who undergo this particular
25 procedure could experience mesh erosion; is that fair to

Page 164

1  say?
2      A.  Again, I've answered it.  I tell them exactly
3  what I tell them now.  The first ten, three patients did
4  it.  We altered how we did it, 90 patients, and zero.
5      Q.  So the answer to my question is, yes,
6  you don't exclude the possibility that it could
7  happen?
8      MR. CARTMELL:  Objection.  Asked and answered three
9  times.
10     MS. GEIST:  I don't think so.
11 BY THE WITNESS:
12     A.  I'm very, very clear how I word it to the
13 patient.  I say it just that way.  The first ten we had
14 it in three and then after that zero.
15     Q.  So, in your practice today, you don't exclude
16 the possibility that it may happen to another patient,
17 true?
18     MR. CARTMELL:  Object to the form.
19 BY THE WITNESS:
20     A.  Statistically speaking, if we were looking at
21 it that way there's, in our hands, in the last 90,
22 0 percent chance of having it, and that's what I tell
23 the patient.
24     Q.  Well, then why do you include it on your
25 informed consent?  If there is zero chance that it's

Page 165

1  going to happen, why do you tell your patients about it
2  at all?  That doesn't make any sense, does it?
3      MR. CARTMELL:  Object to the form.
4  BY THE WITNESS:
5      A.  Sure.  I think it makes perfect sense.  I
6  believe in full disclosure to the patient.  The patient
7  needs to know everything and they also need to know the
8  potential risk with percentages.
9      Q.  So, in other words, if it is -- if it is a
10 true potential risk, not something hypothetical or
11 something that could never occur, if it's a true
12 potential risk, you tell them about it?
13     A.  Well, I also give them statistics.
14     Q.  I understand.
15     A.  So I don't -- I don't just say carte blanche
16 there is a risk.  I say what are her -- their odds.
17 Patients aren't -- patients want to know what are their
18 chances of complication.
19     Q.  You're not going to tell one of your patients,
20 Doctor, about the risk of erosion if there is no chance
21 it could ever happen?  You wouldn't tell them about it
22 if there was no chance?
23     A.  I tell them, in the last 90, zero.  So the
24 odds of her experiencing it in our hands, if they're
25 involved in that last 90, is going to be zero.

Page 166

1    Q.  So, just so I understand, you -- sitting here
2  today, you think there is zero chance of one of your
3  patients experiencing mesh erosion from your current
4  procedure?
5      MR. CARTMELL:  Object.
6  BY MS. GEIST:
7    Q.  Zero, zero chance; is that right?
8      MR. CARTMELL:  Object.  Misstates his testimony.
9      MS. GEIST:  No.  I want to understand his
10  testimony.
11  BY THE WITNESS:
12    A.  No.  I am very, very clear with the patients
13  and fully open with all of the pros and cons, because,
14  again, we follow these patients very carefully, so I
15  know what happens with them so they don't wander off and
16  have a complication elsewhere.  So we're saying, in our
17  hands, first ten, yes.  The first ten, if you look at
18  it, 30 percent.  The second group of 90 patients,
19  0 percent.  And I say in our hands, when we do this,
20  0 percent chance.
21    Q.  So you tell your patients about risks where
22  there is a 0 percent chance?
23    A.  I believe in full disclosure about everything
24  good and bad that's happened in the past and the future.
25  That was during the part of an early learning curve,

Page 167

1  too.
2    Q.  Do you tell your patients about other risks
3  associated with the procedure when there is 0 percent
4  chance of those risks occurring?
5    A.  I don't talk about dyspareunia because we've
6  never seen it.  In fact, in our series, we're seeing
7  improvement of sexual functions.
8    Q.  So you don't -- you don't -- so dyspareunia is
9  not included in the informed consent for your current
10  procedure, correct?
11    A.  Because we have not seen it.
12    Q.  Right.  And erosion is included because you
13  have experienced it in your own patients?
14    A.  Not erosion, no.  That's the wrong word.
15    Q.  Exposure, extrusion?
16    A.  Extrusion.
17    Q.  I think we're talking about the same thing,
18  are we not?
19    A.  Well, no.  But erosion -- erosion is into
20  other organs.  So I don't talk about that because we've
21  never seen it, never experienced it.
22    Q.  All right.  So that was my bad terminology.
23    A.  I talk about exposure.
24      THE REPORTER:  I'm sorry.
25

Page 168

1  BY MS. GEIST:
2    Q.  Hold on.  Dr. Elliott, the court reporter is
3  going to get mad at us.  You talk about exposure or
4  extrusion, right?
5    A.  I mention it with the caveats that I've
6  mentioned several times now.
7    Q.  Okay.  I assume you would agree with me,
8  Dr. Elliott, that, in terms of options that a pelvic
9  floor reconstructive surgeon has in his or her arsenal
10  of things to offer to a patient, that there is no
11  clear consensus among the medical community that one
12  option is better than anything else for any given
13  patient?
14      MR. CARTMELL:  Object to the form.
15  BY THE WITNESS:
16    A.  You're referring to, I assume, transvaginal
17  prolapse rate, specifically that?  No, I would say that
18  the consensus out there is that the sacrocolpopexy has
19  the highest chance of a high quality permanent success.
20  I don't think there's too many around there who are
21  arguing about that.
22    Q.  When you say the sacrocolpopexy, are you
23  talking about via the abdominal approach or the
24  robotic-assisted procedure?
25    A.  Both, just the abdominal route.

Page 169

1    Q.  Do you -- you've published pretty extensively,
2  as we've talked about earlier, right, Doctor?
3    A.  I've published quite a bit.
4    Q.  Yeah.  And a lot of your publications relate
5  to the robotic sacrocolpopexy as we went through
6  earlier, right?
7    A.  Robotic and just abdominal, yes.
8    Q.  And you published on that procedure
9  specifically how it compares with other prolapse repair
10  techniques, true?
11    A.  Correct.
12    Q.  And, in your publications, you've noted that
13  options for surgical treatment include a number of
14  things, such as the ASC, the laparoscopic sacrocolpopexy
15  or the robotic sacrocolpopexy, right?
16    A.  That sounds consistent with something I might
17  say.
18    Q.  Okay.  And you've concluded, in your own
19  publications, that it's still not clear in the medical
20  community which of these approaches is the best?
21    A.  I'd have to see that article and when we wrote
22  that.  You can just tell me the date.
23    Q.  Do you want to look it up, or do you want me
24  to give you a copy?
25    A.  Well, if you have the copy right there, you

In Re: CR Bard 200                 Daniel Elliott, M.D.                 11/15/2014

Page 170

1  can just say the date.
2     Q.  I don't have a copy.  It's 2013, so just last
3  year?
4     A.  Okay.  So 2013, that reflects the thinking
5  going on in, roughly, 2010 when we started doing
6  research on that.  And then we're probably considering
7  or thinking about the robotics.  But, again, the
8  robotics, originally, no one was doing them, and then it
9  slowly got hold and now, in certain regions in the
10  United States, it is the most common type of abdominal
11  approach.  Again, I have to look at what we were
12  thinking at the time and relative to what.
13     Q.  Well, this was -- this was just last year,
14  right?  It wasn't that long ago?
15     A.  No.  But that's when the paper comes out.
16     Q.  Right.
17     A.  But we start writing that paper two years, at
18  least, prior.  We then submit it.  It goes through
19  multiple revisions, and then it gets accepted and then
20  six months or so later it gets published.  Now, you
21  should have on there when it was submitted and when it
22  was published.  So from the time a project is started
23  until it comes out in print is usually about two years
24  or so.
25     Q.  Okay.  Well, let me just mark this.  I think

Page 171

1  we're up to Exhibit 4, so I can ask you some questions
2  about it.
3         (Elliott Deposition Exhibit No. 4 was
4         marked for identification.)
5     MS. GEIST:  Okay.  I actually do have a copy this
6  time.  Doctor, here is yours.  Counsel.
7     MR. CARTMELL:  Thanks.
8  BY MS. GEIST:
9     Q.  Doctor, just for the record, I've handed you
10  what we've marked as Exhibit 4.  And this is a copy of
11  your article published in --
12     A.  Yeah.  This was in a requested opinion piece
13  from Howard Goldman.
14     Q.  And who is Howard Goldman?
15     A.  He is a surgeon at -- in Cleveland.
16     Q.  At the Cleveland Clinic?
17     A.  Well, he's got a dual appointment there.  I
18  don't know how exactly it works.  He's mainly -- I'm
19  blanking on the place there in Cleveland.  If Ben were
20  here, he would know.  I can't recall.  Case Western?
21     Q.  He's a --
22     A.  No.  That's in Chicago; isn't it?
23     MR. CARTMELL:  No.  Case Western is in
24  Cleveland.
25  BY THE WITNESS:

Page 172

1     A.  I know Howard very well.
2     Q.  Okay.
3     A.  We can say, it's fair to say, he has a dual
4  appointment of some kind in Cleveland, but he's mainly
5  at the other institution that's there.
6     Q.  He's pretty reputable in the area of pelvic
7  floor repair?
8     A.  He -- he is a very, very good, thoughtful
9  person.  He is a -- tends to be a pro-mesh surgeon and
10  transvaginal kits, but he is a good person.
11     Q.  Is he a good surgeon?
12     A.  I've never seen him operate.  Unless I've seen
13  somebody operate, I can't attest to that.
14     Q.  And you're aware that he still uses
15  transvaginal mesh to repair pelvic organ prolapse?
16     A.  I haven't spoken to him for a year, so I don't
17  know what he's using now.
18     Q.  At least, as of a year ago, were you aware
19  that he was still using transvaginal mesh to repair
20  pelvic organ prolapse in certain of his patients?
21     A.  I can't say that.  I didn't ask him that
22  specifically.  I don't know if he does.  I know in the
23  past -- all I can say to have accuracy is, in the past,
24  he did use mesh kits.  I cannot say what he's done now.
25     Q.  If Dr. Goldman or any other pelvic floor

Page 173

1  reconstructive surgeon is using transvaginal mesh in
2  some of their patients for a treatment of pelvic organ
3  prolapse, are they acting within the standard of care?
4     A.  We would have to look at all of the parameters
5  involved in that patient to be able to ask or answer
6  that correctly.  I do know of some in the past, of
7  high-volume surgeons, that use mesh.  And when we were
8  at meetings, we would discuss it and I would be against
9  their opinion, and they would be, obviously, for theirs.
10     And if they put clarify -- clarifiers on
11  there, on highly select, fully informed patients,
12  perhaps, multiple revision patients who have failed
13  everything else and are having a significant amount of
14  problems and the patient knows all of the potential
15  complications, there possibly would be a role for mesh
16  in those types, but without mesh arms.  So there's --
17  there's a lot of qualifiers on there.
18     Q.  There are a lot of qualifiers on there.
19     A.  And that's why we talk, because this is
20  complicated, and this is what we talk about at meetings,
21  at the highest level of meetings.  You don't get any
22  higher than the International Incontinence Society and
23  the SUFU in the United States, and this is what we talk
24  about.
25     Q.  So, just so I understand, it's your opinion,

In Re: CR Bard 200                 Daniel Elliott, M.D.                 11/15/2014

Page 174

1 Doctor, that there still -- still may be a role for the
2 use of transvaginal mesh to repair pelvic organ prolapse
3 depending on a number of particular patient factors --
4     MR. CARTMELL: Wait. Let her finish.
5 BY MS. GEIST:
6     Q. I don't know if I'm finished yet. Hold on.
7 Let's strike that question and let me start again.
8         Would you agree with me, Doctor, there are
9 still today, notwithstanding the controversy and
10 discussion among the medical community, there still may
11 be a role for the use of transvaginal polypropylene
12 mesh to repair pelvic organ prolapse in certain
13 patients?
14     MR. CARTMELL: Object to the form.
15 BY THE WITNESS:
16     **A. Okay. I don't feel comfortable answering that**
17 **question just as it is because I want those qualifiers**
18 **on there, and it has to be, again, a high-volume, highly**
19 **trained surgeon who is fully aware of the complications**
20 **who can deal with the complications, a patient who is**
21 **fully informed of the specific risks, the longevity, the**
22 **permanence of it, the delayed onset, and that has --**
23 **she's tried and failed multiple other options, they have**
24 **failed, and she is severely symptomatic, in that one,**
25 **possibly, without arms.**

Page 175

1     Q. So if all of those criteria are met, and let's
2 just assume it's Dr. Goldman, who you know is a
3 reputable and very skilled surgeon in the area of
4 pelvic -- female pelvic reconstructive surgery, okay,
5 let's assume it's Dr. Goldman and all of those criteria
6 are met, if Dr. Goldman implants transvaginal mesh in
7 one of his patients to correct pelvic organ prolapse, is
8 that within the standard of care?
9     **A. I think, if all of the aforementioned**
10 **criteria, that we won't go over again, assuming that is**
11 **consistent with this and he has a mesh without arms and**
12 **Dr. Goldman, again, a highly advanced tertiary care**
13 **center, thoughtful person, were to consider doing it, I**
14 **would not criticize him. I would manage the patient**
15 **differently.**
16     Q. Is this one of those areas, Doctor, that we
17 sometimes see in medicine where there is a lot of debate
18 among physicians who practice in a particular area?
19     MR. CARTMELL: Object to the form.
20 BY THE WITNESS:
21     **A. No. I disagree. I think that -- Tom wants to**
22 **get his cookie.**
23     MR. CARTMELL: Sorry. I've got to get a piece of
24 my cookie.
25     MS. GEIST: I can't eat my cookie because I'm

Page 176

1 talking. That's unfair.
2 BY THE WITNESS:
3     **A. And I want my cookie, but they'll see crumbs**
4 **on my face. To answer your question, that's a very,**
5 **very good question. I think this was a very hot topic**
6 **in 2005, 2008, that time frame. And then, as the data**
7 **starts coming out, there was no question -- I will not**
8 **deny it -- a big wave of surgeons doing transvaginal**
9 **mesh kits, also a large wave of trainees only learning**
10 **how to do mesh kits. And the pendulum has swung.**
11         **So I -- in meetings now, again, I just got**
12 **back from a meeting, an international meeting in**
13 **Stockholm. The SUFU meeting was in February of this**
14 **year. It's not a discussion point now. There is not an**
15 **argument. There is no one coming up saying, We've got**
16 **to do meshes. Meshes are good for prolapse.**
17     Q. So there's not one single solitary doctor that
18 you're aware of who treats women experiencing pelvic
19 organ prolapse who will still use transvaginal mesh?
20     **A. Well, I can't speak for all of the surgeons**
21 **out there. As far as the ones I know, and I know a few**
22 **that in the past were very high-volume mesh kit**
23 **surgeons, they are not presenting data anymore on this**
24 **and they have changed. I can't speak for everybody out**
25 **there in the world. I'm saying for the ones that I know**

Page 177

1 at the high level they are not.
2     Q. But, as we've just discussed even today, with
3 the number of caveats and criteria that you mentioned
4 earlier, there would still be certain patients who would
5 be appropriate candidates for the use of transvaginal
6 mesh?
7     MR. CARTMELL: Objection. Asked and answered
8 multiple times.
9 BY THE WITNESS:
10     **A. Okay. With all of those aforementioned,**
11 **incredibly important screening criteria, there may be a**
12 **possible -- I disagree with it -- but a possibility of**
13 **putting a transvaginal mesh without arms. But, again,**
14 **that's a tiny, tiny fraction of the patients out there.**
15     Q. But they exist, don't they?
16     **A. Well, you're talking about minutia. And --**
17 **but, again, in my practice, zero. So I've got -- I've**
18 **got -- I take care of all of those people with all of**
19 **those things, multiple reoperations, multiple failures,**
20 **and I manage them successfully without putting in mesh.**
21     Q. And I understand that, Doctor. We talked
22 about that, but you don't know what percentage. Your
23 only experience, you can't tell me what percentage of
24 those women -- strike that.
25         You can't tell me what percentage of women who

In Re: CR Bard 200      Daniel Elliott, M.D.      11/15/2014

Page 178

1  have had mesh implanted, and, in particular, the Avaulta
2  product, actually come to you with complications?
3      A.  We've already gone around that a bunch of
4  times.  I do not know the denominator of how many of
5  these were implanted.  All I know is what I see at my
6  practice.
7      Q.  Okay.  Well, let's -- you mentioned an article
8  to me when we were having this discussion.  So let me
9  shift to that for a second.  We looked at the Blandon
10  article that was published by the chair of urogynecology
11  at Mayo --
12      A.  No, it wasn't pub- -- no, it was --
13      Q.  -- among -- hold on.  You're not letting me
14  finish -- among other colleagues.  Do you have something
15  to say about that?
16      A.  Well, it was -- no, that's acceptable.
17      Q.  Okay.  I just wanted to see if we had an
18  argument there.
19      A.  No.  I mean, in our language, we wouldn't say
20  it was published by the chair because he wasn't the
21  senior author.
22      Q.  Okay.  Sorry.
23      A.  That's minor.  I'll let you have that.
24      Q.  No.  That's fine.  That's a fair correction.
25  And the complications that Mayo reviewed at that time

Page 179

1  was from the 2003 to 2007 time period for patients who
2  were referred to the clinic.  And none of those women
3  have had an Avaulta product.  You remember that, right?
4      A.  Yeah.  And it was -- it was a study -- that's
5  a very good point, because it was January of 2003
6  through September of 2007.
7      Q.  Right.
8      A.  That's my recollection.  Avaulta didn't become
9  available until a couple of months prior to that.  So it
10  had -- it would only include two months when the product
11  was on the available list.
12      Q.  Right.
13      A.  So to answer your question, yeah, there are no
14  Avaultas on here because Avaulta was essentially not
15  even available during this time frame.
16      Q.  Well, it was available per the article,
17  itself, right?  We talked about that three different
18  times.  It's listed right in the article as one of the
19  currently marketed POP products at this time?
20      A.  Incorrect.  In 2009 when they submitted it,
21  but this does not include -- this is January of 2003
22  through September of 2007.
23      Q.  Doctor, my point was, you mentioned the Karram
24  article, I think?
25      A.  Yeah.  He was one of the authors.  I would be

Page 180

1  able to get the reference for you here.
2      Q.  That's all right.  I think I have it.
3      A.  Abbott.  Abbott, et al.
4      Q.  Yeah.  There you go.  So let's look at that
5  article, because that was a more recent look, right?
6      A.  Correct.
7      Q.  At complications relating to mesh implants?
8      A.  Correct.
9      Q.  And that was what you had mentioned before,
10  right?
11      A.  Yes, I had.
12      MS. GEIST:  Okay.  So I just marked this as
13  Exhibit --
14      THE REPORTER:  5.
15      MS. GEIST:  -- 5 -- thank you, Madam Court
16  Reporter -- to your deposition.  Let me hand you that.
17          (Elliott Deposition Exhibit No. 5 was
18           marked for identification.)
19  BY MS. GEIST:
20      Q.  Doctor, you don't have to look for it.  I just
21  handed you the hard copy.
22      A.  I have my copy that I've reviewed and read.
23      Q.  Well, let me ask you this.  You're clicking
24  away on your mouse there and you've got your laptop,
25  right?

Page 181

1      A.  Yes.
2      Q.  So you didn't bring any of those papers with
3  you in hard copy today to your deposition?
4      A.  Well, we're in the electronic era, so I didn't
5  think I had to.
6      Q.  That's very green of you.  But my only
7  question is, do you have notes or comments or highlights
8  on these articles?
9      A.  I have highlights, yes.
10      Q.  Do you have any notes or comments?
11      A.  No.
12      Q.  Underlining?
13      A.  We can -- I have highlight.  No underlining,
14  but I have highlights.  We can go through every
15  single --
16      Q.  Okay.
17      A.  What we could do -- how about this?  I'll
18  close this, you close your paper.  Let's do it nose to
19  nose on memory.  Let's do that.
20      Q.  On memory?
21      A.  Because you are taking away this.  This is my
22  data and let's do it.
23      MR. CARTMELL:  Let her ask the questions.
24  BY MS. GEIST:
25      Q.  Well, Doctor, see, let me explain how the

In Re: CR Bard 200          Daniel Elliott, M.D.          11/15/2014

Page 182

1 deposition proceeds.  I actually get to ask the
2 questions and you get to answer the questions.  So I
3 appreciate the offer, but I'm going to decline.
4     **A.  That's fine.**
5     Q.  Let's -- so you have the paper in front of you
6 with your highlights, correct?
7     **A.  Correct.**
8     Q.  And this was a review -- well, the paper is
9 entitled, Evaluation and Management of Complications
10 From Synthetic Mesh After Pelvic Reconstructive Surgery:
11 **A Multicenter Study.  That was published just last year**
12 **in 2013, correct?**
13    **A.  Correct.**
14    Q.  Actually, you know what?  I take that back.  I
15 have a copy of what is an accepted manuscript.  It was
16 accepted in October of 2013 by the American Journal of
17 Obstetrics and Gynecology.
18    **A.  Yeah.  You don't have the final article.**
19    Q.  No.  Do you?
20    **A.  Yeah.  I have the final article.**
21    Q.  Okay.  I'm looking at the accepted manuscript.
22 So you can let me know if anything differs from the
23 final as we go along.  But the paper, Doctor, per the
24 objective is to describe the evaluation and management
25 of synthetic mesh-related complications after surgery

Page 183

1 for stress urinary incontinence and/or pelvic organ
2 prolapse, correct?
3     **A.  Correct.**
4     Q.  And it was a multicenter retrospective
5 analysis?
6     **A.  This was the patient, four patient -- four**
7 **tertiary care centers.**
8     Q.  Okay.  We're talking about -- they're looking
9 at referrals of women from four different centers from
10 January 2006 to December 2010, correct?
11    **A.  Correct.**
12    Q.  How many women that were referred to these
13 centers for complications relating to mesh were
14 implanted with the Avaulta product?
15    **A.  From this paper, as far as I recall, they did**
16 **not know the status of a fairly significant number of**
17 **the patients, but they do not specifically single out**
18 **Avaulta.**
19    Q.  So this study doesn't tell us anything about
20 the incidence rates or the frequency with which
21 complications occurred in women implanted with the
22 Avaulta products?
23    **A.  No.  It cannot state the frequency because**
24 **they don't know the denominator either.  This describes**
25 **the severity of the complications that came into these**

Page 184

1 four select institutions.
2     Q.  So we don't know, from the 347 patients
3 reviewed in this study that you mentioned earlier,
4 whether any of them had complications relating from the
5 Avaulta product; is that fair to say?
6     **A.  I cannot.  Because there are a certain number**
7 **of patients here that did not -- it was not known what**
8 **mesh, so I cannot say if Avaulta was there or not, but**
9 **there was nothing reported on Avaulta.**
10    Q.  And we also don't know anything in terms of
11 the incidence rates.  We don't know how many patients
12 were implanted with mesh products, during this period of
13 time, who actually experienced these complications?
14    **A.  You're talking about all meshes?**
15    Q.  Right.
16    **A.  No.  We do not know.  This is, again, just**
17 **representing the complications that come into these four**
18 **institutions.  So incidence, overall incidence, is not**
19 **recorded in this study.**
20    Q.  That's all I wanted to ask you about that
21 paper, Doctor, if you want to put it aside.
22    Doctor, I think we talked earlier a little bit
23 about my suggestion to you that you are one of the more
24 outspoken physicians in terms of being anti-mesh in the
25 medical community?

Page 185

1     **A.  I would disagree with that.  I think there's**
2 **others out there who are a lot more vocal and adamant**
3 **against meshes.  I'm one of them.  I'm not going to deny**
4 **that.**
5     Q.  There has been lots of opinions and
6 discussions in the medical community, as we've just
7 talked about, over the controversy relating to
8 transvaginal mesh, true?
9     **A.  Yes.**
10    MR. CARTMELL:  Object to the form.
11 BY MS. GEIST:
12    Q.  Would you agree with me, at least, that your
13 opinions and stance on this issue is one of the more
14 extreme?
15    **A.  No.**
16    Q.  You wouldn't?
17    **A.  Not at all.  Absolutely not.  In 2005 had I**
18 **made these statements, then you would have been correct.**
19 **In 2008, no.  They're starting to become the pendulum.**
20 **In 2011, I'm one of the many.  So, no.**
21    Q.  You're not -- you're not one of the -- your
22 opinions in 2011 were not extreme in your opinion?
23    **A.  No.  I don't think so at all.  In our national**
24 **meetings, when we're all together talking about this, I**
25 **am one of the many.  And there are others out there who**

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 186

1  are tremendously more outspoken than I am.  I just
2  happen to have a public forum based upon the institution
3  that I work at.
4      Q.  So you wouldn't agree with me that you are
5  sort of out there and on the fringe and that your
6  opinions are inconsistent with some other physicians
7  practicing in the area of female pelvic reconstructive
8  surgery?
9      MR. CARTMELL:  Object to the form.
10  BY THE WITNESS:
11     A.  Well, you're putting a lot of qualifiers out
12  there. I can tell you the names of certain very
13  high-profile, high-volume implanters, and we would be at
14  meetings and I would moderate the sessions and we would
15  talk about it.  There was a scholarly discourse.
16  There's no anger and there's no, you know, soapboxing.
17  But I was -- I was -- again, if I did it in 2005, I
18  would agree with you.  Not now.
19     Q.  Not in 2011 either?
20     A.  No, not at all.  I'm at these meetings.
21  That's what I do for a living all over the world.
22     Q.  So your opinions back in 2011 were consistent
23  with the leading physicians practicing in this area and
24  with the medical organizations representing physicians
25  who practice in the area of female pelvic reconstructive

Page 187

1  surgery?
2      A.  Speaking within the confines of female
3  urology --
4      Q.  Right.
5      A.  -- and the circle that I --
6      Q.  That's what we're talking about, right?
7      A.  In very, very high-profile female urologists,
8  Shlomo Raz, arguably one of the bigger and better ones,
9  Gerry Blaivas, oh, Greg Bales, University of Chicago,
10  all of these types, no.  We're -- this was a consistent,
11  you know -- Philippe Zimmerman.  Philippe Zimmerman, if
12  you want somebody who is vocal, Philippe Zimmerman is.
13  I've tried to retain a balance.  And I have a problem.
14  I'm taking care of women whose lives have been destroyed
15  by a product and I'm trying to do something that's good
16  for them.
17          (Elliott Deposition Exhibit No. 6 was
18          marked for identification.)
19  BY MS. GEIST:
20     Q.  Doctor, let me hand you what I've marked as
21  Exhibit 6 to your deposition.  I'm sorry to throw it at
22  you.  I'm not really meaning to throw it at you.
23     MR. CARTMELL:  That's all right.
24  BY MS. GEIST:
25     Q.  Do you have that in front of you, Doctor?

