EXHIBIT 5

Daniel S. Elliott, M.D.

```
 1      IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2             CHARLESTON DIVISION
                   -  -  -
 3
     IN RE: C. R. BARD, INC.,    : MDL NO. 2187
 4   PELVIC  REPAIR SYSTEM       :
     PRODUCTS LIABILITY          :
 5   LITIGATION                  :
 6
     THIS DOCUMENT RELATES TO    :
 7
     Becky Smith and Donald      :Case No. 2:15-cv-16402
 8   Mackie,                     :
     Plaintiffs,                 :
 9        v.                     :
     C. R. BARD, INC.            :
10        Defendant.             :
11
                   -  -  -
12             JULY 29, 2019
                   -  -  -
13
14           Videotape deposition of
     DANIEL S. ELLIOTT, MD, taken pursuant to
15   notice, was held at the law offices of
     Reed Smith LLP, 136 Main Street, Suite
16   250, Princeton Forrestal Village,
     Princeton, New Jersey 08540, beginning at
17   1:27 p.m., on the above date, before
     Amanda Dee Maslynsky-Miller, a Certified
18   Realtime Reporter in and for the State of
     New Jersey.
19
20
                   -  -  -
21
22       GOLKOW LITIGATIONS SERVICES
        877.370.3377 ph| 917.591.5672 fax
23           deps@golkow.com
24
```

Page 2

```
1   APPEARANCES:
2
3       WAGSTAFF & CARTMELL, LLP
        BY:  LINDSEY N. SCARCELLO, ESQUIRE
4       4740 Grand Avenue,
        Suite 300
5       Kansas City, Missouri 64112
        (816) 701-1100
6       Lscarcello@wcllp.com
        Representing the Plaintiff
7
8
9
10      REED SMITH
        BY:  DEVIN J. GRIFFIN, ESQUIRE
11      136 Main Street
        Suite 250
12      Princeton Forrestal Village
        Princeton, New Jersey, 08540
13      (609) 987-0050
14      Dgriffin@reedsmith.com
15      - and -
        VIA TELECONFERENCE
16      BY: ERIC J. BUHR, ESQUIRE
        355 South Grand Avenue
17      Suite 2900
        Los Angeles, California, 90071
18      (213) 457-8000
        Ebuhr@reedsmith.com
19      Representing the Defendant
20
21
22   ALSO PRESENT:
23   Dan Lawlor, Videographer
24           - - -
```

Page 3

```
1            - - -
2          I N D E X
3            - - -
4   Testimony of:  DANIEL S. ELLIOTT, MD
5
6     By Mr. Buhr                7
7            - - -
8          E X H I B I T S
9            - - -
10
11  NO.        DESCRIPTION            PAGE
12  Elliott-1   Notice of Videotaped
                Deposition of Dr. Daniel
13              S. Elliott         9
14  Elliott-2   Case-Specific Expert
                Report            16
15  Elliott-3   List of Previous
                Witness Testimony    27
16
17  Elliott-4   11/15/07 Dr. Julie
                Crawford Medical Note   44
18  Elliott-5   11/20/17 Dr. Kim Medical
                Record          50
19
20  Elliott-6   1/10/08 Dr. Julie
                Crawford Medical Record   52
21  Elliott-7   1/11/08 Consent Form   67
22  Elliott-8   Hospital Record     76
23  Elliott-9   8/8/13 Hoth Note    93
24
```

Page 4

```
1            - - -
2          E X H I B I T S
3            - - -
4
5   NO.        DESCRIPTION            PAGE
6   Elliott-10  2/16/12 Hoth Office
                Visit          96
7   Elliott-11  The Oregon Clinic
                Records         105
8
9   Elliott-12  6/13/19 Deposition
                Testimony of Dr.
                Mary Denman       121
10
11  Elliott-13  1/2/19 Dr. Mary Denman
                Report          131
12  Elliott-14  Placeholder       165
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1            - - -
2   DEPOSITION SUPPORT INDEX
3            - - -
4
5   Direction to Witness Not to Answer
6   Page Line     Page Line     Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line     Page Line     Page Line
12  None
13
14
15  Stipulations
16  Page Line     Page Line     Page Line
17  6     1
18
19
20  Question Marked
21  Page Line     Page Line     Page Line
22  None
23
24
```

Daniel S. Elliott, M.D.

Page 6

1          - - -
2          (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9          - - -
10         VIDEO TECHNICIAN:  We are
11   now on the record.  My name is Dan
12   Lawlor, I'm a videographer with
13   Golkow Litigation Services.
14   Today's date is July 29th, 2019,
15   and the time is 1:27 p.m.
16         This video deposition is
17   being held in Princeton, New
18   Jersey, in the Matter of Becky
19   Smith versus C.R. Bard, Inc.,
20   Pelvic Mesh.  The deponent is
21   Daniel Elliott.  Counsel will be
22   noted on the stenographic record.
23         The court reporter is Amanda
24   Miller and will now swear in the

Page 7

1    witness.
2          - - -
3          DANIEL S. ELLIOTT, MD, after
4    having been duly sworn, was
5    examined and testified as follows:
6          - - -
7          VIDEO TECHNICIAN:  Please
8    proceed.
9          - - -
10         EXAMINATION
11         - - -
12   BY MR. BUHR:
13     Q.   Good afternoon, Doctor.  My
14   name is Eric Buhr, I represent the
15   defendant in this case.
16         Can you please state your
17   full name for the record?
18     A.   Daniel Stephen Elliott.
19     Q.   And you understand you're
20   here today as a retained expert for Becky
21   Smith in her case against C.R. Bard?
22     A.   Correct.
23     Q.   Is there any reason you
24   cannot understand and answer my questions

Page 8

1    to the best of your ability today?
2      A.   As long as they're stated
3    clearly, no.
4          Yes.
5      Q.   Fair enough.
6          You've been deposed several
7    times in the past; is that right?
8      A.   Correct.
9      Q.   You feel comfortable with
10   the deposition process and the rules we
11   typically like to follow?
12     A.   Yes.
13     Q.   So I won't go over the
14   typical admonitions, then.
15         But I will say that with the
16   video conference here with the slight
17   delay, make a special effort, and I'll do
18   the same, to let each other finish and
19   not talk over each other for the sake of
20   the court reporter and just understanding
21   each other.
22         Is that fair?
23     A.   Yes, it is.
24     Q.   Let's start with just

Page 9

1    housekeeping and attach as Exhibit A a
2    copy of the deposition notice.
3          - - -
4          (Whereupon, Exhibit
5          Elliott-1, Notice of Videotaped
6          Deposition of Dr. Daniel S.
7          Elliott, was marked for
8          identification.)
9          - - -
10   BY MR. BUHR:
11     Q.   Doctor, have you seen this
12   deposition notice before today?
13     A.   Yes, I have.
14     Q.   It includes a long list of
15   document requests.  And I won't go
16   through each one of them.
17         I understand from our
18   discussion off the record that you've
19   already produced most or all of the
20   records that would be responsive, except,
21   perhaps, invoices regarding this case.
22         Is that a correct
23   understanding?
24     A.   That is what I understand as

Daniel S. Elliott, M.D.

Page 10

1 well.
2      Q.   So just to be clear, you
3 haven't brought anything with you?
4      A.   No.
5          You cut out on us a little
6 bit.  I think I understood your question,
7 but there was a little bit of a gap
8 there.  You may just want to repeat it so
9 I know.
10     Q.   Just to be clear, you didn't
11 bring anything with you today to produce?
12     A.   That is correct, I did not
13 bring anything.
14     Q.   You've been retained on
15 behalf of Wagstaff Cartmell to provide
16 expert testimony in this case; is that
17 right?
18     A.   Correct.
19     Q.   And you previously provided
20 expert reports and provided expert
21 testimony in this MDL against C.R. Bard;
22 is that right?
23     A.   Correct.
24     Q.   And, in fact, you previously

Page 11

1 provided a generic report on the involved
2 products and were deposed on those
3 generic opinions; is that right?
4      A.   Correct.  Several years ago,
5 yes.
6      Q.   So we'll try not to tread
7 any old ground on those generic opinions.
8          So today we're specifically
9 discussing your opinions regarding Becky
10 Smith.  Is that consistent with your
11 understanding?
12     A.   Yes, exactly.
13     Q.   Do you recall when you were
14 first retained by the Wagstaff firm to
15 provide expert opinion in Bard cases?
16     A.   I don't recall the exact
17 time.  I know I gave a general report and
18 deposition four, five years ago.  But I
19 don't have the exact timeframe of that,
20 though.
21     Q.   Do you know how many Bard
22 cases you have provided expert opinion
23 in?
24     A.   Off the top of my head,

Page 12

1 without a -- I would say three or four
2 perhaps.
3      Q.   Do you know the total amount
4 of time that you've spent in this
5 litigation against Bard?
6          MS. SCARCELLO:  Object to
7      the extent it calls for testimony
8      about general opinions.
9          THE WITNESS:  No, I don't.
10     I don't have that number.
11 BY MR. BUHR:
12     Q.   Do you have any general
13 estimate of the amount of hours you spent
14 on the C.R. Bard cases?
15         MS. SCARCELLO:  Same
16     objection.
17         THE WITNESS:  I don't keep
18     any record.
19 BY MR. BUHR:
20     Q.   You don't keep invoices that
21 you submitted to the Wagstaff firm?
22     A.   No, I do not.
23     Q.   And am I correct that you
24 charge $700 per hour for case review and

Page 13

1 testimony?
2      A.   Correct.
3      Q.   Am I correct that you've
4 also provided expert testimony in a
5 number of pelvic mesh cases against
6 Ethicon?
7      A.   Correct.
8      Q.   And are you retained through
9 the Wagstaff firm for those cases as
10 well?
11     A.   Yes.
12     Q.   Do you recall approximately
13 how many Ethicon cases you've provided
14 expert testimony in?
15     A.   I don't have an exact
16 number.  The majority of the work would
17 be done with Ethicon as opposed to Bard,
18 though.
19     Q.   Have you provided expert
20 testimony in any other pelvic mesh
21 litigation other than Ethicon and C.R.
22 Bard?
23     A.   There was work done early on
24 against -- with the Cook product, which

Page 14

1 is a non-mesh.  And then a little bit of
2 work with the AMS products.  I don't know
3 how far those extended, but I didn't do
4 any patient case-specific reviews, and I
5 do not believe I turned in any general
6 expert report.  But I looked at issues
7 originally.
8       Q.   Do you have any estimate for
9 how much time you spent specifically on
10 the Becky Smith case?
11       A.   I don't have an exact
12 number.  That work was done in May of
13 this year and sent to the Wagstaff firm.
14 So they have that, which I've been told
15 will be provided to you.
16            Generally, they take several
17 hours or more.  But I don't have a
18 specific recollection of this one.
19       Q.   So when you say "they have
20 that," are you referring to an invoice
21 for your time?
22       A.   That is correct.
23            MR. BUHR:  And then,
24 counsel, I know we mentioned this

Page 15

1     prior to the deposition, but for
2     the record, you'll agree to
3     produce those to our offices,
4     whatever invoices you have
5     specific to this Becky Smith case?
6            MS. SCARCELLO:  Yes.
7 BY MR. BUHR:
8       Q.   Have you spent additional
9 time since the submission of those
10 invoices, or invoice, around the May
11 timeframe?
12            Do you have an estimate for
13 how much additional time, if any, you've
14 spent on this case?
15       A.   It's been several hours
16 spent this month alone.  So since May,
17 there's been none until this month, July.
18 And, again, that would be several hours
19 reviewing depositions and expert reports.
20       Q.   So, then, would it be
21 approximately six hours you spent in
22 total on this case, if I'm understanding
23 what you said, in your time spent in May
24 and your time spent in July?

Page 16

1            MS. SCARCELLO:  Object to
2     the form of the question.
3            THE WITNESS:  I would
4     just -- I would have to be
5     guessing, because I have not seen
6     that May invoice.  I would suspect
7     the May invoice would be around
8     the four- to seven-hour range.
9     Again, that's very much of a
10     guess.
11            And then in July, it's
12     around the same amount of time.
13 BY MR. BUHR:
14       Q.   I assume you haven't
15 submitted your -- an invoice for your
16 July time; is that right?
17       A.   That's correct.  That will
18 be done at the end of the month.  So in a
19 few days.
20            MR. BUHR:  Let's go ahead
21     and attach your case-specific
22     expert report as Exhibit-2, I
23     believe it would be.
24            - - -

Page 17

1            (Whereupon, Exhibit
2     Elliott-2, Case-Specific Expert
3     Report, was marked for
4     identification.)
5            - - -
6 BY MR. BUHR:
7       Q.   So what we've attached as
8 Exhibit-2, does that appear to be your
9 complete expert report in this case?
10       A.   It appears to be signed and
11 dated May 24th, 2019.  It includes my
12 report, my -- my C.V. and my reliance
13 list.
14       Q.   And does this report contain
15 all of the opinions that you intend to
16 offer in this case specific to Becky
17 Smith?
18       A.   Up to this point, yes.  If
19 new material becomes available,
20 obviously, that would change.  But as of
21 today, July 29th, this is complete.
22       Q.   And can you generally
23 describe for me how you go about forming
24 your opinions?

Page 18

1    A.   Forming my opinions on this
2 case or anything I do in my normal daily
3 work would be the same.  It would be
4 reviewing the outside medical records,
5 talking with the patient usually, though
6 in this case I can't talk to her,
7 obviously, and based upon my experience,
8 my review of the medical literature,
9 discussions with colleagues, et cetera,
10 come up with an opinion ruling in or
11 ruling out various different pathologies.
12    Q.   And so Exhibit B to your
13 expert report is your reliance list.
14         And that's everything you
15 relied on in forming your opinions at the
16 time of your expert report, correct?
17    A.   Correct.
18    Q.   And how did you go about
19 compiling these materials?
20    A.   As part of my usual, I ask
21 whatever law firm it happens to be, this
22 time, obviously, it's Wagstaff and
23 Cartmell, give me all medical records
24 that are available, all depositions, all

Page 19

1 expert reports, everything.  And then I
2 review whatever they give me.
3    Q.   Did you feel you had
4 adequate materials to form your opinion
5 at that time?
6    A.   Yeah, at that time.  Yes.
7 There's been added on since that time,
8 with depositions of the implanting doctor
9 and one of the revision surgeons, and
10 then the -- what would you call it?  The
11 defense expert witness.  I've reviewed
12 that since then.
13    Q.   What do you mean by --
14    A.   But my opinions did not --
15         Sorry, go ahead.
16    Q.   I didn't want to cut you off
17 if you were still finishing your answer.
18    A.   I was going to finish by
19 saying the reviewing of those further
20 documents, the deposition and expert
21 report did not change my opinions
22 significantly, it mainly supported them.
23    Q.   Did you request any
24 additional medical records?

Page 20

1    A.   Well, I request all medical
2 records that are available.  And so I'm
3 at the mercy of the law firm of giving me
4 whatever they can get ahold of.
5         If I find an operative note
6 or something that I don't have, I ask
7 them for it.  But that wasn't in this
8 particular case.  So as far as I know,
9 I've been given all of the records.
10    Q.   And you kind of alluded to
11 this a little bit already, but just to be
12 clear, at the time you formed your
13 opinions and signed your report, you
14 didn't have the depositions of any of the
15 treating physicians in this case; is that
16 right?
17    A.   That is correct.
18    Q.   And did you feel that you
19 could form your opinions without the
20 testimony of the implanting and
21 explanting physicians?
22    A.   I can essentially form my
23 opinions based upon the medical records,
24 and then augment that with the

Page 21

1 deposition.
2         Had the depositions shown a
3 significant opinion difference or changed
4 my opinion one way or the other
5 significantly, then I would have asked
6 for a supplemental report to be filed.
7    Q.   So several times, I believe,
8 you used the term "significantly."
9         Did reviewing those
10 depositions after your expert report
11 change your opinions in any way?
12    A.   No, they just reinforced
13 them.  So it didn't change.  Reinforced.
14    Q.   Did you review the entirety
15 of those depositions or just excerpts?
16    A.   No, as per my usual, I asked
17 for the entire deposition, all
18 however-many-hundreds of pages they are,
19 and then I go through them.  So I do not
20 get ever a summary.
21    Q.   Do you get a summary, any
22 type of summary, of the medical records,
23 or do you review those in their entirety
24 as well?

Page 22

1    A.   I review them in their
2  entirety.  I found that chronologies as
3  provided, they weren't provided in this
4  case, but if they are provided, they
5  tended to not be very accurate.  So I did
6  it all myself, every single page.
7    Q.   So, then, just to be clear,
8  even though you reviewed additional
9  materials since you signed your expert
10  report, you still feel it's complete and
11  accurate?
12    A.   Yes.
13    Q.   And it contains all of the
14  opinions you intend to offer and your
15  basis for those opinions?
16    A.   As I stated before, unless
17  new information were to be provided
18  that's not available as of July 29th,
19  2019.  But right now it is complete.
20    Q.   I believe you mentioned
21  reviewing an expert report from the
22  defense.
23      What specifically are you
24  referring to?