Page 188

1      A.  Yes, I do.  It's the AUGS report on surgical
2  treatments.
3      Q.  All right.  And you're -- you're familiar with
4  this, I'm sure?
5      A.  Yes.
6      Q.  Correct?
7      A.  Yes, I am.
8      Q.  And you're a member of AUGS, which is
9  shorthand for the American Urogynecologic Society,
10  correct?
11     A.  I believe I am, yes.  I have to look at my CV.
12     Q.  Do you know?
13     A.  I'm almost convinced I am, but I'm a member of
14  the International Urogyn Society and AUG or AUGS, SUFU,
15  so I'd have to say, yes, I am.
16     Q.  Okay.  And AUGS, as indicated in the paper, is
17  a nonprofit organization of thousands of physicians who
18  specialize in treating pelvic floor disorders?
19     A.  Yeah.  That would be fair to say.
20     Q.  So this is an organization for -- of health
21  care providers, doctors.  There's no lawyers in this
22  organization, correct?
23     MR. CARTMELL:  Object to the form.
24  BY THE WITNESS:
25

Page 189

1      A.  I can't speak to that, no.
2      Q.  You're not aware that there's any, right?  I
3  mean, these are doctors looking for the best things for
4  women who are experiencing pelvic organ prolapse,
5  correct?
6      MR. CARTMELL:  Object to the form.
7  BY MS. GEIST:
8      Q.  That's what the purpose of the organization
9  is?
10     MR. CARTMELL:  Object to form.
11  BY THE WITNESS:
12     A.  Yeah.  But as far as lawyer involvement, a
13  lawyer reviewed this.  They reviewed the ones for SUFU,
14  so they reviewed this, I'm sure.
15     Q.  Okay.  Well, this was -- this paper was put
16  out as a physician statement by AUGS in response to the
17  FDA safety communication in 2011, correct?
18     A.  That is correct.
19     Q.  So after FDA came out in 2011 and made a
20  statement relating to transvaginal mesh for the use in
21  POP, this group of physicians put out a position
22  statement and response.  Fair summary?
23     A.  That is correct.
24     Q.  And if you look with me on the third
25  paragraph, the position statement says, The American

Page 190

1  Urogynecologic Society strongly opposes any restrictions
2  by state or local medical organizations, health care
3  systems, or insurance companies which ban currently
4  available surgical options performed by qualified and
5  credentialed surgeons on appropriately informed patients
6  with pelvic floor disorders?
7      A.  That's what it states, yes.
8      Q.  Do you agree with that position?
9      A.  There are a lot of caveats in here.  Number
10 one, appropriately informed patients.  If the patients
11 aren't appropriately informed, the IFUs are incomplete,
12 they can't be appropriately informed.  So you have to
13 assume, then, they have received all of the appropriate
14 information.  Qualified and credentialed.  Credentialed
15 means nothing.  Qualified, okay.  If you want to go on
16 qualified, you're going to have to have high-volume,
17 tertiary center individuals.  So subsequently it's
18 eliminated almost all of the private practice doctors
19 from that group there.
20     So -- and then I disagree as far as state and
21 local medical organizations and health care systems and
22 insurance companies getting involved.  This is for the
23 betterment of women.  This is a women's rights issue.
24 Women are being hurt by this product.  I would want
25 those organizations to have at least take a look.

Page 191

1      Q.  Well --
2      A.  And a healthy discourse and looking at this is
3  not wrong.
4      Q.  I --
5      A.  Okay.  Go ahead.
6      Q.  Sorry.  Were you finished?
7      MR. CARTMELL:  Were you done?
8  BY MS. GEIST:
9      Q.  I didn't want to interrupt you, Doctor.  We
10 had that issue earlier.  Go ahead.
11     A.  No.  I think this is -- there are -- I cannot
12 fully agree or fully disagree with this.  But you can't,
13 as a blanket statement, say one or the other.  Now, I'm
14 done.
15     Q.  Okay.  So I actually agree with you on one of
16 the things you said, that this is a women's right --
17 rights issue, Doctor.  So do you agree with the other
18 statements in this paper beginning on page 2?
19     MR. CARTMELL:  Take your time and look at it if you
20 need to.
21 BY MS. GEIST:
22     Q.  At the top, that a ban on alternative surgical
23 treatment interferes with the patient/physician
24 relationship and withholds FDA-acceptable options that
25 the patient and her physician may decide is the best

Page 192

1  treatment option for her particular clinical situation.
2  Do you agree with that?
3      A.  To a certain extent, I do.  If the physicians
4  involved and medical organizations involved are not
5  appropriately policing themselves and women are being
6  permanently damaged sexually and physically, and I'm the
7  one picking up the pieces, I disagree with this.
8      I think that a ban, at the minimum, is the
9  most appropriate thing until appropriate studies show
10 that it's safe and that the benefits outweigh the risks.
11 Currently, the risks far outweigh the benefits and
12 that's a testament to what I see every day in my clinic.
13     Q.  So when you say the risks out see the
14 benefits, the risks of what in particular?
15     A.  Okay.  That is an excellent question.
16     Q.  Thank you.
17     A.  Number one -- I didn't mean that to be
18 sarcastic.  I'm saying that is actually a good question.
19     Q.  No.  And I was thanking you legitimately.  Go
20 ahead.
21     A.  Okay.  Pelvic organ prolapse and stress
22 incontinence, but let's just deal with pelvic organ
23 prolapse, is a quality-of-life issue.  It does not kill
24 patients.  Okay.  In all of my years, I've never --
25 well, there's been one patient in California that had

Page 193

1  erosion infection, but that's a unique situation.
2      For the vast majority, it's quality of life.
3  They come in with a sense of fullness, pressure, falling
4  out, as we have covered very well before.  They then get
5  this procedure, and these women's lives, they are -- not
6  just them, but their partner and their family, their
7  children, their grandchildren, their parents, their
8  lives are destroyed because this woman can't sit.  She
9  can't -- she can lie down sometimes, can't stand.
10     So extreme views on severe damage and risks
11 versus benefit?  Take somebody with a quality-of-life
12 issue and give them a permanent disability, the risk
13 outweighs the benefit.  If we have an individual who had
14 a heart problem and there's some type of valve and
15 they're going to die without it, a different ball game.
16 But we're not.  We're talking quality of life.
17     Q.  All right.  So let me try and break it down a
18 little bit.  When we were talking about risks, you just
19 gave me a very long answer, which I appreciate, but I
20 would like to focus a little bit on what we're talking
21 about.  Are we talking about pelvic pain, dyspareunia,
22 and erosion?  Are those the three main risks that you
23 say are unreasonably high with respect to transvaginal
24 mesh?
25     A.  No.  I'm talking about the severity and the

Page 194

1  frequency of pain, the location of the pain, buttock
2  pain, obturator foramen pain, vaginal vault pain,
3  adductor and abductor, A-B-D-U-C-T-O-R, and then,
4  A-D-D-U-C-T-O-R, thigh pain, the mesh extrusion, the
5  mesh erosion, the granulation tissue, chronic vaginal
6  discharge, chronic inflammatory process, foreign body
7  reaction, chronic severe debilitating vaginal pain,
8  chronic severe debilitating pelvic pain, pain for the
9  sexual partner, and a lifelong risk of this, and, very
10  importantly, advanced level of complications requiring
11  advanced level of surgeons to try and fix.
12      Q.  All right.  So hold on a second.
13      MR. CARTMELL:  Were you done?
14      THE WITNESS:  Yes, I am.
15  BY MS. GEIST:
16      Q.  So we're talking about pain.  You're not going
17  to dispute, are you, Doctor, that the pain you just
18  described, all of the different types of pain you just
19  described, may be experienced by a woman who has had a
20  native tissue repair, or an ASC, to treat her pelvic
21  organ prolapse?  That is a known and well-established
22  side effect in the literature for either one of those
23  procedures, true?
24      MR. CARTMELL:  Object to the form.
25  BY THE WITNESS:

Page 195

1      A.  I disagree, because we are -- we have to put
2  qualifiers in there.  In my 25 years of medical
3  experience going back to medical school and OB/GYN,
4  which was all native back then, my surgery training at a
5  high-volume tertiary care center, advanced level
6  training, I have never once seen the severe -- the
7  severity of the location of the pain and the
8  irreversibility of it and the ability for us not to be
9  able to fix in the native transplants.
10      Q.  Well, and what about -- what about
11  dyspareunia, in particular?
12      A.  As I'm --
13      Q.  Dyspareunia, in particular, I'm sure you're
14  not going to disagree with me, is a known and
15  well-established side effect with a native tissue repair
16  or an ASC or even a laparoscopically performed
17  sacrocolpopexy, true?
18      A.  Okay.  I disagree because you have to put on
19  with the qualifiers of the severity, the delayed onset,
20  the ability to fix it.  Remember, I mentioned, in my
21  series, which I've watched very closely, I had one
22  patient who had severe dyspareunia after an anterior
23  colporrhaphy.  But we were able to cut the suture and
24  the pain went away.  But compare that to all of the
25  other patients that I had with pelvic pain after mesh, I

Page 196

1  can't even remotely fix.  I'm done.
2      Q.  Okay.  Thank you.  I was just going to ask
3  you.  All right.  So let me see where we agree and where
4  we don't agree.  Okay.
5          A woman has a potential complication or side
6  effect with pain with either native tissue, ASC, or
7  transvaginal mesh.  But it's your opinion that the pain
8  is more significant or more severe with the mesh versus
9  the other procedures.  Did I get that right?
10      A.  Correct.  And different onset and different
11  location.
12      Q.  Okay.  Same things with dyspareunia, a woman
13  has a risk of a potential complication or adverse event
14  of dyspareunia if she's had a native tissue repair or an
15  ASC repair for her prolapse, but it's your opinion that
16  the dyspareunia with transvaginal mesh is, what, more
17  significant?
18      A.  Severe, relenting, progressive, and destroying
19  of women's lives.
20      Q.  Okay.  Same side effects and complications,
21  but the severity is the difference among these different
22  procedures.  Is that what you're telling me?
23      A.  No.  I disagree as far as with using the word
24  same.  These are not the same.  This is what I do on a
25  daily basis.  And I see these women who can't even sit

Page 197

1  down on my exam table.  Not on my exam table, on the
2  chair because of the severity of pain.  I have never
3  once seen that with a native repair.  That's my own and
4  the others coming in referred to me.
5      Q.  Okay.
6      A.  And if I'm at a tertiary care center, arguably
7  one of the biggest volumes in the United States, and I
8  have not seen one patient sent in to me with a native
9  repair problem, but I see five a day of the other ones,
10  we're talking a different type of problem.
11      Q.  Well, Doctor, you've said a couple of times
12  you're referring back to your own experience with your
13  patients at the Mayo Clinic, correct?
14      A.  No.  That's not -- well, yes and no with that.
15  I'm referring to my experience in the ones that I've
16  seen.  But, remember, I'm a referral center.  So I'm
17  getting patients from all over the United States sent in
18  to me.  And if transvaginal native repair problems,
19  we're having all of these problems, I would be seeing
20  them, but I'm not seeing them.
21      Q.  So I just want to explore the basis for the
22  opinions you just gave on -- relating to pain and
23  dyspareunia.  All right.  I also want to talk about
24  erosion a little bit.
25          Doctor, let me start with dyspareunia.  Okay.

Page 198

1  It's your opinion that women who have had transvaginal
2  mesh experience greater dyspareunia than women who have
3  had their prolapse repaired via another surgical
4  procedure; is that a fair summary?
5       A.  I'm saying there's a qualitative difference
6  and a location difference, and that goes along with
7  severity and frequency.
8       MS. GEIST:  I'm not doing this very well.  So the
9  record is clear, I'm talking about the exhibit marker.
10          (Elliott Deposition Exhibit No. 7 was
11            marked for identification.)
12 BY MS. GEIST:
13      Q.  Dr. Elliott, let me hand you what I've marked
14 as Exhibit 7.  Again, I'm sorry, I'm not really trying
15 to throw it at you, but the table is kind of long.
16      Dr. Elliott, for the record, Exhibit 7 is an
17 article entitled, Incidence and Management of Graft
18 Erosion, Wound Granulation, and Dyspareunia Following
19 Vaginal Prolapse Repair With Graft Materials:
20 Systematic Review?
21      A.  Correct.
22      Q.  Do you see that, Doctor?
23      A.  Yes, I do.
24      Q.  And this was published in 2011 by Dr. Abed and
25 others for the symptomatic review group for the Society

Page 199

1  of Gynecologic Surgeons?
2       A.  Correct.
3       Q.  Is that correct?
4       A.  Correct.  For the International Urogyn
5  Journal, which I'm a reviewer for.
6       Q.  Did you review this paper in particular?
7       A.  I don't recall doing that one, this one, no.
8       Q.  And, as you can see, either in the abstract or
9  the introduction, the purpose of this study was to
10 describe the incidence of graft erosion, wound
11 granulation, and dyspareunia adverse events
12 following vaginal repair.  Do you see that?
13      A.  Yeah, from 1950 to 2010.
14      Q.  That's the time period for the review of
15 reports --
16      A.  Yeah, so 55 --
17      Q.  -- on these types of adverse events, correct?
18      A.  Yeah.  So 55 years of this is not considered
19 involvement with the mesh kits.
20      Q.  I'm sorry?
21      A.  55 years of this paper of the 60 total are not
22 involving the mesh kits.
23      Q.  Correct.  But the paper went through and
24 looked at adverse events reported in Medline articles
25 through November 2010, correct?

Page 200

1       A.  Yeah.  But they're put --
2       Q.  Okay.  Hold on.
3       A.  But you asked me -- no, you asked me a
4  question, though.
5       Q.  Sorry.  I wasn't finished.
6       A.  You said correct, and correct means I'm
7  supposed to respond.
8       Q.  Okay.  You know what?  Point -- point to you.
9  Go ahead and respond.
10      A.  Okay.  But, also, they're looking at from 1950
11 to 2005 a lot of other horrible products were put in
12 women's vaginas; Gortex, various other things, cotton,
13 all of that type of stuff.  So it's not exactly -- we're
14 not comparing apples to apples.  I've made my peace.
15 You can go ahead.
16      Q.  Okay.  Well, the study -- the study results
17 concluded that dyspareunia, which is pain during vaginal
18 intercourse, correct?
19      A.  Correct.
20      Q.  Okay.  That was described in 7 -- 70, pardon
21 me.  Dyspareunia was described in 70 of the studies that
22 were included in the systematic review, correct?
23      A.  I don't see where you are, but I'll take your
24 word for it.
25      Q.  I'm at the top --

Page 201

1       A.  In the abstract.
2       Q.  Yeah.
3       A.  Under Conclusions.
4       Q.  It's above Conclusions.  It says, Dyspareunia
5  was described in 70 studies.
6       A.  Oh, here we go.
7       Q.  Do you see that?
8       A.  Yes.  It was described in 70 studies for a
9  rate of 9.1 percent, correct.
10      Q.  And dyspareunia was reported both in pelvic
11 organ prolapse repair surgeries and involved both
12 synthetic and biologic mesh, correct?
13      A.  That's what it states, yeah.
14      Q.  And the rate -- the incidence rate or the
15 reports of dyspareunia were greater in the women who had
16 had a biological implant or biological graft used in the
17 tissue repair versus the synthetic?
18      A.  That's what the results are quoting from 1950
19 to 2010.  They're talking about those biologicals being
20 at a slightly higher rate.  I don't know if it was
21 statistically significant, though.
22      Q.  Well, statistically significant or not, you
23 can see that the -- there were 8.9 -- 8.9 percent
24 reported dyspareunia when using -- when having -- when
25 having a synthetic versus 9.6 for biologic graft.  Do

Page 202

1   you see that?
2       A. I see it. But I think, for the record, we
3   want to come on the record that you are stating
4   statistical significance is not important. Is that what
5   you're saying?
6       Q. You can ignore that. I'm just saying, if you
7   look at the -- you can ignore my statement about
8   statistical significance.
9       A. Okay. Then it's back on the playing field
10  then, so this could just be by chance. We'd have to go
11  in the paper and find out statistically significant.
12  Regardless, it's still showing nearly 90 percent of the
13  synthetics had problems, dyspareunia. It's still high.
14      Q. But not any higher than the biologic grafts
15  used to treat pelvic organ prolapse, true?
16      A. Well, with biologics there's SIS, there's
17  cadaveric tissue, there's porcine dermis. You know,
18  that's immaterial comparing it to those. These aren't
19  comparing it to natives, native repairs.
20      Q. No. This is -- this is comparing the use of a
21  biologic versus a synthetic --
22      A. Okay. Then what --
23      Q. -- graft, correct?
24      A. I'm sorry. Yes. And what I will go on the
25  record as agreeing with you that the synthetic in this,

Page 203

1   whether it's statistical or not, is 0.7 percent less bad
2   than biologics. It's still bad. It's just less bad
3   than the biologics.
4       Q. All right. You can put that one aside. Let
5   me show you --
6       MR. CARTMELL: Keep going.
7   BY MS. GEIST:
8       Q. Let me show you, Doctor, what we'll mark as
9   Exhibit 8 to your deposition.
10          (Elliott Deposition Exhibit No. 8 was
11           marked for identification.)
12  BY MS. GEIST:
13      Q. Let me hand that to you. Now, this study, to
14  your point, Doctor, actually looked at trocar-guided
15  vaginal mesh compared with conventional or native tissue
16  repair, correct? And, just for the record, this is the
17  Withagen 2011 study entitled, Trocar-Guided Mesh
18  Compared With Conventional Vaginal Repair and Recurrent
19  Prolapse?
20      A. Yeah. It's Withagen. He's Dutch.
21      Q. Withagen. Thank you for that correction. Are
22  you looking for the paper on your laptop?
23      A. I have it. I have it right here. We can go
24  through it again. It's highlighted. I've read it.
25      Q. Okay. Good. So you read this one?

Page 204

1       A. Yes.
2       Q. And this is on your reliance list, right?
3       A. Correct. And there are no notes. This is
4   just highlighted.
5       Q. And this study concludes, does it not, Doctor,
6   that vaginal mesh was introduced due to the high failure
7   rates or recurrence rates seen in native tissue repairs?
8       A. Yeah, but they're based upon that, their
9   submission in 2011, which means, you know, earlier than
10  that, on the anatomic and the perceived. This is
11  somewhat the old era of thinking.
12      Q. Well, this study, you say it's the old era of
13  thinking, Doctor, but this study looks at not just
14  anatomic success, but it also looks at quality-of-life
15  issues, does it not?
16      A. Correct. It does.
17      Q. Because it looks at dyspareunia in particular,
18  right?
19      A. I'd have to look and see if it did. I would
20  suspect it would talk about it, but I would have to find
21  it.
22      Q. Okay. Well, let's talk about -- let's talk
23  about anatomic failure or success rates first. Okay.
24  Is that all right with you, Dr. Elliot?
25      A. That's fine. Sure.

Page 205

1       Q. Okay. Well, this -- this study looked at
2   essentially where a woman -- where women were at 12
3   months after either having a native tissue repair or a
4   transvaginal mesh repair, right?
5       A. Correct. I wanted to see which type of repair
6   they did. Withagen usually uses Prolift, which is a
7   different product. Yeah. They're using Prolift. So
8   that's a different -- when we talked about it before,
9   that's a different product than what we're talking about
10  with Avaulta; different arms, collagen, density, high
11  density, those types of things. But, yes, that is --
12  that is --
13      Q. It's still -- it's transvaginal mesh, though,
14  right?
15      A. Yeah. But before you didn't let me talk about
16  these types of papers when we were talking about
17  Avaulta. So now we're going to accept this data and
18  correlate it to Avaulta.
19      Q. Well, we're talking about trocar-guided
20  transvaginal mesh, right?
21      A. Okay. Good. So now -- all right. That's
22  fine.
23      Q. Hold on. That is one of your criticisms of
24  the Avaulta product, which is why I brought out this
25  paper, true?

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 206

1    A.  Yes, but we didn't bring it out earlier when I
2  was trying to bring them out.  So we're not being
3  consistent.
4    Q.  Okay.  Well --
5    MR. CARTMELL:  For the record, we're talking about
6  Avaulta products.
7  BY MS. GEIST:
8    Q.  Well, my bad.  I brought it out now.  But the
9  point is, Doctor, it's talking about -- it's looking at
10  and comparing not just the success of women who have
11  undergone a transvaginal mesh procedure, a trocar-guided
12  transvaginal mesh procedure, but also looking at quality
13  of life issues, correct?
14    A.  That is what it's doing, yeah.
15    Q.  And the authors of this paper found that there
16  was a 45.2 percent anatomic failure rate in the native
17  tissue group after 12 months compared to a 9.6 percent
18  failure rate in the mesh group after 12 months.  Is that
19  what they found in their study?
20    A.  That is what they stated, and that's why I
21  earlier stated we're treating symptoms, not anatomy.
22    Q.  And we'll get -- we'll get to that, Doctor?
23    A.  Oh, I don't have a guarantee we will, but go
24  ahead.
25    Q.  We will.  And this -- so, based on this study,

Page 207

1  Doctor, the women who proceeded with a native tissue
2  repair were five times more likely to have an anatomic
3  failure after surgery, correct?
4    A.  Yes.
5    Q.  In other words, a recurrence of the prolapse
6  that they wanted to fix in the first instance, five
7  times more likely in the native tissue group.  Isn't
8  that what this study tells us?
9    A.  It tells us that and that 80 percent were
10  happy just saying equal.  So they were both happy in
11  each group.
12    Q.  And we got five times more failure rate in the
13  native tissue, correct?
14    A.  You're right.  And then what I stated very,
15  very clearly, the majority of the time women don't care
16  about their anatomic success.  They care about are their
17  symptoms relieved.
18    Q.  Well, and let's go -- let's go to that right
19  now because I know that's what you want to talk about,
20  and I want to talk about it, too.  So dyspareunia is one
21  of the problems we've been discussing today, right?
22    A.  Correct.
23    Q.  And Withagen's paper or study looked
24  specifically at dyspareunia reports of the women who had
25  both a trocar-guided transvaginal mesh inserted and

Page 208

1  women who underwent the native tissue repair, right?
2    A.  Correct.
3    Q.  And the paper concluded that the difference in
4  reported dyspareunia between groups was not significant
5  at the 12-month period, correct?
6    (Exit Mr. Jeffrey Kuntz.)
7  BY THE WITNESS:
8    A.  And that is a very good point, also, yes.  At
9  12 months, 51 of 97, 53 percent of the conventional
10  group and 53 of 93, 57 percent were sexually active and
11  the dyspareunias were equal at 12 months.  However, we
12  know, from Klosterhalfen and others, mesh degradation
13  continues up to 15 years.  So one-year data does not
14  help us out.  However, to agree with you, that is their
15  findings at 12 months with the Prolift.
16    Q.  Okay.  And at 12 months we also know that
17  there were reports of de novo dyspareunia in both
18  groups, correct?  In other words, de novo dyspareunia
19  means brand-new dyspareunia, did not -- did not exist
20  prior to the surgery?  That's what de novo dyspareunia
21  means, correct?
22    A.  No.  I'm familiar with what de novo means.
23    Q.  Well, I'm doing this for the purposes of the
24  jury and the lay people trying to understand this stuff.
25    A.  Sure.  Yes.  At 12 months, which I've

Page 209

1  reiterated is -- or should reiterate is insufficient
2  because this is not 15 years on down the road.  But
3  three out of 29, in the conventional 10 percent, and
4  three out of 37, 8 percent in the tension-free.  So I
5  would -- statistically, those are going to be identical.
6    Q.  Statistically identical.  But, specifically,
7  as you've just said, 8 percent of women in the mesh
8  group reported de novo dyspareunia and 10 percent of the
9  women in the native tissue group reported de novo
10  dyspareunia, true?
11    A.  Possibly, because, unfortunately, they did not
12  give us qualifiers on the severity of this pain.
13  They're stating pain, yes or no.  It's like being
14  pregnant, yes or no, at three months is different than
15  at nine months.  Okay.  So, yes, this is what they
16  stated at 12 months without any qualifiers.
17    Q.  Okay.  The reports of dyspareunia, in both
18  groups, native tissue and trocar-guided transvaginal
19  mesh, were statistically the same at 12 months, correct?
20    A.  I will agree with you as you state it, that at
21  12 months; but, again, that has no qualifier on the
22  severity.
23    Q.  Well, we don't know from the study, and I'm
24  sure -- I'm sure you wouldn't guess, Doctor, that there
25  was any difference in the severity, right?

Page 210

1 A. Absolutely, I would. Most questionnaires, if
2 you look at most studies, again, that's what I do for a
3 living. They're insufficient. And all they're saying
4 is, do you have sexual discomfort; yes, no? That is
5 nothing on the qualifier and the severity of it.
6 Q. All right. But you have no basis, based on
7 this study, to say that the women in the mesh group had
8 more significant dyspareunia than the women in the
9 native tissue group, true?
10 A. Well, with the Prolift product here -- I'm not
11 talking about Avaulta. So, really, this is kind of a
12 moot point to talk about this. In this study, they do
13 not give us those qualifiers. However, that is
14 inaccurate to say I don't have data to support that has
15 it higher from other studies that look at it with a
16 Visual Analog Scale and the severity of the pain.
17  So if we're going to start talking about lots
18 of papers -- let's go to the totality of knowledge out
19 there -- many papers talk about the severity of mesh
20 pain. My personal experience taking care of patients
21 daily talk about the severity. So, in this study, they
22 do not give us qualifiers to know the severity.
23 Q. So is that -- is that your criticism of
24 Withagen, that there's no qualifiers with respect to the
25 dyspareunia severity?

Page 211

1 MR. CARTMELL: Other than the other things he's
2 told you?
3 MS. GEIST: Well, sure.
4 BY THE WITNESS:
5 A. Well, that would be one of them. And Mark
6 Vierhout I happen to know. I was just with him in a
7 meeting. And these are the things that we talk about,
8 that, when we look at studies and really do good
9 metaanalysis of studies, most of them are deficient and
10 this would be a deficiency. It doesn't mean it's a
11 worthless paper, but there's deficiencies.
12 Q. I just want to understand your reasons for not
13 finding this paper reliable, in your view, in terms of
14 the incidence rates of dyspareunia among mesh-implanted
15 patients versus native tissue repair.
16 A. Well, that somewhat misstates my statement
17 here or misstates what I said. I didn't say it was
18 unreliable. I said it's in- -- it's insufficient,
19 short, not enough -- not enough follow-up, a different
20 product -- Prolift, not Avaulta -- and what they don't
21 give me is the severity of this pain. There's no Visual
22 Analog Scale. There's no quality-of-life survey
23 relative to sexual discomfort.
24 Q. But you don't know, and I don't want to
25 belabor the point, but you don't know from this study

Page 212

1 that the pain was any different in the mesh group versus
2 the native tissue group?
3 A. The authors do not provide us with enough
4 data. Had I reviewed this, I'd say we need to know that
5 data.
6 Q. Okay. But you can't? I mean, you're not
7 going to guess, I assume, right, Doctor? You're not
8 going to guess and just assume that the pain in the mesh
9 group was greater than the pain in the native tissue
10 group? You wouldn't do that, would you?
11 A. I'm not in the ball game of guessing. And
12 based upon my experience, it would be worse. And what's
13 it going to be five years from now, and that is worse.
14 Q. Well, we don't know that, though. There is
15 no -- there is no reanalysis of this data. There is no
16 update by Withagen and the other authors looking at what
17 happened over the next -- I think you said five years,
18 but the paper was in 2011, so three years.
19  We don't know that there is any change or
20 difference in the incident rates of dyspareunia in the
21 mesh group versus the native tissue group, do we?
22 MR. CARTMELL: Object to the form.
23 BY THE WITNESS:
24 A. Well, we do know from the other literature out
25 there. Again, I keep going back to Klosterhalfen

Page 213

1 because it's a good one, but there's others.
2 Degradation, contraction of the mesh is progressive.
3 Klosterhalfen gave us up to 15 years. This is one year
4 in time. So all I'll agree with is what the authors
5 have stated here with my points that there is
6 insufficiency -- insufficiencies of this paper.
7 Q. That's fine. And, by the way, we'll talk
8 about degradation shortly. But are you -- are you
9 telling me that you believe that mesh degradation is
10 directly attributable to dyspareunia?
11 A. Yes.
12 Q. Polypropylene degradation results in
13 dyspareunia?
14 A. It can, yes. Definitely. That is one of the
15 cascades of the process to cause dyspareunia and
16 scarring.
17 Q. And this is your opinion, Doctor, even while
18 you still implant polypropylene mesh in your patients
19 today?
20 A. That is -- that is an unfair statement. I am
21 not putting in mesh kits with mesh arms that fold and
22 saw the tissues and are contaminated with bacteria and
23 candida species from the vagina. I'm putting it in
24 sterilely, lying it flat on the abdomen -- excuse me, in
25 the vagina, in sterile positions, suturing it down so it

Page 214

1   lays flat, and analyzing those patients over 12, 15
2   years -- excuse me -- 13 years and not finding the
3   problem.
4       Q.   So degradation of polypropylene mesh doesn't
5   occur unless it's a four-armed product; is that what
6   you're telling me?
7       A.   No.
8       Q.   So explain to me what you're talking about
9   when you say degradation of polypropylene.
10      A.   Okay.  That's outlined specifically in my
11  notes, in my expert report.  I mean, we are looking at
12  the confluence of multiple different factors of
13  transvaginal, contaminated mesh, plus or minus collagen
14  on it, which impairs healing, torquing on this to go
15  through the obturator foramen, rolling of the mesh arms,
16  having them scar in place through the buttock muscles,
17  the adductor muscles of the thigh, and that process is
18  different than what I'm saying that occurs through the
19  abdominal route.  Those are completely separate
20  surgeries.
21      Q.   So mesh implanted via the abdominal route
22  doesn't have any risk of degradation?
23      A.   No.  I would say it probably does degrade
24  (sic) to a certain extent.  Polypropylene is
25  polypropylene no matter where it's put in the body.