Page 23

1    A.   There was a Dr. -- I won't
2  pronounce his name correctly, so I have
3  to apologize -- Guidice, Guidice,
4  something like that.
5    Q.   I say Guidice, but I don't
6  know if that's correct either, to be
7  honest.
8      So you reviewed his report?
9    A.   Correct.
10    Q.   Did you have any significant
11  disagreements with his report?
12    A.   Yeah, that's a -- we'd have
13  to go through point by point of his
14  report.  But, yes, I have some major
15  disagreements.
16    Q.   Did you do anything to
17  specifically prepare for the deposition
18  today?
19    A.   Other than just on my own,
20  reviewing my expert report, as I said --
21  mentioned earlier, reviewing the
22  depositions from the two physicians and
23  then the expert report, Dr. Guidice, and
24  I had a 15-minute meeting with counsel

Page 24

1  this afternoon.
2    Q.   You had a 15-minute meeting
3  with counsel today?
4    A.   Correct.
5    Q.   And was that with the
6  counsel that's here at the deposition
7  today?
8    A.   Correct.
9    Q.   There was also a subsequent
10  deposition of plaintiff Becky Smith that
11  took place maybe a month and-a-half ago.
12      Did you review that
13  deposition transcript?
14    A.   I have not seen that one.
15    Q.   So the only deposition of
16  the plaintiff that you've reviewed is the
17  deposition that took place in 2017; is
18  that right?
19    A.   Correct.
20    Q.   Is that something you would
21  like to review, her new deposition?
22    A.   Yes.
23    Q.   And you have not personally
24  examined Becky Smith; is that right?

Page 25

1    A.   Correct.
2    Q.   I believe in some prior Bard
3  cases you performed examinations, what we
4  sometimes refer to as an IME.
5      Do you recall that?
6    A.   Yes.
7    Q.   And why did you not do an
8  IME or any type of examination with Becky
9  Smith?
10    A.   I was under the
11  understanding that there was an agreement
12  that if this case, or whatever you call
13  it, were to proceed forward, then I would
14  do one prior to any trial case.
15    Q.   So is that something you
16  think would be helpful in forming your
17  opinions?
18    A.   Yes.
19    Q.   Have you spoken with Becky
20  Smith?
21    A.   No.
22    Q.   Have you spoken with any of
23  her doctors?
24    A.   No.

Daniel S. Elliott, M.D.

Page 26

1   Q.   Can you describe generally
2   for me your method in drafting this
3   expert report?
4   A.   It would be the same as all
5   reports I do.  I review all of the
6   medical records, write down a chronology
7   with key comments made within the
8   records.  From there, formulate a
9   differential diagnosis ruling in or
10   ruling out various different pathologies.
11        And then I write the report
12   up and then come to conclusions, based
13   upon the information I had at that point
14   in time.
15   Q.   So would you personally take
16   notes as you're reviewing the medical
17   records?
18   A.   No.  I do it -- as I go, I
19   write it.  So there's no separate set of
20   notes.
21   Q.   And does the report contain
22   everything you ruled in and ruled out in
23   your differential diagnosis?
24   A.   Correct.  As what is

Page 27

1   indicated on Page 4 of my report going to
2   Page 5, that would be my standard
3   differential diagnosis.
4   Q.   Did you have any assistance
5   preparing your report?
6   A.   None.
7        Other than the reliance
8   list.  Sorry, I should -- I did not type
9   up the reliance list.  I typed up the
10   medical billing records, the depositions
11   and then the Wagstaff firm provided the
12   other.  So I did not personally type that
13   up.
14   Q.   I'd like to attach, just for
15   the record, your list of previous
16   testimony that was provided to us.  This
17   wasn't attached to your expert report, it
18   was provided to us separately.
19        MR. BUHR:  So I just want to
20   make sure it was attached for the
21   record.  Let's do it as Exhibit-3.
22        - - -
23        (Whereupon, Exhibit
24   Elliott-3, List of Previous

Page 28

1   Witness Testimony, was marked for
2   identification.)
3        - - -
4   BY MR. BUHR:
5   Q.   So is this an accurate list
6   of your previous testimony?
7   A.   Well, I don't keep a list of
8   my testimony, so this would have come
9   from the Cartmell firm.  So I cannot
10   attest to the accuracy or completeness of
11   it.
12        It looks fairly complete.
13   But, again, I don't -- in retrospect,
14   can't say if it's complete.
15   Q.   Can you tell by looking at
16   it what time period this covers?
17   A.   It would cover roughly 2011
18   to the present.
19   Q.   Does it appear to be roughly
20   in chronological order, to the best you
21   can tell?
22   A.   Well, the very first one
23   says Coloplast versus Generical Medical
24   Devices and the very last one is the same

Page 29

1   thing.  So, I don't know, it says, In
2   regards to Mentor ObTape, that was --
3   wait, I'm sorry, that's different.
4        I would have to say, yes, it
5   does look accurate.  I just don't know
6   why that Mentor -- the last one is Mentor
7   ObTape.  I don't know how that fits in
8   there.  But it looks fairly accurate.
9   Q.   Do you recall roughly when
10   you last testified?
11   A.   Well, "testified," do you
12   mean -- does that mean a deposition?
13   Q.   Yes.
14   A.   Or a trial, in the
15   courtroom?
16   Q.   Either one.
17   A.   Last deposition I gave was
18   last weekend.  Last time I was in a
19   courtroom was February of 2018.
20   Q.   Is your deposition last
21   weekend listed on this report?
22   A.   No.
23   Q.   So what case was that in?
24   A.   That was a deposition --

Daniel S. Elliott, M.D.

Page 30

1  case-specific depositions on three Bard
2  cases -- excuse me, three Ethicon cases
3  and one Bard case.
4       Q.    What was the product at
5  issue in the Bard case?
6       A.    Avaulta.  And the individual
7  also had an AMS sling, but that was not
8  part of the deposition.
9       Q.    And what were the Ethicon
10  products involved in those cases?
11      A.    Two Prolift?s and one TVT-O.
12      Q.    Is the Prolift? a product to
13  treat pelvic organ prolapse?
14      A.    Correct.
15      Q.    And the TVT-O is a pelvic
16  mesh product to treat stress urinary
17  incontinence?
18      A.    Correct.
19      Q.    And you provided expert
20  opinion that those products were
21  defective and caused injury; would that
22  be right?
23      A.    Correct.
24      Q.    And with respect to your

Page 31

1  courtroom testimony in February 2018, do
2  you recall what case that was and what it
3  involved?
4       A.    It was a Prolift? case with
5  Wagstaff Cartmell in Indiana, if that
6  helps.
7       Q.    Are there additional Ethicon
8  products that you provided expert opinion
9  on?
10      A.    TVT as well, and TVT-Secur.
11      Q.    And your opinion is all
12  those products were defective and caused
13  injury?
14      A.    Correct.
15            MS. GRIFFIN:  Eric, just for
16      the record, that came in a little
17      spotty, in case you want to repeat
18      that.
19            MR. BUHR:  Thank you for
20      that.
21  BY MR. BUHR:
22      Q.    So you provided expert
23  opinion that all the products you just
24  listed from Ethicon were defective and

Page 32

1  caused injury; is that right?
2       A.    Correct.
3       Q.    So turning more specifically
4  to Becky Smith, you referenced your
5  general differential diagnosis list on
6  Pages 4 and 5 of your report, correct?
7       A.    Yes.
8       Q.    And you were able to rule
9  all of those out as potentiality
10  alternative causes?
11      A.    Well, no, I don't rule them
12  all out, because some of those include
13  mesh complications.  So some of them are
14  ruled in, some of them are ruled out.
15  The majority are ruled out.
16      Q.    So you ruled out everything
17  other than those related to mesh?
18      A.    Well, we would have to go --
19  sure, I don't want to make a blanket
20  statement and miss something here, but
21  either mesh or mesh-specific
22  complications, yes, I ruled them out.
23      Q.    So just to be clear as a
24  starting point, that I understand the

Page 33

1  opinions that you intend to offer here,
2  with respect to Becky Smith's specific
3  injuries, am I correct that you're
4  offering an opinion that the Bard mesh
5  implants caused plaintiff, Becky Smith,
6  pelvic pain and dyspareunia and mesh
7  extrusion?
8       A.    As summarized on Page 18 of
9  my report, starting on Page 18, yes,
10  pelvic pain, vaginal pain and dyspareunia
11  resulting from the complications caused
12  by the presence of the mesh in her body.
13      Q.    So just to be clear, you're
14  not offering an opinion that she has any
15  other injuries such as voiding
16  dysfunction or anything like that, right?
17      A.    Well, voiding dysfunction
18  can be caused by the presence of the
19  mesh, the removal of the mesh, or
20  dysfunction caused by.  So we would have
21  to be very specific.
22            From what I understand, as
23  of now she was not complaining of
24  significant voiding dysfunction.  But if

Daniel S. Elliott, M.D.

Page 34

1 you had something, I'd have to see it in
2 the records.  I didn't see that.
3      Q.    Well, I didn't see anything
4 either.  I just want to make sure that
5 what you're alleging her injuries are
6 related to the mesh is encompassed by
7 pelvic pain, dyspareunia and extrusion
8 requiring removal of the mesh, correct?
9      A.    Correct.  As of right now,
10 yes.
11      Q.    You're aware that plaintiff
12 has complained of fecal incontinence; is
13 that right?
14      A.    Yes.
15      Q.    And you're not offering an
16 opinion that that was caused by the mesh;
17 is that right?
18      A.    As of what I know right now,
19 it is very difficult to draw a logical
20 physiologic relationship between the
21 presence or absence of the mesh or
22 surgery for the mesh causing fecal
23 incontinence.
24      Q.    So you are not offering an

Page 35

1 opinion that her fecal incontinence was
2 caused by the mesh?
3      A.    Well, as I stated, as of
4 what I know right now, I cannot draw a
5 logical connection between the mesh and
6 the surgery to remove the mesh with fecal
7 incontinence.
8      Q.    And you would agree that
9 plaintiff's treating physician, Dr.
10 Denman, also concluded that the -- her
11 fecal incontinence was not related to the
12 mesh; is that right?
13      A.    Yes.
14      Q.    Is it your opinion that both
15 the Avaulta and the Align are responsible
16 for her injuries?
17      A.    They are both contributing.
18      Q.    Can you say what percentage
19 of her injuries are related to the
20 Avaulta versus the Align?
21      A.    It's very difficult to
22 assign a percentage.  However, due to the
23 significantly enlarged volume of the
24 Avaulta mesh, the multiple arms and the

Page 36

1 collagen coating, it is going to be more
2 responsible than the TVT-O -- excuse me,
3 the Align.
4      Q.    But you intend to offer an
5 opinion that the Align is responsible for
6 her pelvic pain and dyspareunia?
7      A.    It will be a contributing
8 factor.  Since the mesh is identical and
9 it's going in the same obturator foramen,
10 it is not going to be helping any.
11           What I'm saying is, I cannot
12 assign a percentage.  More likely, the
13 Avaulta is going to be the much greater
14 percentage, just, as I mentioned, due to
15 the volume and the presence of the
16 collagen coating.
17      Q.    And you're saying that the
18 mesh of the Align and the Avaulta are
19 identical?
20           MS. SCARCELLO:  Object to
21      the form.
22           THE WITNESS:  No, they are
23      not identical.  The meshes are
24      quite similar.  But the Align does

Page 37

1      not have a collagen coating like
2      the Avaulta Plus, which Ms. Smith
3      has, or had.
4 BY MR. BUHR:
5      Q.    Are you offering an opinion
6 that the extrusion was related to the
7 Align product as opposed to the Avaulta?
8      A.    From what I understand at
9 this point, the Avaulta product was the
10 product that had extruded, not the Align.
11      Q.    I understand, from your
12 prior testimony -- well, let me confirm
13 if my understanding is correct.
14           Have you ever implanted a
15 transvaginal mesh for pelvic organ
16 prolapse?
17      A.    No.  I have chosen not to do
18 that.
19      Q.    Have you implanted
20 midurethral slings made out of
21 polypropylene?
22      A.    Yes.
23      Q.    Have you ever implanted the
24 Align?

Daniel S. Elliott, M.D.

Page 38

1    A.   No.
2    Q.   What midurethral slings have
3 you implanted?
4    A.   I've gone through a series
5 of them and had problems, and that's why
6 there's been a series.
7         I started with the Mentor
8 ObTape in the early 2000s, probably 2002
9 or '03, around that time.  We obviously
10 had major problems with that.  Then I
11 switched to the AMS product called the
12 Monarc, used that for a couple of years.
13 But we had a significant amount of
14 problems of pain for the patient for
15 that, so I stopped that.  And then used
16 the Coloplast product, their
17 transobturator sling.
18    Q.   And is that made of
19 polypropylene?
20    A.   Correct.
21    Q.   And it's implanted
22 transobturally -- through the
23 transobturator, sorry, similar to the
24 Align sling; is that right?

Page 39

1    A.   Correct.  It's a
2 transobturator sling, correct.
3    Q.   And would you agree that all
4 of those products have a risk of pelvic
5 pain and dyspareunia?
6    A.   All the mesh slings, to a
7 varying degree, have a problem with
8 dyspareunia, scarring, mesh contraction,
9 foreign body reaction; so yes.
10    Q.   And that includes the
11 Coloplast sling?
12    A.   Correct.
13    Q.   And you still implant that
14 today?
15    A.   Very rarely.  I used to, and
16 then as of 2011 or so, the numbers
17 plummeted to one or two a year from a
18 high of about 100 to 150.  And now
19 there's maybe a few a year I do.  I can't
20 give you an exact number, roughly 5 out
21 of 100 a year for unique patient
22 situations.
23    Q.   Do you agree that the
24 midurethral slings made of polypropylene

Page 40

1 are within the standard of care?
2    A.   In the properly consented
3 patient and with a surgeon who knows what
4 they're doing and can handle the
5 complications, it is within the standard
6 of care.
7    Q.   Are they generally
8 considered safe and effective in the
9 medical community?
10    A.   The general community?  I
11 can't speak for everybody.  But there
12 have been position statements making
13 that, that's what they state.
14    Q.   Are you referring to the
15 AUGS position statement?
16    A.   That's one of them.
17    Q.   Are you a member of AUGS?
18    A.   Yes.
19    Q.   Do you agree with that
20 position statement?
21    A.   I agree that it has been
22 the -- that statement is long, with
23 multiple points to it.  So I can't give a
24 blanket yes or no to it.  We'd have to go

Page 41

1 through each point.
2         But I agree it has been
3 studied, and I agree that there have been
4 advances with that product.  But there
5 have also been significant complications
6 associated with it.  And that's where the
7 problem occurs with me.
8    Q.   So at the time of Ms.
9 Smith's implant in 2008, you agree it was
10 within the standard of care for Dr. Kim
11 to implant the Align midurethral sling to
12 treat her stress urinary incontinence; is
13 that right?
14    A.   Correct.  I have no fault
15 with Dr. Kim for implanting that at that
16 point in time.
17    Q.   Right.  And one of the
18 opinions listed in your report is that
19 the treating doctor, including Dr. Kim,
20 acted within the standard of care.
21         Is that an opinion that you
22 intend to offer?
23    A.   Yes, I agree with that, in
24 2008 when it was put in.

Daniel S. Elliott, M.D.