Page 215

1   However, there are multiple different factors.
2   Polypropylene is put in for inguinal hernia repairs.
3   It's put in the thoracic cavity.  It's put in the eye
4   and it's put in for sacrocolpopexies.
5       Q.   And --
6       A.   That's different than transvaginal.
7       Q.   And polypropylene, I assume you would agree
8   with me, is a well-established material that is safe for
9   implantation in the human body, true?
10      MR. CARTMELL:  Object to the form.
11  BY THE WITNESS:
12      A.   That's too broad.  If it's for inguinal
13  hernias where there is no other treatment option, or
14  thoracic wall hernias where there's no treatment option,
15  I would say that is an acceptable risk-versus-benefit
16  ratio.  But, as we keep going back to, putting it
17  through the vagina, a contaminated, lactobacillus,
18  candida, et cetera, torquing on the arms, rolling on the
19  arms, sawing back and forth, then, no.
20      Q.   What does sawing and torquing and the
21  other things you just said have to do with
22  degradation?
23      A.   A huge amount to do with degradation, okay.
24  Because degradation occurs in the presence of
25  inflammation and with bacterial contamination.  The

Page 216

1   greater the inflammatory process, the greater the
2   rolling of the mesh; the greater the inflammation, the
3   greater the release of peroxides, free radicals, the
4   oxidation process starts, the mesh starts to degrade.
5   The more the mesh degrades, the more the increased
6   inflammation, subsequently pain.  Pain happens down the
7   vagina.  And as it goes around the obturator foramen, it
8   gets rock hard and it hurts like crazy and you can't get
9   it out.
10      Q.   Okay.  Doctor, thank you for that.  We're
11  going to go back to degradation, but I want to finish up
12  on some of these other topics we started exploring.
13  in particular, dyspareunia.  Did -- in reaching your
14  opinions, did you look at the Carey study?
15      A.   Yes.  It depends which one you're talking
16  about.  He's been fairly prolific.
17      Q.   Agreed.  I'm marking it as Exhibit 9.
18          (Elliott Deposition Exhibit No. 9 was
19          marked for identification.)
20  BY THE WITNESS:
21      A.   Vaginal Repair With Mesh Versus Colporrhaphy
22  For Prolapse?
23      Q.   Correct.
24      A.   Okay.
25          (Enter Mr. Jeffrey Kuntz.)

Page 217

1   BY MS. GEIST:
2       Q.   This is another study, Doctor, again comparing
3   both anatomic success of transvaginal mesh versus native
4   tissue repair and also looking at quality of life
5   issues, to your point, right?
6       A.   Well, all they state their objective is to
7   compare vaginal repairs with mesh and traditional with
8   the prolapse.  This is not an Avaulta study.
9       Q.   And, in this study, Doctor, first starting
10  with anatomic success, 81 percent of the women in the
11  mesh group achieved anatomic success after 12 months
12  and 65 percent of the women in the native tissue
13  group had anatomic success at the 12-month period,
14  correct?
15          (Exit Ms. Ann Gayle.)
16  BY THE WITNESS:
17      A.   Which was not statistically significant.  So,
18  in other words, based upon statistics, they're
19  identical.  So there were no difference.
20      Q.   Okay.  So the mesh was certainly -- looking at
21  statistical significance, the mesh was certainly no
22  worse, in terms of anatomic success, in this study than
23  native tissue, correct?
24      A.   All you can say with this is it was an
25  underpowered study, they didn't have enough patients in

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 218

1  it, and that, based upon this, statistically they were
2  equal.
3      Q.  And, in terms of dyspareunia, do you have
4  highlights on this study, too, Doctor?
5      A.  Yes, I do.
6      Q.  All right.  In terms of dyspareunia, the same
7  exact number of women reported de novo dyspareunia at
8  the 12-month period, correct?
9      A.  That is correct, limiting it to 12 months with
10  the Prolift.  I imagine this is Prolift.  Carey usually
11  writes about Prolift.  That is what the findings were at
12  12 months.
13     Q.  And even though it's the same number of women,
14  the incidence rate was actually higher in the native
15  tissue group, correct?
16     A.  Yes, but statistically insignificant.
17     Q.  Okay.  But still higher?
18     A.  But statistically insignificant.
19     Q.  But still higher, right?  Yes?
20     A.  The percentages that they had were
21  statistically identical.
22     Q.  16.7 in the mesh group, 15.2 in the native
23  tissue group, correct?
24     A.  That is what they state in this study.
25     Q.  And --

Page 219

1      A.  Which were statistically insignificant.
2      Q.  And, again, because this study looked at only
3  a 12-month period after the surgeries, you don't find
4  this study to be reliable in terms of the comparative
5  incident rate of dyspareunia in women having native
6  tissue repair versus mesh repair?
7      A.  No.  I think that -- I think this is an
8  important study, but there's limits to it.  It's
9  under -- underpowered, meaning insufficient number of
10  patients, and not statistically different at 12 months.
11     Q.  But like the Withagen study, Doctor, you would
12  agree with me, if you look at both of these studies,
13  both of these studies indicate that the dyspareunia
14  reports from women in the mesh group and the native
15  tissue group were the same?
16     MR. CARTMELL:  Object to the form.
17  BY THE WITNESS:
18     A.  For the Prolift product, which does not have
19  the ultra-dense, high-density arms, does not have
20  collagen, at 12 months, they were statistically the
21  same.
22     Q.  What -- the Avaulta product, the Avaulta Plus
23  product, has collagen, correct?
24     A.  That is correct.
25     Q.  The other Avaulta products do not, correct?

Page 220

1      A.  I'm un- -- I don't -- no, I never heard of
2  them being on there.  The Solo does not have it.
3      Q.  Right.  So you think that there might be a
4  difference between this product and the Solo based on
5  density?
6      A.  I didn't say that.
7      Q.  What did you say?
8      A.  Excuse me.  Yes, I did say that.
9      Q.  I thought you said density made the
10  difference.
11     A.  The arms of the Avaulta products are
12  heavyweight at, what, 95 grams-per-meter-squared
13  compared to the Prolift, which I believe was right
14  around 45 or so.  I could be off on those numbers, but
15  that and in addition with the Plus having the collagen.
16     Q.  All right.  Let's set aside the collagen for a
17  second.  All right.  Let's just talk about the Solo,
18  which doesn't have collagen.  Okay.
19         (Enter Ms. Ann Gayle.)
20  BY MS. GEIST:
21     Q.  You think the reason why this study outcome
22  would be different for Avaulta is because of the arms
23  density of the product?
24     A.  Yes.  And that not having a plastic sheath
25  over it causing you to saw through the tissues because

Page 221

1  both of those have to come into play.
2      Q.  What studies do you rely on for your opinion
3  that the arms' density would have a greater impact on
4  dyspareunia rates?
5      A.  Okay.  I'm going to go to my expert report.  I
6  talk through the density -- that's on page 21 -- where
7  the biggest studies I'd be quoting would be -- the
8  classic one would be Cobb, et al., talking about the
9  higher density, having more reaction, more inflammatory
10  response.  Inflammatory response leads to degradation.
11  Degradation leads to increased inflammation, which leads
12  to scarring, which leads to incorporation of nerve
13  tissue and leads to pain.
14     Q.  So we've got to make -- what did you just give
15  me, like five hops until we get to dyspareunia?
16     A.  The body --
17     MR. CARTMELL:  Object to the form.
18  BY THE WITNESS:
19     A.  Yeah.  That is an incredible
20  oversimplification.  If I were to cut my hand, there is
21  a cascade of clotting.  There is like 12 different
22  steps.  Things in the body lead to other things.  It's
23  not just in isolation.  You just don't have degradation.
24  That's it.  It's a process and then you have to throw in
25  there the rolling of the arm, which then decreases the

Page 222

1  pore size, which then increases the inflammation. So,
2  yeah, there's multiple steps. It's complicated, but
3  it's logical.
4      Q. Is there any study that actually looked at the
5  density of the arms and different products and looked at
6  the resulting dyspareunia rates?
7      A. Worded that way, I can't think of a study off
8  the top of my head right now looking at that
9  implement -- implantation.
10     Q. Let's -- since we're having such fun with
11 these studies, let's look at another one on dyspareunia.
12 Did you look at Nieminen --
13     A. Yeah.
14     Q. -- Nieminen when you formed your opinions,
15 Doctor?
16     A. Yes, I did. He has multiple papers, so
17 it's --
18     Q. Yep. So I'm looking at the 2010 one, and I
19 think we're up to Exhibit 9.
20     MR. CARTMELL: I think we're at 10.
21     MS. GEIST: We're at 10?
22     MR. CARTMELL: Yeah.
23     MS. GEIST: I apologize.
24     THE REPORTER: We were going too fast. I missed
25 it.

Page 223

1          (Elliott Deposition Exhibit No. 10
2              was marked for identification.)
3  BY MS. GEIST:
4      Q. Okay. Dr. Elliott, I'm handing you what we've
5  marked as Exhibit 10 to your deposition, a copy for
6  counsel. And, as I stated to you, this is the Nieminen,
7  N-I-E-M-I-N-E-N, study published in 2010 entitled,
8  Outcomes After Anterior Vaginal Wall Repair With Mesh:
9  A Randomized Controlled Trial With a Three-Year
10 Follow-Up.
11        So I think, Doctor, some of the criticisms
12 you've stated to me earlier about some of the other
13 studies you looked at, the Withagen and the Carey study,
14 was that they only looked at what was going on with
15 women after 12 months, right?
16     A. Short-term.
17     Q. Right. Too early. This study looks at what
18 was going on with women after three years, right?
19     A. They have it at 36 months. I don't know how
20 many patients made it that far.
21     Q. Okay. So 36 months is three years. We don't
22 have a disagreement there?
23     A. No. We don't, unless I need to know how many
24 patients made it. That's the mean follow-up or if
25 they -- what the variance is with that.

Page 224

1      Q. Okay.
2      A. But they say at three years follow-up.
3      Q. Yeah.
4      A. Which is still short-term.
5      Q. It's a lot longer than the 12-month studies we
6  looked at. Fair?
7      A. I disagree. If you put this in a 40-year-old
8  woman who is going to live 40 years, three years is
9  insufficient.
10     Q. Okay. So you don't like this study either
11 because it's insufficient in terms of time period after
12 surgery to see what's going on?
13     A. No. I'm saying it's definitely an
14 improvement, but we have a permanent device to go into
15 women and three years is, in this big spectrum of
16 things, very small follow-up.
17     Q. Well, this study established that three years
18 after, there was a 41 percent recurrence of prolapse in
19 the native tissue group versus a 13 percent recurrence
20 of prolapse in the mesh group, correct?
21     A. That's what they state, and we'd have to then
22 find out how many of those were symptomatic with it.
23 But that's what they state.
24     Q. All right. But, again, this is the third
25 study we've looked at together where anatomically mesh

Page 225

1  was clearly better than native tissue --
2      A. No.
3      Q. -- in repairing the defect, right?
4      MR. CARTMELL: Object to the form.
5  BY THE WITNESS:
6      A. I'm sorry, no. That second one we looked at
7  was statistically insignificant, okay, because it was an
8  underpowered study. I would have to look at -- now,
9  this has a P value showing that anatomically these women
10 had the percentages that you referenced with anatomic
11 improvement that, again, we are treating a
12 quality-of-life problem. So we treat the subjective,
13 not necessarily the anatomy.
14     Q. And I hear you, Doctor, and this study looked
15 at exactly that. Like the other studies we looked at,
16 it looked at quality of life issues. The study looked
17 at dyspareunia in particular. One of the main issues
18 we've been talking about; so did this study. And this
19 study also looked at the feeling of vaginal bulge as
20 well, which is another symptom of prolapse, true?
21     A. Correct.
22     Q. So, in this study, the authors concluded that
23 there was no difference in the reporting of dyspareunia
24 in the mesh group versus the native tissue group?
25     A. Had I reviewed this record, I would have said,

Page 226

1  How can you have 19 percent of the women have a mesh
2  extrusion and not have dyspareunia?  Because it's like
3  barbed wire in there, so either the patient or spouse is
4  going to have it.  So you're saying that -- so I would
5  say there's a major issue that they'd have to address.
6  What happened to those patients?  So this would be
7  something that I would write the authors about if I were
8  doing a review.
9      Q.  All right.  So you'd have some questions --
10      A.  Their data does not jive.
11      Q.  I'm sorry.  You have some questions or you're
12  critical of the data in this study, right?
13      A.  No, I didn't say I was critical of.  I was
14  saying there are issues that would have to be resolved.
15  I would say these would be questions that would pop up
16  at meetings, those types of things.  And this was from
17  April of 2003 to 2005.  So, again, we're talking about a
18  different product.  Again, we're probably -- I don't
19  know what product they would put in there.  I don't even
20  know if it has arms in it either.
21      Q.  Well, actually four-armed mesh products were
22  used in this study, Doctor.
23      A.  Okay.  Manufactured by who, what was the pore
24  size, what was the weight size, all of those types of
25  issues.  So that would be important to know.  And I'm

Page 227

1  going through the materials and methods.  And it's in
2  Finland, so who knows what they have there in their
3  health system.
4          No.  Here we go.  There -- it's a 6-by-11
5  patch.  I don't see anything about arms.  Oh, here we
6  go, self-tailored arms.
7      Q.  Four arms, do you see it on page --
8      A.  Yes.  It's on 235.e.3.  I see it.
9      Q.  Right.  Okay.  So we can agree it's a
10  monofilament polypropylene four-armed mesh used in the
11  mesh group, correct?
12      A.  Correct.
13      Q.  And this study, at least, in 2010, tells us
14  that the dyspareunia reports in the mesh group versus
15  the native tissue group were the same at the three-year
16  period?
17      A.  That was the findings of this study at that
18  time, yes.
19      Q.  Okay.  Well -- and you say at that time.  I
20  mean, there was no update or reanalysis of this study
21  that you're aware of, is there?
22      A.  And that is one of the major faults in these
23  studies.  They don't follow up on the patients.  So, in
24  this study, at three years, with a nonBard product, that
25  was the results they had.

Page 228

1      Q.  Okay.  But it's another one of those
2  awful four-armed products you're talking about,
3  right?
4      MR. CARTMELL:  Object to the form.
5  BY MS. GEIST:
6      Q.  It's a four-armed polypropylene mesh product
7  similar to the Avaulta product, true?
8      A.  No.  I can't say that.  I don't know the
9  weight of this.
10      Q.  Okay.  But it is four-armed and it's
11  polypropylene, right?
12      A.  Correct.  They have a self-tailored,
13  four-armed light they call it.  So we don't know the arm
14  lengths.  As we've mentioned, it makes a big deal --
15      Q.  Well --
16      A.  -- if those arms are thick and heavy.
17      Q.  -- you keep saying the arms are thick and
18  heavy with the Avaulta product.  Isn't the Avaulta
19  product classified as Type 1, lightweight, monofilament,
20  macroporous mesh?
21      MR. CARTMELL:  Object to the form.
22  BY MS. GEIST:
23      Q.  Are they not?
24      A.  You're using the Abed rating system from 1997.
25      Q.  Well, it's still in effect, is it not?

Page 229

1      A.  No, it is not.  That's archaic.
2      Q.  So you think that the classification of the
3  Bard product as lightweight, Type 1, monofilament,
4  macroporous, polypropylene mesh is no longer true?
5      A.  For 1997, when he came out with it, when
6  Abed came out with that.  I would look more at the
7  Cobb study, which calls it heavyweight, 95
8  grams-per-perimeter-squared.  And it calls the Prolift
9  medium at 45 and Ultrapro Light at 28
10  grams-per-meter-squared.
11      Q.  At the point in time when the Bard products
12  were marketed and available on the market, were they
13  considered lightweight for the time?
14      A.  What component are you talking about, because
15  they have a hybrid?  They have thick arm meshes.  The
16  arms are thicker than the body.  So Cobb's -- Cobb's
17  article was in -- Cobb's article produced it in 2005.
18  Avaulta came on the market in the end of 2007 or the
19  beginning of '08.  Polypropylene, 95 -- 95
20  grams-per-meter-squared; 45 was Prolene Soft, and
21  Ultralight was 28, and they called that lightweight.  So
22  he calls it heavyweight.
23      Q.  You're referring to Cobb?
24      A.  Yes, I am, where he used the Bard product.
25      Q.  And he calls it heavyweight?

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 230

1    A.  He calls it heavyweight.
2    Q.  Anybody else call it heavyweight?
3    A.  I don't know.  Klosterhalfen.  Actually, I
4  shouldn't say I don't know.  Yes, Klosterhalfen.
5    Q.  Yes.  Anybody else?
6    A.  Probably Klingele.  I would have to look at
7  the articles on that one.
8    Q.  I would bet you're right.
9    MR. CARTMELL:  Klinge.
10    THE WITNESS:  Klinge.  Yeah, he's German.
11    VIDEO TECHNICIAN:  Can we jump off real quick?
12    MS. GEIST:  We need a break?
13    VIDEO TECHNICIAN:  I need to switch my card.
14    MS. GEIST:  Yeah.  Sure.  Let's take a break.
15    VIDEO TECHNICIAN:  We're off the record.  The time
16  is 2:49 p.m.
17         (A recess was had.)
18         (Exit Mr. Brandon Morris.)
19    VIDEO TECHNICIAN:  We're back on the record.  The
20  time is 3:03 p.m.
21         (Elliott Deposition Exhibit No. 11
22          was marked for identification.)
23  BY MS. GEIST:
24    Q.  Doctor, let's continue our discussion, but I
25  want to try and wrap it up shortly so we can move on.

Page 231

1  But let me mark, as Exhibit 11, another study by
2  Nieminen and ask you if had looked and considered this
3  one.  Again, this is on the issue of dyspareunia.  I
4  hand that to you, or throw that to you.  Thank you.
5    Again, Doctor, this study looked at women who
6  had undergone a transvaginal mesh procedure to repair
7  pelvic organ prolapse and women who had undergone a
8  native tissue repair for their prolapse.  Do you see
9  that?
10    A.  Yes.
11    Q.  And, by the way, Doctor, this article notes
12  that a posterior repair is associated with a higher risk
13  and higher incidence of dyspareunia, generally speaking.
14  Do you agree with that?
15    A.  That is the -- that is correct.
16    Q.  And that's what the literature tells us,
17  right, not just this article?  That's pretty
18  well-established in the literature?
19    A.  That is that posterior repairs can be
20  associated with more pain following surgery.
21    Q.  And in particular dyspareunia, right?
22    A.  Or dyspareunia has been reported, yes.
23    Q.  Okay.  And the Nieminen 2008 study looks
24  specifically at the incidence of dyspareunia in the mesh
25  group versus the native tissue group, correct?

Page 232

1    A.  Yeah.  It's a randomized trial looking at
2  those factors that you just mentioned.
3    Q.  Right.  And this study actually looked at the
4  incidence rate at the two-year follow-up.  So it's
5  longer than the 12-month studies we looked at before?
6    A.  No.  They're -- no, that's not -- they're
7  evaluated up to 12 months.  So what I would have to do
8  is look at the studies to find out how many made it
9  two months -- 12 -- or, excuse me, 24 months.  Because
10  with that phrase there, that doesn't tell us how long
11  they were studied.  It's that some made it to 24 months.
12  It would describe it in the results.
13    Q.  Okay.  And let's look at that in a minute.
14  But the conclusions of this study are, as you see at the
15  top, that the dyspareunia score was statistically
16  significantly lower in the mesh group?
17    A.  That is correct.  That's what they report in
18  this study with -- I'm trying to determine which product
19  they were using.  And, again, Nieminen tends to use
20  Prolift.
21    Q.  So just so I understand, Doctor, some of these
22  studies that we've looked at I think you were critical
23  about the time in which women were followed.  It was too
24  short for some of the studies, right?
25    A.  There is no known study out there that is

Page 233

1  adequately valuing the risk of this product of the
2  lifetime of a woman.
3    Q.  Okay.  So there is no -- well, strike that.
4      And this study, I assume you're going to tell
5  me, well, it's sort of meaningless here because it
6  didn't look at the Avaulta product in particular?
7    A.  No, absolutely not.  This is -- I mean, Kari
8  Nieminen and then the other one, Heinonen, the senior
9  author I've met.  No.  They've done good work here.
10  This is a contribution to literature.
11      But what I'm saying is, if we're putting this
12  in a 40- or a 50-year-old woman who has 40 or 50 years
13  of life left in her, we don't know what happens.  We do
14  have animal data showing continued degradation as we've
15  mentioned over and over.  So at 24 months, that is good
16  at 24 months, but what's going to happen on down the
17  road?
18    Q.  And you can't -- we don't have any study that
19  tells us exactly that?  It would be guesswork or it
20  would be speculative to guess, right?
21    MR. CARTMELL:  Object to form.
22  BY THE WITNESS:
23    A.  Well, I wouldn't say it's going to be
24  speculative.  I mean, in the animal model, up to 15
25  years we see degradation.  And so there's no reason to

Page 234

1  think that degradation in humans, especially when it's
2  contaminated or heavy -- heavyweight arms rolling, that
3  this is going to continue.
4     Q.  Well, looking at -- looking at actual women in
5  this study, we know that there was a statistically
6  significant lower rate of dyspareunia in the mesh group
7  after two years, correct?
8     A.  That is -- that is actually what they do
9  report here.  And, again, the mesh exposure rate of 8
10  percent I would want to know were these women -- you
11  know, was that included into it or not.  So -- but you
12  stated it accurately.  Based upon the findings and what
13  these people found at 24 months in this specific study,
14  which is a nonAvaulta study, the dyspareunia score was
15  lower in the mesh group.
16     Q.  There is no Avaulta-specific study that found
17  a statistically significant difference in dyspareunia
18  reports between the Avaulta mesh group and the native
19  tissue group, true?
20     MR. CARTMELL:  Object.  Object to the form.
21  BY THE WITNESS:
22     A.  Culligan, et al., Evaluation of Transvaginal
23  Mesh Delivery System For the Correction of Pelvic Organ
24  Prolapse; Subjective and Objective Findings At Least One
25  Year.  From what I understand, that is an Avaulta study.

Page 235

1  They had 11.7 percent extrusion and pain at 3.3 percent.
2     Q.  I asked about dyspareunia, Doctor.
3     A.  I would have to look at my studies here
4  because I don't have them broken down.  But they have
5  Avaulta Plus Fractional -- Functional Results and
6  Quality of Life, which that one you would think would
7  have a discussion there of dyspareunia.  So I have all
8  of my studies, which are in my expert report.  You
9  should probably -- if you ask that question of which
10  study has it, we need to go through it and find out.
11     But here is one.  Bondili, B-O-N-D-I-L-I, et
12  al, Two-Year Follow Up of Sexual Function Symptoms and
13  Quality of Life After Innovative Procedure Avaulta
14  Synthetic For Pelvic Organ Prolapse, that was presented
15  at the ICS, International Continence Society in 2010.
16  That study would have the data in there.
17     Q.  Was there a comparison?  Was there a nonmesh
18  arm in that study?
19     A.  We would have to get that study and look at
20  it.
21     Q.  Right.  So that's what I'm trying to ask you.
22  Do you have a study where there was a comparison between
23  the -- a group of women implanted with the Avaulta
24  product and a group of women who had prolapse repaired
25  using a native tissue procedure?