1    Q.   Do you also agree that it
2  was within the standard of care in 2008
3  to implant mesh for treatment of pelvic
4  organ prolapse?
5    A.   Correct.  As of January of
6  2008, I agree that was within the
7  standard of care.
8    Q.   So you agree it was within
9  the standard of care to implant the
10  Avaulta Plus in 2008?
11    A.   Well, in 2008, we were in
12  our very infancy of knowing what was
13  going on with meshes.  I had chosen not
14  to implant meshes, I didn't see a benefit
15  for them, but I didn't feel they would be
16  wrong.  We were seeing increases in
17  complications slowly rolling in.
18        But as of January 2008, when
19  that was implanted, I would find no fault
20  in that, it was within the standard of
21  care.  So I agree with what I've stated
22  in my report.
23    Q.   Would it be within the
24  standard of care to implant mesh to treat

1  pelvic organ prolapse -- well, strike
2  that.
3        Would it be within the
4  standard of care in 2008 to implant the
5  Avaulta Plus if the patient did not have
6  pelvic organ prolapse?
7    A.   Well, it is -- the Avaulta
8  or the Avaulta Plus, Avaulta Solo, is
9  defined for prolapse.  If a woman has
10  absolutely no prolapse, you would not
11  want to implant it, because it's designed
12  to treat prolapse.
13    Q.   What if the patient had a
14  mild prolapse but was asymptomatic, would
15  it be within the standard of care to
16  implant the Avaulta mesh?
17    A.   That becomes a judgment
18  call.  That one has to be a discussion
19  with the patient.  If you are going in to
20  operate already for another indication,
21  and they have a low-grade prolapse, it
22  depends what grade you're talking, we
23  have to use specifics.
24        Technically, for the female

1  pelvic mesh and reconstructive surgery
2  exam, if you have a grade 2 and above,
3  it's acceptable to treat.  But it has to
4  be a discussion with the patient.
5    Q.   The doctor that performed a
6  hysterectomy at the same time the mesh
7  was implanted was Dr. Crawford; is that
8  right?
9    A.   Correct.
10    Q.   Were you aware that Dr.
11  Crawford found that Becky Smith did not
12  have any significant cystocele?
13    A.   That's what I've heard, yes.
14        MR. BUHR:  And let's just go
15        ahead and attach that record as
16        Exhibit-4, just to make sure we're
17        looking at the specifics.
18        - - -
19        (Whereupon, Exhibit
20        Elliott-4, 11/15/07 Dr. Julie
21        Crawford Medical Note, was marked
22        for identification.)
23        - - -
24  BY MR. BUHR:

1    Q.   Do you have that record in
2  front of you, Doctor?
3    A.   Yes, I do.  I have, as you
4  said, Exhibit-4.  And this is dated
5  November 15th, 2007.  It's a note by Dr.
6  Kim -- no, I'm sorry, Dr. Crawford, Julie
7  Crawford.
8    Q.   And if you turn to -- well,
9  before we get there.  On Page Bates
10  number 8, they list the past surgical
11  history.
12        Number 2 is, Prior bilateral
13  tubal ligation.
14        Can you explain what that
15  is?
16    A.   That's for -- most likely,
17  for sterility.  So they ligate the tubes,
18  analogous to a vasectomy in a male.  It
19  was done laparoscopically.
20    Q.   Is that a procedure that can
21  lead to any type of pelvic pain or
22  dyspareunia?
23    A.   It would be exceedingly
24  rare.  That's a small procedure done

Daniel S. Elliott, M.D.

Page 46

1 laparoscopically with small cameras. So
2 I'm sure we can find a case report here
3 or there, but this would be an
4 exceedingly small risk.
5    Q.   Is it possible to develop
6 adhesions following that type of
7 procedure?
8    A.   Adhesions could happen up in
9 the abdomen.
10    Q.   And adhesions are
11 essentially scar tissue, right?
12    A.   They are a type of scar
13 tissue.
14    Q.   And they can lead to pain?
15    A.   There have been reports of
16 that, yes.
17    Q.   Is this something you
18 considered in your differential diagnosis
19 of Becky Smith's pelvic pain and
20 dyspareunia?
21    A.   Correct.  And prior to her
22 surgery, her implant surgery on January
23 15th, 2008, I did not see any record of
24 pelvic pain.

Page 47

1    Q.   So you ruled it out because
2 she didn't complain of any pelvic pain at
3 that time?
4    A.   Correct.  Following the
5 surgery, adhesions, et cetera, you're
6 going to have -- it's not a delayed
7 development like we see in the meshes;
8 it's immediate.  And there's no record of
9 anybody attributing any abdominal pain,
10 pelvic pain, attributing it to any
11 adhesions.
12       If you have those records,
13 I'd like to see it.  I did not see
14 anything in the records.
15    Q.   They also list a 2003
16 endometrial ablation.
17       Can you describe for the
18 jury what that is?
19    A.   Well, that falls definitely
20 into the benign GYN land, which I do not
21 do these procedures.  Usually, this is
22 done for uterine fibroids; usually.  And
23 it's to help reduce the severity or
24 bleeding, abnormal bleeding, caused by

Page 48

1 the fibroids.
2    Q.   Are you familiar with the
3 potential complications from that type of
4 procedure?
5    A.   I do not do that procedure,
6 but I am familiar with the types of pain
7 that they could have.  Same thing with
8 fibroids.
9       And, again, as I mentioned
10 before, I didn't see anything documented
11 in the records attributing any of her
12 conditions, prior to her 2008 surgery, to
13 procedures such as that.
14    Q.   Under medications, she's
15 taking Lexapro.
16       And I think you note in your
17 record that she had preexisting
18 depression prior to the implant meshes,
19 right?
20    A.   Correct.
21    Q.   Going on to the next page,
22 Dr. Crawford performed an exam, right?
23    A.   Correct.  Starting on the
24 Bates number 8 going to, it looks like,

Page 49

1 just 9.
2    Q.   And the vaginal exam notes,
3 No evidence of a significant cystocele or
4 rectocele, appears well supported.
5       Is that right?
6    A.   That is what she states as
7 of November 15th, 2007.
8    Q.   And that was just a month
9 prior to her implant surgery, right?
10    A.   Well, technically, like two
11 and-a-half months.  But it was close.
12 Because her surgery was -- actually, it
13 was, like, two months.
14       Not to be difficult, just
15 for specifics here.  January 15, '08 was
16 her surgery.
17    Q.   You're right.
18       So about two months prior to
19 her surgery, Dr. Crawford did not find
20 any evidence of a significant cystocele
21 or rectocele?
22    A.   Correct.  On her exam on
23 that day, that's what she reported.
24    Q.   And then she sees Dr. Kim a

Page 50

1 few weeks later, on November 30th.
2       MR. BUHR:  And let's go
3 ahead and attach Dr. Kim's records
4 as Exhibit-5.
5          - - -
6       (Whereupon, Exhibit
7 Elliott-5, 11/20/17 Dr. Kim
8 Medical Record, was marked for
9 identification.)
10         - - -
11 BY MR. BUHR:
12      Q.   Do you have those records in
13 front of you now, Doctor?
14      A.   Yes, I do.
15      Q.   So on Page -- if you go to
16 Page 12 and 13 of the Bates numbers, this
17 is the visit with Dr. Kim on November
18 30th, 2007.
19      A.   Correct.
20      Q.   And under assessment --
21 actually, under examination, it says she
22 does have a grade 1 to 2 cystocele and a
23 mild rectocele.
24      Do you see that?

Page 51

1      A.   Yes, I do.
2      Q.   And what symptoms can
3 cystocele and rectocele cause?
4      A.   Fullness, pressure,
5 sensation of something falling out;
6 asymptomatic, retention of urine,
7 retention of stool.
8      Again, I think I mentioned
9 pelvic pressure.  Symptoms such as that,
10 or those.
11      Q.   Prolapse can cause pelvic
12 pain and dyspareunia, too, right?
13      A.   Well, pelvic pain, not
14 necessarily.  Pelvic pain would be
15 different.
16      Pelvic pressure can -- it
17 can interfere with sexual activity,
18 depending upon the severity of the
19 prolapse.  They should be very specific.
20      Pelvic pain is not something
21 we normally attribute, unless it's a
22 major, major prolapse where the vagina
23 has everted itself and it's irritating on
24 the clothing and things.

Page 52

1      Q.   And Dr. Kim did not repair
2 the mild rectocele, right?
3      A.   Correct.
4      Q.   So would you agree that the
5 grade 1 to 2 cystocele is a mild
6 cystocele?
7      A.   Grade 1 is mild.  Grade 2 is
8 not.  It's in the realm of more
9 significant.  And prolapses vary from
10 day-to-day depending how the woman is,
11 the time of day, how much standing they
12 have been doing.  So it's not uncommon to
13 have a variable exam.
14      Q.   Going back to Dr. Crawford's
15 records --
16      MR. BUHR:  Actually, do we
17 have her January 10th, 2008
18 record?
19      MS. GRIFFIN:  We do.  And
20 that can be marked as Exhibit
21 Number 6.
22         - - -
23      (Whereupon, Exhibit
24 Elliott-6, 1/10/08 Dr. Julie

Page 53

1 Crawford Medical Record, was
2 marked for identification.)
3         - - -
4 BY MR. BUHR:
5      Q.   Do you have that record,
6 Doctor?
7      A.   Yes, I do.
8      Q.   On Bates number ending in
9 27, under the physical examination, about
10 three or four sentences above the end of
11 that paragraph, it says, On my exam,
12 there is no evidence of significant
13 cystocele or rectocele and she appears
14 apically supported.  However, on exam by
15 Dr. Kim, she has a mild rectocele and
16 cystocele.
17      Do you see that language?
18      A.   Yes, I do.
19      Q.   So do you have any criticism
20 of implanting the Avaulta product in a
21 patient with only mild cystocele and is
22 asymptomatic?
23      A.   I have criticism of
24 implanting the Avaulta product.  However,

Daniel S. Elliott, M.D.

Page 54

1  on Dr. Kim's examination, grade 1 is low,
2  grade 2 is acceptable.  And so that
3  becomes a judgment call by the doctor who
4  is there.  And, as I mentioned, prolapses
5  vary from day-to-day.
6        If I were operating with a
7  doctor who I felt was doing something
8  wrong, I wouldn't operate with him.  I
9  wouldn't do a combined case.  Dr.
10  Crawford just mentions it, so I don't
11  have a criticism, really.  If it were
12  only a grade 1, that would be different.
13  But it reports grade 2.
14      Q.   And you agree she was
15  asymptomatic at this time with respect to
16  her cystocele?
17      A.   I didn't see anything in the
18  records indicating significant prolapse
19  symptoms.
20        But they were going to be
21  doing an anti-incontinence procedure, so
22  it's quite common to do a combined repair
23  when you're doing that, because otherwise
24  it will affect your incontinence

Page 55

1  procedure.
2      Q.   So you stand by your opinion
3  that Dr. Kim acted within the standard of
4  care?
5      A.   I would -- if I were in the
6  same situation, I would not have done an
7  Avaulta product.  I would have done the
8  anterior repair at the time of the sling
9  surgery.
10        Because when you're
11  repairing incontinence, if you don't
12  repair concurrent prolapse, if you find a
13  grade 2, that can affect your repair.  So
14  it's not uncommon to do a prophylactic
15  either incontinence procedure or a
16  prolapse repair.
17        If Dr. Kim had repaired the
18  posterior, I would have a major problem
19  with that.  But anterior compartment,
20  it's a judgment call, so I don't
21  criticize it.
22      Q.   Would you agree that there
23  are risks associated with any implanted
24  product?

Page 56

1      A.   Well, it depends what type
2  of implanted product we're talking about,
3  and the severity and the progressive
4  nature of them can vary tremendously.
5  But procedures do have risks.
6      Q.   And we talked about some of
7  the other transvaginal mesh products
8  where you provided specific opinions in
9  other litigation.
10        Would you agree that all
11  transvaginal mesh products for pelvic
12  organ prolapse and stress urinary
13  incontinence have risks?
14      A.   So I just want to make sure
15  I heard your question correctly.
16        You stated all pelvic organ
17  meshes for prolapse and slings have
18  risks; is that -- am I correct?
19      Q.   Yes, essentially.
20      A.   Okay.
21        Yes.  To varying degrees,
22  yes, they do.
23      Q.   And they all have the risk
24  of extrusion, pelvic pain and

Page 57

1  dyspareunia?
2      A.   Yes, to varying degrees; as
3  long as we're still talking about pelvic
4  organ meshes and slings, they all do to
5  varying degrees.
6      Q.   Would you agree that these
7  are common and well-known risks?
8      A.   I agree that they are
9  common.  I disagree that they are well
10  known, the true incidence is not usually
11  disclosed.  It is becoming much more well
12  known since 2011.
13      Q.   And if I understand your
14  report correctly, you intend to offer an
15  opinion that Dr. Kim was not advised of
16  all the potential risks?
17      A.   What I'm saying is as far as
18  the level of disclosure of the known
19  risks with the Avaulta, the Avaulta Plus,
20  and the Align, that was not fully
21  disclosed, so Dr. Kim would not be able
22  to know those full risks, as I do, having
23  read internal documents, e-mails, et
24  cetera, as outlined in my general report.

Daniel S. Elliott, M.D.

Page 58

1    Q.   Would you agree that Dr. Kim
2  is the better authority on what she knows
3  and what she doesn't know?
4    A.   No.  She knows only what she
5  knows, but she doesn't know what I know.
6         And important -- an
7  important part of that is, I've had a
8  chance to review internal documents,
9  which I'm under a confidentiality
10 agreement, so I can't discuss that, even
11 with my own colleagues, I can't
12 discuss -- or, I don't know if I can
13 discuss it so I don't.  So they don't
14 know what was known at the launch of the
15 product and everything.
16        Dr. Kim knows everything she
17 knows.  But, again, she doesn't know what
18 else there is out there to know.  The old
19 phrase "you don't know what you don't
20 know" type of thing.  That's very
21 confusing, however, it's very accurate.
22   Q.   She may not know everything
23 that you know, and it's equally true that
24 you may not know everything that she

Page 59

1  knows; is that fair?
2    A.   Yes, to a certain extent.  I
3  have an advantage of being at a large
4  teaching institution, attend meetings
5  nationally, internationally, speak on
6  this subject, and have read internal
7  documents from, essentially, all of the
8  producers of meshes.
9         There is the chance she
10 knows something I don't.  This is not a
11 criticism of her by any means, but that's
12 unlikely.  So I am playing the
13 overwhelming odds I have -- I've had an
14 opportunity to know and learn more than
15 she has.
16        But, again, that's not a
17 criticism of her, by any means.
18   Q.   I guess the point I'm trying
19 to get at is, if she says that she's
20 aware of the risk of extrusion, you're
21 not in a position to disagree with her;
22 is that fair?
23   A.   We would have to ask her
24 what percentage.  It's a vague, are you

Page 60

1  aware of the risk of a fuel pump going
2  out in a Mustang?  Well, I don't know, I
3  think I do.
4         But specifics.  Is she going
5  to be able to say, yeah, it's 12 to 22
6  percent, based upon e-mails that we've
7  seen from internal documents; or is she
8  going to go on the literature or is she
9  going to go off the IFU, which doesn't
10 tell us any risks?
11        So we would have to ask her
12 specifically, what are -- what percentage
13 of individuals have mesh contraction,
14 extrusion, et cetera, progressive nature.
15 And if she gave me a percentage, then I
16 would be more likely to agree or disagree
17 with your comment.
18   Q.   So is it your position that
19 she can't understand the risks of the
20 product sufficiently if she doesn't know
21 the exact percentage of every potential
22 risk?
23        MS. SCARCELLO:  Objection to
24 form.

Page 61

1         THE WITNESS:  Yeah.  With
2  patients, I feel we have an
3  obligation to tell them, you have
4  a 1 in 5 percent risk of X, Y or Z
5  complication.
6         The word significant, minor,
7  rare, don't mean anything to an
8  individual patient.  That's been
9  studied; that's, you know, in some
10 of my reports.  I think we have to
11 give numbers to those.
12        So Dr. Kim has a good
13 education, I don't doubt anything
14 like that.  But, again, I just
15 don't think she -- she never had a
16 chance to know all that could go
17 wrong with the product.
18 BY MR. BUHR:
19   Q.   Did you read her deposition
20 testimony when she talked about her
21 knowledge of the risks?
22   A.   Yes.
23   Q.   Do you agree that she
24 testified she was aware of the risk of

Daniel S. Elliott, M.D.

Page 62

1  extrusion?
2      A.   Yes.  And I also know that a
3  doctor is not going to tell you that they
4  did not know, because they're opening
5  themselves up.  So I agree that's what
6  she stated.
7      Q.   And she also testified that
8  she was aware of the risk of chronic
9  pelvic pain at the time she implanted
10 these products?
11     A.   Correct, that's what she
12 stated.
13     Q.   And she also testified that
14 she was aware of the risk of chronic
15 dyspareunia associated with these
16 products at the time she implanted them
17 in Ms. Smith?
18     A.   That is -- that is what she
19 states.
20     Q.   If Plaintiff would have
21 received a different transvaginal mesh
22 product, would you agree that she still
23 may have had pelvic pain and dyspareunia?
24         MS. SCARCELLO:  Object to

Page 63

1      form.
2          THE WITNESS:  Well, as I've
3      stated before, the various
4      different mesh products all have
5      different sets of complications,
6      depending upon the composition of
7      the mesh, plus or minus having a
8      collagen -- or a, excuse me, a
9      protein coat to them.
10         But there is significant
11     level of risk with all of them.
12 BY MR. BUHR:
13     Q.   So you're not saying that if
14 she used a different product it would
15 have eliminated her risk of pelvic pain
16 or dyspareunia; is that fair?
17     A.   Well, Avaulta is unique --
18 the Avaulta Plus, excuse me.  It is
19 unique with that extra layer on it, which
20 has never been shown to have any
21 potential benefit.
22         So I can't state that she
23 would have had more or less with the
24 other ones, but the other ones don't have

Page 64

1  that coating to it.  So you're not going
2  to be lowering the risk any.
3      Q.   Would you agree that a
4  hysterectomy can cause pelvic pain and
5  dyspareunia?
6      A.   In specific locations, in
7  varying severity and progressive nature
8  of it, it can be associated with pelvic
9  discomfort.
10     Q.   Is that something you
11 considered in your differential
12 diagnosis?
13     A.   Yes.
14     Q.   Is that listed anywhere in
15 your report as something you considered
16 in your differential diagnosis?
17     A.   When I review the location
18 and the descriptions of the other
19 doctors, and their palpation of mesh
20 contraction, I am going to automatically
21 rule out hysterectomy-related pain,
22 because that's not going to cause -- or
23 be associated with mesh contraction and
24 palpation tenderness.