Page 236

1     A.  In a quick review of what I've got here, I
2  don't see it.  However, if -- in reviewing of the Bard
3  depositions, I never saw anybody raise that, and that
4  would be a very good one.  I would like to see that if
5  it exists.
6     Q.  Okay.  But that was my question to you
7  originally.  We're looking at dyspareunia rates between
8  women experiencing native tissue repair and transvaginal
9  mesh repair, correct?
10     A.  That's what we've been looking at, yes.
11     Q.  That's what we've been looking at.  And, you
12  know, some of your criticisms of these studies are,
13  well, it's not -- it's not a specific Avaulta study.
14  But there is no Avaulta study that has looked at the
15  comparative rates of dyspareunia between an Avaulta arm
16  and a native tissue arm in the study, correct?
17     A.  I am unaware of any.  And that seems to me to
18  be a major fault of the product not doing that
19  comparison.  That's a very important study that should
20  be done.
21     Q.  The two Nieminen or Nieminen --
22     A.  Mm-hmm.
23     Q.  Am I saying that correctly -- studies that
24  we've looked at, the 2008 and 2010 studies, those --
25  those both also looked at one of the quality of life

Page 237

1  issues we talked about before, which is the sensation of
2  vaginal bulging?
3     A.  Correct.  They discussed it in their reports.
4     Q.  Okay.  Well, it was one of the -- they were
5  looking at anatomic failure rates in those studies,
6  right?
7     A.  Yeah.  They looked at anatomic and I
8  believe -- we'd have to go through the studies in
9  detail -- I believe they were looking at quality of life
10  as well.
11     Q.  Okay.  So we just marked as Exhibit 11 the one
12  Nieminen study, and we already marked as Exhibit 10 the
13  other one.  Do you have those in front of you, 10 and
14  11?
15     A.  I have 11.  I don't see 10.  I would be able
16  to look at 10 though.  Okay.
17     Q.  Okay.  Well, my only questions for you for
18  these two studies, Doctor, is they both looked at
19  anatomic success rates and both studies concluded that
20  transvaginal mesh had a better anatomic success rate or
21  less recurrence of prolapse symptoms, correct?
22     A.  I have to look at those.  You're asking me to
23  compare two different studies over different periods of
24  times.  I would -- I would bet -- how do I bet?  I know
25  these are comparing the same patients.  This is actually

Page 238

1 one study that's extended out, I bet. So in these two
2 studies were actually the same group of patients, the
3 same group of patients. The findings you mentioned,
4 that's what -- that's what their findings were on the
5 non-Avaulta product.
6     Q. Well, I don't think that's right, Doctor.
7 Because if you look at the one study, Exhibit 10, it's
8 talking about 202 women in a randomized controlled trial
9 who underwent either native tissue repair or a
10 transvaginal mesh procedure. And then, if you look at
11 Exhibit 11, the other study, that's talking about 97
12 patients in a randomized controlled trial?
13     A. No. 97 and 105.
14     MR. CARTMELL: Yeah.
15     THE WITNESS: So together that equals --
16     MR. CARTMELL: The same.
17     THE WITNESS: -- 200 and what?
18     MR. CARTMELL: 2.
19     THE WITNESS: 2, which is interestingly, on this
20 other paper, 202. This is the same, these people.
21 BY MS. GEIST:
22     Q. No. You're right, Doctor. I'm sorry. That
23 was my mistake.
24     A. Well, these people -- this was unethical, what
25 they did. You have to acknowledge this is a

Page 239

1 continuation of a previous study. They are presenting
2 this, and this is wrong and authors get caught up in
3 this all of the time, and it's wrong, they are
4 presenting this as two different study groups. Unless
5 they state -- I would have to read this article very
6 closely --
7     Q. Well, let's not do that.
8     A. No. You interrupted me.
9     Q. Oh, sorry.
10     MR. CARTMELL: Go ahead.
11 BY THE WITNESS:
12     A. Unless they state in here somewhere this is a
13 continuation, they have done something that's unethical.
14 They submitted it to, what journal here, International
15 Urogyn and then they went over and submitted it to AJOG.
16 Okay. Same authors. They're borderline unethical.
17     Q. Well, Doctor, I'm sure you don't want to make
18 that statement until you read either paper cover to
19 cover to make sure they didn't disclose what they did.
20     A. And what did they state? I'm sorry. I
21 interrupted you.
22     Q. I don't want to get into the ethics of the
23 authors. My only question to you --
24     A. Well, we should. We should. This is --
25 you're talking on record, and I'm stating on record, if

Page 240

1 they did not, they've done something unethical.
2     Q. That's fine, but that's sort of aside from the
3 expert opinions you're offering in this litigation,
4 right?
5     A. No. Because I'm an expert as far as dealing
6 with, also, paper journal review, because I do it for a
7 lot of them.
8     Q. I --
9     A. And you're presenting -- you presented two
10 separate studies claiming that they're different. I'm
11 saying they're not different, and so all of this should
12 be stricken.
13     MR. CARTMELL: And you're cross-examining him with
14 this.
15     MS. GEIST: Well, I'm --
16     MR. CARTMELL: I mean, he gets to point out the
17 problems with the study. It's relevant.
18 BY MS. GEIST:
19     Q. The point is, Doctor, whether you want to say
20 it's the same patient population or not, it doesn't
21 matter to me. Because if it's the same population, they
22 were followed longer than the original 2008 study?
23     A. Yes. But you present it as two separate
24 studies with two separate sets of data that both support
25 that the product is good. And I'm saying, no, that's

Page 241

1 not it. This is just the same continuation of people
2 who have made questionable judgments.
3     Q. Okay. Well, you know what? That aside, and
4 I'm not making any representations about these studies.
5 I'm showing you different studies that were on your
6 review list and mine. So any statements about same
7 study or different study, I'm talking about two separate
8 papers. I'm not trying to misstate or mislead anything.
9     But the point is, in both of these articles,
10 and they may be the same patient population, in both of
11 these articles, the authors concluded that they were
12 better anatomical rates at the 12-month mark and then
13 the three-year mark in the mesh group; is that correct?
14     A. Well, no. I'm not going to get beyond that
15 these are the same patients. It's too much of a
16 coincidence to have 202 patients in both of them. So I
17 see one study here that's probably a continuation. And
18 the findings that you recorded, that's what they state.
19     Q. Okay. So we'll just -- we'll ignore the
20 earlier one. We'll just stick with the one that looked
21 at women after three years and found that the recurrence
22 rate of prolapse in the mesh group was only 13 percent
23 compared to 41 percent in the native tissue group.
24 That's what they found, correct?
25     A. That's what they state in this non-Avaulta

Page 242

1  study, yes.
2     Q.  Okay.  And -- and the mesh group did not have
3  a higher incidence rate of dyspareunia after three
4  years, correct?
5     A.  According to what they state in this
6  non-Avaulta study, that is correct.  However, as I
7  mentioned before, the mesh erosion rate was 19 percent.
8  I bet those women were not sexually active during that
9  time, and so this is actually somewhat false findings,
10  misleading findings.
11     Q.  And the other conclusion that the authors drew
12  in this study was that the vaginal bulge symptom, which
13  we talked about earlier, was statistically significantly
14  lower in the mesh group.  Do you see that in the 2010
15  paper?
16     A.  Yeah.  That is what they state in there.  But,
17  again, the worrisome fact of this is what's going to
18  happen over time.  If you look at Paper No. 1, exposure
19  rate 8 percent.  Paper No. 2, at three years, exposure
20  rate was 19 percent.  That is a progressive disease
21  process.  That is a defective product.
22     Q.  Do you say that, Doctor, even knowing that
23  some of the mesh exposures that were reported in this
24  study do not require any treatment?
25     A.  Yes, I do.  That's a defective product.

Page 243

1     Q.  So hold on a second.  That's an interesting
2  point.  So if there is a mesh exposure, even though it
3  doesn't require any type of treatment, any type of
4  surgical intervention, if that happens, that means the
5  product is defective?
6     A.  Yes.  It does.  That's not a good product.
7  That's a problem.  Now, the severity of which, we can
8  argue about that.  But the native procedures do not have
9  that.  It's at zero percent.
10     Q.  But ASCs do, do they not?  There are mesh
11  exposures associated with an ASC for any other
12  implantation of mesh?
13     A.  Yes.  And the argument that's coming back on
14  that is that 19 percent.  The answer to that is, no.
15     Q.  Well, hold on.  You just said any mesh
16  exposure means the product is defective?
17     MR. CARTMELL:  Object to form.  I think that
18  misstates what he said.  Do you mean mesh exposure?
19     MS. GEIST:  No.  I don't -- I don't think it does.
20     MR. CARTMELL:  We were talking about 19 percent.
21  BY MS. GEIST:
22     Q.  We just looked at a paper, five of the women
23  who had mesh exposures didn't require any sort of
24  surgical intervention, whatsoever?
25     A.  Correct.

Page 244

1     Q.  And your opinion to me just now is that the
2  product is defective because there was exposure?
3     MR. CARTMELL:  Object to form.
4  BY MS. GEIST:
5     Q.  Is that your opinion?
6     A.  My opinion is that we were seeing a
7  progressive problem from 8 percent at one year to 19
8  percent.  With this particular non-Avaulta product,
9  we're seeing this problem.  Sacrocolpopexies, yes, they
10  can have extrusions rarely.  As I mentioned, for the
11  past 90 patients, zero.
12     Q.  What's the incidence rate of mesh exposure for
13  an ASC?
14     A.  We'd have to pull out the data on that one.
15     Q.  Okay.  Let's do that, because I want to see
16  what's your defining line of what makes a product
17  defective or not defective based on the erosion rate.
18        Doctor, let me ask you to put the Carey study
19  in front of you.  Do you have that?  We've previously
20  marked that.
21     A.  Yeah.  I'll be able to find it.  Carey,
22  vaginal repair with mesh versus colporrhaphy.
23     Q.  Yeah.  In that study, Doctor, there was a mesh
24  exposure rate of 5.6 percent in the mesh group, correct?
25     A.  Well, this study is not comparing

Page 245

1  sacrocolpopexies.
2     Q.  No.  I know that.
3     A.  They're --
4     Q.  I'm just talking about -- I'm just talking
5  about incidence of erosion rates using transvaginal
6  mesh.  The Carey study tells us and in that study there
7  was 5.6 percent of the women in the mesh group who
8  experienced erosion, correct?
9     A.  I would have to see where you're talking
10  about.  I just don't -- because we're talking about
11  sacrocolpopexy, and so I don't see a reference in here
12  of mesh extrusion with sacrocolpopexies.
13     Q.  No.  And there is not.  There is not.  So let
14  me restate it.
15     A.  Oh.
16     Q.  I want to show -- I want to talk about a
17  couple of studies that looked at mesh erosion rates in
18  the abdominal sacrocolpopexy.
19     A.  All right.
20     Q.  Okay.  But in terms of what we see in the
21  literature using transvaginal mesh, the Carey study
22  tells us that there was 5.6 percent of the women in the
23  mesh group had some mesh exposure?
24     A.  At 12 months, which is very much similar to
25  the other, the Nieminen study, we just reviewed.  So the

In Re: CR Bard 200                     Daniel Elliott, M.D.                     11/15/2014

Page 246

1  question would be what is it at at 36 months.  Is it up
2  to 18?  I don't know.  These patients weren't followed,
3  but that's what it states.
4      Q.  Okay.  And then the -- in the Withagen study
5  we looked at before, they also had an erosion rate in
6  that study.  There were 14 patients in the mesh group
7  that had some degree of erosion.  Do you see that in
8  Withagen?
9      A.  16.9 percent at 12 months.
10     Q.  And the erosion rates in that study actually
11 varied significantly depending on what center the
12 patient had the surgery at, correct?
13     A.  I would have to look through that.  And,
14 actually, it was exposure rate, not erosion.
15     Q.  Would you agree with me, Doctor, that
16 sometimes, in the literature, exposure, erosion,
17 extrusion are all used interchangeably?
18     A.  Early on, but not currently.  So I had to look
19 when this was originally written in 2011.  Because these
20 complications are new and we didn't know how to
21 necessarily manage them early on, we still don't
22 necessarily know how to manage them.  That remains to be
23 seen.  There is confusion in the literature, but I'm
24 saying currently -- and they say exposure.  That's why
25 I'm just making sure we're clear it's not erosion,

Page 247

1  because that's obviously a different beast.
2      Q.  In the Withagen study, though, they note that
3  some of the centers that performed the surgery had a
4  0 percent erosion or exposure rate, actually exposure
5  rate, and some of the centers had a greater rate, even
6  100 percent.  Do you see that?
7      A.  I don't -- I don't see it.  I have heard it
8  elsewhere.
9      Q.  Okay.  Would that indicate to you, Doctor,
10 that the risk of exposure or erosion depends in a large
11 degree on the skill and technique used by the surgeon?
12     A.  Well, that reflects in this study they had
13 that finding.  But if you go to the other ones, you
14 know, the Carey, you know, this one is in Australia,
15 which is a large volume center.  The other ones they
16 didn't report that.  So all I can do is, based on your
17 question, in this one study, that is what they found.
18 The question is, was it statistically significant or
19 just by chance.
20     Q.  Okay.
21     A.  And so it was underpowered, so I'm sure they
22 wouldn't -- they wouldn't be able to do that.
23     Q.  But in terms of trying to compare the
24 incidence rates between the ASC and transvaginal mesh,
25 we know from Carey it's 5.6 percent.  It was 5 percent

Page 248

1  in Nieminen's -- Nieminen's 2010 study?
2      A.  Well, again, those studies, at 12 months, it's
3  what you -- what you reported there.
4      MS. GEIST:  And, sorry, the videographer is trying
5  to tell us something.  What's wrong?
6      VIDEO TECHNICIAN:  (Inaudible.)
7  BY MS. GEIST:
8      Q.  Okay.  Did you look at the Nygaard 2004 study?
9      A.  I recognize the name.
10     Q.  Okay.  Let's take a look at that one.  That
11 specifically looked at the erosion rate for mesh being
12 implanted using the abdominal approach, the ASC
13 approach, right?
14     A.  Yeah.  This is the Kari study, yes.
15     Q.  Okay.  So, in this study, we see a similar
16 erosion rate of 3.4 percent; is that correct?
17     A.  I agree with you.  Well, I don't see where
18 they say 3.4.  I can't say that that is a similar rate,
19 but that's what they report in here.
20     Q.  3 -- I'm sorry.  Go ahead.
21     A.  In these other studies, and this is what's
22 important, is we'd have to look at the absolute numbers.
23 In the Kari study with Nygaard -- Nygaard, Brubaker, you
24 know, and Geoff Cundiff -- and I know a lot of these
25 people here -- that's 215 of one specific study or one

Page 249

1  specific type of surgery.
2          These other ones are going to be randomized,
3  so they have smaller numbers in their arms.  So in 93
4  patients, in the Withagen paper, so, you know, half,
5  less than half was short follow-up, they had a higher
6  rate.  So, again, you can't compare.  It's not apples to
7  apples.  You can't do that.
8      Q.  Well, let me show you what I've marked as
9  Exhibit 12, which is the Nygaard study we just started
10 talking about.
11          (Elliott Deposition Exhibit No. 12
12            was marked for identification.)
13 BY THE WITNESS:
14     A.  Yeah.
15     Q.  Do you have it?
16     A.  I have it here.
17     Q.  All right.  I'm just going to put it down
18 there for our pile anyway.
19     A.  And I'm seeing what we have as far
20 as --
21     MR. CARTMELL:  We have a pile.
22     MS. GEIST:  You have a pile, too?
23     MR. CARTMELL:  Yeah.
24 BY MS. GEIST:
25     Q.  All right.  I'm getting the overall rate of

In Re: CR Bard 200       Daniel Elliott, M.D.       11/15/2014

Page 250

1 mesh erosion at 3.4 percent from the section of the
2 study on the left-hand side entitled, Tabulation,
3 Integration, and Results?
4     **A. Yes. And in that -- yes, you are quoting that**
5 **correctly, I believe. I still don't see the mesh**
6 **erosion in there. But, important to note, this is five-**
7 **and seven-year follow-up. We now have with Withagen or**
8 **Nieminen, we have one-year follow-up at 8 percent; three**
9 **years, 18-point something percent. Wasn't it? Or**
10 **whatever. I don't -- I don't remember exactly what the**
11 **number was.**
12     MR. CARTMELL: 19.
13 BY THE WITNESS:
14     **A. 19 percent, and this is five to seven years**
15 **with 3 percent. That is significant. Because we cannot**
16 **compare the Kari study with the other ones until the**
17 **other one gets to five to seven years.**
18     Q. So the Nieminen -- the Nieminen or Nieminen
19 2010 study looked at the erosion rate at the three-year
20 period, and that was 5 percent. Do you see that?
21     **A. I'm trying to find it. I've got papers**
22 **everywhere. Nieminen, I have one of them here.**
23     Q. The 2010 one is the one I'm referring to,
24 Doctor?
25     **A. Okay. Yeah. I'd have to pull that study back**

Page 251

1 up here. That's a difficult name to spell, Outcomes
2 after anterior vaginal, here we are.
3     Q. I keep saying Nieminen, but maybe it's
4 Nieminen?
5     **A. I've heard Kari speak, and I don't know how**
6 **she pronounces her last name. At three years, it was 19**
7 **percent. The same study at one year was 8 percent. So**
8 **until they get out to five to seven years, we can't**
9 **compare those two studies. And, if anything, this**
10 **makes -- makes abdominal sacrocolpopexy look very, very**
11 **good.**
12     Q. How about the Wu study from 2006? Did you
13 look at that one?
14     **A. I do not recall that name.**
15     Q. Let me see if I have a copy of that. That's
16 another study looking at erosion rate using the
17 abdominal sacrocolpopexy.
18     **A. And with that said, that was perfectly**
19 **acceptable. I'll really look forward to seeing it**
20 **because I'm interested in this subject. But the Nygaard**
21 **paper, the Kari study, is arguably the best, better than**
22 **my studies, of looking at large volumes with multicenter**
23 **and their results. So it would be interesting to**
24 **compare a smaller study.**
25     Q. So I have to look at your reliance list and

Page 252

1 see if you looked at the Wu 2006 study. That had a 5.4
2 percent rate of mesh erosion for ASC procedures. I
3 don't have a copy with me. I don't know if you have it.
4     **A. I don't -- do you know how to pronounce the**
5 **last name?**
6     Q. No. It's, W-U?
7     **A. W-U, no. I do not have that one.**
8     Q. But I guess my question to you, Doctor, is,
9 when we look at 5.4 percent or 3.4 percent and some of
10 the other studies we looked at were 5 percent for
11 transvaginal mesh, your criticism of those studies is
12 that they didn't look at the erosion rates long enough?
13     **A. Absolutely. Because, again, look at the**
14 **sacrocolpopexy, the Kari study. It's been a while since**
15 **I've looked at this one. Five- to seven-year follow-up.**
16 **That is incredible. Median follow-up, seven years. And**
17 **if we're seeing a curved increase from one year at 8**
18 **percent, three years at 19 percent, that's a curve**
19 **that's going up. So what is it going to be at seven**
20 **years? I don't know.**
21     Q. Well, it would be speculation to say whether
22 it would be any higher, wouldn't it?
23     **A. The erosion -- the extrusion rate will not go**
24 **down. Once a patient had exposure, you can't eliminate**
25 **them from that. So it's only going to go up. That's**

Page 253

1 basic statistics.
2     Q. If new -- if new patients experience exposure
3 or erosion?
4     **A. Or if a patient has been treated and she has a**
5 **repeat exposure.**
6     Q. Let me -- let me flip for a second and show
7 you what I'll mark as Exhibit 13.
8     (Elliott Deposition Exhibit No. 13
9         was marked for identification.)
10 BY MS. GEIST:
11     Q. Doctor, and for the record what I've marked as
12 Exhibit 13 is an article entitled, Time to Rethink an
13 Evidence-Based Response From Pelvic Surgeons to the FDA
14 Safety Communication: Update on Serious Complications
15 Associated With Transvaginal Placement of Surgical Mesh
16 For Pelvic Organ Prolapse?
17     **A. Correct.**
18     Q. I hope I read that correctly.
19     **A. No. I'm familiar with this paper.**
20     Q. Okay.
21     **A. And I'm familiar with one, two, three, four,**
22 **five of the authors.**
23     Q. Okay. These are all well-known reputable
24 pelvic floor surgeons specializing in women suffering
25 from pelvic organ prolapse; is that fair to say?

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 254

1    A.  They're well-known.
2    Q.  Are some of them reputable, some of them are
3  not?
4    A.  No.  I'm saying that these are well -- some of
5  these are very, very well-known to be making seven
6  figures a year from industry, and that is a concern for
7  me.
8    Q.  Who is making seven figures a year from
9  industry on this paper?
10    A.  Lucente.
11    Q.  Anybody else?
12    A.  Murphy, possibly.  I don't know how much --
13    Q.  So you don't know?
14    A.  I said some of them and Lucente would count as
15  some.  Murphy, I don't know how much he makes.  I don't
16  know how much Goldman makes.
17    Q.  You make money from the plaintiffs' bar, do
18  you not, Doctor?
19    MR. CARTMELL:  Object to form.
20  BY MS. GEIST:
21    Q.  Well, do you make money, a third of your
22  income over the last three or four years, from the
23  plaintiffs' bar?
24    A.  I make money -- you are correct.  I do make
25  money, but it's in the fight to protect women that I

Page 255

1  have to deal with all -- every day.  I do not make money
2  in implantation of a defective device that ruins some
3  women.
4    Q.  But that's your opinion, is it not, Doctor?
5    A.  It is my opinion based upon fact.
6    Q.  Well, before we looked at the AUGS position
7  statement, and that position statement, as we discussed
8  together, talks about the importance of allowing
9  synthetic mesh materials to be accessible to women who
10  need those materials to repair their pelvic organ
11  prolapse.  And there are physicians who believe in
12  continuing to permit and allow that option to be
13  available for women.  Do you disagree with that?
14    A.  Well, we've gone over this already.  And I'd
15  have to state that, when a doctor, whoever he is, or any
16  study that is industry-sponsored, there is an increased
17  risk for there to be a bias introduced and favorable of
18  that company, and those are all referenced in my
19  bibliography, which I can't find a copy of right now.
20    Q.  Well, there is a risk of bias in any study,
21  correct?
22    A.  Yes.  But when money is involved, there is a
23  reason why they have a phrase follow the money.
24    Q.  Well, so if there's money involved or paid to
25  you, there is a risk of bias in things that you say as

Page 256

1  well; isn't that fair?
2    A.  No.  I think that's a mischaracterization.
3    Q.  Well, how is it different for you?
4    A.  Because my opinion -- I'm sorry.  Go ahead.
5    Q.  No.  But how is it different -- how is it
6  different from you?  You made a very strong statement
7  against some very reputable, skilled surgeons who treat
8  women suffering from pelvic organ prolapse about -- and,
9  you know, you essentially implied that their -- their
10  opinions are biased because they're paid by industry.
11    How is it that you and other experts who are
12  compensated by the plaintiffs' bar are not similarly
13  biased?
14    A.  My opinions were established prior to this
15  lawsuit, any of this litigation.  Okay.  I made comments
16  with Public Citizens, Ralph Nader's group, about this
17  prior to all of this.  I was -- so I am not involved.  I
18  don't make a dime off of inserting something into a
19  woman or not.  I am trying to protect women that I see
20  on a daily basis.  That is different than writing a
21  paper, studies, those types of things.
22    Q.  Do you think these doctors are not acting in
23  the best interest of their patients?
24    A.  I can't answer as to all of them.  I mean, I
25  know Howard Goldman is very, very good doctor.  I

Page 257

1  respect him immensely.  We have kindly debated this
2  subject as of last year in May, okay.  We talked about
3  it at the SUFU meeting within the AUA.  He's a very good
4  person.
5    The other ones, Murphy, Lucente, and van
6  Raalte -- well, Kohli I also kind of know.  I haven't
7  talked to them.  I don't know.  But I'm not saying
8  they're not good surgeons.  Be very clear about that.
9  They could be a very, very good surgeon.  But when I see
10  somebody who makes a lot of money and comes out in a
11  statement that is in support of them making a lot of
12  money, so be it.  When all of this litigation stops, I
13  go back to taking care of patients on a daily basis.
14  Okay.  So I see the possibility of bias.
15    Q.  So you discount the positions taken by these
16  surgeons on behalf of the Pelvic Surgeons Network
17  because you think they're all biased?
18    A.  The Pelvic Surgeons Network is a made-up
19  group.  That's not an organization.  That came about --
20  you have to look at the politics of that.  That came
21  about with all of this mesh litigation.  They got
22  together, everybody who puts in mesh, and said, Ooh,
23  let's band together and make a statement.
24    So that's not a preexisting that's been around
25  for five, ten years that has fought through this.  No.

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 258

1  Those are all people who -- and if you go down the list,
2  I can't give you a specific number -- how many make
3  money from industry.  And that's a dangerous process.
4  That's why manuscripts, everything, now have to do a
5  full disclosure of how much money you make where.
6      Q.  So the 600 surgeons who take care of women
7  suffering from pelvic organ prolapse that signed on to
8  the response to the FDA safety communication, do you
9  think they're all biased, too, and motivated by money
10  they make from industry?
11     A.  I would never say all.  I say there is the
12  potential.  And what would be very interesting, this
13  statistic is available, how many make money from
14  companies.  And that is not disclosed on there, how many
15  make money.
16     Q.  The AUGS statement that we referred to and
17  discussed earlier together, do you have that in front of
18  you yet?
19     A.  Sorry.  I thought we were done with it, so I
20  tossed it.  Here.  I have that now, yes.
21     Q.  Okay.  Do you see on page 2, at the top, this
22  is where we had stopped reading, page 2 at the top?
23     A.  Yes.  I'm there.
24     Q.  If you go down to the fifth line of that
25  paragraph --

Page 259

1      A.  The top paragraph?
2      Q.  Actually, you know what?  Let's start on the
3  third line.  I forgot to ask you about this.  On the
4  third line of this paragraph, in the AUGS position
5  statement, it says, A ban on the use of synthetic mesh
6  materials would potentially prohibit many women from
7  accessing the full range of treatment options available.
8  Is that something you would like to see?
9      MR. CARTMELL:  Object to the form.
10  BY THE WITNESS:
11     A.  I would have to read the whole document,
12  because I don't know if they're talking about just POP
13  or the slings because you're talking about a mixed bag
14  here.  According to this, effectiveness of POP mesh.
15     Q.  This is talking about POP mesh.
16     A.  Okay.  If we are under the understanding that
17  this is specifically POP mesh, so everything I'm going
18  to state from this point on about this document is going
19  to be on POP mesh, then I agree with that statement.
20  Oh, excuse me.  Excuse me.
21     Q.  You would agree with the ban --
22     A.  I agree with the ban, that's correct.
23     Q.  All right.
24     A.  Let me be very clear.  I'll start over.  I
25  agree that a ban is the appropriate thing, but not an

Page 260

1  across-the-board ban.  I'm saying that, perhaps, in
2  controlled circumstances, with controlled surgeons, with
3  very unique situations, fully informed patients,
4  randomized controlled trial, non-industry supported,
5  then they could possibly, in those individuals, do some
6  work.  Okay.  A full ban on just random use for
7  everybody to put in any women, I do agree with that.
8  Does that make sense?
9      Q.  No.
10     A.  No one, okay.
11     Q.  So -- no.
12     A.  Do you want me to start over?
13     Q.  No.
14     A.  Okay.
15     Q.  I'm trying to understand because, back in
16  2011, you joined in the petition to the FDA for a
17  complete and full ban of all pelvic organ prolapse mesh
18  products, correct?
19     A.  Until further data is available and
20  non-industry supported to support that it has some
21  benefit.
22     Q.  But unless -- at the time, if there was an
23  absence of that data, you were looking for a ban on the
24  products at the time.  So it wouldn't be available to
25  this small percentage of women in the population that

Page 261

1  you just described?
2      A.  No.  I -- I am of the position.  We have to be
3  very clear about this.  I stated it in the record
4  already.  The routine use of POP transvaginal mesh
5  should be banned until there is further data available
6  long term to say it's safe in women and that the
7  benefits outweigh the risks.  Right now there is not any
8  data of that.  You know, the FDA came back with that 522
9  to all of the companies, as far as I know, Ethicon,
10  Bard, and they were not able to produce data that met
11  the FDA requirements for that 522.
12         So that data is not available.  I am
13  definitely clearly against, based upon my experience
14  from day-to-day dealing with patients, the international
15  clinic, et cetera, et cetera, that routine use should be
16  banned.
17     Q.  Do you agree with the statement in the AUGS
18  paper that there are certain clinical situations where
19  the use of transvaginal mesh would be preferred?
20     A.  Like I stated before, remember, I had all of
21  those multiple different criteria.
22     Q.  Right.
23     A.  I probably won't remember all of them.
24     Q.  Right.
25     MR. CARTMELL:  Haven't we talked about that in

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 262

1  depth?
2  BY THE WITNESS:
3      A.  I -- I can go over it again.  I don't mind.
4  In highly advanced surgeons with a woman -- and, again,
5  I'm not going to have all of the data, so we have to go
6  back to my previous statements.  A woman fully informed,
7  in certain unique circumstances, it might possibly be
8  acceptable.  However, in my experience at one of the
9  largest -- the largest institution in the United States,
10  we have not needed -- we have never come to that.
11     Q.  Let me -- let me go back to the Time to
12  Rethink article that I put in front of you, Doctor.  The
13  authors indicate that they performed a systematic review
14  of the scientific literature from 1996 to 2011, similar
15  to what FDA did; do you see that?
16     A.  Yeah.  That is -- that is what they stated.
17     Q.  Any reason to believe they didn't do that?
18     A.  Well, I have no reason to support it or not.
19  I looked at the bibliography, and it's 25 articles.
20  There are hundreds and hundreds.  I mean, I have 509 in
21  mine.  So they only have 25.  So I can't state they did
22  it.  I have no reason to think they did not.
23     Q.  Would you -- let me see where you agree and
24  disagree with some of the statements in this Time to
25  Rethink article.  Okay?