Page 65

1      Q.   Is it possible that some of
2  her pain is related to the hysterectomy?
3      A.   On the anterior vault and
4  obturator space, no.
5          It's going to be in varying
6  degrees.  So I can't completely, 100
7  percent, rule out everything.  I have to
8  look at the data and my experience, and
9  that's what points to the mesh.
10         Because the vaginal vault
11 discomfort after a hysterectomy is
12 different, it's treated differently.  We
13 have different successes with it than
14 with the meshes.  So that's why I have
15 to -- we have to look at the totality of
16 the patient for that answer.
17     Q.   And would you agree that
18 nowhere in your report do you discuss the
19 hysterectomy as a possible alternative
20 cause or how you ruled it out?
21     A.   I didn't feel I needed to,
22 because I talk about the specific mesh
23 contraction, mesh exposure, tenderness on
24 palpation on the anterior vault.  That's

Daniel S. Elliott, M.D.

Page 66

1  away from where the hysterectomy was
2  performed.
3          So my experience, on a daily
4  basis dealing with women who have had
5  hysterectomies, we don't see discomfort
6  in that region.  So we're talking about a
7  different region.
8          Similar, I don't talk about
9  ovarian pain or ovarian cysts, because
10 it's a different location, different
11 intensity.
12         So I don't specifically
13 state it that way, and I didn't feel I
14 needed to.
15    Q.   Did you review the consent
16 form from Dr. Kim?
17    A.   Yes.  And I have -- I
18 believe, the consent form, I make a
19 reference to on November 30th, 2007.
20 It's on Page 11 of my report, where it
21 states, at the very last sentence -- it's
22 the middle paragraph, very last sentence,
23 and it says, A full PARQ conference was
24 held regarding the procedure.

Page 67

1    Q.   Did you review the actual
2  consent form for the operation?
3    A.   I don't recall -- I mean, I
4  reviewed whatever was there.  I'd have to
5  go look.  I don't recall the specific
6  page.  I'd have to look at it.
7          MR. BUHR:  Let's attach as
8       the next exhibit, I think is
9       Exhibit-7, the consent form.
10         - - -
11      (Whereupon, Exhibit
12      Elliott-7, 1/11/08 Consent Form,
13      was marked for identification.)
14         - - -
15 BY MR. BUHR:
16    Q.   Do you have that in front of
17 you now, Doctor?
18    A.   Yes, I do, dated January
19 11th, 2008.
20    Q.   And under the risks section,
21 do you agree it discusses the risks of
22 further procedures, pain, scarring, wound
23 problems, sexual dysfunction,
24 dyspareunia, malfunction of implanted

Page 68

1  devices?
2          Those are all risks included
3  on this form, correct?
4    A.   Yes.  This is a generic
5  form.  They also have cure cancer,
6  persistent stones.  This is just a
7  generic consent, not a specific one.
8          But they mentioned the
9  things you mentioned.  They also talk
10 about impotence, women don't have
11 impotence.  And ejaculatory dysfunction.
12 Well, women don't have that either.
13         So this is just a
14 cookie-cutter form.
15    Q.   But it does include the
16 risks of dyspareunia and pelvic pain that
17 we discussed?
18    A.   With no description of the
19 severity, the progressive nature of it,
20 the inability to cure it.  Those things
21 are mentioned in a generic form --
22 generic fashion, excuse me.
23    Q.   Are you also intending to
24 offer an opinion on the adequacy of the

Page 69

1  IFU warnings?
2    A.   For a general report, not
3  for a case-specific.  I don't know how
4  that legal stuff goes.  It depends what
5  I'm asked.
6          The IFU, in my opinion, is
7  incomplete, as we discussed in my general
8  deposition several years ago.
9    Q.   And I don't want to re-tread
10 all that testimony.
11         But I do want to confirm
12 that specifically related to the alleged
13 injuries by Ms. Smith that it
14 specifically warns of dyspareunia and
15 scarification and contraction and
16 extrusion, correct?
17    A.   Correct.  That is stated in
18 there in those words that you use,
19 correct.
20    Q.   And did you see Dr. Kim's
21 testimony that she doesn't rely on
22 instructions for use?
23    A.   Correct.
24    Q.   So you're not going to offer

Daniel S. Elliott, M.D.

Page 70

1  an opinion in this case, then, that a
2  different warning on the IFU would have
3  made any difference to Dr. Kim; is that
4  fair?
5      A.   Well, what I state is
6  regardless of what Dr. Kim relied upon,
7  the IFU has to be complete with the
8  severity, the frequency, the inability to
9  cure the problems, et cetera, as known by
10  the company.
11      Q.   Right.  But in terms of
12  Becky Smith's specific case, you're not
13  offering an opinion that Dr. Kim would
14  have done anything different if a
15  different warning had been provided?
16      You have to rely on Dr. Kim
17  for that, right?
18      A.   Well, yeah, you're --
19  ultimately you're right.  I can't state
20  what Dr. Kim would have known.
21      However, had the IFU been
22  fully complete in the severity, the
23  frequency, the inability to fix the
24  problem, Dr. Kim may have heard about

Page 71

1  that.  So I can't speak -- so that would
2  be best addressed to Dr. Kim once she
3  knows all the risks of the procedure.
4      Q.   And did you see her
5  testimony that she had good clinical
6  outcomes implanting both the Align and
7  the Avaulta Plus?
8      A.   I saw that that's what she
9  reported.
10      Q.   And you've never implanted
11  either of these products, correct?
12      A.   I have chosen not to.
13      Q.   Would you agree that Ms.
14  Smith initially healed well following the
15  implant surgery?
16      A.   Correct, as that's what is
17  the usual.
18      Q.   She did not have any
19  extrusion until approximately one year
20  after the implant; is that right?
21      A.   I see, in my records,
22  February 13th, 2008.  So you are correct,
23  it's a year and one month later was, I
24  believe, the -- no, excuse me, that's

Page 72

1  incorrect.
2      It's April of 2008 that I
3  believe the records state the first mesh
4  exposure.  So a year and, what, three
5  months, something like that.
6      Q.   Well, that's one of the
7  things I wanted to talk to you about.
8      Because I think -- so April
9  9, 2008 is only a few months after the
10  implant surgery, right?
11      A.   You are correct.
12      Q.   And so I think the date on
13  that is wrong, and we'll pull that out in
14  a second.
15      A.   Okay.
16      Q.   So in her follow-up, her
17  first post-op visits with Dr. Kim,
18  everything seemed to be healing properly,
19  right?
20      A.   That is correct.
21      Q.   There was no sign of any
22  mesh extrusion on January 23rd, 2008 or
23  February 13th, 2008, right?
24      A.   That is correct.

Page 73

1      Q.   And she was noted to be
2  doing extremely well by Dr. Kim, right?
3      A.   That is correct.
4      Q.   And at this point, the Align
5  had corrected her stress urinary
6  incontinence?
7      A.   In the records, I believe it
8  states something that she's doing very
9  well without any problems.  So the answer
10  to that would be yes.
11      Q.   And the Avaulta had
12  corrected her cystocele?
13      A.   Correct.  Completely gone is
14  what Dr. Kim notes on February 13th of
15  2008.
16      Q.   On what date?  I'm sorry.
17      A.   February 13th, 2008,
18  cystocele, quote/unquote, what I have
19  down here is, completely gone.  That's on
20  Page 13 of my report.
21      Q.   Right.
22      And on that date, and I
23  think it's part of, if you wanted to turn
24  to the records, part of Exhibit-5, and

Daniel S. Elliott, M.D.

Page 74

1 Dr. Kim notes that the anterior vaginal
2 wall has healed very nicely; is that
3 right?
4      A.   I don't have those records.
5 But that's, from my recollection,
6 correct.
7      Q.    Then turning to this April
8 9th, 2008 note that you have of possible
9 mesh extrusion.  And that would be on
10 Exhibit-5, ending in Bates number 11.
11          MS. SCARCELLO:  Exhibit-5.
12          THE WITNESS:  I'm sorry,
13      Exhibit-5.  I thought you were
14      going to hand me something, turns
15      out I already have it.
16          You said Exhibit-5?
17          MR. BUHR:  Yes.
18          THE WITNESS:  Okay, I'm
19      sorry.  And then Bates number?
20          MR. BUHR:  11.
21          THE WITNESS:  Okay, I'm
22      there.
23 BY MR. BUHR:
24      Q.   So is this the record you're

Page 75

1 referring to in your report for April
2 9th, 2008?
3      A.   Correct.
4      Q.    Is it possible that that
5 handwritten date is actually January
6 19th, 2008 -- or 2009, rather, and that
7 it was a mistake that's often made in
8 January by writing the prior year, 2008?
9      A.   So you're saying --
10     Q.   1/19 instead of 4/9?
11     A.   I'm not a, what do you call
12 it, writer expert.  I'm just looking at
13 it.  I see a 4 and then a 1 with a little
14 slash up, 9, and the slash and up again,
15 08.
16          To me it looks like 4/1 -- I
17 mean, we can't be definitive.  But, I
18 mean, it looks like my date of April 9th,
19 and you're telling -- you're suggesting
20 what again?  1 --
21     Q.   1/19 and that they
22 mistakenly wrote 2008 instead of 2009?
23     A.   Well, I -- I don't want to
24 be difficult.  To me, it looks like a

Page 76

1 4/1/9 -- I mean, I don't know.  If we did
2 1 --
3          Q.    And I think we do have
4 another copy of this that was in the
5 hospital records.
6          MR. BUHR:  Can we attach it
7      as the next exhibit?  Is that
8      Exhibit-8, then?
9          MS. GRIFFIN:  Correct.
10          -  -  -
11          (Whereupon, Exhibit
12      Elliott-8, Hospital Record, was
13      marked for identification.)
14          -  -  -
15          THE WITNESS:  If you look
16      down in the history of present
17      illness, 49-year-old female
18      underwent cystocele/Avaulta
19      repair, 1/15/08.  Now with mesh
20      extrusion.
21          So, I mean, it -- I'm going
22      to hold with 4/9/08, unless you
23      have something to be definitive.
24      I'm not going to be --

Page 77

1 BY MR. BUHR:
2      Q.    And the plan there is
3 excision of the mesh, right?
4      A.   Correct.
5      Q.    And you're not aware of any
6 excision of the mesh at that time, in
7 April of 2008?
8      A.   I'm not aware of any, no.
9      Q.    And this is written by Dr.
10 Kim's physician assistant; is that right?
11     A.   I don't know whose assistant
12 it is, but it's a physician assistant.
13          MR. BUHR:  Did we mark
14      Exhibit-8?
15          MS. GRIFFIN:  We did, yes.
16 BY MR. BUHR:
17     Q.    And you see, Doctor, at the
18 top there, how it lists typewritten,
19 1/19/2009?
20     A.   Sure.
21     Q.    So just keep that in mind
22 and let me know in a minute if the timing
23 of January 19th, 2009 makes more sense
24 with the subsequent reports by Ms. -- by

Daniel S. Elliott, M.D.

Page 78

1  Dr. Kim.
2      A.   Well --
3      Q.   And so, specifically, on --
4  go ahead.
5      A.   I'm sorry, I did interrupt
6  you.  That was my fault.  My bad.
7      Q.   So specifically on January
8  16th, 2009 she returned to see Dr. Kim,
9  right?
10     A.   Yes.
11     Q.   And even according to your
12 report, it says, With a new complaint of
13 vaginal mesh exposure beginning roughly
14 one month prior.
15     A.   Yeah, that's what -- yeah, I
16 must have gotten that from the records.
17     Q.   Right.  So this is what
18 she's reporting to Dr. Kim on January
19 16th, 2009.  And you even quote, in your
20 report, About a month ago, her husband
21 noticed some evidence of mesh during
22 sexual intercourse, and this is becoming
23 progressively worse.
24         Is that right?

Page 79

1      A.   Yeah.  That's what the
2  report says, yes.
3      Q.   And if you actually look at
4  that report, which is at -- again, it's
5  on Exhibit-5, Bates number ending in 07.
6         Do you have Bates number 7
7  in front of you?
8      A.   Yes, I do.
9      Q.   So there in that first
10 paragraph is the language that's quoted
11 in your report that I just read.
12         And the subsequent sentence
13 says, The patient states that up until a
14 month ago, she did not feel anything at
15 all.
16         Do you see that?
17     A.   Yes.
18     Q.   So would you agree that that
19 conflicts with the suggestion that the
20 prior report, from Dr. Wyndham, was on
21 January -- sorry.  Let me start over.
22         Would you agree that that
23 conflicts with the suggestion that the
24 report from Dr. Wyndham was April 9th,

Page 80

1  2008, where she had a plan of mesh
2  excision?
3         MS. SCARCELLO:  Objection to
4  form.
5         THE WITNESS:  Yeah, there's
6  a conflict there.
7         First of all, this is not to
8  be picky, it's a physician
9  assistant, so it's not a
10 physician.
11         But, yeah, there is -- there
12 is a discrepancy as far as the
13 dates go.  I won't argue with
14 that.
15 BY MR. BUHR:
16     Q.   So at least according to Dr.
17 Kim's report, she did not feel anything
18 until about a month prior to this January
19 16th, 2009 report, correct?
20     A.   Correct, that's what Dr. Kim
21 reports.
22     Q.   And then Dr. Kim recommended
23 mesh excision, which took place a few
24 days later on January 20th, 2009?

Page 81

1      A.   Correct.
2      Q.   And had she stopped using
3  her Estrace cream at this point?
4      A.   I believe I saw a mention of
5  that.
6      Q.   Can that increase your risk
7  for mesh extrusion?
8      A.   Well, I'm not aware of
9  anywhere it states that with the Avaulta
10 product you have to be on it permanently.
11         Estrogen can potentially
12 help reduce that risk.  But, again, I'm
13 not -- I've never seen where you're
14 supposed to be on it.
15     Q.   No.  But Dr. Kim had
16 prescribed estrogen cream following the
17 implant, correct?
18     A.   Correct.  And it's not
19 uncommon for women not to like it for
20 some reason, concerns about breast
21 cancer, blood clots and those types of
22 things, to stop taking -- or it's just
23 plain messy.  But he did prescribe it
24 afterwards.

Daniel S. Elliott, M.D.

Page 82

1     Q.   And having a hysterectomy at
2 the same time, would she have had
3 postmenopausal changes after the surgery?
4     A.   No.
5     Q.   Was she found to have
6 vaginal atrophy and thinning tissue?
7     A.   Yes. But she still has her
8 ovaries in place. They were not removed,
9 by her request. So we don't know the
10 volume of estrogen being produced. A
11 49-year-old female, you don't know.
12     Q.   But Dr. Kim recommended
13 restarting the Estrace cream on January
14 16th, 2009, based on her complaints; is
15 that right?
16     A.   Yeah. As I have in my -- on
17 Page 13, third paragraph, Dr. Kim
18 recommended restarting Estrace cream.
19 But because of the extent of the erosion,
20 I think this needs to be treated
21 surgically, end quote.
22     Q.   Are there factors that can
23 increase a woman's risk for having mesh
24 extrusion?

Page 83

1     A.   I've never read in the IFU
2 factors, which if they are known, they
3 should be in there.
4     I have seen internal
5 documents that if you have a hysterectomy
6 at the same time, you're increasing your
7 risk for exposure. But, again, that's
8 not in the IFU.
9     Advanced age probably would
10 increase it. But, again, that's not in
11 the IFU. And presence of an infection
12 would do it.
13     So there are going to be
14 factors there. But I'm not aware of the
15 company disclosing that they knew of
16 factors. If they did, they should report
17 it.
18     Q.   Well, there's also certain
19 factors that are generally known in the
20 medical community.
21     For example, would you agree
22 that smoking can increase the risk of
23 extrusion?
24     A.   Excellent point. No. If

Page 84

1 smoking were a risk factor, then that has
2 to be in the IFU, and it's nowhere. At
3 least I haven't seen it. We can pull it
4 out and show it, and I'll change my
5 opinion. But I'm not aware of that.
6     In fact, some will say the
7 mesh kits are better because a smoker has
8 a chronic cough, so it needs to be a
9 stronger repair. So I'd have to -- I'd
10 have to disagree with you.
11     Q.   I guess my question is more
12 that smoking can have an effect on a
13 patient's tissue quality, right?
14     A.   Yes.
15     Q.   And if a patient has poor
16 tissue quality, that can increase their
17 likelihood for something like extrusion;
18 is that right?
19     A.   I suppose, in theory, that
20 is possible.
21     As far as I know, Ms. Smith
22 is a nonsmoker, so it's a moot point
23 here. But, again, if meshes have an
24 increased risk of complication like

Page 85

1 exposure with smoking, then that's got to
2 be on the IFU.
3     Q.   Turning more specifically to
4 Ms. Smith, if she has thinning of the
5 vaginal tissue and vaginal atrophy, can
6 that increase her risk for extrusion?
7     A.   Well, we're talking
8 theoretically here. But the presence of
9 the mesh inside of her body will cause
10 thinning of the vaginal tissue and
11 atrophy appearance, because it is slowly
12 causing a necrosis. So you can't say
13 which comes first.
14     She's, at this point in
15 time, a 49-year-old female.
16 Theoretically, she should be producing
17 estrogen still. Her ovaries are still in
18 place. So I can't completely agree with
19 you on what's coming first.
20     Prior to her surgery, there
21 was -- one year prior, there was no
22 indication of vaginal atrophy. Then she
23 has surgery, a mesh is put in with
24 foreign body reaction, inflammation,

Daniel S. Elliott, M.D.