Page 263

1      A.  Okay.
2      Q.  If you go to -- it's actually page 6, for
3  whatever reason, of the article.  It's actually the
4  second page, but on the top it says 6?
5      A.  That's because --
6      Q.  Do you see that?
7      A.  Yes.  That's because this is an editorial
8  piece.  This is not peer reviewed, and so it's right at
9  the very beginning, which is important to note.  So this
10  has been -- again, it's an opinion piece.
11     Q.  It is an opinion piece.  No one is stating
12  otherwise.  It's supported by 600 surgeons who take care
13  of women with pelvic organ prolapse, true?  I mean, 600
14  surgeons in the United States signed off on this?
15     A.  In 2011, I'll take your word for it as far as
16  600 surgeons put on there, but I also said the caveat of
17  how many were getting paid by industry.
18     Q.  Well, you don't have to take my word for it.
19  It says, on the first page of the article, that the
20  manuscript has been endorsed by over 600 members of the
21  Pelvic Surgeons Network, and a list of those surgeons
22  are included with the article?
23     A.  Yeah.
24     Q.  Hopefully, in the copy I gave you.
25     A.  I don't -- that's fine.  I don't need it.

Page 264

1      Q.  Okay.  Are you dismissing -- I just want to
2  understand.  Are you dismissing the conclusions reached
3  by the authors here and the 600 surgeons who endorsed it
4  because you think they're all biased in favor of
5  industry?
6      A.  No, absolutely not.  That's minimizing what I
7  said and my experience.  Two things, it's 600 surgeons
8  out of how many?  Number two, you're just taking the
9  pelvic -- pelvic whatever network, which is a recently
10  made-up thing.  And so based upon what you're saying,
11  yes, that is what this non-peer-reviewed article stated.
12     Q.  Now, I assume you agree with the statement
13  that there is no question that mesh placed abdominally
14  in the form of an abdominal sacrocolpopexy is an
15  excellent procedure for treating POP?
16     A.  In certain patients, it is, yes.
17     Q.  And would you also agree that surgical
18  technique appears to play a significant role in the rate
19  of mesh erosion and the rate varies greatly between the
20  studies?
21     A.  Some of the surgeons that I respect the most,
22  the TBN group out of France, arguably the highest volume
23  surgeons, they are reporting -- they are reporting
24  extrusion rates 15 to 20 percent.  So I agree that there
25  is going to be variations in the exposure rate, but some

Page 265

1  of that could be due to the duration of the study.  The
2  surgeon's role plays a role.  The surgeon's training
3  does play some role.  I cannot say how much of a role.
4      Q.  The study looked -- well, strike that.
5          This paper looks specifically at the incidence
6  rate of erosion comparing transvaginal mesh to the ASC
7  procedure.  Do you see that?
8      A.  I'd have to -- page 2, I believe you're on?
9      Q.  Page 3, actually.
10     A.  Page 3.  Okay.  So which is page 7?
11     Q.  Right.
12     A.  Okay.
13     Q.  It's a little confusing.
14     A.  Oh, here we are, erosion.
15     Q.  Do you see under, Erosion?  Do you see the
16  author knows --
17     A.  Yes.
18     Q.  -- that the results, at least in two large,
19  multicenter trials, the results of the abdominal and
20  vaginal approach are quite similar in terms of erosion
21  rates?
22     A.  Yes.  But they're -- you know, they're cherry
23  picking.  Let me see what study they're quoting here,
24  Study No. 20, Brubaker, Nygaard -- well, see, they're
25  not even quoting the Kari study, which is the biggest

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 266

1  one out there.  So, yeah, the studies that they have
2  quoted, I will not argue with the data they have written
3  down here.
4      Q.  Would you agree, at least, Doctor that, while
5  they're choosing to discuss certain studies, you're
6  discussing certain studies, we've looked at other
7  studies, there is varied rates of erosion in all of
8  these studies with respect to transvaginal mesh and the
9  ASC?
10     A.  There are varying numbers of extrusion rates
11  out there.  The ramifications and the frequency and the
12  severity and the complications are going to be
13  different, which are not discussed here.  But I'll agree
14  with you, there's varying rates out there.
15     Q.  And I think we've -- I think we've beat this
16  like a -- like a horse, but I think, on the next page,
17  you would agree with me and agree with the statement
18  that mesh erosion is a risk any time mesh is used in
19  reconstructive pelvic surgery and that surgical
20  experience and technique play a significant role in the
21  risk of erosion?
22     A.  Yeah.  We've beaten this thing.  I disagree
23  with that.
24     Q.  Okay.  I just wanted to make sure.
25     A.  For the aforementioned reasons that even, in

Page 267

1  high-volume, very talented surgeons, they're having an
2  unacceptably high extrusion rate.
3      Q.  Let me show you quickly, Doctor, your -- I
4  think I'm on Exhibit 14.  Okay.  We're all in agreement
5  on some things, right?
6      MR. CARTMELL:  Mm-hmm.
7          (Elliott Deposition Exhibit No. 14
8              was marked for identification.)
9  BY MS. GEIST:
10     Q.  Let me show you Exhibit 14, Doctor, which is a
11  copy of the FDA petition that we talked about before.
12  And this was the petition to the FDA by Public Citizen
13  back in August -- August of 2011?
14     A.  Correct.
15     Q.  I assume you reviewed that and signed off on
16  it?
17     A.  Yes.
18     Q.  You actually are a signatory to the petition;
19  is that correct?
20     A.  That is correct.
21     Q.  And you, along with Public Citizen, were
22  seeking government involvement and an actual, I guess,
23  order from the government to order all manufacturers to
24  recall their products?
25     A.  Well, that's an oversimplification of this.  I

Page 268

1  mean, it's a lot of data to support that opinion.
2      Q.  Well, I don't mean to oversimplify.  But let
3  me point you to the request.
4      A.  And I can just cut to the chase.  Yes, you're
5  right.
6      Q.  Well, hold on.  All right.  Okay.  Because on
7  the first page it says, what you're asking is to ban the
8  marketing of all currently available, nonabsorbable,
9  surgical mesh products specifically designed to treat
10  POP.  So you're asking for a ban of the marketing of all
11  products, correct?
12     A.  That's what the document states, yes.
13     Q.  And -- well, that's what you wanted, right?
14     A.  Yeah.
15     Q.  And the second part, the second request to
16  FDA, is an order that all manufacturers of
17  nonabsorbable -- nonabsorbable surgical mesh products
18  designed for POP, to recall the products.  So you wanted
19  a recall order immediately of all products?
20     A.  That's what it states, yes.
21     Q.  Then there is no caveats in here about, Well,
22  let's wait and see.  Let's look at studies.  This was
23  requesting an immediate recall at that moment, urgent
24  request, pull all products from the market.  That's what
25  this was asking for, right?

Page 269

1      A.  Correct.  Based upon that on a daily basis I
2  see these individuals, and I have seen individuals who
3  have been implanted after this document.  So when we
4  wrote this up with Michael Karram, who is -- who is the,
5  Carome, excuse me, who is the deputy officer involved
6  with this.  He is the one who wrote the document.  I
7  completely signed off on it.  My opinion was -- is that
8  extremism in the protection of women and their bodies
9  was justified in this situation.  Because if one more
10  woman is permanently injured by a product that has no
11  benefit or minimal benefit, that is unacceptable.
12     Q.  Did you know Dr. Carome before you
13  participated in this FDA petition?
14     A.  No.  He e-mailed me out of the blue.
15     Q.  How did he find you and why, do you know?
16     A.  I have no idea.  I got an e-mail from him,
17  from Public Citizen, or he went through our media
18  department.  I don't know.  I don't recall how that
19  actually happened.  He contacted me.  I did not want to
20  get involved at all.  I told him I did not want to get
21  involved.  I had enough headaches.
22          And he is the one who convinced me stating
23  that he asked me a lot of questions, you know, are you
24  seeing these type of people?  And, I said, yes.  He
25  says, you have a moral obligation to be helping out

Page 270

1 these women, and that's why I signed on.
2        (Exit Mr. Jeffrey Kuntz.)
3 BY MS. GEIST:
4    Q.  Do you know who funds the efforts of Public
5 Citizen?
6    A.  No.  People.  Industry.
7    Q.  Industry?
8    A.  No.
9        (Enter Mr. Jeffrey Kuntz.)
10 BY THE WITNESS:
11    A.  No, you're right.  Not --
12    Q.  You're saying medical device companies --
13    A.  No, not medical device.
14    Q.  -- funds Public Citizen, do you?
15    A.  As far as -- no.  As far as I don't know who
16 all gets involved in the funding of it.  I know there's
17 been -- they deal with it.  I don't know where the money
18 comes from; but, no, not medical industry.
19    Q.  Do you know whether the plaintiffs' bar funds
20 Public Citizen?
21    A.  I have no -- I'll be on the record very, very
22 clear.  I have no idea where one single dollar comes
23 from to fund them.  I don't know.
24    Q.  Wouldn't you want to know maybe something
25 about the motivation of an organization like Public

Page 271

1 Citizen?  We've been talking a lot about why people are
2 putting articles out there and what motivates them.
3    A.  Sure.  No.
4    Q.  Wouldn't you want to know what motivates
5 Public Citizen?
6    A.  You raise a very good point.  I did as much
7 looking into it.  I never did come out and ask that
8 specific question.  But that's a good one.  I can give
9 Michael a call or an e-mail.
10       When I looked into where the money is coming
11 from, all I could find is that, when Ralph Nader ran for
12 president, he was no longer going to be in charge of
13 Public Citizen because they thought it introduced bias,
14 which I respected that position.  But, no, I do not know
15 where money came from.
16    Q.  Would it surprise you to learn that certain
17 members of the plaintiffs' bar fund Public Citizen?
18    A.  I'm not -- after getting involved in this
19 whole mesh issue, I'm not surprised at much anymore.
20 Individuals I respected have changed their writing
21 styles based upon funding, which has come out in trial,
22 like Altman in the Gross trial versus Ethicon.
23       If lawyers are supporting this, I'm not
24 necessarily against it because I have made public
25 statements that, unfortunately, to the denigration -- I

Page 272

1 don't know if that's the right word -- of my own
2 profession.  Lawyers have led the way in getting this
3 problem solved.
4    Q.  I noticed that, in one of your articles, you
5 made that statement after you had already received quite
6 a bit of compensation from the plaintiffs' bar, true?
7    A.  No.  I disagree with that.  I wrote that
8 article in September of '11.  Chris Winters, who is the
9 chair of SUFU, asked me to write it for Current Opinions
10 of Urology.  At that point in time, maybe a month or
11 two -- I would have to look at the specific dates.  So,
12 as far as a significant amount of money, I don't know
13 what I had made, but it was not a -- I probably couldn't
14 buy a car with it.
15    Q.  Well, you all -- let's not get into the
16 details of how much you were being paid by the
17 plaintiffs' bar at the time.  But you were being
18 compensated by the plaintiffs' bar at the time you wrote
19 that article and talked about how wonderful it was that
20 lawyers are leading the charge --
21    A.  No.
22    MR. CARTMELL:  Wait.  Hold on.
23 BY MS. GEIST:
24    Q.  -- in the pelvic mesh litigation; isn't that
25 true?

Page 273

1    MR. CARTMELL:  Object to the form.  You keep saying
2 that they're being paid by the plaintiffs' bar.  He's
3 never been paid by the plaintiffs' bar.  He has been
4 retained as an expert in litigation by certain
5 attorneys.  And your continual statements of payments by
6 a bar on the plaintiffs' side in inappropriate.  It's
7 argumentative and it misstates facts.
8 BY MS. GEIST:
9    Q.  Okay.  Well, you're paid by plaintiffs'
10 counsel or plaintiffs' lawyers in this litigation and in
11 the Ethicon litigation; is that accurate?
12    A.  Correct.
13    Q.  And when you wrote this article, Doctor, which
14 I'll mark as Exhibit 15 -- I hope that's right.  And I'm
15 not getting any better at using the stamp as we go along
16 today.
17    MR. CARTMELL:  Thank you.
18    MS. GEIST:  You're welcome.
19       (Elliott Deposition Exhibit No. 15
20        was marked for identification.)
21 BY MS. GEIST:
22    Q.  Do you have Exhibit 15 in front of you,
23 Doctor?
24    A.  Yes, I do.
25    Q.  Okay.  When -- when you wrote that article,

Page 274

1 that was published in 2012, correct?
2    **A.  July of 2012 it was published.**
3    Q.  And, at that point in time, you had already
4 been retained as an expert for certain plaintiffs by
5 plaintiffs' lawyers in the pelvic mesh litigation, true?
6    **A.  Correct.**
7    Q.  And, on page 280 of the article, which is,
8 again, sort of misleading, right, because it's six
9 pages?
10   **A.  Correct.**
11   Q.  For some reason on the bottom left it says
12 280?
13   **A.  That just because Current Opinions of Urology**
14 **continues January 1st with page 1 and then December just**
15 **continues right on through, so that's why.**
16   Q.  Okay.  And, in this article, under the
17 discussion, this is where you essentially applaud the
18 plaintiffs' lawyers for doing something about the pelvic
19 mesh problem as you call it, correct?
20   **A.  No.  I do not applaud them.  I say sadly, for**
21 **whatever reason, it seems to be them, meaning lawyers,**
22 **not us, doctors, looking at the data, recognizing**
23 **something is wrong, and aggressively trying to stop mesh**
24 **use.  This is a condemnation of my -- myself and my**
25 **peers.  This is not praising lawyers.  That's the last**

Page 275

1 thing I'd ever want to do is praise a lawyer.  We're
2 **told that from day one.  This is a condemnation of my**
3 **own profession, and this is something I have stated in**
4 **audiences.  This is -- this is not a new thought.**
5    Q.  Okay.  And all of that withstanding, at this
6 point in time, you had already been providing expert
7 opinions against manufacturers when you published this
8 for more than a year, right?
9    **A.  No.  That's not correct at all.  September of**
10 **'11 is when Mr. Anderson first contacted me, or right**
11 **around there, very, very close.  That was my first**
12 **interaction.  I was asked, perhaps, in October, we had a**
13 **visiting professor, Dr. Christopher Winters, the chair**
14 **of SUFU, a very powerful position, he knew my position**
15 **on meshes.  He asked me to write this opinion piece.**
16 **Again, it was in October.  I wrote the piece.  It just**
17 **took seven months for it to come out.**
18   Q.  So how did you know that the legal community,
19 as you write under the discussion section, you write, It
20 seems the legal community is significantly ahead of the
21 medical community in realizing the magnitude of the
22 problem and doing something about it?
23   **A.  Because that's a true statement.**
24   Q.  Well, how did you know?
25   **A.  Because I am in the medical community, I am**

Page 276

1 **attending the meetings, we are hearing of the**
2 **complications, and no physician that I knew of,**
3 **including myself, had really done anything to try and**
4 **stop it.**
5    Q.  Well, how did you know the legal community
6 were involved in the issue at this point in time --
7    **A.  Well.**
8    Q.  -- if you hadn't yet been talking to the
9 lawyers about it?
10   **A.  No.  You know, at this point in time, the FDA**
11 **had already come out with their warnings and things like**
12 **that, and you can't turn on a TV without hearing about**
13 **all of these lawsuits.**
14   Q.  So do you think this paper is the reason why
15 you got retained by counsel?
16   **A.  No, absolutely not.  This was -- this was**
17 **written after they had contacted me.  But in February of**
18 **2011, at our national meeting, I presented an article --**
19 **or, excuse me, I gave a talk and talked with all of**
20 **the -- you know, I just did a Google search and came up**
21 **with all of the various different lawyers searching for**
22 **cases.  So that was well-known that was going on.  I --**
23 **this, again, is a condemnation of me and my colleagues**
24 **of not doing something to protect women.  Okay.**
25   Q.  So this was written after you had been

Page 277

1 contacted by plaintiffs' lawyers?
2    **A.  As I mentioned, in September or so of 2011,**
3 **Mr. Anderson had contacted me.**
4    Q.  Did -- are you working with Citizens
5 Petition -- I'm sorry.  Strike that.
6        Are you working with Public Citizen on any
7 other types of petitions to ban any other types of
8 products or any other activity?
9    **A.  No.  Every once in a while Michael Carome,**
10 **again, who his title is -- whatever his title is here,**
11 **he is the one in charge of things, will contact me when**
12 **some issue is coming up for the FDA.  It's been a long**
13 **time, a year or more on that.  Deputy Director of Health**
14 **Research Group, Michael Carome, again, he is responsible**
15 **for getting me involved in stuff.**
16   Q.  Does Mr. Carome --
17   **A.  Dr. Carome.**
18   Q.  I'm sorry.  Does Dr. Carome or anybody else at
19 Public Citizen compensate you for your consulting work
20 with that group?
21   **A.  No.  If anything, it is adding work onto my**
22 **schedule without any compensation, but I'm doing that to**
23 **help.**
24   Q.  You do it for free?
25   **A.  I do it for free.**

Page 278

1    Q.  FDA, of course, denied the relief that you and
2  Public Citizen were seeking, right?
3      MR. CARTMELL: Object to the form.
4  BY MS. GEIST:
5      Q.  Well, you wanted -- you wanted an immediate
6  and urgent order to pull all products from the market,
7  and the FDA disagreed with you, correct?
8      **A.  The FDA made a decision not to the extent that**
9  **I felt was appropriate.**
10     Q.  They disagreed with what you wanted?
11     MR. CARTMELL: Object to the form.
12 BY THE WITNESS:
13     **A.  No. I didn't say that. I said they didn't go**
14 **to the extent that I wanted them to go.**
15     Q.  Right.  You wanted them to immediately pull
16 all products from the market, and they didn't?  They
17 wouldn't do that, correct?
18     **A.  Yes. And if you look at the people who are on**
19 **that FDA board, I don't believe a single one of those is**
20 **the one who is taking care of these mesh complications.**
21 **That's besides the point. But at least we have -- the**
22 **fact that it failed to get to the extent that I wanted**
23 **is not an issue for me. It's we're trying to make a**
24 **difference in these women's lives.**
25     Q.  And you wrote separately, in support of that

Page 279

1  position -- I'm sorry.  Strike that.
2          You wrote separately, in support of the
3  request, to remove and immediately ban all products from
4  the market?
5      **A.  There was a follow-up something. I don't**
6  **recall the details on that one.**
7      Q.  All right.  Let me --
8      **A.  But I would have to look at that document.**
9  **But, yeah, there was a follow-up petition.**
10         (Elliott Deposition Exhibit No. 16
11             was marked for identification.)
12 BY MS. GEIST:
13     Q.  Okay.  Well, let me show you what I've marked
14 as Exhibit 16.  This is a separate letter from you,
15 Dr. Elliott, to the FDA in strong support of the Public
16 Citizen petition, correct?
17     **A.  Yes, which is very, very, very important. The**
18 **date on that is prior to me having any interaction with**
19 **any legal team. Okay, August 19th, 2011.**
20     Q.  And if you look with me down at the last
21 paragraph, the fourth paragraph in your lower, sort of
22 in the middle --
23     **A.  The fourth paragraph, the bottom?**
24     Q.  Yeah.
25     **A.  The last? Yes, I'm there.**

Page 280

1      Q.  The fourth paragraph, are you with me?
2      **A.  Yes, I am.**
3      Q.  And on the fifth line, you state in your
4  letter, I do feel this position is extreme.  Do you see
5  that?
6      **A.  Mm-hmm. Yep. I see it.**
7      Q.  So, at this point in time, your position and
8  your opinions and thinking in 2011, you admit was
9  extreme?
10     MR. CARTMELL: Well, objection. That misstates it.
11     **THE WITNESS: Yeah.**
12     MR. CARTMELL: And you add a bunch of additional
13 things. It says what it says, and your question is
14 misstating what the letter says.
15     **THE WITNESS: Yeah. That is -- I'm sorry.**
16 BY MS. GEIST:
17     Q.  Does the letter say --
18     MR. CARTMELL: Why don't you read it?
19 BY MS. GEIST:
20     Q.  And it stands on its own. It says, I do feel
21 this position is extreme?
22     **A.  Absolutely. It states it. And as it**
23 **continues, However, extremism in the pursuit of surgical**
24 **responsibility, patient care, financial responsibility,**
25 **and medical ethics is the only honorable end point. So,**

Page 281

1  **yes, and I stand by that then and I stand by it now. If**
2  **anything, it's more firm of a conclusion.**
3      Q.  And that's -- that's fine, Doctor. But I
4  asked you earlier back in 2011 if you thought your
5  position was extreme. Back in 2011 we had a group of
6  pelvic floor reconstructive surgeons writing in response
7  to the FDA petition setting forth their statements that
8  women needed to have transvaginal mesh as an option. We
9  had 600 surgeons sign on to that document. And in
10 contrast, you were working with Public Citizen to get an
11 order immediately banning and recalling all products?
12     MR. CARTMELL: Okay.
13 BY MS. GEIST:
14     Q.  Isn't that position extreme at the time you
15 made it?
16     MR. CARTMELL: Okay. Object and move to strike the
17 statement of counsel. I'll also note for the record
18 that your statement that you asked him previously in
19 this deposition, if his position was extreme, related to
20 the FDA actions he wanted. You had never asked him that
21 previously in the deposition. So that was a
22 misstatement of what you asked.
23 BY MS. GEIST:
24     Q.  Well, the record is what it is. But can you
25 answer my question, Doctor?

In Re: CR Bard 200                      Daniel Elliott, M.D.                      11/15/2014

Page 282

1    A.  Absolutely, and I can answer that very
2  clearly.  2011 is 365 days.  As of August 19th, I make
3  that statement.  Prior to that time, a month or two
4  prior, is when Mr. -- or Dr. Carome contacts me and I
5  start looking at the literature and what he had written
6  up.  Okay.  And so my position evolved.  So, in 2011, I
7  can still make a comment that I was not extreme.  But,
8  again, extremism in taking care of patients and women
9  and their bodies is not a wrong thing.  And I'll stand
10  by that and I'll state that over and over and over.  And
11  I'm proud of that.
12     Q.  So notwithstanding what you're saying in your
13  letter to a government agency, you're telling me you
14  don't think you were extreme back then?
15     A.  You have to look at the entire document, not
16  just one.  If all I wrote on here, To whom it may
17  concern.  I do feel this position is extreme, period,
18  and signed it, that's a foolish statement.  I put
19  qualifiers.  I say why and I follow it up saying
20  extremism, in this situation, responsibility, patient
21  care, financial, medical ethics is the honorable thing.
22  That's a good thing, and I'll stand by that.
23     Q.  Doctor, let me show you -- I think I'm up to
24  17.
25

Page 283

1           (Elliott Deposition Exhibit No. 17
2            was marked for identification.)
3  BY MS. GEIST:
4     Q.  Doctor, let me show you what I've marked as
5  Exhibit 17 to your deposition.  And, for the record,
6  this is a copy of an article that was on the Levin
7  Papantonio Website.  Do you see that?
8     A.  Yes, I do.
9     Q.  And this was published on the Website back on
10  August 19th, 2011?
11     A.  I'll trust you on that.  I don't know.  I
12  don't see a published date.
13     Q.  If you look under the title, it says, Mayo
14  Clinic Doctor:  Mesh patients have suffered needlessly.
15  And underneath that, it says --
16     A.  Yes.
17     Q.  -- August 19th, 2011.  Do you see that?
18     A.  Yes, I do.
19     Q.  Do you know who Levin Papantonio are?
20     A.  I don't recognize those names, no.
21     Q.  They're a plaintiffs' law firm involved in the
22  mesh litigation.  Were you working with them back in
23  August of 2011?
24     A.  No.  I have no idea who they are.  If you
25  search my name and mesh and Publish Citizen, there will

Page 284

1  be about a thousand hits on it.  It's been taken.  And I
2  don't necessarily appreciate lawyers using in that
3  fashion, but I have no control over that.
4     Q.  Okay.  Well, that was my question.  Were you
5  aware of this?  Were you being compensated --
6     A.  No.
7     Q.  -- by Levin Papantonio to use your statements
8  on their Website?
9     A.  Absolutely -- I have not received a dollar
10  from anybody as far as posting comments, and we get
11  those things frequently.
12     Q.  How about the Mesh News Desk?
13     A.  No.
14     Q.  Do you remember being interviewed by somebody
15  from the Mesh News Desk?
16     A.  Yes.  Julie Akre or something like that.
17     Q.  Do you know who runs the Mesh News Desk?
18     A.  No, I don't.  I know they have solicited money
19  from me to support putting my words on her page, which I
20  didn't like.
21     Q.  Have they ever provided you with any
22  compensation for your statements that they put on the
23  Mesh News Desk site?
24     A.  Zero.  And recently, as of, I don't know, a
25  month or two ago, she contacted me asking for money to

Page 285

1  support her Web page, and I say, no.  So that Website I
2  am not a supporter of.
3           (Elliott Deposition Exhibit No. 18
4            was marked for identification.)
5  BY MS. GEIST:
6     Q.  Let me show you Exhibit 18, Doctor.  This is
7  the -- this is a copy of one of the articles on the Mesh
8  News Desk site.  This appears to be pretty recent, from
9  October 27th, 2014?
10     A.  Yeah.  It's one that was posted, yes.
11     Q.  And that's you.  That's your smiling face
12  there on the article, right?
13     A.  Yeah.  It's an updated photo.
14     Q.  I'm sorry?
15     A.  It's an updated photo.  I don't know where she
16  got it.  That's interesting.  She must have got it off
17  the Web page, Mayo's Web page.
18     Q.  But you provided her with the interview that's
19  set forth here, correct?
20     A.  She interviewed me, took lots of notes, sent
21  me a manuscript that was severely false.  I then edited
22  it to what it is, and I have not reviewed this final one
23  because it got posted without my permission.  So, again,
24  I am not a supporter of the Medical Desk.
25     Q.  But, at least, you know, some of the

In Re: CR Bard 200                  Daniel Elliott, M.D.                  11/15/2014

Page 286

1  statements in here, Doctor, seem to be consistent with
2  our discussion here today. If you look at page 2, there
3  is a question, Should it be off the market, referring to
4  transvaginal mesh?
5      A.  Yeah.  If this is quoting me correctly, and I
6  have been consistent with what I've stated.  But I'll
7  say it should be off the market.  Polypropylene mesh
8  used for transvaginal prolapse should never have been
9  put on the market.  I stand by that.  For selected
10 individuals who have failed standard treatment -- that's
11 what we've gone through ad nauseam today -- there may be
12 a role.  I was abbreviating what we've talked about
13 today.
14     Q.  And you stand by that statement with the
15 caveats you made today in your deposition; is that fair?
16     A.  That is correct.  This here does not go into
17 all of them.  I did say in selected individuals.  With
18 selected individuals is what we have talked about today.
19     Q.  Got it.  Now, on the first page of the
20 interview, Doctor, it says that you reported that no one
21 in the urology department at the Mayo Clinic used
22 polypropylene transvaginal mesh for prolapse.  Do you
23 see that?
24     A.  Yeah.  And, actually, that's -- that's
25 correct, but short.  No one in the urology or GYN at