Page 86

1 she's getting exposure, which means
2 thinning out.  So I would say a logical
3 conclusion, that's due to the presence of
4 the mesh, not due to her.
5       Q.   I think my question was, if
6 a patient has vaginal atrophy, can that
7 increase their risk for extrusion?
8       A.   I know -- I hear what you're
9 saying.
10           And not to be difficult,
11 we're talking about a theoretical
12 patient, how severe that is, and we're
13 not talking about Ms. Smith.
14           So we would have to have a
15 specific individual we're talking about
16 how bad this atrophy is.  And, again,
17 let's say you are correct, then that's
18 not on the IFU and it's not warned at
19 all.  So if that is a known risk, that
20 will be very important to know.
21       Q.   And so are you agreeing with
22 me that it's a factor to consider?
23       A.   Vaginal atrophy would be,
24 definitely, something that you would want

Page 87

1 to consider if it's severe prior to
2 putting in a mesh.
3           You don't have to worry
4 about that with nonmesh repairs.  But in
5 a mesh repair, you would.  And it would
6 be a woman's right to know that her body
7 could be permanently harmed if this
8 product is put in.  So, for me, it
9 becomes under a woman's rights issue.
10       Q.   Did you consider vaginal
11 atrophy in your differential diagnosis?
12       A.   Yes, I did.  By the reasons
13 I have already explained in the last
14 couple of questions ago; 49 year old, she
15 was 48, I believe, at the time of her
16 surgery, she was premenopausal, her
17 ovaries are still in, there's no vaginal
18 atrophy prior to her surgery.
19           One year later, with her
20 ovaries still in place, we have mesh
21 exposure, thinning and atrophy.  And in
22 my opinion, based upon my experience,
23 vaginal atrophy due to menopause takes
24 years and years to develop, it's not

Page 88

1 going to happen in over one year's time.
2 So, then, the culprit becomes the
3 presence of the Avaulta and the
4 inflammatory process it causes.
5       Q.   In the list of examples of
6 your differential diagnosis on Page 4 and
7 5, you do not list vaginal atrophy or
8 postmenopausal changes in that list; is
9 that right?
10       A.   It is not listed there, no.
11       Q.   In the excision procedure
12 performed by Dr. Kim, she was able to
13 remove the exposed mesh quite easily,
14 right?
15       A.   Yes, she uses those words,
16 "quite easily."
17       Q.   And I believe you said
18 earlier that this extrusion relates to
19 the Avaulta and not the Align; is that
20 right?
21       A.   I'd have to go back and look
22 at the specific operative note.  But, as
23 I recall, this is specifically due to the
24 Avaulta, where it is located.  It was

Page 89

1 well away from the Align.
2       Q.   And she healed well
3 following this procedure; is that right?
4       A.   Correct.
5       Q.   The anterior vaginal wall
6 completely healed?
7       A.   Yes.  As of the note, April
8 16th, 2009, I believe she uses that word,
9 The anterior vaginal wall has healed up
10 completely.  I do not feel any mesh
11 exposure -- extrusion.  End quote.
12       Q.   And Dr. Kim prescribed
13 Vagifem tablets on that date?
14       A.   I did not make a record of
15 that.  I would have to see the record.
16       Q.   I think it's the first page
17 on Exhibit-5.
18       A.   He gave -- she gave Ms.
19 Smith samples of Vagifem.  So she didn't
20 give a prescription, she gave some
21 samples.
22       Q.   And what is Vagifem, for the
23 record?
24       A.   Vagifems are actually

Page 90

1  estrogen tablets that go into the vagina.
2  They are usually, for most patients,
3  easier to use.  They are cleaner.  The
4  Premarin cream tends to be quite messy,
5  has an applicator that women don't like.
6        So Vagifem is just an easier
7  way to insert the estrogen.  The problem
8  with it is, it doesn't necessarily stay
9  where you want it to go.  But just think
10  of it as a different form of estrogen.
11        Q.   And do you have an
12  understanding as to why Dr. Kim was
13  prescribing estrogen at this time?
14        MS. SCARCELLO:  Object to
15  form.
16        You can answer.
17        THE WITNESS:  Trying to heal
18  up the vaginal wall or continue to
19  heal it up.
20  BY MR. BUHR:
21        Q.   Is that something that is
22  needed in order to heal the vaginal wall?
23        A.   Not necessarily, but she was
24  having trouble with the Estrace cream, it

Page 91

1  was causing irritation.  So that could be
2  part of the reason why she stopped it
3  before.
4        Q.   And Dr. Kim obviously felt
5  like it was important for her to have
6  some estrogen cream or estrogen tablets?
7        A.   That would be the standard
8  party line of what you do after a mesh
9  exposure, is to give vaginal estrogen.
10  But, again, some women can't
11  tolerate it, for multiple different
12  reasons.  And if she had trouble with the
13  Estrace cream, which is just a form of
14  Premarin cream, she could also have
15  trouble with the Vagifem, because, it's,
16  again, the same thing, it's just
17  estrogen.
18        Q.   And would you agree at this
19  point in the records there's no
20  documented complaint of pelvic pain or
21  dyspareunia?
22        A.   For her, Ms. Smith, there
23  was no documented pelvic pain or
24  dyspareunia.  Her partner had noticed

Page 92

1  discomfort prior.
2        Q.   And would you agree that
3  the -- she did not complain to a doctor
4  about any problems after this until 2017?
5        A.   I did not have anything in
6  the records from 2009 until March 21,
7  2017.  So I agree with you.
8        Q.   And, in fact, during that
9  period of time, she saw Ms. Hoth for her
10  annual exams and reported no complaints
11  of dyspareunia; is that right?
12        A.   That is correct.
13        Q.   You reference an August 8th,
14  2013 record from Ms. Hoth where she had
15  bothersome arm pain but no other
16  complaints on that day.
17        A.   That is correct.
18        Q.   Did you see that Ms. Smith
19  actually asked Ms. Hoth on that day about
20  advertisements for vaginal mesh
21  litigation?
22        A.   I remember seeing a
23  reference about that somewhere.  I
24  don't -- I'd have to see the specific

Page 93

1  note.
2        MR. BUHR:  Let's attach as,
3  I believe it's Exhibit-9 we're on
4  now, the record from Ms. Hoth on
5  February 16th -- actually, no.
6  Let's attach the record from
7  August 8th, 2013.
8        - - -
9        (Whereupon, Exhibit
10  Elliott-9, 8/8/13 Hoth Note, was
11  marked for identification.)
12        - - -
13        THE WITNESS:  I have it.
14  BY MR. BUHR:
15        Q.   And if you'd go to the Bates
16  number that ends in 08.
17        A.   Okay.  I'm there.
18        Q.   The top of the next page.
19        But has no other complaints
20  today.  Although has a mesh and is
21  concerned about this, given the current
22  TV ads for, Do you have a mesh, you could
23  be due compensation.  Has had sling and
24  had mesh put in when she had the

Daniel S. Elliott, M.D.

Page 94

1  hysterectomy.  And then they had to trim
2  it up.
3        Do you see that?
4     A.  Yes, I do.
5     Q.  So she was specifically
6  asking her doctor about concerns about
7  the mesh, but at this point she was not
8  complaining of any symptoms of pelvic
9  pain or dyspareunia or extrusion or
10 anything like that, right?
11    A.  You are correct.
12    Q.  Just to be clear, your
13 report includes a reference to a February
14 16th, 2012 report?
15    A.  Yes.
16    Q.  Where you have a reference
17 to pelvic pain with exercise.
18    A.  Correct.
19    Q.  You're not offering an
20 opinion that that pain is anywhere
21 related to the mesh at this point; is
22 that right?
23    A.  I'm just stating what the
24 records stated.  The record,

Page 95

1  unfortunately, and what I deal with all
2  the time, is incomplete.  It just makes a
3  reference to it.
4        So I put it down as
5  documentation.  But I'm not making a
6  conclusion at that point in time.
7     Q.  So at what point in time are
8  you making a conclusion that she's having
9  pain related to the mesh?  Is that in
10 March 2017?
11    A.  Well, I have to go off of
12 the records.  All I saw in there, and we
13 can maybe go to that February 16th, 2012
14 note, if it's there, and that was just in
15 there.  That's all it stated.
16        If it stated more, like it's
17 lifting or a pelvic exam confirms it --
18 I'm just stating that it is there for
19 completeness sake.  But I'm not stating
20 that is due to mesh.  All I've got is a
21 statement there.  That's all I've got.
22        So, like, for a differential
23 diagnosis, I don't have enough
24 information to make a conclusion.  I'm

Page 96

1  just documenting that that's what's in
2  the records.
3     Q.  Okay.  Fair enough.
4        MR. BUHR:  And let's for
5  completeness just go ahead and
6  attach that record as Exhibit-10.
7           - - -
8        (Whereupon, Exhibit
9  Elliott-10, 2/16/12 Hoth Office
10 Visit, was marked for
11 identification.)
12           - - -
13 BY MR. BUHR:
14    Q.  Do you have that in front of
15 you now, Doctor?
16    A.  Yes.  The first page is
17 2017, so it must be before that.
18    Q.  I think that's the printing
19 date.
20        If you look on the left
21 side, it should be 2/16/2012 office visit
22 with Ms. Hoth.
23    A.  I have February 16th of '12.
24 Is that --

Page 97

1     Q.  Yes.
2     A.  Yes, I have it then.
3     Q.  So towards the bottom of
4  that page, it says, Is pain an issue
5  needing to be addressed today?  And it
6  says, No.
7        Right?
8     A.  Yeah, that's what it states.
9     Q.  And then on Bates number
10 ending in 225, about halfway down the
11 page, it has a list for dyspareunia and
12 then it says no.
13        Do you see that?
14    A.  Correct, that's what it
15 states.
16    Q.  And then a little bit
17 further down is what I believe you were
18 referring to in your record, under
19 musculoskeletal, where she says, Pelvis
20 with exercise hurts and put back out this
21 Christmas.
22        Is that what you were
23 referring to in your report?
24    A.  Correct.

Daniel S. Elliott, M.D.

Page 98

1    Q.   And then if you go onto the
2    next page -- well, she does -- she does
3    an exam?
4        A.   Correct.
5            - - -
6        (Whereupon, a discussion off
7        the record occurred.)
8            - - -
9    BY MR. BUHR:
10       Q.   And her assessment for the
11   GYN assessment is normal exam, correct?
12       A.   Correct.  Note, With
13   fullness, no masses or tenderness.  A
14   negative exam.
15       Q.   So then at this point, it's
16   pretty clear she is not complaining of
17   any pain or dyspareunia related to the
18   mesh, correct?
19       A.   Well, as before, she has
20   pelvic -- quote/unquote, Pelvis with
21   exercise hurts and puts -- and put back
22   out this Christmas.
23       So, again, I am not stating
24   it's due to the mesh.  I'm not

Page 99

1    eliminating mesh as an option.  I'm not
2    including it.  It's just a statement
3    that's there.
4        But in the physical exam,
5    there was no pain on exam.
6        Q.   So, then, in March of 2017,
7    as we've discussed, is her first real
8    complaint of pelvic pain and dyspareunia
9    related to the mesh.
10       And she saw a doctor -- or,
11   sorry, a nurse practitioner, Shawn Cool;
12   is that right?
13       A.   Correct.
14       Q.   And this doctor also -- or
15   this nurse practitioner also advised on
16   starting vaginal estrogen cream; is that
17   right?
18       A.   Correct.
19       Q.   And why would she prescribe
20   that at the time?
21       A.   Well, I can't speak for this
22   individual, a nurse practitioner.  It's
23   pretty much the standard thing, knee-jerk
24   response, to give estrogen.

Page 100

1        It's not going to change
2    pain.  It's for a vaginal extrusion.  So
3    I can't vouch for the correctness of that
4    decision.
5        Q.   And you state in your
6    report, Said will trial for two months
7    and see if it provides relief.
8        A.   Correct.  And vaginal
9    estrogen in two months is not going to do
10   any good, you need much longer than that.
11       So that's, reading between
12   the lines, somebody who doesn't deal with
13   meshes.  It's not a criticism.
14       Q.   She had no -- sorry?
15       A.   I interrupted.
16       Q.   She had no evidence of mesh
17   extrusion at this time; is that right?
18       A.   All I have down is, on Page
19   14, during the vaginal exam, Ms. Cool
20   noted that the, quote, bladder sling
21   palpable anteriorly during bimanual exam,
22   end quote.
23       So there's -- I don't know
24   what that means.  Is that exposure or

Page 101

1    what?  We can't put a lot into that,
2    because this is a nurse practitioner not
3    experienced in this.
4        So I can't say, is that
5    exposure?  Is that just that you could
6    feel the scarring and the contraction?  I
7    put that in there for thoroughness sake.
8        She needs -- the patient,
9    Ms. Smith, needs somebody more advanced
10   to be able to give us specifics if we
11   want accuracy.
12       Q.   Do you know if she continued
13   using the estrogen cream?
14       A.   I don't recall.  I
15   remember -- I know she's used it on and
16   off.  But, again, she had vaginal
17   irritation with it, so I don't -- I can't
18   say how well she used it.
19       Q.   In terms of your
20   differential with respect to dyspareunia
21   and the pelvic pain, did you consider the
22   vaginal atrophy that she was having at
23   this point?
24       A.   Yeah.  Vaginal atrophy will

Daniel S. Elliott, M.D.

Page 102

1 cause diffuse -- can cause diffuse
2 irritation of the vagina, thinning of the
3 vagina.  It's not going to cause specific
4 pinpoint pain or palpation of a mesh
5 causing pain.
6        It can cause some burning
7 with sexual activity.  It does not cause,
8 usually, discomfort with normal, daily
9 activities.
10        So that is always in the
11 differential diagnosis.  I ruled it out
12 in this one, again, because the suspicion
13 on exam of palpating the sling.
14     Q.   Are you saying that vaginal
15 atrophy isn't playing any type of role
16 here?
17     A.   It can be a very mild
18 complicating factor.  If vaginal atrophy
19 is the source for the problem, estrogen
20 can help repair it.  But it's not going
21 to cause pain along a mesh.
22     Q.   But you can't rule it out
23 completely as a mild complicating factor?
24     A.   I can rule it out 99.9

Page 103

1 percent, based upon my experience, my
2 attendance at national/international
3 meetings, giving lectures on the subject,
4 and daily exposure to patients.
5     Q.   Did she have a rectocele at
6 this point?  Well, let me rephrase that.
7        She had a mild rectocele at
8 the time of the implant; had the
9 rectocele progressed?
10     A.   I'd have to go over -- the
11 notes are classic for a general
12 practitioner family practice-type, but
13 they don't give specifics.
14        The first note with the
15 nurse practitioner, in March of '17, does
16 not tell me anything of specifics of
17 concurrent prolapse.
18        Follow-up note with the same
19 practitioner, August 13th, 2018, does not
20 state of the posterior -- it does not
21 state of any prolapse, which is an
22 incomplete note and not acceptable with
23 advanced-level-of-care individual.
24        And the physical exam by Dr.

Page 104

1 Denam, Mary Denam, on -- unfortunately, I
2 don't think I have a date here on this
3 one.  Page 15, starting with the bottom
4 paragraph -- for some reason I don't have
5 a date on that, there needs to be a
6 date -- there's no mention of a posterior
7 prolapse.
8        MR. BUHR:  We've been going
9 for a while, Doctor.  How about we
10 take a five-minute break and then
11 come back and finish up with the
12 rest?
13        THE WITNESS:  I'm good, if
14 you want to keep going.
15        MR. BUHR:  I'd like a
16 five-minute break, if you don't
17 mind.
18        THE WITNESS:  That's no
19 problem.
20        VIDEO TECHNICIAN:  We're
21 going off record.  The time is
22 3:14.
23           - - -
24        (Whereupon, a brief recess

Page 105

1 was taken.)
2           - - -
3        VIDEO TECHNICIAN:  We're
4 going back on the record.
5 Beginning of Media File 2.  The
6 time is 3:24.
7 BY MR. BUHR:
8     Q.   I'd like to attach some of
9 the records from The Oregon Clinic as
10 Exhibit-11, I believe.  These are the
11 Bates numbers that end in 7 -- well,
12 sorry, from 11 to 22.
13           - - -
14        (Whereupon, Exhibit
15 Elliott-11, The Oregon Clinic
16 Records, was marked for
17 identification.)
18           - - -
19        THE WITNESS:  Okay, I have
20 it.
21 BY MR. BUHR:
22     Q.   If you go to Bates number
23 that ends in 17, it should be an office
24 visit with Lindsey Waugh, if I'm

Daniel S. Elliott, M.D.