Page 287

1  Mayo use meshes for prolapse transvaginal.
2      Q.  So that was my question to you.  Does anyone,
3  in the urogynecology division of the Mayo Clinic, use
4  transvaginal mesh to treat pelvic organ prolapse?
5      A.  No.  In 2005, when they came out, there were
6  roughly six or seven of us on staff at that point in
7  time.  All of us independently, without a discussion,
8  elected not to use it.  So that is a correct statement,
9  and they misspelled my name, too.
10     Q.  So if we look at -- let me just mark Exhibit
11 19.
12         (Elliott Deposition Exhibit No. 19
13          was marked for identification.)
14 BY MS. GEIST:
15     Q.  Doctor, this is a print off from the Mayo
16 Clinic -- I'm sorry.
17     A.  That's all right.
18     Q.  This is a download or a printed page from the
19 Mayo Clinic site.  Do you see that?
20     A.  Yeah, I do.  I'm trying to figure out, because
21 I was involved with Mayo's policy on meshes and -- but I
22 was not involved with the drafting of this.  But I don't
23 know what --
24     Q.  Okay.
25     A.  -- I don't know what this -- I have not seen

Page 288

1  this document before.
2      A.  Well, I'll just represent to you, as you can
3  tell from the date on the bottom right corner, that we
4  printed this out on November 5th, 2014.  And on page 2
5  of the exhibit, it appears to indicate that this is
6  dated August 9th, 2014.  Do you see that?
7      A.  Yeah.  I don't have any reason to doubt its
8  validity.  I just wasn't involved in this, the
9  production of this.
10     Q.  Okay.  It says, pelvic organ prolapse at the
11 top, correct?
12     A.  You're on page -- the first page?
13     Q.  I'm on the first page, yeah.
14     A.  Yes, it does.  That's what it says.
15     Q.  And, it says, concerned about transvaginal
16 mesh complications associated with treatment for pelvic
17 floor disorders?  Here is what you need to know,
18 correct?
19     A.  Yes.
20     Q.  And this is provided by the Mayo Clinic staff,
21 true?
22     A.  Mayo Clinic staff, there is a ghostwriter who
23 interviewed somebody and this was written up.
24     Q.  Okay.  At least, according to this statement
25 from the Mayo Clinic, surgical mesh, including synthetic

Page 289

1  materials, can be used to treat pelvic organ prolapse;
2  do you see that?
3      A.  I don't see that document.
4      Q.  All right.  So go with me to the second --
5      A.  I mean, I don't see --
6      Q.  Sorry.  Second paragraph, it says, Surgical
7  mesh is a medical device that is used to provide extra
8  support when repairing weakened or damaged tissue?
9      A.  Yep.
10     Q.  Most surgical mesh devices are made from
11 synthetic materials or animal tissue?
12     A.  Yes.
13     Q.  Surgical mesh can be used to treat, and then
14 it says POP, right?
15     A.  Yes.
16     Q.  And it says surgery can be done through the
17 abdomen or through the vagina, transvaginal, correct?
18     A.  That's what it states, yes.
19     Q.  And then, on the second page of the statements
20 from Mayo Clinic, it says, if you are considering
21 treatment for a pelvic floor disorder that involves
22 surgical mesh, be sure to have your health care provider
23 explain all of your options, as well as their possible
24 risks and benefits.  In particular, be aware of the
25 risks associated with surgical mesh for transvaginal

Page 290

1 repair of POP, such as the need for additional surgery
2 due to mesh-related complications. Did I read that
3 correctly?
4    **A. Yes, you did.**
5    Q. But, at least, according to this statement
6 from the Mayo Clinic, as of August 9th, 2014, the
7 surgeons at the Mayo Clinic were still offering
8 transvaginal mesh for the repair of pelvic organ
9 prolapse?
10   **A. Absolutely not. No one has. No one at Mayo**
11 **Clinic Rochester has ever put in, to the best of my**
12 **knowledge, a transvaginal mesh kit.**
13   Q. So where did this statement come from?
14   **A. This is a ghostwriter. This was written up**
15 **for information for patients. So I had nothing to do**
16 **with this one. But all of those authors on that Blandon**
17 **article, I know them. I operate with them daily. And**
18 **so, you know, they're -- they're giving the warnings**
19 **because we are inundated with**
20 **patients calling up, and this is a resource for patients**
21 **to look at this.**
22     **And then we're not -- we're saying, if you're**
23 **considering pelvic floor surgery that involves mesh,**
24 **okay, no one at Mayo does that. But patients come from**
25 **all over the world to the Website for information. But**

Page 291

1 **we're saying, whoever wrote this, make sure you've got**
2 **all of your options and risks, and they go on and on and**
3 **on here about the potential risks.**
4    Q. Right. But nowhere in this document, Doctor,
5 does it say, Don't use transvaginal mesh for POP repair,
6 does it?
7    **A. Well, that's what the article states, and it**
8 **states what it states.**
9    Q. Right.
10   MR. CARTMELL: Where does it say that you're
11 supposed to -- that they use it like you just said in
12 your question?
13   MS. GEIST: You can't ask me questions.
14   MR. CARTMELL: Well, you just asked him a question
15 that said --
16   MS. GEIST: I said you can't --
17   MR. CARTMELL: -- so as of this time --
18   MS. GEIST: No, no, no.
19   MR. CARTMELL: -- Mayo was using it.
20   MS. GEIST: Stop.
21   MR. CARTMELL: And there is nowhere in this
22 document that says Mayo was using it.
23   MS. GEIST: You can't make speaking objections like
24 you are.
25   MR. CARTMELL: No. I'm just supposed to sit here

Page 292

1 and let you ask questions --
2    MS. GEIST: You can ask your own questions if you
3 want.
4    MR. CARTMELL: -- that misstate evidence.
5    MS. GEIST: You can ask your own questions if you
6 want. Be my guest.
7    MR. CARTMELL: I don't get that.
8 BY MS. GEIST:
9    Q. So my question was, Doctor, is that -- is that
10 the accurate site for the Mayo Clinic, mayoclinic.org?
11   **A. Yeah. This is for patient access. But**
12 **myself, Dr. Lithner, in our department of female**
13 **urology, Dr. Klingele, Dr. Ochino, Dr. Trabuco, and I**
14 **believe there is another gynecologist who has never**
15 **implanted it. So this isn't information for patients**
16 **who contact the Web. It's not. If they come into Mayo,**
17 **they're not getting the mesh.**
18   Q. Well, and there is nowhere in this statement,
19 on behalf of the Mayo Clinic, as it states by the Mayo
20 Clinic staff, there is nowhere in here that says, by the
21 way, we don't agree with the implant of transvaginal
22 mesh, we don't use transvaginal mesh, or we think you,
23 patient accessing our site, should not use transvaginal
24 mesh? There is nowhere in here that states that, is
25 there?

Page 293

1    **A. Well, there is no statement of support either.**
2    Q. Well, there is a statement that says, Surgical
3 mesh can be used to treat pelvic organ prolapse through
4 the vagina. And if you're considering this transvaginal
5 repair, talk to your doctor about the risks and
6 benefits. That's what it says, correct?
7    **A. I -- I can completely support that the**
8 **document says surgical mesh can be used to treat pelvic**
9 **organ prolapse. I agree with that. It can be. It's**
10 **not a statement of support.**
11   Q. Well, you have -- I understand your
12 interpretation of that.
13   MR. CARTMELL: I'll object and move to strike the
14 statement of counsel. Ask him questions if you want to.
15   MS. GEIST: I am. And if you would stop
16 interrupting me, we would get along a lot better today.
17 You're making your own statements.
18 BY MS. GEIST:
19   Q. Doctor, I want to move on to some of the
20 specific opinions in your report that we didn't talk
21 about already. Do you need a break before we move on?
22   **A. No. Let's keep going.**
23   Q. Okay. Okay. Let me start, Doctor, with --
24 the videographer is signaling us again.
25   MS. GEIST: Are we okay?

In Re: CR Bard 200                 Daniel Elliott, M.D.                 11/15/2014

Page 294

1    VIDEO TECHNICIAN: (Inaudible.)
2  BY MS. GEIST:
3     Q.  All right.  Doctor, let me start with a
4  discussion in your report relating to degradation.  We
5  talked a little bit about that before?
6     A.  Correct.
7     Q.  And I think you told me earlier, and correct
8  me if I'm misstating it, that, while polypropylene mesh
9  is polypropylene -- polypropylene mesh, degradation does
10 not occur in all polypropylene mesh?
11    A.  I never stated that.
12    Q.  All right.  So then here is my question.  Do
13 you still use polypropylene-made urethral slings to
14 treat stress urinary incontinence?
15    A.  No.
16    Q.  Have you ever?
17    A.  Yes.
18    Q.  And how about your colleagues at Mayo?  Do
19 they continue to use polypropylene midurethral slings to
20 treat stress urinary incontinence?
21    A.  My colleague in urology used mesh slings for
22 about a year or two starting in 2003 or 2004.  She felt
23 it should never have been done and she stopped using it
24 back then.  I continued using it longer.  But she
25 stopped using it.  I cannot speak to what my

Page 295

1  urogynecology colleagues, what they use.
2     Q.  So the opinion in your report that
3  polypropylene mesh in the Avaulta products degrades and
4  is not inert, does that apply to polypropylene used in
5  slings?
6     A.  Well, I think polypropylene has to be looked
7  at the specifics of the product.  From everything I have
8  read and the literature that we have quoted,
9  polypropylene, in the human body, degrades.  I don't
10 think that's even a point of discussion.  We can go
11 through the articles that talk about that.
12    Q.  Well, let me ask you a question.  I don't mean
13 to interrupt you.  But let me ask you a question about
14 what you just said.  You're providing expert opinions in
15 three plaintiffs' cases tomorrow, correct?
16    A.  I believe so, yes.
17    Q.  Did you see or observe any degradation in the
18 polypropylene mesh they had implanted?
19    A.  Absolutely.
20    Q.  Okay.  So we'll talk about -- we'll talk about
21 that more tomorrow.  Do you consider yourself to be an
22 expert in the human body's response to polypropylene?
23    A.  As it pertains to implantation in the human
24 body relative to female organ prolapse and incontinence,
25 yes.

Page 296

1     Q.  So do you consider yourself to be a
2  physiological expert in how the body actually reacts to
3  polypropylene?
4     A.  I would say, yes, based upon my experience, my
5  review of the literature, surgical experience, yes, I
6  am.  I see it on a daily basis.
7     Q.  Is there any article, Doctor, or anything in
8  the literature that has said that polypropylene cannot
9  be used in the human body to correct pelvic organ
10 prolapse or stress urinary incontinence?
11    MR. CARTMELL:  Object to the form.
12    MS. GEIST:  When in doubt.
13    MR. CARTMELL:  I mean, I don't get it, anything in
14 the literature.
15 BY MS. GEIST:
16    Q.  Well, is there any -- anything in the
17 literature, any medical article, that has said
18 polypropylene cannot be used in the human body to treat
19 anything, or pelvic organ prolapse, in particular?
20    A.  Well, when you state anything, that's very,
21 very broad.  If we want to just focus on just the
22 urinary tract or reproductive tract, for lack of a
23 better phrase, there are hundreds of articles that warn
24 against its use and the complications and the
25 devastating nature of it.  Do they come out and use that

Page 297

1  specific language?  They probably don't use those exact
2  words.  But they will state over and over, and I can
3  find those articles, that there is limited data to
4  support their use.
5     Q.  Even though polypropylene-based products have
6  been used for decades and decades in different medical
7  device applications?
8     A.  Well, I'd have to ask, are those the same
9  grade that's put through the vagina?  Is it in contact
10 with the vaginal flora, lacto- -- lactobacillus, does it
11 have arms going through the vagina, through the
12 obturator foramen, through the buttocks?  So we have to
13 be very, very specific in our question and the answer.
14    Q.  Is it your opinion that the specific grade of
15 polypropylene in the Avaulta products has resulted in
16 pain?
17    A.  Yes.
18    Q.  And what do you base that on?
19    A.  My experience of seeing patients in the
20 clinic, my research on the data here of, you know, the
21 national meetings, international meetings, talking with
22 colleagues.  Because it's not just my experience.  It's
23 also the experience of all of my urogynecology
24 colleagues who arguably see more of this than I do.  So,
25 by all means, we see it, the pain.

In Re: CR Bard 200                          Daniel Elliott, M.D.                          11/15/2014

Page 298

1    Q.   So maybe my question was bad, Doctor, but
2    have -- what evidence or article can you point me to
3    that specifically links up the use of polypropylene with
4    pain?  Do you understand my question?
5    **A.   No.  No, I do.  If we want to go down -- you**
6    **know, let's just say -- just here.  I'm just looking at**
7    **this, Clave, et al., polypropylene is not inert.  That's**
8    **an abbreviation of the title, okay, but he's going**
9    **through the complications that happen.  Complication is**
10   **pain.  Pain is a reflection of inflammation.**
11   **Inflammation is a response to degradation.  Okay.  Mamy,**
12   **et al., correlation between mesh shrinkage and infection**
13   **of implanted synthetic meshes.  And this is in the**
14   **animal model.  You know, yeah, there is an extensive**
15   **amount.**
16   Q.   All right.  Well, let's look at that.  You
17   want to bring up Clave.  Do you have a copy of Clave?
18   **A.   Yes, I do.**
19   Q.   Because when you talk about degrading and not
20   being inert, you're citing specifically to Clave,
21   correct?
22   **A.   That was one of them.  My expert report has,**
23   **when we're talking about degradation of the product,**
24   **Liebert, et al.; Ali, et al.; Zhong, et al.; Castello,**
25   **et al.; Mamy, as I already mentioned; Smith, et al. --**

Page 299

1    **again, we can go on -- white, et al.  I have it in here.**
2    Q.   Well, let's talk about Clave, first of all?
3    MR. CARTMELL:  Clave.
4    BY MS. GEIST:
5    Q.   Clave, is it Clave?
6    **A.   Clave, yeah.  He's part of the French group.**
7    Q.   Oh, I see that.  It's Clave.  Okay.  So Clave
8    in the article entitled, Polypropylene As a
9    Reinforcement in Pelvic Surgery is Not Inert?
10   **A.   Correct.**
11   Q.   Colon, Comparative Analysis of 100 Explants,
12   that's what we're talking about, correct?
13   **A.   Correct.**
14   Q.   And Clave notes that this is the first study
15   to evaluate synthetic implants used in a vaginal
16   approach for pelvic floor reinforcement; that's what it
17   says?
18   **A.   That is correct.**
19   Q.   And this was published in 2010?
20   **A.   Well, it was received in '09, published online**
21   **January of '10.**
22   Q.   And he admits, if you look in the conclusions
23   part of the study, he admits, in his study, that there
24   is quite considerable medical literature that has
25   concluded and demonstrated that polypropylene is, in

Page 300

1    fact, inert?
2    MR. CARTMELL:  Object to the --
3    BY MS. GEIST:
4    Q.   Do you see that?
5    MR. CARTMELL:  Object to the form.
6    BY THE WITNESS:
7    **A.   I don't see.  I vaguely remember what you're**
8    **talking about.  Yeah.  It says, This study, however,**
9    **brings into question the prevailing understanding of**
10   **polypropylene as inert when it comes to transvaginal.**
11   Q.   All right.  So up --
12   MR. CARTMELL:  Are you --
13   BY THE WITNESS:
14   **A.   Now, you interrupted me.**
15   Q.   Go ahead.  No.  I'm sorry.  I didn't mean to.
16   **A.   So this study --**
17   Q.   I'm getting tired.
18   **A.   -- is one of the landmark studies of saying,**
19   **Wait a second, people.  What we have been told, what is**
20   **in the IFUs, what the industry has told us is actually**
21   **not true.  This thing is not inert.  It is ert.**
22   Q.   All right.  So -- I'm sorry.  Go ahead.
23   **A.   It is active.**
24   Q.   Right.  So Clave is saying, in 2010, he's
25   acknowledging that all of the studies that came before

Page 301

1    found that polypropylene is inert, right?
2    MR. CARTMELL:  Object to form.
3    BY THE WITNESS:
4    **A.   No.  That's not true.  And even if that's what**
5    **they state, you have papers in 1976, Liebert, et al.,**
6    **talking about polypropylene degradation in their**
7    **studies, White from 19-, also, the '70s.  So they're**
8    **saying this and specifically vaginal floor repair.**
9    **And you have to look at the Ostergard's paper,**
10   **I don't know when Ostergard's paper came out, talking**
11   **about it is not inert, too.  I don't know, again, when**
12   **that one came out.  That was 2011.  Excuse me.  So that**
13   **was after that.  So I don't think --**
14   Q.   Okay.  And you know what?  That was my bad
15   question.
16   MR. CARTMELL:  Were you done?
17   BY MS. GEIST:
18   Q.   So let me -- let me state it again.
19   His paper in 2010 is the first paper to
20   provide contrary evidence that characterized
21   polypropylene as inert in the context of its use in the
22   vaginal application?
23   **A.   Yeah.  What they're stating here -- again, I**
24   **have not gone back and looked at the dates of other**
25   **studies that have come out.  And Klosterhalfen and**

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 302

1  Klingele have studies, but that's in abdominal wall
2  hernias. But I'll assume, which is never a good thing
3  to do, that they are accurate in saying -- we're saying,
4  hey, everybody, there is an issue here that we are
5  unaware of. And I will trust that they're accurate, but
6  they must have done a literature search.
7     Q.  Okay. And I should have been more precise.
8  We're talking about polypropylene used in -- in the
9  vagina as a method for pelvic floor reconstructive
10 surgery. So that's what we're talking about?
11    A.  For transvaginal implantation, correct.
12    Q.  Yes. Okay. So Clave acknowledges that this
13 is contrary to the evidence that has come before looking
14 at that specific application, looking at polypropylene
15 as being inert in the use of transvaginal mesh. He
16 acknowledges that, correct?
17    A.  I'm sorry. Can you repeat the question or
18 read it back?
19    Q.  Sure.
20    A.  I'm sorry.
21    Q.  I'll actually read it. Clave says, The study
22 provides evidence contrary to published literature
23 characterizing polypropylene as inert in such
24 applications, and that's referring to synthetic implants
25 used in a vaginal approach for pelvic floor

Page 303

1  reinforcement?
2     A.  Correct. I agree with that statement, yeah.
3     Q.  Okay. Thank you. I should have just read it
4  from the beginning to make things simpler. Now, Clave,
5  in this study, performed three types of tests, correct?
6     A.  I would have to go back and look at the
7  specifics. I remember he did fairly exhaustive research
8  on it, but I can't say it's three. Scanning, electron
9  microscopy, chemical analysis, statistical analysis, and
10 then infrared spectroscopy.
11    Q.  Yeah.
12    A.  So -- and a histological analysis, so he's
13 done a lot more than just that.
14    Q.  All right. Well --
15    A.  He's done a lot.
16    Q.  Okay. He looked at 100 explants; is that
17 correct, in this study?
18    A.  Yeah. Based upon the title, 100 explants.
19    Q.  Okay. And it's also in the body of the paper,
20 right?
21    A.  Correct.
22    Q.  And it says -- let's see. I'm trying to use
23 the acronyms. He performed the scanning electron
24 microscopy, SEM, right?
25    A.  Correct. Yeah. That's looking for physical

Page 304

1  evidence for just the degradation cracking of the
2  product, for lack of a better phrase.
3     Q.  He did a chemical analysis, which he referred
4  to as FTIR, correct?
5     A.  Yeah. And that's a study just looking at --
6  and it's oversimplified, but is something being
7  released, is there information around it, those types of
8  things.
9     Q.  Okay. And then he also did something he
10 called DSC or differential scanning?
11    A.  Yeah. And, again, that -- that -- he's doing
12 some pretty advanced stuff here, but he's just looking
13 at the morphology of the polymer, of the polypropylene
14 polymer -- sheesh, polypropylene polymer. Again, that's
15 involved with degradation breakdown changing of the
16 sub-- of the material.
17    Q.  It's like a tongue twister today.
18    A.  I'll give that one. That's a tough one.
19    Q.  Now, two of his three tests that we just
20 discussed did not actually show any degradation in this
21 study, true?
22    A.  Again, I would have to look at the specifics
23 of the study. If you support that as being true, I'll
24 follow along with that.
25    Q.  Okay. Well, I'm happy to have you look at it,

Page 305

1  but --
2     A.  I don't think you are, because it will take
3  you a long time. This is a detailed paper. This is a
4  big paper, so...
5     Q.  I hear you, but this is one of the main things
6  that you cited in your expert report.
7     A.  Okay.
8     Q.  So I kind of thought you'd be prepared to talk
9  about it?
10    A.  I am.
11    MR. CARTMELL: Object to the form.
12 BY THE WITNESS:
13    A.  I have written -- reviewed 509 papers, so I
14 will now read this one then, and that's going to take
15 some while, as per your permission.
16    MR. CARTMELL: Please do.
17    VIDEO TECHNICIAN: Is it okay if I go off real
18 quick? I need a file break.
19    MS. GEIST: Oh, yeah. Absolutely. That's a good
20 idea, and then the doctor can have time to read the
21 article.
22    THE WITNESS: I'll stop reading. I'll read on
23 camera.
24    VIDEO TECHNICIAN: We're off the record. The time
25 is 4:39 p.m.

In Re: CR Bard 200                          Daniel Elliott, M.D.                          11/15/2014

Page 306

1     (A recess was had.)
2     VIDEO TECHNICIAN:  We're back on the record.  The
3  time is 4:52 p.m.
4  BY MS. GEIST:
5     Q.  Okay.  Doctor, we were talking about the Clave
6  article before we took a break, and I think you said you
7  would need an opportunity to review the article in
8  detail and in full before you could answer my question
9  about whether two of his three tests did not show
10 degradation?
11    **A.  Correct.**
12    Q.  Okay.  In the interest of time, I'm going to
13 move on and skip to a couple of other things I'd just
14 like to point out to you in the article and ask if you
15 considered them?
16    **A.  Okay.**
17    Q.  Okay.  Did -- did you at all consider whether
18 the degradation that was observed in one of the three
19 tests that Clave performed was actually grooves in the
20 biofilm?
21    **A.  Well, I, by all means, considered the multiple**
22 **different reasons for the possibility of a**
23 **false-positive study.  However, when you look at the**
24 **actual photographs on page 265, I mean, it demonstrates**
25 **fractures in it.  That is not biofilm.  That's true**

Page 307

1  fracture.
2     Q.  Okay.  So you considered but disagree with the
3  thinking that the cracks or the groves or the fractures
4  could be the biofilm?
5     **A.  Yes.**
6     Q.  Is that fair?
7     **A.  I'm sorry.**
8     Q.  Yes?
9     **A.  No.  I agree with that, and I've heard that**
10 **argument multiple different times.  I think it's a**
11 **legitimate argument to look at; however, when these are**
12 **washed appropriately, I believe the data shows that that**
13 **is not a result.  So that is not causing a**
14 **false-positive study.**
15    Q.  Okay.  Fair enough.  So if you look at page
16 269 of Clave under Conclusion --
17    **A.  Okay.**
18    Q.  -- under the third paragraph there, he notes,
19 Several hypotheses persist concerning the nature of
20 polypropylene in vivo degradation?  Do you see that?
21    **A.  Correct.**
22    Q.  Is he right that there are several hypotheses
23 that still persist?
24    **A.  Well, I think in 2010 or whenever he wrote**
25 **this -- remember, he's the first person to come out with**

Page 308

1  this.  Subsequent there have been other authors talking
2  about degradation.
3     Q.  Okay.
4     **A.  So at that point in time, as being the first**
5  **author, he's going to say there, We're trying to figure**
6  **this thing out.**
7     Q.  Right.
8     **A.  So you have several possible etiologies of**
9  **this.**
10    Q.  Okay.  But a hypothesis, Doctor, whether that
11 term is used by a medical doctor, a scientist, a
12 hypothesis, by definition, means something that is not
13 proven, correct?  It's an idea?  It's a theory, but it's
14 not proven; is that correct?
15    **A.  Yeah.  I mean, I think that's probably a fair**
16 **assessment at that point in time when this was written.**
17 **Yeah, there are several evolving theories as far as why**
18 **this is occurring.**
19    Q.  All right.
20    **A.  And that's what they wrote in 2010.**
21    Q.  Okay.  And that's fair.  So the paper is about
22 theory.  It's nothing that's proven?
23    **A.  I disagree.  They're not -- they're saying**
24 **this product degrades, period.  Why it degrades is up**
25 **for discussion.**

Page 309

1     Q.  But it didn't degrade using two of the three
2  tests that Clave put the materials through?
3     **A.  But it degraded in one of them at least.**
4     Q.  On page 266 of his article, does he also
5  state, in the second paragraph, several hypotheses
6  concerning the degradation of the polypropylene are
7  described below.  None of these particular direct
8  oxidation could be confirmed in this study.  Does he
9  also state that?
10    **A.  I don't see where you are; however, I listened**
11 **to what you had to say because I didn't know which**
12 **column you were in.  But, again, this is a landmark**
13 **paper saying, Everybody, this product is not inert.  It**
14 **degrades.  We're trying to figure out why.**
15    Q.  Well, the why is sort of important, right,
16 because the why would determine whether or not
17 degradation would occur in a particular woman, for
18 example?
19    **A.  The why is very important.  This one paper**
20 **might not be able to answer all of the questions, and**
21 **that's why I have to look at the totality of knowledge**
22 **out there.**
23    Q.  Did --
24    VIDEO TECHNICIAN:  Counsel, your mic.
25    MS. GEIST:  Sorry.

Page 310

1 BY MS. GEIST:
2    Q.   Did you look at any other articles looking at
3 the Clave study, in particular?
4    A.   I'm sorry.  Looking at -- did I look at the
5 other articles in reference to the Clave?
6    Q.   Yeah.  So did you look at it with any other --
7 strike that.
8         Did you look at any other papers that actually
9 discussed the Clave article in particular?
10   A.   Well, I don't know if I could look at ones
11 that discussed it.  I would have to go back and look at
12 each one and reference it.  It's a very popular
13 manuscript to go to.  I mean, but the other ones,
14 Ostergard looking at degradation; Coda, C-O-D-A;
15 Costello; Cozad; Sternschuss, S-T-E-R-N-S-C-H-U-S-S --
16 and the list goes on -- Ali, et al.; Zhong, et al.  I
17 don't know if I mentioned Costello or Mamy.  But, I
18 mean, there's like 20 -- if we keep going, 20 articles
19 at least that are building upon Clave's original work.
20   Q.   Did -- did you look at the De Tayrac, and I
21 may be pronouncing that wrong, the De Tayrac article
22 from 2011 that actually looked at what Clave did?
23   A.   Yes.  I looked at De Tayrac.  He's written
24 multiple articles.
25   Q.   I'm talking about the De Tayrac article

Page 311

1 entitled, Basic Science and Clinical Aspects of Mesh
2 Infection in Pelvic Floor Reconstructive Surgery?
3    A.   Yes.  I've looked at that one.  I have that
4 one.
5    MS. GEIST:  Okay.  Let me mark it.  And I have no
6 idea where I am with exhibits, so maybe the court
7 reporter can help me out.
8    THE REPORTER:  I think 20.
9    MS. GEIST:  I'm sorry?
10   THE REPORTER:  20.
11   MS. GEIST:  20, thank you.
12        (Elliott Deposition Exhibit No. 20
13         was marked for identification.)
14 BY MS. GEIST:
15   Q.   Doctor, let me hand you the De Tayrac --
16 sorry.
17   A.   I have a copy.
18   Q.   Let me toss it to you.  Let me give a copy to
19 counsel.  Thank you.  So you've heard of Dr. De Tayrac.
20 You've read several of his articles I think you
21 indicated?
22   A.   Yes.  I know him by reputation at various
23 different meetings.
24   Q.   And did you consider this particular paper in
25 reaching your opinions relating to degradation?