Page 106

1 pronouncing that correctly, dated August
2 23rd, 2018.
3     A.   Okay.  I'm there.
4     Q.   And this is one of the
5 reports that you reference in -- or one
6 of the records you reference in your
7 report on Page 15; is that right?
8     A.   That is correct.
9     Q.   And it states at this point
10 that she's having a constant, dull pain
11 with intercourse?
12     A.   Well, constant, dull pain,
13 especially with intercourse.
14     Q.   And it notes that the pain
15 level is 2 on a scale of 1 to 10.
16         Would you agree with me that
17 that's not severe pain that you describe
18 in your report?
19     A.   Well, on a scale of 1 to 10,
20 it doesn't rank up as severe.  It's worse
21 than a 1, but it is not in the highest
22 scores, obviously.
23     Q.   And then in the third
24 paragraph on that page, it says, The

Page 107

1 sling is working great, no leaking.
2         So her stress urinary
3 incontinence has still been corrected by
4 the Align product, right?
5     A.   That is correct.
6     Q.   Do you see the note that
7 says, Does not use estrogen cream on a
8 regular basis?
9     A.   Correct.
10     Q.   And this is despite being
11 prescribed estrogen cream the prior year
12 by Nurse Practitioner Cool, right?
13     A.   That is correct.
14         The vaginal estrogen would
15 be for the health of the vaginal tissue,
16 for lubrication during sexual activity.
17 And so it states, And does not have
18 issues with vaginal lubrication.
19         So the only reason to give
20 her -- or for her to take it would be for
21 a mesh complication.  And she's not
22 having exposure, so there's really no
23 reason to be on it.
24         But that's what it states,

Page 108

1 she does not use it despite what was
2 given to her.
3     Q.   And if you can turn to the
4 notes of physical exam on Bates number
5 21.
6     A.   Okay.  I'm there.
7     Q.   So the external genitalia,
8 it notes, Postmenopausal with moderate
9 atrophy; is that right?
10     A.   Correct.
11     Q.   And then, actually, inside
12 the vagina is postmenopausal atrophic
13 appearance; is that right?
14     A.   That's what it states.
15     Q.   And the estrogen cream would
16 be helpful for that type of atrophy,
17 would you agree with that?
18     A.   If she's making the right
19 call that it's due to atrophy, that would
20 theoretically help, if she can tolerate
21 it.
22     Q.   And then it notes, The
23 posterior compartment prolapse to level
24 of the hymenal ring.

Page 109

1     A.   Correct.
2     Q.   What stage prolapse is that?
3     A.   Stage 2.
4     Q.   It's a stage 2 rectocele she
5 has now, right?
6     A.   Correct.  It's to the level
7 of the hymenal ring.  It doesn't say it
8 goes beyond.  That would be a stage 2.
9     Q.   And under impression it
10 notes that she has symptomatic posterior
11 compartment prolapse.
12         What symptoms was she having
13 related to that prolapse?
14     A.   Well, from the note, she
15 denies feeling a vaginal bulge.  She does
16 feel some pressure towards her rectum.
17         So that would be the
18 posterior prolapse symptoms.
19     Q.   Can posterior prolapse cause
20 pelvic pain and dyspareunia?
21     A.   It can cause a sense of
22 fullness and pressure, but it would not
23 cause a tender-to-palpation issue like
24 she had on her exam.

Daniel S. Elliott, M.D.

Page 110

1    Q.   And that rectocele hasn't
2  been repaired at any time subsequent to
3  this; is that right?
4    A.   I have not reviewed any
5  records stating that it has been
6  repaired, correct.
7    Q.   So she would still be
8  expected to have symptoms related to that
9  posterior prolapse, right?
10   A.   Prolapse symptoms tend not
11 to go away, so I would expect for her to
12 still have symptoms.
13   Q.   And even though she states
14 that she doesn't believe she has any
15 trouble with lubrication, vaginal atrophy
16 can cause painful sex, right?
17   A.   It can cause irritation and
18 burning with sexual activity, which is
19 usually treated with a lubricant -- or
20 can be successfully treated with
21 lubricant or the vaginal estrogen.
22      But, again, it won't cause
23 tender-to-palpation or specific pinpoint
24 pain.

Page 111

1    Q.   There is no evidence of mesh
2  extrusion at this visit, right?
3    A.   There is no report of mesh
4  exposure.
5    Q.   And then she's referred to
6  Denman.
7      And I think that's what you
8  were referring to prior to our break?
9    A.   Correct.
10   Q.   And that's when Dr. Denman
11 notes that she has pelvic pain with
12 intercourse and feels a bulge with and
13 after a bowel movement, right?
14   A.   Correct.
15   Q.   And so could some of that be
16 related to her rectocele?
17   A.   That's why you would need
18 the physical exam to confirm it.  A
19 physical exam will tell you if she has
20 the rectocele, palpation in certain
21 areas, pelvic floor, et cetera.
22      Again, that's why the
23 physical exam is so important.
24   Q.   And Dr. Denman even notes

Page 112

1  that she was on vaginal estrogen for a
2  period of time but not long-term --
3    A.   Correct.
4    Q.   -- correct?
5    A.   Yes.
6    Q.   And she has not had any
7  pelvic floor physical therapy?
8    A.   Correct.
9    Q.   Is that something that can
10 help with pelvic pain?
11   A.   It depends what type of
12 pelvic pain it is.  In my experience,
13 pelvic floor myalgia which is de novo,
14 you can have some benefit from it.
15      Secondary to mesh, I have
16 never had a patient get significant
17 reduction of pain with physical therapy.
18   Q.   Would you agree that Dr.
19 Denman felt that physical therapy was an
20 important part of her plan for Ms. Smith?
21   A.   Well, not really, because
22 she recommended going to surgery fairly
23 soon afterwards.  So it was not a serious
24 consideration.  She gives it as an

Page 113

1  option.
2    Q.   Let's turn to Dr. Denman's
3  report from August 29th, 2018, which is
4  actually part of that last exhibit.
5      Do you have that record in
6  front of you?
7    A.   Yes, I do.  You're talking
8  Exhibit-11?
9      MS. GRIFFIN:  Correct.
10      MR. BUHR:  Yes.
11      THE WITNESS:  And what
12 page -- I'm sorry, Bates number?
13      MR. BUHR:  The Bates number
14 11.  So the first page of that
15 exhibit.
16      THE WITNESS:  I'm there.
17 BY MR. BUHR:
18   Q.   So about halfway through the
19 paragraph, under plan, it says, Discussed
20 need for PT -- which I assume is physical
21 therapy -- after surgery to help decrease
22 scar tissue formation as well as decrease
23 pain.
24   A.   Correct.  That's what she

Daniel S. Elliott, M.D.

1  states.
2      Q.   Do you agree that that's --
3  do you agree that that's part of her
4  plan, then, and she thought that would
5  help?
6      A.   Well, she discusses it after
7  surgery.  It won't have any bearing on
8  scar tissue, but it may help decrease the
9  pain.  In my experience, it does not.
10     Q.   Will it help --
11     A.   I'm sorry.
12     Q.   Would it help decrease the
13 formation of scar tissue after the
14 surgery?
15     A.   No, absolutely not.  It has
16 nothing to do with that.  Unless she's
17 talking about vaginal dilators to help
18 prevent scarring of the vagina.  But
19 physical therapy alone does not help with
20 that.
21     Q.   So you think she's just
22 wrong on this?
23     A.   I didn't say that.  The note
24 is not clear.

1      Who knows what she's
2  thinking.  If she's talking about vaginal
3  dilators, sometimes they'll use various
4  different vaginal procedures and
5  stretching.  If they're talking about
6  that physical therapy, yes.  But that
7  falls into the pelvic floor rehab.
8      So I can't state what she's
9  referring to here.  And if she's
10 referring to the vaginal dilators, then,
11 yes, that will help reduce the narrowing
12 and aggressive scarring of the vagina.
13     Q.   And Ms. Smith hasn't done
14 any type of PT after the surgery, right?
15     A.   I'm not aware of her doing
16 any, no.
17     Q.   Then she also states,
18 Discussed need for perioperative vaginal
19 estrogen to improve healing.
20     Do you have any disagreement
21 with that part of the plan?
22     A.   For mesh exposure, I think
23 it probably plays a role.  For mesh
24 scarring, mesh arm contraction, it will

1  have no benefit.
2      Q.   She refers to the -- her
3  impression -- well, strike that.
4      You can have vaginal
5  scarring after any type of vaginal
6  procedure; would you agree with that?
7      A.   In varying degrees,
8  severity, progression, permanence,
9  inability to fix, that can happen with
10 procedures.
11     But, again, there's going to
12 be variables with each procedure.
13     Q.   Right.  But it's something
14 that's well known and expected, correct?
15     A.   Well, no.  It depends upon
16 who you're talking to, their level of
17 knowledge, their level of experience.
18 And then, again, in varying degrees.
19     Not all doctors read the
20 same books, attend the same meetings.
21 There's variable --
22     Q.   You agree that Dr. Kim
23 testified that she was aware of the risk
24 of scarring and scarification?

1      A.   She was aware of what she
2  knew but not the full extent of it, as
3  we've talked about before.
4      Q.   Well, again, you don't know
5  the full extent of what she knows?
6      A.   I don't.  I'm playing odds
7  that she has not reviewed what I've
8  reviewed.  And she knows what she knows,
9  and I have no argument against that.
10     Q.   But there's expected to be a
11 certain amount of scarring around any
12 type of pelvic mesh that's implanted;
13 would you agree with that?
14     A.   All meshes have been shown
15 to increase fibrosis and scarring.  Not
16 all meshes are the same, so there would
17 be varying degrees of mesh scarring with
18 a specific product.
19     Q.   And how do you define banded
20 as you refer to it in your report?  Is
21 that related to scarring?
22     A.   That is a function of
23 scarring and the product design.  And
24 that's referring to, usually, the mesh

Page 118

1 arms, as when they're pulled through,
2 they roll and contract and cause banding.
3 They are palpable, you can feel it.
4 There's a very classic feel to it.
5    Q.   Here, Dr. Denman advised
6 against removing the arms, she doesn't
7 feel there's any problems related to the
8 arms.
9        Would you agree with that?
10    A.   No, I disagree -- I mean, I
11 agree not to remove the arms, that is a
12 risky, dangerous surgery without any
13 clear benefit.
14        Now, some surgeons around
15 the United States still do that, or are
16 trying to do it.  We still don't know if
17 that's the right way to go.  I personally
18 do not remove the arms.  Again, it's a
19 very, very difficult, morbid procedure
20 with the risk/benefit ratio more on the
21 risk.
22        So it's not that Dr. Denman
23 didn't think that was the source of the
24 problem, she didn't feel that it would

Page 119

1 cure the problem.
2    Q.   Well, did you read her
3 deposition testimony where she
4 specifically testified that there was no
5 pain at the arms of the mesh?
6    A.   Correct.
7    Q.   And do you have any reason
8 to disagree with that assessment?
9    A.   Based upon the physical exam
10 at that point in time, she touched the
11 right area, I have no reason to doubt it.
12    Q.   So there's no evidence that
13 she has pain related to the arms of the
14 mesh, right?
15    A.   Well, she had -- she was
16 tender to palpation and she had the thick
17 banding on the anterior wall painful to
18 palpation, 2 centimeters in width at max
19 with lateral arms obturator.  So that, to
20 me, tells it's -- the arms are a
21 component to this.
22    Q.   But she specifically
23 testified there was no pain at the arms
24 of the mesh?

Page 120

1    A.   I'm just going off of what
2 her note is here.  And it seems pretty
3 clear here.  Again, thick banding
4 anterior wall painful to palpation,
5 approximately 2 centimeters in width at
6 max with lateral arms, question mark,
7 obturator.
8        And so I don't know -- we'd
9 have to look at her exact testimony,
10 which may be helpful.  But this, to me,
11 seems pretty clear.
12        But, again, if I were her in
13 her situation, I would not go after
14 removing those mesh arms.
15    Q.   Let's look at her deposition
16 testimony.  If you can hand him Dr.
17 Denman's transcript from June 13th, 2019.
18        MS. GRIFFIN:  I'm sorry,
19        Eric, that came in spotty.  But we
20        will mark Dr. Denman's deposition
21        testimony from June 13th, 2019.
22        And that will be Exhibit-12.
23            - - -
24        (Whereupon, Exhibit

Page 121

1    Elliott-12, 6/13/19 Deposition
2    Testimony of Dr. Mary Denman, was
3    marked for identification.)
4        - - -
5        THE WITNESS:  Okay, I have
6    it.
7 BY MR. BUHR:
8    Q.   If you'd go to Page 79.
9    A.   You cut out.
10    Q.   If you'd go to Page 79.
11    A.   Oh, 79.
12    Q.   And this is the individual
13 page number.  Because on Page -- because
14 there's four pages per page.
15    A.   Sure.  I'm there.
16    Q.   So Page 79, Line 5:  So
17 going back to the plan on Page 11, it
18 states here that you didn't find any
19 issues with the arms of the mesh; is that
20 right?
21        Denman responds:  Correct.
22        And then further down, Line
23 14:  And when you say there were no
24 issues, that's because on examination it

Daniel S. Elliott, M.D.

Page 122

1 was not tender there, right?
2         Her answer is:  Correct.
3         She was not reporting pain
4 there, right?
5         She responds:  Correct.
6         So would you agree, then,
7 that she wasn't having any pain at the
8 site of the arms?
9     A.   That's what she states.  I'm
10 just going off -- we have a discrepancy
11 between her that-day exam and then what
12 she testifies, you know, a year or so
13 later.
14         But that's what she states.
15 There's a discrepancy here.
16     Q.   Right.  Her sworn testimony
17 as she's reviewing her records.
18     A.   Correct, that's what she
19 states.
20     Q.   Are you going to disagree
21 with her assessment?
22     A.   No, that's what she states
23 under oath.  I have no reason to
24 disagree.  I was just going off of the

Page 123

1 physical exam at the time.  But, you
2 know, that's what she states later.
3     Q.   Dr. Denman, in her report,
4 there's a reference to that she discussed
5 likely nerve damage from FAVD, which I
6 believe is forceps-assisted vaginal
7 delivery; is that right?
8     A.   Yes.  I would assume so.
9 That's not an abbreviation -- I don't do
10 any OB, so I assume that.
11     Q.   Then it goes on, Episiotomy
12 with delivery.  Reassurance there's not a
13 mesh factor involved with this issue,
14 speaking of the fecal incontinence.
15         And you don't have any
16 disagreement with that, do you?
17     A.   No.  A vaginal delivery and
18 episiotomy and, I believe, she had four
19 or five, maybe even six children, which
20 were all decent-sized babies, that,
21 logically, is going to cause fecal
22 incontinence.  And it is -- in my
23 opinion, the Avaulta and Align are not
24 associated with fecal incontinence.

Page 124

1     Q.   Excuse me for a second.
2         Are there any more
3 conservative options Dr. Denman should
4 consider before removing the mesh?
5     A.   No.  Dr. Denman did a nice
6 job.
7         Your two options, which we
8 still do not know, I don't know, even
9 though I see this every day, is, what do
10 you do with these individuals?  Do you
11 operate or let them be?  And then if you
12 do operate, how aggressive do you get?
13 It still remains to be defined.
14         So I think she did a nice
15 job.  She felt this -- she felt the mesh,
16 so she felt surgery to get rid of the
17 mesh was a viable option.  So I have no
18 criticism.  I think she did a nice job.
19     Q.   Ms. Smith wasn't on any pain
20 medications at this point, was she?
21     A.   No, she was not.
22     Q.   And she had not done any
23 physical therapy, correct?
24     A.   I am not aware of her doing

Page 125

1 any physical therapy.
2     Q.   And she was periodically on
3 estrogen but not consistently, correct?
4     A.   Correct.  As I stated
5 before, it won't help with mesh-related
6 pain.  But you are correct, she took it
7 intermittently.
8     Q.   Can trigger point injections
9 help pelvic pain like this?
10     A.   Due to the mesh, no.  Due to
11 pelvic floor myalgia muscle spasms, they
12 may play a role and have shown some
13 success.
14     Q.   Then they proceeded to the
15 explant on November 15th, 2018.
16     A.   Okay.
17     Q.   And she was noted to have
18 moderate scarring; is that right?
19     A.   That is what she states,
20 Moderate scarring of contracted mesh at
21 the level of the trigone/UBJ.
22     Q.   And, again, you're going to
23 have scarring with any type of vaginal
24 mesh procedure, right?