Page 312

1    A.   Yes.  It should be in my report.  I have a
2 copy of it here with me.  So I would assume so.
3    Q.   And De Tayrac, if you look at page -- I think
4 it's 778.  Again, it's one of those weird numbering
5 things.  778 is on the fourth page of the De Tayrac
6 article?
7    A.   Yes.  I'm there.
8    Q.   Okay.  And he notes, Using the same model of
9 mesh infection, we also experimentally tested Clave's
10 conclusion regarding a correlation between infection and
11 polypropylene degradation.  Do you see that?
12   A.   Yes, I do.
13   Q.   And then it goes on to describe what they
14 actually did.  They implanted polypropylene mesh in
15 Wistar rats and the mesh were explanted and examined,
16 correct?
17   A.   There we have to be more specific.  They
18 implanted it in an incisional abdominal hernia in the
19 rats.
20   Q.   Okay.  Fair enough.  I'm trying to summarize.
21   A.   And inoculated it with E. coli, which all of
22 those are very important factors in this.
23   Q.   And he concludes, at the end of that
24 discussion, that they also observed signs of superficial
25 degradation and transverse cracks, but these appeared to

Page 313

1 concern only the biofilm with no effect on the implant
2 thread itself?
3    A.   Yeah.  And that's what the study found, which
4 is, to me, completely immaterial, because, number one,
5 it's not implanted in the vagina.  They inoculated it
6 with E. coli, which, to the best of my knowledge, does
7 not produce hydrogen peroxide like lactobacillus, which
8 is in the Sternschuss article saying that's the most
9 common bacteria in women that produces hydrogen
10 peroxide.  So in this study here with E. coli, which is
11 a rare bacteria in adult females' vaginas, that's what
12 finding they had at 30 days.
13   Q.   Doctor, just so I understand your opinions,
14 you don't have the same concern with polypropylene
15 degradation when polypropylene materials are used in a
16 midurethral sing application; is that correct?
17   A.   No.  I don't think that is correct.  I do
18 have -- I don't use it in my practice anymore because of
19 my concerns because of the complications I saw and
20 because of the complications that have been referred in
21 to me.
22   Q.   Okay.
23   A.   So I do have those concerns.
24   Q.   So you don't agree with the AUGS position
25 statement regarding polypropylene midurethral slings and

In Re: CR Bard 200                    Daniel Elliott, M.D.                    11/15/2014

Page 314

1 those slings being the gold standard for the treatment
2 of stress urinary incontinence?
3     A.  I would have to look at exactly what the AUGS
4 said on that.  I'm familiar.  We looked at the one for
5 prolapse.  I would have to look at the ones -- what they
6 said for stress incontinence.
7     Q.  Well, before I show you that, let me just show
8 you what I'll mark as Exhibit 21.
9          (Elliott Deposition Exhibit No. 21
10              was marked for identification.)
11 BY MS. GEIST:
12    Q.  A copy for counsel.  This is one of your
13 publications, Doctor.  This one was published in -- or
14 actually accepted for publication in the last year,
15 September of 2013, entitled Risk of Repeat
16 Anti-Incontinence Surgery Following Sling Release:  A
17 Review of 93 Cases.  Do you see that?
18    A.  Yes, I do.
19    Q.  And you note, in your conclusions, that sling
20 release remains an important treatment option in
21 patients with obstruction after anti-incontinence
22 surgery.  Did I read that correctly?
23    A.  I don't see where you are.  It sounds correct.
24    Q.  Sorry.  I'm in the first page of the
25 conclusion in your report.

Page 315

1     A.  Yeah.  I agree with that.
2     Q.  And you also state that only a small
3 percentage of patients require repeat anti-incontinence
4 surgery.  Do you see that?
5     A.  Yeah.  It was 14 percent required a repeat.
6 It's debatable if you call that small or not, but that's
7 what we state there.
8     Q.  That's what you state there, though, correct?
9     A.  That is correct.
10    Q.  And you also conclude, in this article, that
11 the synthetic sling remains a mainstay and an important
12 treatment option for women?
13    A.  That's -- that's what we stated there, yes.
14 It is a -- it is still -- I think I can say this with
15 some accuracy.  It is still the most common procedure
16 done for incontinence, but not in my practice it's not.
17    Q.  Okay.  But -- and that's -- we're talking
18 about a polypropylene-based sling, correct?
19    A.  That is correct.
20    Q.  And I assume you're also familiar with the
21 Nilsson study that looked at whether there were any
22 issues with a polypropylene-based sling after 11 years?
23    A.  Oh, the Nilsson, yeah.  There's -- he
24 published five, ten, 12, 15, and 17 years of TVT.
25    Q.  Right.  He actually went all the way out and

Page 316

1 looked to see whether there were any issues with erosion
2 or adverse events after 17 years, after a woman had a
3 sling in place for 17 years, right?
4     A.  For specifically for the TVT.
5     Q.  Transvaginal mesh?
6     A.  Correct.  TVT is the product, transvaginal
7 tension-free mesh for incontinence.
8     Q.  And there were no late-onset erosions or
9 adverse events reported in that study even at 17 years,
10 correct?
11    MR. CARTMELL:  Objection.  Misstates the evidence.
12 There was an erosion.
13 BY THE WITNESS:
14    A.  I would -- I would have to look at the
15 manuscripts.  I have reviewed them in the past; but as I
16 stated there, I think four Nilsson studies.
17    Q.  Well, let's look at it together.  22, I think,
18 is the one I'm referring to.  I'm sorry.  I'm marking it
19 as Exhibit 22.
20          (Elliott Deposition Exhibit No. 22
21              was marked for identification.)
22 BY MS. GEIST:
23    Q.  Just for the record, Exhibit 22 is the Nilsson
24 study published in 2008 entitled, Eleven Years
25 Prospective Follow-Up of the Tension-Free Vaginal Tape

Page 317

1 Procedure For Treatment of Stress Urinary Incontinence?
2     A.  Yes.
3     Q.  And under -- and the conclusions of this study
4 were that there were no late-onset adverse events found
5 and no case of tape erosion was seen.
6     A.  That is -- that is what they state here, yes,
7 except this was -- came out in other depositions from
8 the medical director at Ethicon that they don't even
9 believe this was the TVT product.  They can't vouch for
10 that.  That's immaterial to what you're saying, but
11 that's an issue with this paper.  But that's the
12 conclusion the authors came to.
13    Q.  Is there -- and that sling, obviously, is
14 implanted transvaginally, correct?
15    A.  Yes.  We're talking apples and oranges as far
16 as the angle that's put in, the volume of mesh, the
17 tension that's put on the mesh.  It's not going
18 transobturator.  It's going suprapubic or retropubic
19 would be more accurate to say.
20    Q.  So that's the reason why we can -- so that's
21 the reason why we don't see any degradation of that mesh
22 in your opinion?
23    MR. CARTMELL:  Object to the form.
24    THE WITNESS:  No.
25    MR. CARTMELL:  This study didn't talk about

Page 318

1  degradation.
2  BY MS. GEIST:
3      Q.  Right.  Well, this study actually says there
4  were no adverse event whatsoever, and you told me
5  earlier that degradation results in all sorts of adverse
6  events, including dyspareunia?
7      A.  Yeah.  We have to -- let's go look at this
8  study carefully.  I never said there were no adverse
9  events.  There is less mesh put in.  So we were not
10  comparing apples to apples here.  We're comparing a TVT
11  procedure that's done transvaginal with a plastic sheath
12  over it versus Avaulta.  So we can't -- there is no
13  correlation to Avaulta with this.
14          With this one, as far as complications, I
15  would have to look at the study.  They talk about cure
16  rate, which is one aspect as far as complications.
17  Again, I would have to look at all that they state.  If
18  there is an erosion or an extrusion, that's a
19  complication.
20      Q.  Agreed.  And I'm reading from the study at
21  page 1046 and it says, It is therefore reassuring that
22  we do not find a single case of tape erosion, tissue
23  reactions, or other adverse events during, at the most,
24  up to 13 years of follow-up.
25      A.  I don't see exactly where you are, but that's

Page 319

1  okay.  That's the findings of these authors relative to
2  a possible TVT with plastic sheaths over the arms in a
3  different route that's put in compared to Avaulta, but
4  that's what these findings are.
5      Q.  You said you wanted to see the position
6  statement on mesh midurethral -- midurethral slings or
7  stress urinary incontinence?
8      A.  Well, I said, if we're going to talk about it,
9  I want to see it.
10      Q.  Okay.  Let me show it to you briefly.  I'm
11  trying to move along.  I think I'm up to 23.
12          (Elliott Deposition Exhibit No. 23
13              was marked for identification.)
14  BY MS. GEIST:
15      Q.  This statement, Doctor, was put out as a joint
16  position statement by both AUGS and SUFU, which you've
17  mentioned a few times before.  That's the Society of
18  Urodynamics Female Pelvic Medicine and Urogenital
19  Reconstruction, correct?
20      A.  Correct, which I'm a member of and sit on the
21  education committee.
22      Q.  And you're a member of both of these
23  societies, correct?
24      A.  Correct.  I don't have any leadership role in
25  AUGS, though.

Page 320

1      Q.  Okay.  And the position paper put out by these
2  groups states, at the top, the polypropylene mesh
3  midurethral sling is the recognized worldwide standard
4  of care for the surgical treatment of stress urinary
5  incontinence.  The procedure is safe, effective, and has
6  improved the quality of life for millions of women.  Do
7  you agree with that?
8      A.  Well, let's take it sentence by sentence.  The
9  polypropylene mesh midurethral sling is the recognized
10  worldwide standard of care in the surgical treatment of
11  stress urinary incontinence.  I think that is somewhat
12  debatable.  It is, I think, no question probably the
13  most common implantation done now.  Many in the society
14  don't use meshes anymore.  We are a member of the
15  society.  So it doesn't mean that everybody is in
16  support of it, but I can argue that it is the most
17  common procedure done.
18          The procedure is safe, effective, and improved
19  the quality of life for millions of women.  I can't
20  necessarily argue with that.  However, what it doesn't
21  also say is the complications that have been seen.
22  Millions of women may have been benefitted, but how many
23  have been injured?
24          So, you know, the way they state it, that's --
25  yeah, I can -- it states what it states.  How could they

Page 321

1  show me data?  Do we have the studies on millions of
2  women?  No.  We have the studies, you know, a hundred
3  here and a hundred there.  So there is no data to
4  support it's helped millions of people.  Millions have
5  been sold.
6      Q.  So you think the statement put out by AUGS and
7  SUFU is a formal position statement and it's not based
8  on data?
9      A.  Well, show me the data.  Show me where a study
10  with millions of women.
11      Q.  Well, we just looked at the Nilsson study,
12  which looked at women who had slings implanted and
13  looked at women not 17 years later, correct?
14      A.  Mm-hmm.
15      MR. CARTMELL:  No.  We didn't look at the 17-year
16  study.
17      MS. GEIST:  Oh, we looked at the 11-year study?
18      MR. CARTMELL:  Right.
19      MS. GEIST:  Sorry.
20      MR. CARTMELL:  And the reason I objected is because
21  the 17-year shows the erosion.  I just didn't want it to
22  look like I was trying to jack with you.
23      MS. GEIST:  That's fine.
24  BY THE WITNESS:
25      A.  Yes.  That study, in a very high-volume center

Page 322

1  of an individual who was involved with the inventor of
2  the TVT and arguably one of the best surgeons in the
3  world for this, that is the results that they have
4  found. But that does not correlate to everybody else's
5  results.
6      Q. Well, how about the Mayo Clinic? Doesn't the
7  Mayo Clinic discuss sling procedures and actually state
8  that using surgical mesh is a safe and effective way to
9  treat stress urinary incontinence?
10     A. I would have to look at -- but, again, I
11  didn't write that article. I don't use -- no one in
12  urology uses mesh slings.
13     Q. Who is Dr. John Ochino, O-C-H-I-N-O?
14     A. He is a urogynecologist.
15     Q. Is he with Mayo?
16     A. Yes.
17     Q. And he's a colleague of yours?
18     A. Well, he's in urogynecology.
19     Q. Has -- have you seen his YouTube video where
20  he states that sling procedures to treat stress urinary
21  incontinence are safe and effective and have minimal
22  risk associated with mesh complications?
23     A. I have not seen his video, no.
24     Q. At least as of last year, though, Doctor,
25  referring back to your own article that we looked at

Page 323

1  before, the risk of repeat anti-incontinence surgery --
2      A. Yes.
3      Q. -- you stated, in that article, that synthetic
4  slings remain an important treatment option for women
5  experiencing stress urinary incontinence, correct?
6      A. Yeah. But that's not -- that's just stating
7  that it is used frequently. That's all that is stating.
8      Q. Well, it says it remains an important option.
9  Do you disagree with that, that it should be offered as
10  an option?
11     A. It is an option. I don't do it, but it is an
12  option out there.
13     Q. And certainly you wouldn't say that the
14  doctors who offered that option are not performing
15  according to the standard of care, would you?
16     A. No, I'd say --
17     MR. CARTMELL: Object to the form.
18  BY THE WITNESS:
19     A. I would say that the pendulum is swinging
20  anti-mesh. And so right now they're being done. What's
21  going to happen a few years from now, I don't know. The
22  same thing with pelvic organ prolapse.
23     Q. Let me show you, Doctor, one of your other
24  articles that I thought was of interest. I think I'm up
25  to 24.

Page 324

1          (Elliott Deposition Exhibit No. 24
2          was marked for identification.)
3  BY MS. GEIST:
4      Q. Do you recognize this article,
5  Doctor?
6      A. Yes.
7      Q. I'm trying to give a copy to counsel.
8      MR. CARTMELL: Thanks.
9  BY MS. GEIST:
10     Q. This is one of the articles you mentioned to
11  me earlier, Doctor, when we talked about some of your
12  review of the different types of meshes available in the
13  sling surgery?
14     A. Yes. That's correct.
15     Q. And this is an animal study, correct?
16     A. Yeah. It's a rabbit study we did.
17     Q. And this was published back in 2003?
18     A. Excuse me, with work starting in 2001 or so,
19  yes.
20     Q. And you looked at slings of different types of
21  materials, including polypropylene slings, correct?
22     A. That is correct.
23     Q. And each rabbit had different types of slings
24  implanted? Some of these were autologous and some were
25  synthetic?

Page 325

1      A. Yes. We put in human, cadaveric, porcine,
2  polypropylene, porcine dermis, SIS. We put, as I
3  recall, five.
4      Q. And you note in this study that the results of
5  this study support the use of polypropylene mesh for
6  sling surgery relative to other nonautologous materials,
7  correct?
8      A. Yes. And this is a very good one. I'm glad
9  you brought that up because this is a study we did very
10  early on looking at the product and issues. And we
11  raised issues in the discussion that polypropylene mesh
12  gained stiffness with time. At that point in time, we
13  thought that was a good thing, and that's what we wrote
14  in our conclusion. But this is in 2003.
15     Q. Right.
16     A. Sine there's been a vast amount of data
17  gathered we're actually realizing that's not a good
18  thing.
19     Q. And, in your own words, as you've just
20  indicated, in this study, you say, More important than
21  tensile strength is material stiffness. The stretching
22  of the suburethral sling with time is a much more likely
23  scenario than breakage and it may be partly responsible
24  for the reemergence of symptoms following a successful
25  anti-incontinence procedure. So, in other words, you

In Re: CR Bard 200                     Daniel Elliott, M.D.                     11/15/2014

Page 326

1  conclude from this study that the stiffness seen in
2  polypropylene mesh is a positive or a negative for
3     A.  Yeah.  And, at that point in time, I agree.
4  And I stand by the arguments that we proposed here.  But
5  what we originally thought, and individuals like Chris
6  Winters, when he came to Mayo, raised this as one of the
7  early papers describing the mesh problems.  We had our
8  facts correct.  Our interpretation of those facts I
9  would have to say, in the 12-week model, was not
10  correct.
11     Q.  Well, what about your investigation in the
12  same study, Doctor, regarding the issue of shrinkage.
13  You looked specifically at the issue of shrinkage with
14  polypropylene mesh in this study, correct?
15     A.  That is correct.  In the 12-week
16  transabdominal model in a rabbit, we did.
17     Q.  And you concluded, from this study, that
18  polypropylene mesh did not demonstrate a significant
19  decrease in surface area compared to the other sling
20  types; in other words, no shrinkage per your own study,
21  correct?
22     A.  Yeah.  At 12 weeks, in the rat model -- excuse
23  me, in the rabbit model without the contamination in the
24  vagina.  I think others have come along and shown that
25  our data does not correlate to other things.

Page 327

1     Q.  Well, flipping quickly to that issue,
2  shrinkage or contraction, that's one of the opinions in
3  your report?
4     A.  Yes.
5     Q.  I assume you would agree with me that there is
6  a normal amount of contraction and shrinkage after a
7  medical device is implanted due to the normal and
8  expected healing process?
9     MR. CARTMELL:  Object to the form.
10  BY THE WITNESS:
11     A.  Well, you say a medical device.  Certain
12  medical devices have no contraction.
13     Q.  Well, it's not atypical or abnormal or
14  unexpected to see contraction and scarring after a
15  medical device is implanted; is that true?
16     MR. CARTMELL:  Object to the form.
17  BY MS. GEIST:
18     Q.  The wound healing process needs scarring and
19  inflammation.  It's part of the normal process?
20     MR. CARTMELL:  Object to the form.
21  BY THE WITNESS:
22     A.  I disagree.  Artificial hips don't have any
23  contraction.
24     Q.  Are there many medical devices that do have
25  scarring and inflammation after they're implanted and

Page 328

1  it's needed for the body to heal?
2     A.  I don't know of any that scarring and
3  contraction is actually a good thing.  Heart valves
4  can't do that.  I mean -- so, no, I don't know of any.
5     Q.  So I just want to make sure I understand.
6  It's part of the body's normal healing process.  You
7  disagree that scarring and inflammation is part of the
8  normal process that the body goes through to heal itself
9  after surgery when a device is implanted?
10     MR. CARTMELL:  Object to the form.
11  BY THE WITNESS:
12     A.  Well, the body's natural response is to heal
13  itself and to decrease inflammation.  It is normal with
14  any surgery to have that to a certain extent that then
15  heals up and finishes and that process stops.  It is
16  abnormal for that process to continue on.
17     Q.  You looked at inflammation specifically with
18  polypropylene mesh in another one of your studies,
19  correct?
20     A.  That is correct.
21     Q.  And you looked at inflammation and scar
22  formation, true?
23     A.  Correct.
24     Q.  And didn't you conclude in that study that the
25  inflammation and scar formation seen, after the

Page 329

1  polypropylene mesh was implanted, was actually a good
2  thing and helped the in-tissue growth process?
3     A.  Our conclusions that we reached in 2006, on
4  that specific study, we attributed that.  We thought
5  that was a good thing.  I have subsequently been proven
6  wrong.
7     Q.  Well, in your own -- let's just mark it
8  quickly so we know what we're talking about.  I think
9  I'm up to 24.
10     MR. CARTMELL:  5.
11     MS. GEIST:  5, but who's counting.
12        (Elliott Deposition Exhibit 25 was
13        marked for identification.)
14     MR. CARTMELL:  Man, you've used a lot of exhibits.
15     MS. GEIST:  Well, I think it's helpful to look at
16  what you're talking about.
17  BY MS. GEIST:
18     Q.  Doctor, here is Exhibit 25.  This is another
19  one of your studies that we mentioned earlier entitled,
20  Time-Dependent Variations in Inflammation and Scar
21  Formation of Six Different Pubovaginal Sling Materials
22  in the Rabbit Model.  So, again, this is another animal
23  study looking at different types of sling materials,
24  including polypropylene sling after implantation,
25  correct?

In Re: CR Bard 200                Daniel Elliott, M.D.                11/15/2014

Page 330

1      A.  Yeah, in a 12-week model.  I think we had six
2  weeks and 12 weeks.  So, roughly, three months.
3      Q.  And you conclude from the study that
4  polypropylene mesh compared to the other types of meshes
5  that you looked at in this study had low inflammation,
6  correct?
7      A.  Yeah.  The high fibrosis and low inflammation
8  in the rabbit transabdominal model at 12 weeks.
9      Q.  And you conclude that not only did
10  polypropylene mesh have lower inflammation than the
11  other materials you've looked at, but that the fibrosis
12  and scarring noted with polypropylene mesh may also
13  contribute to a more lasting repair?
14      A.  That was our conclusion.  And then I go on and
15  warn, Urologists performing this procedure should be
16  aware of the time-dependent tissue reactions when
17  choosing a sling material.  As I mentioned, we had -- we
18  reached certain conclusions, which, now, I think are
19  actually incorrect.  And it's been pointed out by other
20  authors that we had our facts right, our interpretation
21  wrong.
22      Q.  Well, you said -- you said a couple of times
23  that these studies were done in rabbits, correct?
24      A.  Correct.
25      Q.  Would you agree with me that it would be more

Page 331

1  important to see what's actually going on in the human
2  body?  The best way to do this is to look into the body
3  in vivo, see what's going on?
4      A.  Well, I mean that would be the ideal is
5  actually what happens when it's implanted in women.
6      Q.  Did -- did you consider, in reaching your
7  opinions relating to contraction and shrinkage, the
8  Dietz study?
9      A.  The Dietz study?
10      Q.  Yeah.
11      A.  I don't recall.  I'd have to look at that.  I
12  do not recall that name.  D-I-E?
13      Q.  D-I-E-T-Z?
14      A.  Mechanical Properties of Urogynecologic
15  Implants.
16      Q.  No.  Dietz is the European urogynecologist,
17  and he published a study entitled, Mesh Contraction:
18  Myth Or Reality.  Did you review that?
19      A.  Okay.  I do not have that in -- on my list of
20  ones I reviewed.  I'd be happy to take a look at it,
21  though.
22          (Elliott Deposition Exhibit No. 26
23           was marked for identification.)
24  BY MS. GEIST:
25      Q.  I'll be happy to hand it to you.  Here you go.

Page 332

1  If you look with me at it quickly, Doctor, Dietz
2  actually looked at the issue and phenomenon of mesh
3  contraction or shrinkage by looking at the mesh via
4  ultrasound and concluded that there was no contraction
5  after 18 months?
6      A.  That is what this one study states.  But if
7  you look at my actual report, I've got a list of 12 or
8  15 articles that state opposite to that.
9      Q.  Well, you don't consider this study in
10  forming your opinions relating to mesh contraction and
11  shrinkage; is that fair to say?
12      A.  That is --
13      MR. CARTMELL:  Objection to form.  Go ahead.
14  BY THE WITNESS:
15      A.  That is -- that is true.
16      Q.  Did you look at Bard's soft mesh study in
17  forming your opinions?
18      A.  I don't know what study that is.
19      Q.  Did you look at the Pierce study?  It showed a
20  shrinkage of less than 10 percent?
21      MR. CARTMELL:  With Avaulta?
22      MS. GEIST:  You're asking me a question?
23      MR. CARTMELL:  Yeah.
24  BY THE WITNESS:
25      A.  Piece, Biomechanical Properties of Synthetic

Page 333

1  and Biologic Graft Materials.  Is that the article
2  you're referring to?
3      Q.  No.  I'm referring to Piece, 120-day
4  Comparative Analysis --
5      A.  Okay.
6      Q.  -- Of Adhesion Grade and Quantity Mesh
7  Contraction and Tissue Response?
8      A.  No.  I have not seen that article.
9      MS. GEIST:  How much time on the video?
10      VIDEO TECHNICIAN:  6 hours, 43.
11      THE WITNESS:  Half and half.  The half and half,
12  it's right in the cup.  Sorry.  Sorry.
13  BY MS. GEIST:
14      Q.  Doctor, one of the -- one of the opinions you
15  set forth in your report is that the blind passage of
16  the trocar used to implant the Avaulta products is
17  unsafe, correct?
18      A.  That is correct.
19      Q.  Are there any other procedures that you, as a
20  urologist or a urogynecologist or a gynecologist,
21  perform in women that are considered to be blind, blind
22  passage; in other words, you have to use palpation?
23      A.  Not to the extent and the distance of these.
24      Q.  But you still use procedures or engage in
25  procedures that would be considered to be blind passage

In Re: CR Bard 200                     Daniel Elliott, M.D.                     11/15/2014

Page 334

1   such as a D&C, for example?
2      **A.  I don't do D&Cs.**
3      Q.  All right.  So gynecologists do D&Cs, correct?
4      **A.  Some of them do, I suppose.**
5      Q.  Do you understand that they need to use
6   palpation in order to apply the correct amount of
7   tension or pressure on the needle?
8      **A.  I've never performed one, so I can't speak to**
9   **that.**
10     Q.  Can you give me any other examples or
11  procedures that you may have performed that are
12  considered to be a blind procedure or, in other words,
13  where you need to use palpation?
14     **A.  Not anymore.**
15     Q.  What about the robotic procedures that you
16  perform?  Are those not considered to be blind
17  procedures in some respect?
18     **A.  It's all under direct vision.**
19     Q.  What about the laparoscopic procedures that
20  we've talked about?
21     **A.  Again, that's all under direct vision.**
22     Q.  What about the sacrospinous?
23     **A.  Sacrospinous fixation, I don't -- I don't**
24  **perform that procedure.**
25     Q.  Did you ever perform it?