Daniel S. Elliott, M.D.

Page 126

1  A.   In varying degrees,
2  dependent upon the specific mesh, you
3  will have some.
4  Q.   It notes that she removed,
5  quote, blue mesh; is that right?
6  Do you see that?
7  A.   Yes.  She makes a
8  specific -- midline blue mesh was noted,
9  meaning that in the middle of that, there
10  was some that was blue.
11  Q.   And you would agree with me
12  that that would be the Avaulta mesh?
13  A.   That is correct.
14  Q.   And Dr. Denman noted that
15  the tissue was really thin, the vaginal
16  tissue.
17  Is that possibly due to not
18  using estrogen cream consistently?
19  A.   It's due to the presence of
20  the mesh causing chronic inflammation and
21  pending erosion -- excuse me, exposure.
22  And there's granulation tissue, meaning
23  poor healing.
24  Q.   Every patient heals

Page 127

1  differently, would you agree with that?
2  A.   Well, no.  I mean, there can
3  be certain patient factors that can slow
4  it down or speed it up.  There can be
5  variations there.
6  Q.   And what patient factors --
7  what patient factors are those?
8  A.   Chronic steroid use,
9  perhaps; markedly advanced age, perhaps.
10  But we're talking with --
11  the vagina is different than with
12  abdominal procedures.  So the vaginal
13  estrogen content would probably be one.
14  But the presence, also, of a
15  foreign body in there is the main factor.
16  Q.   And vaginal atrophy can be a
17  factor.
18  But if I understand your
19  testimony right, you believe that vaginal
20  atrophy itself was caused by the mesh in
21  some fashion?
22  A.   Well, I'm saying that's a
23  contributing factor, a major contributing
24  factor.

Page 128

1  If vaginal atrophy, just
2  using logic here, were a major aspect of
3  poor vaginal healing, then all of the
4  hundreds of transvaginal repairs I do
5  without a foreign body would also be
6  breaking down and having exposure, and
7  they're not.  I don't get any, zero.
8  We watch our patients very
9  closely with questionnaires, telephone
10  follow-ups, seeing them back in clinic,
11  wound breakdowns in the vagina.
12  With meshes, you know, there
13  is the known risk of the granulation
14  tissue -- granulation tissue, poor
15  healing, inflammatory process.
16  So I'm saying in Ms. Smith,
17  looking at all the factors, the presence
18  of the foreign bodies and the
19  inflammation is causing her thin tissue
20  breaking down and the scarring is causing
21  the pain.
22  Q.   But would you agree with me
23  that not every patient that has
24  transvaginal mesh results in vaginal

Page 129

1  atrophy and thinning of the vaginal wall?
2  A.   You are correct.  Not every
3  patient has bad outcomes like Ms. Smith.
4  Q.   Right.  So in some fashion,
5  it's a patient factor?
6  A.   Well, no, I disagree with
7  that.  I mean, if there's a known risk
8  factor that we can point at in Ms. Smith
9  that the Bard people know about, then
10  it's got to be in the IFU.  But there's
11  nothing in there.
12  They have some
13  contraindications, I believe, it's just
14  for pregnancy, bleeding problems.  But
15  that's it.  So to blame her is to be
16  blaming, what, 20, 30 percent of the
17  patients who have Avaulta?  So I don't
18  think that's right.  I don't have any
19  logic to go off of for that.
20  Q.   The fact is that some
21  patients have complications from
22  surgeries and some patients don't?
23  A.   That is a fact, yes.
24  Q.   Right?

Daniel S. Elliott, M.D.

Page 130

1      A.   Correct.
2      Q.   So, then, after the
3   procedure -- well, first, let me confirm,
4   the Align sling is still performing as
5   intended in correcting the stress urinary
6   incontinence, correct?
7      A.   From everything I know at
8   this point, you are correct.
9      Q.   And I believe her last --
10  well, let's look at your report.
11         You reference a visit with
12  Dr. Denman on December 3rd, 2018 on Page
13  17 of your report.
14     A.   Correct.
15     Q.   And I think that might be an
16  incorrect date.
17         MR. BUHR:  Let's attach as
18  Exhibit-12 the report from Dr.
19  Denman, January 2nd, 2019.
20         MS. GRIFFIN:  Okay.  We will
21  be attaching this as Exhibit-13.
22              - - -
23         (Whereupon, Exhibit
24  Elliott-13, 1/2/19 Dr. Mary Denman

Page 131

1   Report, was marked for
2   identification.)
3              - - -
4         THE WITNESS:  Okay, I have
5   it.
6   BY MR. BUHR:
7      Q.   So not that it's a
8   controversial issue, but just for the
9   accuracy of the report, what you
10  reference here as December 3rd, 2018
11  appears to be from this January 1st -- I
12  might be corrected.
13     A.   I think it's correct.  If we
14  look at Bates Number 32, that's 12 --
15  it's, what, two pages in?  12/3/18, first
16  post-op exhibit.  Then if you go to Page
17  33, exam, vaginal incision.  And then
18  that's less than 5 centimeters
19  separation.  So I think that date is
20  correct.
21     Q.   You're right.
22         In your report, you don't
23  have the January 2nd, 2019 report, right?
24     A.   That is correct, yes.

Page 132

1      Q.   Okay.  So for the December
2   3rd, you have a, quote, Small area of
3   midline granulation tissue.
4         Well, actually, I think the
5   quote is that there was a separation
6   along the incision with good granulation
7   tissue.
8         Do you see that on Page 33?
9      A.   Yes, I do.  I -- yeah, so
10  the December 3rd quote -- well, there's
11  not a quote.  It says, Small separation
12  of vaginal incision measuring less than
13  .5 centimeters.
14         And then I do quote the
15  follow-up visit on January 2nd, that's
16  what you were referring to.  But I don't
17  see the physical exam on that one.
18     Q.   Okay.  We'll just -- that
19  makes sense.  Sticking with Page 33.
20         Do you know what she means
21  by "good granulation tissue"?  What does
22  that mean to you as a doctor?
23     A.   This is a fresh post-op.
24  This is two weeks after surgery.  You

Page 133

1   expect to see granulation tissue there.
2         It just means that it's in
3   the very early healing periods.  It's
4   healing appropriately.
5      Q.   And it was nontender to
6   palpation on December 3rd, 2018?
7      A.   That is correct.
8      Q.   And then going to January
9   2nd, 2019, which is the last report we
10  have -- is that right?  This is the last
11  report we have from the doctor?
12     A.   That's the last that I have,
13  yes.
14     Q.   And her vaginal exam is
15  nontender?
16     A.   Correct.
17     Q.   And there's a small area of
18  midline granulation tissue?
19     A.   Correct.  That's in my
20  report and on this -- from this date.
21     Q.   And she prescribes estrogen
22  again for her?
23     A.   I don't know if she
24  prescribed it.  But it states, Estrace to

Daniel S. Elliott, M.D.

Page 134

1 vagina, which would be an estrogen cream.
2     Q.   And that would be to help
3 with the healing?
4     A.   Correct.
5     Q.   And she okays her for
6 intercourse after two weeks.
7         Do you have any criticism of
8 that, based on what the exam showed?
9     A.   I personally would wait
10 until it's completely, 100 percent,
11 healed up.  So I don't go by a date.  Six
12 weeks out is usual timeframe.   And so
13 she's postponing it another two weeks.
14         So Dr. Denman's assessment
15 was that it would be safe at that point
16 in time.
17     Q.   But she doesn't examine her
18 and confirm that the healing is complete
19 before authorizing intercourse; is that
20 fair?
21     A.   I do not see that in the
22 records anywhere.
23     Q.   And if Ms. Smith had vaginal
24 intercourse before the -- her vaginal

Page 135

1 wall had completely healed, could that
2 contribute to continued problems healing?
3         MS. SCARCELLO:  Objection.
4     You can answer.
5         THE WITNESS:  Well, I would
6     need to know -- I mean, we're
7     talking in theory here.
8         With this small area of
9     midline granulation tissue, I
10     don't know how extensive that is.
11     I feel that Dr. Denman, in her
12     experience, must have felt it was
13     mild.  And then two weeks would
14     have been safe.
15         If she went -- preceded
16     those two weeks, or within that
17     two weeks had intercourse, that
18     might not be the ideal.  If she
19     waited until afterwards, Dr.
20     Denman felt it was safe.
21 BY MR. BUHR:
22     Q.   Thank you.  But I think my
23 question was, if you have sexual
24 intercourse before the vaginal wall is

Page 136

1 completely healed, can that contribute to
2 continued healing problems?
3         MS. SCARCELLO:  Same
4     objection.
5         THE WITNESS:  I would agree
6     with you.  It's definitely not
7     going to help.
8 BY MR. BUHR:
9     Q.   And you, in your report, are
10 offering certain opinions about Ms.
11 Smith's likely prognosis; is that right?
12     A.   That is correct.
13     Q.   And you describe her
14 prognosis as poor?
15     A.   That is correct.
16     Q.   And you wrote this report
17 before reading Dr. Denman's testimony; is
18 that right?
19     A.   That is -- yes, that is
20 correct.
21     Q.   And Dr. Denman testified
22 that her pain and dyspareunia is markedly
23 improved since the 2018 surgery; is that
24 right?

Page 137

1     A.   That is correct.
2         And that is also my
3 experience on early post-ops after
4 meshes.  You usually have a period that
5 the pain is less and it comes back, in my
6 experience, and in the experience of
7 individuals who have written papers on
8 this subject.
9         I hope it doesn't, but it
10 usually comes back.
11     Q.   So are you saying -- are you
12 offering an opinion, to a reasonable
13 degree of medical certainty, that her
14 pain is going to return?
15     A.   Based upon my experience, my
16 attendance at national/international
17 meetings and my giving lectures on the
18 subject, my dealing with patients, and
19 I've operated on these types of patients,
20 that the odds are greatly that pain will
21 come back.
22     Q.   So can you state, with a
23 reasonable degree of medical certainty,
24 that the pain will come back?

Daniel S. Elliott, M.D.

Page 138

1   A.   Just as I already stated,
2   with all those aforementioned criteria,
3   that pain usually does come back.
4       And that's why I have chosen
5   to stop operating for these conditions
6   for pain.  And that's also based upon a
7   paper by Ho, et al., H-O, et al., where
8   the poor success of operating for pain,
9   because it doesn't work.
10  Q.   But you would at least agree
11  that at this point it's markedly
12  improved?
13  A.   Correct.  And that is
14  wonderful.  And I hope I'm wrong.  And if
15  I'm wrong, that's wonderful for Ms.
16  Smith.
17      I just -- in my experience,
18  it doesn't last.
19  Q.   So it may come back but it
20  may not; is that fair?
21  A.   The odds are, based, again,
22  the Ho, et al. -- I believe it's Ho, it's
23  a Zimmerman -- Phillipe, Zimmerman, at UT
24  Southwestern, talks about roughly a 70

Page 139

1   percent chance that the pain comes back
2   or is not cured by surgery.
3       Again, if I'm wrong, that
4   would be wonderful for her.  But,
5   unfortunately, experience has told me
6   otherwise.  I've had many patients.  I do
7   surgery on it, and they have great pain
8   relief, and we're thrilled, and then
9   disappointed months later or years later.
10  Q.   In Dr. Denman's testimony,
11  she describes some more -- a more recent
12  visit with Dr. -- I'm sorry, let me start
13  over.
14      In Dr. Denman's testimony,
15  she discusses a more recent visit with
16  Ms. Smith where she had some lateral
17  muscle pain.
18      Are you offering any opinion
19  about the cause of that lateral muscle
20  pain?
21  A.   I would have to see that
22  actual report before I could state
23  definitively.  Lateral is very worrisome
24  for the arm pain, mesh contraction.

Page 140

1   Q.   Did you see Denman's
2   testimony that she could not conclude the
3   cause of it?
4   A.   Yeah, we would have to look
5   at the specific report.  I recall her
6   stating that.
7   Q.   And she didn't note any
8   muscle pain prior to the explant in the
9   same area; is that right?
10  A.   Again, we need to look at
11  the specifics.  I would be going off of
12  memory, so it wouldn't be fair.  I have
13  the report here.
14  Q.   Well, we don't have the
15  report from --
16  A.   I'm sorry, deposition.  I'm
17  sorry, you said deposition, I thought.
18  Q.   I think it's on Page 55.
19  A.   Okay.  I'm there.
20  Q.   So she was having a little
21  increased pain?
22  A.   Correct.  That's what I'm --
23  that's what I'm describing.  In my
24  experience, that fits perfectly.

Page 141

1       You have an initial good
2   response, and then it comes back.  Again,
3   I wish I were wrong, but that's what
4   happens.
5   Q.   But do you see how she
6   describes this as muscle pain on Line 9?
7   A.   Correct.
8   Q.   And then says she does
9   not -- she does not know what's causing
10  that muscle pain?
11  A.   Yeah.  I agree she doesn't
12  know what's causing it.
13  Q.   So I'm saying, to a
14  reasonable degree of medical certainty,
15  she doesn't know what's causing it, can
16  you state -- you can't state, to a
17  reasonable degree of medical certainty,
18  what's causing it without examining the
19  patient, correct?
20  A.   An exam would be very
21  beneficial.  I can state, based upon my
22  experience of doing probably hundreds of
23  these, that she has pain that's coming
24  back.  It's in the muscles due to the

Daniel S. Elliott, M.D.

Page 142

1 presence of the arms; going through the
2 various different muscles from the
3 obturator foramen bilaterally.
4        Dr. Denman, no criticism to
5 her at all, doesn't know because she just
6 hasn't done these.  This is probably her
7 one and only time she's done this.  So I
8 don't criticize her.  She doesn't know,
9 she admits it, which is very admirable.
10       And I'm saying, with a
11 reasonable degree of medical certainty,
12 it's due to the presence of the mesh
13 arms.
14    Q.   If you'd turn to Page 35 of
15 her deposition.
16    A.   Okay, I'm there.
17    Q.   The very last -- Lines 24
18 and 25, where it says she didn't have any
19 muscle pain, so this was prior to the
20 explant, she didn't have pain in the same
21 area where she's complaining of pain now.
22       So wouldn't that make it
23 less likely to be related to the mesh?
24    A.   It's a progression of the

Page 143

1 fibrosis and scarring.  They know from
2 animal models, from, like, Closter,
3 Hoffin and others, that the mesh
4 extraction continues indefinitely.  They
5 have dog studies 15 years, 20 years out.
6 So this is the natural progression of it.
7    Q.   After the mesh -- the
8 central part of the mesh connecting the
9 arms has been removed?
10    A.   Yes.  But the mesh arms are
11 still going through the obturator foramen
12 connected to -- off the top of my head I
13 would say it's six or seven different
14 muscles.  So the mesh continues to
15 contract, and you get continued pain.
16    Q.   Does Ms. Smith have back
17 pain, lower back pain?
18    A.   Yes, she does.
19    Q.   Can that radiate into the
20 pelvis area?
21    A.   Not causing specific
22 pinpoint pain.  That's where an exam
23 would help sort that out.
24       But back pain is in the

Page 144

1 back.  You can have radiculopathies going
2 down the legs.  Again, it just depends
3 upon where this pelvic pain is.
4        If it's mid vault, is it
5 obturator foramen versus if it's in the
6 low back -- if it's in the low back, I
7 agree with you, it's not due to the mesh.
8    Q.   And we just don't have the
9 detailed descriptions, as we sit here
10 today, to completely rule out pain
11 radiating from her back?
12    A.   Well, I have no medical
13 records describing her back pain and
14 where that pain is and where it radiates
15 to.  If we had that, that would help sort
16 out the issue.
17       I'm saying that when you put
18 all the factors together of having a
19 large volume of mesh put through the
20 obturator foramen, having mesh
21 contraction and pain, removing it, and in
22 my experience, in the literature, 50 to
23 70 -- 30 to 50 percent mesh arm
24 contraction rate, everything fits as far

Page 145

1 as it being with mesh.
2        But definitively answering
3 the question would require either an IME
4 or an advanced expert to examine her and
5 telling us otherwise.
6    Q.   But you would agree that the
7 pain is still markedly improved over
8 prior to the explant?
9    A.   I can't say that.  She says
10 it's increased.  But it's -- there's no
11 indication that it's back to where it
12 was.  I forget, we were on Page 35, I
13 believe.
14    Q.   55.
15    A.   55.
16    Q.   She describes it as having a
17 little increase in pain.
18    A.   Yeah.  So that would imply,
19 to answer your question, yes.  As of
20 that -- the last exam, which I don't have
21 the records from that, she states she was
22 having a little increase in pain.  You're
23 correct.
24    Q.   Do you have any opinion on

Daniel S. Elliott, M.D.