Page 335

1      **A.  I performed them as a fellow under the staff**
2   **guidance.  However, the staff never let me pass the**
3   **needles through the sacrospinous.  Even with that it's a**
4   **small degree of passage.  But he didn't feel it was safe**
5   **for someone learning to do, so I never did pass it.**
6      Q.  Well, but some doctors do it.  It goes through
7   the deepest recesses of the vagina; isn't that true?
8      **A.  Yeah.  But that's with a Capio needle.**
9      Q.  Right.
10     **A.  And you're passing it, perhaps, 2 centimeters,**
11  **maybe, with your finger back there.  That's different**
12  **than passing a trocar through the obturator foramen or**
13  **larger passages of several centimeters.  It's over 5, 10**
14  **centimeters.  That's different.**
15     Q.  Okay.  So you'll agree with me it's considered
16  a blind procedure because it's done by palpation, but
17  it's less than the amount of -- strike that.
18     You'll agree with me it's a blind procedure
19  because there is some portion of it where you would need
20  to use palpation only?
21     **A.  No. I can't necessarily.  I mean, there is a**
22  **minor passage of a minor distance.  So very strictly**
23  **defining it as that, yes.  But, again, we're not talking**
24  **of 10 centimeters of blind passage.  And with a Capio**
25  **needle, your finger is back there and you just pass the**

Page 336

1   needle right onto it, so...
2      Q.  Well, you've recently done some work in
3   developing innovations in autologous sling procedures,
4   correct?
5      **A.  Autologous transobturator sling.**
6      Q.  And I'm referring to your case report that was
7   published just this year?
8      **A.  Correct.**
9      Q.  And to implant that autologous sling, you used
10  a trocar, correct?
11     **A.  And it would be passed 5 millimeters to,**
12  **perhaps, 1 centimeter onto your finger behind the**
13  **obturator bone.**
14     Q.  So that's a good example of a blind passage,
15  agree?  It's a blind passage procedure using the trocar,
16  true?
17     **A.  To a minor degree, yes, that is going to be**
18  **blind because it's going to be passing it 5 millimeters**
19  **to 1 centimeter.**
20     Q.  And you consider that to be an innovation and
21  another option that you could offer for women suffering
22  from stress urinary incontinence, true?
23     **A.  Yeah.  That is -- that is an evolving option.**
24  **We are the world's first to do that.  We have to have**
25  **the data pan out to see if it's going to be a viable**

Page 337

1   option.  It appears to be, though.
2      Q.  Sure.  It's a novel technique, as you state in
3   your own case report, but it is used with a trocar and a
4   blind passage?
5      **A.  With the caveat that it is a 5 millimeter to,**
6   **perhaps, 1 centimeter of passage right down onto your**
7   **finger.**
8      Q.  Okay.
9      **A.  So it is minimal.**
10     Q.  I'm running out of time here, Doctor, so I'm
11  going to try and wrap it up as fast as I can.
12     Let me ask you some questions about pore size.
13  Pore size is one of the opinions in your report that the
14  pore size of the Avaulta products was inadequate to
15  promote proper tissue ingrowth?
16     **A.  Correct.**
17     Q.  What do you believe or define as optimal pore
18  size in a mesh product?
19     **A.  According to my review of the literature, my**
20  **experience of taking care of complications in patients,**
21  **I believe that the pore size ranging between 4**
22  **millimeters or so is going to be a lower chance of**
23  **complications.**
24     Q.  Is there a consensus in the literature as to
25  what the optimal pore size should be?

Page 338

1    **A. I believe there is based upon the literature**
2  **out there, that because the pore size as it's taken out**
3  **of the box does not correlate to the pore size once it**
4  **in the women when there's contraction.**
5    Q.  You've never designed a mesh product; is that
6  correct, Doctor?
7    **A. I've been involved in consulting with**
8  **Coloplast -- excuse me, AMS on theirs, but I'll leave it**
9  **at that.**
10    Q.  Have you ever designed a mesh product?
11    MR. CARTMELL:  Object to the form.  Asked and
12  answered.
13  BY THE WITNESS:
14    **A. Yeah. I've been a consultant on their mesh**
15  **and their design.**
16    Q.  On the design specifically?
17    **A. The shape, the length of it.**
18    Q.  How about the pore size?
19    **A. Pore size, I was not involved specifically in**
20  **the pore size of this product, no.**
21    Q.  Have you ever done a study looking at pore
22  size and its impact on tissue integration?
23    **A. I have relied on the work of others as**
24  **outlined in my expert report.**
25    Q.  Can you point to me, Doctor, any study that

Page 339

1  has demonstrated that a pore size of greater than 2.0
2  millimeters is superior to a 1.0- or 1.3-millimeter pore
3  size in a mesh?
4    **A. I think when you look at Cobb's study,**
5  **Klingele's study, looking at various different pore**
6  **sizes, that -- and probably also Klingele and also**
7  **looking at the internal documents with Bard where they**
8  **acknowledge that the pore size has to be larger.**
9    Q.  Are you referring to the Bobbie Orr memo
10  that's cited in your report?
11    **A. Yeah. What's cited there, yes, Dr. Ross.**
12    Q.  Did you read that memo in its entirety?
13    **A. Yes.**
14    Q.  The memo says that the -- what's proposed by
15  Mr. Orr is a hypothesis, does it not?
16    **A. I would have to see it, because I don't have**
17  **that document with me. I've read it, but I don't have**
18  **the document with me.**
19    Q.  Let me quickly go to the section of your
20  report, Doctor, if you could, with me.  Go to the end.
21  On page 35 of your report, page 35 to 39, Doctor --
22    **A. Yes.**
23    Q.  -- this section of your report relates to your
24  opinions that Bard failed to disclose pertinent risk
25  information; do you see that?

Page 340

1    A.  Yes, I do.
2    Q.  And I think I counted in this these pages that
3  you said Bard failed to do any number of things, but I
4  think you said Bard failed to do something about 36
5  times from pages 35 to 38.  Does that seem like a fair
6  estimate?
7    **A. Well, without counting it up, just that seems**
8  **a little bit high, but I wouldn't be surprised.**
9    Q.  There is no citations anywhere to any
10  authority for your opinions about what Bard did or
11  didn't do or warned or should have warned of in this
12  section of the report, true?
13    **A. I guess I don't know what you mean citations.**
14  **I mean, what I have down here is, in my understanding of**
15  **labeling and warnings and regulations, that Bard is**
16  **responsible for warning about complications. And so,**
17  **you know, we could go through each one of those**
18  **complications and find a manuscript that discusses it.**
19  **And so I have depositions here talking about them. So I**
20  **guess I disagree that there's -- there are references**
21  **listed.**
22    Q.  You don't consider yourself to be an expert in
23  terms of what a label should and should not say, do you, 24
24  Doctor?
25    MR. CARTMELL:  Object to the form.

Page 341

1  BY THE WITNESS:
2    **A. No. I disagree with that. Based upon --**
3  **based upon my experience in dealing with patients for 20**
4  **years, dealing with IFUs, handing out patient brochures,**
5  **I can count up 20 or so different products that I've**
6  **used the IFU, being a researcher, talking about**
7  **complications in my manuscripts which you have listed,**
8  **being on the SUFU Board of Education where we talk**
9  **about warnings, asked to be speaking**
10  **nationally/internationally, no, everything I do is about**
11  **warnings. What I talk to my patients about, the**
12  **complications I have to see is all about warnings.**
13    Q.  Have you ever participated in the drafting of
14  an instruction for use or directions for use for any
15  medical device product?
16    MR. CARTMELL:  Okay.  Hold on.  I think we're at
17  seven hours according to the -- we're not yet?  Okay.
18    VIDEO TECHNICIAN:  About five and a half minutes
19  left.
20    MR. CARTMELL:  Five and a half minutes left.
21  You're in good shape.
22    MS. GEIST:  Oh, yeah.  I'm in great shape.
23  BY MS. GEIST:
24    Q.  Can you answer that question, Doctor?
25    **A. And the question -- let me reiterate it to**

Page 342

1  make sure I've got it correct.  Have I ever been
2  involved in the drafting of an IFU?  I have been
3  involved in the discussions about complications that can
4  go on IFUs.  I have not sat down and written an IFU.
5      Q.  You've never drafted a label or an IFU for a
6  medical device company, true?
7      A.  I have not.  In your specific limitations, I
8  have never sat down with a company and written up
9  specifically an IFU.
10     Q.  Are you an expert in the regulations relating
11 to what IFUs should contain or not contain?
12     A.  Yes.
13     Q.  You are?
14     A.  Yes.
15     Q.  What are those regulations?
16     A.  Those regulations are that every -- every
17 known complication, regardless of severity or frequency,
18 need to be reported on an IFU.
19     Q.  So you looked at the Bard IFUs, right?
20     A.  Yes.
21     Q.  And there is, in the adverse event section, a
22 warning relating to erosion, correct?
23     A.  Yeah.  I would like to see that IFU, because I
24 have to see all of the IFUs, including the original one.
25 So I would have to look at that.  I don't have those

Page 343

1  IFUs with me.
2      Q.  You don't remember sitting here now talking
3  about these sorts of issues that we've been talking
4  about all day, whether Bard warned of erosion in the
5  IFUs for the Avaulta products?
6      A.  Well, no.  That's why we have to go back to my
7  expert report and what I've talked about.  The failure
8  to warn to the extent and the severity and the lifelong
9  nature of that, I never saw anything in there to support
10 that.
11     Q.  What regulation says you need to do that?
12     A.  Well, based upon the FDA regulations as far as
13 everything needs to be warned about and the severity and
14 the frequency of it.
15     Q.  What FDA regulation are you referring to?
16     A.  Based upon the FDA Blue Book.
17     Q.  Can you give me the particular regulation or
18 the cite?
19     A.  Yeah.  FDA Blue Book started in March of 1991,
20 but updated -- this one is a 3/11/13.  It's the guidance
21 for labeling, contraindications of warnings, an adverse
22 reaction is an undesirable effect, all of these have to
23 be reported.  Adverse reactions should be listed in
24 descending order according to their clinical
25 significance determined upon their severity and

Page 344

1  frequency.  Provide frequency data from adequately
2  reported clinical studies.
3      Q.  That wouldn't apply to a product that was
4  cleared by FDA through the 510(k) process, would it?
5      MR. CARTMELL:  Object to the form and misstates the
6  evidence.
7  BY THE WITNESS:
8      A.  Well, absolutely.  I mean, the 510(k) is just
9  merely a clearance.  It's not an approval of the safety
10 of that product.  And so I cannot speak to what
11 information, all the FDA was given and all of the
12 discussions that was going on.  But when I read over the
13 IFU, that is what doctors are going to be reviewing, I
14 don't see in there, based upon the FDA Blue Book,
15 adverse reaction, descending order, and provide
16 frequency data.
17     Q.  No.  But you just referred to clinical
18 studies, and those are not required through the 510(k)
19 clearance process.  You understand that, correct?
20     A.  However, with the 522 where the FDA came back
21 to all of the manufacturers of kits saying, You need to
22 provide us with adequate data, none of those companies,
23 including Bard, could come up with that data and decided
24 to pull their product off the market.
25     Q.  I think what actually the FDA said was, in

Page 345

1  order to continue marketing and selling the products,
2  you need to engage in clinical trials at this time?
3      A.  Absolutely, and they did not have it.
4      Q.  They did not proceed with the clinical trials,
5  correct?
6      A.  Because they did not have that data.
7      Q.  No.  They didn't do it?
8      A.  But I'm correct in that they did not have it.
9      Q.  There were 21 articles relating to the Avaulta
10 products from the time of launch through 2013.  Do you
11 dispute that?
12     A.  I would have to look at it.  According to my
13 recollection, I have 17 down.  So if you have 21, I
14 would not dispute that.
15     Q.  So that's clinical data, correct?  That's data
16 from actual product use?
17     A.  Absolutely that is data.  But for the reasons
18 of the FDA, when they reviewed them, none of that data
19 was sufficient for the FDA to be appeased.
20     Q.  In this litigation, you're not holding
21 yourself out as an expert in FDA regulations or whether
22 Bard complied with each and every regulation in terms of
23 the IFUs, are you?
24     A.  No.  I would disagree.  Because, as I
25 mentioned, you know, multiple times to you, all of those

Page 346

1  various different criteria as far as reviewing the
2  manuscripts, reviewing patients, taking care of
3  patients, education committee, talking about warnings
4  that I have a very good working knowledge of what is
5  required of a product to meet the standards.
6      Q.  So let me just make sure I understand.  You
7  don't have any formal education, training, or experience
8  designing a pelvic mesh product; is that correct?
9      A.  Well, no.  That's also incorrect.
10     Q.  When have you designed a pelvic mesh product?
11     MR. CARTMELL:  We're at seven hours.
12     MS. GEIST:  Okay.  Well, counsel is telling me I
13  need to stop, so...
14     MR. CARTMELL:  I think you asked that last
15  question.  If you want him to answer, I think it's
16  already been asked and he told you he consulted on it.
17  But I'll let him answer that last question.
18  BY THE WITNESS:
19     A.  Yeah.  I've been involved as far as with the
20  Interpro as far as the measurements, the design of the
21  product, and that's a pelvic organ prolapse mesh.
22     MS. GEIST:  All right.  If you're telling me my
23  time is up, my time is up.
24          CROSS-EXAMINATION
25

Page 347

1  BY MR. CARTMELL:
2      Q.  And, Doctor, I'm going to ask you a few
3  follow-up questions.  But let me start by asking you,
4  have all of your opinions that you've offered today been
5  within a reasonable degree of medical certainty?
6      A.  Yes.
7      Q.  Okay.  And you've talked ad nauseam about all
8  of the materials that you've reviewed, including
9  literature, Bard documents, you've talked about your
10  experience and training.  Do you feel like you have all
11  of the information you need as of this time to offer the
12  opinions that you have offered throughout today's
13  deposition?
14     A.  Yes.
15     Q.  Okay.  Now, you were asked, at some length,
16  about 2011 when you sent a letter, I believe, to the FDA
17  supporting a petition by Public Citizen for the Avaulta
18  products that we have here today, among
19  other pelvic organ prolapse, being banned or removed
20  from the market.  Is that true?
21     A.  That is correct.
22     Q.  Okay.  And, again, that was in 2011.  So the
23  Avaulta products that we're talking about today had been
24  on the market for approximately three years, maybe a
25  little longer than that; is that true?

Page 348

1      A.  Correct.
2      Q.  Now, at that time, I think you were asked
3  questions and asked if you were an extremist in your
4  position about pelvic organ prolapse that are
5  transvaginal mesh products like the Avaulta products; do
6  you remember that?
7      A.  Yes.
8      MS. GEIST:  Objection to form.
9  BY THE WITNESS:
10     A.  Yes, I do.
11     Q.  And, in fact, in your submission to the FDA
12  that you signed off in 2011, I believe it was August; is
13  that correct?
14     A.  August 19th, 2011, something like that.
15     Q.  In your Public Citizen submission that you
16  signed off on your letter, you admittedly
17  acknowledged that what you were asking the FDA to do, as
18  far as banning the products, was admittedly an extreme
19  position; is that right?
20     A.  Yeah.  It was extreme.  The extreme word
21  everyone is getting hooked up on.  I took it as an
22  aggressive measure to protect women and their bodies.
23  And everyone is getting hooked up on extremism.  But as
24  it pans out, I was absolutely right.  Jump forward three
25  years.

Page 349

1      Q.  Let me ask you about that.  So in 2011,
2  August, you asked the FDA -- and feel free to review
3  Exhibit 14, which was talked about earlier.  You asked
4  the FDA, as a urologist practicing at the Mayo Clinic,
5  to ban the product and to require that medical device
6  manufacturers like Bard, who was selling the Avaulta
7  products, you asked the FDA to make them do actually
8  controlled, randomized studies to demonstrate safety,
9  didn't you?
10     A.  That is correct.
11     Q.  And I think you testified that you did that
12  because you didn't believe, at that time, that there had
13  been adequate data to suggest or support that the
14  Avaulta products were safe for women, correct?
15     A.  There was not data to support the use of any,
16  including Avaulta, mesh kits in women.
17     Q.  Now, I will represent to you that only four
18  months later the FDA sent what's called a 522 letter or
19  order to Bard as a manufacturer of the Avaulta products;
20  did you know that?
21     A.  I know a 522 was sent out.  I don't know the
22  date on that.
23     Q.  Well, I'll represent to you that it was in
24  January of 2012, just four months after you asked the
25  FDA to ban these products and require the manufacturers

In Re: CR Bard 200      Daniel Elliott, M.D.      11/15/2014

Page 350

1 to do well-controlled studies to demonstrate safety.
2 Will you assume that for purposes of my questions?
3      MS. GEIST:  I'll just object to the form.
4 BY THE WITNESS:
5      **A.   Yeah.  I have no reason to doubt that's**
6 **accurate.**
7      Q.   And just four months later, when the FDA sent
8 a letter to Bard, did you know that the FDA told Bard,
9 like you had said and recommended, that they needed to
10 do well-controlled, randomized studies in order to
11 continue marketing the Avaulta products?
12      A.   I'm --
13      MS. GEIST:  Objection to form.
14 BY THE WITNESS:
15      A.   I'm aware of that, yes.
16      Q.   And that was exactly what you had asked for,
17 as a part of your submission, just four months before
18 that; isn't that right?
19      **A.   That is correct.  I feel that my statement**
20 **there was taking an educated moral stand on the product**
21 **trying to protect women.  So I'm very proud of that**
22 **document because I think it possibly may have led to**
23 **some good.**
24      Q.   And what is your understanding based on your
25 review of Bard's documents that they produced in this

Page 351

1 litigation?  In other words, when the FDA asked Bard to
2 do controlled studies to try to demonstrate that the
3 Avaulta products were safe, what was Bard's response?
4      MS. GEIST:  Objection to form.  Misstates facts.
5 BY THE WITNESS:
6      **A.   My understanding of the situation is just as**
7 **you mentioned.  The FDA asked for certain documentation,**
8 **certain studies.  Bard came forward with incomplete data**
9 **and then elected not to pursue the studies that would**
10 **allow the product to be continued to be sold.**
11      Q.   And then Bard actually took the products off
12 the market, didn't they?
13      **A.   That is correct.**
14      Q.   In other words, since, approximately, 2012,
15 shortly after you asked the FDA to make them no longer
16 sell these products and look into safety studies, Bard
17 decided, themselves, not to do a safety study and
18 took the product off the market.  Is that your
19 understanding?
20      MS. GEIST:  Objection to form.
21 BY THE WITNESS:
22      **A.   That is absolutely correct.  However, from my**
23 **angle on it, it is that there were four or five months**
24 **there that this was continued to be implanted in women**
25 **and continued to have damage for women.  So to me it's a**

Page 352

1 success, but it's also a failure.
2      Q.   And not only did Bard take these products,
3 these pelvic organ -- strike that.
4      Not only did Bard take these pelvic organ
5 prolapse mesh products off the market, but other
6 manufacturers of those products also took their products
7 off the market; isn't that fair?
8      MS. GEIST:  Objection to form.
9 BY THE WITNESS:
10      **A.   My understanding is that all manufacturers of**
11 **mesh kits have been pulled off the market because they**
12 **could not meet the criteria of the 522 as requested by**
13 **the FDA.**
14      Q.   And so now going on several years, these
15 products are not being marketed and sold by Bard,
16 correct?
17      **A.   That is my understanding, but I'm continuing**
18 **to see the complications and will for years.**
19      Q.   Now, you were asked several questions about
20 the AUGS, or the American Urogynecologic Society
21 position statement related to pelvic floor disorders; do
22 you remember that?
23      **A.   Yes.**
24      Q.   Okay.  And that's a 2011 document, correct?
25      **A.   That was right around the time of the first**

Page 353

1 FDA warning in, what, August of '11.
2      Q.   And that was before the time that the FDA had
3 told the manufacturers that they needed to do safety
4 studies in order to keep marketing their products,
5 correct?
6      **A.   Correct.**
7      Q.   So this 2011 statement by AUGS, since this
8 statement, there virtually -- there are no pelvic organ
9 prolapse kits still being sold in the United States,
10 correct?
11      **A.   That is my understanding.  To the best of my**
12 **knowledge, there are none available.**
13      Q.   So this AUGS position statement that you were
14 asked questions about is referring to products, POP kits
15 like the Avaulta products, that aren't even being sold
16 anymore, right?
17      **A.   Correct.**
18      Q.   And this position statement that you were
19 asked about, this was written by a select small group of
20 authors from AUGS; is that right?
21      MS. GEIST:  Objection to form.
22 BY THE WITNESS:
23
24
25

Page 354

1    A. I have no idea who wrote it. Usually this is
2 coming from the board, but I don't know who wrote that.
3 I know for SUFU, members of the board wrote it.
4    Q. Okay. But you can't tell from this position
5 statement if any of the authors of this document
6 even used the Avaulta products on their patients, can
7 you?
8      MS. GEIST: Objection to form.
9 BY THE WITNESS:
10    A. No, I can't. I can't state that, no.
11    Q. This position statement certainly
12 doesn't endorse the Avaulta products specifically, does
13 it?
14     MS. GEIST: Objection to form.
15 BY THE WITNESS:
16    A. Avaulta is never mentioned in that one.
17    Q. And then you were asked also several questions
18 about midurethral slings that are transvaginally placed.
19 Do you recall that?
20    A. Correct.
21    Q. Now, your opinions in this case, in your
22 report and during your testimony today, relate to
23 the Avaulta pelvic organ prolapse products,
24 correct?
25    A. Correct.

Page 355

1    Q. Okay. This case is not about a midurethral
2 sling, correct?
3    A. No.
4    MS. GEIST: Objection to form.
5    THE WITNESS: It's about Avaulta.
6 BY MR. CARTMELL:
7    Q. Okay. And is a pelvic organ prolapse mesh kit
8 very, very different than a midurethral sling?
9    A. There are many, many factors in there, which
10 we could kind of go down and dissect it out, that it is
11 a different device for a different problem, different
12 locations the mesh is going, different volume of meshes,
13 arms, et cetera.
14    Q. And you were asked specifically about AUGS
15 again, the position statement, related to the slings.
16 But this position statement doesn't specifically endorse
17 any of Bard's products, does it?
18    A. No.
19    MS. GEIST: Objection to form.
20 BY THE WITNESS:
21    A. No products are mentioned. And now SUFU is on
22 that one, which I'm a member of the education
23 committee. But many of us -- and there are strong
24 anti-mesh people. So just because the foundation came
25 out with that document, doesn't mean all of its members

Page 356

1 support it.
2    Q. And you were asked a question about this
3 statement in here that says, at this time, AUGS was
4 saying the procedure is safe, effective, and has
5 improved the quality of life for millions of women
6 talking about slings, not pelvic organ prolapse,
7 correct?
8    A. That document is very clearly, as it mentions,
9 mesh midurethral slings for stress urinary incontinence,
10 has nothing to do with prolapse.
11    Q. In fact, you were asked if you agreed with
12 this statement. But in your personal practice, you have
13 now concluded that the risks even of these transvaginal
14 mesh slings outweigh the benefits in your patients,
15 correct?
16     MS. GEIST: Objection to form.
17 BY THE WITNESS:
18    A. Correct. And that is based upon my review of
19 the literature, my interactions with patients who are
20 coming in refusing to have slings put in because of fear
21 of complications, and dealing with the complications of
22 these.
23    Q. And have you found in your practice, based on
24 your interactions with doctors all around the world in
25 your professional meetings, in your publications, and in

Page 357

1 your practice, that more and more doctors are like you
2 and now finding that they should not implant even
3 transvaginal mesh slings? Are you finding that that
4 tide is turning?
5    MS. GEIST: Objection to form.
6 BY THE WITNESS:
7    A. There's no question the pendulum is swinging
8 back towards native tissue types of repairs because at
9 least then we don't deal with the long-term
10 complications.
11    MR. CARTMELL: That's all I have. Thank
12 you.
13    MS. GEIST: You're not letting me go past seven
14 hours.
15    MR. CARTMELL: Well, I think the Federal Rules are
16 pretty clear, and I did tell you beforehand that, if you
17 were going to do an examination, again, that you should
18 save some time.
19    MS. GEIST: I'm just making sure I understand your
20 position.
21    MR. CARTMELL: Okay. And if we need to take it up
22 later, we can.
23    MS. GEIST: No. That's fine. I just wanted to
24 understand your position. All right.
25    VIDEO TECHNICIAN: This concludes today's

In Re: CR Bard 200                     Daniel Elliott, M.D.                          11/15/2014

Page 358

1  deposition of Dr. Daniel Elliot.  We're off the record.
2  The time 5:58 p.m.
3                      (Elliott Deposition Exhibit Nos. 27 &
4                      28 were marked for identification.)
5                      (Whereupon, the deposition was
6                      continued to November 14, 2014 at
7                      8:53 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 359

1    UNITED STATES OF AMERICA     )
     NORTHERN DISTRICT OF ILLINOIS )
2    EASTERN DIVISION             )    SS.
     STATE OF ILLINOIS            )
3    COUNTY OF COOK               )
4
5         I, Jennifer L. Bernier, Certified Shorthand
6  Reporter, Registered Professional Reporter, and Notary
7  Public, do hereby certify that DANIEL S. ELLIOTT, was
8  first duly sworn by me to testify to the whole truth and
9  that the above deposition was reported stenographically
10 by me and reduced to typewriting under my personal
11 direction.
12        I further certify that the said deposition was
13 taken at the time and place specified and that the
14 taking of said deposition commenced on November 3, 2014,
15 at 9:23 a.m.
16        I further certify that I am not a relative or
17 employee or attorney or counsel of any of the parties,
18 nor a relative or employee of such attorney or counsel,
19 nor financially interested directly or indirectly in
20 this action.
21
22
23
24
25

Page 360

1         In witness whereof, I have hereunto set my
2  hand and affixed my seal of office at Chicago, Illinois,
3  this 5th day of November, A.D., 2014.
4
5
6
7
8
9         JENNIFER L. BERNIER, CSR, RPR, CLR
           CSR No.  084-004190
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 361

1  TO: Daniel Elliott, M.D.
2  Re: Reading and Signing Your Deposition Transcript
3  Date Errata due back at our offices:  12/20/2014
4
5  Greetings:
6  You have reserved the right to read and sign your
   deposition transcript. Please review the attached
7  PDF transcript, noting any changes or corrections
   on the attached PDF Errata.  You may fill out the
8  Errata electronically or print and fill out manually.
9
   The PDF files open with Adobe Reader. If you need help
10 opening these files, please see the instructions in the
   cover letter of this email.
11
   Once you have completed your Errata, please print it, sign
12 it, and have the document notarized in the place provided.
13
   When the signed Errata is returned to us, we will seal
14 and forward to the taking attorney to file with the
   original transcript.  We will also send copies of the
15 Errata to all ordering parties.
16
   If the signed Errata is not returned within the time
17 below, the original transcript may be filed with the
   court without your signature.
18
19
20 Please send completed Errata to:
21 Tiffany Alley Global Reporting & Video
22 730 Peachtree St. NE, Ste 470
23 Atlanta, GA 30308
24 (770) 343-9696
25

In Re: CR Bard 200         Daniel Elliott, M.D.         11/15/2014

Page 362

```
1   ERRATA
2   I, the undersigned, do hereby certify that I have read the
    transcript of my testimony, and that
3
4   ___ There are no changes noted.
5   ___ The following changes are noted:
6
    Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7   Procedure and/or OCGA 9-11-30(e), any changes in form or
    substance which you desire to make to your testimony shall
8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any
9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.
10
11  Page _____ Line _____ Change _____
12  _____
13  Reason for change _____
14  Page _____ Line _____ Change _____
15  _____
16  Reason for change _____
17  Page _____ Line _____ Change _____
18  _____
19  Reason for change _____
20  Page _____ Line _____ Change _____
21  _____
22  Reason for change _____
23  Page _____ Line _____ Change _____
24  _____
25  Reason for change _____
```

Page 363

```
1   Page _____ Line _____ Change _____
2   _____
3   Reason for change _____
4   Page _____ Line _____ Change _____
5   _____
6   Reason for change _____
7   Page _____ Line _____ Change _____
8   _____
9   Reason for change _____
10  Page _____ Line _____ Change _____
11  _____
12  Reason for change _____
13  Page _____ Line _____ Change _____
14  _____
15  Reason for change _____
16  Page _____ Line _____ Change _____
17  _____
18  Reason for change _____
19
20          _____
                DEPONENT'S SIGNATURE
21
    Sworn to and subscribed before me this ___ day of
22  _____, _____.
23
    _____
24  NOTARY PUBLIC
25  My Commission Expires:_____
```