Page 146

1 what future care Ms. Smith may need?
2      A.   In my opinion, the only
3 chance for some improvement would be very
4 aggressive advanced-level physical
5 therapy, biofeedback, bladder retraining;
6 questionable injections into the mesh,
7 around the mesh.  In my experience, that
8 has worked very poorly.
9          The other option is surgery
10 to remove the mesh arms.  In my
11 experience, that tends not to work very
12 well and can make the pain worse.  There
13 are surgeons around the nation who do go
14 after that.  I have just felt the risk
15 outweighs the benefit.
16         So she has options, none of
17 them are really good options.
18     Q.   That would depend on whether
19 her pain returns and, if so, how much --
20     A.   Correct.
21     Q.   -- right?
22     A.   Correct.
23     Q.   So as of today, you're not
24 offering an opinion that she's going to

Page 147

1 require any further surgeries; is that
2 fair?
3      A.   I'm saying that I would have
4 to wait and watch with time.  If she only
5 now, or whenever this last exam was, has
6 a little increase in pain, then she
7 should not undergo surgery.
8     Q.   Do you have any opinion as
9 to whether she will require future
10 surgery to repair her rectocele?
11     A.   Well, a rough estimate is
12 that roughly a third of women have their
13 prolapse progress to needing surgery.  So
14 that's just a rough idea.
15         But it would be immaterial
16 to the Avaulta.  It's a separate problem.
17     Q.   Right.  But further
18 surgeries related to -- for an unrelated
19 rectocele could result in more pelvic
20 pain and dyspareunia, correct?
21     A.   Well, we're talking, in
22 theory, she could.  But she wouldn't have
23 any mesh-related pain.  Again, we're
24 talking in theory.

Page 148

1          Right now she doesn't
2 warrant it.  So I don't have specifics
3 where I can give an answer to that one.
4     Q.   But, in general, in terms of
5 the known risks of repair of pelvic organ
6 prolapse, it can result in pelvic pain
7 and dyspareunia, right?  Even without
8 mesh?
9      A.   You have to put qualifiers
10 on there.  There's varying degrees,
11 severity, progression, inability to fix
12 it.  But the posterior prolapse can be
13 associated with it.  But, again, it's not
14 to the severity that we see with the
15 meshes.
16     Q.   And if she would have had --
17 one of -- well, let me start over.
18         One of the safer
19 alternatives that you allege in your
20 report is repair with biologics.  And
21 that's both for stress urinary
22 incontinence and pelvic organ prolapse.
23         But those types of repairs
24 also include the risk of pelvic pain and

Page 149

1 dyspareunia, right?
2      A.   Not to the degree that we
3 see with the meshes and the severity and
4 the progressive nature of it.  So no.
5     Q.   But there's risks and
6 benefits to both of those procedures,
7 right?  And the doctor has to make that
8 risk/benefit analysis?
9      A.   If that physician, he or she
10 knows all of the risks known to the
11 company, the severity, the progressive
12 nature of it, and the inability to repair
13 it with the meshes -- again, there's too
14 many variables to give a blanket
15 statement to.
16     Q.   Let me say it this way:
17 Using a biologic -- which, first of all,
18 a biologic is not a similar product; it's
19 a completely different product, right?
20     A.   It is a non-mesh product,
21 yes.
22         With her situation,
23 biologics would be way down the list.  It
24 would just be use of standard absorbable

Daniel S. Elliott, M.D.

Page 150

1 sutures that cost $5, would be what I
2 would do with her.
3     Q.   For the treatment of her
4 pelvic organ prolapse?
5     A.   Correct.  With the stage 2
6 anterior prolapse like she had, a
7 standard suture repair of five or six
8 sutures, or less, that cost all of,
9 again, $5, would be what I'd do.
10     I would not go down the
11 route of biologics.  They are
12 theoretically an option.  But she had a
13 relatively mild prolapse, so I wouldn't
14 do that.  It's an option, but it wouldn't
15 be what I would do.
16     Q.   So, again, that's not
17 utilizing any type of transvaginal mesh,
18 then?
19     A.   Correct.
20     Q.   What about for treatment of
21 stress urinary incontinence?
22     A.   Then you can use her own
23 tissue.  You can use tissue from a tissue
24 bank.  Then you could use biologics.

Page 151

1 Others are available.  Using her own
2 tissue is the easiest and cheapest.
3     Q.   And the use of biologics
4 wouldn't completely eliminate her risk of
5 pelvic pain and dyspareunia, correct?
6     A.   As we mentioned before, I go
7 based upon my previous testimony,
8 depending on the severity, the frequency,
9 the progressive nature of it and the
10 inability to repair it is going to be
11 different with the biologics.
12     You don't see those problems
13 with it.  You see recurrence, but you
14 don't see those other chronic, lifelong
15 problems.
16     Q.   But recurrence is a major
17 consideration in determining what
18 procedure is best for the patient, would
19 you agree?
20     A.   It is a consideration.  If
21 you asked the patient, would you rather
22 have a recurrence of your prolapse or
23 lifelong pain and inability to have
24 intercourse, those are two different

Page 152

1 things.
2     Q.   The main reason the
3 community, medical community, was looking
4 towards polypropylene mesh was to
5 increase -- or, rather, decrease the risk
6 of recurrence, correct?
7     A.   That was the goal, which is
8 an admirable goal.  However, it didn't
9 pan out that way.  And so the anatomic
10 repair rate was possibly better in the
11 anterior vaginal vault.  But apical and
12 posterior, there was no benefit.  So the
13 reoperation rate was the same.
14     So you increase the
15 complications for the woman without
16 giving her a significant benefit.
17     Q.   Plaintiff's implant
18 procedure was in January 2008, right?
19     A.   Correct.
20     Q.   The only safer alternative
21 that you list that's specific to vaginal
22 mesh is a lighter-weight, larger-pore
23 polypropylene mesh, right?
24     A.   Correct.

Page 153

1     Q.   And are you aware of a
2 midurethral sling, at that time, that
3 meets the description in your report?
4     A.   Well, I talked about POP
5 repair.  I didn't mention anything as far
6 as a sling.
7     So that Point Number 3 on
8 Page 19 is a POP repair using a
9 lighter-weight, large-pore mesh.  So
10 that's not pertinent to the sling.
11     Q.   What about Number 4 on Page
12 20?
13     A.   Correct.  I am not aware of
14 there being an on-the-market, available,
15 a lightweight, large-pore mesh sling.
16 There were trials of them, but they were
17 never released.
18     Q.   But you believe there was a
19 POP, pelvic organ prolapse, mesh that's
20 lighter weight and larger pore --
21     A.   Ethicon had --
22     Q.   -- in 2008?
23     A.   I'm sorry, I interrupted
24 you.

Daniel S. Elliott, M.D.

Page 154

1    I cannot specifically state
2  to 2008.  Ethicon did have a product that
3  was out there, but didn't have the arms.
4  The arms are what causes a significant
5  component of the problem with pain.
6    That's what I'm saying, is
7  that this particular patient, Ms. Smith,
8  did not need those advanced-level
9  repairs.  It was a first-time surgery
10  with a low-grade prolapse.
11    Q.   And even if there was a
12  lighter-weight, larger-pore mesh
13  available at the time, it wouldn't have
14  eliminated her risk for pelvic pain or
15  dyspareunia or extrusion, correct?
16    A.   Let's break that down.
17  That's a -- what I call a compound
18  question.  I don't know what you guys
19  call it.
20    We have to define the type
21  of mesh we're doing.  If all you're doing
22  is a mesh without the arms -- see, the
23  arms are a major source of the problem --
24  so your risk of extrusion would

Page 155

1  theoretically be the same, as long as it
2  doesn't have the, you know, like the
3  Avaulta Plus has that confounding factor
4  of the extra layer of tissue on it.
5    And then you said pelvic
6  pain.  Pelvic pain may be less because
7  you don't have the arms.
8    And I think you said a third
9  thing there, I forget what that was.  You
10  had three.
11    Q.   Dyspareunia.
12    A.   Dyspareunia.  Dyspareunia
13  has a chance of being less when you don't
14  have the arms, because you don't have the
15  mesh contraction and the pulling that you
16  get with those things.
17    So that would -- I know
18  surgeons who still will put in those
19  grafts without the arms.  I personally
20  don't.  I don't think there's a need for
21  it.
22    And, again, in Ms. Smith's
23  situation, she didn't need it.  She just
24  needs standard sutures.

Page 156

1    Q.   But to answer my question,
2  it wouldn't have eliminated her risk of
3  pelvic pain or dyspareunia or extrusion?
4    A.   Correct.  It would lower it,
5  but not eliminate it.
6    Q.   I don't want to retread
7  grounds from your generic deposition, but
8  you're not aware of any more recent
9  literature finding that the Bard mesh,
10  the Avaulta, has a higher risk of any
11  complications as compared to any other
12  transvaginal mesh; is that fair?
13    A.   As I'm sitting here right
14  now, I cannot recall off the top of my
15  head a document such as that.  But I
16  would have to look through the literature
17  for it.  And since it's been pulled off
18  the market, no one is researching it.
19    Q.   So it's possible, if she had
20  a different pelvic organ prolapse mesh,
21  that she would have had dyspareunia and
22  pelvic pain and extrusion, correct?
23    MS. SCARCELLO:  Object to
24  form.

Page 157

1    THE WITNESS:  Well, it
2  depends what we're talking about.
3    Are we talking about, like,
4  the Prolift? anterior?  Are we
5  talking about the Monarc product?
6  Excuse me, not Monarc, American
7  Medical Systems, the Apogee and
8  the Perigee?  There's a lot out
9  there.  All of them have their
10  known risks to it.
11    Again, with -- Avaulta is a
12  unique one with having that outer
13  coating to it, which throws in
14  another variable in a situation.
15    But the risk with all meshes
16  is there in varying degrees.
17  BY MR. BUHR:
18    Q.   Looking back at the opinions
19  in your report, on Page 18, we talked
20  earlier about Dr. Kim's testimony that
21  she was aware of the risks of erosion,
22  extrusion, pelvic pain, dyspareunia.
23    You recall that discussion,
24  right?

Daniel S. Elliott, M.D.

Page 158

1    A.    Yes, I do.
2    Q.    In your report here, you
3  specifically refer to foreign body
4  reaction and chronic inflammatory
5  response related to the Bard products.
6    A.    Correct.
7    Q.    Would you agree that Dr. Kim
8  specifically testified that she was aware
9  of those risks?
10    A.    As I've already stated, she
11  was aware of what she knows, but does not
12  know the full extent of it.
13    Q.    You also reference painful
14  contracture and banding of the mesh.
15        Would you agree that Dr. Kim
16  testified that she was aware of those
17  risks as well?
18    A.    As I stated previously, and
19  I'll rely on the previous testimony, she
20  stated what she knew, and she doesn't
21  know the full extent, as I do and others
22  involved in this, what's going on behind
23  the scenes with the company.
24    Q.    So I understand that that's

Page 159

1  your testimony, that she didn't know the
2  full extent.
3        But there's no risks that
4  she wasn't aware of that are relevant for
5  Ms. Smith?
6    A.    She knew about risks.  But
7  she didn't know about the severity, the
8  frequency and the progressive nature of
9  those risks.
10    Q.    But she was aware of each of
11  the risks and complications that you're
12  opining Ms. Smith had as a result of the
13  Bard products, right?
14    A.    Well, as I've stated, she
15  knew of risks.  But she didn't know of
16  the severity, the frequency, the
17  progressive nature and the inability to
18  fix those complications.
19    Q.    Her anterior prolapse that
20  was corrected by the Avaulta, that has
21  still not returned, correct?
22    A.    Based upon the January 2nd,
23  2019 so, what, six, seven months ago,
24  there was no record of the prolapse

Page 160

1  coming back.
2    Q.    So both the Align and the
3  Avaulta corrected the conditions for
4  which they were implanted for, right?
5    A.    At a certain cost, you are
6  correct.
7        MR. BUHR:  That may be all
8    the questions I have.  If we can
9    just take a quick break and then
10    come back.
11        THE WITNESS:  Sure.
12        VIDEO TECHNICIAN:  We're
13    going off record.  The time is
14    4:25.
15           - - -
16        (Whereupon, a brief recess
17    was taken.)
18           - - -
19        VIDEO TECHNICIAN:  We're
20    going back on record.  Media File
21    Number 3.  The time is 4:27.
22  BY MR. BUHR:
23    Q.    So we talked earlier that
24  Ms. Smith had preexisting depression; is

Page 161

1  that right?
2    A.    She was on medication for
3  depression.  I don't know how severe it
4  was.
5    Q.    Can there be a psychological
6  component to dyspareunia?
7    A.    Possibly.  However, it's not
8  going to cause pinpoint pain and pain at
9  the site of the mesh.  That's not --
10  that's not a component of depression.
11        And if depression is a major
12  factor in causing complications with
13  meshes, it needs to be on the IFU, which
14  it's not.
15        So she had a preexisting
16  condition.  And that's worrisome if it's
17  not on the IFU, that worsens things.
18    Q.    Well, I wasn't suggesting
19  that it was relevant to the mesh.
20        But even without mesh, a
21  patient can have dyspareunia due to
22  psychological issues and depression?
23    A.    Well, that's a broad
24  statement.  If there's a history of

Daniel S. Elliott, M.D.

Page 162

1  physical trauma, rape, abuse of some
2  sort, that's a different story.  That
3  becomes very complicated.
4         But she reported nothing
5  prior to the surgery.  This all happened
6  years later.  So I don't see a logical
7  connection between the two.
8     Q.   Because she didn't have
9  similar complaints prior to the implant?
10    A.   Well, the location of the
11 pain, the progressive nature of it, the
12 severity all happen years later.  So,
13 again, I don't see a logical connection
14 between the depression and this.
15        Again, if it is a known
16 issue, that's got to be on the IFU.
17    Q.   Can depression and general
18 wellbeing affect the healing process in
19 an individual?
20    A.   As far as it relates to the
21 vagina, I've never heard of anything
22 related to that.
23    Q.   Have we discussed all the
24 opinions you intend to offer in this

Page 163

1  case?
2     A.   All my opinions are included
3  in my report.  I don't recall if we've
4  discussed every one.
5         We've discussed all the
6  opinions you've asked me.  Not to be a
7  smart-mouth about it, but I don't know if
8  there's something else here we haven't
9  discussed.
10    Q.   And at this point, you don't
11 have any intention of performing an
12 examination on Ms. Smith?  But you
13 might -- you would like to have the
14 opportunity to do that if the case were
15 to go to trial; is that how I understand
16 your testimony?
17        MS. SCARCELLO:  Object to
18 form.
19        You can answer.
20        THE WITNESS:  Yes.  If this
21 case were to go to trial, then I
22 would have to perform an IME
23 prior, to further support or
24 refute my opinions at this point.

Page 164

1  I'll keep an open mind, based upon
2  what's going on.
3         And the farther she goes out
4  from her revision surgery, it
5  would be important to have a
6  documented exam, too.
7         MR. BUHR:  All right,
8  Doctor, I think that's all the
9  questions I have today.
10        MS. SCARCELLO:  Nothing from
11 me.
12        VIDEO TECHNICIAN:  This
13 concludes today's --
14        MR. BUHR:  Hold on.  Before
15 we go off the record.
16        I just want to make sure we
17 have a placeholder exhibit for the
18 invoices that will be provided by
19 counsel's office.
20        - - -
21        (Whereupon, Exhibit
22 Elliott-14, Placeholder, was
23 marked for identification.)
24        - - -

Page 165

1         MR. BUHR:  With that, I
2  think we're done.  Thank you.
3         MS. SCARCELLO:  Thank you.
4         VIDEO TECHNICIAN:  This
5  concludes today's deposition.
6  We're going off the record.  The
7  time is 4:31.
8         - - -
9         (Whereupon, the deposition
10 concluded at 4:31 p.m.)
11        - - -

Daniel S. Elliott, M.D.

Page 166

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated:  August 12, 2019

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 168

- - - - - -
E R R A T A
- - - - - -
PAGE  LINE  CHANGE

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

Page 167

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 169

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages,  1 - 165, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
DANIEL S. ELLIOTT, MD        DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Daniel S. Elliott, M.D.

Page 170

1     LAWYER'S NOTES
2  PAGE  LINE
3  ____ ____  _____
4  ____ ____  _____
5  ____ ____  _____
6  ____ ____  _____
7  ____ ____  _____
8  ____ ____  _____
9  ____ ____  _____
10 ____ ____  _____
11 ____ ____  _____
12 ____ ____  _____
13 ____ ____  _____
14 ____ ____  _____
15 ____ ____  _____
16 ____ ____  _____
17 ____ ____  _____
18 ____ ____  _____
19 ____ ____  _____
20 ____ ____  _____
21 ____ ____  _____
22 ____ ____  _____
23 ____ ____  _____
24 ____ ____  _____